**No. 23-16141**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

Robert F. Kennedy, Jr.,

*Plaintiff-Appellant*,

vs.

Google LLC, and YouTube, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-03880
Hon. Trina Thompson

_____

## APPELLANT'S EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR INJUNCTION PENDING APPEAL

_____

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

*Attorneys for Robert F. Kennedy, Jr.*

## CIRCUIT RULE 27-3 CERTIFICATE

Pursuant to Circuit Rule 27-3, Appellant Robert F. Kennedy, Jr., provides

the following information:

**(i)     The names, telephone numbers, e-mail addresses and office**

**addresses of the attorneys for all of the parties.**

| Attorneys | Parties |
|---|---|
| Jonathan H. Blavin<br>Juliana Lee<br>Carson Scott<br>MUNGER TOLLES & OLSON LLP<br>560 Mission Street<br>Twenty-Seventh Floor<br>San Francisco, California 94105-2907<br>Telephone: (415) 512-4000<br>Facsimile: (415) 512-4077<br><br>HELEN E. WHITE (*pro hac vice*)<br>Helen.White@mto.com<br>MUNGER, TOLLES & OLSON LLP<br>601 Massachusetts Avenue NW, Suite 500 E<br>Washington, DC 20001<br>Telephone: (202) 220-1100<br>Facsimile: (202) 220-2300 | Defendants Google LLC and YouTube, LLC |

**(ii)     The facts showing the existence and nature of the emergency.**

Mr. Kennedy is seeking the Democratic Party's nomination for president. He

filed the underlying case to declare YouTube's medical misinformation policies

i

(which have since been amended and merged into a single policy) unconstitutional under the First Amendment and state action doctrine. He sought a temporary restraining order to prevent Google from using the policy to remove videos of his speech, whether posted by him or by third parties, during his presidential campaign. Although written by a private party, the medical misinformation policy relies entirely on government sources to determine which information gets removed from YouTube. Essentially, Google does not allow people to disagree with public health authorities (*i.e.*, the government) about certain subjects, including COVID-19 and abortion. Indeed, Google said the multipage list of prohibited topics "isn't a complete list" thus raising the possibility that other speech the government does not want people to hear—such as speech regarding transgender policies—will also be censored.

The chilling effect from this unprecedented public/private censorship campaign is great. It is especially problematic for Mr. Kennedy's presidential campaign, which relies heavily on social media—including content posted by third parties—to get Kennedy's message out. And, without judicial intervention, it will continue. Indeed, Google seems to believe that it has a civic obligation to remove Kennedy's speech about public health policy from YouTube.

This censorship campaign cannot continue, not in one of the most important elections in American history. "The loss of First Amendment freedoms, for even

ii

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, this Court has held that irreparable injury is often presumed when the plaintiff alleges a "colorable First Amendment claim ...." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005). Those principles justify emergency relief here.

Moreover, the District Court set this case for trial on March 17, 2025. Dist. Ct. ECF 30. The 2024 election will be done by then. And while the District Court may simply dismiss the case before that, as Google is urging it to do, that order will not be issued until late this year or early next year, right as the primaries get underway. Thus, emergency relief is needed to protect Mr. Kennedy's fundamental right to freely communicate with the American people as he tries to win their votes.

**(iii)    Why the motion could not have been filed earlier.**

Mr. Kennedy has diligently pursued relief. He filed this case on August 2, 2023. Dist. Ct. ECF 1. He did so after spending several months trying to convince Google to stop censoring his speech on YouTube during his presidential campaign, as Facebook and Twitter pledged to do. He applied for a temporary restraining order in the District Court on August 9, 2023. Dist. Ct. ECF 7. The District Court heard arguments on the requested TRO on August 21, 2023, and denied the application on August 23, 2023. Dist. Ct. ECF 29, 32. Although Judge Thompson

set a hearing on Kennedy's motion for a preliminary injunction for November 7, 2023, with further briefing to be done between September 25 and October 16, Dist. Ct. ECF 30, she denied Kennedy's request for limited discovery and made clear that she believes this Court's decision in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), is controlling and effectively precludes Kennedy from prevailing. Thus, this Court will have to decide the matter at some point. It will be far more efficient to do so now, with the primaries still several months away and with argument in a similar case (*Trump v. Twitter*, No. 22-15961) set for October 4, 2023. Furthermore, the Fifth Circuit Court of Appeals issued a decision last Friday that resolved similar issues in favor of the plaintiffs, although neither Google nor any of the other large technology companies accused of state-sponsored censorship are defendants in that case. *Missouri et al. v. Biden et al.*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam).

**(iv)   Notice and service of motion to counsel for other parties and Clerk's Office.**

Mr. Kennedy's counsel contacted Google's counsel by email at 2:20 pm on September 8, 2023, and informed them that Kennedy would seek an emergency injunction pending appeal. Google's counsel opposes the request for an emergency injunction but agrees with Kennedy's suggestion that Judge Thompson's denial of

the TRO was tantamount to the denial of a preliminary injunction and thus that the Court has jurisdiction over this appeal.

Mr. Kennedy's counsel also contacted the Ninth Circuit Motions Unit by phone on the afternoon of September 8 and left a voicemail (with a subsequent email) advising the unit of the nature of the emergency and that Kennedy intended to file an emergency motion for injunction pending appeal by Monday, September 11.

**(v)     Whether the relief sought in the motion was sought in the district court.**

Pursuant to Rule 8(a)(2)(A)(i), it would be impracticable for Mr. Kennedy to first seek an injunction pending appeal in the District Court as it just denied Kennedy's application for a TRO based on its belief that Google cannot be held liable under the state action doctrine, even when it relies on government sources to censor dissenting viewpoints that the government does not want Americans to hear.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct and based upon my personal knowledge. Executed at Pasadena, California.

Respectfully submitted,

Date:  September 11, 2023

v

JW HOWARD/ATTORNEYS, LTD.


_____*/s/ Scott J Street*_____
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

## DISCLOSURE STATEMENT

Rule 26.1 of the Federal Rules of Appellate Procedure does not require the filing of a Disclosure Statement here.


Date: September 11, 2023

JW HOWARD/ATTORNEYS, LTD.


_____*/s/ Scott J. Street*_____

Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 27-3 CERTIFICATE .................................................................. i

TABLE OF AUTHORITIES .................................................................................x

INTRODUCTION ...........................................................................................16

FACTS AND PROCEDURAL BACKGROUND .................................................19

STANDARD FOR INTERIM RELIEF................................................................28

ARGUMENT ................................................................................................30

A.  YouTube's Medical Misinformation Policy—Which Was Developed in Response to Government Demands for It and Which Relies Entirely on the Government to Decide Which Information to Censor—Likely Violates the First Amendment. ..................................................................30

B.  Mr. Kennedy Will Be Irreparably Harmed If the Court Allows Google to Continue Using its Misinformation Policy to Remove His Political Speech from YouTube. ........................................45

C.  Google Is Not a Publisher, So It Will Not Suffer from Being Ordered Not to Remove Video of Kennedy's Political Speech. ..................................................................48

D.  The Public Interest in Having Open Dialogue During the Political Process Strongly Favors Granting Injunctive Relief..51

E.  The Court Should Set an Expedited Briefing Schedule and Schedule Argument at the Same Time as the Trump/Wolf Appeal…………………………………………………………….54

CONCLUSION ..............................................................................................56

STATEMENT OF RELATED CASES…………………………………….…..57

CERTIFICATE OF COMPLIANCE…………………………………………..58

CERTIFICATE OF SERVICE……………………………………………………59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,

