**No. 23-16141**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

Robert F. Kennedy, Jr.,

*Plaintiff-Appellant*,

vs.

Google LLC, and YouTube, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-03880
Hon. Trina Thompson

_____

**DECLARATION OF SCOTT J. STREET IN SUPPORT OF APPELLANT'S
EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL**

_____

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

*Attorneys for Robert F. Kennedy, Jr.*

## DECLARATION OF SCOTT J. STREET

I, Scott J. Street, declare as follows:

1.      I am an attorney duly licensed to practice law before all courts in the state of California and before this Court. I am a partner with the law firm JW Howard/Attorneys, Ltd., counsel of record to Appellant Robert F. Kennedy, Jr., in this action. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so.

2.      I am submitting this declaration in support of Mr. Kennedy's emergency motion for an injunction pending appeal that would temporarily prohibit Defendants Google LLC and YouTube, LLC, from enforcing their "medical misinformation" policies to remove videos of Mr. Kennedy's speech on matters of public concern from YouTube during the 2024 presidential campaign. As explained in the motion papers, I gave notice of the emergency motion to Defendants' counsel and the Ninth Circuit Motions Unit. Defendants' counsel will oppose the motion.

3.      Mr. Kennedy is seeking the Democratic Party's nomination for president, having declared his candidacy on April 19, 2023. Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. He

accepted an invitation to speak about that and other issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March.

4.     Mr. Kennedy's NHIOP speech, which I attended, was viewed as a political speech and was attended by several prominent New Hampshire Democrats including the chairman of New Hampshire's Democratic Party. It lasted nearly two hours and centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, an issue he has fought about for years and which, in recent years, caused him to question the increasing numbers of vaccines American children must take. Mr. Kennedy explained during the NHIOP speech that he does not oppose the use of vaccines but that he is worried about the cozy relationship between the pharmaceutical companies that produce the vaccines and the government agencies that are supposed to review and approve them. Mr. Kennedy explained during his speech that government agencies receive much of their funding from the companies they regulate, a conflict of interest that reminds Kennedy of the situation he encountered decades ago when he was working with environmentalists to take on large polluters like Monsanto. Kennedy received accolades, including from many Democrats, for that work. These concerns about the corrupt merger of corporate and state power—whether in environmental policy, healthcare policy, or foreign policy—are a central part of his presidential campaign. And it is a message that resonates with millions of Americans,

especially given the evidence of corruption that has emerged from the Biden White House.

5.     Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. Google removed it. The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." A true and correct copy of a news article that reported on the matter on March 6, 2023, is attached as **Exhibit "A."**

6.     Mr. Kennedy complained about the action, particularly since his comments about vaccine safety only consumed a portion of the NHIOP speech (in other parts he spoke about his environmentalism and legal work fighting corporate polluters, among other things). Google refused to change its position. It said it "removed the [Kennedy speech] for violating our policies on COVID-19 vaccine misinformation …. While we do allow content with educational, documentary, scientific or artistic context, such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context." A true and correct copy of a news report from March 8, 2023, about this matter and which contains Google's statement is attached as **Exhibit "B."**

7.     A true and correct copy of YouTube's original "Vaccine misinformation policy" is attached as **Exhibit "C-1."**

4

8.     A true and correct copy of YouTube's original "COVID-19 medical misinformation policy" is attached as **Exhibit "C-2."**

9.     After we filed this case, Google created a new medical misinformation policy that merged the two policies discussed above into a single "medical misinformation" policy. A true and correct copy of it is attached as **Exhibit "D."**

10.     During the past few election cycles, YouTube has played an important role in the political process. Attached to this declaration as **Exhibit "E-1"** is a true and correct copy of an article written by YouTube's director of advertiser marketing, Kate Stanford, in March 2016 titled "How Political Ads and Video Content Influence Voter Opinion" which discussed that development. Attached to this declaration as **Exhibit "E-2"** is a true and correct copy of a Forbes article titled "Top Social Media Statistics And Trends Of 2023," which was published on May 18, 2023, and which also discusses YouTube's global popularity.

11.     Mr. Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign. It has refused. That led to the filing of this case.

12.     A similar censorship case was filed in Louisiana by two state attorneys general, *Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM. On July 4, Judge Terry Doughty issued a lengthy decision that enjoins federal government

officials from coercing technology companies to censor the government's critics. The injunction does not bind the technology companies themselves, though, and thus does not prohibit Google from continuing to censor Mr. Kennedy based on the misinformation policies.

13.     The government appealed the decision in *Missouri v. Biden* to the Fifth Circuit Court of Appeals. It head argument last month and seems poised to affirm Judge Doughty's decision.

14.     I have reviewed much of the evidence that was produced in *Missouri v. Biden*, including documents that were produced and deposition testimony that was taken in that case. The evidence sheds light on the partnership that Google and Executive Branch officials developed to remove speech from people like Mr. Kennedy who disagree with Executive Branch officials about COVID-19, vaccines, and other public health matters.

15.     Attached to this declaration as **Exhibit "F"** is a true and correct copy of an email sent by White House official Rob Flaherty to Google executives, among other people, on April 22, 2021, which was produced in *Missouri v. Biden*.

16.     Attached to this declaration as **Exhibit "G"** is a true and correct copy of sworn discovery responses provided by the Executive Branch officials in *Missouri v. Biden*, which were signed by Max Lesko, Chief of Staff in the Office of the Surgeon General ("OSG") on December 16, 2022.

6

17.     Attached to this declaration as **Exhibit "H"** is a true and correct copy of excerpts from the deposition of Eric Waldo, an OSG official, which was taken in *Missouri v. Biden*.

18.     Attached to this declaration as **Exhibit "I"** is a true and correct copy of the document that was marked as Exhibit 8 to Waldo's deposition transcript.

20.     Attached to this declaration as **Exhibit "J"** is a true and correct copy of the document that was marked as Exhibit 31 to Waldo's deposition transcript.

22.     Attached to this declaration as **Exhibit "K"** is a true and correct copy of the document that was marked as Exhibit 47 to Waldo's deposition transcript.

23.     Attached to this declaration as **Exhibit "L"** is a true and correct copy of excerpts from the deposition of Carol Crawford, an official from the Centers for Disease Control, which was taken in in *Missouri v. Biden.*

24.     Attached to this declaration as **Exhibit "M"** is a true and correct copy of the document that was marked as Exhibit 40 to Crawford's deposition transcript.

25.     Attached to this declaration as **Exhibit "N"** is a true and correct copy of the document that was marked as Exhibit 43 to Crawford's deposition transcript.

26.     Attached to this declaration as **Exhibit "O"** is a true and correct copy of excerpts from the deposition of Elvis Chan, an agent of Federal Bureau of Investigation, which was taken in *Missouri v. Biden.*

27.    Attached to this declaration as **Exhibit "P"** is a true and correct copy of an email exchange between Mr. Flaherty, the White House official, and Twitter executives about Mr. Kennedy that occurred between January 22 and 23, 2021.

28.    To my knowledge, neither Google nor YouTube were subpoenaed in in *Missouri v. Biden*. None of their executives were deposed. No White House officials were deposed in *Missouri v. Biden* either.

29.    Although we have already obtained evidence that, in my opinion, raises serious questions about the constitutionality of Google's use of the medical misinformation policies to censor government dissent, we will seek additional discovery in this case as it proceeds, discovery that was not done in *Missouri v. Biden* and which will shed further light on Google's efforts to censor viewpoints that public health officials do not want Americans to hear. We will also seek discovery from executive branch officials who work for the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA"), which has updated its regulatory mission to include the removal of false, misleading, and (according to the government) dangerous information online.

30.    Mr. Kennedy's presidential campaign has been gaining momentum, despite his being ignored by much of the mainstream media and disavowed by the Democratic National Committee and most Democratic members of Congress (who tried to censor his testimony at a Congressional hearing on censorship). The

primaries will get underway in January, just a few months from now. Every day matters. That is why Mr. Kennedy is seeking emergency injunctive relief now.

31.     Furthermore, there is little chance that Google will change its policies to stop removing Mr. Kennedy's speech during the presidential campaign. At the hearing in the district court that occurred on August 21, Google's counsel seemed to embrace the company's role in censoring Kennedy's speech, even when it removes video, like the NHIOP speech, that focuses on issues other than public health. For example, Google's counsel said that people could comply with the company's rules simply by editing videos to remove the comments that public health officials do not want Americans to hear.

32.     A district court's denial of an application for a TRO is usually not appealable but it can be appealed immediately if the district court's denial of the TRO request is tantamount to the denial of a preliminary injunction. I believe that is the case here, as Judge Thompson made clear at the hearing on August 21, and in her written decision, that she believes this Court's decision in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), is controlling and virtually precludes relief here. It was also clear that Judge Thompson does not intend to follow Judge Doughty's decision in *Missouri v. Biden*, regardless of whether the Fifth Circuit affirms it, and will wait for guidance from this Court (or the Supreme Court) about how to apply the state action doctrine to technology companies' content

9

moderation policies. Thus, although there is a hearing on Mr. Kennedy's motion for a preliminary injunction scheduled for November 7, 2023, in the district court, I believe that Judge Thompson will likely reach the same result as before and thus that the Court has jurisdiction to hear this appeal now.

33.    There is also good cause to expedite this review, as a similar case, *Trump v. Twitter, Inc.*, No. 22-15961, involving Twitter's content moderation policies, is set for argument in this Court on October 4. My colleague John Howard and I represent one of the plaintiffs/appellants (Dr. Naomi Wolf) in that case.

Under penalty of perjury, under the laws of the United States of America, I declare that the foregoing is true and correct. Executed this 8th day of September 2023 at Pasadena, California.

Scott J. Street

**EXHIBIT A**





NEWS

Politics
(https://nhjournal.com/category/politics/)

## RFK, Jr's NHIOP Speech Banned From YouTube

Posted to Politics (https://nhjournal.com/category/politics/) March 06, 2023 by Michael Graham (https://nhjournal.com/author/michaelgraham/)

Jason Cote has a simple mission at Manchester Public TV. "Proudly bringing MANCHESTER to your television: open government, free expression, education, arts, activities," as it says on the station's website (https://www.manchestertv.org/).

For Cote, the station's executive director, achieving that goal often involves broadcasting political speeches from the New Hampshire Institute of Politics. For example, MPTS shared New Hampshire Journal's GOP candidate debates with viewers last year.

But when the station tried to post its video of Robert F. Kennedy, Jr's NHIOP speech on its YouTube channel, something happened Cote had never experienced before.

"YouTube will not allow us to post the video because of controversial vaccination content," Cote told NHJournal.

"MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before.

"First time for everything, I guess," he added.

According to a message from YouTube sent to Cote, the media platform declared RFK, Jr.'s speech "medical misinformation" and would not allow it to be posted.

"YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization," the YouTube message read.

A spokesperson for YouTube responded to NHJournal's requests with assurances a statement would be forthcoming, but it failed to respond by late Monday night.

NHIOP Executive Director Neil Levesque was puzzled by YouTube's decision.

"This was a political and public policy speech that YouTube has censored."

RFK, Jr. is well known for advocating views often labeled "conspiracy theories," including his suggestion that childhood diseases like autism are linked to vaccines. He also spread the debunked conspiracy (https://clevelandmagazine.com/in-the-cle/politics/articles/robert-f-kennedy-jr-nut-job) that the 2004 presidential election was stolen from John Kerry.

His views on vaccines have gotten him banned from social media in the past. In 2021, he was blocked from Instagram



Case: 23-16141, 09/11/2023, ID: 12789916, DktEntry: 9-2, Page 13 of 165

However unorthodox his views, RFK, Jr. was still welcomed by some of the biggest names in the New Hampshire Democratic Party, including state party chair Ray Buckley and Senate Minority Leader Donna Soucy (D-Manchester). If they could sit and hear what the possible 2024 presidential candidate had to say, why not voters across the state, Cote asked.

"We only try to help the Manchester citizens be the most educated about all views and opinions that we can."

## More from New Hampshire Journal

**EXHIBIT B**

Case: 23-16141, 09/11/2023, ID: 12788916, DktEntry: 9-2, Page 15 of 165



Patch

 Sign up

## Bedford, NH

✉ Subscribe

News Feed | Neighbor Posts | Local Businesses | Events

Politics & Government

# RFK Jr. Suing Over YouTube Ban Of NH IOP Speech

Kennedy spoke of his environmental causes and belief that the expanded regime of childhood vaccines was contributing to autism.

 **New Hampshire Journal,** News Partner

Posted Wed, Mar 8, 2023 at 8:41 pm ET

💬 Reply

ADVERTISEMENT



An attorney for Robert F. Kennedy Jr. tells NHJournal the potential 2024 presidential candidate plans to sue YouTube over its decision to ban his recent speech at the prestigious New Hampshire Institute of Politics (NHIOP) from its video platform. (NH Journal)

## By Michael Graham, NH Journal

ADVERTISEMENT

ADVERTISEMENT

An attorney for Robert F. Kennedy Jr. tells NHJournal the potential 2024 presidential candidate plans to sue YouTube over its [decision to ban his recent speech](#) at the prestigious New Hampshire Institute of Politics (NHIOP) from its video platform.

"We will be filing suit," said John Howard, a legal adviser to Kennedy.

---

**Find out what's happening in Bedford with free, real-time updates from Patch.**

Your email address | Subscribe

---

Kennedy spoke at the NHIOP last Friday, recounting his efforts on behalf of environmental causes and his suspicions regarding the expanded regime of childhood vaccines he suggests are linked to increased cases of autism in children.

The Institute, based on the campus of St. Anselm College, is a must-stop destination for politicians considering a run for the White House. Asked by NHJournal if he had any plans to challenge President Joe Biden in the Democratic primary, Kennedy said ["I'm thinking about it."](#)

ADVERTISEMENT

ADVERTISEMENT

Manchester Public Television often broadcasts political speeches from the NHIOP venue to its viewers, as well as posts them on the station's YouTube channel. The possibility of a Kennedy challenge to President Joe Biden is particularly newsworthy given the DNC's decision to strip New Hampshire of its First in the Nation primary status.

But when MPTS executive director Jason Cote attempted to post RFK's remarks, he received a message that the content was being blocked.

ADVERTISEMENT

"YouTube will not allow us to post the video because of controversial vaccination content," Cote told NHJournal. "MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before.

"First time for everything, I guess," he added.

On Wednesday, a spokesperson for YouTube confirmed to NHJournal the speech was banned from the platform.

"We removed the content for violating our policies on COVID-19 vaccine misinformation. Our policies are enforced for everyone, regardless of the speaker's political views," the spokesperson said in a statement. "While we do allow content with educational, documentary, scientific or artistic context,

ADVERTISEMENT

such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context."

Kennedy's attorney said they are taking the matter to court.

"Justice Anthony Kennedy said the right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought," said Howard. "We should keep those principles in mind. YouTube may not be the government, but its actions have all the signs of government censorship. The people of New Hampshire—all Americans, really—deserve to hear from people who seek their vote."

Alphabet, the parent company of YouTube and Google, is already under scrutiny from Congress over its uneven — some say politically biased — application of content restrictions on its platforms. Alphabet CEO Sundar Pichai has been subpoenaed by the House Judiciary Committee to answer accusations regarding "the federal government's reported collusion with Big Tech to suppress free speech."

ADVERTISEMENT

While Kennedy is viewed as a longshot presidential candidate, he garnered praise from Granite State Democrats for intervening on behalf of the state's FITN primary. On the eve of the Democratic National Committee's vote to strip New Hampshire of its place at the front of the 2024 line, Kennedy published an open letter to the DNC urging it "not to interfere in New Hampshire's plan to hold the nation's first primary.

"My Uncle Jack spoke to voters in Dover on the eve of the 1960 New Hampshire primary. He said that 'We Democrats realize that the days when presidential candidates can be nominated in smoke-filled rooms, by political leaders and party bosses, have forever passed from the scene.' He said 'that no man has

ADVERTISEMENT

won a national election who was unwilling to test his candidacy with the people.'

"I echo those thoughts," Kennedy wrote.

Some of New Hampshire's top Democrats turned out for his NHIOP speech, including state party chairman Ray Buckley and state Senate minority leader Donna Soucy (D-Manchester).

Best-selling author Marianne Williamson has announced her candidacy in the 2024 Democratic presidential primary. She is scheduled to make campaign appearances across the Granite State [between March 8 -13](#).

ADVERTISEMENT

Polls consistently show a majority of Granite State Democrats would prefer to back someone other than Biden as their party's nominee. And while no prominent local Democrats have endorsed Kennedy or Williamson, some have expressed dissatisfaction with Biden.

Asked if he wants Biden to run again, former N.H. Speaker of the House Steve Shurtleff (D-Penacook) told the AP, "In my heart of hearts, no. I think a lot of people just don't want to say it."

---

*This story was originally published by the NH Journal, an online news publication dedicated to providing fair, unbiased reporting on, and analysis of, political news of interest to New Hampshire. For more stories from the NH Journal, visit [NHJournal.com](#).*

♡ Thank    💬 Reply    ↪ Share

## More from Bedford

ADVERTISEMENT

Community Corner | 3h

🍸 **Fecal Bacteria Alert: NH Beaches + Hike The New Hollow Fairy Trail**

Arts & Entertainment | 1d

**Events: Bedford Garden Club's Mum Sale; Corn Hole; Zero Waste Store**

Community Corner | 14h

🍸 **Kayla Stoll 18 Under 18 Award + Senator Ricciardi Budget Wins**

ADVERTISEMENT

## Latest News Nearby

1. 📍 Concord, NH News
   **Fatal Car Crash; Teen Dies In Boating Accident; More: PM Patch NH**

2. 📍 Bedford, NH News
   🍸 **Fecal Bacteria Alert: NH Beaches + Hike The New Hollow Fairy Trail**

3. 📍 Across America, US News
   **Help Patch Recognize Outstanding Community Leaders Across The Country**

4. 📍 Concord, NH News
   **New York Teen Dies In Crescent Lake Boating Crash: NH State Police**

ADVERTISEMENT

Find out what's happening in your
community on the Patch app

**Corporate Info**

About Patch

Careers

**Partnerships**

Advertise on Patch

**Support**

FAQs

Contact Patch

Community Guidelines

Posting Instructions

    

Terms of Use    Privacy Policy

© 2023 Patch Media. All Rights Reserved.