632 F.3d 1127 (9th Cir. 2011)…………………………………………...28

*Am. Mfrs. Mutual Ins. Co. v. Sullivan*,

526 U.S. 40 (1999) ……………………………………………….....40

*Ashcroft v. Free Speech Coal.*,

535 U.S. 234, 253 (2002)…………………………………………………..18

*Atkinson v. Meta Platforms, Inc.*,

No. 20-17489, 2021 WL 5447022 (9th Cir. Nov. 22, 2021)……………..…38

*Biden v. Knight First Amend. Inst.*,

-- U.S. --, 141 S. Ct. 1220 (2021)……………………………………….48

*Blum v. Yaretsky*,

457 U.S. 991 (1982) ………………………………………….…………32

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,

531 U.S. 288, 295 (2001)……………………………………….…27

*Brown v. Hartlage*,

456 U.S. 45 (1982)………………………………………………47

*Buckley v. Valeo*,

424 U.S. 1 (1976)………………………………………………..……46

*Caribbean Marine Servs. Co. v. Baldrige*,

844 F.2d 668 (9th Cir. 1988)………………………………………….52

*Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*,

827 F.2d 1291 (9th Cir.1987)……………………………………..…43

*Citizens United v. F.E.C.*,

558 U.S. 310 (2010)…………………………………………….…54

*Cohen v. Calif.*,

403 U.S. 15 (1971) ……………………………………..…….…41

*Cuviello v. City of Vallejo*,

944 F.3d 816 (9th Cir. 2019)……………………………………..…53

*Daunt v. Benson*,

956 F.3d 396 (6th Cir. 2020)………………………………………46

*Denver Area Ed. Telecomms. Consortium, Inc.*,

518 U.S. 727 (1996) ……………………………………………40-41

*Doe v. Google, LLC*,

No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022)…………...…38

*Doe v. Harris*,

772 F.3d 563 (9th Cir. 2014)………………………………..……….51

*Dow Jones & Co. v. Kaye*,

90 F. Supp. 2d 1347 (S.D. Fla. 2000)……………………………….53

*Elrod v. Burns*,

427 U.S. 347 (1976)……………………………………….…….45

*Farris v. Seabrook*,

677 F.3d 858 (9th Cir. 2012)………………………………..…….47

*Fashion Valley Mall, LLC v. NLRB*,

42 Cal.4th 850 (2007)………………………………………….41

*Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*,

192 F. Supp. 3d 1120 (E.D. Cal. 2016)……………………….……45

*Gallagher v. Neil Young Freedom Concert*,

49 F.3d 1442 (10th Cir. 1995) ……………………………………………….33

*Graham v. Teledyne-Continental Motors*,

805 F.2d 1386 (9th Cir. 1987)……………………………………………..29

*Griffin v. Bryant*,

30 F. Supp. 3d 1139 (D.N.M. 2014)……………………………….…….46

*Heineke v. Santa Clara Univ.*,

965 F.3d 1009 (9th Cir. 2020) ………………………………….…….23

*Howerton v. Gabica*,

708 F.2d 380 (9th Cir. 1983) …………………………………………16

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,

515 U.S. 557 (1995)………………………………………………...33

*Index Newspapers LLC v. City of Portland*,

474 F. Supp. 3d 1113 (D. Or. 2020) ………………………………………14

*Jackson v. Metropolitan Edison Co.*,

419 U.S. 345 (1974)…………………………………….………………43

*Kirtley v. Rainey*,

326 F.3d 1088 (9th Cir. 2003)……………………………………..…31

*Klein v. City of San Clemente*,

584 F.3d 1196 (9th Cir. 2009)…………………………………….……45

*Lee v. Katz*,

276 F.3d 550 (9th Cir. 2001)………………………………….......16, 32, 41

*Lopez v. Heckler*,

　　713 F.2d 1432 (9th Cir. 1983) .……………………………………………28

*Lugar v. Edmondson Oil Company*,

　　457 U.S. 922 (1982)……………………………………………...…42

*Manhattan Cmty. Access Corp. v. Halleck*,

　　-- U.S. --, 139 S. Ct. 1921 (2019).……………………………….……31

*Mathis v. Pacific Gas & Electric Company*,

　　891 F.2d 1429 (9th Cir. 1989)………………………………….....43

*Missouri v. Biden*,

　　-- F. Supp. 3d --, 2023 WL 4335270 (W.D. La. July 4, 2023)…………27, 35

*Missouri v. Biden*,

　　--F.4th--, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam)..24, 27, 36, 43

*Moose Lodge No. 107 v. Irvis*,

　　407 U.S. 163 (1972)…………………………………………………..42

*NetChoice, L.L.C. v. Paxton*,

　　49 F.4th 439 (5th Cir. 2022)…………………………………………..50

*O'Handley v. Weber*,

　　62 F.4th 1145 (9th Cir. 2023)………………….....…16, 17, 27, 30, 34, 37-39

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,

　　475 U.S. 1 (1986) ("*PG&E*")………………………………16, 43, 48

*Packingham v. North Carolina*,

　　-- U.S. --, 137 S. Ct. 1730 (2017)…………………………………..48

*PG&E, Miami Herald Publishing Company v. Tornillo*,

　　418 U.S. 241 (1974)……………………………………………....49

*Puerto Rico Ass'n of Mayors v. Velez-Martinez*,

xiii

480 F. Supp. 3d 377 (D.P.R. 2020)…………………………………….…..46

*Rawson v. Recovery Innovations, Inc.*,

   975 F. 3d 742 (9th Cir. 2020)…………………………………………27, 32, 39

*Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*,

   869 F.2d 1306 (9th Cir. 1989) …………………………………………29, 32

*Roberts v. AT&T Mobility, LLC*,

   871 F.3d 833 (9th Cir. 2017) …………………………………………………40

*Robins v. Pruneyard Shopping Center*,

   23 Cal.3d 899 (1979) …………………………………………………………41

*Rosenberger v. Rector & Visitors of Univ. of Va.*,

   515 U.S. 819 (1995)…………………………………………………………31, 46

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,

   547 U.S. 47 (2006)……………………………………………………………49

*Rutenberg v. Twitter, Inc.*,

   No. 21-160743, 2022 WL 1568360 (9th Cir. May 18, 2022)……………....38

*Sec'y of State v. Joseph H. Munson Co.*,

   467 U.S. 947 (1984)…………………………………………………………..51

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,

   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)…………………………….50

*Sutton v. Providence St. Joseph Medical Center*,

   192 F.3d 826 (9th Cir. 1999)………………………………………...41-44

*Thornhill v. Alabama*,

   310 U.S. 88 (1940)……………………………………………………………53

*Trump v. Twitter*, Inc.,

No. 22-15961……………………………………………………….……55

*Tunick v. Safir*,

209 F.3d 67 (2d Cir.2000)………………………………………………….51

*Turner Broad. Sys., Inc. v. F.C.C.*,

512 U.S. 622 (1994)…………………………………………………..19

*United States v. Kincaide*,

379 F.3d 813 (9th Cir. 2004)……………………………………………54

*U.S. WeChat Users Alliance v. Trump*,

488 F. Supp. 3d 912 (N.D. Cal. 2020) ………………………………….29

*Valle Del Sol Inc. v. Whiting*,

709 F.3d 808 (9th Cir.2013)……………………………………….…46

*Villegas v. Gilroy Garlic Festival*,

541 F.3d 950 (9th Cir. 2008) …………………………………………33

*Warsoldier v. Woodford*,

418 F.3d 989 (9th Cir. 2005)………………………………….………45

*Winter v. Natural Resources Defense Council, Inc.*,

555 U.S. 7 (2008).…………………………………………………….29

**Other**

California Constitution, Article I, section 2……………………………………41

House Report:  Telecommunications Act of 1996
H.R. REP. No. 104-458 (1996)…………………………………………..50

## INTRODUCTION

This case challenges the conventional wisdom that private parties cannot violate the First Amendment. They can, especially when, as here, they engage in viewpoint discrimination during the political process to prevent people from hearing dissenting voices.