Do Not Sell My Personal Information

ADVERTISEMENT

**EXHIBIT C-1**

# Vaccine misinformation policy



YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO). This is limited to content that contradicts local health authorities' or the WHO's guidance on vaccine safety, efficacy, and ingredients.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes harmful misinformation about currently approved and administered vaccines on any of the following:

- **Vaccine safety:** content alleging that vaccines cause chronic side effects, outside of rare side effects that are recognized by health authorities

- **Efficacy of vaccines:** content claiming that vaccines do not reduce transmission or contraction of disease

- **Ingredients in vaccines:** content misrepresenting the substances contained in vaccines

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Claims that vaccines cause chronic side effects such as:
  - Cancer
  - Diabetes
  - Other chronic side effects
- Claims that vaccines do not reduce risk of contracting illness
- Claims that vaccines contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal byproducts
- Claims that vaccines contain substances or devices meant to track or identify those who've received them
- Claims that vaccines alter a person's genetic makeup
- Claims that the MMR vaccine causes autism
- Claims that vaccines are part of a depopulation agenda

- Claims that the flu vaccine causes chronic side effects such as infertility
- Claims that the HPV vaccine causes chronic side effects such as paralysis

## Educational, scientific, artistic, or testimonial content

YouTube may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

YouTube also believes people should be able to share their own experiences, including personal experiences with vaccinations. This means we may make exceptions for content in which creators describe firsthand experiences from themselves or their family. At the same time, we recognize there is a difference between sharing personal experiences and promoting misinformation about vaccines. To address this balance, we will still remove content or channels if they include other policy violations or demonstrate a pattern of promoting vaccine misinformation.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

## Additional resources

More information on vaccines, including their safety and efficacy, can be found below.

**Health Authority Vaccine Information:**

- Centers for Disease Control and Prevention (CDC)    (US)
- European Vaccination Information Portal    (EU)
- National Service    (UK)
- World Health Organization vaccine safety    (Global)
- World Health Organization vaccine preventable diseases    (Global)

**Additional Vaccine Information:**

- American Academy of Pediatrics    (US)
- GAVI, the Vaccine Alliance    (Global)
- UNICEF    (Global)

Vaccine misinformation policy - YouTube Help

## Need more help?
Try these next steps:

**Post to the help community**
Get answers from community members

**EXHIBIT C-2**

# COVID-19 medical misinformation policy

The safety of our creators, viewers, and partners is our highest priority. We look to each of you to help us protect this unique and vibrant community. It's important you understand our Community Guidelines, and the role they play in our shared responsibility to keep YouTube safe. **Take the time to carefully read the policy below**. You can also check out this page for a full list of our guidelines.

YouTube doesn't allow content about COVID-19 that poses a serious risk of egregious harm.

YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19. This is limited to content that contradicts WHO or local health authorities' guidance on:

- Treatment
- Prevention
- Diagnosis
- Transmission
- The existence of COVID-19

**Note**: YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus. There may be a delay between new LHA/WHO guidance and policy updates given the frequency with which this guidance changes, and our policies may not cover all LHA/WHO guidance related to COVID-19.

Our COVID-19 policies were first published on May 20, 2020.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes any of the following:

**Treatment misinformation**:

- Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment such as consulting a doctor or going to the hospital
- Content that claims that there's a guaranteed cure for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19
- Claims that Hydroxychloroquine is an effective treatment for COVID-19
- Categorical claims that Ivermectin is an effective treatment for COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Other content that discourages people from consulting a medical professional or seeking medical advice

**Prevention misinformation**: Content that promotes prevention methods that contradict local health authorities or WHO.

- Claims that there is a guaranteed prevention method for COVID-19
  - Claims that any medication or vaccination is a guaranteed prevention method for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the prevention of COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO

- Claims that an approved COVID-19 vaccine will cause death, infertility, miscarriage, autism, or contraction of other infectious diseases
- Claims that an approved COVID-19 vaccine will contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal products
- Claims that an approved COVID-19 vaccine will contain substances or devices meant to track or identify those who've received it
- Claims that COVID-19 vaccines will make people who receive them magnetic
- Claims that an approved COVID-19 vaccine will alter a person's genetic makeup
- Claims that COVID-19 vaccines do not reduce risk of serious illness or death
- Claims that any vaccine causes contraction of COVID-19
- Claims that a specific population will be required (by any entity except for a government) to take part in vaccine trials or receive the vaccine first
- Content that promotes the use of unapproved or homemade COVID-19 vaccines
- Instructions to counterfeit vaccine certificates, or offers of sale for such documents

**Diagnostic misinformation**: Content that promotes diagnostic information that contradicts local health authorities or WHO.

- Claims that approved COVID-19 tests are dangerous or cause negative physical health effects
- Claims that approved COVID-19 tests cannot diagnose COVID-19

**Transmission misinformation**: Content that promotes transmission information that contradicts local health authorities or WHO.

- Content that claims that COVID-19 is not caused by a viral infection
- Content that claims COVID-19 is not contagious
- Content that claims that COVID-19 cannot spread in certain climates or geographies
- Content that claims that any group or individual has immunity to the virus or cannot transmit the virus

**Content that denies the existence of COVID-19:**

- Denial that COVID-19 exists
- Claims that people have not died or gotten sick from COVID-19
- Claims that the death rate of COVID-19 is equal to or less than that of the common cold or seasonal flu
- Claims that COVID-19 is equal to or less transmissible than the common cold or seasonal flu
- Claims that the symptoms of COVID-19 are never severe

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to [external links](#) in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Denial that COVID-19 exists
- Claims that people have not died from COVID-19
- Claims that any vaccine is a guaranteed prevention method for COVID-19
- Claims that a specific treatment or medicine is a guaranteed cure for COVID-19
- Claims that hydroxychloroquine saves people from COVID-19
- Promotion of MMS (Miracle Mineral Solution) for the treatment of COVID-19

- Claims that certain people have immunity to COVID-19 due to their race or nationality
- Encouraging taking home remedies instead of getting medical treatment when sick
- Discouraging people from consulting a medical professional if they're sick
- Content that claims that holding your breath can be used as a diagnostic test for COVID-19
- Videos alleging that if you avoid Asian food, you won't get the coronavirus
- Videos alleging that setting off fireworks can clean the air of the virus and will prevent the spread of the virus
- Claims that COVID-19 is caused by radiation from 5G networks
- Videos alleging that the COVID-19 test is the cause of the virus
- Claims that countries with hot climates will not experience the spread of the virus
- Claims that COVID-19 vaccines kill people who receive them
- Claims that COVID-19 vaccines are a means of population reduction
- Videos claiming that COVID-19 vaccines contain fetal tissue
- Claims that the flu vaccine causes contraction of COVID-19
- Claims that the flu is more contagious than COVID-19
- Claims that COVID-19 vaccines cause contraction of other infectious diseases or makes people more vulnerable to contraction of other infectious diseases
- Claims that COVID-19 vaccines contain a microchip or tracking device
- Claims that achieving herd immunity through natural infection is safer than vaccinating the population
- Claims that COVID-19 never causes serious symptoms or hospitalization
- Claims that the death rate from the seasonal flu is higher than the death rate of COVID-19
- Claims that people are immune to the virus based on their race
- Claims that children cannot or do not contract COVID-19
- Claims that there have not been cases or deaths in countries where cases or deaths have been confirmed by local health authorities or the WHO

## Educational, documentary, scientific or artistic content

We may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

Need more help?
Try these next steps:

**Post to the help community**
Get answers from community members

**EXHIBIT D**

# Medical misinformation policy

YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances. This policy includes the following categories:

- Prevention misinformation
- Treatment misinformation
- Denial misinformation

**Note:** YouTube's medical misinformation policies are subject to change in response to changes to guidance from health authorities or WHO. There may be a delay between new LHAs/WHO guidance and policy updates, and our policies may not cover all LHA/WHO guidance related to specific health conditions and substances.

## What this policy means for you

**Don't post content on YouTube if it includes any of the following:**

**Prevention misinformation:** We do not allow content that promotes information that contradicts health authority guidance on the prevention or transmission of specific health conditions, or on the safety, efficacy or ingredients of currently approved and administered vaccines.

**Treatment misinformation:** We do not allow content that promotes information that contradicts health authority guidance on treatments for specific health conditions, including promotion of specific harmful substances or practices that have not been approved by local health authorities or the World Health Organization as safe or effective, or that have been confirmed to cause severe harm.

**Denial misinformation:** We do not allow content that denies the existence of specific health conditions.

These policies apply to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube. This isn't a complete list.

**Prevention misinformation**

Harmful substances & practices as prevention methods

- Promotion of the following substances and treatments that present an inherent risk of severe bodily harm or death:
  - Miracle Mineral Solution (MMS)
  - Black Salve
  - Turpentine
  - B17/amygdalin/peach or apricot seeds
  - High-grade hydrogen peroxide
  - Chelation therapy to treat autism
  - Colloidal silver
  - Ozone therapy

- Gasoline, diesel and kerosene
- Content that promotes use of Ivermectin or Hydroxychloroquine for the prevention of COVID-19.

## Guaranteed prevention misinformation

- Claims that there is a guaranteed prevention method for COVID-19.
- Claims that any medication or vaccination is a guaranteed prevention method for COVID-19.

## Vaccine misinformation

- Claims that contradict health authority and World Health Organization guidance on **safety, efficacy** and **ingredients of currently administered and approved vaccines**.
  - **Vaccine safety:** Content alleging that vaccines cause chronic side effects, such as cancer or paralysis, outside of rare side effects that are recognized by health authorities.
    - Examples:
      - Claims that the MMR vaccine causes autism.
      - Claims that any vaccine causes contraction of COVID-19.
      - Claims that vaccines are part of a depopulation agenda.
      - Claims that the flu vaccine causes chronic side effects such as infertility, or causes contraction of COVID-19.
      - Claims that the HPV vaccine causes chronic side effects such as paralysis.
      - Claims that an approved COVID-19 vaccine will cause death, infertility, miscarriage, autism, or contraction of other infectious diseases.
      - Claims that achieving herd immunity through natural infection is safer than vaccinating the population.
      - Content that promotes the use of unapproved or homemade COVID-19 vaccines.
  - **Vaccine efficacy:** Content claiming that vaccines do not reduce transmission or contraction of disease.
    - Examples:
      - Claims that vaccines do not reduce risk of contracting illness.
      - Claims that vaccines do not reduce the severity of illness, including hospitalization or death.
      - Claims that any vaccine is a guaranteed prevention method for COVID-19.
  - **Ingredients in vaccines:** Content misrepresenting the ingredients contained in vaccines.
    - Examples:
      - Claims that vaccines contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal byproducts.
      - Claims that vaccines contain substances or devices meant to track or identify those who've received them.
      - Claims that vaccines alter a person's genetic makeup.
      - Claims that vaccines will make people who receive them magnetic.

### Additional resources

More information on vaccines, including their safety and efficacy, can be found below.

Health authority vaccine information:

- Centers for Disease Control and Prevention (CDC) (US)
- European Vaccination Information Portal (EU)
- National Health Service (UK)

- Korea Disease Control and Prevention Agency (Korea)
- National Health Mission (India)
- MHLW Immunization Information (Japan)
- National Vaccination Calendar (Brazil)
- Universal Vaccination Program (Mexico)
- World Health Organization vaccine safety (Global)
- World Health Organization vaccine preventable diseases (Global)

Additional vaccine information:

- American Academy of Pediatrics (US)
- GAVI, the Vaccine Alliance (Global)
- UNICEF (Global)

---

Transmission information

- Content that promotes transmission information that contradicts local health authorities or the World Health Organization.
  - Content that claims that COVID-19 is not caused by a viral infection.
  - Claims that COVID-19 is caused by radiation from 5G networks.
  - Content that claims COVID-19 is not contagious.
  - Content that claims that COVID-19 cannot spread in certain climates or geographies.
  - Content that claims that any group or individual has immunity to the virus or cannot transmit the virus.

**Treatment misinformation**

Harmful substances & practices as treatment methods

- Promotion of the following substances and treatments that present an inherent risk of severe bodily harm or death.
  - Miracle Mineral Solution (MMS)
  - Black salve
  - Turpentine
  - B17/amygdalin/peach or apricot seeds
  - High-grade hydrogen peroxide
  - Chelation therapy to treat autism
  - Colloidal silver
  - Ozone therapy
  - Gasoline, diesel and kerosene
- Content that recommends the use of specific methods for the treatment of cancer when those have not been approved by local health authorities or the World Health Organization as safe or effective or have been confirmed to be harmful or ineffective for cancer treatment.
  - Examples:
    - Content that promotes the use of the following methods for the treatment of cancer, outside of clinical trials:
      - Caesium chloride (cesium salts)
      - Hoxsey therapy
      - Coffee enema
      - Gerson therapy

• Content that claims that the following methods are safe or effective for the treatment of cancer, outside of clinical trials:

  • Antineoplaston therapy

  • Quercetin (intravenous injection)

  • Methadone

  • Over-the-counter chelation therapy

• Content that promotes use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19.

### Guaranteed treatment misinformation

• Content that claims that there is a guaranteed cure for cancer outside of approved treatment.

• Content that claims that there is a guaranteed cure for COVID-19.

### Harmful alternative methods & discouragement of professional treatment

• Content that claims that approved treatments for cancer are never effective.

  • Examples:

    • Content that claims that approved treatments for cancer, such as chemotherapy or radiation, are never effective.

    • Content that discourages people from seeking approved treatments for cancer.

• Claims that alternative treatments are safer or more effective than approved treatments for cancer.

  • Content that claims that juicing has better results than chemotherapy in treating cancer.

• Content that recommends alternative treatments in place of approved treatments for cancer.

  • Content that promotes diet and exercise instead of seeking approved treatment for cancer.

• Discouraging people from consulting a medical professional or seeking medical advice if they're sick with COVID-19.

• Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment for COVID-19 such as consulting a doctor or going to the hospital.

• Content that contradicts local health authorities' or the World Health Organization's guidance on the safety of chemical and surgical abortion:

  • Claims that abortion causes breast cancer.

  • Claims that abortion commonly results in or carries a high risk of infertility or future miscarriage.

• Promotion of alternative abortion methods in place of chemical or surgical methods deemed safe by health authorities.

• Promotion of alternative formulas for infants in place of breast milk or commercial formula.

**Denial misinformation**

• Content that denies the existence of COVID-19 or that people have died from COVID-19.

  • Examples:

    • Denial that COVID-19 exists

    • Claims that people have not died or gotten sick from COVID-19

    • Claims that there have not been cases or deaths in countries where cases or deaths have been confirmed by local health authorities or the WHO

# Educational, documentary, scientific or artistic content

We may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content discussing the results of a specific medical study, or showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

YouTube also believes people should be able to share their own experiences, including personal experiences with vaccinations, for example. This means we may make exceptions for content in which creators describe firsthand experiences from themselves or their family. At the same time, we recognize there is a difference between sharing personal experiences and promoting misinformation. To address this balance, we will still remove content or channels if they include other policy violations or demonstrate a pattern of promoting medical misinformation.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

Need more help?

Try these next steps:

Post to the help community
Get answers from community members

**EXHIBIT E-1**



# How Political Ads and Video Content Influence Voter Opinion

**Written by**
Kate Stanford

**Published**
March 2016

**Topics**
Video, Government & Education, Advertising

There are so many major moments that lead up to Election Day: debates, caucuses, primaries. But the moments that matter most won't make major headlines. They'll happen quietly and quickly in micro-moments, when undecided voters become decided voters, often by going online.



Voter decisions used to be made in living rooms, in front of televisions. Today, they're increasingly made in micro-moments, on mobile devices. Election micro-moments happen when voters turn to a device to learn about a candidate, event, or issue.

Today's voters want a quick way to catch up on the latest elections buzz and they've found it in online video. Since April 2015, people have watched more than 110 million hours of candidate- and issues-related content on YouTube. That's 100X the amount of time it would take to watch all content ever aired on CNN, C-Span, MSNBC, and Fox News combined.[1] Whether voters are looking for a debate sound bite, instructions on how to vote, or Stephen Colbert's latest burn, they turn to YouTube.

## Since April 2015, people have watched more than 110 million hours of candidate- and issues-related content on YouTube. That's 100X the amount of time it would take to watch all content ever aired on CNN, C-Span, MSNBC, and Fox News combined.

In fact, searches for election-related content on YouTube have grown by nearly 4X since presidential candidates started making their announcements last April.[2] And voters of all ages—not just young people—turn to YouTube in their I-want-to-know moments. While 59% of people who turn to online video to learn more about the candidates are under the age of 35, one in four are over the age of 45.[3]

So, how can candidates win these micro-moments to win in November? As the season heats up, here are three ways all candidates—whether they're running for a local seat, Congress, or the presidency—can meet voters in their micro-moments:

## 1. Be there: What online video trends reveal about voter micro-moments

Being there for voters in critical micro-moments means knowing what they're looking for. To get a map of voter wants and needs when it comes to video, we use Google Trends and filter by YouTube.

Here's a look at the trending topics since the presidential candidates launched their campaigns in April 2015 and how much search volume has grown on those topics.

Source: Google data, U.S., YouTube search interest in top issues, April 2015–February 2016.

### Top Video Search Trends for Political Issues

| Political Issue | Increase in searches since April 2015 |
| --- | --- |
| Refugees | +224% |
| Immigration | +51% |
| Gun Control | +27% |
| Economy | +22% |
| Health Care | +10% |

As you look at what voters want, ask yourself: Do I have the video content to answer their queries? Are my videos showing up for voters experiencing micro-moments on YouTube?

In Nevada, Hillary Clinton's campaign answered "yes" to both of those questions. First, her campaign created a moving video ad about the second issue on the list above: immigration. Then, the campaign used standard targeting features to try to reach voters who might be interested in the issue:



Thanks to the TrueView "skip" button, campaigns can get immediate feedback: Did viewers skip the ad, or choose to watch it? Based on that feedback, campaigns are able to adjust TrueView ads midflight. As The Wall Street Journal noted recently from the perspective of the Ted Cruz campaign, TrueView ads "offer the closest parallel to the power to persuade voters offered by classic TV ads, but allow for much better targeting."

## 2. Be useful and quick: How candidates' video content helps when micro-moments happen

Timing is everything when it comes to micro-moments. Voters don't just want the right content—they want it right now. While micro-moments can happen at any time, we see spikes in interest around key decision-making moments. Take the Iowa caucuses, for example, when voters went to YouTube to get informed: Watch Time Trends for Videos Related to the Iowa Caucuses



Watch Time Trends for Videos
Related to the Iowa Caucuses

● Video Watch Time

Source: Google data, U.S., classification as a
candidate-related "Iowa caucuses" video was
based on public data such as headlines, tags, etc.,
and may not account for every such video available
on YouTube, January 15–February 7, 2016.