During the past forty years, as urged by Justices Brennan and Marshall, this Court has applied the state action doctrine liberally. It has emphasized that the analysis does not involve rigid criteria but focuses on determining whether seemingly private action is "fairly attributable" to the state. Many of those cases involved the deprivation of liberty or property rights. A few, including *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2001), found state action when a private party violated an individual's free speech rights. *Lee* recognized, as Justice Thurgood Marshall did in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), that First Amendment rights are entitled to special protection, even when they are invoked against a private party that engages in viewpoint discrimination in a privately owned space.

Although it did not discuss *Lee*, the Court pulled back from that rationale in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), when it found no constitutional problem with Twitter removing posts that government officials flagged for violating Twitter's civic integrity policy. That was a mistake. The

internet is the modern public square. It is the place where millions of Americans get their news and discuss the issues of the day, especially during the political process. It is akin to the parks, sidewalks, squares, and billboards that the Supreme Court has always recognized as public fora for speech, even when those places are owned or controlled by a private party. And YouTube is not an ordinary website. It is the second largest search engine on the Internet, behind only its parent Google.

The Court seemed to recognize that in *O'Handley*. It noted that Twitter created the civic integrity policy itself, based on concerns that people had manipulated its product to mislead voters during the 2016 election. It emphasized the one-way nature of the communication. And it said, correctly, that a constitutional problem would arise if Twitter had effectively agreed to serve as an arm of the government in censoring speech that the government did not want people to hear.

The Court did not find such evidence in *O'Handley* but it surely exists here. In fact, even at this early stage of litigation, the evidence (most of which was revealed during discovery in a similar case) is compelling. It shows that Google developed its medical misinformation policies in response to the federal government's demands for them. It shows that Google consulted with government officials when drafting the policies. And, most importantly, it shows that the speech that is subject to removal from YouTube is only speech that public health

officials—*i.e.*, the government—deem false, misleading, or dangerous. Speech that many people would call false, misleading, or dangerous—for example, that there are more than two genders or that abortion has physical and psychological risks—is not subject to removal from YouTube because the current public health administration supports those messages.

The district court seemed swayed by the fact that the speech Google seeks to block from YouTube involves public health. Google's counsel also invoked public health at the argument on Mr. Kennedy's application for a TRO, suggesting that Google has a civic obligation to prevent people from hearing messages that might harm them, especially during a pandemic. That only strengthens Kennedy's argument. Promoting *public* health is a *public* function. It is subject to constitutional scrutiny. Thus, it is reasonable to apply constitutional scrutiny when a private party like Google plays the middleman in that public function—particularly when, as here, it does so willingly, in partnership with the government and to get around First Amendment constraints that would indisputably apply to the government.

This is not a trivial matter. "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). That is especially true in the political process. The Supreme Court has repeatedly

emphasized that "each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Google's medical misinformation policy threatens that ideal. And it will not just hurt Mr. Kennedy's campaign. Judge Terry Doughty noted that social media companies have targeted "conservative" speech, more than "liberal" speech, for censorship under the Biden Administration. That seems likely to continue, as Google's updated medical misinformation policy prohibits speech from conservative viewpoints about medical care and abortion.

The First Amendment does not sanction such blatant viewpoint discrimination. It is time for this Court to apply the state action doctrine faithfully and to uphold the First Amendment principles upon which American democracy rests.

## FACTS AND PROCEDURAL BACKGROUND

Mr. Kennedy is a lawyer, a son of former Attorney General Robert F. Kennedy and a nephew of former President John F. Kennedy. Mr. Kennedy is seeking the Democratic Party's nomination for president. Declaration of Robert F. Kennedy, Jr., dated September 7, 2023 ("RFK Decl."), ¶¶ 1-2.

Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. Declaration of Scott J. Street, dated September 8, 2023 ("Street Decl."), ¶ 3. He accepted an invitation to speak about that and other political issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March. *Id.*, ¶ 4. His speech, which was attended by several prominent New Hampshire Democrats and viewed as a soft presidential launch, lasted nearly two hours. *Id.* It centered on Mr. Kennedy's concerns about the merger of corporate and state power, a danger he has fought for years, and which has recently caused him to question the increasing number of vaccines American children are required to take. *Id.*

Mr. Kennedy does not oppose the use of vaccines. Instead, his central concern has been the cozy relationship between the pharmaceutical companies that produce the vaccines and the government agencies that approve them. *Id.* In fact, government agencies receive much of their funding from the companies they regulate, a conflict of interest that reminds Mr. Kennedy of the situation he encountered decades ago when he was working with environmentalists to take on large polluters like Monsanto. *Id.* Mr. Kennedy received accolades, including from many Democrats, for that work. *Id.* These concerns about the corrupt merger of corporate and state power—whether in environmental policy, healthcare policy, or

foreign policy—are a central part of his presidential campaign. *Id.* It is a message that resonates with millions of Americans, especially given the evidence of corruption that has emerged from the Biden White House. *Id.*

Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. Street Decl., ¶ 5. Google removed it. *Id.* The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." *Id.*, Exh. A.

Mr. Kennedy complained about the action, particularly since his comments about vaccine policy only consumed a portion of the NHIOP speech and since criticism of the government's public health policymaking is such an important part of Kennedy's campaign. *Id.*, ¶ 6. Indeed, Kennedy became a vocal critic of the government's COVID-19 policies not just because of his advocacy for enhanced vaccine safety—recall that the COVID shots did not exist at the beginning of the pandemic—but because he saw how the federal government and large corporations used the pandemic to enrich themselves while hurting others. RFK Decl., ¶ 10. Thus, for Kennedy's campaign, COVID-19 has been a contemporary example of the corrupt merger of corporate and state power, something he has spent decades advocating against. *Id.*

Despite Mr. Kennedy's pleas, Google refused to change its position. It said it "removed the [Kennedy speech in New Hampshire] for violating our policies on COVID-19 vaccine misinformation …. While we do allow content with educational, documentary, scientific or artistic context, such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context." Street Decl., Exh. B.

Google has removed other videos of Kennedy during his presidential campaign, including interviews he did with Jordan Peterson and Joe Rogan, which were removed in June and July, respectively. RFK Decl., ¶ 4; Declaration of Amaryllis Kennedy, dated September 11, 2023 ("A. Kennedy Decl."), ¶¶ 4-5, Exh. A.) Again, although Google cited its vaccine misinformation policy to justify these decisions, it removed the entire video, which included Kennedy speaking about other matters of public concern that are central to his presidential campaign. It often does this. RFK Decl., ¶¶ 3-5; A. Kennedy Decl., ¶¶ 4-8. And while Google has not removed every video of Kennedy speaking about these matters from YouTube, it has removed several high-profile videos, including the Peterson and Rogan videos, creating a chilling effect around Mr. Kennedy's campaign, which, like many insurgent campaigns, depends on third parties to circulate Kennedy's message. *Id.* That is especially true now, since the Democratic Party has refused to

hold primary debates or do anything to allow anybody to mount a challenge to President Biden.

YouTube is not some bit player in the campaign. Users consumed roughly 110 million hours of election-related content on YouTube during the early stages of the 2016 campaign. Street Decl., Exh. E-1. Kate Stanford, the director of YouTube's advertiser marketing at the time, made much of that, saying: "Voter decisions used to be made in living rooms, in front of televisions. Today, they're increasingly made in micro-moments, on mobile devices [and while watching YouTube]." *Id.* The data on the 2020 campaign will likely show even greater use of YouTube by voters. Thus, YouTube has become an important platform for political campaigns, especially when it comes to raw content like candidate interviews and speeches. RFK Decl., ¶ 5; A. Kennedy Decl., ¶¶ 6-8. YouTube is an especially important platform for Mr. Kennedy, who many mainstream media outlets have refused to cover or censored to remove comments critical of the current government. RFK Decl., ¶ 10.

Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign, but it refused. RFK Decl., ¶ 7; A. Kennedy Decl., ¶ 10; Street Decl., ¶ 11. That led to the filing of this case. It was filed on the heels of a similar case led by two state attorneys general, *Missouri et al. v. Biden et al.*, No. 3:22-cv-01213-TAD-KDM. On July 4, Judge Terry

Doughty issued an opinion that enjoins federal government officials from coercing technology companies to censor the government's critics. Street Decl., ¶ 12. The injunction does not bind the technology companies themselves, though, and thus does not prohibit Google from continuing to use its misinformation policies to censor Mr. Kennedy during his presidential campaign. *Id.*

The government appealed that decision to the Fifth Circuit Court of Appeals, which stayed the injunction pending appeal. *Id.*, ¶ 13. The Fifth Circuit issued an opinion last week that largely affirmed Judge Doughty's order. *State of Missouri et al. v. Biden et al.*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023)(per curiam).

Shortly after the Fifth Circuit's argument, Mr. Kennedy filed an application for a temporary restraining order in the District Court. Dist. Ct. ECF 7. The application was eventually heard by District Judge Trina Thompson, who held oral argument regarding the TRO request on August 21, 2023. At the argument, Google's attorneys made clear that Google has no intention of rescinding its medical misinformation policies and that Google believes it has an obligation to remove alleged medical "misinformation" from YouTube. Street Decl., ¶ 31. Indeed, before the argument, Google amended its medical misinformation policy by merging the COVID-19 and vaccine misinformation policies. *Id.*, Exh. D.

24

Google also added a host of other subjects that are subject to removal from YouTube, including:

- "Content that recommends the use of specific methods for the treatment of cancer when those have not been approved by local health authorities or the World Health Organization as safe or effective …."

- "Content that promotes use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19."

- "Claims that alternative treatments are safer or more effective than approved treatments for cancer."

- "Content that promotes diet and exercise instead of seeking approved treatment for cancer."

- "Discouraging people from consulting a medical professional or seeking medical advice if they're sick with COVID-19."

- "Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment for COVID-19 such as consulting a doctor or going to the hospital."

- "Content that contradicts local health authorities' or the World Health Organization's guidance on the safety of chemical and surgical abortion."

- "Promotion of alternative abortion methods in place of chemical or surgical methods deemed safe by health authorities."

*Id.* These are just a few examples—fully expanded, the new medical misinformation policy spans multiple pages—and Google notes that it "isn't a complete list." *Id.* Presumably, anything that public health authorities say is false, misleading, or dangerous may be removed from YouTube. In addition, the person who posted the prohibited content could be issued a strike—YouTube's form of punishment—with multiple strikes leading to additional punishment, up to and including termination of the user's account. *Id.*

Like the earlier policies, the amended medical misinformation policy looks entirely to government sources to decide what information gets removed. It prohibits people from saying anything "that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances." *Id.* And it gets changed only "in response to changes to guidance from health authorities or WHO." *Id.*

On August 23, Judge Thompson issued an order denying Mr. Kennedy's application for a TRO. Dist. Ct. ECF 32. Judge Thompson believed that the balance of equities favored Kennedy over Google. *Id.* at 9. She also believed that the public interest favors more speech, not less. *Id.* at 10. But she denied the application because she did not believe that Google can be held liable under the

state action doctrine for using its government-dependent misinformation policies to remove videos of Mr. Kennedy's political speech from YouTube. *Id.* at 5-8. Judge Thompson gave no weight to Judge Doughty's decision in *Missouri v. Biden*, which, while focusing on the government's efforts to coerce Facebook and Twitter into censoring its critics, also described how Google embraced the Biden Administration's censorship efforts in 2022, developing is vaccine misinformation policy in response to them and in collaboration with government officials. *See Missouri v. Biden*, -- F. Supp. 3d --, 2023 WL 4335270 (W.D. La. July 4, 2023), *aff'd*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam). Instead, Judge Thompson held that she was bound by this Court's decision in *O'Handley v. Weber*, 62 F.4th 1125 (9th Cir. 2023), which she construed to set a high bar for state action cases and to preclude relief here. Dist. Ct. ECF 32, at 7-8.

Judge Thompson gave short shrift to *Rawson v. Recovery Innovations, Inc.*, 975 F. 3d 742 (9th Cir. 2020), where this Court held that the state action analysis is a flexible concept that does not require the use of specific tests, or even specific facts, but focuses on determining, as required under Supreme Court caselaw, whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotations omitted). Judge Thompson ignored *Brentwood Academy*, the Supreme

27

Court's most recent state action case, and described *O'Handley* as having "declined to extend *Rawson* …." Dist. Ct. ECF 32 at 8.

Judge Thompson found that the public interest supported denying Kennedy's application because of Google's asserted interest in "preventing widespread illness and death." *Id.* at 10. According to the court: "The coronavirus still poses a health risk to certain individuals, and it would not serve the public interest to let medical misinformation proliferate on YouTube." *Id.* Judge Thompson did not address Mr. Kennedy's argument that the speech Google has censored during his campaign is not "misinformation" (Google did not produce evidence that anything Kennedy said was false) but political speech about matters of public concern that are highly relevant in the presidential campaign.

On August 31, 2023, Google filed a motion to dismiss Mr. Kennedy's complaint. Dist. Ct. ECF 37. It is set for a hearing on November 7, 2023, the same time as the hearing on Kennedy's motion for a preliminary injunction. Dist. Ct. ECF 30.

## STANDARD FOR INTERIM RELIEF

To obtain an injunction pending appeal, Mr. Kennedy must demonstrate either (1) "a probability of success on the merits and the possibility of irreparable injury," or (2) "that serious legal questions are raised and that the balance of hardships tips sharply in [their] favor." *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th

Cir. 1983); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (discussing latter test, which this Court has found to survive *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)). Courts in this circuit often use the "serious questions" test instead of *Winter* when the case involves First Amendment rights. *See, e.g., Index Newspapers LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1125 (D. Or. 2020) (applying serious questions test, instead of *Winter*'s likelihood of success test, to grant TRO in First Amendment case brought by media); *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 916 (N.D. Cal. 2020) (applying serious questions test to grant injunction in First Amendment case brought by people using WeChat app).

Although ordinarily not appealable, a district court's denial of an application for a TRO may be appealed immediately when further motion practice in the district court would be futile and, absent an injunction, the controversy would become moot. *See Graham v. Teledyne-Continental Motors*, 805 F.2d 1386, 1388 (9th Cir. 1987) (holding that denial of TRO was de facto denial of permanent injunction). That is the case here, as this case would not be tried until 2025, after the 2024 election. Dist. Ct. ECF 30. Moreover, an order denying an application for a TRO is appealable when "denial of all relief was implied in the trial judge's denial of a temporary restraining order." *Miller v. Lehman*, 736 F.2d 1268, 1269 (9th Cir. 1984) (per curiam); *see also Religious Tech. Ctr., Church of Scientology*

29

*Int'l, Inc. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989) (concluding that court had jurisdiction over appeal where "the circumstances render the denial [of TRO] tantamount to the denial of a preliminary injunction" (cleaned up)). Judge Thompson made clear in her ruling on the TRO that she believes *O'Handley* is controlling here and that it precludes relief in a case like this. Dist. Ct. ECF 32, at 6-8; *see also* Street Decl., ¶ 32. Thus, the Court has jurisdiction over this appeal.