The chart above shows watch time before, during, and after the Iowa caucuses. The first major spike was driven by people coming to YouTube to catch up on video of recent debates and town halls. The second was driven by people watching Donald Trump's caucus speech. Both are micro-moments experienced by voters en masse.

But it's not just political events, like debates and caucuses, that are shaping election watch time trends. Timely, cultural conversations spark voter micro-moments, too. For example, the week after same-sex marriage was legalized, watch time for related videos grew by 23X compared to the average of the three weeks prior: Watch Time Trends for Videos Related to Same-Sex Marriage



Watch Time Trends for Videos
Related to Same-Sex Marriage

**Same-sex marriage legalized**
Jun. 26

● Video Watch Time

6/16/15                    7/1/15                    7/11/15

Source: Google data, U.S., classification as a
candidate and issues-related "same-sex
marriage" video was based on public data
such as headlines, tags, etc., and may not
account for every such video available on
YouTube, June 2015–July 2015.

Some candidates are getting out in front of these micro-moments with
event- or issue-related content, combined with more targeted ads. In
an effort to get out the vote, Donald Trump's "Find Your Iowa Caucus
Location" video and Bernie Sanders' "How to Caucus in Iowa" explained to
Iowans how to register and caucus:





The Trump and Sanders campaigns knew voters would head to YouTube to ask "how to caucus" ahead of Iowa, and they were ready with two simple videos that offered step-by-step instructions. Talk about a decision-making moment: These videos could have meant the difference between showing up for your candidate on caucus day or staying home.

### 3. Be Influential: Who influences voter opinion in micro-moments

We've talked about understanding what voters are looking for in election micro-moments and when those moments occur most. But who carries the most sway in these moments? More than half of daily YouTube users ages 18–49 say their personal opinions (including politics) have been influenced by YouTube creators.[4]

Savvy politicians have taken advantage of YouTube creators' influence, taking interviews with them or partnering on videos to share in the dialogue. Six YouTube creators interviewed President Obama after his last two State of the Union addresses. And this election season, politicians are acting more like creators themselves. For example, Marco Rubio published several videos that are more in the style of creator Casey Neistat's "Ask Me Anything" videos than typical campaign TV ads:



Creators are, ultimately, master listeners. The most influential creators on YouTube listen for audience questions and create content that answers them. The most influential politicians on YouTube do, too.

At a time when politicians and pundits are asking, "Do Political TV Ads Still Work?," YouTube trends show that online video is now table stakes for political campaigns. In our connected world, video works hardest when it answers a need or want that voters experience in election micro-moments.

These micro-moments might occur before, during, or after a debate or in reaction to a cultural event. They might happen when voters need a question answered fast, like "how to caucus in Iowa." Politicians can have extra influence in micro-moments by working alongside creators or taking a page out of their playbooks, as Marco Rubio did.

Micro-moments are shaping the electorate in 2016. I, for one, can't wait to find out which candidate won the most micro-moments—who met the most voters in their decision-making moments on YouTube. We'll find out on November 8.

*Dive into the data to learn more about voter micro-moments with The Presidential Elections on YouTube - Trends Report 2016.*

## Sources

1 Google data, U.S., classification as election "candidates" and "issues" was based on public data such as headlines and tags, and may not account for every such video available on YouTube. Content broadcast by CNN, C-SPAN, Fox News, and MSNBC was estimated by adding the number of days since their first broadcast. April 2015–February 2016.

2 Google data, U.S., YouTube search interest related to election candidates and issues, April 2015–February 2016.

3 Google/Ipsos Connect, Google Elections Omnibus, U.S. adults 18+, n=2,022, January 2016.

4 Google/Ipsos Connect, "The YouTube Generation" study", U.S., 18–49 year-olds, n=1,125, November 2015

**EXHIBIT E-2**

Case: 23-16141, 09/11/2023, ID: 12799916, DktEntry: 9-2, Page 49 of 165



Advisor    Business                                                                      Advertiser Disclosure

# Top Social Media Statistics And Trends Of 2023

By  **Belle Wong, J.D.**                                    **Cassie Bottorff**

Contributor                                                 Editor     Reviewed By

Updated: May 18, 2023, 2:09pm

Editorial Note: We earn a commission from partner links on Forbes Advisor. Commissions do not affect our editors' opinions or evaluations.



Getty

## Table of Contents    ⌄

Recent announcements at Google I/O have propelled social media into an even larger share of the web spotlight. Platforms such as TikTok, Instagram, Facebook and YouTube are poised to become powerful marketing stages for your brand to interact with your audience.

And these major changes in search mean it's now crucial for marketers and small businesses to understand current social media trends and evolving user behaviors on these platforms. Our

Case: 23-16141, 09/11/2023, ID: 12790916, DktEntry: 9-2, Page 50 of 165

## Key Social Media Statistics

### In 2023, an estimated 4.9 billion people use social media across the world

The number of social media users worldwide has swelled to a record 4.9 billion people globally. What's more, this number is expected to jump to approximately 5.85 billion users by 2027.[1]

These aren't users tied to a single platform, either: The average user now spreads their digital footprint across a staggering six to seven platforms every month—highlighting the need for a multi-platform approach to social media marketing.

### Featured Partner



Advertisement ⓘ

1  **Nextiva**

**Learn More**

On Nextiva's Website

Pricing                    $149.99/ per month (Includes Social & Reputation)

Free Option                No

Supported Platforms        Facebook, Instagram, Twitter, Yelp!, YouTube, LinkedIn, Google Business Reviews, WhatsApp, Amazon Review

### The social media app market in 2022 was valued at $49.09 billion

This number isn't expected to stay stagnant, though, with forecasts predicting a compound annual growth rate (CAGR) of 26.2% from 2023 to 2030.[2] The driving force? The increasing global adoption of 5G technology. Social media platforms will need to continuously evolve to meet the

## The most used social media platform in the world is Facebook, with 2.9 million monthly active users across the world

Facebook's reign continues into 2023, but it doesn't stand alone. YouTube is hot on its heels, clocking in with 2.5 million monthly active users.[3]

These staggering numbers aren't just statistics, either. They highlight the expansive influence and potential of social media platforms. The takeaway for marketers? To harness the increasing power of social, marketing strategies will need to leverage these platforms effectively to engage with audiences. Using social media management tools effectively is crucial to capturing this traffic.



### Monthly Active Users by Social Media Platform (in millions)
Source: Statista

WhatsApp

Source: Forbes Adivsor • Embed

**Forbes** ADVISOR

## Facebook is the most visited social media site in America

The numbers back this up: Facebook commands 53% of all social media site visits in the United States.[3] It's a supremacy that remains unchallenged to date. Other platforms, despite their individual strengths and popularity, continue to find themselves in Facebook's shadow across desktop, mobile and tablet devices. This means Facebook remains essential for marketers aiming to capture and engage American audiences.

## People in the U.S. have an average of 7.1 social media accounts

turns out, on a global perspective, the average individual holds 8 [social media accounts.] Americans aren't far behind, with 7.1 accounts—in between the high of 11.5 accounts in India and Japan's more modest 3.8. These stats illustrate the broad and complex multi-platform landscape facing social media marketers.

## Social Media Usage Statistics

### The average person spends about 145 minutes on social media every day

Time is a precious commodity. So it's significant that the average person globally spends a significant portion of their day—about 145 minutes—on social media. Interestingly, Americans fall slightly below this average, clocking in at 2 hours and 7 minutes daily.[4]

To put this into perspective, if the average person maintained this usage over an average life span of 73 years, the end result is an astonishing 5.7 years spent on social media platforms.[7] For marketers, these numbers highlight the reach and potential of an effective social media strategy.

### The most engaging type of content on social media is short-form videos

Both brevity and authenticity are winning the day on social media, with short-form videos— typically less than a minute in length—capturing the attention of 66% of consumers. Highly shareable, these bite-sized videos are 2.5 times more engaging than longer videos, and 34% of consumers appreciate the more genuine nature of the shorter form.[5]

### The most common way people access social media is a mobile device

It comes as no surprise that the majority of people are tapping into social media through their mobile devices, but the number itself might raise some eyebrows: 99% use a tablet or smartphone to connect to social media, while 78% do so exclusively from their phones. At 1.32%, desktop social media users are dwarfed by their mobile-loving counterparts.[4] It's clear, then: mobile-focused social media strategies are key. Make sure that when you create a website for your business, you utilize a website builder that can reflexively optimize your site for both desktop and mobile experiences.

### The country where people spend the most average hours on social media is Nigeria

Nigeria tops the global charts in social media use, with its citizens averaging more than four hours a day on social networks—far surpassing the global daily average of 2 hours and 27 minutes.[3] Other emerging markets with youthful demographics such as the Philippines and India also show

## Social Media Platforms Statistics

### TikTok generated $350 million in revenue in Q4 of 2022

TikTok made headlines in Q4 2022, generating $350 million in revenue, easily outperforming—to the tune of $205 million—Facebook, Instagram, Twitter and Snapchat combined.[6] For marketers who've been sitting on the fence about TikTok, these stats are a clear sign of the platform's significant potential.

### 52% of internet users use YouTube as least once a month

YouTube's numbers reflect its expansive reach, with 52% of internet users accessing the video-sharing giant at least once a month. As of 2023, the platform boasts 2.68 billion active users, as well as 80 million YouTube Premium subscribers. It's also established itself as the second-largest search engine in the world, next to its parent Google.[1]

### 84% of people aged 18 to 29 use at least one social media site

Social media usage has typically skewed toward the younger demographic, with 84% of those aged 18 to 29 and 81% of people between 30 to 49 actively using at least one social media site. But this active usage trend continues in the older demographics as well, with 73% in the 50 to 64 range and a somewhat surprising 45% of those in the 65-plus group.[7]

The takeaway? This evolution of social media to better mirror the demographics of the broader overall population emphasizes the importance of age-differentiated strategies when planning out social media campaigns.

## Percentage of each age group that uses at least one social media site

Source: PewResearch

| Age group | Percentage |
| --- | --- |
| 18-29 | 84% |
| 30-49 | 81% |
| 50-64 | 73% |
| 65+ | 45% |

## The average CTR of ads across social media was 1.21% in 2022

Data from 2022 shows that the average click-through rate (CTR) across all social media platforms was 1.21%—a slight dip from the previous year's CTR of 1.3%.[3] Despite this minor decline, the numbers highlight the continuing need to create compelling social media ad campaigns to maximize engagement and conversion.

## 77% of businesses use social media to reach customers

Businesses are often among the first to leverage the power of new technology, so it makes sense that, in an increasingly digital business landscape, 77% of small businesses use social media to connect with their customers. In addition to building brand awareness (44%), a significant number of small businesses—41%—also depend on social media as a revenue driver.[8]

## 90% of users follow at least one brand on social media

Social media's reach is everywhere these days, as evidenced by the 90% of social media users who are following at least one brand.[9] It's a powerful illustration of the shift in consumer behavior towards more direct and engaged relationships with brands—and a strong indication of the importance of brands' strong social media presence to establish and maintain brand loyalty.

## 76% of social media users have purchased something they saw on social media

While the purchase pathway varies—with 11% buying immediately, 44% deferring online purchases for later and 21% opting to buy in-store—the 76% of users who have bought a product based on a brand's social media post reflects how social media has changed the face of retail.[10]

# Influencer Statistics

## Half of Millennials trust influencers' product recommendations

In a twist of trust worthy of prime-time consideration, 50% of Millennials place their faith in social media influencers' product recommendations, surpassing their trust in their favorite celebrities, which stands at 38%.[11] The key driver behind this trust? Authenticity: An impressive 88% of Millennials say they value authenticity in the influencers they follow—laying out a clear framework, rooted in relatability and sincerity, for marketers to follow.

## 3.8 million posts on Instagram had the hashtag "ad" in 2021

Instagram saw an impressive uptick in ad content in 2021, with 3.8 million posts worldwide donning the #ad hashtag—a significant 27% hike from the 3 million reported by the social media

## Influencer spending hit $4.14 billion in 2022

Influencer marketing took a quantum leap in 2022, as expenditure in this realm skyrocketed to $4.14 billion.[3] It's an impressive number, marking an increase of around a billion dollars from the previous year's numbers. With this kind of trajectory, the future looks bright for influencer marketing.

## The minimum average cost of a sponsored YouTube video with 1 million views is $2,500

On the YouTube sponsorship landscape, 2022 saw an average minimum price tag of $2,500 for videos garnering over a million views. Videos that racked up between 500,000 to a million views came in at a more modest $1,105—and a more hefty average maximum price of $16,234.[3]

## The minimum average cost of an Instagram post with 1 million followers is $1,200

Influencers on Instagram with over a million followers saw their star power translate into posts that fetched an average minimum price of $1,200 in 2021. Macro-influencers (with followers ranging from 100,000 to a million), meanwhile, settled for a lower average minimum cost of $185 per post, with potential to escalate to an average maximum cost of $2,500.[3]

## The minimum average cost of a Tik Tok post with 1 million followers is $1,034

TikTok mega-influencers, with a fan base of over a million followers, commanded an average minimum price of $1,034 per video. Macro-influencers on the platform, with followings of between 100,000 to a million, saw a lower average minimum of $151 per post, with the possibility of netting an average maximum of $793.[3]

## Social Media and Mental Health Statistics

### 39% of social media users report that they are addicted to social media

A whopping 39% of U.S. online users admit to feeling the addictive pull of the digital rabbit hole that is social media, with 9% of these users agreeing completely with the statement "I am addicted to social media."[3] It appears a sizable proportion of users find the dopamine-fueled allure of social media difficult to resist.

### Research shows that there is a correlation between social media use and depression for adolescents

Researchers have also found that social media can foster diverse friendships and provide easily accessible support.[12]

There's even the potential for social media to serve as a crucial tool in the early detection of depressive signs.[12] Overall, there's a definite need for a nuanced understanding of the complex relationship between social media and adolescent mental health and the development of targeted interventions.

### 67% of adolescents report feeling worse about their own lives as a result of their social media use

Social media is a complex web for today's teens: While 67% feel a dip in self-esteem as they compare their lives with the filtered "realities" they see on social media, 73% report finding solace and support on these platforms during tough times.[13] It's a delicate balance that reflects the multifaceted impact of social media on young lives.

### Adolescents who spend more than three hours a day on social have an increased risk of mental health struggles

For many teens, social media can be a slippery slope leading to mental health issues. Research has found that teens who spend over three hours daily on social media platforms are more likely to internalize problems—suggesting that excessive social media use could be silently contributing to adolescent mental health struggles.[14]

Potential solutions? Limiting social media time, increasing media literacy and redesigning platforms might be keys to healthier digital interactions to counter this troubling trend.

## Social Media Trends for 2023

### As of April 2023, the fastest-growing social media platform is BeReal

BeReal has been lighting up the social media stage, with a 313% surge in user interest reflecting a rapid climb from 0.7% to 2.8% usage. Here's the real headline: BeReal's 1,200% increase in Gen Z usage.[15] Whether its commitment to authentic, unfiltered content will prevail against the threat of imitation and potential obscurity is still to be seen.

### 81% report that social media increases accountability for businesses

Today's brands are held to a higher standard than friends, family and even politicians, with a staggering 81% of individuals believing social media has raised the bar for business accountability.

foster strong brand-consumer bonds.

## Featured Partner

Advertisement 



| | Nextiva |

**Learn More**

On Nextiva's Website

| Pricing | $149.99/ per month (Includes Social & Reputation) |
|---|---|
| Free Option | No |
| Supported Platforms | Facebook, Instagram, Twitter, Yelp!, YouTube, LinkedIn, Google Business Reviews, WhatsApp, Amazon Review |

## The social media advertising market is expected to reach $207 billion in 2023

Ready, set, launch: The social media advertising market is set to soar to an astounding $207.10 billion in 2023, with an impressive 4.53% annual growth rate projected to take the market even higher, to $247.30 billion by 2027.[3] It's a bright-looking future that offers plenty of untapped opportunities for brands and marketers alike.

## The Bottom Line

Social media is about more than just apps and platforms: It's a digital environment that's clearly reshaping the world of marketing. Platforms such as TikTok, Instagram, Facebook and YouTube are the arenas where your brand can truly connect, engage and grow with your audience. With our 2023 social media statistics as a road map, embrace the evolution of social media and watch your brand story unfold in captivating ways.

Visit our hub to view more statistic pages.

1. DemandSage

2. Grand View Research

3. Statista

4. Backlinko

5. SproutSocial

6. Forbes

7. Pew Research

8. Score.org

9. Instagram

10. Retail TouchPoints

11. Morning Consult

12. NCBI

13. Healio

14. Jama Psychiatry

15. Hubspot

💬 Was this article helpful?    **SHARE YOUR FEEDBACK**

BUYING GUIDES

Best VPN Services

Best Project Management Software

Best Web Hosting Services

Best Antivirus Software

Best LLC Services

Best POS Systems

Best Business VOIP Services

Best Conference Calling Services

Best Credit Card Processing Companies

Best CRM Software for Small Business

Best Business Loans

GUIDES

---

How to Start a Business?

How To Make A Website For Your Brand Or
Small Business

How To Trademark A Name

What Is An LLC?

How To Set Up An LLC In 7 Steps

What is Project Management?

Why Use a VPN?

# Next Up In Business

---

Best VPN Services

Best Project Management Software

Best Web Hosting Services

Best Antivirus Software

Best LLC Services

Best POS Systems For Small Business

**More from Forbes ADVISOR**



## What Is The Five Eyes Alliance?

By **Kathy Haan** Contributor



## Coda vs. Notion (2023 Comparison)

By **Anna Baluch** Contributor



## What Is Mobile Security? Definition & Best Practices
By **Shweta** Contributor



## How To Get A Business License In Indiana (2023)
By **Jacqueline Nguyen, Esq.** Contributor



**What Is EDR? Endpoint Detection & Response**
By **Shweta** Contributor



**Confluence vs. Jira (2023 Comparison)**
By **Anna Baluch** Contributor

Case: 23-16141, 09/11/2023, ID: 12789916, DktEntry: 9-2, Page 63 of 165

brokerage services, nor do we recommend or advise individuals or to buy or sell particular stocks or securities. Performance information may have changed since the time of publication. Past performance is not indicative of future results.

Forbes Advisor adheres to strict editorial integrity standards. To the best of our knowledge, all content is accurate as of the date posted, though offers contained herein may no longer be available. The opinions expressed are the author's alone and have not been provided, approved, or otherwise endorsed by our partners.



**Belle Wong, J.D.**

Contributor

Belle Wong is a freelance writer specializing in small business, personal finance, banking, and tech/SAAS. She spends her spare moments testing out the latest productivity apps and plotting her latest novel. Connect with Belle on LinkedIn or Twitter.