Finally, there is a substantial likelihood that this and other cases that have arisen out of the public/private censorship regime, including *O'Handley*, *Missouri v. Biden* and two lawsuits brought by technology industry groups against anti-censorship laws enacted by Florida and Texas (the "*NetChoice* cases"), could be heard by the Supreme Court during its next term. That possibility weighs in favor of expedited appellate review.

## ARGUMENT

The Court should grant the injunction pending appeal because it is necessary to prevent irreparable harm to Mr. Kennedy and to prevent Google from manipulating the political process by removing criticism of the government that the Biden Administration does not want people to hear.

**A.    YouTube's Medical Misinformation Policy—Which Was Developed in Response to Government Demands for It and Which Relies Entirely on the Government to Decide Which Information to Censor—Likely Violates the First Amendment.**

There is no doubt that the medical misinformation policy at issue in this case would violate the First Amendment if the government issued it. After all, it makes distinctions about which speech is allowed on YouTube based on the speech's content. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, Google's primary argument is that, unlike the government, *it* can decide which speech to allow, or not allow, on YouTube based on its content. It is wrong.

A "private entity is not ordinarily constrained by the First Amendment …." *Manhattan Cmty. Access Corp. v. Halleck*, -- U.S. --, 139 S. Ct. 1921, 1930 (2019). But it may be sued for violating a person's constitutional rights under certain circumstances. This Court recognizes "at least four different criteria, or tests, used to identify [such] state action: (1) public function; (2) joint action; (3) government compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (cleaned up). But it has also emphasized that "there is no specific formula for defining state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (quotations omitted). Moreover, the tests discussed above are guideposts and "the criteria lack rigid simplicity." *Brentwood Academy*, 531 U.S.

at 295. The goal is to decide whether "seemingly private behavior may be fairly treated as that of the State itself." *Id.* (quotations omitted).

*Brentwood* represented a sea change in the Supreme Court's state action jurisprudence. It stopped the narrowing of the doctrine that had developed since the 1980s and moved the doctrine back to the functional and factual analysis that Justice Brennan had urged in cases like *Blum v. Yaretsky*, 457 U.S. 991, 1013 (1982) (Brennan and Marshall, JJ., dissenting). This Court did the same thing. For example, in *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002), the court reversed a district court's decision that found no state action in a case brought by preachers against a private party (the "OAC") who leased land (the "Commons") from the City of Portland. The OAC had occasionally excluded the preachers from preaching on the land, a plaza near Portland's basketball arena. The City played no role in excluding the preachers from the property: the OAC, a private entity, made that decision for its own reasons. *Id.* at 552-53. But the court "conclude[d] that, in regulating speech within the Commons, the OAC performs an exclusively and traditionally public function within a public forum." *Id.* at 557. That satisfied the state action doctrine.

Similarly, in *Rawson*, this Court reversed a grant of summary judgment for the defendant, a private entity that operated a private hospital, which the plaintiff sued after he was involuntarily committed at the hospital. The Court emphasized that, "[a]t bottom, the inquiry is always whether the defendant has exercised power

32

possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." 975 F.3d at 748 (quotations omitted). And it concluded that the private health care workers could potentially be held liable as state actors because a "county prosecutor played an outsized role in the duration of [the plaintiff's] detention" at the private facility. *Id.* at 754.

Other examples abound. Indeed, until 2021, on the rare occasion that this Court applied the state action doctrine narrowly, it did so over the objection of its most liberal judges. For example, in *Villegas v. Gilroy Garlic Festival*, 541 F.3d 950 (9th Cir. 2008) (en banc), the court, sitting en banc, affirmed the district court's grant of summary judgment for the private association that operates the Gilroy Garlic Festival, and which was sued for excluding the plaintiff (the member of a group called the Top Hatters). Five judges dissented. They explained that, when "deciding whether conduct of private parties amounts to government action, we engage in a highly factual inquiry." *Id.* at 958 (Thomas, Wardlaw, Fisher, Paez and Gould, JJ., dissenting). They criticized the majority's focus on just one of the state action tests—not the one (joint action) that mattered—and they said that "in limiting its analysis to whether organizing a garlic festival is an exclusive governmental function, the majority ignores both the ultimate state action inquiry and the Supreme Court's traditional means of answering that question: 'taking a flexible approach … and applying a variety of tests to the facts of each case.'" *Id.*

at 960 (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (cleaned up).

Google's actions in removing Kennedy's speeches and interviews from YouTube satisfy several aspects of the state action tests and show that, at root, it is the government, not Google, that is responsible for removing Kennedy's speech from YouTube. After all, the misinformation policy that Google has used to remove Kennedy's speech from YouTube relies *entirely* on the government to decide what speech is false, misleading, or dangerous. Street Decl., Exhs. C-D. The policy changes only when the government sources change their guidance about certain issues. *Id.* In fact, according to the misinformation policy, if public health authorities said that birds can talk but can't fly, a person would be prohibited from posting a video that says otherwise on YouTube—at least, that is, until the public health authorities decide otherwise.

Moreover, Mr. Kennedy has obtained evidence that Google worked with public health and other government officials to develop its medical misinformation policy. Street Decl., Exhs. F-P. They did so not as part of a one-way information sharing agreement like the one involved in *O'Handley*, but through a deeply intertwined partnership in which the government told Google what information it thinks is false, misleading, and dangerous and Google crafted a policy that censors that information.

34

The fact that Google communicated and worked with executive branch officials to develop its misinformation policy strengthens the state action analysis. Many of the previous social media related state action cases were based on comments made by Democratic Party legislators. Unlike legislators, executive branch officials have direct regulatory authority over companies like Google. That is why the record developed in *Missouri v. Biden* led Judge Doughty to describe the pressure that executive branch officials put on technology companies to censor dissenting viewpoints as "unrelenting pressure" which "had the intended result of suppressing millions of protected free speech postings by American citizens." *Missouri v. Biden*, -- F. Supp. 3d --, 2023 WL 4335270, at *44 (W.D. La. July 4 2023).

Judge Doughty discussed that record at length. For example, with respect to Google/YouTube, Judge Doughty described several acts of coordination that raised constitutional problems, including meetings between Google/YouTube and officials from the White House, Surgeon General's office and Centers for Disease Control about the information that the government wanted to see removed. *Id.* at *9-15. Judge Doughty also described how the CDC and Census Bureau have regular meetings with Google/YouTube about removing alleged medical misinformation which "continue[ ] to the present day." *Id.* at *22, 27-28.

Judge Doughty had no problem finding these actions to constitute state action, and to violate the First Amendment, because at least some of the government officials "either exercised or provided significant encouragement, which resulted in the possible suppression of Plaintiffs' speech." *Id.* at *42; *see also id.* at *48 (emphasizing that both White House officials and tech executives referred to themselves as "'partners' and 'on the same team' in their efforts to censor disinformation, such as their efforts to censor 'vaccine' hesitancy"). Indeed, Judge Doughty concluded that federal government officials "aligned themselves with and partnered with" third parties like Google "to avoid Government involvement with free speech" that would clearly violate the First Amendment. *Id.* at *52.