# Forbes

© 2023 Forbes Media LLC. All Rights Reserved.

AdChoices    Privacy Statement    Terms and Conditions    About Us    Contact Us    Careers    Coupons

Newsroom    Forbes Quote of the Day    Advertise

Cookie Preferences

# EXHIBIT F

| From: | Flaherty, Rob EOP/WHO ███████████████████████████████ |
| --- | --- |
| Sent: | 4/22/2021 12:05:16 AM |
| To: | ██████████████████@google.com]; ████████████@google.com]; ██████████@google.com]; ██████████@google.com; ██████████@google.com; ██████████@google.com; ██████████@google.com] |
| CC: | Slavitt, Andrew M. EOP/WHO ████████████@who.eop.gov]; Humphrey, Clarke EOP/WHO ██████████@who.eop.gov]; Fitzpatrick, Kelsey V. EOP/WHO ██████████████@who.eop.gov] |
| Subject: | Following Up on Today's Conversation |

All – Thanks again for the conversation today.

We'll look out for the top trends that you've seen in terms of misinformation around the vaccine.

To recap: As we move away from a supply problem toward a demand problem, we remain concerned that Youtube is "funneling" people into hesitance and intensifying people's hesitancy. We certainly recognize that removing content that is unfavorable to the cause of increasing vaccine adoption is not a realistic – or even good – solution. But we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. This is a concern that is shared at the highest (and I mean highest) levels of the WH, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out.

Just before we were meeting, this article from Buzzfeed popped, highlighting the Youtube misinformation that is spreading through the Vietnamese community. I think this brings up a question that I had in our first meeting about your capabilities around misinformation in non-english-speaking communities. Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages – how your enforcement has differed in languages and what your road map to improvement is.

A couple of other things it would be good to have from you all:

• As mentioned up top, the top trends that you're seeing in terms of misinformation/hesitance inducing content (Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing)

• A deeper dive on reduction and its effectiveness. It's helpful that you mentioned that watch time is your key metric. I believe you said you reduced watch time by 70% on "borderline" content, which is impressive. Obviously, the term "borderline" is moveable, but taking it for what it is: How does that track with vaccine-related content specifically (removing the "UFO stuff"). What has the comparative reduction in watch time on "borderline" vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?

• I appreciated your unequivocal response that you are not recommending anti-vaccine content and you are lifting authoritative information in both search and recommendations to all audiences. Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a "strike" still being recommended and shown in prominent search positions?

• I feel like I am not coming away with a very clear picture of how you're measuring the effectiveness of uplifting authoritative information. I obviously buy the theory – but how did you arrive at info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? What are you doing mechanically to boost the authoritative information? When you have relevant influencers speak to experts, I imagine (hope?) it's not just putting the content out there and that you're recommending it to people for whom it would be most relevant. How does that work?

• What are the general vectors by which people see the "borderline" content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?

We are excited to continuing partnering with you on this work as we have via ████████████ but we want to make sure that the work extends to the broader problem. Needless to say, in a couple of weeks when we're having trouble

MOLA_DEFSPROD_00018147

getting people to get vaccinated, we'll be in the barrel together here. We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly?

Looking forward to more conversation.

-Rob

**Rob Flaherty**
Director of Digital Strategy
The White House
Cell: ▮▮▮▮▮▮▮▮

**EXHIBIT G**

**OSG**. Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, OSG responds that the following meetings took place with the Social-Media Platforms relating to Misinformation:

- On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Slavitt from the White House met remotely with Nick Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg. Misinformation may have been discussed.

- On July 12, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG met remotely with Lauren Culberton and Todd Boyle from Twitter. Kyla Fullenwider from U.S. Digital Response was invited and may have also attended. The meeting provided notice of the upcoming OSG Advisory and a high-level view of what issues OSG would be prioritizing in the Advisory.

- On July 14, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG met remotely with Kevin Kane from YouTube, Jan Antonaros from Google, and Ariel Altman from YouTube. The meeting provided notice of the upcoming OSG Advisory and a high-level view of what issues OSG would be prioritizing in the Advisory.

- On July 16, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG and Kyla Fullenwider from U.S. Digital Response met remotely with Payton Iheme and Justine Isola from Facebook. Kate Thornton and Brian Rice from Facebook were invited and may have also attended. The meeting discussed the newly issued OSG Advisory.

- On July 23, 2021, from 1:30 pm to 2:00 pm ET, Dr. Vivek Murthy and Eric Waldo from OSG, and D.J. Patil (who OSG understands to be a then part-time consultant

32

supporting the Office of Science Technology and Policy) met remotely with Nick Clegg and (very likely) Brian Rice from Facebook. The meeting discussed a recent e-mail from Mr. Clegg to Dr. Murthy concerning recent public comments by the Administration about Facebook.

- On July 30, 2021, from 2:00 pm to 2:30 pm ET, Eric Waldo from OSG met with Kevin Kane from YouTube, Lauren Kelly from Google, and Jan Antonaros from Google. The topics discussed included YouTube/Google following up on the announcement of the OSG Advisory to share more of the work it was doing around health mis- and disinformation.

- As indicated by MOLA_DEFSPROD_00007276, on August 10, 2021, there was a call between Eric Waldo from OSG, Robert Flaherty from EOP, and personnel from Facebook that discussed, as stated in the document, "an operation [Facebook] uncovered that is related to vaccine misinformation."

- As indicated by MOLA_DEFSPROD_00007455, on or about September 14, 2021, there was a call between Eric Waldo from OSG and Kevin Kane and Jan Antonaros from Google/YouTube. As stated in the document, the purpose was "a brief meeting to discuss a new policy we are working on as well as provide an update on our overall efforts to combat harmful COVID-19 misinformation on the platform."

- As indicated by MOLA_DEFSPROD_00007398, on November 22, 2021, from 4:00 to 4:30 pm ET, there was a virtual meeting attended by Tericka Lambert, other ASPA personnel, personnel from Fors Marsh Group (a contractor for ASPA), personnel from OSG, and Google/YouTube personnel. This meeting briefly touched on misinformation among other topics.

The above list reflects OSG's identification to date, based on reasonably diligent efforts, of meetings that took place with the Social-Media Platforms relating to Misinformation and the included participants. OSG is not aware of specific additional meetings with the Social-Media Platforms relating to Misinformation, but it is possible that the above list is not exhaustive.

**NIAID.** Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, NIAID responds that no meetings took place with the Social-Media Platforms relating to Misinformation. NIAID has identified two possible meetings to discuss the potential participation by the NIAID director in U.S. Government efforts to publicize health information and provide COVID-19 and vaccine education via social media, which are not responsive to the Interrogatory, but are identified in the documents being produced in response to Plaintiffs' First Requests For Production to Defendants:

- Facebook approached NIAID in March 2020 to discuss public service announcements and ads, Facebook's CV19 hub, and an interview between Dr. Fauci and Mark Zuckerberg; NIAID scheduled the interview between Dr. Fauci and Mr. Zuckerberg (which aired on Facebook Live)
- NIAID was invited to, but did not attend, a meeting scheduled for March 4, 2021, to discuss possible Facebook Live interviews with celebrities/influencers related to COVID-19 vaccines

Further, in accordance with the Court's September 6, 2022 Order, subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, including consultation with Dr. Fauci and review of Dr. Fauci and NIAID staff e-mail records, NIAID responds on behalf of Dr. Fauci in his role as Director of NIAID as follows: NIAID has not identified any communications, written or

**<u>VERIFICATION</u>**

I, Max Lesko, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the interrogatory response of the Office of the Surgeon General to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories dated July 18, 2022, Common Interrogatories Numbers 1-5 and Additional Interrogatories Numbers 1-3, contained in the Responses of the Office of the Surgeon General, is true and correct, to the best of my knowledge.

Dated: December ___16___, 2022

*Max Lesko*
_____

Max Lesko

Chief of Staff

Office of the Surgeon General

# EXHIBIT H

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF LOUISIANA
2                      MONROE DIVISION

3

4    THE STATE OF MISSOURI, et al.,

5         Plaintiffs,

6    vs.                          Case No.
                                  3:22-cv-01213-TAD-KDM
7    JOSEPH R. BIDEN, JR., et al.,

8         Defendants.

9

10

11

12

13

14       VIDEORECORDED VIDEOCONFERENCED DEPOSITION
                      OF ERIC WALDO
15                  DECEMBER 22, 2022

16

17

18

19

20

21

22

23

24

25
```

**ERIC WALDO  12/22/2022**

**Page 117**

1  And all of them had -- you know, had an opportunity

2  to improve how they were handling this issue.  And

3  our job was to raise this as an issue so folks

4  could know about it and hopefully take steps to --

5  to ameliorate the situation.

6        **Q.    Yeah.  And that -- those taking steps**

7  **to ameliorate would include social media platforms,**

8  **correct?**

9        A.    Correct.  But I would again

10  highlight, you know, when you think about our --

11  the advisory but also the work we were doing, the

12  -- the community toolkit, we recognize that we did

13  call for an all-society approach, and we recognize

14  that there are multiple ways to stop or lessen the

15  spread or damage of misinformation, including

16  individuals and others.  You know, it's -- it's not

17  just -- it wasn't just a technology company issue

18  or a social media issue.

19        **Q.    Are you aware who devised that phrase**

20  **all-of-society approach to describe the advisory --**

21  **or the advisory --**

22        A.    I'm not --

23        **Q.    -- recommendations?**

24        A.    I'm not aware.

25        **Q.    Scrolling down in Exhibit 3, the next**

 1   bullet point talks about meeting on July 30th, 2021

 2   between yourself and representatives of

 3   Google/YouTube, correct?

 4        A.    That is correct.

 5        Q.    And the interrogatory responses

 6   supplied as topics discussed included in

 7   YouTube/Google, following up on the announcement of

 8   the OSG advisory to share and work the work it was

 9   doing around health mis- and disinformation,

10   correct?

11        A.    That's correct.

12        Q.    What do you remember being said about

13   that in this phone call or Zoom call?

14        A.    It was a Zoom call.  I think it was

15   really just the YouTube and Google teams saying,

16   hey, we agree that this is a really important

17   issue, and here's all the things that -- that we

18   are working on about it.  So it was -- it was them

19   informing us of the steps they are currently

20   taking.

21        Q.    And I believe you said part of the

22   follow-up call with Facebook was to ask them to,

23   you know, give a report on any steps they would be

24   taking in response to the health advisory, correct?

25        A.    Correct.

ERIC WALDO  12/22/2022

Page 119

```
 1          Q.    And is that what's going on here with
 2  -- with YouTube as well, to ask them, okay, we've
 3  issued a health advisory.  What are you guys doing
 4  about it?
 5          A.    I think they -- they asked for the
 6  call.  So this was a little different.  They asked
 7  for the call on their own to share with us what
 8  they were doing.  I think they -- from a government
 9  affairs perspective, public affairs people were
10  trying to say, hey, look, you know, we agree with
11  you, and we want to let you know all the things
12  we're doing.
13          Q.    Did the report --
14          A.    And, again, I think --
15          Q.    Go ahead.
16          A.    And I would think, right, we had
17  first had that first call to let them know the
18  report was coming out.  The report came out.  They
19  looked at it, and then they said, hey, we've looked
20  at it.  Let us tell you, you know, what we're
21  doing.
22          Q.    And in the first call you had
23  mentioned, I think, that you advised them that
24  there would be some potential recommendations for
25  them, right?
```

```
 1         A.    That there were recommendations for
 2    -- I think they -- certainly within the advisory
 3    there are recommendations for what social media
 4    companies can do.
 5         Q.    And then in the follow-up call, they
 6    came back to you and said, okay, we've read the
 7    advisory and here are steps that we are taking or
 8    plan to take in response to the issues raised in
 9    the advisory?
10         A.    I don't recall specifically, but that
11    was -- the general tone was let us tell you what
12    we're doing about this issue.  I didn't -- I didn't
13    get the impression that it was new things.  I got
14    the impression that it was work that they were
15    already doing.
16         Q.    What did they report to you?
17         A.    I don't really remember, but I think
18    it was generally saying, hey, we have a -- you
19    know, we have a team that does -- that works on
20    this issue.  Like we're -- you know, it's important
21    to us.  Like we're thinking about how we're
22    addressing it.
23              Just it was, I think, more of a
24    process call of saying, you know, we want you to
25    know this is on our agenda.
```

```
1          Q.    So did they, for example, report that
2    they had adopted new policies to address
3    misinformation on YouTube?
4          A.    I don't recall.
5          Q.    Or did they give indication they were
6    taking more steps to kind of remove more harmful
7    information on YouTube?
8          A.    I don't recall if there was a new.  I
9    recall them telling us what they were currently
10   doing to address that.  So I -- and some of these
11   calls I experienced as them -- you know, they read
12   the advisory and said, yeah, we are doing that.
13   Thanks.  You may not know all the things we're
14   doing, so let us share with you what we're doing.
15         Q.    And you don't -- you don't remember
16   whether they, you know, advised you of kind of new
17   policies, like, hey, you raised an issue for us,
18   and -- and here's are some things we're going to do
19   to respond to it?
20         A.    I don't recall.  I think I would
21   remember because if it was the something new, I
22   feel like we would have shared it or probably done
23   something like put it in a fact sheet to say, look,
24   because of this report, these many new things are
25   happening.
```

```
 1          Q.     Did you do that for any of them?  Did
 2   you issue any fact sheets saying, you know, here
 3   are some positive developments that came out of the
 4   health advisory?
 5          A.     I don't remember.  I don't think so.
 6   The only time that could have happened would have
 7   been when we did the -- that -- what I keep calling
 8   the community toolkit, but I don't recall -- I do
 9   remember Twitter tweeted something in support of
10   Dr. Murthy's advisory.
11               So when we launched on whatever, the
12   15th or 16th, the Twitter policy handle I think
13   either retweeted or quote tweeted and said
14   something like, we agree.  This does call -- we do
15   need an all-society approach, and here's what we're
16   doing.  So that's my one recollection.
17          Q.     And we talked earlier about how there
18   was a particular focus on Facebook on July 15th and
19   16th, and you mentioned that, I think, Jennifer
20   Psaki mentioned Facebook specifically in the press
21   conference and President Biden said "They're
22   killing people," the next day.
23               Do you know why the White House
24   thought a particular focus on Facebook was
25   appropriate?
```

**ERIC WALDO  12/22/2022**

**Page 128**

```
 1   of -- something they discovered.  I think it ended

 2   up being like a foreign entity was doing work on

 3   Facebook, spreading -- I don't know if it -- what

 4   type of misinformation, but they were letting us

 5   know that they discovered it.

 6         Q.    Do you know why they thought to brief

 7   you guys on that?

 8         A.    I do not --

 9         MS. CHUZI:  Objection.  Calls for

10   speculation.

11         THE WITNESS:  I don't know why.

12         Q.    (BY MR. SAUER)  Scrolling down

13   another bullet point, there's a reference to a

14   September 14th meeting between yourself and Kevin

15   Kane and Jan Antonaros at Google/YouTube, correct?

16         A.    That is what the document says,

17   correct.

18         Q.    Yeah.  And do you recall that meeting

19   or phone call?

20         A.    Not really.  That's actually a few

21   days before my first child was born, so I don't --

22   I -- I vaguely remember this.

23         Q.    You had other matters on your mind at

24   that time?

25         A.    I -- I did.
```

```
 1        Q.     It -- it -- it -- it says the purpose
 2   was a brief meeting to discuss a new policy we are
 3   working on as well as provide and update on our
 4   overall efforts to combat harmful COVID-19
 5   misinformation on the platform, right?
 6        A.     That's what it says, yes.
 7        Q.     So this would have been, I take it, a
 8   kind of second update by them to you following the
 9   health advisory of stuff they're doing to combat
10   harmful COVID-19 misinformation through YouTube,
11   correct?
12        A.     That's correct.
13        Q.     So first, they provided that update,
14   I think, on the July 30th meeting that we talked
15   about above, correct?
16        A.     Yes.
17        Q.     And then they --
18        A.     Correct.
19        Q.     Sorry.  And they followed up again on
20   September 14th of another update of, you know, kind
21   of telling the Surgeon General's office what they
22   were doing to fight misinformation?
23        A.     That's correct.
24        Q.     Do you know what it was -- it says
25   they gave some kind of update on overall efforts to
```

```
 1    combat harmful COVID-19 misinformation on the

 2    platform.  Do you know what those efforts were?

 3          A.    I don't recall.

 4          Q.    Do you remember anything specific

 5    about what YouTube and Google were doing in this

 6    time frame to kind of remove or -- or reduce the

 7    spread of misinformation?

 8          A.    I don't recall.

 9          Q.    It also says that they were -- the

10    meeting was to discuss a new policy we were working

11    on.  Do you remember that?

12          A.    I do not.

13          Q.    Do you know what new -- was that a

14    new policy that related to misinformation?

15          A.    I'm not sure.

16          Q.    Or a new policy related to something

17    unrelated?

18          A.    I don't recall.

19          Q.    You remember YouTube and Google

20    raising anything that was unrelated to the health

21    advisory about this information and these two

22    calls?