The Fifth Circuit largely affirmed Judge Doughty's decision, most notably with respect to officials from the White House and Surgeon General's office. It focused on "coercion and significant encouragement—two distinct means of satisfying the close nexus test." *Missouri*, 2023 WL 5821788, at *13. As to the latter, it found "that the clear throughline for encouragement in our caselaw is that there must be some exercise of *active* (not passive), *meaningful* (impactful enough to render them responsible) *control* on the part of the government over the private party's challenged decision." *Id.* at *14 (original emphasis). That can be

demonstrated either by "entanglement in a party's independent decision-making" or by "direct involvement in carrying out the decision itself …." *Id.*

The court concluded that the executive branch officials' actions satisfied both the coercion and significant encouragement tests. *See id.* at *19-24. As to encouragement, it noted that "the officials entangled themselves in the platforms' decision-making processes, namely their moderation policies." *Id.* at *23. They "had consistent and consequential interaction with the platforms and constantly monitored their moderation activities." *Id.* They did so not informally or indirectly but by "repeatedly communicat[ing] their concerns, thoughts, and desires to the platforms." *Id.* Critically, the court noted that "[t]he platforms responded with cooperation—they invited the officials to meetings, roundups, and policy discussions. And, more importantly, they complied with the officials' requests, including making changes to their policies." *Id.*[1]

These were not isolated actions. The court summarized its analysis as follows:

> Consequently, it is apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions. By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not

---

[1] The Fifth Circuit referred to the large technology companies that participated in this state-sponsored censorship project collectively as "the platforms" but they included Google/YouTube, Facebook/Instagram and Twitter.

> made in accordance with independent judgments guided by independent standards. Instead, they were encouraged by the officials' imposed standards.

*Id.* at *24 (cleaned up).

Judge Thompson barely acknowledged Judge Doughty's decision, which the Fifth Circuit vindicated with its equally historic opinion. Instead, she concluded that *O'Handley* precludes relief in a case like this. That misreads *O'Handley*. That case arrived at a precarious time. Courts in this district had dismissed several state action cases against technology companies, usually by deeming their allegations of joint action implausible. In each case, this Court affirmed the dismissal in a short order. *See Doe v. Google, LLC*, No. 21-16934, 2022 WL 17077497, at *1-3 (9th Cir. Nov. 18, 2022) (affirming dismissal because plaintiffs "failed to show any link between the alleged actions by the Speaker and the House and YouTube's decision to remove [their] channels"); *Rutenberg v. Twitter, Inc.*, No. 21-160743, 2022 WL 1568360, at *1 (9th Cir. May 18, 2022) (noting plaintiff's "acknowledge[ment] that Twitter exercised its own 'discretion and authority' in moderating President Trump's account, and that Twitter acted as President Trump's 'opponent' in doing so); *Atkinson v. Meta Platforms, Inc.*, No. 20-17489, 2021 WL 5447022, at *1 (9th Cir. Nov. 22, 2021) (declining to infer that state officials "'dominate[d]' Meta Platforms' decision making"). Unlike the plaintiffs in the previous cases, Mr. O'Handley had evidence that Twitter suspended his account at least once after a

California government agency called the Office of Elections Cybersecurity (OEC) notified Twitter of his post. O'Handley alleged that this government notification process constituted state action. 62 F.4th at 1153-55.

This Court struggled with these allegations, issuing a lengthy, published opinion after rejecting the previous cases in short, unsigned dispositions. It dispatched O'Handley's argument by stating that "[t]he OEC offered Twitter no incentive for taking down the post it flagged." *Id.* at 1158. It said the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.* Of course, in saying that, the court improperly drew inferences in Twitter's favor. The panel seemed to recognize that, qualifying its analysis by noting that "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government," but it concluded that "we do not see the high degree of entwinement needed for state action in this case." *Id.* at 1158 n.2 (citing *Rawson*).

That high degree of entwinement exists here. Moreover, *O'Handley* said "[a] constitutional problem would arise if Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *Id.* at 1159. That is exactly what Google is doing to public health critics like Kennedy. It is removing

39

speech that public health authorities (the government) deem false, misleading, or dangerous, and it seems to be doing so voluntarily, as part of its civic duty to combat alleged misinformation. That cooperation, combined with the shared goals, distinguishes this case from *O'Handley*.

This does not mean that Google had to cloak itself in the power of the state, nor that Mr. Kennedy must identify a specific threat made by a government official that got Google to do its bidding, although he has obtained evidence of White House officials directing tech companies to censor him. Street Decl., Exh. P. True, merely accepting public funds and complying with generally applicable laws will not suffice. *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1014 (9th Cir. 2020). And laws that simply give legal protection to private actions (like arbitration agreements) do not automatically transform private action into state action. *Roberts v. AT&T Mobility, LLC*, 871 F.3d 833, 844-45 (9th Cir. 2017). For good reason, as the Supreme Court has said it "will not tolerate the imposition of constitutional restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 54 (1999) (cleaned up) (quotations omitted).

But if the state action doctrine means anything, it must be applied faithfully when a private party like Google does the government's bidding at the government's behest and to promote the government's preferred message.

40

That is especially important when the case involves political speech. "In the realm of speech and expression, the First Amendment envisions the citizen shaping the government, not the reverse; it removes 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity.'" *Denver Area Ed. Telecomms. Consortium, Inc.*, 518 U.S. 727, 782-83 (1996) (O'Connor, J., concurring in part and dissenting in part) (quoting *Cohen v. Calif.*, 403 U.S. 15, 24 (1971)).

That principle may explain *Lee v. Katz*, a unique case in which this Court "conclude[d] that, in regulating speech within" a public space, "the OAC [a private entity] performs an exclusively and traditionally public function within a public forum." 276 F.3d at 557. If Judge Thompson were correct, the plaintiffs should have lost that case. After all, like Google, the OAC was a private entity regulating speech that occurred on private property. *Lee* reflects a fundamental principle, one this Court has long championed: freedom of speech is different than the interests the plaintiffs asserted in other state action cases. It is the foundation of American democracy. And when giant corporations work with the government to silence

speech that the government does not want people to hear—in a forum otherwise open to all viewpoints—they assume the role of the censor and violate that right.[2]

*Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999), did not hold otherwise. There a prospective employee (Sutton) could not get a job from a private hospital because he refused to give the hospital his social security number. He sued, alleging that the hospital's refusal to hire him violated his constitutional and statutory rights. Essentially, Sutton argued that "because the federal government compels every employer to obtain employees' social security numbers, every employer is liable under [federal law] for violating the rights of employees (or applicants) who object on religious grounds to the social-security number requirement." *Id.* at 836. The court rejected that argument, finding that "in a case involving a private defendant, the mere fact that the government compelled a result does not suggest that the government's action is 'fairly attributable' to the private defendant. Indeed, without some other nexus between the private entity and the government, we would expect that the private defendant is not responsible for the government's compulsion." *Id.* at 838.

---

[2] Article I, section 2 of the California Constitution protects expressive activities conducted in privately-owned shopping centers. *Fashion Valley Mall, LLC v. NLRB*, 42 Cal.4th 850, 869-70 (2007) (citing *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899 (1979)). That principle should extend to large digital spaces like YouTube. Indeed, there is an even greater reason to extend the *Pruneyard* principle to YouTube since, unlike the shopping centers in *Pruneyard* and *Fashion Valley*, YouTube's entire purpose is to host and disseminate speech.

*Sutton* gave some examples. It noted that, in *Lugar v. Edmondson Oil Company*, 457 U.S. 922 (1982), the Supreme Court "held that the private defendants who had initiated the attachment process could be liable as state actors for 'participating in that deprivation'" because the act of inducing the "state officials to take advantage of state-created attachment procedures' made the private defendants 'willful participant[s] in joint activity with the State or its agents.'" *Id.* at 839 (quoting *Lugar*, 457 U.S. at 941-42). *Sutton* also explained that, in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972), the "private defendant was deemed to be acting in concert with the state when it sought the state's help to enforce the defendant's own racially discriminatory bylaws. Once again, the 'something more' required for a finding of governmental action on the part of a private defendant was satisfied when the plaintiff alleged that the private defendant and the state were jointly pursuing an unconstitutional end." *Sutton*, 192 F.3d at 840; *see also Missouri*, 2023 WL 5821788, at *19 (concluding that "relationship between the officials and the platforms went beyond" mere advocacy and constituted "'something more'" needed satisfy state action doctrine).