23          A.    I don't recall.

24          Q.    So you don't know whether other

25    topics came up or if they were just focused on
```

```
 1    health misinformation following the advisory?
 2         A.    I'm not certain.  I don't recall.
 3         Q.    Do you remember anything specific
 4    that was said in this call on September 14th?
 5         A.    I do not.
 6         Q.    Did you say anything?
 7         A.    I mean, I would have, in general,
 8    been -- tried to greet them, asked them how they
 9    were doing, and certainly asked them, you know, be
10    -- expressed some sort of feeling of, you know,
11    interest in what they wanted to share.
12         Q.    Okay.  But do you remember saying
13    anything in response to what they did share about a
14    new policy and update on overall efforts to combat
15    harmful misinformation?
16         A.    I do not.
17         Q.    Going down a little further, last
18    bullet point here refers to a meeting on
19    November 22nd, 2021.  It mentions that personnel
20    from OSG were involved in this meeting.  Do you
21    remember -- were you involved in this meeting?  Do
22    you know?
23         A.    I don't think so.  I do not believe
24    so.  If I was on it -- if I was in the meeting, I
25    would have identified it.
```

ERIC WALDO 12/22/2022

Page 296

```
 1    focused, given your personal situation at the time,
 2    but do you know whether there was a briefing on
 3    this?
 4         A.    I do not.
 5         Q.    Do you know whether Facebook talked
 6    to, you know, Courtney, Rob Flaherty, DJ Patil
 7    about this in your absence?
 8         A.    I do not.
 9         Q.    Exhibit 31.  Do you remember this
10    e-mail from the Google/YouTube team in
11    September 29th?
12         A.    So I would have been on paternity
13    leave during this time.
14         Q.    Okay.  And in this e-mail, they
15    report back to you and Nancy S. Negron about --
16         A.    Negron.
17         Q.    Yeah, who's she?
18         A.    Nancy Negron was my deputy director
19    of engagement.
20         Q.    And they report back about having a
21    COVID-19 vaccine misinfo policy that allows them to
22    remove a limited list of verified false claims
23    about COVID vaccines, right?
24         A.    Yes, that's what the e-mail says.
25         Q.    And they also report back to you guys
```

```
 1    that they're introducing a new policy that
 2    prohibits content that includes harmful
 3    misinformation about the safety, efficacy, and
 4    ingredients for the vaccines, right?
 5         A.    Yes, that's what the e-mail says.
 6         Q.    Is this an unsolicited e-mail or are
 7    they responding to some kind of communication or
 8    request from you guys, do you know?
 9         A.    I'm not positive, but it would appear
10    to be an unsolicited e-mail.
11         Q.    I know that you had said earlier that
12    you reached out to Facebook, Twitter, and YouTube
13    in the aftermath of the health advisory that --
14    to -- to see what steps they were taking.  Is that
15    response to that request for information?
16         A.    Could be.  I'm not certain, to be
17    honest with you.  But based on both my departure --
18    and I think I had had an out-of-office at this
19    moment, which may have led them to add Nancy.
20    Nancy was also just coming on, and I don't think
21    her HHS e-mail had been set up yet, but I'm not --
22    I'm not positive.
23         Q.    Let's look at Exhibit 32.  Can you
24    see this one on screen share?
25         A.    Yes, I see this note.
```

**ERIC WALDO  12/22/2022**

```
 1                 THE VIDEOGRAPHER:  The time is 3:41

 2   p.m. Central Standard Time.  We are back on the

 3   record.

 4        Q.   (BY MR. SAUER)  Mr. Waldo, you're

 5   aware that on March 3rd the Surgeon General's

 6   office issued a Request For Information about

 7   social media misinformation.  You recall that?

 8        A.   Yes.

 9        Q.   Yeah.  And here on the screens share,

10   I'm showing you Exhibit 42 that I previously

11   e-mailed your counsel.  (Technical difficulty) this

12   the RFI --

13        A.   That's correct.

14        Q.   -- on here, right?  Yeah.  Called

15   Impact of Health Misinformation on the Digital

16   Information Environment in the United States

17   Through the COVID-19 Pandemic Request for

18   Information, right?

19        A.   That's correct.

20        Q.   And were you involved in formulating

21   this RFI at all?

22        A.   I was involved in meetings where the

23   -- where there was a discussion about whether or

24   not to do this RFI or for the overall strategy

25   around -- around this data by -- with -- with the
```

1    team, yes.

2         Q.    Overall strategy.  What overall

3    strategy was there with -- regarding this RFI?

4         A.    I'm sorry, I didn't say strategy

5    about this RFI.  Strategy whether or not there was

6    going to be additional data requests to make and

7    how to make them.

8         Q.    Oh.  You mean additional data

9    requests.  What do you mean by that?

10        A.    I mean -- I shouldn't say additional.

11   I think there was a question of whether or not we

12   were going to -- going to make questions, you know,

13   ask for -- given that the -- given the

14   conversations with Facebook and others, was there

15   something more constructive we could do around

16   helping researchers have a better understanding of

17   what's happening in this community.  And so

18   ultimately, the RFI was -- was determined as the

19   path forward.

20        Q.    Okay.  So were there other paths

21   forward (technical difficulty) Surgeon General's

22   office --

23             (A discussion was held off the

24   record.)

25        Q.    (BY MR. SAUER)  Were there other

**ERIC WALDO  12/22/2022**

```
 1    paths forward about COVID-19 misinformation that
 2    the Surgeon General's office did or was this the
 3    only one at this time?
 4             MS. CHUZI:  Objection.  To the extent
 5    that question calls for information covered by the
 6    deliberative process privilege, I will instruct the
 7    witness not to answer.
 8             THE WITNESS:  On the advice of
 9    counsel, I will not answer the question.
10        Q.   (BY MR. SAUER)  I'm not asking about
11    deliberations.  I'm asking if there were actions
12    taken.  Did the Surgeon General's office do
13    anything other than RFI to address issues of COVID
14    misinformation in this time frame?
15        A.   Not to my knowledge.
16        Q.   Scrolling down, were you involved in
17    formulating, you know, kind of what kind of
18    information to ask for here in the RFI?
19        A.   No.
20        Q.   Who was involved in formulating kind
21    of the specific types of information to ask for?
22        A.   I think Kyla was the primary driver
23    on the RFI from a content expert perspective.
24        Q.   That's Kyla Fullenwider?
25        A.   That's correct.
```

1      Q.    Do you know if she had input from

2  Renee DiResta or other academics in formulating the

3  RFI?

4      A.   I do not.

5      Q.    Do you know -- do you know who she --

6  who she would have worked with in formulating it?

7      A.   I do not.

8      Q.    Do you know if anyone besides Kyla

9  had any input into what information to ask for?

10     A.   I know that Kyla was running these

11  ideas by Max Lesko from an -- more of a process,

12  getting Dr. Murthy's input perspective.  More or

13  less of a content expertise perspective.  But I

14  think she certainly ran this by Max.

15     Q.    And that was to get Dr. Murthy's

16  approval on the approach taken?

17     A.   I believe so, yes.

18     Q.    Do you know if Dr. Murthy provided

19  input on the content of the RFI, asked for this

20  information, that kind of thing?

21     A.   I'm not certain.

22     Q.    Anyone else you know of besides

23  Dr. Murthy, Max Lesko, and Kyla Fullenwider

24  involved in the formulation of the RFI?

25     A.   Not to my knowledge.

1      Q.      What is Kyla's role in the Surgeon
2  General's office in this time frame?  I remember
3  she's in US Digital Response.  Is she a -- an
4  employee of the Surgeon General's office by now or
5  what's her formal role?
6      A.      I'm not certain how -- what was the
7  mechanism for how she was employed out of HHS, but
8  I know she was doing work on behalf of the Surgeon
9  General.
10      Q.      The RFI here on the -- I think it's
11  on the second page of the document -- asks for
12  information about technology platforms, correct?
13      A.      What page are you on, sir?
14      Q.      Second page of the document, here
15  down in the bottom right, column number 2,
16  Information about Technology Platforms.
17      A.      Yes.  That's correct.
18      Q.      And it asks number 3:  Information
19  about how widespread COVID-19 misinformation is on
20  individual technology platforms including general
21  search engines, content sharing platforms, social
22  media platforms, e-commerce platforms, crowdsourced
23  platforms, and instant messaging systems, correct?
24      A.      That's correct.
25      Q.      Were there discussions -- general

ERIC WALDO  12/22/2022

```
 1    search engines, that's like Google, right?

 2         A.    I assume so.

 3         Q.    What's a content sharing platform?

 4    Is that like Reddit?

 5         A.    I'm not certain.  I don't -- I'm not

 6    sure what the technical definition is there, but

 7    it --

 8         Q.    Do you know what kind of platform --

 9         A.    Because that seems -- that seems

10    different than social media.

11         Q.    Yeah, what kind of platforms are they

12    referring to there, do you know?

13         A.    I do not.

14         Q.    It goes on to say social media

15    platforms, then e-commerce platforms.  What are

16    those?

17         A.    I presume places where you -- where

18    e-commerce occurs so...

19         Q.    eBay, Amazon, places like that?

20         A.    I think -- I definitely would think

21    Amazon, yeah.

22         Q.    What -- were there discussions that

23    you're aware of about COVID misinformation being

24    shared on e-commerce platforms?

25         A.    I recall at some point in the rollout
```

```
 1   Kyla sharing with me just from a factual
 2   perspective that on sites like Amazon it was
 3   possible to also spread health mis- and
 4   disinformation based on promotion of, you know,
 5   certain -- I think the algorithm could promote if
 6   you like this, buy this, and maybe promoting
 7   conspiracy theories.
 8        Q.    So conspiracy theories about COVID or
 9   other conspiracy theories?
10        A.    I think it was about COVID but I
11   don't truly recall.
12        Q.    Okay.  What are crowdsourced
13   platforms?
14        A.    I'm not sure what the technical
15   definition is of a crowdsourced platform.
16        Q.    Do you know what platforms are being
17   referred to there in that -- in that phrase?
18        A.    As I said just now, I don't know what
19   crowdsourced platforms means in the context of this
20   document.
21        Q.    So one of the things that's asked for
22   here is aggregate data and analysis on the
23   prevalence of COVID-19 misinformation on individual
24   platforms including exactly how many users saw or
25   may have been exposed to instances of COVID-19
```

ERIC WALDO 12/22/2022

Page 343

```
 1   misinformation, right?
 2        A.    Yes, that's what the RFI says on that
 3   paragraph.
 4        Q.    Is that the kind of data that you
 5   guys have been asking Facebook for in the meetings
 6   in 2021 where you talked about data transparency?
 7        A.    It appears to be a version of that,
 8   yes.
 9        Q.    Scrolling down here at number 5, it
10   says information about the sources of COVID-19
11   misinformation.  Do you see that?
12        A.    I do see that.
13        Q.    And it asks for information about the
14   major sources of COVID-19 misinformation associated
15   with exposure, correct?
16        A.    That is what 5 sub bullet A says,
17   correct.
18        Q.    What does "associated with exposure"
19   mean there?
20        A.    It says -- I'm not sure technically.
21   It says information about COVID -- resources about
22   COVID-19 misinformation.  Information about the
23   major sources of COVID-19 misinformation associated
24   with exposure.  I don't -- let's see, does it have
25   the definition in there further down?
```

```
1          Q.     I don't recall.  I guess up here it
2     says --
3          A.     Sorry.  I was trying to look.  Yes.
4          Q.     Seeing content in news feeds and
5     exposure.
6          A.     Yeah, okay.  So it seems to be saying
7     that information associated with seeing the content
8     in news feeds and search results are
9     algorithmically nominated content.
10         Q.     It goes on under little I there to
11    say:  By source, we mean both specific public
12    actors that are providing misinformation as well as
13    components of specific platforms that are driving
14    exposure to misinformation, correct?
15         A.     Yes, that's what the document says.
16         Q.     So the RFI is actually seeking
17    information about specific speakers or posters on
18    social media platforms that spread misinformation,
19    right?
20         A.     I'm not sure, because earlier, you
21    highlighted that it talks about aggregate data and
22    I'm pretty sure the document also talks about
23    anonymity.
24         Q.     So you think that specific public
25    actors does not refer to specific people who spread
```

```
 1   -- provide misinformation?
 2        A.    It may, but I'm pretty sure in this
 3   document there's some sort of caveat about having
 4   to submit anonymized data.
 5        Q.    Okay.  That would be an indicator of
 6   people who are reviewing it, right, the people
 7   exposed to the misinformation, right?
 8        A.    I'm sorry.  Say again, sir.
 9        Q.    Doesn't the anonymized data refer to
10   the users who are exposed, not the public actors
11   who are providing this information?
12        A.    I'm not sure.  If you can bring up
13   that portion of the document, I'm happy to take a
14   look.  But I'm pretty sure in general when the
15   federal government does requests for information
16   like this, there are various stipulations that have
17   to be made to -- for -- to ensure that there's
18   anonymized data.
19        Q.    Let me ask you this.  I believe there
20   was a plan expressed by the Surgeon General's
21   office to render any comments received in response
22   of this information public, right, to publicly post
23   them?
24        A.    Are you asking -- can you repeat the
25   question?  It sounded like a statement.
```

ERIC WALDO  12/22/2022

Page 346

```
 1              Q.    Did the -- did the Surgeon General's
 2    office announce that it would publicly post all the
 3    comments received in response to this RFI?
 4              A.    I don't know.
 5              Q.    Was there a -- do you recall a policy
 6    of that?
 7              A.    I don't know.  In my other life
 8    working in government for, like, noticing common
 9    rule making, which I'm sure you know from your law
10    school days, there was requirements about public --
11    making public comments, but I'm not sure if that
12    refers to RFIs as well.
13              Q.    Let me ask this.  Do you know whether
14    the comments received in response to this RFI have
15    ever been published?
16              A.    I'm -- I'm not aware of whether they
17    have or not.
18              Q.    And we submitted a FOIA request for
19    them months ago and haven't received any yet.  Are
20    you aware of that?
21              A.    I am not.
22              Q.    So you don't know whether the Surgeon
23    General's office ever made these -- the comments it
24    received public?
25                    MS. CHUZI:  Objection.  Asked and
```

**ERIC WALDO  12/22/2022**

```
 1          Q.    And here, for example in Exhibit 45,
 2    there's an e-mail from Max Lesko to Nick Clegg and
 3    Brian Rice and someone else at Facebook with a
 4    letter from the U.S. Surgeon General attached,
 5    correct?
 6          A.    Yes, that's an e-mail from Max Lesko
 7    to Nick Clegg, Brian Rice, and Nathaniel Gleicher.
 8          Q.    And it indicates that he's attached a
 9    letter from Surgeon General Murthy to Mark
10    Zuckerberg, right?
11          A.    That's correct.
12          Q.    And he says -- also says:  Let me
13    know if I can be helpful with respect to the
14    request for information which has been sent to the
15    Federal Register and expect to receive submissions
16    in the coming days.  Correct?
17          A.    Yes, that's what Max has written to
18    -- to those individuals.
19          Q.    And so the Surgeon General's office
20    e-mailed a link to the RFI to Facebook and also
21    attached a letter directly from Surgeon General
22    Murthy to Mark Zuckerberg, right?
23          A.    That is what the e-mail says, yes.
24          Q.    And then Exhibit 46.  And this is --
25    is this actually the letter from Surgeon General
```

```
 1   Murthy to Mark Zuckerberg dated March 3rd, 2022
 2   that Max Lesko e-mailed?
 3        A.   It would appear so.
 4        Q.   Yeah, let me put it on the screen
 5   share.  And the purpose of this letter is to
 6   encourage Facebook to participate in the RFI,
 7   right?
 8        A.   It's -- it says:  I am writing today
 9   to request that your company contribute to the RFI.
10        Q.   So he's encouraging Facebook to
11   contribute to the RFI, right?
12        A.   He's definitely asking him to do so,
13   yes.
14        Q.   And he says:  Given that a large
15   proportion of health misinformation is spread
16   through technology platforms, my Advisory includes
17   a call for technology companies to join this
18   broader effort to create a safer, healthier
19   information environment, right?
20        A.   Yes, that's what -- that's an
21   accurate reading of that portion of the letter.
22        Q.   And he requests responses from
23   companies about the extent and spread of COVID-19
24   misinformation on your platforms, policies to
25   address COVID-19 misinformation, and their
```

 1    effectiveness, sources of COVID-19 misinformation

 2    and so forth, right?

 3        A.    That's an accurate reading of that

 4    portion of the letter.

 5        Q.    Were you involved in drafting the

 6    letter?  I think you probably were still on

 7    paternity leave at this time, right?

 8        A.    Yeah.  As I mentioned, this letter is

 9    dated March 3rd and I was still on paternity leave.

10    So I was not involved in the drafting of this

11    letter.

12        Q.    Did Max Lesko send similar letters to

13    other social media platforms?

14        A.    I think so.

15        Q.    Yeah.  I mean, I don't want to put

16    six more exhibits in front of you, but would you

17    agree that he sent a very similar, basically

18    identically phrased letter to Google, LinkedIn,

19    Twitter, YouTube, and Microsoft all on that same

20    day, March 3rd, 2022?

21        A.    I don't know if he did, but if you --

22    I don't have any reason to disbelieve that he did,

23    so.  That, I believe was the plan.

24        Q.    Let's just very briefly, I'm going to

25    e-mail those to your counsel and I'll pull them up

```
1    real quick.

2              And you said you're aware that that

3    was the plan, right?

4         A.    I think I became aware after I got

5    back that that happened.  I wasn't part of the

6    planning process.

7         Q.    Here on the screen share, I'm showing

8    you Exhibit 47.  Similar letter to Sundar Pichai of

9    Google from Surgeon General Murthy about the RFI

10   dated March 3rd, correct?

11        A.    Yes, that's the date of the letter.

12              Sir, if you're -- okay.  Sorry.

13        Q.    Exhibit 48, yeah, -- similar

14   letter --

15        A.    Thank you.

16        Q.    -- to the CEO of LinkedIn about the

17   RFI encouraging them to participate, correct?

18        A.    It's a letter asking -- informing

19   them and requesting that they participate in the

20   RFI.

21        Q.    In fact, these letters kind of all

22   have exactly the same text, right?  Is that your

23   understanding?

24        A.    You're moving the letters up and down

25   very quickly but I don't have any reason to believe
```

1    they're not virtually the same.

2         Q.    Exhibit 49, similar letter to

3    Twitter, right, and Parag Agrawal, who was then the

4    CEO of Twitter?

5         A.    Yes, it appears to be the same

6    functional letter.  I'm not having much of an

7    opportunity to review it.  But I don't have any

8    reason to believe it's not the same overall text

9    requesting that they participate in the RFI.

10        Q.    Exhibit 50, same letter to Microsoft

11   -- I'm sorry, YouTube, I apologize.  Same letter to

12   YouTube, correct?

13        A.    You're okay.  Yes, sir, I'm only

14   looking at part of the letter that you're sharing

15   and I can't actually review all of it in the way

16   that we're doing it right now.  But it appears to

17   be the same form of a letter asking for a request

18   -- requesting that -- informing them about the RFI

19   and requesting that they participate.

20        Q.    And then finally, Exhibit 51, similar

21   letter to Microsoft, correct?

22        A.    That looks like it's to the Microsoft

23   corporation.  Right now, I'm only being exposed to

24   the first couple of lines.  But it looks -- the

25   first -- overall, it seems to be the same letter

```
 1    requesting that they participate in the RFI.
 2          Q.    Did all of those companies that got
 3    the letter, did they all participate, do you know?
 4          A.    I don't know.
 5          Q.    Do you know if Facebook submitted
 6    anything?
 7          A.    I think so.  But I'm not positive.
 8          Q.    How about Google?
 9          A.    I don't know.
10          Q.    How about Twitter?
11          A.    I don't know.
12          Q.    How about Microsoft?
13          A.    I don't know.
14          Q.    Shortly after the RFI was issued, the
15    Surgeon General gave an interview to GQ Magazine,
16    right?  Does that ring a bell?
17          A.    It does not.
18          Q.    So you weren't -- let me -- let me
19    show Exhibit 52 on the screen share.  Does this
20    dazzling picture of Surgeon General Murthy jog your
21    memory?
22          A.    It does not.
23          Q.    So you don't recall him giving an
24    interview to GQ Magazine on March 11th of 2022?
25          A.    I do not.
```

```
 1                    NOTARIAL CERTIFICATE

 2

 3        I, Tammie A. Heet, Registered Professional

 4   Reporter, certified Shorthand Reporter for the

 5   State of Illinois, and Certified Court Reporter for

 6   the state of Missouri and a duly commissioned

 7   Notary Public within and for the States of Missouri

 8   and Illinois, do hereby certify that the witness

 9   whose testimony appears in the foregoing deposition

10   was duly sworn by me; that the testimony of said

11   witness was taken by me to the best of my ability

12   and thereafter reduced to printing under my

13   direction; that I am neither counsel for, related

14   to, nor employed by any of the parties to the

15   action in which this deposition was taken, and

16   further that I am not a relative or employee of any

17   attorney or counsel employed by the parties

18   thereto, nor financially or otherwise interested in

19   the outcome of the action.