As in *Missouri v. Biden*, that "something more" also exists here. Furthermore, *Sutton* distinguished *Mathis v. Pacific Gas & Electric Company*, 891 F.2d 1429 (9th Cir. 1989), a case in which this Court found the plaintiff's state action allegations to be sufficient at the pleading stage because the defendant sued

for collaborating with the government there was a public utility. "'It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be state 'acts' than will the acts of an entity lacking these characteristics." *Id.* at 843 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350-51 (1974)). *Sutton* distinguished another coercion case, *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Company*, 827 F.2d 1291 (9th Cir.1987), on the same ground. It also emphasized that, in *Carlin*, "the government directed a specific entity to take a specific (allegedly unconstitutional) action against a specific person." *Sutton*, 192 F.3d at 843.

So here. We have already obtained evidence that the White House directed Twitter to censor Mr. Kennedy. Street Decl., Exh. P. Discovery will likely reveal similar directions from executive branch officials to Google. Indeed, the White House and other executive branch officials have repeatedly denounced Mr. Kennedy as a member of the "disinformation dozen" and specifically called for technology companies to censor him. RFK Decl., ¶ 16.

That evidence is significant. Although Google may not have a legal monopoly on online video sharing, the Fifth Circuit found that it, like Facebook and Twitter, has an "effective monopoly over its particular niche of online discourse." *NetChoice*, 49 F.4th at 476. Indeed, YouTube's influence is only

44

growing. "As of 2023, the platform boasts 2.68 billion active users, as well as 80 million YouTube Premium subscribers. It's also established itself as the second-largest search engine in the world, next to its parent Google." Street Decl., Exh. E-2. According to *Forbes*, more than half of internet users visit YouTube at least once per month. Those "staggering numbers aren't just statistics, either. They highlight the expansive influence and potential of social media platforms." *Id.* And they continue to grow, with the technology companies using federal law to immunize themselves from liability for the content they host.

Historically, this has been the type of situation in which the courts paid closer attention to the inherent nexus between the government and the private entity. Those factors, combined with the self-described public/private partnership and Google's reliance on government policies to censor speech, weigh in favor of finding state action here.

> **B.** **Mr. Kennedy Will Be Irreparably Harmed If the Court Allows Google to Continue Using its Misinformation Policy to Remove His Political Speech from YouTube.**

There is no dispute that Mr. Kennedy will suffer irreparable harm if the Court does not order Google to stop using its misinformation policy to censor Kennedy's speech during his political campaign. Nor could there be. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed,

this Court has held that irreparable injury is often presumed when the plaintiff alleges a "colorable First Amendment claim …." *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005).

Judge Thompson held otherwise because she believed that Kennedy has other ways of communicating with voters. She erred. This Court "has repeatedly found irreparable harm to plaintiffs even where a speech restriction left them free to speak in other ways." *Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1128 (E.D. Cal. 2016) (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009), and *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827-28 (9th Cir.2013)). Moreover, contrary to Google's arguments below, a plaintiff does not need to show that he, and he alone, is being censored, as "the Supreme Court has acknowledged that a party may claim viewpoint discrimination even when it is not the only one targeted for censorship." *Daunt v. Benson*, 956 F.3d 396, 419–20 (6th Cir. 2020) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831-32 (1995)); *see also Griffin v. Bryant,* 30 F. Supp. 3d 1139, 1175-77 (D.N.M. 2014) (concluding that plaintiff had standing to challenge rule because it "most likely affected his speech," and because of lax standing requirements for such cases).

That would not matter anyway. "The First Amendment protects political association as well as political expression." *Puerto Rico Ass'n of Mayors v. Velez-*

*Martinez*, 480 F. Supp. 3d 377, 378 (D.P.R. 2020) (citing *Buckley v. Valeo*, 424 U.S. 1, 15 (1976)). The chilling effect created by YouTube's medical misinformation policy disrupts Kennedy's political organization and thus interferes with his and other people's right to political association. RFK Decl., ¶ 5; A. Kennedy Decl., ¶¶ 6-8.

Judge Thompson also erred in discounting the political nature of Mr. Kennedy's speech. The harm that accompanies the denial of First Amendment rights "is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and a delay of even a day or two may be intolerable." *Klein*, 584 F.3d at 1208 (cleaned up); *see also Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (upholding preliminary injunction against state's limitations on contributions to political committees in state or county recall campaigns for this reason). That may be why the Supreme Court has repeatedly rejected government efforts to control the information voters receive during the political process. *See, e.g., Brown v. Hartlage*, 456 U.S. 45, 61-62 (1982) (finding that application of state statute to invalidate election results based on candidate's promise to serve at impermissible reduced salary violated First Amendment).

*Brown* is instructive. Like YouTube's government-based misinformation policy, the Kentucky statute involved in that case imposed a penalty on a candidate

for distributing alleged misinformation. That did not save it. "Although the state interest in protecting the political process from distortions caused by untrue and inaccurate speech is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount." *Id.* at 61. In fact, a "candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent." *Id.* Thus, in the political process, "[t]he preferred First Amendment remedy of more speech, not enforced silence, [ ] has special force." *Id.* (cleaned up).

This case is no different. The fact that it involves a private party punishing people for disagreeing with the government only makes it more important. The Supreme Court was right: the internet *is* the "modern public square." *Packingham v. North Carolina*, -- U.S. --, 137 S. Ct. 1730, 1737 (2017); *see also Biden v. Knight First Amend. Inst.*, -- U.S. --, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring) (noting that internet platforms like YouTube "hold themselves out as organizations that focus on distributing the speech of the broader public"). It is where political debate occurs, where people get their news, where they decide how to vote. That will only increase in the future. Allowing the companies that control the biggest parts of that square to silence the incumbent government's critics,

48

based solely on the incumbent government's views, would set a dangerous precedent.

### C. Google Is Not a Publisher, So It Will Not Suffer from Being Ordered Not to Remove Video of Kennedy's Political Speech.

We are not the only ones who think so. Justice Marshall, a champion of the state action doctrine, drew an important distinction between the limited nature of the private speech forum involved in *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*"), and the way the company used it.

In that case, the Supreme Court decided that the California government could not force PG&E, a private company, to give an opponent space in a newsletter that PG&E included in its billing statements. The Court emphasized that "because access is awarded only to those who disagree with appellant's views and who are hostile to appellant's interests, appellant must contend with the fact that whenever it speaks out on a given issue, it may be forced … to help disseminate hostile views." *Id.* at 14. The Court had no problem finding that regulation to violate the First Amendment. *Id.* But Justice Marshall explained that if PG&E were "to use its billing envelopes as a sort of community billboard, regularly carrying the messages of third parties, its desire to exclude a particular speaker would be deserving of lesser solicitude." *Id.* at 23 (Marshall, J., concurring).

49

That is exactly what Google did with YouTube and why its desire to remove Mr. Kennedy's political speech after the fact does not deserve the protection the Supreme Court showed in *PG&E*, *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241 (1974), or *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995), the cases that Google cited below to justify its actions. Moreover, those cases were compelled speech cases and "[t]he compelled speech violation in each … resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006) ("*FAIR*"). But Google is *not* a publisher. Under section 230 of the Communications Decency Act, it cannot be held liable for the content its users publish. 47 U.S.C. § 230(c)(1). In fact, Congress enacted section 230 in response to a decision, *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), that deemed an internet platform, over its objection, to be akin to a newspaper because its content removal process "constitute[d] editorial control" over the platform. *See* H.R. REP. No. 104-458, at 194 (1996) ("One of the specific purposes of [section 230] is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers….").

50

Moreover, Google does not engage in expressive activity when it allows people to post videos on YouTube. "Unlike newspapers," internet platforms like YouTube "exercise virtually no editorial control or judgment." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 460 (5th Cir. 2022). They use "algorithms to screen out certain obscene and spam-related content. And then virtually everything else is just posted to the Platform with zero editorial control or judgment." *Id.* That further distinguishes this situation from *Tornillo* and its progeny.