20

21

22            _____
             Tammie A. Heet, RPR, CSR, CCR
23

24

25
```

# EXHIBIT I

| | |
|---|---|
| **From:** | Kevin Kane ███████████████████ |
| **Sent:** | 7/9/2021 12:36:47 PM |
| **To:** | Waldo, Eric (HHS/OASH) ████████████ |
| **CC:** | ████████████ Kyla Fullenwider ████████████████ |
| **Subject:** | Re: Connecting with Dr. Murthy's office |

Thank you! Look forward to speaking with you then.
Best,
Kevin

On Fri, Jul 9, 2021 at 10:28 AM Waldo, Eric (HHS/OASH) ███████████ wrote:
Sorry about that! Moving too fast. Will update.

**From:** Kevin Kane ███████████████
**Sent:** Friday, July 9, 2021 9:28 AM
**To:** Waldo, Eric (HHS/OASH) ███████████████
**Cc:** ████████████ Kyla Fullenwider ███████████████
**Subject:** Re: Connecting with Dr. Murthy's office

Thanks Eric -

The invite you sent was for 3:30-4:15, and unfortunately some of my colleagues won't be able to make it then. Any chance we could meet 3:00-3:30 (ET) on the 14th?

Thanks again, and hope you have a good weekend!

Kevin

On Thu, Jul 8, 2021 at 5:30 PM Waldo, Eric (HHS/OASH) ████████████████ wrote:
Great. Just send you a zoom!

**From:** Kevin Kane ████████████████
**Sent:** Thursday, July 8, 2021 8:35 AM
**To:** Waldo, Eric (HHS/OASH) ██████████████
**Cc:** ████████████ Kyla Fullenwider ███████████████
**Subject:** Re: Connecting with Dr. Murthy's office

Good Morning Eric -

How about we shoot for 3:00-3:30pm (ET) on Wednesday, July 14?

Thanks,

Kevin

On Wed, Jul 7, 2021 at 5:11 PM Waldo, Eric (HHS/OASH) ▮▮▮▮▮▮▮▮▮ wrote:

Hi Kevin,

Thanks so much for your note. Would love to have more of your colleagues join.

I'm traveling with Dr. Murthy for part of next week so it's a bit tight. Here are some options:

Wednesday, July 14: 2:45pm-4:15pm ET; 5pm-6pm ET

Thursday, July 15: 4:15pm-5pm ET

If none of those work, I have some time on Friday, July 16 and we can always discuss the following week.

Thanks so much!

Eric

**From:** Kevin Kane ▮▮▮▮▮▮▮

**Sent:** Wednesday, July 7, 2021 4:51 PM

**To:** Waldo, Eric (HHS/OASH) ▮▮▮▮▮▮▮

**Cc:** ▮▮▮▮▮▮▮ Kyla Fullenwider ▮▮▮▮▮▮▮▮▮

**Subject:** Re: Connecting with Dr. Murthy's office

Hi Eric -

It's great to e-meet you as well. If possible, I wanted to include a few of my colleagues for this conversation and see if you had any availability next Wednesday or Thursday to meet. Would you happen to have any time open either of those days? If not, I'm more than happy to find another day that would work for you.

Thank you for reaching out and look forward to speaking with you soon!

Best Regards,

Kevin

On Tue, Jul 6, 2021 at 9:49 AM Waldo, Eric (HHS/OASH) ████████████ wrote:

Hi Alexandra and Kevin,

I hope this finds you well. I'm Dr. Murthy's Director of Engagement and I wanted to reach out.

As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond. I know you and your teams are working hard and thinking deeply about this issue. We'd love to chat over zoom to connect and discuss what's on the horizon for our teams.

Is there a good time this week to connect? Happy to work with whomever on your team to coordinate calendars.

Thanks so much!

Eric

Eric W. Waldo [He/Him]
Director of Engagement
Office of the U.S. Surgeon General, Dr. Vivek Murthy
U.S. Department of Health & Human Services

--

Kevin Kane | Government Affairs & Public Policy Manager,
YouTube | ████████████ | ████████████

--



Kevin Kane || Government Affairs & Public Policy Manager, YouTube ||

--

Kevin Kane || Government Affairs & Public Policy Manager, YouTube ||

--

Kevin Kane || Government Affairs & Public Policy Manager, YouTube ||

MOLA_DEFSPROD_00007442

**EXHIBIT J**

| From: | Kevin Kane ████████@google.com] |
| --- | --- |
| Sent: | 9/29/2021 12:56:30 PM |
| To: | Waldo, Eric (HHS/OASH) ████████ @hhs.gov]; ████████ @gmail.com |
| CC: | Jan Antonaros [████████ @google.com] |
| Subject: | YouTube Vaccine Policy Announcement |

Good Afternoon -

I'm writing to share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation.

Today we have a COVID-19 Vaccine misinfo policy which allows us to remove a limited list of verified false claims about COVID-19 vaccines.

We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO).

You can learn more about the announcement we made here and a detailed overview of our policy in our help center here.

Please let me know if you have any questions.

Best Regards,
Kevin

--



Kevin Kane || Government Affairs & Public Policy Manager,
YouTube || ████████@google.com || ████████

**EXHIBIT K**



**OFFICE OF THE SURGEON GENERAL**
March 3, 2022

Sundar Pichai
Chief Executive Officer
Google, Inc.



Dear Mr. Pichai,

I hope this letter finds you well.

As you know, the proliferation of health misinformation during the pandemic has been both extensive
and dangerous. Over the last year I've spoken with health care and public health workers across the
country about how health misinformation is harming their ability to care for patients, contributing to
burnout, and posing a growing threat to the nation's health. It is clear that we must do everything we can
to address this threat. We also owe a debt of action to the doctors, nurses, and public health
professionals who have sacrificed so much for us throughout this pandemic.

To this end, my office issued a Surgeon General's Advisory on Health Misinformation in July 2021,
calling for action across all sectors of society to address the spread of health misinformation. Given that
a large proportion of health misinformation is spread through technology platforms, my Advisory
includes a call for technology companies to join this broader effort to create a healthier, safer
information environment.

My office is launching an initiative to deepen our understanding of the spread of COVID-19
misinformation, the role the information environment played in societal response to the pandemic, and
its implications for future public health emergencies. We are issuing a public *Request for Information
(RFI)* to gather and share data and research on health misinformation during the COVID-19 pandemic,
including the unique role that technology and social media platforms play in the dissemination of critical
health information during a public health emergency. We will share what we learn through the RFI
directly with the public at surgeongeneral.gov/RFI.

I am writing today to request that your company contribute to the RFI. To date, our collective
understanding of the nature of misinformation that is spreading online is incomplete which in turn
hinders our nation's ability to implement a robust, effective response. Specifically, I am requesting
responses from companies about the extent and spread of COVID-19 misinformation on
their technology platforms, policies to address COVID-19 misinformation and their effectiveness,
sources of COVID-19 misinformation, and information about the sale of unproven COVID-19 products
or services.

I hope that all of us – researchers, companies, members of the health care community, civic leaders, families, and concerned Americans alike – can work together to protect people's right to make decisions about health based on accurate information. I remain confident that through our collective efforts, we can address the harms of health misinformation and safeguard the health of the nation.

Thank you for your cooperation and partnership on this critical public health matter.

Sincerely,

Vivek Murthy, MD, MBA
Surgeon General of the United States

**EXHIBIT L**

**CAROL CRAWFORD  11/15/2022**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF LOUISIANA
 2                       MONROE DIVISION

 3    STATE OF MISSOURI ex
      rel. ERIC S. SCHMITT,
 4    Attorney General,
      et al.,
 5                             No. 3:22-cv-01213-TAD-KDM
          Plaintiffs,
 6
      vs.
 7
      JOSEPH R. BIDEN, JR.,
 8    in his official capacity

 9    as President of the United

10    States, et al.,

11        Defendants.

12

13      THE VIDEOTAPED DEPOSITION OF CAROL CRAWFORD

14                 November 15, 2022

15               9:24 a.m. to 5:33 p.m.

16
                   Office of General Counsel
17       Centers for Disease Control and Prevention
                    1600 Clifton Road NE
18                   Atlanta, Georgia

19
      Reporter:
20          Maureen S. Kreimer, CCR-B-1379, CRR

21

22

23

24

25
```

```
 1    I interpreted the "check in first."
 2         Q.  And by this time were you already having
 3    regular meetings with Google like we've seen with
 4    Facebook?
 5         A.  Yeah.  This was in 2021.  So we had been
 6    meeting pretty regularly with Google by this time.
 7              MR. VECCHIONE:  Okay.  You can put that
 8    aside.
 9              (Plaintiffs' Exhibit 29 marked.)
10    BY MR. VECCHIONE:
11         Q.  Let's try Exhibit 29.  Same thing, read me
12    the subject line, the date, and then take a look at
13    it.
14         A.  Okay.  Okay.  Subject line's:  Followup on
15    misinformation, or misinfo conversation.  It's
16    4/5/2021.
17              THE WITNESS:  Can I see this?
18              MS. SNOW:  Yes.
19         A.  Okay.
20    BY MR. VECCHIONE:
21         Q.  All right.  So can you go to the very end,
22    I guess, the very last page, read what you said on
23    March 29 at 9:52.
24         A.  "Are you all open to using our regular 4pm
25    meetings to go over things with Census, or what is
```

CAROL CRAWFORD 11/15/2022

Page 180

1    preferred?  I wasn't clear how interested you all
2    were on this effort or who the players are on your
3    end."
4         **Q.  So what were the regular 4:00 p.m.**
5    **meetings you refer to?**
6         A.  I think -- because I still have a
7    4:00 p.m. meeting every other Monday with Google.  I
8    think that these were the same every-other-week
9    check-in meetings.  Sometimes we wouldn't have them.
10   Sometimes we would have them and discuss things.
11        **Q.  Did you have similar regular meetings with**
12   **the other platforms we've been discussing, Face- --**
13   **Meta and Twitter?**
14        A.  We -- you asked some of this earlier.
15        **Q.  I did.**
16        A.  The same answer.  So we had regular
17   meetings with Google, and we had regular meetings
18   with Meta.  Most -- you know, the frequency changed.
19   So, you know, I don't meet as often.  I mean, Google
20   we meet every other week.  Right now with Meta it's
21   more ad hoc.
22        **Q.  Okay.**
23        A.  We had had a regular meeting with
24   Pinterest for a short period of time, and we had my
25   memory was just more ad hoc meetings on occasion

CAROL CRAWFORD 11/15/2022

Page 181

```
 1   with Twitter.
 2        Q.  So on the regular meetings with either
 3   Google or Facebook?
 4        A.  Mm-hmm (affirmative).
 5        Q.  Well, let me ask the question this way.
 6   From the CDC end, were the same people usually
 7   attending those meetings with each social media?
 8        A.  It could vary.  I mean, I was always -- I
 9   mean, with Google, it was typically me and Fred
10   Smith, who's our technical lead, because often the
11   Google questions would be more about technical
12   implementations that we might have to work on.  We
13   were usually always on it.  Sometimes I would --
14   depending on the subject, I would bring in other
15   people.
16           With Meta, I was pretty much always on
17   there.  Jay typically listened in.  And then I would
18   bring people in depending on the subject.
19        Q.  All right.  And what were the -- were the
20   topics typically misinformation, or technical
21   subjects?
22        A.  They -- by and large, they were mostly
23   about things other than misinformation; though
24   misinformation was discussed in the meetings.  But
25   they were originated about getting our credible
```

CAROL CRAWFORD 11/15/2022

Page 241

```
 1    or what the format, or Microsoft Teams, or in

 2    person, or?

 3         A.  It was always on either teams or they had

 4    BlueJeans that we used occasionally.

 5         Q.  Okay.  What's BlueJeans?

 6         A.  It's something like a Teams or a Zoom.

 7         Q.  Okay.  And, once again, do you know if

 8    there is any notes or record kept of the meeting?

 9         A.  I did not take any notes at the meeting

10    that I recall.  I mean, same answer I have been

11    giving.  If there were any, it was minor and they

12    would have been in Word or email.

13         Q.  Okay.

14             MR. VECCHIONE:  40.

15             MR. GILLIGAN:  I remember when everybody

16    just used Skype when it was simpler times.

17             (Plaintiffs' Exhibit 40 marked.)

18    BY MR. VECCHIONE:

19         Q.  Exhibit 40.  Once again the date and the

20    subject line, and then read it to yourself.

21         A.  Subject line:  COVID BOLO meetings on

22    misinformation, sent on May 10, 2021.

23             Okay.

24         Q.  All right.  Let's go back to the back page

25    of this that's Bates number 682.
```

```
 1        A.  Okay.

 2        Q.  Now, this is -- I think we've said this

 3   date.  It's May 10th of 2021?

 4        A.  Yes.

 5        Q.  And you send to Facebook the COVID BOLO

 6   misinformation meeting request; right?

 7        A.  Yes.

 8        Q.  And could you please read that for me?

 9        A.  (As read)  We would like to establish

10   COVID BOLO meetings on misinformation and invite all

11   platforms to join the meetings.  We are aiming for

12   the first one on Friday at noon.  I know you were

13   considering a possible process on your end, but we

14   wanted to start here just as an interim first step.

15   Are there direct POCs on your end I should include

16   on the invite?  I'm happy to chat if better, thanks.

17        Q.  All right.  Now, so this is the first BOLO

18   meeting.  Does that comport with your recollection?

19        A.  This is a note that I'm about to send an

20   appointment for the first BOLO meeting and asking

21   them who to include.

22        Q.  All right.  And we've already said POCs --

23        A.  Yes.

24        Q.  -- are the point of contacts; right?

25        A.  Mm-hmm (affirmative).
```

CAROL CRAWFORD  11/15/2022

Page 243

```
 1          Q.  And you said:  "I know you are considering
 2    possible process on your end."
 3               What did you mean by that?
 4          A.  As I mentioned, that I was engaging with
 5    the platform saying what format would be best for us
 6    to talk about this.  And I think there were
 7    references in the exhibit a couple of times where
 8    they said they were thinking internally about what
 9    would be best.  So I think I was just referencing
10    that I knew that they were considering it as well.
11          Q.  Do you know what the topics -- did you
12    know what the topics for the BOLO were when you sent
13    this out?
14          A.  I don't know if I did or not.
15          Q.  All right.  Let's go to the next page back
16    where we have -- I believe this is from Jan
17    Antonaros to you, but he includes your email to him;
18    right?
19          A.  This -- the bottom part --
20          Q.  Mm-hmm (affirmative).
21          A.  -- is where I sent a similar note to
22    Google, which is Jan.
23          Q.  Okay.
24          A.  And I was telling her that we would like
25    to invite the digital platforms to attend the BOLO.
```

CAROL CRAWFORD  11/15/2022

Page 244

1     I think it was me sending the appointment or a

2     heads-up that it was coming.  I can't -- it looks

3     like maybe I -- this is an actual appointment.

4         Q.  Okay.

5         A.  But I tried to send each of them a

6     personal note that we were doing it.

7         Q.  And in this one you actually spelled out

8     be on the lookout; right?

9         A.  I did.

10        Q.  And was that because you hadn't discussed

11    it with them before, or did you have some concern

12    they wouldn't know what it was?

13        A.  I don't know why I didn't do it that time.

14        Q.  All right.  And there is Kevin Kane here

15    with the email address ████████@Google.com.  Who is

16    that?

17        A.  I don't remember Kevin, but this indicates

18    that he was from YouTube.

19        Q.  Okay.  And do you recall having

20    discussions with YouTube?

21        A.  YouTube would occasionally -- people from

22    YouTube would occasionally be on our regular

23    meetings, depending on what we talked about.  And

24    because YouTube has the most content, like, hosting,

25    they -- they were at the -- they were a part of the

 1    BOLO meetings, I believe, that Kevin attended

 2    probably, or someone from YouTube did.

 3        **Q.  And you responded:  "Great.  I was going**

 4    **to ask about Kevin."**

 5        A.  Yeah.  Maybe I remembered who Kevin was at

 6    the time.

 7        **Q.  Okay.  And then finally the front page.**

 8        A.  That's a repeat of -- oh, no, that's not.

 9    I apologize.  I'm looking at the wrong one.

10        **Q.  And here you're sending this to the Google**

11    **folks?**

12        A.  Yes.

13        **Q.  Why don't you read it for the record?**

14        A.  "We would like to establish COVID BOLO

15    meetings on misinformation and invite all platforms

16    to join the meetings.  We were aiming for the first

17    one on Friday at noon.  We heard through the

18    grapevine that Kevin Cain at YouTube would want to

19    join.  Are there other POCs on your end I should

20    include on the invite?"