As Google admitted below, there are many videos of Kennedy speaking on YouTube about public health matters that the government disagrees with, and which therefore could be removed at any time, especially under Google's new medical misinformation policy. Judge Thompson viewed that fact as weighing against Mr. Kennedy. In fact, it tilts the scales sharply in Kennedy's favor because it shows that Google acts arbitrarily when it removes videos (often the most popular ones) of Kennedy's political speech. Furthermore, Google does not have to censor Kennedy completely to violate his rights. In the current political environment, Mr. Kennedy needs *every* avenue open to him. After all, the president won't debate him, and the DNC won't even acknowledge his candidacy. RFK Decl., ¶ 5. Any video could go viral. Every video matters. Thus, the chilling effect from Google's actions hurts Kennedy's campaign. *Id.,* ¶¶ 5-6.

51

**D.    The Public Interest in Having Open Dialogue During the Political Process Strongly Favors Granting Injunctive Relief.**

That gives Mr. Kennedy the personal interest needed to pursue this relief. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984) (noting that "when there is a danger of chilling free speech, ... society's interest" in promoting speech outweighs prudential standing considerations that might otherwise require greater degree of harm to sue). And it tilts the public interest in favor of granting an in junction pending appeal.

That should not be surprising. "The Ninth Circuit has consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *cf. Tunick v. Safir*, 209 F.3d 67, 95 (2d Cir.2000) (Sack, J., concurring) (explaining that courts should not "mak[e] unnecessary distinctions ... between speech that we find to be urgent and that which we think can bide its time"). Judge Thompson recognized that but held that the public interest favored denying the requested TRO because Kennedy's speech, which she described as "misinformation," might lead to more COVID illnesses and deaths. ECF 32, at 10.

She erred. The record contains no evidence that anything Mr. Kennedy said was false. In fact, the government has increasingly targeted Kennedy's speech not because it is false (and thus "misinformation" or "disinformation") but because the government believes it is misleading or potentially harmful (and thus something

called "malinformation"). RFK Decl., ¶ 8. Even if that was a meaningful distinction—it still constitutes viewpoint discrimination—the record did not contain any evidence that Kennedy's speech, especially his political speech about public health policymaking, would cause any harm to anybody. *Id.* Thompson's concerns about the public health consequences of Kennedy's speech were, at best, speculative. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Speculative harm to the public should not be used to deny relief in an important First Amendment case where, under established law, the balance of equities otherwise favors the plaintiff and justifies relief.

Judge Thompson also erred in denying the TRO based on Mr. Kennedy's purported delay in seeking relief. Courts have rejected such arguments when the injunctive relief would prevent a violation of First Amendment rights, reasoning that "[t]his rationale of denial due to delay is not applicable in the context of an alleged First Amendment violation where each passing day may constitute a separate and cognizable infringement on the First Amendment." *Dow Jones & Co. v. Kaye*, 90 F. Supp. 2d 1347, 1362 (S.D. Fla. 2000) (cleaned up); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (discussing this principle and noting that "courts are loath to withhold relief solely on that ground" (cleaned up)).

53

Moreover, Mr. Kennedy has provided a compelling reason for his decision to seek injunctive relief now because, unlike Facebook and Twitter, Google has continued to censor his speech on matters of public concern during his political campaign and despite his repeated requests that they stop. RFK Decl., ¶¶ 7-10; A. Kennedy Decl., ¶¶ 8-10.

That is especially true now, in what will be one of the most important elections in American history. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940). It does not matter that Mr. Kennedy's political speech often references COVID-19, an illness that Judge Thompson believes "still poses a health risk to certain individuals …." Dist. Ct. ECF 31, at 10. "'They that can give up essential liberty to obtain a little safety deserve neither liberty nor safety.'" *United States v. Kincaide*, 379 F.3d 813, 842 (9th Cir. 2004) (en banc) (Reinhardt, Pregerson, Kozinski and Wardlaw, JJ., dissenting) (quoting B. Franklin, Historical Review of Pennsylvania (1759)). COVID-19 will always pose a health risk to Americans, just as the flu does more than a century after it first struck. The risk of illness could always be used to chill public health debate. That cannot be proper.

### E.    The Court Should Set an Expedited Briefing Schedule and Schedule Argument at the Same Time as the Trump/Wolf Appeal.

Time is of the essence. "There are short timeframes in which speech can have influence." *Citizens United v. F.E.C.*, 558 U.S. 310, 334 (2010). That is especially true in the political process. "The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others. A speaker's ability to engage in political speech that could have a chance of persuading voters is stifled if the speaker must first commence a protracted lawsuit." *Id.*

So here. Some people would like to forget the COVID-19 pandemic. They want to treat it as a historical anomaly, a once-in-a-century event that won't be repeated. Others, like Mr. Kennedy, feel otherwise. They saw government and corporations manipulate the pandemic to increase their power and enrich themselves while destroying small businesses and trampling civil liberties. RFK Decl., ¶ 10. They saw the government's COVID-19 response, which included shutting down the global economy and then spending trillions of dollars to try to turn it back on at the right time, as the biggest public policy blunder in history. *Id.* They saw billions of dollars in taxpayer money wasted on ineffective, and potentially unsafe, vaccines. *Id.* They saw children's lives set back by the unprecedented and unnecessary forced closure of schools. *Id.*

Public health officials supported all those failed policies. How can America recover from the COVID pandemic, and deal with future public health events, without questioning the public health orthodoxy?

Moreover, Google's amended medical misinformation policy shows that the company does not view COVID-19 as an isolated emergency that briefly required the censorship of dissent. It prohibits the discussion of many topics that, while involving individual health, are also matters of public and political concern, including abortion. Street Decl., Exh. D. No doubt Google's medical misinformation policy will also soon prohibit people from posting videos that say there are only two genders (if it does not already do that, since the list of prohibited viewpoints is not exhaustive). *Id.*

Thus, the Court must act now. A case involving similar issues, *Trump v. Twitter, Inc.*, No. 22-15961, in which Mr. Kennedy's counsel represents one of the appellants (Dr. Naomi Wolf), is pending and will be argued in Pasadena on October 4, 2023. *Id.*, ¶ 33. This case could be set for argument at the same time. That will ensure that these important issues get the prompt attention they deserve—both in this Court and above.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion or set an expedited briefing and argument schedule so this important matter can be decided as soon as possible.

Respectfully submitted,

Date: September 11, 2023

JW HOWARD/ATTORNEYS, LTD.


_____ */s/ Scott J. Street*_____
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* <http://www.ca9.uscourts.gov/forms/form17instructions.pdf>

**9th Cir. Case Number(s)** 23-16141

The undersigned attorney or self-represented party states the following:

[  ] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ x ]   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Trump v. Twitter, Inc.*, No. 22-15961 (described above, raises similar First Amendment and state action issues against a technology company)

**Signature:** /s/ Scott J. Street          **Date September 11, 2023**

58

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16141

I am the attorney or self-represented party.

**This brief contains 9,491 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** /s/ Scott J. Street **Date September 11, 2023**
*(use "s/[typed name]" to sign electronically filed documents)*

59

# CERTIFICATE OF SERVICE

### *Robert F. Kennedy, Jr. v. Google, LLC, et al.*
### U.S. Court of Appeals for the Ninth Circuit, Case No. 23-16141

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On September 11, 2023, I caused **APPELLANT'S EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR INJUNCTION PENDING APPEAL** to be filed and served via the Court's Electronic Service upon the parties listed on the Court's service list for this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 11, 2023 at San Diego, California.

*/s/ Dayna Dang*
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com