21        **Q.  All right.  You said YouTube.  Who's**

22    **YouTube related to, is it Google or Facebook?**

23        A.  YouTube is a Google property.

24        **Q.  Okay.**

25        A.  Or platform.

CAROL CRAWFORD  11/15/2022

Page 246

```
 1          Q.  And is it your recollection that you did
 2   have a meeting on Friday?
 3          A.  I think we did, but I don't have the exact
 4   date.  But I believe we had -- that's when we had
 5   the first BOLO meeting.
 6          Q.  All right.  And do you have any list of
 7   who actually showed up and was an attendee?
 8          A.  No.
 9          Q.  All right.  And, once again, it would be
10   on your calendar as far as if it happened?
11          A.  Now, to clarify I don't remember keeping a
12   list of who attended.  Maybe Census might have
13   because this is something they were arranging.  But
14   I don't recall it being sent to me.  It could have
15   been, but I don't believe so.
16          Q.  So they were helping you arrange this
17   because they'd done it before, this particular
18   meeting?
19          A.  Yes.  I mean, I mentioned that they
20   drafted the slides.
21          Q.  Right.
22          A.  And, you know, Chris participated in the
23   meeting.
24          Q.  Okay.  Chris.  Remind me his last name?
25          A.  Lewinsky, Lewitzke.
```

```
 1   had one.
 2          Q.  So the email states that --
 3              You can put that aside.
 4              (Plaintiffs' Exhibit 43 marked.)
 5   BY MR. VECCHIONE:
 6          Q.  Let's go to -- yeah, let's go to the last,
 7   43.
 8              Once again for Exhibit 43 please state the
 9   subject matter line, and then the -- and who it --
10   what the date of it is?
11          A.  Subject:  Claims review.  6/29/2022.
12              I have read it.
13          Q.  Okay.  So can you read the -- well, who is
14   Rachel Gruner?
15          A.  She is my new point of contact at Google.
16   She replaced Jan Antonaros.
17          Q.  And who's Lindsay Steele?
18          A.  Lindsay Steele replaced Stanley.
19          Q.  Onyimba?
20          A.  "O".
21          Q.  Okay.  And they're both -- their emails
22   are here in the to line; right?
23          A.  Yes.
24          Q.  All right.  And if you could read the
25   after Hi, Carol, Hi, Fred from Rachel, what does she
```

CAROL CRAWFORD  11/15/2022

Page 255

```
 1    say here?
 2         A.  "The YouTube policy team is requesting
 3    evidence-based input on the claims below.  In the
 4    past, the CDC has reviewed COVID information claims
 5    and commented true or false plus any additional
 6    context needed."
 7         Q.  And then what are the claims?
 8         A.  (As read)  Claim:  High dosage of
 9    progesterone is a safe method of reversing chemical
10    abortion, in parentheses, mifepristone and
11    misoprostol.
12              Sorry.
13              (As read)  Claim:  High doses of
14    progesterone is an effective method of reversing
15    chemical abortion, in parentheses, mifepristone and
16    misoprostol.
17         Q.  All right.
18         A.  "Please let me know if you have questions
19    or concerns."
20         Q.  And then what -- how do you respond?
21         A.  "I'll check on this, but I think I'll
22    probably end up needing to refer you to another
23    agency.  I'll get back to you."
24         Q.  So this -- this -- is it your
25    understanding this didn't have anything to do with
```

CAROL CRAWFORD  11/15/2022

Page 256

1    **COVID-19 or vaccines?**

2         A.  It definitely didn't have anything to do

3    with COVID-19 or vaccines.

4         **Q.  Do you know why it was sent to you?**

5         A.  Well, as COVID's -- our focus is not

6    solely on COVID.  We're focusing on other topics.  I

7    think Rachel thought that we might be able to help

8    with this topic as well.

9         **Q.  Okay.  Do you know who you sent it, what**

10   **agency you sent it to, if any?**

11        A.  I -- I didn't know.  I called one of our

12   centers and asked if this was something that CDC

13   dealt with.  I didn't think that we did, and they

14   confirmed that we do not.  And I don't think they

15   had a suggestion on where to refer this to, but I

16   can't recall for sure.

17             MR. VECCHIONE:  All right.  I would like

18   to take a brief break and have the court reporter

19   put my last exhibit together and give you copies

20   and then --

21             MR. GILLIGAN:  There is a 44, too?

22             MR. VECCHIONE:  -- confer, confer with

23   counsel, and I think we'll be finishing up.

24             (Comments off the record.)

25             THE VIDEOGRAPHER:  Off the record at 5:07.

CAROL CRAWFORD 11/15/2022

```
 1                    C E R T I F I C A T E

 2    STATE OF GEORGIA:

 3    DEKALB COUNTY:

 4              I, Maureen S. Kreimer, a Certified Court

 5    Reporter for the State of Georgia, before whom the

 6    foregoing deposition was taken, do hereby certify:

 7              That CAROL CRAWFORD, the witness whose

 8    deposition is hereinbefore set forth in pages 1 to 269,

 9    was duly sworn by me and that such deposition is a true

10    record of the testimony given by the witness.

11              I further certify that I am not related to

12    any of the parties to this action by blood or marriage,

13    and that I am in no way interested in the outcome of this

14    matter.

15              IN WITNESS HEREOF, I have hereunto set my

16    hand this 18th day of November, 2022.

17

18

19

20

21    _____

22    MAUREEN S. KREIMER, CCR-B-1379

23    Notary Public in and for the

24    State of Georgia.  My Commission

25    Expires August 14, 2024.
```

**EXHIBIT M**

CONFIDENTIAL



PLAINTIFF'S
EXHIBIT

40

From:      Crawford, Carol Y. (CDC/OD/OADC)

Sent:      5/10/2021 12:42:50 PM
To:        Stanley Onyimba          @google.com]; Jan Antonaros          @google.com]
Subject:   COVID BOLO meetings on misinformation

We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. We have heard through the grapevine that Kevin Cain at YouTube would want to join. Are there other POCs on your end I should include on the invite?

---

| From: | Crawford, Carol Y. (CDC/OD/OADC) |
|---|---|
| Sent: | 5/11/2021 3:55:11 PM |
| To: | Jan Antonaros ;@google.com]; Kevin Kane @google.com] |
| Subject: | RE: COVID 19 BOLO Meeting |

Great – I was going to ask about Kevin at 4. ☺

**From:** Jan Antonaros ;@google.com>
**Sent:** Tuesday, May 11, 2021 3:51 PM
**To:** Crawford, Carol Y. (CDC/OD/OADC) @cdc.gov>; Kevin Kane @google.com>
**Subject:** Re: COVID 19 BOLO Meeting

Hi Carol, Could you please add +Kevin Kane from our YouTube team to the call below? Thank you!

Jan Fowler Antonaros
Google Government Affairs and Public Policy
25 Mass Ave NW, 9th FL
Washington, DC 20001
@google.com
Android Mobile

On Tue, May 11, 2021 at 3:25 PM Crawford, Carol Y. (CDC/OD/OADC) @cdc.gov> wrote:

We would like to invite digital platforms to attend a short "Be On The Lookout" meeting on COVID. Let us know if you have questions and feel free to forward this message to anyone in your organization that should attend.

Thank you.

Carol Crawford
Chief, Digital Media Branch
Division of Public Affairs
OADC
@cdc.gov

Join ZoomGov Meeting

Dial by your location

CONFIDENTIAL

| From: | Crawford, Carol Y. (CDC/OD/OADC) |
|---|---|
| **Sent**: | 5/10/2021 12:44:41 PM |
| **To**: | Payton Iheme ▉▉▉ @fb.com]; Genelle Adrier ▉▉▉ @fb.com] |
| **Subject**: | COVID BOLO Misinformation meetings |

We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. I know you were considering possible process on your end, but we wanted start here just as interim first step. Are there direct POCs on your end I should include on the invite? Happy to chat if better.

THANKS!

**EXHIBIT N**

PLAINTIFF'S
EXHIBIT

43

| From: | Crawford, Carol Y. (CDC/OD/OADC) | JP |
|---|---|---|
| Sent: | 6/29/2022 6:01:54 PM | |
| To: | Rachel Gruner @google.com]; Smith, Fred (CDC/OD/OADC) @cdc.gov]; Lindsay Steele @google.com] | |
| Subject: | RE: Claims review | |

I'll check on this but I think I'll probably end up needing to refer you to another agency. I'll get back to you.

**From:** Rachel Gruner @google.com>
**Sent:** Wednesday, June 29, 2022 4:38 PM
**To:** Crawford, Carol Y. (CDC/OD/OADC) @cdc.gov>; Smith, Fred (CDC/OD/OADC @cdc.gov>; Lindsay Steele @google.com>
**Subject:** Claims review

Hi Carol and Fred,

The YouTube Policy team is requesting evidence-based input on the claims below. In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed.

**CLAIM:** High doses of progesterone is a **safe** method of reversing chemical abortion (mifepristone & misoprostol)
**CLAIM:** High doses of progesterone is an **effective** method of reversing chemical abortion (mifepristone & misoprostol)

Please let me know if you have any questions or concerns.

Thanks, Rachel

--

| x | The linked...

Rachel Gruner, MPH
Health Outreach Lead, Google
@google.com

**EXHIBIT O**

```
 1        IN THE UNITED STATES DISTRICT COURT

 2      FOR THE WESTERN DISTRICT OF LOUISIANA

 3               MONROE DIVISION

 4               ---o0o---

 5

 6
    STATE OF MISSOURI, et al.,        )
 7                                    )
                     Plaintiff,       )
 8                                    )
         vs.                          )   Case No.
 9                                    )   3:22-cv-01213
    JOSEPH R. BIDEN, JUNIOR, et       )   -TAD-KDM
10  al.,                              )
                                      )
11                   Defendants.      )
                                      )
12

13

14

15               ---o0o---

16        TUESDAY, NOVEMBER 29, 2022

17   ZOOM VIDEOTAPED DEPOSITION OF ELVIS CHAN

18               ---o0o---

19

20

21

22

23

24  REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

25
```

```
 1   But I understand that Mr. Sur is defending the
 2   deposition, not Mr. Berger.  So if you've got an
 3   issue, I don't mind if you guys want to talk about
 4   it, but I don't want to have multiple -- multiple
 5   attorneys objecting and instructions being started.
 6   Can we proceed on that basis from now on?
 7          MR. SUR:  We intend to do so.  There my be
 8   some exceptional circumstances that warrant a
 9   different approach, but that's how we expect to
10   proceed.
11          MR. SAUER:  I am fine to hear that.  You
12   know, if things come up that raise an issue, you
13   know, we can -- we can raise them.  But, yeah,
14   anyway, all right.  I mean, to be clear, you know,
15   any law enforcement privilege is held by the
16   government, not by Mr. Chan's personal capacity,
17   and Mr. Sur is the one who is there to represent
18   the government today.
19      Q.     So -- but anyway, okay.  Mr. Chan, or
20   Agent Chan, who do you recall on the social media
21   platform side participating in these -- in these
22   working group meetings that you have been
23   testifying about from 2020 and 2022?
24      A.     The companies that I remember attending
25   the meetings are Facebook; Microsoft; Google;
```

```
 1    Twitter; Yahoo!, which may have been known as
 2    Verizon Media at the time; Wikimedia Foundation and
 3    Reddit.
 4        Q.    Do you remember any others at this time?
 5        A.    I think I listed seven.  I -- those were,
 6    like, the regular participants that I can remember.
 7        Q.    How about on the U.S. government side,
 8    what agencies were represented at these meetings?
 9        A.    At these meetings, CISA is the host and
10    facilitator for the meeting.  They also invite
11    another component of Department of Homeland
12    Security called Intelligence and Analysis, I&A, so
13    DHS I&A I know attends.  The Office of the Director
14    of National Intelligence, ODNI, attends.  And then
15    from the FBI there is typically a representative
16    from the FBI's Foreign Influence Task Force, which
17    you will hear me abbreviate as FITF regularly.  And
18    then I attend from FBI San Francisco when I am
19    available.
20        Q.    And why are you included in particular?
21        A.    The reason that I attend these meetings is
22    because the way the FBI works is FBI field offices
23    are responsible for maintaining the day-to-day
24    relationships with the companies that are
25    headquartered in their area of responsibility,
```

```
 1   which I may occasionally abbreviate to AOR.  And
 2   all of the companies that have been listed, with
 3   the exception of Microsoft, are all headquartered
 4   in FBI San Francisco's territory.
 5        Q.    Now, where is Microsoft headquartered?
 6        A.    They are headquartered in Redmond,
 7   Washington.
 8        Q.    And then on the CISA side in particular,
 9   what individuals participate in these meetings?
10        A.    Typically there are senior-level -- what I
11   believe are senior-level officials.  The two that I
12   specifically remember are Matt Masterson and Brian
13   Scully.
14        Q.    Is that Matt Masterson, did you say?
15        A.    Yeah.  Yeah, Matthew Masterson and Brian
16   Scully are the two regular attendees.  And they are
17   usually -- one or both of them -- one -- either one
18   of them is usually emceeing the meeting.
19        Q.    So Brian Scully, do you know him
20   personally?
21        A.    I know him just through work.
22        Q.    Okay.  In what connection at work?
23        A.    And I only know -- I only know
24   Mr. Masterson through work as well.
25        Q.    When you say you know him through work,
```

```
 1    did you work together on anything other than these
 2    meetings?
 3        A.    So we have met -- I want to say I have met
 4    in person with each of those individuals, twice in
 5    person; but they are primarily through either the
 6    preparatory calls for these meetings that they are
 7    hosting or the meetings themselves.
 8        Q.    So you work with CISA in preparatory calls
 9    for these industry working group meetings?
10        A.    Yes.
11        Q.    And in that connection, you've met Brian
12    Scully and Matt Masterson, correct?
13        A.    Yes.
14        Q.    And Brian Scully is involved in kind of
15    leading or emceeing these meetings; is that right?
16            MR. SUR:  Objection; vague.
17        Q.    BY MR. SAUER:  Or is he the -- is he the
18    leader of the meeting when it convenes?
19        A.    For the 2020 election cycle, Mr. Masterson
20    was the primarily -- he was primarily the
21    facilitator.  Ahead of the 2022 midterm elections,
22    Mr. Scully has been the primary facilitator.
23        Q.    Was that because Mr. Masterson left CISA
24    in the -- in the intervening time?
25        A.    Yes.
```

```
 1        Q.    Do you know where he works now?

 2        A.    Yes.  I believe he works at Microsoft now.

 3        Q.    Do you -- do you interact with him now as

 4   a representative of a -- of a tech company?

 5              MR. SUR:  Objection; vague.

 6              THE WITNESS:  I have only interacted with

 7   him on two occasions.  One was when he showed up at

 8   one of the more recent industry meetings ahead of

 9   the 2022 midterm elections.  That is when I

10   discovered that he went to Microsoft.  And then I

11   asked him to send me his new contact information

12   during the call, and then he sent me an email and

13   provided me with his new contact information.

14        Q.    BY MR. SAUER:  You work with CISA on these

15   industry working group meetings to help prepare

16   them, what's the nature of your involvement in

17   preparing for these meetings?  Do you kind of set

18   the agenda or -- you know, what's your involvement?

19              MR. SUR:  Objection; vague and compound

20   and implicates the deliberative process privilege.

21              MR. SAUER:  Let me rephrase the question.

22        Q.    Are you involved in preparing for these

23   meetings?

24        A.    No.  I participate in the preparation

25   meetings, but I do not provide any agenda items.
```

```
 1      Q.    Do you remember anyone else at CISA
 2   besides Mr. Scully and Mr. Masterson who
 3   participates in these meetings?
 4      A.    I don't recollect any other people's names
 5   at this time.
 6      Q.    Were there others who participated in --
 7   but you just don't remember who they were?
 8      A.    Yes, that is correct.
 9      Q.    Okay.  Let me -- do you still have Exhibit
10   1 on the screen in front of you, your thesis?
11      A.    Yes.
12      Q.    Okay.  Let me ask -- let's turn back to
13   that for a little while.  And if we could, I am
14   going to scroll ahead to your abstract on Page v.
15   Can you see that clearly, Roman numeral v.
16           MR. SUR:  Roman numeral v.  Okay.
17           THE WITNESS:  Yes, I see it now.
18      Q.    BY MR. SAUER:  And can you see it also on
19   the screen share as well as on the iPad?  I want to
20   make sure you can see the document in both places
21   as we go forward today.
22      A.    I can see the bottom half of one
23   paragraph, and then -- wait, now -- now I see --
24   yeah, I see the bottom paragraph of the --
25      Q.    Actually, can I -- can I direct your
```

1   **attention this sentence here in your abstract that**

2   **I am highlighting?  I guess, actually, for context,**

3   **if you see above -- actually, just focus on that**

4   **sentence.  "This" -- you say, "This thesis finds**

5   **that the Russians shifted their tactics from 2016**

6   **to 2020," right?**

7      A.   Correct.

8      **Q.   And then you say, "Still, the U.S.**

9   **government and social media companies effectively**

10   **impeded their influence campaigns primarily through**

11   **information sharing and account takedowns,**

12   **respectively," correct?**

13      A.   Correct.

14      **Q.   What do you mean by "information sharing"**

15   **here?**

16      A.   So "information sharing" is meant --

17   there -- as I mentioned previously, there are two

18   types of information that the U.S. government,

19   specifically the FBI, shares with the social media

20   companies.  The first type of information, the

21   strategic information, which discusses the tools,

22   tactics or processes, shortened to be TPPs, used by

23   the Russians.

24         The second type of information shared by

25   the U.S. government is tactical information.  And

```
 1    when I mean tactical information, I specifically

 2    mean indicators or selectors.  And both of those

 3    are a term of art within the cybersecurity

 4    industry.  And indicators or selectors include IP

 5    addresses, email accounts, social media accounts,

 6    well, website domain names, and, like, file hash

 7    values.

 8        Q.    Sorry.  Say the last thing.  What kind of

 9    hash values?

10        A.    File, like electronic file hash values.

11        Q.    Okay.  And so, yeah, I take it the

12    strategic information is kind of high-level advice

13    to the social media platforms about, you know, the

14    kinds of -- kinds of campaigns the Russians might

15    be conducting; is that fair to say?

16            MR. SUR:  Objection; lacks foundation.

17            THE WITNESS:  I would not -- I would not

18    characterize the information we share as advice.

19        Q.    BY MR. SAUER:  Okay.  Then in that case it

20    is sort of -- is it high-level general information

21    about what FBI understands the Russians are

22    engaging in when it comes to social media influence

23    campaigns?

24            MR. SUR:  Objection; lacks foundation.

25            THE WITNESS:  Yes.
```

```
 1        Q.   BY MR. SAUER:  And then -- go ahead.
 2   Sorry.  Go ahead.
 3        A.   I can provide an example if that would be
 4   illustrative.
 5        Q.   That would be super helpful.  Please do.
 6        A.   I had the 2020 elections, through our
 7   investigation of the Internet Research Agency, we
 8   discovered that they were trying to set up a base,
 9   as it were, or set up offices in western Africa.
10   We shared this type of strategic information with
11   the social media companies.  They were able to use
12   whatever detection methods they have to discover
13   that there were Russian troll farms being set up
14   specifically in Ghana and Nigeria.
15        Q.   Okay.  And so you mentioned earlier that
16   tactical -- that would be strategic information?
17        A.   That would be strategic.  To summarize, an
18   example would be we believe the Russian troll
19   farms, specifically the Internet Research Agency,
20   is trying to make inroads in western Africa.
21        Q.   Got you.  And then tactical information
22   would be much more specific.  Here are specific --
23   I think you said IP addresses, websites, social
24   media accounts, that are actually -- the FBI has
25   concluded are being operated by the Russians.  Is
```

```
 1    that what tactical information is?
 2        A.    That is correct.
 3        Q.    So there is -- and so is there information
 4    sharing from the FBI to social media platforms
 5    providing that kind of specific tactical-level
 6    information?
 7        A.    Yes, there is.
 8        Q.    And I think your -- that then the timeline
 9    in your thesis goes on specifically with
10    "information sharing and account takedowns."  Does
11    "account takedowns" refer to the social media
12    platforms kind of taking down those social media
13    accounts where the FBI identifies them as being
14    operated by Russian actors?
15            MR. SUR:  Objection; lacks foundation.
16            THE WITNESS:  So the FBI shares
17    information with the social media companies, no
18    strings attached, so that the social media
19    companies can protect their platforms as they deem
20    appropriate.  And from what I have observed and
21    what they have told me when we have provided them
22    with high confidence of Russian selectors, that
23    they have been able to discover fake Russian
24    accounts and take them down.
25        Q.    BY MR. SAUER:  So you don't control what
```

1    they do, correct?

2        A.   I do not control what they do.

3        Q.   But you provide them with information that

4    they don't have about the source of certain -- you

5    called them selectors or social media accounts,

6    correct?

7        A.   Correct.

8        Q.   And when you provide them with that

9    information, they take it and they pull down those

10   accounts, at least sometimes, fair to say?

11           MR. SUR:  Objection; lacks foundation.

12           THE WITNESS:  If I can clarify, what they

13   do is they take the information that we share, they

14   validate it through their own means.  And then if

15   they determine that these are accounts being

16   operated by Russian state-sponsored actors, then

17   they have taken them down.

18       Q.   BY MR. SAUER:  Oh, okay.  And then -- and

19   that's, I -- I take it, part of the point of your

20   sharing the information with them, right?  So that

21   they can assess and evaluate and then ultimately,

22   if they agree with your conclusion, take them down,

23   correct?

24       A.   Correct.

25       Q.   In other words, the purpose of the

```
 1   information sharing on the FBI's side is to have
 2   the inauthentic Russian accounts taken down so that
 3   they are not influencing political discourse in the
 4   United States, correct?
 5           MR. SUR:  Objection; lacks foundation,
 6   calls for speculation.
 7           THE WITNESS:  I would characterize it as
 8   the FBI provides information to these companies so
 9   that they can protect their platforms as they deem
10   appropriate, and they can take whatever actions
11   they deem appropriate without any suggestion or
12   interference from the FBI.
13       Q.   BY MR. SAUER:  But my question's a little
14   different, which is what -- my question is:  Part
15   of the purpose from the FBI's perspective is to
16   give them the tools to assess and potentially take
17   down accounts that the FBI has deemed to be
18   inauthentic, correct?
19           MR. SUR:  Objection; lacks foundation,
20   calls for speculation.
21       Q.   BY MR. SAUER:  You may answer.
22       A.   So I would say -- inauthentic -- so my
23   focus is on Russian state-sponsored, -controlled
24   accounts.  And so whether the companies take them
25   down or not, it's their own choice.
```

```
 1        Q.    Right, but is it your purpose in giving

 2   them the information that the FBI believes or has

 3   concluded that they are Russian-operated accounts,

 4   is it your purpose to equip them to take them down

 5   if they end up agreeing with your assessment?

 6             MR. SUR:  Objection; lacks foundation,

 7   calls for speculation.

 8             THE WITNESS:  My purpose is to share the

 9   information with them so that they can protect

10   their platforms as they deem appropriate.

11        Q.    BY MR. SAUER:  And one way to protect

12   their platforms is to take down these accounts,

13   correct?

14        A.    That is correct.

15        Q.    And, in fact, that's what you say here in

16   this sentence, right?  You say that, "the U.S.

17   government and social media companies effectively

18   impeded their influence campaigns...through

19   information sharing and account takedowns," right?

20        A.    I said that.  You can see -- I put

21   "respectively" because it was the U.S. government,

22   specifically the FBI, sharing information; and it

23   was the social media companies doing the account

24   takedowns.

25        Q.    Right.  And the joint result of that was
```

```
 1    effectively impeding Russian influence campaigns,
 2    correct?
 3        A.    Correct.
 4        Q.    And -- and that's FITF's goal, right?  To
 5    effectively impede Russian influence campaigns,
 6    right?
 7            MR. SUR:  Objection; lacks foundation,
 8    calls for speculation.
 9            THE WITNESS:  Yeah, FITF -- my
10    understanding of FITF's goal is to counter malign
11    foreign-influence campaigns.
12        Q.    BY MR. SAUER:  Does that include
13    effectively impeding their influence campaigns, as
14    you say in your thesis?
15        A.    Yes.
16        Q.    Does that include doing so through account
17    takedowns by information sharing with social media
18    platforms?
19            MR. SUR:  Objection; lacks foundation,
20    mischaracterizes the testimony.
21            THE WITNESS:  Yeah, I believe you're
22    mischaracterizing.  So like I said before, the FBI
23    shares information with no strings attached and no
24    expectations to -- for the companies.  And the
25    companies, they can protect their own platforms.
```

Case 3:22-cv-01213-TAD-KDM Document 274-91 Filed 03/02/23 Page 151 of 165 PageID #:
10097
Case 3:22-cv-01213-TAD-KDM Document 270991 Filed 03/02/23 Page 35 of 365
**ELVIS CHAN  11/29/2022**

**Page 37**

```
 1           MR. SAUER:  I am going to jump ahead to
 2   page little Roman xvii.
 3           You can see there, Indraneel, it's going
 4   to be on Page 19 of the PDF.  See that?
 5           MR. SUR:  Yep.  Yeah, we're on it.
 6      Q.   BY MR. SAUER:  Okay.  I believe this is a
 7   kind of summary section of your thesis.  You talk
 8   about in this paragraph here that begins with, "The
 9   U.S. government's response," that I have
10   highlighted; do you see that?
11      A.   Yes.
12      Q.   And you say, "The U.S. government's
13   response to the Russian influence campaign appeared
14   more robust before the 2020 elections than in the
15   2016 or 2018 elections," correct?
16      A.   Correct.
17      Q.   And then in the next sentence, you say,
18   "The most important actions taken by the U.S.
19   government may have been the information sharing
20   with the social media companies to expose Russia's
21   different operations and shut down its accounts,"
22   correct?
23      A.   Correct.
24      Q.   So the information sharing was done, "To
25   expose Russia's different operations and shut down
```

```
 1    its accounts," right?
 2        A.    Correct.
 3        Q.    And then "its" refers to Russia, right?
 4    So (as read) "to expose Russia's different
 5    operations and shut down Russia's accounts,"
 6    correct?
 7        A.    Correct.
 8        Q.    I am going to jump ahead a few pages to
 9    Page xxii.
10            MR. SAUER:  And, Indraneel, if you're
11    following on your iPad, that's going to be Page 24
12    of the PDF.
13        Q.    There's a reference here in the
14    acknowledgments where you refer to, "My colleagues
15    back at headquarters who were in the trenches with
16    me as we worked to protect the 2020 elections."
17    See that?
18        A.    Yes.
19        Q.    Okay.  What are you talking about there
20    where it says (as read), "in the trenches with you
21    as you worked to protect the 2020 elections"?
22        A.    I'm referring to my colleagues
23    specifically at the Foreign Influence Task Force
24    who participated in the meetings with me, who
25    provided briefings to the companies and who
```

1    coordinated the information sharing.

2        Q.   And so you said you had meetings with the

3    companies.  What meetings did you have?

4        A.   We had -- let me be more clear.  I hosted

5    meetings, bilateral meetings between each of the

6    companies I mentioned and the Foreign Influence

7    Task Force.

8             And we would also bring in field offices

9    that had investigations related to malign foreign

10   influence by state-sponsored actors.  We would also

11   bring in field offices that had cyber

12   investigations.  And when I mean cyber

13   investigations, I mean state-sponsored actors that

14   the FBI was investigating that we believe were

15   capable of hack-and-dump campaigns that we observed

16   in the 2016 election.

17       Q.   Okay.  Let me unpack that a bit.

18            First of all, you said there were meetings

19   with social media companies, between you and social

20   media companies during the 2020 election cycle,

21   correct?  Is that what we're talking about?

22       A.   Yes, that is correct.

23       Q.   Now, did those meetings also continue in

24   the 2022 election cycle?

25       A.   Yes.  They occur at roughly a quarterly

1   cadence.

2       Q.    And then do they -- does the cadence

3   increase as elections get close?

4       A.    Yes, they do.  And --

5       Q.    Now, does that become monthly as the

6   election nears and then weekly very close to the

7   elections?

8       A.    Ahead of the 2020 elections, that is

9   correct.  Ahead of the 2022 elections, we moved it

10  from quarterly to monthly, and then we just had one

11  meeting a week ahead of the midterm elections.

12      Q.    I'm sorry.  You said you had one weekly

13  meeting ahead of the midterm elections?

14      A.    Right.  We had one meeting a week before

15  the midterm elections.

16      Q.    Oh, and how long was the -- how long was

17  that period of weekly meetings?  Was that, like,

18  the month before or the three months before?

19      A.    No.  Just the week before the election

20  itself.

21      Q.    Oh, okay.  There was one weekly meeting,

22  right, the week before the election?

23      A.    Yeah.  There was -- yeah.  So there was a

24  monthly meeting in October; and then we had another

25  meeting out of -- you know, out of cadence the week

ELVIS CHAN  11/29/2022

Page 41

1    before the election, so the end of October.

2        Q.    And then are these meetings going back to

3    quarterly now that the election has passed?

4        A.    That is correct.

5        Q.    And so you're -- you'll have quarterly

6    meetings with the social media companies going

7    forward until the 2024 election cycle gets closer?

8        A.    That is what I anticipate.

9        Q.    And then as that election gets closer,

10    then you'll move to monthly and eventually weekly a

11    couple years from now, or in the fall of 2024; is

12    that fair to say?

13            MR. SUR:  Objection; calls for

14    speculation.

15            THE WITNESS:  That is what I anticipate.

16        Q.    BY MR. SAUER:  Let me ask you this:  What

17    social media companies are involved in these

18    meetings?

19            MR. SUR:  Objection; vague.

20            THE WITNESS:  Currently or in 2020?

21        Q.    BY MR. SAUER:  Well, let's start with

22    2020.  I'd like to know both.  Let's start with

23    2020, please.

24        A.    So for the 2020 elections, we regularly

25    met with Facebook, Google, Twitter, Yahoo!, Reddit

1   they take it very seriously.  And I would say that
2   to the best of their ability, they are very careful
3   before doing account takedowns.
4       **Q.   BY MR. SAUER:  I think that ties back into**
5   **something you said earlier, which was in 2016 they**
6   **really didn't do any account takedowns, fair to**
7   **say?**
8       A.   That is correct.
9       **Q.   And it -- and I take it they may have had**
10  **a -- I -- we may be speculating here, if you know.**
11  **Do you know if that was because they have a**
12  **financial incentive to leave those accounts up**
13  **because it increases their ad revenues?**
14          MR. SUR:  Objection; calls for
15  speculation.
16          THE WITNESS:  I wouldn't even begin to
17  speculate.  I don't know why.
18      **Q.   BY MR. SAUER:  Let me ask you this:  Why**
19  **did things change, in your view?  I take it in 2018**
20  **and 2020 there were many more account takedowns,**
21  **right?**
22      A.   So there are two parts to your question.
23  Why do I think they did it?  I can provide you with
24  my personal opinion.
25      **Q.   Okay.**

ELVIS CHAN  11/29/2022

Page 116

```
 1      A.   My -- I believe pressure from Congress,
 2  specifically HPSCI and SSCI, may have had a part of
 3  it.
 4          And then also because I believe that they
 5  felt that this may have damaged their brands, but
 6  that is my personal opinion.
 7      Q.   Okay.  Well, let me ask you this:  When
 8  you say "pressure from Congress" and you mentioned
 9  HPSCI and SSCI, what are HPSCI and SSCI?  Are
10  those -- are those committees?
11      A.   I'm sorry.  HPSCI is the -- the House
12  Permanent Select Committee on Intelligence.  And
13  SSCI is the Senate Select Committee on
14  Intelligence.
15      Q.   Starting with the House Permanent Select
16  Committee on Intelligence, what kind of pressure
17  did they put on the social media platforms to, you
18  know, engage more aggressively in account
19  takedowns?
20      A.   They compelled -- I don't know if they
21  compelled.  They requested the CEOs for the
22  companies that I mentioned, the -- to testify in
23  front of their committee.
24      Q.   And so they kind of brought in Mark
25  Zuckerberg and Jack Dorsey and Sundar Pichai and
```

Page 117

```
 1    had them testify in front of Congress?

 2         A.   That is correct.

 3         Q.   And that happened -- that happened once or

 4    it happened multiple times?

 5         A.   To my knowledge, that happened more than

 6    once.

 7         Q.   And you believe that that -- that that

 8    kind of scrutiny and public pressure from Congress,

 9    in your view, motivated them to be more aggressive

10    in the account takedowns?

11              MR. SUR:  Objection; lacks foundation,

12    calls for speculation.

13              THE WITNESS:  That is just my personal

14    opinion.

15         Q.   BY MR. SAUER:  Yeah.  What is the basis

16    for your opinion?  Has anyone at a social media

17    platform ever made a comment to you that would

18    reflect that -- that view?

19         A.   I would say yes.  And the types of

20    comments that I have received are that staffers

21    from both of those committees have visited with

22    those companies.  And while they would not reveal

23    the types of discussions that they had with these

24    House and Senate staffers, they would indicate that

25    they had to prepare very thoroughly for these types
```

```
 1   of meetings and that it was -- they indicated that
 2   it felt like a lot of pressure.
 3        Q.   "They" is representatives of social media
 4   platforms?
 5        A.   Yeah.  The social media companies that
 6   were visited.
 7        Q.   What -- what social media companies were
 8   visited by these HPSCI and SSCI staffers?
 9        A.   To my knowledge, it was the three
10   companies that I've mentioned, which include
11   Facebook, Google and Twitter.
12        Q.   And Facebook, Google and -- Facebook,
13   Google and Twitter employees all told you that they
14   experienced these visits from congressional
15   staffers as exercising a lot of pressure on them?
16        A.   That was how I interpreted their comments.
17        Q.   And then you infer from that that their
18   changes in takedown policies resulted from that
19   kind of pressure from Congress?
20        A.   That is my personal opinion.
21             If I can add, I think some of -- some of
22   what was discussed -- I'm interpreting what -- some
23   of what was discussed.  But what the -- the
24   staffers would come and talk to us either before or
25   after they met with those three companies.  And so
```

```
 1   what was discussed with us was legislation that
 2   they were thinking about doing, and them asking for
 3   our opinion.
 4       Q.   Uh-huh.  When you say "legislation that
 5   they were thinking about doing," what do you mean?
 6       A.   Legislation that either HPSCI or SSCI was
 7   thinking about doing.
 8       Q.   So HPSCI and SSCI, these committees on
 9   intelligence, their staffers would be communicating
10   to the social media platforms Facebook, Twitter and
11   Google or YouTube that they intended to try and
12   pass legislation?
13       A.   So I inferred that because that is what
14   they discussed with me personally.
15       Q.   That is what they, the social media
16   platforms, discussed with you, correct?
17       A.   No, no.  That is what HPSCI and SSCI
18   discussed with me when they were coming to these
19   meetings.
20       Q.   Oh, did you -- were you in on these
21   meetings?  Like, were you included in the meetings
22   with the congressional staffers?
23       A.   So I and FBI San Francisco personnel would
24   meet with the congressional staffers, typically
25   before they met or after they met with the social
```

**ELVIS CHAN  11/29/2022**

Page 310

```
 1                  DEPOSITION OFFICER'S CERTIFICATE
 2    STATE OF CALIFORNIA    )

 3                           ) ss.

 4    COUNTY OF SAN FRANCISCO)

 5

 6            I, Balinda Dunlap, hereby certify:

 7            I am a duly qualified Certified Shorthand

 8    Reporter in the State of California, holder of

 9    Certificate Number CSR 10710 issued by the Certified Court

10    Reporters' Board of California and which is in full

11    force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12            I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a)(a)).

17            I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22            I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                          / / /
```

 1   of the testimony given by the witness.  (Fed. R. Civ. P.

 2   30(f)(1)).

 3            Before completion of the deposition, review of

 4   the transcript [  ] was [  ] was not requested.  If

 5   requested, any changes made by the deponent (and

 6   provided to the reporter) during the period allowed, are

 7   appended hereto.  (Fed. R. Civ. P. 30(e)).

 8

 9   Dated:

10

11                                   _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT P**

**From:** ▮▮▮▮▮▮▮▮@twitter.com]
**Sent:** 1/23/2021 1:08:36 AM
**To:** Humphrey, Clarke EOP/WHO ▮▮▮▮▮▮▮@who.eop.gov]
**CC:** ▮▮▮▮▮▮@twitter.com]; Flaherty, Robert EOP/WHO ▮▮▮▮▮@who.eop.gov]
**Subject:** [EXTERNAL] Re: Flagging Hank Aaron misinfo

Thanks. We recently escalated this.

On Fri, Jan 22, 2021 at 8:05 PM Humphrey, Clarke EOP/WHO ▮▮▮▮▮▮@who.eop.gov> wrote:
Hey folks —

Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP:

>https://twitter.com/RobertKennedyJr/status/1352748139665645569<

And then if we can keep an eye out for tweets that fall in this same ~genre that would be great.

Thanks!
Clarke
--
_

▮▮▮▮▮▮▮▮▮▮
Twitter, Inc. | Public Policy
@TwitterGov & @Policy

# CERTIFICATE OF SERVICE

***Robert F. Kennedy, Jr. v. Google, LLC, et al.***
**U.S. Court of Appeals for the Ninth Circuit, Case No.
23-16141**

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On September 11, 2023, I caused **DECLARATION OF SCOTT J. STREET IN SUPPORT OF APPELLANT'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL** to be filed and served via the Court's Electronic Service upon the parties listed on the Court's service list for this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 11, 2023 at San Diego, California.

*/s/ Dayna Dang*
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com