# EXHIBIT A

TYLER BURSCH, LLP
Robert Tyler (STATE BAR NO. 179572)
rtyler@tylerbursch.com
Nada Higuera (STATE BAR NO. 299819)
nhiguera@tylerbursch.com
25026 Las Brisas Rd.
Murrieta, California 92562
Telephone: 951-600-2733
Facsimile: 951-600-4996

LIBERTY JUSTICE CENTER
Daniel Suhr, pro hac vice admitted
dsuhr@libertyjusticecenter.org
M.E. Buck Dougherty III, pro hac vice admitted
bdougherty@libertyjusticecenter.org
James McQuaid, pro hac vice admitted
jmcquaid@libertyjusticecenter.org
440 N. Wells Street, Ste. 200
Chicago, Illinois 60654
Telephone: 312-637-2280
Facsimile: 312-263-7702
*Attorneys for Plaintiff Justin Hart*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JUSTIN HART,<br><br>    Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., Inc.; TWITTER, INC.; VIVEK MURTHY in his official capacity as U.S. Surgeon General; JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; ROB FLAHERTY, in his official capacity as Deputy Assistant to the President and White House Director of Digital Strategy; and CAROL Y. CRAWFORD, in her official capacity as Chief of Digital Media within the Centers for Disease Control and Prevention,<br><br>    Defendants. | Case No. 3:22-cv-00737-CRB<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The [United States Supreme] Court has sought to protect the right to speak in this spatial context." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

2. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace — the 'vast democratic forums of the Internet' in general, *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 868 (1997), and social media in particular." *Packingham*, 137 S. Ct. at 1735.

3. The Internet is a "dynamic, multifaceted category of communication" that "includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue." *Reno*, 521 U. S. at 870.

4. Congress determined that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). And Congress further found that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(4).

5. It is the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

6. Here, the Defendants conspired to remove from the Internet—a public forum devoted to the marketplace of ideas—valid public health messages and social media posts by Plaintiff, Justin Hart, and others, because they disagreed with the viewpoint and message expressed in such posts on the Internet, which contradicted the federal government's COVID-19 public health message and views expressed.

7.  The Federal Government Defendants (President Biden, Surgeon General Murthy, Flaherty, and Crawford) publicly criticized, exerted pressure, and threatened the Social Media Defendants (Meta Platforms, Inc. and Twitter, Inc.) and other social media platforms for allowing views opposed to the federal government's COVID-19 public health message to be posted on their platforms that access the Internet.

8.  Such coercive, bullying, and intimidating threats and tactics by government officials designed to censor speech through private social media companies have been referred to as illegal jawboning.[1] "The term 'jawboning' was first used [during World War II] to describe official speech intended to control the behavior of businessmen and financial markets."[2]

9.  The Ninth Circuit has long recognized the inherent problems associated with illegal jawboning techniques where government officials desired effect is censoring lawful free speech rights under the First Amendment. *See, e.g., Writers Guild of America, West, Inc. v. American Broadcasting Co., Inc.*, 609 F. 2d 355, 365 (9th Cir.1979) ("Regulation through 'raised eyebrow' techniques or through forceful jawboning is commonplace in the administrative context, and in some instances may fairly be characterized . . . as official action by the agency.") (footnotes omitted), *cert. denied*, 449 U.S. 824 (1980); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 52, 64 (1963) (holding government threats that amount to a censorship scheme violate free speech rights under the First Amendment.); *see also Backpage.com, LLC v. Dart*, 807 F. 3d 229, 231 (7th Cir. 2015) (Posner, J.) ("The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is

---

[1] *See* Will Duffield, *Jawboning against Speech*: *How Government Bullying Shapes the Rules of Social Media*, Policy Analysis no. 934, Cato Institute, Washington D.C. (Sep. 12, 2022), *available at* https://www.cato.org/policy-analysis/jawboning-against-speech.

[2] *Id* at p.2.

compliance with his demands.").

10. And in private communications, the Federal Government Defendants held regular "be-on-the-lookout" warning meetings with the Social Media Defendants and overtly instructed them on the specific types of so called COVID-19 "disinformation" or "misinformation" that should be excluded from their platforms and the Internet, regardless of whether such public posts violated the Social Media Defendants' terms, conditions, and policies on "disinformation" or "misinformation." The Social Media Defendants even adjusted their policies and algorithms on valid public health messages and acceptable viewpoints on the Internet to align with the Federal Government Defendants' pre-approved COVID-19 public health message and viewpoint.

11. The Social Media Defendants removing from the Internet COVID-19 related posts that opposed or contradicted the Federal Government Defendants' COVID-19 message—such as Hart's posts—violated the Social Media Defendants' terms, conditions, and policies on "disinformation" or "misinformation," because they acquiesced under duress to coercive pressure from the Federal Government Defendants.

12. Some of the Social Media Defendants further acquiesced under duress by giving the Federal Government Defendants millions of dollars in free advertising on their private platforms so the government's COVID-19 public health message would not be challenged on the Internet, despite the private Social Media Defendants substantially earning their revenue from third party advertising on their social media platforms.

13. The Federal Government Defendants knowingly received a benefit from the Social Media Defendants excluding from the Internet opposing views to the government's COVID-19 public health message such as Hart's public posts, because the government's views were unchallenged and without public scrutiny on the "vibrant and competitive free market that presently exists for the Internet" in violation of United States policy. 47 U.S.C. § 230(b)(2).

14. The Federal Government Defendants also knowingly received a financial benefit from some of the Social Media Defendants' financial gifts of millions of dollars in free

advertising to promote the government's COVID-19 public health message, because the Federal Government Defendants did not have to pay for a service—advertising its COVID-19 public health message on the Internet—that others who sought and paid for message advertising on the Internet, such as Hart, were required to pay to the Social Media Defendants.

15. First, Hart brings this action to defend the freedom of speech under the First Amendment from viewpoint-based, discriminatory collusion between private social media companies and the federal government, because they jointly removed his COVID-19 social media posts from the Internet since Hart's posts contradicted the federal government's COVID-19 public health message and views.

16. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Under the Free Speech Clause of the First Amendment, "discrimination against speech because of its message is presumed to be unconstitutional." *Id.*

17. A conspiracy between private and governmental actors satisfies the joint action test when they have had a "meeting of the minds" to "violate constitutional rights." *Fonda v. Gray*, 707 F. 2d 435, 438 (9th Cir. 1983). When a government actor has "so far insinuated itself into a position of interdependence" with private actors it is recognized as a joint participant in the challenged constitutional deprivation. *See Gorenc v. Salt River Project Agr. Imp. & Power Dist.*, 869 F. 2d 503, 507 (9th Cir. 1989) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)). Such joint action between government and private parties transforms private actors into state actors. *See Pasadena Republican Club v. W. Justice Ctr.*, 985 F. 3d 1161, 1167 (9th Cir. 2021).

18. When the federal government admits to conspiring with social media companies to censor messages on the Internet with which it disagrees, as it has in this case, both the government and the private companies are guilty of unconstitutional viewpoint discrimination: "Joint action exists where the government . . . encourages . . .

unconstitutional conduct through its involvement with a private party . . . ." *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013) (cleaned up). Joint action further occurs when there is "substantial cooperation" between the private and state actors, or their actions were "inextricably intertwined." *Brunette v. Humane Society of Ventura Cnty.*, 294 F. 3d 1205, 1211 (9th Cir. 2002).

19.  This Court should declare the actions of Defendants Meta Platforms, Inc., f/k/a Facebook, Inc., Twitter, Inc., President Biden, Surgeon General Murthy, Flaherty, and Crawford unconstitutional and permanently enjoin them from monitoring, flagging, censoring, and deleting social media posts on the Internet based on the viewpoints the posts espouse that contradict the federal government's pre-approved viewpoint. The Court should further enjoin the Social Media Defendants from adjusting their policies on misinformation to align with the Federal Government Defendants' misinformation policies.

20.  Second, Defendants Meta Platforms, Inc., f/k/a Facebook, Inc., and Twitter, Inc. are liable under the doctrine of promissory estoppel for promising Hart the use of their social media platforms to access the Internet so he could further his business interests and then rescinding this promise after he relied on them to his detriment.

21. Third, Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., is liable to Hart for intentional interference with a contract for knowingly denying him the ability to fulfill his contractual duty to administer the Facebook account of Donorbureau, LLC.

22. Fourth, Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., is liable to Hart for negligent interference with a prospective economic advantage for knowingly disrupting the contractual relationship between Donorbureau, LLC and him by preventing him from administering the Facebook account of Donorbureau.

23.  For these reasons, Hart brings this lawsuit and seeks declaratory, injunctive, and monetary relief for the constitutional deprivation, injuries, and injustices he has suffered at the hands of the Defendants.

**PARTIES**

24.  Plaintiff, Justin Hart, is a natural person domiciled in San Diego County, California.

25.  Defendant Meta Platforms, Inc., f/k/a Facebook, Inc., ("Facebook") is a publicly traded corporation incorporated in Delaware with a principal place of business at 1601 Willow Road, Menlo Park, California in San Mateo County.

26.  Defendant Twitter, Inc. ("Twitter") is a publicly traded corporation incorporated in Delaware with a principal place of business at 1355 Market Street, Suite 900, San Francisco, California in the City and County of San Francisco.

27.  Defendant Vivek Murthy is sued in his official capacity as the Surgeon General of the United States. In that role, he directs the office of the Surgeon General, a part of the Department of Health and Human Services ("HHS") agency within the Executive Branch of the federal government.

28.  Defendant Joseph R. Biden, Jr. is sued in his official capacity as the President of the United States. In that role, he directs the Executive Branch of the federal government, including the Office of Management and Budget ("OMB"), White House staff, and HHS.

29. Defendant Rob Flaherty is sued in his official capacity as the Deputy Assistant to the President of the United States and Director of Digital Strategy at the White House.

30. Defendant Carol Y. Crawford is sued in her official capacity as Chief of the Digital Media Branch of the Division of Public Affairs within the Centers for Disease Control and Prevention ("CDC"). The CDC is an agency within HHS and the Executive Branch of the federal government.

**JURISDICTION AND VENUE**

31. This case raises federal claims under the First Amendment of the United States Constitution; therefore, the Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

32. This Court has jurisdiction to issue injunctive relief to protect constitutional rights. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

33. The Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. § 2201 and to order further necessary or proper relief based on a declaratory judgment or decree pursuant to 28 U.S.C. § 2202.

34. The Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

35. The Court has personal jurisdiction over Defendants Murthy, Biden, Flaherty, and Crawford because they are officers of, or oversee agencies of, the United States.

36. The Court has personal jurisdiction over Defendants Facebook and Twitter because they maintain their principal places of business in California.

37. Venue is appropriate in this district because Facebook and Twitter maintain their principal places of business here and a substantial part of the events giving rising to the claims occurred in this district.

## FACTUAL ALLEGATIONS

***Facebook offered the government $15 million dollars in free COVID-19 advertising***

38. On February 21, 2021, Payton Iheme, a Facebook employee in charge of U.S. Public Policy at the social media platform, sent an email to Carol Crawford, an employee of the CDC. The CDC is a public health agency within HHS and its employees work with Surgeon General Murthy on public health issues such as COVID-19. A true and correct copy of this email string between Facebook's Iheme and the CDC's Crawford is attached as ***Exhibit 1***.

39. In the email, Facebook employee Iheme offered CDC and the federal government a $15 million-dollar in-kind donation to allow the government to advertise for free its COVID-19 public health message on Facebook's private platform and the Internet. *Id*.

40. CDC employee Crawford responded to Facebook's offer on the same day, stating, "Thank you for this amazing offer. We'll work with our policy staff on next steps." *Id*.

***The government placed a condition on the $15 million gift and Facebook accepted***

41. On April 5, 2021, Dia Taylor, CDC's Acting Chief Operating Officer, sent an email to Facebook's Iheme and copied Crawford and other CDC employees. The email contained an attached letter, and true copies of the email and letter are attached hereto as ***Exhibit 2***.

42. In the letter from the CDC to Facebook, the federal government placed a "Publicity and Endorsements" conditional clause on Facebook's $15 million gift of free COVID-19 advertising. This clause required Facebook to not use the name of HHS, CDC, or any related federal agencies regarding the federal government's COVID-19 public health messages to be posted on Facebook and the Internet. *Id.*

43. The "Publicity and Endorsements" clause further required Facebook to "clear all publicity materials for this gift with HHS and CDC to ensure compliance with this paragraph." *Id.*

44. Facebook acknowledged there was a meeting of the minds by accepting the federal government's "Publicity and Endorsements" conditional clause, evidenced by Iheme's signature to the letter. Iheme then emailed a copy of the signed acceptance letter to the CDC on April 8, 2022. *Id.*

***The government held "Be-on-the-lookout" meetings with social media companies***

45. Beginning in May of 2021, the CDC scheduled regular "be-on-the-lookout" or BOLO meetings with social media platforms, including Facebook and Twitter, and provided detailed and specific instructions on what the government deemed to be COVID-19 disinformation or misinformation and what information the private social media companies should or should not allow on their platforms and on the Internet.

46. On May 6, 2021, the CDC sent an email to Facebook with examples of what COVID-19 messages were inappropriate for the public on private social media platforms and the Internet. Attached as ***Exhibit 3*** is a true and correct copy of this email.

47. On May 14, 2021, the CDC's Crawford sent an email inviting social media companies including Facebook and Twitter to participate in a BOLO meeting and included a slide presentation related to COVID-19 "Misinformation." Attached as ***Exhibit 4*** is a true and correct copy of this email along with the COVID-19 slide presentation.

48. On May 28, 2021, the CDC sent an email invitation for a second BOLO meeting with social media platforms including Facebook and Twitter, on COVID-19

"Misinformation." Attached as ***Exhibit 5*** is a true and correct copy of this email along with the COVID-19 slide presentation.

49. On June 18, 2021, the CDC sent another email invitation for a third BOLO meeting with social media platforms including Facebook and Twitter, on COVID-19 "Misinformation." Attached as ***Exhibit 6*** is a true and correct copy of this email along with the COVID-19 slide presentation.

50. These BOLO meetings held in May and June, between the federal government and private social media platforms, including Facebook and Twitter, followed a trend that began in December of 2020, with the CDC's Crawford initially emailing Facebook about COVID-19 "Misinformation." Attached as ***Exhibit 7*** is a true and correct copy of this December 2020 email, along with a COVID-19 slide presentation.

### *Deplatforming Justin Hart and removing his posts from the Internet*

51. In early July of 2021, in preparation for the upcoming school year, the CDC updated its guidelines and recommended that young children should continue to wear masks at school but vaccinated older students and teachers did not need to wear masks.[3]

52. Following Facebook's $15 million-dollar gift to the federal government, regular government BOLO instructional meetings with Facebook and Twitter, and the CDC's updated masking guidelines for children, on or around July 13, 2021, Hart posted to his personal Facebook page and on the Internet a graphic entitled, "Masking Children is Impractical and Not Backed by Research or Real World Data."

---

[3] https://www.chalkbeat.org/2021/7/9/22570068/new-cdc-guidance-schools-masks (last visited Oct. 10, 2022)

53. Below is a photo of the graphic in Hart's post:

54. The graphic Hart posted is science-based, contains footnotes to scientific evidence supporting its claims, and is a valid public health message.

55. Facebook flagged the above post on or around July 13, 2021, with the following notice:

> **You can't post or comment for 3 days.**
>
> This is because you previously posted something that didn't follow our Community Standards.
>
> This post goes against our standards on misinformation that could cause physical harm, so only you can see it.
>
> **Learn more about updates to our standards.**

56. On or around July 18, 2021, Hart posted to his personal Twitter page and on the Internet a tweet that read:

> So the CDC just reported that 70% of those who came down with
>
> #COvId19 symptoms had been wearing a mask. We know that
>
> masks don't protect you… but at some point you have to wonder
>
> if they are PART of the problem.

57. Although Hart's post stated a valid public health message, Twitter locked Hart's account on or around July 18, 2021, after his post, with the following notice sent to his email:

> **Hi Justin Hart,**
>
> **Your Account, @justin_hart has been locked for violating the Twitter Rules.**
>
> Specifically for: Violating the policy on spreading misleading and potentially harmful information related to COVID-19.

### *President Biden, the White House, and Surgeon General Murthy*

58. Within days of these two removals of Hart's posts from the Internet, Defendant Biden's administration revealed publicly that it was directing social media companies to remove posts that bucked their party line on COVID-19.

59. On July 15, 2021, at a White House Press Conference, Defendant Surgeon General Murthy stated, "We're asking [our technology companies] to consistently take action against misinformation super-spreaders on their platforms."[4]

60. The White House revealed that a team of government employees was actively researching and tracking social media posts with which it disagreed and relaying those posts to social media companies with instructions to take them down from the Internet.

61. Former White House Press Secretary Jen Psaki admitted, "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation."[5]

62. Psaki also revealed that the White House effort to suppress free speech on the

---

[4] Vivek H. Murthy, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

[5] Jen Psaki, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

Internet that contradicted the government's COVID-19 public health message reaches all the way to the level of senior staff for Defendant Biden's administration.

63. Psaki gave a glimpse of how the scheme works: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team . . . ."[6]

64. Emails confirm Psaki's public comments. For example, in February and March of 2021, Facebook conducted a survey, shared its survey data with the CDC, and held meetings with government employees to discuss COVID-19 vaccine hesitancy on Facebook's platform and the Internet. Attached as ***Exhibit 8*** are true and correct copies of emails regarding this communication between Facebook and the CDC.

65. Psaki further revealed in public comments that the far-reaching government effort targeted multiple posts on multiple social media sites and the Internet exclaiming, "You shouldn't be banned from one platform and not others."[7]

66. Against United States policy as set forth by Congress "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation" 47 U.S.C. § 230(b)(2), Defendants Biden and Murthy directed four key changes for social media platforms and the Internet.

67. First, Biden and Murthy directed that private companies "measure and publicly share the impact of misinformation on their platform."[8]

68. Second, Biden and Murthy directed social media companies to "create a robust enforcement strategy that bridges their properties and provides transparency about the rules."[9]

---

[6] *Id.*

[7] Jen Psaki, White House Press Briefing (July 16, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/ (last visited Aug. 18, 2021).

[8] Psaki, *supra* n. 3.

[9] *Id.*

69. Third, Biden and Murthy stressed that "it's important to take faster action against harmful posts" because "information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts[.]"[10]

70. Fourth, Biden and Murthy directed Facebook to "promote quality information in their feed algorithm."[11] No definition was provided by Biden and Murthy publicly as to the government's definition of "quality information."

71. At the direction of Biden, Murthy created and published a 22-page Advisory with instructions on how social media companies should remove posts with which Murthy and Biden disagree.[12]

72. Biden further threatened social media companies who do not comply with his directives by publicly shaming and humiliating them, stating, "They're killing people."[13]

73. Emails between Facebook and the government confirm that Facebook had used its proprietary tool "CrowdTangle" to monitor and report on social media posts that contradicted the federal government's COVID-19 message and shared such information with the government. Attached as ***Exhibit 9*** are true and correct copies of emails regarding this communication between Facebook and the CDC regarding CrowdTangle reports.

74. At the direction of the Federal Government Defendants Biden and Murthy, Facebook used CrowdTangle, along with social media algorithms designed to cast a wide net, to remove posts from the Internet that contradicted the government line on COVID-19,

---

[10] *Id.*

[11] *Id.*

[12] Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (2021), *available at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf (last visited Aug. 18, 2021).

[13] Lauren Egan, *"They're killing people": Biden blames Facebook, other social media for allowing Covid misinformation*, NBC News (July 16, 2021, 4:10 PM), *available at* https://www.nbcnews.com/politics/white-house/they-re-killing-people-biden-blames-facebook-other-social-media-n1274232 (last visited Aug. 18, 2021).

1    regardless of whether such posts violated Facebook's terms of service.

2         75. For example, in April of 2021, the CDC's Crawford and Facebook's Iheme

3 communicated via email that the Wyoming Public Health Department notified the federal

4 government that Facebook's and other platforms' algorithms, intended to screen out

5 COVID-19 "misinformation," were also screening out "valid" public health messaging,

6 including social media posts on the Internet by the Wyoming Public Health Department.

7 Attached as ***Exhibit 10*** is a true and correct copy of this email communication.

8         76. Like the Wyoming Public Health Department's valid public health message that

9 was wrongfully removed from the Internet because of social media platforms' adjusted

10 algorithms, Hart's public Facebook and Twitter posts in July of 2021 were valid public

11 health messages wrongfully removed from the Internet by algorithms designed jointly by

12 the Federal Government Defendants and the Social Media Defendants.

13         77. Defendants Biden and Murthy directed Defendants Facebook and Twitter to design

14 specific algorithms to identify and remove social media posts from the Internet that

15 contradicted the federal government's COVID-19 public health message and viewpoint. The

16 Social Media Defendants substantially cooperated with the Federal Government

17 Defendants' request by designing algorithms that would target viewpoint messages and

18 posts that contradicted the federal government's COVID-19 public health viewpoint,

19 resulting in Hart's social media posts being removed from the Internet.

20         78. On July 23, 2021, ten days after Facebook removed Hart's valid public health

21 message from Facebook's platform and the Internet, Facebook employee Nick Clegg

22 emailed Defendant Surgeon General Murthy. In the email, Clegg advised Murthy that

23 Facebook had recently taken steps "to adjust policies on what we are removing for

24 misinformation." Attached as ***Exhibit 11*** is a true and correct copy of this email

25 communication.

26         79. Clegg's tone in his email to Surgeon General Murthy was defensive, and he stated,

27 "We hear your call for us to do more and, as I said on the call, we're committed to working

28 toward our shared goal of helping America get on top of this pandemic." *Id.*

80. Clegg continued with his defensive and submissive posture in his email to Defendant Murthy, and he said, "We will reach out directly to DJ to schedule the deeper dive on how to best measure Covid related content and how to proceed with the question around data." *Id.*

81. On information and belief, "DJ" is not employed by Facebook, does not have authority and control over Facebook's misinformation policies and terms of service, and "DJ" operates under the authority and control of Murthy, the Executive Branch, and the federal government.

82. Clegg further stated to Murthy, "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress." *Id*. Clegg also noted to Surgeon General Murthy, "You have identified 4 specific recommendations for improvement, and we want to make sure to keep you informed of our work on each." *Id*.

83. On information and belief, these "4 specific recommendations for improvement" Clegg referred to in his email to Surgeon General Murthy are the same 4 Executive Branch policy recommendations Psaki stated in her July 16, 2021, press briefing. *See supra*, Psaki transcript, n.5.

84. The following month, on August 20, 2021, Clegg sent Murthy a lengthy email because Surgeon General Murthy requested an update. Attached as ***Exhibit 12*** is a true and correct copy of this email communication.

85. In that email, Clegg stated to Defendant Murthy, "You asked for an update on existing and new steps Facebook is taking." Clegg noted to date that Facebook had removed over 20 million pieces of content for COVID-related misinformation. *Id*.

86. Clegg further stated to Murthy, "In light of our conversation we have been reviewing our efforts to combat COVID-19 and are eager to continue working toward our shared goal of helping more people get vaccinated and limiting the spread of harmful misinformation." *Id*.

### *Facebook*

87. Defendant Facebook is one of the most popular social media sites in the world. It

boasts "more than 2.8 billion monthly users worldwide," who use it for both business and pleasure.[14] Almost 70% of Americans use Facebook in some capacity.[15] Of these users, 70% visit Facebook daily.[16]

88. Facebook's services involve creating a sort of personal website for its users who can post pictures of themselves and others, create posts on their wall where they can "debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 137 S. Ct. at 1735. These posts are published on the Internet and can also include links to news articles and videos. Other users can post comments on a user's posts and thereby have a dialogue with one another. Users may also send each other direct messages through Facebook's Messenger feature.

89. Given this tremendous opportunity to network and speak with other people throughout the United States and even the world on the Internet, users frequently use Facebook to promote their business. "There are over 60 million active business [p]ages" on Facebook.[17] Millions of businesses pay to be active advertisers.[18]

90. Facebook's hosting of advertisements is very lucrative for it. In 2018, it generated a total of $55.8 billion in revenue, 99% of which came from ads on Facebook and other platforms that it owns, such as Instagram.[19]

91. On December 31, 2021, the same fiscal year when Facebook made its $15 million

---

[14] John Gramlich, *10 facts about Americans and Facebook*, Pew Research Center (June 1, 2021), *available at* https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/) (last visited Aug. 18, 2021).

[15] *Id.*

[16] *Id.*

[17] Kit Smith, *53 Incredible Facebook Statistics and Facts*, Brandwatch (June 1, 2019), *available at* https://www.brandwatch.com/blog/facebook-statistics/ (last visited Aug. 18, 2021).

[18] *Id.*

[19] Erin Black, *How Facebook makes money by targeting ads directly to you*, CNBC (Apr. 2, 2019), *available at* https://www.cnbc.com/2019/04/02/how-facebook-instagram-whatsapp-and-messenger-make-money.html?__source=facebook%7Cmain&fbclid=IwAR05sCPLjY61T3UOfYNvQQZwOiMY64mJsnMQ0Lu4UNYqXkaXa1FUPpn1Huo (last visited Aug. 18, 2021).

free advertising donation to the Federal Government Defendants, Facebook filed its Form 10K Annual Report with the Securities and Exchange Commission ("SEC").[20]

92. In its 2021 filed Annual Report with the SEC, Facebook noted: "Substantially all of our revenue is currently generated from third parties advertising on Facebook and Instagram."[21]

93. Facebook's terms of service invite businesses to use its services to "connect with [other people], build communities, and grow businesses."[22] Facebook describes its services as "[e]mpower[ing] you to express yourself and communicate about what matters to you."[23]

94. The terms of service require users to follow Facebook's "Community Standards."[24] Those standards state that Facebook is "a service for more than two billion people to freely express themselves across countries and cultures and in dozens of languages."[25] They go on to state, "To ensure that everyone's voice is valued, we take great care to craft policies that are inclusive of different views and beliefs, in particular those of people and communities that might otherwise be overlooked or marginalized."[26]

95. The limits on this pro-free-speech stance include abstract categories such as "Violence and Criminal Behavior," "Safety" (which includes "Suicide and Self-Injury," "Child Sexual Exploitation, Abuse, and Nudity," "Sexual Exploitation of Adults," "Bullying and Harassment," "Human Exploitation," and "Privacy Violations and Image Privacy Rights"), "Objectionable Content" (which includes "Hate Speech," "Violent and Graphic Content," "Adult Nudity and Sexual Activity," and "Sexual Solicitation"), "Integrity and

---

[20] https://www.sec.gov/Archives/edgar/data/1326801/000132680122000018/fb-20211231.htm (last visited Oct. 10, 2022).

[21] *Id.* at p. 15.

[22] Terms of Service, Facebook, *available at https://www.facebook.com/terms.php* (last revised Oct. 22, 2020) (last visited July 19, 2021).

[23] *Id.*

[24] *Id.*

[25] Community Standards, Facebook, *available at* https://www.facebook.com/communitystandards/ (last visited July 19, 2021).

[26] *Id.*

Case No. 3:22-cv-00737-CRB                    18

FIRST AMENDED COMPLAINT

1  Authenticity," (which includes "Account Integrity and Authentic Identity," "Spam,"

2  "Cybersecurity," "Inauthentic Behavior," "False News," "Manipulated Media," and

3  "Memorialization"), and "Respecting Intellectual Property." For the "False News" sub-

4  category, Facebook states that "we do not remove false news from Facebook but we

5  significantly reduce its distribution by showing it lower in News Feed."[27]

6  96. At no point in the terms of service or Community Standards does Facebook prohibit

7  valid public health messages and viewpoints that oppose making children wear masks,

8  such as Hart's posts.

9  97. Further, at no point in the terms of service or Community Standards does Facebook

10  mention that it would adjust its policies at or about the same time Hart posted on

11  Facebook in July of 2021, and substantially cooperate with, and follow, Defendants Biden

12  and Murthy's "4 specific recommendations for improvement" Clegg referred to in his email

13  to Surgeon General Murthy that Psaki mentioned in her July 16, 2021, press briefing.

14  98. Facebook voluntarily commits itself to be governed by an Oversight Board, which is

15  an independent non-Article III quasi-judicial board that interprets Facebook's content

16  policies by reviewing content moderation decisions.

17  99. For example, in March of 2021, shortly before Facebook removed Hart's valid public

18  health message, the Oversight Board "upheld Facebook's decision to leave up a post by a

19  state-level medical council in Brazil which claimed that lockdowns are ineffective and had

20  been condemned by the World Health Organization (WHO)."[28]

21  100. Hart is an executive consultant with over 25 years' experience creating data-driven

22  solutions for Fortune 500 companies and presidential campaigns alike. He is the Chief

23  Data Analyst and founder of RationalGround.com, which helps companies, public policy

24  officials, and parents gauge the impact of COVID-19 across the country.

25  101. He has used Facebook's services since 2007. He has roughly 1,700 Facebook users

26  who follow his account, and roughly 3,000 Facebook friends.

27  _____

[27] *Id.*

28  [28] https://www.oversightboard.com/decision/FB-B6NGYREK/ (last visited October 20, 2022).

102. He uses his Facebook account as a feeder for his other social media accounts, as a networking tool for his consulting business, and as a promotion for his online website, RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

103. Given Hart's use of Facebook for his business, he has purchased advertising on Facebook to promote his consulting business. Over the years, Hart has spent thousands of dollars on Facebook advertisements and has never been gifted free advertisement from Facebook as it gifted the Federal Government Defendants.

104. Hart has also purchased advertising for his consulting clients over the years, spending tens of thousands of dollars.

105. On his website RationalGround.com Hart offers some of his articles exclusively to subscribers. His subscriptions generate thousands of dollars per month.

106. On April 23, 2021, Facebook restricted Hart's ability to post or comment for 24 hours because it claimed the following three posts violated its Community Standards:

    a.    On or around April 14, 2021, Hart created a post on Facebook stating, "If you ever want to know where your BLM donation is going – the co-founder 'trained Marxist' Patrisee Cullars – just bought this amazing home in LA" and it included a link to a picture of the house.

    b.    That same day, a second post of his was removed from Facebook.

    c.    On April 23, 2021, he created a post stating: "This is the truth: Covid is almost gone in America. Hospitals are literally empty. Every willing senior has already been vaccinated. In a few weeks every willing adult can be…

107. Losing the ability to connect with people on the Internet through his Facebook account has harmed Hart's online business and work to help educate and provide information to others. He is also suffering injury because he serves as the administrator of at least one of his client's Facebook pages. While Hart's personal account is suspended, he cannot service this account.

108. Facebook's policies and standards for censorship on its platform and the Internet are constantly shifting and adjusting in accordance with Defendants Biden and Murthy's

direction on COVID-19 "misinformation" and the federal government's pre-approved public health message and views allowed on the Internet.

109. For example, since early 2020, there has been widespread debate over whether COVID-19 was made by humans in a lab in Wuhan, China, and escaped from the lab or whether it started naturally through animal-to-human transmission.

110. Despite this public health debate, in February 2020, Facebook announced it would remove posts that suggested the virus was man-made, stating that the theory had been debunked by public health officials.[29]

111. But in May 2021, after Defendant Biden acknowledged the possibility of the theory, Facebook adjusted and reversed its policy to align with Biden's view and announced that it would no longer remove posts expressing that viewpoint.[30] Therefore, Facebook is stifling the free debate of scientific theories and valide public health messages on the Internet such as Hart's by taking its directions from the Federal Government Defendants.

### Twitter

112. Defendant Twitter is also a popular social media site; more than one in five adult Americans use the platform.[31] Of these users, 46% visit Twitter daily.[32]

113. Twitter's services involve creating a personal profile from which its users can "tweet"—meaning post messages, photos, and weblinks to their feed for other users to see. Users can "like", repost, or reply to other users' tweets.

---

[29] Peter Suciu, *Social Media About Face: Facebook Won't Remove Claims Covid Was Man-Made*, Forbes (May 28, 2021, 3:39 PM), *available at* https://www.forbes.com/sites/petersuciu/2021/05/28/social-media-about-face-facebook-wont-remove-claims-covid-was-man-made/?sh=d21e05c6aa1a (last visited Aug. 18, 2021).

[30] Donie O'Sullivan & Jordan Valinsky, *Facebook will no longer remove claims that Covid-19 was man-made*, CNN Business (May 27, 2021, 12:16 PM), *available at* https://www.cnn.com/2021/05/27/tech/facebook-covid-19-origin-claims-removal/index.html (last visited Aug.18, 2021).

[31] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Research Center (Apr. 7, 2021), *available at* https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021/ (last visited July 19, 2021).

[32] *Id.*

114. Twitter allows users to have a dialogue on a variety of issues, including topics of national importance. 42% of U.S. adults on Twitter say they use the site to discuss politics.[33] Twitter is known for being "one of the social media sites with the most news-focused users."[34] 71% of adult Twitter users in the U.S. use the site to get news.[35]

115. "The Twitter Rules" proclaim that "Twitter's purpose is to serve the public conversation."[36]

116. The limitations on that "public conversation" include tweets that threaten or glorify violence or terrorism, sexually exploit children, abuse or harass other people, promote self-harm or suicide, show excessively gory media or adult content within live videos or profile photos, or serve any unlawful purpose.[37]

117. At no point in the terms of service or Twitter Rules does Twitter prohibit valid public health messages and viewpoints that oppose wearing masks. Nor do the terms of service or Twitter Rules state that Twitter would have regular BOLO meetings with the Federal Government Defendants to get instruction and direction on COVID-19 "misinformation."

118. Hart has used Twitter's services since 2007.

119. He uses his Twitter account as a feeder for his other social media accounts, as a networking tool for his consulting business, and to promote his website RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

---

[33] Adam Hughes & Stefan Wojcik, *10 facts about Americans and Twitter*, Pew Research Center (Aug. 2, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/ (last visited July 19, 2021).

[34] *Id.*

[35] *Id.*

[36] The Twitter Rules, Twitter, *available at* https://help.twitter.com/en/rules-and-policies/twitter-rules (last visited Aug. 19, 2021).

[37] *Id.*

120. Hart has purchased ads on Twitter to promote his consulting business. Over the years, he has spent thousands of dollars on Twitter ads. Hart planned to increase his use of Twitter advertising, but Twitter has denied him the ability to do so.

121. Losing the ability to communicate with people through his Twitter account has harmed his online business.

### *Missouri v. Biden*

122. There is a similar pending case to this case, *State of Missouri v. Biden,* Case No. 3:22-cv-01213-TAD-KDM, in the United States District Court for the Western District of Louisiana, Monroe Division.

123. On October 21, 2022, that court issued a 28-page Memorandum Order Regarding Witness Depositions ("Order"). A copy of the Order is attached as *Exhibit 13.*

124. In the Order, District Judge Terry A. Doughty explained that plaintiffs' claims involve allegations of collusion between the federal government and private social media companies to suppress disfavored views and content on social media platforms by labeling such content "dis-information," "mis-information," and "mal-information."

125. The court further determined that expedited discovery and depositions were appropriate for 10 witnesses. Three of the witnesses to be deposed as set forth in the Order are either parties in this case or play a prominent role in the allegations of this case.

126. The three individuals and witnesses relevant to this case with Judge Doughty's analysis as to why they should submit to depositions and expedited discovery in *State of Missouri v. Biden* are as follows:

- **Jennifer Psaki – Former White House Press Secretary**

127. The *Missouri* court noted that Psaki had made a series of public statements at press conferences in her former role as Press Secretary.

128. Judge Doughty found that Psaki had publicly spoken of pressuring social media companies to censor disfavored views related to COVID-19 misinformation.

129. In ordering her to submit to a deposition, the Court found that "Psaki has made a number of statements that are relevant to the Government's involvement in a number of

social-media platforms' efforts to censor its users across the board for sharing information related to COVID-19."

- **Dr. Vivek Murthy – Surgeon General**

130. The court found that Dr. Murthy, a named defendant in this case, had publicly criticized "tech companies" by asserting that they are responsible for COVID-19 deaths due to their failure to censor "misinformation."

131. And that Murthy also engaged in communications with high-level Facebook executives about the "demand" for greater censorship of COVID-19 "misinformation."

132. Judge Doughty determined that Murthy's actions went beyond the scope of his rank as Surgeon General. In ordering his deposition, the court found that "Dr. Murthy made public statements about how the [social] media companies' failure to censor its users resulted in COVID-19 deaths."

- **Carol Y. Crawford – CDC's Chief of the Digital Media Branch**

133. The court addressed Crawford's organization of the BOLO meetings referenced above, which were essentially meetings that attempted to "quell the spread of misinformation" related to COVID-19.

134. In ordering her deposition, the court found that "Crawford organized meetings and engaged in a number of communications with social-media officials, and the contents of those meetings and communications are highly important for the issues presented by this case."

135. On November 15, 2022, Crawford submitted to a video deposition. A copy of the Crawford deposition transcript is attached as ***Exhibit 14***.

136. In her deposition, Crawford testified that the federal government had insinuated itself into a position of interdependence with the Social Media Defendants by holding regular BOLO meetings to assist them with implementing their misinformation policies on their private platforms and the Internet.

137. For example, Crawford explained this interdependence between the federal government and Social Media Defendants in her deposition as follows:

Q; What's BOLO?

A: Be on the lookout.

Q. Why were you concerned about this?

A. Similar to all the other BOLOs, we still thought it was good to point out if we had facts around something that was widely circulating as a cause of misinformation to the platforms to assist them in whatever they were going to do with their policy or not do. And this was one that was kind of growing, and we had a lot of facts about it, and the team was concerned about this, this misunderstanding.

Crawford Depo., *Exhibit 14*, p. 153-54, Lines 20-26.

138. In addition to the three individuals above named in the Order in *Missouri v. Biden*, emails were produced in discovery in that case from federal government employee Rob Flaherty to anonoymous Facebook officials. Attached hereto as *Exhibit 15* are the Flaherty emails in and around March of 2021.

139. The Flaherty emails were not produced by the federal government to Hart in this case pursuant to his FOIA claim.

140. The Flaherty emails' subject line is, "You are hiding the ball." The Flaherty emails may be summarized as Flaherty dressing down and admonishing a Facebook official for the private social media company's lack of transparency to the federal government regarding vaccine hesitancy and borderline content misinformation allowed to be posted on Facebook's platform.

141. For example, on March 15, 2021, Flaherty writes to this Facebook official and says, "I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you are trying, we want to know how we can help, and we want to know that you are not playing a shell game with us when we ask you what is going on."

142. And the anonomymous Facebook official responds on behalf of the private social media company by groveling and asking Flaherty to hold Facebook "accountable."

143. For example, on March 15, 2021, the anonymous Facebook official responds to Flaherty and says, "We obviously have work to do to gain your trust. You mention that you are not trying to play "gotcha" with us – I appreciate the approach you are taking to continued discussions. We are also working to get you useful information that's on the

level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."

### *The Federal Defendants Engaged in Illegal Jawboning*

144. It was not essential for him to perform his duties and make decisions as President of the United States for Biden to direct the Social Media Defendants to employ his 4 recommendations for improvement; design algorithms to target opposing views of the government's COVID-19 message on the Internet; declare publicly they were "killing people;" and to adjust their misinformation policies related to COVID-19.

145.  Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

146. It was not essential for him to perform his duties and make decisions as Surgeon General for Murthy to engage in communications with high-level Facebook executives and demand greater censorship of COVID-19 "misinformation;" direct the Social Media Defendants to employ the 4 recommendations for improvement; design algorithms to target opposing views of the government's COVID-19 message on the Internet; and to adjust their misinformation policies related to COVID-19.

147. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

148. It was not essential for her to perform her duties and make decisions on behalf of the CDC for Crawford to conduct regular BOLO meetings with the Social Media Defendants to assist them with their misinformation policies related to COVID-19; and to negotiate with Facebook for the federal government to receive a $15 million advertising credit to promote its COVID-19 message on Facebook's platform that accesses the Internet.

149. Rather, the desired effect of her actions was a censorship scheme designed to threaten and intimidate the Social Media Defendants so they would censor their users' speech that was in opposition to the federal government's message on COVID-19.

150. It was not essential for him to perform his duties and make decisions on behalf of the White House for Flaherty to admonish an anonymous Facebook official and demand greater transparency from Facebook and to hold it accountable for COVID-19 "borderline content information" as he defined it that in his view was being posted to Facebook's private platform and on the Internet.

151. Rather, the desired effect of his actions was a censorship scheme designed to threaten and intimidate Facebook so it would censor its users' speech that was in opposition to the federal government's message on COVID-19.

### Elon Musk's public release of the Twitter Files

152. After purchasing and taking control of Twitter in late Fall of 2022 and firing most of its upper level management and many employees, Elon Musk released a number of internal Twitter documents to various journalists. Referred to as the "Twitter Files," they were then released to the public and were summarized into 15 Parts.[38]

153. In Part 10 of the summary of the Twitter Files, it was revealed that the United States government pressured Twitter and other social media platforms to elevate certain content and suppress other content about COVID-19.

154. The Twitter Files revealed three serious problems with Twitter's process related to moderating COVID-19 "misinformation:"[39]

> o First, much of the content moderation was conducted by bots, trained on machine learning and AI—impressive in their engineering, yet still too crude for such nuanced work.
> o Second, contractors, in places like the Philippines, also moderated content. They were given decision trees to aid in the process, but tasking non experts to adjudicate tweets on complex topics like myocarditis and mask efficacy data was destined for a significant error rate.
> o Third, most importantly, the buck stopped with higher level employees at Twitter who chose the inputs for the bots and decision trees, and

---

[38] See *The Twitter Files Parts 1-15: A Comprehensive Summary, Analysis, and Discussion of Ramifications for American Institutions (updated 1.19.23) – Stopping Socialism*, available at https://stoppingsocialism.com/2023/01/the-twitter-files-comprehensive-summary-analysis-and-discussion-of-ramifications-for-american-institutions/

[39] *See id* at Part 10.

subjectively decided escalated cases and suspensions. As it is with all people and institutions, there was individual and collective bias. With Covid, this bias bent heavily toward establishment dogmas.

155. And the Twitter Files revealed that on September 3, 2021, former FDA commissioner and Pfizer board member Dr. Scott Gottlieb, contacted Todd O'Boyle, a top lobbyist in Twitter's Washington office and the White House's Twitter point of contact. Gottlieb complained to O'Boyle about a tweet from Justin Hart, known to be a "lockdown and Covid vaccine skeptic with more than 100,000 Twitter followers."[40]

### COUNT I – Free Speech

**Murthy, Biden, Crawford, Flaherty, Facebook, and Twitter violated the Free Speech clause of the First Amendment when they acted jointly to remove Hart's social media posts from the Internet and block him from using his accounts.**

156. The allegations in the preceding paragraphs are incorporated herein by reference.

157. "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger*, 515 U.S. at 819.

158. Murthy, Biden, Crawford, and Flaherty knowingly engaged in viewpoint discrimination when they directed Facebook and Twitter to remove from the Internet social media posts and valid public health messages like those of Hart's that contained a viewpoint on COVID-19 that did not fit with their own political public health narrative.

159. Murthy, Biden, Crawford, and Flaherty further knowingly engaged in viewpoint discrimination against Hart when they and Executive Branch officials (1) directed Facebook and Twitter representatives to employ the federal government's "4 specific recommendations for improvement;" (2) held BOLO meetings with Facebook and Twitter representatives to target opposing public health messages on the Internet; (3) directed the Social Media Defendants to design algorithms to specifically target valid public health messages on the Internet opposing the government's COVID-19 views resulting in 20

---

[40] *See id*. at Part 13.

million pieces of content being removed from platforms and the Internet, including Hart's valid public health messages; (4) directed Facebook to adjust its policies regarding COVID-19 "misinformation" on the Internet at or about the time of Hart's valid public health message; and (5) negotiated and received a $15 million advertising credit from Facebook to advertise the government's unchallenged COVID-19 public health message on the Internet shortly before Hart's valid public messages were removed.

160. Murthy, Biden, Crawford, and Flaherty's unconstitutional viewpoint discrimination acts that deprived Hart of his First Amendment rights were further contrary to the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet" that is "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2).

161. Private companies engage in state action when they jointly work with government officials to deprive individuals of their constitutional rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

162. "The Supreme Court has articulated four tests for determining whether a non-governmental person's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Ohno,* 723 F.3d at 995.

163. "Joint action exists where the government affirms, authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a private party." *Id.* at 996.

164. The Ninth Circuit finds joint action when "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (cleaned up). "This requirement can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Id.*

165. And threats from government officials that amount to a censorship scheme violate the First Amendment. *See Bantam Books,* 372 U.S. at 64; *Writers Guild of America*, 609 F. 2d at 365.

166. "Particularly relevant here is the maxim that if the state knowingly accepts the benefits derived from unconstitutional behavior, then the conduct can be treated as state action." *Tsao,* 698 F.3d at 1140.

167. Facebook and Twitter engaged in state action when they removed valid public health messages and posts like Hart's from their platforms and the Internet at the request of Murthy, Biden, Crawford, and Flaherty based on the viewpoint of those posts on COVID-19 that differed from the public health message of the federal government.

168. Facebook and Twitter worked in concert, substantially cooperated with, and/or conspired with Murthy, Biden, Crawford, and Flaherty to deprive Hart of his First Amendment right to free speech to post valid public health messages on the Internet.

169. Murthy, Biden, Crawford, and Flaherty affirmed, authorized, encouraged, and/or facilitated Facebook and Twitter's unconstitutional conduct of censorship of Hart's posts and valid public health messages on the Internet.

170. Facebook and Twitter either were willful participants when they removed Hart's posts from the Internet based on his viewpoint at the direction of Murthy, Biden, Crawford, and Flaherty or were subject to government compulsion, either of which makes the removal of the posts state action and transforms Facebook and Twitter into state actors.

171. Murthy, Biden, Crawford, and Flaherty knowingly accepted the benefits of censored speech derived from the unconstitutional behavior of Facebook and Twitter in removing posts from the Internet based on a valid COVID-19 public health viewpoint with which Murthy, Biden, Crawford, and Flaherty disagreed.

172. Further, Murthy, Biden, Crawford, Flaherty, and Executive Branch officials knowingly accepted the benefits of $15 million in advertising credit from Facebook to promote the federal government's unchallenged public health COVID-19 viewpoint and

message on the Internet, a public forum Congress intended to be a marketplace of ideas free from government regulation.

173. Although Hart remains active on Facebook and Twitter in an attempt to rebuild his brand and continue to post valid public health messages, Facebook and Twitter now require that Hart and other users in the future express a government-approved viewpoint to use their platforms that reach the Internet and that are subject to the COVID-19 public health policies and control of the federal government, and such posts that reach the Internet are no longer subject to the Social Media Defendants' policies.

174. Further, Facebook adjusts and deviates from its voluntary submission to its independent Oversight Board on COVID-19 public health misinformation and instead follows the direction of Murthy, Biden, Crawford, and Flaherty's recommendations.

175. Hart is entitled to declaratory and injunctive relief against Murthy, Biden, Crawford, and Flaherty for violating his right to free speech on the Internet under the First Amendment and to stop them from directing Facebook and Twitter to utilize the federal government's policies on what constitutes COVID-19 "misinformation" on their platforms and Internet.

176. Hart is entitled to declaratory and injunctive relief as well as compensatory and nominal damages from Facebook and Twitter for violating his right to free speech on the Internet under the First Amendment and to stop them from adjusting their algorithms and policies to align with the federal government's COVID-19 "misinformation" policies.

## COUNT II - Promissory Estoppel

**Facebook and Twitter committed promissory estoppel by not fulfilling their promise to Hart to use their social media platforms to reach an audience on the Internet in furtherance of his business.**

177. The allegations in the preceding paragraphs are incorporated herein by reference.

178. Facebook and Twitter made "a clear and unambiguous promise" to Hart that he could use their services to communicate and network with other Facebook and Twitter

users on the Internet. *Bushell v. JPMorgan Chase Bank, N.A.*, 163 Cal. Rptr. 3d 539, 550 (Cal. Ct. App. 2013).

179.  In making this promise, Facebook and Twitter did not include a provision that they would censor speech on the Internet opposing masks at the direction of the federal government.

180.  Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's and Twitter's promise when he started using their services to speak with and network with other Facebook and Twitter users on the Internet to promote his business. *Bushell*, 163 Cal. Rptr. 3d at 550.

181. Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's promise when he invested substantial sums of money to advertise on Facebook and Twitter and their platforms that reach an audience on the Internet. *Id.*

182.  Facebook's and Twitter's removal from the Internet and flagging of Hart's posts and suspension of his account for engaging in speech caused his reliance on their promises to be to the detriment of his business, finances, and reputation.

183. As the result of this detrimental reliance, Hart suffered monetary and non-monetary damages.

184. Hart is entitled to monetary relief from Facebook and Twitter for committing the tort of promissory estoppel.

### COUNT III - Intentional Interference with a Contract

**Facebook committed intentional interference with a contract by interfering with Hart's contract with Donorbureau, LLC.**

185. The allegations in the preceding paragraphs are incorporated herein by reference.

186. To establish a claim of intentional interference with a contractual relationship, the claimant must show (1) a valid contract between claimant and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual

relationship; and (5) resulting damage. *Davis v. Nadrich*, 94 Cal. Rptr. 3d 414, 421 (Cal. Ct. App. 2009).

187.  California law does not require that the defendant act with the specific intent to interfere. *See id.* at 422; *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513 (1998). The tort is applicable if the defendant knows that the interference is substantially certain or certain to happen as a result of defendant's actions. *Nadrich*, 94 Cal. Rptr. 3d at 422.

188.  Hart maintains a valid employment contract with Donorbureau, LLC ("Donorbureau"), a Virginia-based limited liability company.

189.  As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

190. Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

191. Facebook intentionally suspended Hart's use of his personal Facebook account and removed his posts from the Internet, and Facebook knew and intended that such action would prevent Hart from doing his work as an Administrator on the Donorbureau account.

192. Therefore, Facebook intentionally interfered with Hart's contract with Donorbureau.

193. Not being able to service Donorbureau's Facebook page placed Hart in breach of his contract with Donorbureau.

194. Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

195. Hart is entitled to monetary relief from Facebook for intentionally interfering with his contract with Donorbureau.

**COUNT IV - Negligent Interference with a Prospective Economic Advantage**

**Facebook committed negligent interference with a prospective economic advantage by interfering with Hart's contract with Donorbureau, LLC.**

196. The allegations in the preceding paragraphs are incorporated herein by reference.

197. To establish a claim of negligent interference with a prospective economic advantage, a claimant must show (1) the existence of a valid contractual relationship between the plaintiff and a third party containing the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge, actual or construed, of the relationship; (3) the defendant's knowledge, actual or construed, that the relationship would be disrupted if the defendant failed to act with reasonable care; (4) the defendant's failure to act with reasonable care; (5) actual disruption of the relationship; and (6) resulting economic harm. *Nelson v. Tucker Ellis, LLP*, 262 Cal. Rptr. 3d 250, 264 n.5 (Cal. App. Ct. 2020).

198. Hart maintains a valid employment contract with Donorbureau, LLC, a Virginia-based limited liability company.

199. As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

200. Hart has a probability of future economic benefit by fulfilling the terms of his employment contract with Donorbureau.

201. Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

202. When Facebook suspended Hart's use of his personal Facebook account and removed his posts from the Internet, it knew or should have known that Hart's work as an Administrator on the Donorbureau account and his relationship with Donorbureau would be disrupted as a result of its negligent actions.

203. In not providing Hart any avenue to access the Donorbureau account, Facebook failed to act with reasonable care.

204. Facebook's act of suspension caused an actual disruption in the relationship between Hart and Donorbureau because he could not post content to the site or on the Internet or make other changes in his work to increase Donorbureau's revenue.

205. Therefore, Facebook negligently interfered with Hart's prospective economic advantage from his contractual relationship with Donorbureau.

206. Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

207. Hart is entitled to monetary relief from Facebook for negligently interfering with the prospective economic advantage resulting from his contract with Donorbureau.

## PRAYER FOR RELIEF

Plaintiff Justin Hart respectfully requests that this Court enter judgment in his favor on every claim set forth above and award him the following relief:

A. Declare that the actions of Murthy, Biden, Crawford, Flaherty, Facebook, and Twitter constitute a violation of the Free Speech Clause of the First Amendment by denying Hart the ability to speak on the Internet through the private social media platforms of Facebook and Twitter;

B. Enjoin Murthy, Biden, Crawford, and Flaherty from directing in the future social media companies such as the Social Media Defendants to censor information and speech on platforms and the Internet with which Murthy, Biden, Crawford, and Flaherty disagree;

C. Enjoin Facebook and Twitter from removing in the future Hart's posts from the Internet or suspending his posts at the direction of Murthy, Biden, Crawford, and Flaherty or based on the federal government's "misinformation" policies;

D. Enjoin Murthy, Biden, Crawford, and Flaherty from directing social media companies such as the Social Media Defendants from censoring speech in the future;

E. Award Hart compensatory damages in the amount of his past, present, and future lost income resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

F. Award Hart compensatory damages in the amount of a return of the money he spent on Facebook and Twitter advertisements because of Facebook's and Twitter's actions of

1  promissory estoppel and Facebook's intentional interference with a contract and negligent
2  interference with a prospective economic advantage;

3      G.  Award Hart compensatory damages in an amount to fully compensate him for the
4  time he spent building a following on the Internet through Facebook and Twitter that has
5  now been wasted by Facebook's and Twitter's actions of promissory estoppel and
6  Facebook's intentional interference with a contract and negligent interference with a
7  prospective economic advantage;

8      H.  Award Hart compensatory damages in the amount of the harm to his reputation on
9  the Internet resulting from Facebook's and Twitter's actions of promissory estoppel and
10 resulting from Facebook's intentional interference with a contract and negligent
11 interference with a prospective economic advantage; and

12     I.   Award any further relief to which Hart may be entitled, including reasonable
13 attorneys' fees and costs.

14

15     Dated: February 15, 2023          Respectfully submitted,

16                                       s/ Daniel Suhr
                                         Daniel Suhr, pro hac vice admitted
17                                       dsuhr@libertyjusticecenter.org
                                         M.E. Buck Dougherty III, pro hac vice admitted
18                                       bdougherty@libertyjusticecenter.org
                                         James McQuaid, pro hac vice admitted
19                                       jmcquaid@libertyjusticecenter.org
                                         LIBERTY JUSTICE CENTER
20                                       440 N. Wells Street, Suite 200
                                         Chicago, Illinois 60654
21                                       Telephone: 312-637-2280
                                         Facsimile: 312-263-7702
22
23

24
                                         Robert Tyler (STATE BAR NO. 179572)
25                                       rtyler@tylerbursch.com
                                         Nada Higuera (STATE BAR NO. 299819)
26                                       nhiguera@tylerbursch.com
                                         TYLER BURSCH, LLP
27                                       25026 Las Brisas Road
                                         Murrieta, California 92562
28

Telephone: 951-600-2733
Facsimile: 951-600-4996

*Attorneys for Plaintiff Justin Hart*

37

# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF LOUISIANA
 2                      MONROE DIVISION

 3    STATE OF MISSOURI ex
      rel. ERIC S. SCHMITT,
 4    Attorney General,
      et al.,
 5                             No. 3:22-cv-01213-TAD-KDM
          Plaintiffs,
 6
      vs.
 7
      JOSEPH R. BIDEN, JR.,
 8    in his official capacity

 9    as President of the United

10    States, et al.,

11        Defendants.

12

13      THE VIDEOTAPED DEPOSITION OF CAROL CRAWFORD

14                November 15, 2022

15              9:24 a.m. to 5:33 p.m.

16

17              Office of General Counsel
         Centers for Disease Control and Prevention
18              1600 Clifton Road NE
                  Atlanta, Georgia

19
      Reporter:
20          Maureen S. Kreimer, CCR-B-1379, CRR

21

22

23

24

25
```

**CAROL CRAWFORD  11/15/2022**

```
 1                    INDEX TO EXAMINATIONS

 2    Examination                                    PAGE

 3    CAROL CRAWFORD

 4    Cross-Examination by Mr. Vecchione                9

 5                 DESCRIPTION OF EXHIBITS
      Plaintiffs'
 6      EXHIBIT              DESCRIPTION            PAGE

 7    Exhibit 1    Deposition Notice for Carol        21
                   Crawford
 8
      Exhibit 2    Emails ending 2/7/20 Subject FB    22
 9                 Coordination
                   MOLA_DEFSPROD_00004442-4445
10
      Exhibit 3    Emails ending 3/5/20 Facebook's    33
11                 COVID-19 Response Efforts
                   MOLA_DEFSPROD_0004060-4061
12
      Exhibit 4    Emails ending 3/31/20 CDC brief on 38
13                 ways to reach high-risk and
                   frequent travelers
14                 MOLA_DEFSPROD_00003872 and
                   MOLA_DEFSPROD00015014-15017
15
      Exhibit 5    Emails ending 3/30/20 CDC brief on 43
16                 ways to reach high-risk and
                   frequent travelers
17                 MOLA_DEFSPROD_00015018--19
      Exhibit 6    Emails ending 1/26/21 CrowdTangle  49
18                 COVID-19 reports for WHO
                   MOLA_DEFSPRDO_00002595-96
19    Exhibit 7    Emails ending 5/26/21 CrowdTangle  60

20                 COVID-19 reports

21                 MOLA_DEFSPROD_00002591-94

22    Exhibit 8    Emails ending 3/31/21 re: This     67

23                 week's meeting

24                 MOLA-DEFSPROD-00003031-33

25    (CONTINUED NEXT PAGE)
```

**CAROL CRAWFORD  11/15/2022**

```
 1   Exhibit 9     Emails ending 5/6/21 Misinfo on two     85
                   issues MOLA_DEFSPROD_00002686-2688
 2
     Exhibit 10    emails ending 5/10/21 CV19 misinfo      91
 3                 reporting channel
                   MOLA_DEFSPROD002684-2685
 4
     Exhibit 11    Emails ending 5/20/21 Agenda item      102
 5                 for CDC call this week
                   MOLA-DEFSPROD_00002659-2660
 6
     Exhibit 12    Lancet April 2021 article.  Bell's     112
 7                 palsy and SARS-CoV-2 vaccines
     Exhibit 13    Lancet September 2021 article          112
 8                 Bell's palsy and SARS-CoV-2
                   vaccines - an unfolding story
 9   Exhibit 14    Document titled Infection fatality      113
                   rate of COVID-19 in
10                 community-dwelling populations with
                   emphasis on the elderly:  An
11                 overview
     Exhibit 15    Emails ending 6/2/21 RE It was this     118
12                 list sorry!
                   MOLA-DEFSPROD_00002538-2541
13   Exhibit 16    Emails ending 6/3/21 RE It was this     126
                   list, sorry!
14                 MOLA-DEFSPROD_00002532-33
     Exhibit 17    Emails 7/26/21 FB Misinformation        138
15                 Claims_Help Debunking
                   MOLA_DEFSPROD_00002478
16   Exhibit 18    Emails ending 7/20/21 CrowdTangle       141

17                 COVID-19 reports

18                 MOLA-DEFSPROD_00002487-2489

19   Exhibit 19    emails ending 8/18/21 CrowdTangle       145

20                 COVID-19 reports

21                 MOLA-DEFSPROD-00002438-440

22   Exhibit 20    Emails ending 8/19/21 VAERS talking     150

23                 points 8.15_AH_PM_CLEAN COPY.docx

24                 MOLA-DEFSPROD_00002434-435

25   (CONTINUED NEXT PAGE)
```

**CAROL CRAWFORD  11/15/2022**

Page 4

```
 1   Exhibit 21    9/1/21 Email BOLO: CDC lab alert &      152
               misinformation
 2             MOLA-DEFSPROD_00002249
     Exhibit 22    Emails ending 11/2/21 New Claims &      155
 3             Policy updates following EAU
               authorization for 5-11 year olds
 4             MOLA-DEFSPROD_000011778-779

 5   Exhibit 23    Emails ending 11/8/21 New Claims &      163
               Policy updates following EAU
 6             authorization for 5-11 year olds
               MOLA_DEFSPROD_00001774-775
 7   Exhibit 24    Bloomberg article Frequent Boosters     164
               Spur Warning on Immune Response
 8
     Exhibit 26    Emails ending 2/3/22 Vaccine            166
 9             Misinformation Questions for CDC
               MOLA_DEFSPROD_00001683-1686
10
     Exhibit 27    Emails ending 2/4/22 Have 5 minutes     171
11             to chat?  MOLA_DEFSPROD_00001677
     Exhibit 28    Emails ending 3/23/21 COVID misinfo     173
12             project MOLA_DEFSPROD_00003130-31

13   Exhibit 29    Emails ending 4/5/21 Followup on        179
               mis-info conversation
14             MOLA_DEFSPROD_00003024-25

15   Exhibit 30    Emails ending 4/12/21 Followup on       187
               mis-info conversation
16             MOLA_DEFSPROD_00002936

17   Exhibit 31    Emails ending 12/21/21 Omicron page     188
               MOLA_DEFSPROD_00001719-21
18   Exhibit 32    Emails ending 4/9/21 Request for        196
               problem accounts
19             MOLA_DEFSPROD_00002971
20   Exhibit 33    Emails ending 4/14/21 Request for       200
21             problem accounts
22             MOLA_DEFSPROD_00002807
23
24   (CONTINUED NEXT PAGE)
25
```

```
 1    Exhibit 34    Emails ending 6/30/21 COVID      205
                    Misinformation
 2                  MOLA_DEFSPROD_00002496-500
      Exhibit 35    9/3/21 Email BOLO:  CDC lab alert &   219
 3                  misinformation
                    MOLA-DEFSPROD_00002200
 4    Exhibit 36    Emails ending 4/15/21 Call or VC -   221
                    Facebook weekly sync with CDC
 5                  MOLA_DEFSPROD_00002806
      Exhibit 37    Emails ending 4/29/21 CDC Guides    226
 6                  and this week's meeting
                    MOLA_DEFSPROD_00002694-95
 7    Exhibit 38    Emails ending 4/30/21 WY issue      237
                    MOLA_DEFSPROD_00002690-91
 8
      Exhibit 39    Emails ending 5/6/21 Join with New   239
 9                  Info E call or VC
                    MOLA_DEFSPROD_00002689
10
      Exhibit 40    5/10/21 Email COVID BOLO meetings   241
11                  on misinformation
                    MOLA_DEFSPROD_00002683-2682
12
      Exhibit 41    Emails ending 6/10/21 CDC COVID_19   247
13                  BOLO Meeting
                    MOLA_DEFSPROD_00002521-22
14
      Exhibit 42    Emails ending 10/28/21 Booster      249
15                  Shots MOLA_DEFSPROD_00001827-29
      Exhibit 43    6/29/22 email Claims review         254
16                  MOLA_DEFSPROD_00001556

17    Exhibit 44    Emails ending 3/10/21 Themes that   257

18                  have been removed for misinform

19                  MOLA_DEFSPROD_00003159-161

20

21    (REPORTER'S NOTE:  Original Plaintiffs' Exhibits 1

22    through 24 and 26 through 44 have been attached to

23    the original deposition transcript.)

24

25
```

**CAROL CRAWFORD  11/15/2022**

```
 1    APPEARANCES OF COUNSEL:
      On behalf of the Plaintiff State of Missouri:
 2         D. JOHN SAUER, ESQ.
           Missouri Attorney General's Office
 3         Supreme Court Building
           221 W. High Street
 4         P.O. Box 899
           Jefferson City, Missouri 65101
 5         John.sauer@ago.mo.gov
           (877) 696-6775
 6    On behalf of the Plaintiffs Dr. Jayanta Bhattacharya,
      Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill
 7    Hines:

 8         JOHN J. VECCHIONE, ESQ.

 9         New Civil Liberties Alliance

10         1225 19th Street N.W.

11         Suite 450

12         Washington, DC  20036

13         John.vecchione@ncla.legal

14         (202) 869-5210

15    On behalf of Centers for Disease Control and

16    Prevention:

17         JAMES GILLIGAN, ESQ.

18         KYLA SNOW, ESQ.

19         U.S. Department of Justice

20         1100 L Street N.W.

21         Washington, DC 29530

22         202-353-3098

23         James.gilligan@usdoj.gov

24         Kyla.snow@usdoj.gov

25    (Continued next page)
```

**CAROL CRAWFORD  11/15/2022**

```
 1    On behalf of U.S. Department of Health & Human
      Services:
 2         ANANT KUMAR, ESQ.
           U.S. Department of Health & Human Services
 3         200 Independence Avenue S.W.
           Washington, DC 20201
 4         Anant.kumar@hhs.gov

 5    Also Present:
                Kenya S. Ford, Esq.
 6              Sudevi N. Ghosh, Esq.
                Centers for Disease Control & Prevention
 7
                Melissa Thombley, Esq (via Zoom)
 8              U.S. Department of Health and Human

 9              Services

10

11              Joseph Foster, Esq.  (via Zoom)

12              Centers for Disease Control & Prevention

13

14    Legal videographer:  Jason Silling, Lexitas Legal

15

16                     - - -

17

18

19     (Pursuant to Article 10(B) of the Rules and

20    Regulations of the Georgia Board of Court Reporting,

21    disclosure was presented to all counsel present at

22    the proceeding and a written copy is attached

23    hereto.)

24

25
```

**CAROL CRAWFORD  11/15/2022**

```
 1                  THE VIDEOGRAPHER: We are on the record.
 2     Today's date is November 15, 2022.  The time is
 3     9:24.  This is the video-recorded deposition of
 4     Carol Crawford in the matter of the State of
 5     Missouri versus Joseph R. Biden in the U.S. District
 6     Court for the Western District of Louisiana.
 7                  This deposition is being held at the CDC.
 8     The reporter's name is Maureen Kreimer.  My name is
 9     Jason Silling.  I am the legal videographer.  We are
10     with Lexitas Legal.  Would the attorneys present
11     please introduce themselves and the parties they
12     represent.
13                  MR. VECCHIONE:  I am John Vecchione.  I
14     represent the individual plaintiffs Jay
15     Bhattacharya, Aaron Kheriaty, and Jill Hines and
16     Martin Kulldorff.
17                  MS. SNOW:  My name is Kyla Snow.  I'm with
18     the Department of Justice representing the
19     defendants in this case.  And defendants reserve
20     their right to review, read, review and sign the
21     transcript.
22                  MR. GILLIGAN:  James Gilligan, also with
23     the Department of Justice representing the
24     defendants.
25                  MR. KUMAR:  Anant Kumar with the Office of
```

**CAROL CRAWFORD  11/15/2022**

```
 1   General Counsel in HHS, and I also represent the

 2   defendant.  I represent the HHS defendants.

 3            THE VIDEOGRAPHER:  Would the court

 4   reporter please swear in the witness.

 5                    CAROL CRAWFORD,

 6   having been first duly sworn, was examined and

 7   testified as follows:

 8            REPORTER:  You can begin, Counsel.

 9            THE VIDEOGRAPHER:  You may proceed.

10                    EXAMINATION

11   BY MR. VECCHIONE:

12        Q.  Good morning, Ms. Crawford.  Have you ever

13   been deposed before?

14        A.  No, I have not.

15        Q.  All right.  So I'm going to lay out some

16   ground rules.  We have to -- the court reporter and

17   everything else can only pick up verbal cues.  In

18   normal conversation, we nod our heads like you're

19   doing now and all that, but for the record we have

20   to say things out loud.  And that also, to keep a

21   clear record, we have to try not to talk over each

22   other.  And that's really something the lawyers, we

23   say to the lawyers, because they're the ones who

24   interrupt, not the witness.  But keep that in mind.

25            If you don't -- I will be asking
```

```
 1   questions.  If you don't understand the question,
 2   you can ask me to rephrase, or say you don't
 3   understand.  Don't answer a question that you think
 4   you don't understand.  If during the course of this,
 5   your counsel -- which of you is defending this one?
 6   You're going to defend it?
 7           MS. SNOW:  Yes.
 8   BY MR. VECCHIOINE:
 9       Q.  So your counsel will make objections.
10   Wait for the objections to fade, and then answer the
11   question unless I rephrase or something like that,
12   unless she instructs you not to answer.
13           Let's see.  So do you agree with all that?
14   Do you understand the process?
15       A.  I understand.  Could you speak up a
16   little, though?  It's hard for me to hear you.
17       Q.  I can.  You know what, I didn't turn on
18   this.  I was dealing with the other mic that I have
19   on my tie.
20       A.  Thank you.
21       Q.  But in any event, so.
22           All right.  Are you taking any
23   medications, or do you have any condition that would
24   impact your ability to testify truthfully today?
25       A.  No.
```

**CAROL CRAWFORD  11/15/2022**

```
 1            Q.  All right.  For the record please state
 2      your name.
 3            A.  Carol Young Crawford.
 4            Q.  And what's your current employment?
 5            A.  I work for the CDC.
 6            Q.  What's your title?
 7            A.  I am the division director for the
 8      division of Digital Media within the CDC Office of
 9      the Associate Director for Communication, which we
10      call OADC.
11            Q.  Give me the term again.  Office of?
12            A.  The Associate Director for Communication.
13            Q.  And what are your duties in that role?
14            A.  Our division provides leadership for CDC's
15      web presence.  We provide leadership for CDC's
16      social media presence.  We have -- we lead the
17      development operations of CDC's 800-number, which is
18      our Contact Center.  We also provide graphics and
19      visual design services for the Agency.
20            Q.  And what do you do?
21            A.  I'm the director of that work.  I
22      determine strategy, objectives, oversee work.
23            Q.  Do you have any -- well, why don't we
24      start.  Go back a little bit.
25                Could you briefly outline your education
```

```
 1   and employment history up until now?

 2        A.  Yes.  I started work at CDC when I was 18.

 3   So I have been here 34 years.  I went to school -- I

 4   have a bachelor's in business and a master's in

 5   public administration, and I have been working at

 6   CDC within digital communications, web, social

 7   media, for really as long as those things existed at

 8   CDC.

 9        Q.  And where are your degrees from?

10        A.  University of -- the University of Georgia

11   for the master's, Georgia State for the bachelor.

12        Q.  Okay.  So have you always been at CDC here

13   in Atlanta?

14        A.  Yes.

15        Q.  Did you have any back- -- do you have any

16   background in medicine, sciences, or epidemiology?

17        A.  No.

18        Q.  And is there anything else about the role

19   of the division of Public Affairs' place within CDC

20   that you haven't told me?  Is there anything --

21        A.  Can you repeat?

22        Q.  Yeah.  You have told me a little bit about

23   what the division of Public Affairs does, I believe,

24   or was that only what OADC does?

25        A.  I was referring to the division of Digital
```

1    Media.

2          Q.   Okay.

3          A.   Which was created in April of 2022.  Or

4    maybe March 2022.  Sorry.

5          Q.   On or about, as we say.

6          A.   Yes.

7          Q.   Now -- well, let's go back to that, the

8    division.  The division of Public Affairs, you're

9    within that at the CDC?

10         A.   There is no division of Public Affairs in

11   OADC any longer.

12         Q.   What happened there?

13         A.   The reorganization of OADC occurred in

14   March or April of 2022, and there's -- that division

15   does not exist anymore.

16         Q.   Prior to this changeover what did that

17   division do?

18         A.   The division had three branches.  The

19   division -- I mean, the branch of Digital Media,

20   where I was, the branch for News Media, and a branch

21   for Employee Communications.

22         Q.   And then what did the reorganization do

23   with each of those three?  Where did they go?

24         A.   The -- well, Digital Media became the

25   division of Digital Media, and parts from other

```
 1   divisions came to join the work that we were already

 2   doing such as the Contact Center, and the Graphics,

 3   and that was new to my organization.  The News Media

 4   group is now a branch in the division of News Media,

 5   I believe.  I'm sorry.

 6        Q.  That's your understanding?

 7        A.  Yes.  And then they have a Broadcast group

 8   with them.  And the Employee Communication group is

 9   now an office in the OD of the OADC.  That was the

10   other component of the Public Affairs group that you

11   asked about.

12        Q.  Okay.  So the Digital Media branch now --

13   so I understand.  I'm not sure I got all that.  Who

14   did that before?  Was that only in the Digital Media

15   section of the three you've told me, or was there

16   overlap?

17        A.  Well, there is no Digital Media branch

18   now.

19        Q.  Okay.

20        A.  There is now a division of Digital Media.

21        Q.  Okay.

22        A.  You may have to reask the second part of

23   your question.

24        Q.  Okay.  Now it's the division of Digital

25   Media.  Who had that -- what was the name of the
```

**CAROL CRAWFORD 11/15/2022**

Page 15

```
 1    organization that had that role before April of
 2    March of 2022?
 3           A.   I was the branch chief of the Digital
 4    Media Branch within the Division of Public Affairs,
 5    and most of the roles that our division currently
 6    performs, web and social media, were in that branch.
 7           Q.   Thank you.  Did anyone else have overlap
 8    before?
 9           A.   No.
10           Q.   All right.  So what is the current duty of
11    the Division of Digital Media?
12           A.   The current?
13           Q.   Duties?
14           A.   Of the division of Digital Media?  We
15    provide leadership for CDC's website.  We provide
16    leadership for CDC's social media efforts.  We
17    provide graphic support for the entire agency, and
18    we manage the 800-number, the Contact Center.
19           Q.   Okay.  And what's -- what is leadership;
20    when you use that word, what do you mean?
21           A.   We, for web, for example, we convene a web
22    council with people across CDC to manage the
23    governance of the website.  We manage the web
24    content management system.  We draft policies and
25    guidelines around it.
```

Case 3:22-cv-01213-TAD-KDM Document 225-39 Filed 03/23/23 Page 65 of 346 PageID #: 10960

```
 1            Q.  In your current role since April or March
 2    of 2022 --
 3            A.  Mm-hmm (affirmative).
 4            Q.  --  have you had any contact with major
 5    technology companies such as Twitter, Facebook,
 6    LinkedIn, Microsoft or Google?
 7            A.  Yes.
 8            Q.  In your previous role before the
 9    reorganization, did you have such contacts?
10            A.  Yes.
11            Q.  Generally what type of contacts are those
12    when you started them?
13            A.  We started regular contact with the groups
14    at the beginning of the COVID outbreak to exchange
15    information about COVID, and most of the contact
16    since then has been around COVID or other
17    high-priority things, but mostly COVID.
18            Q.  Okay.  Let's get some timeline down.  Is
19    the beginning of COVID, would you think, February or
20    March of 2019?
21            A.  2020.
22            Q.  2020.  Excuse me.
23            A.  Yes.
24            Q.  Okay.  For our purposes.  All right.
25            A.  Mm-hmm (affirmative).
```

```
 1          Q.  So before that, social media had been
 2    around for a while, I mean, but did -- you didn't
 3    have contact with them before COVID?
 4          A.  I had periodic occasional contact with the
 5    platforms, depending on maybe they would reach out
 6    to CDC for something, or we would be trying to reach
 7    out to them for assistance with something.  I didn't
 8    have regular meetings.  They were -- they were very
 9    occasional.
10          Q.  All right.  COVID hits, let's say, early
11    spring of 2020.
12          A.  Mm-hmm (affirmative).
13          Q.  How did you instigate contact with these
14    systems?  Generally, I'm speaking.  I know there may
15    be some differences, but generally how did you
16    initially instigate contacts with them?
17          A.  I don't recall who initiated contact.
18          Q.  Does that mean you don't know who within
19    CDC, or does that mean you don't know if they called
20    you?
21          A.  I don't recall if they called us first, or
22    we called them first.  It could have differed also
23    depending on the platform.
24          Q.  From media company to media company?
25          A.  There was a lot going on at that time, so.
```

**CAROL CRAWFORD  11/15/2022**

```
 1          Q.  Do you have a present recollection of when

 2     you first spoke to any media platform about COVID,

 3     or email, when I say -- had communications with?

 4          A.  I believe, my recollection is, is that we

 5     started talking to some of them in February and

 6     March of 2020.

 7          Q.  And what was the nature of the

 8     discussions?

 9          A.  My memory of our first interactions were

10     around getting out CDC-credible information.  For

11     instance, I know Facebook was looking at making it

12     easier to find COVID information from the CDC and

13     WHO on a platform, and they wanted to use our public

14     domain content and they were similar in

15     conversations with platforms.

16          Q.  Got it.  And did you take the initiative

17     in these meetings, or did someone direct you to go

18     do these meetings, or contacts?

19          A.  I would say I took initiative on the

20     meetings.  But there were a lot of people asking

21     staff, or other staff, are we -- were we in contact

22     with the groups, and do we have any arrangements.

23          Q.  In your current role who do you report to?

24          A.  In my current role I report to the

25     director of OADC, which is Kevin Griffis.
```

**CAROL CRAWFORD  11/15/2022**

Page 19

```
 1            Q.  And who did you report to prior to the
 2    reorganization?  That a good word.
 3            A.  Yes.
 4            Q.  Can I call it a "reorg"?
 5            A.  Yes, you can.
 6            Q.  Prior to the reoorg, who did you report
 7    to?
 8            A.  I reported to the division director for
 9    the division of Public Affairs, who was Michelle
10    Bonds.
11            Q.  All right.  So during the beginning of the
12    pandemic your direct report would be Michelle Barnes
13    [sic]?
14            A.  I was her direct report.
15            Q.  Yes, that's what I meant.
16            A.  Yes.
17            Q.  You would directly report to her?
18            A.  Mm-hmm (affirmative).
19            Q.  All right.  So do you recall her talking
20    to you about what to do with the social media
21    companies early on?
22            A.  I don't believe we discussed it.
23            Q.  And why don't you believe that?
24            A.  It was an extremely busy time, and it was
25    within the scope of work I would normally handle.
```

```
 1            Q.  All right.  Let's look at the early spring
 2     of 2020.  What were the types of contacts you had
 3     with the social media companies?  And I'm going to
 4     go through some, and you tell me if you had them.
 5            Electronic email, or other communications
 6     that are electronic?
 7     A.  Yes.
 8            Q.  Telephonic?
 9     A.  Yes.
10            Q.  And in person?
11     A.  No.
12            Q.  Okay.  Who did -- if they're telephonic,
13     who were you speaking to?  I have a hard time
14     getting any of these people on the phone.  How did
15     you get -- who did you telephonically speak to at
16     any of these social media companies?
17     A.  I had points of contact at several of
18     them, and we would have meetings when we needed to
19     talk.  So we arranged calls.
20            Q.  Do you recall any particular points of
21     contact?
22     A.  Yes.
23            Q.  Who are they?
24     A.  At Facebook my primary point of contact
25     was Payton Iheme.  I-H-E-M-E.  At Google my two
```

```
 1   points of contact were Jan Antonaros, and -- forgive
 2   me.  I'm blanking on this.
 3        Q.  We'll be looking at emails.  If you see
 4   the name, will you --
 5        A.  Yes, mm-hmm.
 6        Q.  Who else?
 7        A.  A contact we had at Twitter was Todd
 8   O'Brien [sic], though I spoke to him very rarely.
 9   We had other contacts at Twitter, but I don't know
10   their names too.  I don't recall the names of other
11   platforms.  I didn't talk to them as regularly.
12             (Plaintiffs' Exhibit 1 marked.)
13   BY MR. VECCHIONE:
14        Q.  Okay.  Can you take a look at Exhibit 1.
15   If counsel would hand it to her, please.
16             And have you seen this document before?
17        A.  Yes, I think I did.
18        Q.  So this is the Notice of Video Deposition
19   to be here today; right?
20        A.  Yes.
21        Q.  You're here pursuant to this notice?
22        A.  Yes.
23        Q.  All right.  And I'll just make one
24   correction.  We're not at Building 21.  We're in
25   Building 19?
```

**CAROL CRAWFORD  11/15/2022**

Page 22

```
 1          A.   That's correct.
 2          Q.   All right.  Thank you.  You can put that
 3     aside.
 4               MR. VECCHIONE:  I'm going to hand to
 5     counsel a packet of Exhibit 2, if I might.  And if
 6     you could give -- and if you could give the witness
 7     an original, and there are two for your purposes.
 8               (Plaintiffs' Exhibit 2 marked.)
 9     BY MR. VECCHIONE:
10          Q.   I'll give you a moment to read through it.
11     Do you recognize this?
12          A.   Yes.
13          Q.   All right.  What is it?
14          A.   An email chain with Facebook around COVID.
15          Q.   Yeah.  Early February 2020?
16          A.   Yes.
17          Q.   Let's get -- just so we can get onto the
18     same page, the way this email chain works is the
19     oldest part is in the back; right?  And then it
20     reads up.
21          A.   Yes.
22          Q.   And let's go to the back.  In the first
23     part of the chain, as far as I can see, it says from
24     Carol Y. Crawford?
25          A.   Yes.
```

Page 23

```
 1              Q.  All right.  And there is a -- there is an
 2    email there.  Well, could you read that for me, your
 3    email?
 4              A.  "Payton, just looping you in on
 5    something."
 6              Q.  Oh.  No, no, no.  I mean, I want to get
 7    the email down.  I think it's C -- because of
 8    your -- I think it's ███@CDC.gov?
 9              A.  Mm-hmm (affirmative).
10              Q.  Am I correct about that?
11              A.  That's mine, yes.
12              Q.  Okay.  And is that the only email,
13    government email, you used over this whole period,
14    or is there a different one?
15              A.  There is a -- it's the same email box, but
16    there is also ███@CDC.gov.  It's like an alias
17    for ██@CDC.gov.  It's the same box.
18              Q.  They all go to the same place?
19              A.  Yes.
20              Q.  It's just how the computer reads it, or?
21              A.  It's just an easier email address for
22    someone to give people --
23              Q.  Quicker to write?
24              A.  -- than ███.
25              Q.  Do you have any other government --
```

```
 1          A.  No.
 2          Q.  And how about have you contacted any of
 3     the social media companies with a personal email?
 4          A.  Never.
 5          Q.  Okay.  So and then this is -- I believe
 6     this is a fellow we identified earlier; right?
 7     Who's Payton Iheme?
 8          A.  Yes.
 9          Q.  And if I see ████@fb.com, that's your
10     understanding that's Payton Iheme --
11          A.  Yes.
12          Q.  -- that's his email?  And then it says cc
13     ████, and then there is an ██ Facebook [sic]
14     ██@CDC.gov".  Who is that?
15          A.  Jay Dempsey worked -- works now and within
16     my branch as the social media lead, and he reported
17     to me.
18          Q.  Okay.  And his ██ has nothing to do with
19     Facebook as in Payton's email; right --
20          A.  No.
21          Q.  -- it's just a coincidence?
22          A.  It's his user ID, yes.
23          Q.  All right.  Thank you.  And what was his
24     role?
25          A.  He was the social media lead within my
```

**CAROL CRAWFORD  11/15/2022**

Page 25

```
 1    branch.
 2         Q.   Okay.  And what do you state here in this
 3    email to Payton?
 4         A.   (As read) Just looping you in on something
 5    Jay and I had awareness of.  Are you in the loop
 6    with this.
 7         Q.   All right.  And what is this?  What have
 8    you attached here?
 9         A.   I don't remember this part of the chain at
10    all, but it appears to be a note from Facebook to
11    someone at the State Department outlining some
12    Facebook work on COVID.
13         Q.   And let's get some terms down here.  The
14    reason you believe that, is that just from your
15    memory, or is that because it's Shelley Thakral --
16    it's from them to a person in the State Department?
17         A.   I don't know any of the names on the
18    email.
19         Q.   Okay.
20         A.   I read this.  This is the first thing I
21    read when you handed --
22         Q.   Yeah.
23         A.   -- me the document.
24         Q.   Got it.
25         A.   I started at the back.
```

```
 1          Q.  So I'm just trying to be clear.  You don't
 2    have a present recollection of what this is --
 3          A.  No.
 4          Q.  -- what you just told me you got because
 5    that's what it says; right?
 6          A.  No.  I don't remember that part of the
 7    chain, no.  No.
 8          Q.  And were you asking Mr. Iheme whether he
 9    knew about this, or was he responsible for it?
10    Which what does it mean "in the loop about it"?
11          A.  As a note, Payton is female.
12          Q.  Okay.
13          A.  I mean, I'm reading what I wrote:  Just
14    looping you on something Jay and I had awareness on.
15    Are you in the loop with this?
16              That's all I know.  It's what I typed.
17          Q.  You don't have any other understanding
18    than that?
19          A.  No.
20          Q.  All right.  Let's move to the next part of
21    the chain.
22              (REPORTER'S NOTE:  Mr. Sauer enters
23          deposition.)
24    BY MR. VECCHIONE:
25          Q.  I see it's from Payton, from Ms. Iheme, to
```

1    you and cc'ing Dempsey; right?

2         A.  Yes.

3         Q.  And he's responding to your request about

4    the loop.  What does he say there?

5         A.  At 3:35 for Payton is what you're asking

6    me?

7         Q.  Yes, I am.  Thank you.

8         A.  Okay.  (As read) Let me know if you're --

9    you would like to speak to our teams working on

10   these items.

11             Do you want me to read the whole email?

12        Q.  Yes, please.

13        A.  Okay.  (As read)  Our teams at Facebook

14   have been working to identify how we can support

15   efforts to provide users with accurate and timely

16   information about coronavirus.  We would like to get

17   CDC's feedback on a few key initiatives that we are

18   considering launching in the coming days, weeks.  I

19   have outlined the specifics below, and would greatly

20   appreciate your thoughts on the tactics and proposed

21   design/content.  We would be happy to jump on a

22   quick call today or tomorrow if that would be easier

23   as well."

24        Q.  All right.  That's great.  That's -- okay.

25   And then he has a bunch of proposals, like three

Page 28

```
 1    proposals; correct?
 2          A.  Yes.
 3          Q.  All right.  And you respond to him the
 4    next day?
 5          A.  Yes.
 6          Q.  All right.  And you say "sorry for the
 7    delay."
 8              Were you in the habit of responding to him
 9    faster than less than 24 hours on these matters at
10    that point in time?
11          A.  Payton is female.
12          Q.  Yeah, I heard.  Thank you.
13          A.  It's okay.
14          Q.  You know what Payton I'm thinking of?
15          A.  No.
16          Q.  The football player.
17          A.  Oh, sorry.
18              I don't know.  At this time I believe we
19    were working a lot of hours, and a few hours seemed
20    like a long time.  I don't think I -- I don't think
21    Payton and I had known each other via email very
22    long at this point, so I can't speculate on how
23    quick I normally email her.
24          Q.  Okay.  And you say in here in item one:
25    As well, if can rotate messages, there might be
```

```
 1    times we might want to address widespread myths like

 2    mask use or new issues.

 3              At this time what was the myth of mask

 4    use?

 5         A.  My general memory of mask use was that

 6    there was confusion about whether people should wear

 7    masks or not.

 8         Q.  And what was CDC's view at that time?

 9         A.  I really can't speak to our

10    recommendations.  I probably don't have the specific

11    recall of the timelines.

12         Q.  Okay.  And then your next sentence:  "This

13    could and should replace flu shot messaging."

14              And was that messaging that the platforms

15    were already doing about flu prior to COVID?

16         A.  This was one of the occasional

17    interactions that I recall having with Facebook.

18    They had -- I believe -- I believe they approached

19    CDC about flu messaging that prior flu season, and

20    we had had a few phone calls with them and our flu

21    division.  And my recollection is that we provided

22    them with some public domain content for them to

23    highlight.

24         Q.  Okay.  And then the next one is you're

25    still trying to get this phone call together.  And
```

**CAROL CRAWFORD  11/15/2022**

```
 1    eventually you get a phone call together; right?
 2         A.  It looks like it from this chain, yes.
 3         Q.  Okay.  Can you tell us who was on that
 4    call besides Payton and you?
 5         A.  I don't recall the specific calls from
 6    that time period.
 7         Q.  Okay.  And do you know what was said on
 8    the call at all, what you discussed?
 9         A.  On that specific call, I do not.
10         Q.  Do you have any notes, calendars, or other
11    records what was said on the call?
12         A.  I don't believe -- I mean, the calendar
13    appointment's probably in my Outlook.  I don't
14    recall us taking notes, much notes, from any of the
15    meetings.  Occasional followup items.  But I don't
16    know if we took any for this.  If we did, it would
17    have been in my email, or my record, the electronic
18    records.
19              MR. VECCHIONE:  All right.  Mr. Sauer has
20    joined us.  Can we take a five-minute break while I
21    put things in order?  And I will give you the next
22    exhibit.
23              MS. SNOW:  Okay.
24              THE VIDEOGRAPHER:  We are off record at
25    9:57.
```

CAROL CRAWFORD  11/15/2022

Page 31

```
 1              (Recess 9:57 a.m.  - 10:09 a.m.)
 2              THE VIDEOGRAPHER:  We are back on the
 3    record at 10:09.
 4              MS. SNOW:  If I could just --
 5              MR. VECCHIONE:  Go ahead.
 6              MS. SNOW:  Defendants just wanted to note
 7    that at the request of plaintiffs' counsel we've
 8    forwarded a Zoom link with a call-in number for
 9    counsel, for plaintiffs' counsel, who could not be
10    here at the deposition to listen in.  And with the
11    agreement of the parties, the Zoom link will not be
12    shared with others beyond the three plaintiffs'
13    counsel who are listening in and the Zoom, the
14    deposition will not be recorded using the phone, the
15    call-in number.
16              MR. VECCHIONE:  Remotely by them.  Just by
17    him.  (Indicating videographer.)
18              MS. SNOW:  Yes, yes.  Exactly, yes.  Thank
19    you.  And then we also just wanted to -- the witness
20    wanted to clarify a point during the last round of
21    questioning.
22    BY MR. VECCHIONE:
23         Q.  Go right ahead.
24         A.  In reviewing this email, it refreshed my
25    memory about roles.
```

Page 32

```
 1         Q.  Are you looking at Exhibit 3 or 2, for my
 2    purposes?
 3         A.  2.
 4         Q.  Thank you.
 5         A.  I recalled that during the time of these
 6    emails, I was actually serving as the acting
 7    director for the division of Public Affairs.  I
 8    served in that role for, I think, five or six
 9    months.
10         Q.  Was that an add-on to your other duties,
11    or instead of, or like was it -- how did that come
12    about?
13         A.  Michelle Bonds had gone on a detail
14    somewhere else.  I don't recall where.  Sorry.  But
15    I was still really -- especially when COVID hit, I
16    really started also focusing on digital in-depth.
17    So that's why I was still involved.  I mean, digital
18    was still part of the division of Public Affairs, so
19    it was still part of my portfolio, but I had the
20    expertise on it, so.
21         Q.  All right.  Thank you for that.  And
22    during the day if there is any -- you have further
23    recollection as further documents get put in front
24    of you, feel free to interrupt me and tell me that.
25         A.  Okay.
```

```
 1              MR. VECCHIONE:  Does the witness have
 2    Exhibit 3 in front of her?
 3              MS. SNOW:  There you go.
 4              (Plaintiffs' Exhibit 3 marked.)
 5              MR. VECCHIONE:  This is a short one.  Take
 6    a second to take a look at it.
 7    BY MR. VECCHIONE:
 8         Q.  Do you recognize this document?
 9         A.  No.
10         Q.  Can you tell me what the subject line is
11    of the first email on the chain?
12         A.  Facebook COVID-19 Response Efforts.
13         Q.  All right.  And it's from Ms. Iheme that
14    we've spoken about before to you; correct?
15         A.  Yes.
16         Q.  And it says:  "Apologies for the late
17    note," she says to you.  I want to ensure you -- "I
18    want to ensure you are aware that Mark just shared
19    our ongoing work to support government."
20              Who's Mark?
21         A.  I don't know for sure, but I'm assuming
22    this was Mark Zuckerberg.
23         Q.  And she says to you:  "Our goal is to help
24    organizations to get their safety message out to the
25    public, remove misinformation, and support overall
```

1    community efforts in areas where we can be of help;"

2    right?

3         A.  Yes.

4         Q.  Now, the next thing I see is above that it

5    says on "March 5, 2020, at 8:55 a.m. Crawford, Carol

6    Y...wrote," is that an email, is that a reply email

7    from you to her?

8         A.  Yes.

9         Q.  You say there:  "We want to do a very

10   controlled Q&A and would like to know our best

11   options."

12              What are you referring to there, what's

13   going on?

14        A.  I believe this is in reference to a

15   Facebook Live event that we were trying to plan, and

16   it was going to be -- we expected it to be pretty

17   big, and we were asking for help in setting it up in

18   the best practices.

19        Q.  Was that from a technological standpoint,

20   like, how it was going to work, or did you need

21   their input on information?

22        A.  My memory is that it was mostly about how

23   it would work.  We had not done many big Facebook

24   Lives before then, and we were worried about having,

25   like, thousands of Q&A that we couldn't possibly

**CAROL CRAWFORD  11/15/2022**

Page 35

```
 1   answer.

 2        Q.  All right.  And the next thing you say

 3   there is:  "Our lead POC" -- is that point of

 4   contact, when I see POC?

 5        A.  Yes.

 6        Q.  Is Kat Turner at ███ -- I'll say ███?

 7        A.  █.

 8        Q.  █@CDC.gov.  So who is that?

 9        A.  Kat was a social media coordinator in one

10   of our centers that was willing to help manage this

11   effort.

12        Q.  In the original email from Payton Iheme

13   what was your understanding of why she was sending

14   you this information?

15        A.  I don't recall the specific email, or --

16   there looks like there is a link -- or what it said,

17   or what it was about.  But they would often forward

18   posts from their corporations for awareness for us.

19   So I assume that was probably what this was about.

20        Q.  Okay.  And then your final email on the

21   chain you send your -- that's your phone number at

22   work, I take it?

23        A.  It's actually my personal cell that I use

24   as a what CDC calls "bring your own device."

25        Q.  Got it.
```

```
 1          A.  Yes, but it was the cell phone.

 2          Q.  It's your cell number you use?

 3          A.  Yes.

 4          Q.  Did you message through that cell to any

 5     of the social media companies?

 6          A.  The only time I recall using my cell phone

 7     to message anyone was like we're late for the

 8     meeting, or the contact number didn't work or

 9     something like that.  We didn't have any kind of

10     conversations on texting.

11          Q.  Do you recall whether you spoke to Payton

12     Iheme at this time?

13          A.  No.

14          Q.  Now, this is -- from my understanding is

15     this call that you're referring at the top, your

16     last part, is that to arrange the Facebook meeting,

17     or is that the Facebook meeting, the Q&A?

18               MS. SNOW:  Objection.  Vague.

19     BY MR. VECCHIONE:

20          Q.  Okay.  So let me tell you -- the reason

21     it's vague is because I don't understand something.

22               Here's what I'm trying to understand from

23     information.  Originally Ms. Iheme writes to you

24     about this information.  And then you say you want a

25     controlled Q&A; right?  On Facebook.  And then
```

Page 37

```
 1    somehow you're going to -- you're going to arrange
 2    that with them and Kat Turner.
 3              And then you say I'll -- here's my number,
 4    and Kat knows it, I have an appointment.
 5              Did you have a conversation is what I'm
 6    getting about besides the Facebook Q&A?
 7        A.  I don't know.  But we talked pretty
 8    regularly around this time, so I imagine we probably
 9    did talk.  But I don't know that for sure.
10        Q.  All right.  What was your understanding of
11    Ms. Iheme's statement that the -- Facebook was going
12    to help organizations remove misinformation?
13        A.  I don't recall a recollection of
14    discussing misinformation with Payton around this
15    time, so I can't speculate.
16        Q.  You don't have a present recollection of
17    what that meant?
18        A.  No.
19        Q.  All right.  And once again for this call
20    that you had, and maybe Kat Turner was on it, maybe
21    she wasn't, do you have any record of that call, or
22    what might have been said?
23        A.  It doesn't look like this had an
24    appointment associated with it, so I don't think
25    there's an appointment, and I don't know -- I don't
```

```
 1    remember the call, so I don't recall if there were
 2    notes.  But I know in general very little notes were
 3    kept.
 4         Q.  Now, you said you don't recall many
 5    conversations about removing misinformation at that
 6    time.  When do you recall such conversations?
 7         A.  I remember it becoming occasionally
 8    discussed in the fall of 2020 perhaps.
 9         Q.  Okay.  And what do you recall being
10    discussed at that time?
11         A.  I can recall us generally saying things to
12    the effect of -- I don't remember any specifics, but
13    misinformation is really growing, or, you know, what
14    do you think we could be doing to address it?  That
15    kind of conversation.
16         Q.  All right.
17         A.  Very general.
18             (Plaintiffs' Exhibit 4 marked.)
19    BY MR. VECCHIONE:
20         Q.  Fair enough.  Let's move on to Exhibit 4.
21         A.  Okay.
22         Q.  All right.  And I'll give you a moment to
23    take a look at that.
24             All right.  Have you had a chance to
25    review?
```

```
 1          A.  Yes.

 2          Q.  Do you recall this email?

 3          A.  No.

 4          Q.  All right.  Well, let's talk about it and

 5     who these people are because I think we have some

 6     new folks.

 7              So what's the subject line of the first,

 8     the email there at the top?

 9          A.  CDC brief on ways to reach high-risk and

10     frequent travelers.

11          Q.  All right.  And what is the CDC brief?

12     What does that refer to?

13          A.  I don't -- I don't recall what the brief

14     was.

15          Q.  Okay.  But as -- my question is a little

16     broader than that.  We're lawyers.

17          A.  Mm-hmm (affirmative).

18          Q.  We write briefs all the time; right?  They

19     are actually physical pieces of a paper that we put

20     forth our arguments for.  Sometimes people use that

21     term as bullet points, or sometimes their positions,

22     even just orally stated.

23              What I'm trying to get at is what does

24     "brief" mean in this context?

25          A.  To me, a brief probably was a one- or
```

**CAROL CRAWFORD  11/15/2022**

```
 1    two-page summary of something that we, or they, were
 2    trying to do.
 3         Q.  Now, this email exchange I think occurred
 4    sometime at the end of March 31st; is that correct?
 5         A.  Yes.
 6         Q.  All right.  And it was between you and
 7    Kevin Hatcher, and his email is          @fb.com?
 8         A.  That's what the email says.
 9         Q.  All right.  Who is Kevin Hatcher?
10         A.  Oh.  That says -- I don't have a clear
11    recollection.  There was a lot going on during this
12    time beyond any of this work.  But I think that
13    Kevin Hatcher might have been some type of
14    instructional designer with Facebook that I --
15    looking at the units and the Unit 1 and Unit 2,
16    there was an effort to put together like learning
17    modules that communities could use.  I think that
18    that might have been what this was about, and that
19    that was Kevin's role.
20         Q.  All right.
21         A.  I cannot be sure, though.
22         Q.  All right.  But from your understanding of
23    what this says --
24         A.  Mm-hmm (affirmative).
25         Q.  -- and how it worked, that is your best
```

1   understanding right now; whether it's right or wrong

2   that's what you understand?

3          A.   Yes, I remember that activity, and this

4   seems to match that activity.

5          Q.   All right.  Then at the top you say:

6   "Kevin, I realized others made comments on the pdfs

7   after I sent you the previous one.  So, this

8   answered your Q."

9               Is that question?

10         A.   Yes.

11         Q.   -- "on breathing.  I hate to ask but can

12  your team check the other comments here?  I

13  apologize."

14              What are the other comments?

15         A.   I don't know what the other comments were.

16  But it appears to me that we sent to a group of

17  people the drafts, and CDC folks commented and I

18  forwarded it back.

19         Q.   All right.

20         A.   But I don't remember the comments.

21         Q.   All right.  Can you go to the end page of

22  this document?

23         A.   Mm-hmm (affirmative).

24         Q.   It says:  "Recommend breaking this

25  sentence up as it's linking stress to severe illness

Page 42

```
 1    in a way I we don't.  If ARTF doesn't suggest an
 2    edit, we can."
 3              Do you know who ARTF is?
 4         A.  I don't.  But I believe it's probably a
 5    CDC task force.  TF would be task force.  I don't
 6    know what AR is.
 7         Q.  Got it.  Do you know what Mr. Hatcher was
 8    referring to where it says:  "Emergency warning
 9    signs include difficulty breathing"?  Do you know
10    what that was referring to?
11         A.  I only know what I'm reading here.
12         Q.  Right.
13         A.  The unit that he was developing must have
14    had this wording, and he was asking for
15    clarification on what the wording should be.
16         Q.  All right.  And do you have an
17    understanding, or do you know, why Mr. Hatcher was
18    asking whether Facebook should add extreme before
19    emergency warning signs?
20         A.  I have no recollection of it.
21         Q.  Okay.  Do you know why Mr. Hatcher asked
22    whether he should replace:  Older people are at high
23    risk from severe illness from COVID to people over
24    65?  Do you know if there was any messaging from CDC
25    at that time?
```

**CAROL CRAWFORD  11/15/2022**

```
 1          A.  I do not know.
 2          Q.  All right.  Do you know now sitting here
 3   whether there is any preference by digital media at
 4   CDC's digital output right now, for either of those
 5   terms?
 6          A.  I do not know because our office does not
 7   write the content.
 8          Q.  Okay.  You can put that aside.
 9          A.  Okay.
10          (Plaintiffs' Exhibit 5 marked.)
11   BY MR. VECCHIONE:
12          Q.  Take a minute, take a look at that.
13          A.  Okay.
14          Q.  You've got it?
15          A.  Mm-hmm (affirmative).
16          Q.  So I think we don't have any new players;
17   right?  These are all the same people we talked
18   about before, you and Ms. Iheme and Mr. Hatcher.
19              Can you tell me what the subject of this
20   email string was?
21          A.  CDC brief on ways to reach high-risk and
22   frequent travelers.
23          Q.  Okay.  And I think this is March 30th?
24          A.  2020, yes.
25          Q.  And so I guess it's before the one I
```

**CAROL CRAWFORD  11/15/2022**

Page 44

```
 1    showed you that was March 31st, Exhibit 4?
 2         A.  I don't have that exhibit, but I assume
 3    that's correct.
 4         Q.  Okay.  We can compare it.
 5             Can you go to the very beginning of the
 6    string on this?
 7         A.  Mm-hmm (affirmative).
 8         Q.  There is a blacked out "from," and then it
 9    says:  "When:  3:30-4:30, Subject:  CDC brief on
10    ways to reach high-risk and frequent travelers."
11             Do you see that?
12         A.  Yes.
13         Q.  What is that?
14         A.  It looks like an appointment for a phone
15    call.
16         Q.  Okay.
17         A.  But I'm not -- it's not fully there.
18         Q.  Yeah.  Would Facebook be sending that to
19    you, or is that just at the bottom of his email?  Do
20    you have any understanding of how it works?
21         A.  They have a different email system than we
22    have, but it looks similar to someone forwarding on
23    an appointment and using the chain as an email,
24    though I don't know that for sure.
25         Q.  Got it.  And this starts at a March 27th
```

CAROL CRAWFORD  11/15/2022

Page 45

```
 1    email from him to him -- or from her to herself and
 2    you; correct?
 3         A.  Yes.
 4         Q.  And then there is a Margaret E. Silver.
 5    Who is that?
 6         A.  She was with our Travelers Health group.
 7    I believe that's where she was.
 8         Q.  And what was the Travelers Health group?
 9         A.  We have a unit at CDC that focuses on
10    traveler's health.  There is a website on traveler's
11    health.
12         Q.  And who's Caroline Seman?
13         A.  I believe she was also with Travelers
14    Health.
15         Q.  All right.  And then I see Dempsey.  Is
16    that the same Dempsey we saw before?
17         A.  Yes, yes.
18         Q.  Does that -- and then █?
19         A.  That's still Jay Dempsey.
20         Q.  Still Dempsey, it's just split; right?
21         A.  Mm-hmm (affirmative).
22         Q.  So Ms. Iheme says to you:  "Hi, Carol and
23    team.  As relayed on the call, we're happy to target
24    additional populations such as youth as the content
25    becomes available.  Just let us know.  For the first
```

1    wave, we'd like to move forward with launching this

2    next week," I think it's "ideally April 3rd to the

3    groups for which you already produced content (older

4    adults, HIV plus, asthma and pregnant women)."

5              Do you know whether that's for travelers,

6    or just general populations?

7         A.   That was for general populations.

8         Q.   All right.  And how do you know that?

9         A.   I have some recollection of this project.

10        Q.   Okay.

11        A.   It was like units of information on COVID

12   that Facebook communities could attach to their

13   groups.  And I'm not 100 percent sure about this,

14   but I think we asked about travel, and then they

15   mentioned the idea of this project and said if you

16   have content for -- that would help other groups, we

17   could do similar things.

18        Q.   Okay.  And then he then asks how you want

19   this to read on the Facebook's sites, whether

20   sourced from CDC, or authored by CDC?

21        A.   Yes, I see that.

22        Q.   Do you know what the answer was to that?

23        A.   I don't recall which one we picked, but

24   I'm pretty sure it was one of the sources.

25        Q.   Okay.  Let's go up to the next, the March

**CAROL CRAWFORD  11/15/2022**

Page 47

```
 1   27th, 3:01 p.m.

 2        A.  Okay.

 3        Q.  There is some more people here, I just

 4   want to -- I don't know that we've seen.  Well, we

 5   have seen her.  Okay.  Never mind.  You described

 6   it.

 7            And then at the very top, March 30, he

 8   says they are going to have their content

 9   strategists make the changes you'd agreed to that

10   day.

11        A.  That's what I'm reading as well.

12        Q.  Okay.  Now, why was the CDC editing this

13   content?

14        MS. SNOW:  Objection.  Mischaracterizes

15   testimony and the document.

16   BY MR. VECCHIONE:

17        Q.  Okay.  You can answer.

18        A.  I don't have the attachments or the

19   documents, so I don't know what we were editing or

20   not editing.  But we had content on the website, but

21   the format of the units was slightly different.  So

22   we had to take the content from our website and have

23   it fit in the units.

24        Q.  Okay.

25        A.  And they requested CDC's review of that.
```

**CAROL CRAWFORD  11/15/2022**

Page 48

```
 1              Q.  All right.  Do you know why in the part
 2      where he says:  "If we don't launch next week we'll
 3      be pulled onto other COVID-19 projects, hence the
 4      urgency," do you know why he's asking you about when
 5      they should launch?
 6              A.  I don't think he was asking me about when
 7      we should launch.  I think he's letting us know if
 8      we don't launch they may not get to it.
 9              Q.  All right.  And do you know if those, if
10      he's referring to other COVID projects he has with
11      CDC, or just generally?
12              A.  I don't know for sure.
13              Q.  You can put that aside.
14              A.  Okay.
15              Q.  Just one more question about that.  Is he
16      creating a Facebook page for CDC, or just for
17      Facebook, do you know?
18              A.  My recollection of what this project was,
19      it was like units that would exist in Facebook that
20      like if you're in a group on travel that the group
21      administrator could provide a link to these units if
22      people wanted additional COVID information.  They
23      are not up any longer and my memory is vague on
24      them.
25                   MR. VECCHIONE:  Got it.  Thank you.
```

```
 1                    (Plaintiffs' Exhibit 6 marked.)
 2    BY MR. VECCHIONE:
 3         Q.  Take a moment to look at this.  This is
 4    Exhibit 6.  The mark may look like a 4, but I assure
 5    you it's Exhibit 6.
 6              All right.  Do you recognize this
 7    document?
 8         A.  No.
 9         Q.  But do you know what it is?
10         A.  Yes.
11         Q.  What is it?
12         A.  It's a discussion about access to or for
13    Facebook giving us CrowdTangle COVID reports.
14         Q.  All right.  And let's talk about this a
15    little bit.  We're more forward in time; right?
16    This is sometime in January 2021?
17         A.  Correct.
18         Q.  And I think both dates say January 26,
19    2021.  Would you agree with me there?
20         A.  Yes.  Well no, the first one is
21    January 25th.
22         Q.  All right.  See, that's why we have
23    witnesses.
24              All right.  The first thing is what's
25    CrowdTangle?
```

```
 1         A.  I have not used CrowdTangle personally,
 2   but I've seen it demonstrated.  But it is to my --
 3   my description of it is it's a social media
 4   listening tool for Meta properties.
 5         Q.  What are Meta properties?
 6         A.  Like Instagram and Facebook.
 7         Q.  Okay.  So by Meta properties you mean
 8   properties of the company Meta, not on some other
 9   level of?
10         A.  No.
11         Q.  Okay.
12         A.  Their platforms.
13         Q.  Got it.  Thank you.
14             Let's look at that January 25th email,
15   because I think we have some new people here.
16             There is Payton Iheme, and you.  It's from
17   her to you.  And you cc Lauren Balog Wright at
18   Facebook.  Do you know who that is?
19         A.  I think that Lauren, just from reading
20   this, she was the person that was the CrowdTangle
21   expert and was going to provide the reports.
22         Q.  Okay.  And Priya Gangolly?
23         A.  Priya Gangolly I interpreted to be like an
24   assistant to Payton.
25         Q.  And Kelly Perron?
```

 1          A.  And from this email I believe Kelly was

 2     also going to provide the CrowdTangle reports.

 3          **Q.  And it says:  Subject CrowdTangle COVID-19**

 4     **reports for WHO.**

 5              **Not to channel Abbott and Costello, but**

 6     **who is that?**

 7          A.  World Health Organization.

 8          **Q.  And why were they asking you about**

 9     **information to WHO?**

10          A.  Well, I do have -- after reading this I do

11     recall the conversation a bit.  But what they are

12     saying in this email is we provide this report to

13     WHO, and we can provide it to you as well.

14          **Q.  Okay.  What do you remember of the**

15     **conversation?**

16          A.  Just that they -- I believe they mentioned

17     on a call that they could possibly do this, and this

18     is a followup email.  And they shared the reports

19     and occasionally they would ask me on the call if

20     these reports were helpful.

21          **Q.  And let's see what he says here, what she**

22     **says here.  "Hi, Carol, I am following up on our**

23     **conversation several weeks ago about providing more**

24     **detailed reporting from our CrowdTangle team.  I**

25     **wanted to share our first CrowdTangle COVID content**

1    report with you courtesy of Lauren and Kelly on this

2    cc.  They are providing these to WHO, thought it

3    helpful for CDC's teams as well."  And then she says

4    what the time period of it is, and that these are

5    going to be biweekly.

6              What kind of information was in the

7    CrowdTangle?  What did it provide you?

8         A.  Well, I don't have a clear recollection of

9    the reports because I sent the reports to other

10   teams.  But typically social media listening reports

11   show themes and -- of discussion on social media

12   channels.

13        Q.  Okay.  And so if you look down further

14   I'll just ask you again some words that I think I

15   know what they mean, but we might as well put on the

16   record.

17              (As read) Lauren, can you -- can do that

18   "distro."

19              That's distribution?

20        A.  Yes.

21        Q.  And "the full report is attached but some

22   highlights the CrowdTangle team would like to call

23   to your attention are:  Top engaged COVID and

24   vaccine-related content overall across Pages and

25   Groups."  And it says "largely a mix of educational

**CAROL CRAWFORD  11/15/2022**

Page 53

```
 1    posts, reports of successful vaccinations," and it

 2    goes on.  And then "news/commentary on COVID and

 3    vaccination rollout."

 4              So does this -- is this like an algorithm

 5    that shows you where -- what people are talking

 6    about?

 7         A.  I wouldn't characterize it as an

 8    algorithm.  But it's a search of content on social

 9    media, and a summary of the higher volume

10    conversations.  It's helpful for communicators to

11    know what is being discussed because it helps

12    improve our communication materials.

13         Q.  All right.  And then he says:  "However,

14    posts falling into the following themes, all of

15    which have potential risks, also garnered high

16    engagement."  And then he has reports of healthcare

17    workers refusing the vaccine; right?

18         A.  Yes.

19         Q.  And he says there was an article in Forbes

20    about it?

21         A.  Yes.

22         Q.  Posts about alleged vaccine-related

23    deaths?

24         A.  Yes, I see that, too.

25         Q.  And:  "News and reports of severe vaccine
```

```
 1   side effects included both first- and secondhand
 2   reports in Groups, with users sharing photos and
 3   video."
 4           Do you see that?
 5      A.  Yes.
 6      Q.  Why are these of concern to the CDC, if at
 7   all?
 8           MS. SNOW:  Objection.  Mischaracterizes
 9   testimony, and the document.
10   BY MR. VECCHIONE:
11      Q.  You can answer.
12      A.  Well, this doesn't say that they were a
13   concern to CDC.  They are providing a report of the
14   most talked about topics on social media during this
15   time period.  But in general, as I mentioned before,
16   it does help for people to -- for communicators to
17   know what conversations occurs on social media
18   because it helps us identify gaps in knowledge, or
19   confusion, or things that we're not communicating
20   effectively that we need to adjust.
21      Q.  All right.  Again, pardon me -- but
22   secondhand reports and groups, groups are like the
23   travelers information groups; if I'm on Facebook I
24   can belong to various groups, and I get information
25   on that feed?
```

```
 1       A.  Can you clarify what you're referring to
 2   with groups?
 3       Q.  He says number 3 -- number -- well, in 1,
 4   2 and 3 he uses the words "groups."  In 1 he says:
 5   Worker-centric groups, groups especially
 6   anti-vaccination groups.  And then in 3 he has
 7   secondhand reports in groups.  So I'm just asking
 8   for the record --
 9       A.  Yeah.
10       Q.  -- that if I am on Facebook I can belong
11   to various groups and get information that that
12   group gets?
13       A.  I cannot -- I can't say for sure that this
14   report was about the Facebook groups, but it seems
15   likely that that's what that is reference to and you
16   are describing them correctly.
17       Q.  Thank you.  And then he tells -- you tell
18   in the next -- in January 26th you write to
19   Ms. Iheme and you say -- you say:  "It looks
20   wonderful and much appreciated," and then send, send
21   them to you.  It says:  "One group we'll be adding
22   is the Census group who hopefully will soon start
23   their project."
24            "Also, the wide group of those looking at
25   misinfo will want this."
```

CAROL CRAWFORD 11/15/2022

Page 56

```
 1              First, what's the Census group within CDC?
 2    Or is that not within CDC?  What is that, Census
 3    group?
 4         A.  This is the Census Bureau.
 5         Q.  Okay.  And they would be on this CDC list?
 6         A.  It appears I was suggesting that, yes.
 7         Q.  Okay.  And then who's the wide group of
 8    those looking at -- well, first let's go back.
 9    Misinfo is misinformation?
10         A.  Yes.
11         Q.  Who's the wide group of those looking at
12    misinformation?
13         A.  I don't know specifically what I was
14    referring to there.
15         Q.  Do you know generally?
16         A.  I suspect that it was probably people
17    working on communication materials or developing
18    reports about gaps and areas of confusion.
19         Q.  Okay.  Do you have notes or other records
20    of the phone call he refers -- she refers to:  "I'm
21    following up on our conversation several weeks ago"?
22         A.  I doubt I have notes.
23         Q.  Okay.
24         A.  If I did, they would have been electronic.
25         Q.  Do you know who took part in the
```

1    conversation?

2        A.  I don't know.  But typically I was on the

3    call, sometimes Jay was as well, Jay Dempsey.  But I

4    don't recall the specific meeting.

5        Q.  **Did you instruct Ms. Iheme or anyone else**

6    **at Facebook to do anything with the biweekly reports**

7    **other than send them to you?**

8            MS. SNOW:  Objection.  Mischaracterizes

9    testimony.

10   BY MR. VECCHIONE:

11       Q.  **You did ask Ms. Iheme to send you the**

12   **biweekly reports, didn't you?**

13       A.  She offered to send me the biweekly

14   reports, and I agreed that would be good.

15       Q.  **Did you instruct her to do anything else**

16   **regarding the biweekly reports?**

17       A.  Not that I recall.

18       Q.  **Do you know who decided the reports would**

19   **be developed biweekly?**

20       A.  I don't recall.  But this email seems to

21   suggest that they were already doing biweekly ones.

22       Q.  **For the -- for your purposes, what was the**

23   **purpose of the reports, receiving them?**

24       A.  They would help us understand what was

25   being discussed on social media about COVID, which

1    helps us look for gaps in information, confusion

2    about facts, things that we might need to adjust our

3    communication materials for.

4        **Q.  Had you prior to this email discussed with**

5    **Ms. Iheme such items as reports of healthcare**

6    **workers refusing the vaccine, posts about alleged**

7    **vaccine-related deaths, and news and reports of**

8    **severe vaccine side effects?  Did you ever report to**

9    **her that those would be of interest to the CDC?**

10       A.  I don't recall reporting or discussing

11   these with them specifically.  I do recall generally

12   discussing misinformation with Facebook around this

13   time and --

14       **Q.  And those could have been included within**

15   **that discussion?**

16       A.  Possibly.

17       **Q.  Why did you add Census to the distribution**

18   **of this?**

19       A.  They were going to start working with the

20   CDC regarding misinformation.

21       **Q.  So what did -- what did the wide group of**

22   **those looking at misinformation do with the reports?**

23       A.  I don't know what they did with the

24   reports.  However, I do know two things that were

25   likely done with the reports.  We had -- we have

**CAROL CRAWFORD  11/15/2022**

Page 59

```
 1    part of our Joint Information Center in the
 2    Emergency Response a research team that compiles all
 3    the themes of discussion on news and social media.
 4    And I know that they received these reports, and
 5    they use a lot of sources to develop a summary for
 6    the response for all the reasons I just described
 7    about why this is helpful.
 8            I believe at this time it was also part of
 9    a publicly-available vaccine confidence report that
10    also looked across themes, what was being discussed,
11    and where areas of confusion were so that they could
12    update vaccine communication and other issues.
13    Those are posted on CDC's website.
14        Q.  Did you do anything with the reports
15    besides forward them on to Census and to this wide
16    group?
17        A.  Anything with the CrowdTangle reports, I
18    didn't personally do anything else with the
19    CrowdTangle reports.
20        Q.  Do you know if anyone else did anything
21    besides what you've described with the CrowdTangle
22    reports?
23        A.  I would assume that it was used by people
24    to look in background of conversations similar to
25    what I have described.
```

```
 1              MR. VECCHIONE:  All right.  You can put
 2     that aside.
 3              (Plaintiffs' Exhibit 7 marked.)
 4     BY MR. VECCHIONE:
 5          Q.  All right.  So what is the subject line of
 6     this email chain?
 7          A.  "Crowd Tangle COVID-19 Reports."
 8          Q.  All right.  Let's take a look at the
 9     February 21, 2021, 8:39.  Who is this from and who's
10     the recipient?
11          A.  Kelly Perron at Facebook, and I'm the
12     recipient.
13          Q.  All right.  And we've discussed her
14     before.  She was going to be one of the contacts
15     with CrowdTangle; right?
16          A.  Yes.
17          Q.  And what is the summary that Perron
18     reports?
19          A.  She attached the report, which is not
20     here, but and then summarized the high points.
21          Q.  Okay.  And why is she reporting this to
22     you?  Is this part of the biweekly report that you
23     agreed to earlier?
24          A.  Yes.
25          Q.  And this would be a summary of a report
```

Page 61

```
 1    that's probably attached, but it's not here?

 2         A.  Correct.

 3         Q.  All right.  And what did you do with this

 4    information?

 5         A.  We created a mail group, and this was

 6    forwarded on by -- I either forwarded it, or over

 7    time I had an assistant that started forwarding

 8    them.

 9         Q.  All right.  So the same groups within the

10    CDC and the Census we talked about before?

11         A.  At some point I recall adding Census to

12    the distro.  I am sure by May or March there were

13    several time periods they were probably included.

14    The distribution list likely changed a bit because

15    people deployed into the response and out of the

16    response, but, yes.

17         Q.  Okay.  Can you take a look at the emails

18    dated Tuesday, February 16 and 17th, 2021 at

19    9:00 p.m.?

20         A.  Yes.

21         Q.  So who is that from, and who is that to?

22         A.  That's Kelly Perron at Facebook to me.

23         Q.  And what is she summarizing here?  What is

24    the summary that she reports?

25         A.  It's the -- it looks like the next
```

```
 1   biweekly report.  And it looks attached, but it's

 2   not in the exhibit.  And she summarized it in the

 3   body of the email.

 4       Q.  All right.  And she's highlighted, some

 5   things are highlighted, right, in dark black?

 6       A.  Some things are bolded.

 7       Q.  Bolded.  That's right.  Reports of deaths

 8   post-vaccination?

 9       A.  Yes, that's in bold.

10       Q.  Double masking?

11       A.  Yes, that's bold.

12       Q.  And personal reports of vaccination?

13       A.  Yes, that's bold.

14       Q.  Why did she report this to you, those

15   highlights?

16       A.  There again, they are using CrowdTangle to

17   do a summary of the themes that are being discussed

18   on Facebook and Instagram channels, and this is a

19   summary of that.

20       Q.  Okay.  And what did you do with this

21   information?

22       A.  As mentioned, we had a distribution list

23   that this was forwarded to.

24       Q.  You just sent it on?

25       A.  Mm-hmm (affirmative).
```

**CAROL CRAWFORD  11/15/2022**

Page 63

```
 1              Q.  Can you look at the email dated Monday
 2     March 1st?  And who is this to?
 3              A.  Kelly at Facebook to me.
 4              Q.  All right.  And she added someone.  She
 5     says she added Chelsey Lepage at Facebook.  Who is
 6     that?
 7              A.  I think that she may have been --
 8              Q.  I'm cheating a little.  I went above what
 9     I told you to look at.
10              A.  Yes.  I'm sorry.  I see that now.  But I
11     believe Chelsey was another assistant to Payton, I
12     think.
13              Q.  Okay.  And then on the one I did direct
14     your attention to, March 1st at 5:47, again she says
15     Hi -- Kelly Perron says:  Hi, Carol.  And she
16     attached the latest CrowdTangle insights report for
17     February 10th to 24, and she says it's attached.
18              A.  Mm-hmm.
19              Q.  And then she does a summary.  And there
20     again there are certain points she's bolded:
21     COVID-19 and mental health, vaccine refusal, testing
22     positive post-vaccination.
23              Do you know whether those were bolded
24     because those were of particular concern to the CDC?
25              A.  No.  That's the format of all the reports.
```

## CAROL CRAWFORD  11/15/2022

Page 64

```
 1          Q.  Okay.  So bolding them was -- your
 2  testimony is bolding them is not because they were
 3  of particular interest to the CDC, that's just how
 4  she did it?
 5          A.  I really couldn't say what her thinking
 6  was when she bolded them.
 7          Q.  Okay.  When you received it did you have
 8  any understanding about the bolded portions?
 9          A.  No.
10          Q.  Were the bolded portions things that you
11  had particularly spoken with Facebook before in your
12  telephone conversations?
13          A.  I don't believe so.
14          Q.  All right.
15          A.  Well, can I clarify that a little bit?
16          Q.  Yes, please.
17          A.  I'm sure -- I don't remember discussing
18  these in terms of the CrowdTangle report or the
19  things in bold.  I am sure that general discussions
20  that there was a lot of information on vaccines,
21  which is one of the bolded words, for example.  I am
22  sure that did occur.
23          Q.  Thank you.  On March 15 Kelly sends you at
24  6:19 p.m.
25          A.  Yes.
```

**CAROL CRAWFORD  11/15/2022**

Page 65

1          Q.   Sort of goes over, she keeps Chelsey

2     Lepage in there, and then she -- this time she

3     summarizes slightly different items:

4     Post-vaccination guidelines and protocols, vaccine

5     ingredients and vaccine side effects.

6          A.   I see that.

7          Q.   And your testimony is the same as to why

8     they are bolded as before, as far as you know?

9          A.   Correct.

10          Q.   And you did the same thing with them as

11     you did before that you've testified?

12          A.   I believe so, yes.

13          Q.   Let's see.  And then at the bottom of that

14     March 15, she says:  This week we also are including

15     a one off content insights report we did looking at

16     Spanish language content relative to the U.S. we

17     thought might be interesting for you.

18               She asks you not to share it externally.

19               Do you recall any other times you got

20     Spanish language-specific material?

21          A.   No.  But I didn't recall this time either

22     until I read it.

23          Q.   Okay.  And then I'll just -- to finish up,

24     March -- May 25th.  Now, there doesn't seem to be

25     something for April.  Do you know why there would be

Case 3:22-cv-01213-TAD-KDM Document 270-3 Filed 03/3/23 Page 66 of 348 PageID #: 11010

```
 1    a break in the two-week reporting?
 2         A.  No.  I don't recall unless she just sent
 3    it separate from the chain.
 4         Q.  And then here she's bolded vaccination in
 5    children, healthcare workers and masks and
 6    vaccination; right?
 7         A.  I see that, too.
 8         Q.  And do you recall whether you spoke to her
 9    about those things, or that was just her choice to
10    highlight those?
11         A.  We did not discuss with them the issues we
12    wanted in the CrowdTangle report.
13         Q.  All right.  And then you say "thanks" in
14    response to this on 5:26.  But we've got a new
15    person here.  Tyler Woods.  Who is that?
16         A.  I think, but I'm not positive, that he
17    took over the reports later, so perhaps he was
18    starting to come in on their team.
19         Q.  Okay.  We've been going about an hour.  I
20    always give the witness a chance to break if she
21    wants.
22         A.  I'm okay.
23         Q.  Okay.
24         A.  Thank you for checking.
25              MR. GILLIGAN:  Can I ask one question,
```

Case 3:20-cv-03345-WHO Document 270-3 Filed 03/31/23 Page 106 of 345 PageID #: 11011

```
 1   John?

 2              MR. VECCHIONE:  Yeah.

 3              MR. GILLIGAN:  What is the number of your

 4   last exhibit?

 5              MR. VECCHIONE:  42.

 6              MR. GILLIGAN:  Thank you.

 7              And I actually -- that was -- I do have

 8   one that's unmarked that I may use.

 9              MR. GILLIGAN:  Okay.  Just to add a little

10   suspense.  Thank you.

11              MR. VECCHIONE:  Mm-hmm (affirmative).

12              (Plaintiffs' Exhibit 8 marked.)

13   BY MR. VECCHIONE:

14        Q.  All right.  Do you recognize Exhibit 8?

15        A.  I haven't finished reading it.

16        Q.  Okay.  Go ahead.

17        A.  Sorry.  Okay.  Sorry.

18        Q.  It's all right.

19        A.  Can you repeat the question?

20        Q.  Can you identify this document?

21        A.  I recognize the first page chain of

22   emails, but not the previous chain.

23        Q.  So you don't -- tell me where -- the first

24   page at the back?

25        A.  Oh, I'm sorry.  No, the first page of the
```

CAROL CRAWFORD  11/15/2022

```
 1   packet.
 2        Q.  Got it.
 3        A.  I remembered this email more -- I don't
 4   have a recollection of this previous back and forth.
 5        Q.  Got it.  Well, what's the subject line?
 6        A.  "This week's meeting."
 7        Q.  Okay.  And by this time were you meeting
 8   with them every week?
 9        A.  We were -- we were meeting weekly during
10   parts, so I imagine we were.
11        Q.  All right.  And can you read the email
12   from Ms. Iheme to you about the meeting on
13   March 30th, 2021, 2:42 p.m.?
14        A.  Yes.  "Hi, Carol, hope all is well as it
15   can be.  At least spring is making an appearance.  I
16   wanted to surface any misinfo questions your team
17   may have for the team that I had briefing last time.
18   They are available to attend again, but also want to
19   make sure that we are answering any of your team's
20   questions."
21        Q.  All right.  What's the briefing she refers
22   to?
23        A.  I don't recall the briefing specifically,
24   but I do recall her bringing in people from their
25   Trust and Safety or Misinformation teams -- I'm not
```

Case 3:22-cv-01213-TAD-KDM Document 276-3 Filed 03/31/23 Page 109 of 349 PageID #: 11013

1  sure what they called the team -- to talk to us

2  about misinformation at some weekly meetings.  I

3  think that's probably what this is in reference to.

4      **Q.  Why is she offering to surface misinfo**

5  **questions and to answer your team's questions?**

6      A.  Because I think -- I can't say for sure

7  what she was thinking.

8      **Q.  What's your understanding?**

9      A.  But I think it was because we -- we had

10  asked questions about what they were seeing in terms

11  of misinformation and inquired about any activities

12  they were undertaking.  And I believe this was an

13  offer to sort of get back to us on any of those

14  questions.

15      **Q.  All right.  That you had?**

16      A.  Yes.

17      **Q.  Given her.  Thank you.**

18      A.  Yes.

19      **Q.  Let's clean up the record a little.  That**

20  **you had -- the questions that you had proposed to**

21  **her?**

22      A.  I think it was questions asked within the

23  meeting, but.

24      **Q.  Got it.**

25      A.  I'm not 100 percent sure because I don't

CAROL CRAWFORD  11/15/2022

Page 70

```
 1   know the timing of that meeting, but I believe
 2   that's what this is in reference to.
 3           Q.  And can you read your response at
 4   3:08 p.m.?
 5           A.  "Hope all is well, too.  I plan to join
 6   and listen to the 3:30 meeting, FYI.  I added this
 7   part in yellow to our chain on turn.io so you
 8   probably missed it.  Did you have thoughts on how we
 9   can regularly meet with Census?  I will also check
10   back with others to see if they have other Qs that
11   went unanswered and get back to you."
12           Do you want me to keep reading?
13           Q.  No, you can stop.
14           A.  Okay.
15           Q.  But what is "turn.io"?
16           A.  This was another project that we were
17   working on with WhatsApp.
18           Q.  And what was that project?
19           A.  I believe this was using WhatsApp to -- so
20   people could use it, they could look up ZIP codes to
21   find vaccines.
22           Q.  Okay.
23           A.  And maybe, I'm speculating, there was also
24   a Spanish offering for vaccine information on
25   WhatsApp.  It was one of those.
```

Case 3:22-cv-01213-TAD-KDM Document 270-3 Filed 03/03/23 Page 110 of 660 PageID #: 11015

1      Q.  Got it.  Why is Census involved in your

2  coordination with Facebook at this time?

3      A.  We had entered an IAA with Census to help

4  advise on misinformation.

5      Q.  And an IAA is?

6      A.  Interagency agreement.

7      Q.  All right.  Did the CDC ever use any

8  software programs developed by Census that enabled

9  the CDC to track the viewpoints of U.S. citizens?

10     A.  No.

11     Q.  Did the CDC ever gain access to or in any

12 way receive information about the viewpoint of U.S.

13 citizens on COVID masking or vaccination from

14 Census?

15     A.  We likely did because they provided

16 reports on misinformation that they were seeing to

17 us.

18     Q.  Did the CDC ever share data on the

19 viewpoints of U.S. citizens with the Census?

20     A.  I don't recall if we did.

21     Q.  You did share the CrowdTangle with them?

22     A.  Yes.  Can you reask the question?

23     Q.  I will.  Did the CDC ever share the data

24 on the viewpoint of -- the viewpoints of U.S.

25 citizens that CDC was seeing with the Census?

CAROL CRAWFORD 11/15/2022

Page 72

```
 1          A.  You refer to it as data.  I don't recall
 2     sharing data.  I do recall sharing social media
 3     listening reports such as this, or the publicly
 4     available vaccine confidence reports that talk about
 5     what people are talking about, and probably the
 6     JIC's research, you know.  They had a standing
 7     summary of what was being discussed.  I suspect I
 8     shared that, too, with Census.
 9          Q.  The JIC?  What kind of research, the?
10          A.  I mentioned the JIC research team that
11     looked at what the conversations were on news,
12     social media and did summaries of that for everyone
13     in the response.
14          Q.  All right.  And did information come back
15     from the Census to CDC about what they were finding?
16          A.  My recollection is that the Census did
17     provide us with the key themes they were seeing
18     around misinformation during the times that they
19     were looking at it.
20          Q.  Who was at the meeting that Ms. Iheme
21     references and that you refer to in the next email?
22          A.  The next email, which email?
23          Q.  So above it.  It says -- oh, hang on.
24     I'll tell you in a second.
25              "Yes, I did see and will know in a few
```

**CAROL CRAWFORD  11/15/2022**

```
 1    hours."
 2              Hang on for a second.
 3              So I took it to mean that this March 30th,
 4    3:16 email that she says:  "Hi, Carol, Yes, I did
 5    see and will know in a few hours, I'm told if we
 6    plan to present for Census Thursday or if it needs
 7    more work."
 8              And then you say that "I didn't ask Census
 9    if they had questions."
10              Do you know if there was a meeting with
11    Census on or about that time?
12        A.  I don't --
13        Q.  Okay.
14        A.  -- remember enough detail to answer the
15    question.  Sorry.
16        Q.  So in this March 30th, 2021 at 7:38.
17        A.  Yes.
18        Q.  There you say:  "I didn't ask Census if
19    they had questions, but I know they were hoping to
20    go over the deck they had."
21              And is that the one you sent them or
22    Facebook sent them, or did they create that
23    themselves?
24        A.  I don't know for sure.  I'm interpreting
25    from this email that the Census created it, but I do
```

Case 3:22-cv-01213-TAD-KDM Document 270-3 Filed 03/03/23 Page 75 of 345 PageID #: 11018

1    not know.

2         Q.  All right.  "And discuss how to engage on

3    a more regular basis."

4              Do you know if they ever decided to engage

5    on a more regular basis?

6         A.  With -- about their activity, or about

7    CDC?

8         Q.  Yeah, with Facebook.

9         A.  I don't know what Census did directly with

10   Facebook.

11        Q.  And then I'll ask you to take a look at

12   the 3:16 again.  She says:  It would be great to

13   have questions that may not have been answered from

14   your team on misinformation.  She says "misinfo",

15   but I'm using the full word.

16             And is she looking -- is it your

17   understanding she's looking for those answers from

18   Census that you didn't have, CDC?

19        A.  Let me reread this chain.

20        Q.  Go ahead.

21        A.  Sorry.  Can you repeat the question?

22        Q.  I will withdraw the question for a moment.

23        A.  Okay.

24        Q.  Just take a look at March 30th, 7:46 as

25   well.  She writes to you, Carol:  "Hi, Carol.  Yes,

Case 3:22-cv-01213-TAD-KDM Document 270-73 Filed 03/03/23 Page 76 of 345 PageID #: 11019

1    I think it's good to have questions from Census to

2    make sure we have the right person.  I can ask Liz

3    to join again so she can be asked questions/provide

4    more information about influencers and I have noted

5    your question about removals and will tee that up as

6    well."

7              What was your question about removals?

8        A.  I -- reading in this email?

9        Q.  Yeah.

10       A.  I'm saying -- the email before this I'm

11   saying the team is still interested in more info

12   about how you analyze the data on removals.  And my

13   general recollection where this question came from

14   was that we -- the -- that I think there was

15   wondering if they delete the info will we know those

16   myths or information so we could update

17   communication activity.  So if they were deleting

18   content would we know what the themes were.

19       Q.  And did you ask them to remove any

20   content?

21       A.  No.  This was -- this was when -- this was

22   a meeting where we were just asking what -- how that

23   worked and would there be data, would we be able to

24   see in CrowdTangle or other reports like what kind

25   of themes were removed so we would still have the

```
 1   full picture of areas of confusion.

 2        Q.  All right.  And if you look at your March

 3   31st, 2:07 p.m., and you say what "Census mentioned

 4   they'd like to discuss."  "It looks like the post

 5   from last week's deck about infertility and side

 6   effects have all been removed.  Were those

 7   re-evaluated by the moderation team or taken down

 8   for another reason?"

 9             What are you saying there?

10        A.  It looks to me like I cut and pasted this

11   from something that Census had said, and I don't

12   have good recollection of what this was on

13   March 31st.

14        Q.  Then you've also cut and pasted:  "One of

15   the main themes we're seeing and from the

16   CrowdTangle report is local news coverage of deaths

17   after receiving the vaccine.  What's the approach

18   for adding labels to those stories?"

19             Why would you or Census want them to add

20   labels to those stories?

21             MS. SNOW:  Objection.  Calls for

22   speculation and mischaracterizes the testimony -- or

23   the document.

24   BY MR. VECCHIONE:

25        Q.  You can answer.
```

**CAROL CRAWFORD  11/15/2022**

Page 77

```
1          A.   I don't think we were asking them to add
2     labels, from what I'm reading here.  We were asking
3     them what their approach for labels were.
4          Q.   Then they have asked:  "Can we add the
5     Census team to CrowdTangle?"
6               Hadn't it already been added to
7     CrowdTangle by this time?  Haven't we established
8     that?
9          A.   There were two different offerings for
10    CrowdTangle.  They had allowed us to directly log
11    into CrowdTangle and run our own reports or
12    searches.  I believe that started back in, you know,
13    March or April 2020.  Then they sent the reports.
14    So this appears to be to log in to CrowdTangle.
15         Q.   Then what did you mean by your team is
16    going to consider how you might want to engage with
17    CDC Census team routinely and get back to us?
18         A.   I don't know specifically this day this
19    email what I meant.  But I do know that we generally
20    discussed, you know, how we should talk about
21    misinformation because they had already been working
22    with Census, on their own Census misinformation, and
23    I wanted to know what was best for them for engaging
24    on any topics that we might want to discuss.
25         Q.   All right.  Do you know what Facebook was
```

1   told previously about engaging with CDC and Census

2   on this?

3            MS. SNOW:  Objection.  Vague, calls for

4   speculation.

5   BY MR. VECCHIONE:

6        Q.  You can answer.

7        A.  Can you rephrase the question?

8        Q.  Yeah.  They were already engaging, it

9   seems to me, with CDC and Census at this time.  Do

10  you know if there was anything additional from what

11  we've discussed about such engagement that's causing

12  them to ask this question?

13       A.  Causing them to ask what question?

14       Q.  About closer engagement with the Census,

15  and you asking to have -- "can we add the Census

16  team to CrowdTangle?"  Do you know what --

17            MS. SNOW:  Objection.  Mischaracterizes

18  the document.

19  BY MR. VECCHIONE:

20       Q.  It's okay.  You can answer if you

21  understand.  I'm trying to understand.  It seems

22  that Facebook has been talking to CDC and Census

23  throughout for a while now.  And yet here is a

24  request that they want a different CrowdTangle, as

25  you've explained.

**CAROL CRAWFORD  11/15/2022**

Page 79

```
 1              MS. SNOW:  Objection.  It assumes facts

 2    not in evidence.

 3    BY MR. VECCHIONE:

 4         Q.  You can still answer.  I'm trying to

 5    understand what is happening in this series of

 6    emails, since they have already been sending you the

 7    CrowdTangle information.  You've explained that

 8    there was a different CrowdTangle information that

 9    Census might want; right?  That is --

10         A.  I think it was the log-in to the

11    CrowdTangle.

12         Q.  Okay.  Well, I'll give you an example.  So

13    Ms. Iheme asks:  Yes, I think it's good -- this is

14    at 7:46 on March 30th, said:  "I think good to have

15    question from Census so we make sure we have the

16    right person."

17              So my question is, is that the right

18    person to answer those questions to the Census from

19    Facebook?  What's your understanding?

20         A.  I don't know this chain of emails

21    specifically, but I believe it was likely in

22    reference to just me mentioning to Payton that we

23    were partnering with the Census to learn more.  We

24    had been discussing things, and we were going to

25    have some collective questions that we would like to
```

```
 1    discuss at a future meeting.
 2         Q.  Okay.  What's the amplification side at
 3    March 30th at 7:38?  You are going to ask Liz about
 4    what is being done on the amplification side.  What
 5    does that mean?
 6         A.  I don't know why I was asking that.
 7         Q.  And why did you want to get a better
 8    understanding of how Facebook was working with
 9    influencers?
10         A.  I don't remember the meeting before that,
11    so I'm not sure what that is in reference to.
12         Q.  And it says the team's interested in more
13    info on how you analyze the data on removals.
14              Why are you asking about how Facebook
15    operates on removals?
16              MS. SNOW:  Objection.  Asked and answered.
17         A.  I did answer it previously.
18    BY MR. VECCHIONE:
19         Q.  I don't believe I have directed you to
20    that exact portion of this, and I would ask the
21    witness to answer unless she's being instructed not
22    to.
23              MS. SNOW:  No, you may answer.
24         A.  Okay.  What I think this was about was I
25    believe the teams that were looking at, like, our
```

1  research reports, or our vaccine confidence report

2  were wondering if the data was removed if it would

3  show up in the report, so would they be missing gaps

4  or information because the posts were removed.

5  That's what I believe that this question is about.

6  BY MR. VECCHIONE:

7      **Q.  All right.  CDC wasn't concerned that they**

8  **weren't removing materials fast enough?**

9      A.  That's not what I believe was being

10  discussed here.  This was about the data that we

11  could get so we had a full picture on confusion so

12  that we could adjust communication materials, or

13  ways that we were communicating.  That's what I

14  believe that that's in reference to.

15         And you know what, I have a clarification.

16      **Q.  Go right ahead.**

17      A.  You asked me what the amplification

18  side --

19      **Q.  Yes.**

20      A.  -- and the influencers.  Now that I'm

21  remembering this, I think that it it was likely

22  about how to promote how to get a vaccine, or where

23  to get a vaccine and I think that was all part of

24  that conversation.

25      **Q.  All right.  Let's go to the March 31st,**

Page 82

```
 1    2021 at 2:07, the one you've told me you've cut and
 2    pasted from Census, at least those bullet points.
 3         A.  You mean March 31st?
 4         Q.  March 31st at 2:07.
 5         A.  Yes.
 6         Q.  It says:  "Were those reevaluated by the
 7    moderation team or taken down for another reason?"
 8              Do you know if that refers to a moderation
 9    team at CDC or Facebook?
10         A.  It must have been Facebook because we
11    don't have a moderation team at CDC.
12              I'd also like to clarify that I think I
13    probably cut and pasted it.  I don't know for sure
14    that I did.
15         Q.  That's fine.  Got it.  I follow you.
16              Why do you -- do you know why you wanted
17    to know what the approach for adding labels to the
18    stories about deaths after receiving the vaccine
19    was?
20              MS. SNOW:  Objection.  Asked and answered.
21         A.  I don't remember this specific set of
22    conversation, or why we were asking about that any
23    longer.
24    BY MR. VECCHIONE:
25         Q.  Okay.  Do you know -- so you're discussing
```

1   talking to Census at some point.  Do you know

2   whether that conversation ever happened, a

3   conversation with -- regarding this string of emails

4   with Census, CDC and at Facebook?

5        A.  I don't know that we were discussing the

6   string of emails, but there were meetings where

7   Census, myself and Facebook were on calls.

8        Q.  Okay.  And do you recall what you

9   discussed?

10       A.  My memory is we had general conversations

11  about what were opportunities to address

12  misinformation.  And things like in this chain I

13  believe were probably discussed, but I don't have

14  specific memory of it.

15       Q.  Do you know who your contact was at

16  Census, like who was the main person at Census on

17  this aspect of the CrowdTangle and dealing with

18  Facebook?

19       A.  There were a couple of people from Census

20  that we were talking with.  I only remember two of

21  the names.  One was Christopher Lewitzke, who I

22  believe was a contractor for them.  And then Jen

23  Shopkorn, I think I'm saying it correctly.  I

24  believe she was their director for digital.

25       Q.  Thank you.

```
 1        A.   But there were a couple of others that
 2   typically participated.
 3        Q.   And then March 31st at 2:18 Ms.  Iheme
 4   writes you:  "Hi, Carol we are working on a proposal
 5   how set up sharing partnership on the misinformation
 6   items, what would it look like, so we can discuss
 7   Thursday.  Lots of team members out the last two
 8   weeks due to all the holidays, but that is the plan
 9   so we can discuss on the Thursday call."
10        Do you know whether that meeting, the
11   Thursday meeting, to set up sharing partnerships on
12   misinformation occurred?
13        A.   I don't remember if this specific meeting
14   occurred.
15        Q.   Would you have a calendar that would tell
16   you?
17        A.   Yes.
18        MR. VECCHIONE:  I would ask counsel to
19   produce that calendar of the date of that meeting.
20        MR. GILLIGAN:  We'll take your request
21   under advisement.
22        MR. VECCHIONE:  Thank you.
23   BY MR. VECCHIONE:
24        Q.   And once again would you have notes or
25   recordings of that conversation?
```

**CAROL CRAWFORD  11/15/2022**

Page 85

```
 1            A.   We never recorded the calls.  If I had --
 2    I didn't take many notes, but if there was anything
 3    it would be in Word or email.
 4            MR. VECCHIONE:  You can put 8 aside,
 5    Exhibit 8 aside.
 6            (Plaintiffs' Exhibit 9 marked.)
 7    BY MR. VECCHIONE:
 8            Q.  In this, if you'll just an initial look at
 9    it you can tell me.  I just ask you to -- I'd like
10    you to identify it and tell me the date of the
11    email.
12            A.   The subject is Misinfo on two issues.  And
13    the date of the email is May 6, 2021.
14            Q.  All right.  You can continue to read it.
15            A.   Read the email?
16            Q.  Yeah.
17            A.   "Payton, Genelle" --
18            Q.  No, no.  I mean, to yourself.
19            A.   Oh.
20            Q.  Just scan through it.
21            A.   Sorry.  Thank you.
22            Q.  I want you to be a little familiar with
23    it.
24            MR. GILLIGAN:  Good clarification.
25            A.   Okay.
```

**CAROL CRAWFORD  11/15/2022**

Page 86

```
 1   BY MR. VECCHIONE:
 2        Q.  All right.  So can you tell us why you
 3   were flagging misinformation about the vaccines for
 4   Facebook?
 5           MS. SNOW:  Objection.  Mischaracterizes
 6   the document.
 7   BY MR. VECCHIONE:
 8        Q.  Well, let's take a look at it for a
 9   moment.  It's from you; right?
10        A.  Yes.
11        Q.  And then it's to Ms. Iheme under a new
12   name Gennelle Adrien.  Do you know her and what her
13   role was?
14        A.  I think she was one of Payton's
15   assistants.
16        Q.  All right.  And then you're cc'ing Sam
17   Huxley at ████████@Reingold.com.  Do you know who that
18   is?
19        A.  Yeah, now that I see the name.  Sam was a
20   contractor for Census that was often on our phone
21   calls with Christopher and Jen.
22        Q.  And that's Christopher Lewitzke; right?
23        A.  Yes.
24        Q.  And then Jennifer Shopkorn, I apologize if
25   you told me who that was, but who was that?
```

```
 1          A.   She's with Census, and I believe she's the
 2    director for their digital team.
 3          Q.   And Lynn Sokler?
 4          A.   Lynn Sokler is a counterpart of mine in
 5    OADC who was working on this partnership with Census
 6    along with myself.
 7          Q.   All right.  And then it says:
 8    "Payton/Genelle.  As mentioned, here are two issues
 9    we are seeing a great deal of misinfo on that we
10    wanted to flag for you all -- vaccine shedding and
11    microchips"; right?  You wrote that?
12          A.   Yes.
13          Q.   Can you tell us why you were flagging
14    misinformation about the vaccines for Facebook?
15          A.   Because we had had conversations with
16    Facebook about ways that we could address
17    misinformation, and my recollection is that one
18    suggestion that was -- that came up in that
19    conversation was to let them know if we were seeing
20    major themes that CDC had scientific information on,
21    or had web content that would address.
22               I believe that is why I was sending these,
23    because these were two large areas of
24    misinformation.
25          Q.   What did you mean by the term "flag" or
```

```
 1    flagging?

 2         A.  Pointing out.

 3         Q.  What was the expectation of what Facebook

 4    would do when something was flagged?

 5         A.  I don't recall having a specific

 6    recollection of what I thought that they would do.

 7             I do know that the platforms have a

 8    variety of ways to address misinformation.  They

 9    might tag it as something that people should look

10    more into.  I think that they have the -- I think,

11    but I do not know, that they have the ability to

12    control how often some of these things show up in

13    peoples' feeds.  And I do know that removing them is

14    an option that they could consider.

15             So I didn't know exactly what they might

16    do with it, but I felt like it was worth pointing

17    out what we knew, that we had seen these myths and

18    that we were going to have information up soon.

19         Q.  All right.  And what was the consequence

20    to Facebook if they didn't do anything with your

21    flagging of these items?

22         A.  Nothing.

23         Q.  All right.  What were you hoping to

24    accomplish by flagging these items for Facebook?

25         A.  I mean, our goal always is to be sure that
```

**CAROL CRAWFORD  11/15/2022**

Page 89

```
 1   people have credible health information so that they

 2   can make the correct health decisions for

 3   themselves.  There were a lot of things circulating

 4   that were not accurate information about COVID.  And

 5   so we were trying to point out and make the credible

 6   information more available to users.

 7        Q.  How did you decide on these particular

 8   posts?

 9        A.  I don't remember specifically this

10   conversation, or what made us decide.  But I do know

11   generally that these were two very high-volume

12   misconceptions online at the time about vaccines.

13        Q.  All right.  Do you recall whether you had

14   any criteria in determining which posts to flag?

15        A.  I don't recall that we had any criteria on

16   what we pointed out to Facebook other than it had to

17   be something that was in CDC's lane that we had

18   information for, you know, to offer about it, and

19   something that had been -- you know, was high

20   volume, that was worth pointing out to this entity.

21        Q.  Did you or anyone at CDC have concerns

22   about the government working with Facebook and

23   telling them what should be flagged or not?

24             MS. SNOW:  Objection.  Mischaracterizes

25   testimony, calls for speculation.
```

```
 1   BY MR. VECCHIONE:

 2        Q.  You can answer.

 3        A.  Can you rephrase the question again, or

 4   say it again?

 5        Q.  Yeah.  Did you or anyone at CDC have any

 6   concerns about CDC or the government flagging

 7   materials for Facebook when you knew they took some

 8   things down?

 9        A.  I can't speculate what others at CDC might

10   have thought about it.  Personally, because I didn't

11   believe we were asking them to remove content

12   specifically, I did think getting credible

13   information out was important.

14        Q.  Where did this information about

15   microchips and the shedding, what kind of

16   information did the Census team have on those posts

17   at that time?

18        A.  My recollection is that we were pointing

19   out to Facebook that there were these themes going

20   around pretty heavily, and these probably came from

21   the social listening tools, you know, that can

22   consolidate examples.  And we provided some examples

23   of what we meant.

24        Q.  Okay.  You can put that aside.

25        A.  Thank you.
```

Page 91

```
 1              (Plaintiffs' Exhibit 10 marked.)
 2   BY MR. VECCHIONE:
 3        Q.  And, again, I'll give you a chance to read
 4   it, but if you could just identify the document and
 5   the subject line?
 6              MR. GILLIGAN:  The document being
 7   Exhibit 10?
 8              MR. VECCHIONE:  Exhibit 10.
 9        A.  It says:  Subject CV19 misinfo reporting
10   channel.  May 10, 2021.
11   BY MR. VECCHIONE:
12        Q.  All right.  What is -- I presume CV19 is
13   COVID-19?
14        A.  Yes.
15        Q.  "Misinfo" is misinformation?
16        A.  Yes.
17        Q.  All right.  What is the COVID-19
18   misinformation channel?
19        A.  Well, I don't think I -- just rereading
20   this email, I don't think I understood this at
21   first, what she was referring to.  I think I thought
22   that this was CrowdTangle, just by reading the
23   chain, but I now know what it was was Facebook
24   apparently has a portal or reporting channel where
25   you can report misinformation or threats or things
```

**CAROL CRAWFORD  11/15/2022**

Page 92

```
1   from a specific log-in that I believe they only
2   provide to like federal agencies.
3        Q.  All right.  And who used it at the CDC?
4        A.  To my recollection, the only person that
5   ever logged in at CDC was Brook Aspinall.
6        Q.  Who was that?
7        A.  She was part of our social media team.
8        Q.  For what?
9        A.  For COVID.
10       Q.  For what did she log on?
11       A.  Oh.  Why did she log on?
12       Q.  Yeah.
13       A.  My memory is that we log on one time to
14   see what it was -- what the system was and
15   understand what we could do in it.  And she logged
16   on one time, and I think reported two or three -- I
17   don't remember what they were -- two or three posts
18   or threats or one or the other.
19       Q.  All right.  Would you have a record of
20   what she put on there?
21       A.  I believe so.  But I only really remember
22   this from pulling documents at some point related to
23   this litigation earlier in the process.  I recall
24   there was an email that listed it, but I don't
25   remember what they said.  But I believe that there
```

**CAROL CRAWFORD 11/15/2022**

Page 93

```
 1   is a record of it because I recall seeing it during
 2   that process.
 3        Q.  All right.
 4            MR. VECCHIONE:  I would request that as
 5   well, Counsel.  But I'll put it in writing.
 6   BY MR. VECCHIONE:
 7        Q.  Well, I'll just ask this question.  I
 8   usually ask this question earlier, but I might as
 9   well.  In preparation for your deposition today, did
10   you review any documents?
11        A.  No.  Well, we -- the only one I reviewed
12   happened to be one of the ones you had during our
13   practice.
14        Q.  Good.  All right.  That's fine.  Do you
15   know which one it was?
16            MS. SNOW:  Objection.
17        A.  Oh, sorry.
18            MS. SNOW:  To the extent this calls for --
19            MR. GILLIGAN:  Does call for.
20            MS. SNOW:  The question calls for
21   information that's covered by the attorney-client
22   privilege.  So I direct the witness not to answer.
23            MR. VECCHIONE:  No, it doesn't.  What
24   she's reviewed I'm allowed to know.  That's --
25            MR. GILLIGAN:  Not if it didn't refresh
```

```
 1   her recollection.

 2           MS. SNOW:  Yeah.

 3           MR. VECCHIONE:  Doesn't matter.  She

 4   reviewed it.  I'm allowed to know it.

 5           MR. GILLIGAN:  No, you're not.

 6           MS. SNOW:  Not if it did not refresh her

 7   recollection about the facts.

 8           MR. VECCHIONE:  She's been shown the

 9   document today.  I'm allowed to know which one she

10   reviewed if she's been shown it today.

11           MS. SNOW:  You're asking about documents

12   that --

13           MR. VECCHIONE:  That she saw today.

14           MS. SNOW:  -- she reviewed in

15   preparation --

16           MR. VECCHIONE:  Yeah.

17           MS. SNOW:  -- for the deposition?

18           MR. VECCHIONE:  Yes.

19           MS. SNOW:  Yes, that is covered by

20   attorney-client.

21           MR. VECCHIONE:  She said she's been shown

22   it today.  There is no attorney-client privilege for

23   that.

24           MR. GILLIGAN:  I don't know that -- I

25   don't know that she said that she was shown it
```

**CAROL CRAWFORD 11/15/2022**

Page 95

```
 1   today.
 2   BY MR. VECCHIONE:
 3       Q.  I'll ask.  Were you shown it today?
 4       A.  One of them, yes.
 5           MR. GILLIGAN:  It's still --
 6           MR. VECCHIONE:  It's an improper
 7   objection, but it's not that important, so I'm going
 8   to let it go for now.
 9           MR. GILLIGAN:  All right.  Well, if you
10   care to raise the issue again later, we'll be happy
11   to discuss it later.
12   BY MR. VECCHIONE:
13       Q.  All right.  So who's responsible for
14   creating this channel, this COVID-19 channel?
15       A.  Well, I have a small recollection of this
16   channel, and I never looked at it myself to my
17   memory.  But it's, to my understanding, you log onto
18   Facebook as an administrator, and it's something
19   that they make available to you as a federal agency.
20       Q.  Okay.  So Facebook made it?
21       A.  Yeah.  It's like a place you can go and
22   report something.  I -- "channel" does feel like an
23   odd description of it to me.
24       Q.  Okay.  How do you know that it was made
25   available to, like, law enforcement?  Do you know
```

Case 3:22-cv-01213-TAD-KDM Document 278-3 Filed 03/31/23 Page 96 of 349 PageID #: 11040

1    that from this document, or do you know that from

2    your own memory?

3                MS. SNOW:  Objection.  Facts not in

4    evidence.

5                MR. VECCHIONE:  She testified to it a

6    minute ago.

7                MS. SNOW:  Okay.  Sorry.  My apologies.  I

8    missed that.  Sorry.

9    BY MR. VECCHIONE:

10        Q.  So how do you know that?  Like, why is

11    that your understanding?

12        A.  I guess I can't say I know that.  I have a

13    vague recollection of it being described to me as

14    something that other, like, official groups could

15    use to report, that it wasn't something that was

16    generally available.  But I might be wrong.

17        Q.  Okay.

18        A.  I don't know for sure.

19        Q.  That's fine.  Now, at the end of this

20    email there is a list of other email lists; right?

21    She says:  Thank you, Genelle.  And then she lists

22    some government people and some Census people and

23    CDC people and Reingold again.

24        A.  I see it.

25        Q.  So those -- and she asks you to confirm if

```
 1    the below emails are correct for onboarding to the
 2    reporting channel; right?
 3         A.  Yes.
 4         Q.  All right.  Are any of those people the
 5    Ms. Aspinall I think you told me before?
 6         A.  Those emails are so difficult, I don't
 7    know.  Perhaps it's ███ or ███ or ███, but I don't
 8    know peoples' user IDs, so I can't answer.
 9              I would also like to clarify that when I
10    was reviewing this based on this chain, I thought
11    this was about CrowdTangle access.
12         Q.  Okay.  At that time?
13         A.  At this -- yes, so.
14         Q.  You don't believe that now, but that's
15    what you thought when you received it?
16         A.  Yes.  I can see in this chain that that's
17    what I thought was happening with this.
18         Q.  All right.  Do you know how this list of
19    employees, whether you recognize them or not, do you
20    know how the people for access were selected,
21    like --
22              (REPORTER'S NOTE:  Loud audio noise heard
23              over loud speakers in room.)
24              (Comments off the record.)
25              MR. VECCHIONE:  Let's go off record.
```

```
 1              THE VIDEOGRAPHER:  Off record at 11:51.
 2          (Comments off the record.)
 3              THE VIDEOGRAPHER:  Back on record at
 4     11:53.
 5     BY MR. VECCHIONE:
 6          Q.  All right.  So the question is, the
 7     question on the floor, before we were so rudely
 8     interrupted, was how was this list of employees or
 9     contractors selected?
10          A.  I don't know.  Maybe from a meeting
11     invite.  Maybe people that were on a meeting, but I
12     don't know.
13          Q.  Do you know whether there was any training
14     involved in using this COVID-19 misinformation
15     channel?
16          A.  I don't remember any training.  The email
17     looks like perhaps there was.
18          Q.  Do you know whether CDC employees or
19     contractors asked to flag or report certain kinds of
20     information to Facebook?
21          A.  Yes.  On occasion there were people saying
22     "we saw this."  Usually they were around threats
23     that they wanted us to report, which you can do as
24     an administrator for Facebook now.
25              In terms of this, I only remember the one
```

 1    occasion that I mentioned a minute ago.

 2         Q.  Was Facebook asked to flag certain types

 3    of material to report to CDC or to Census?

 4              MS. SNOW:  Objection.  Vague.

 5    BY MR. VECCHIONE:

 6         Q.  I mean, I have asked whether or not CDC

 7    asked to flag things to Facebook, and you've

 8    answered that question.  Did Facebook ask CDC to

 9    flag things to them?

10         A.  Well, the way I have been using "flag" in

11    these emails is to point out.

12         Q.  Right.

13         A.  I don't recall asking them to point

14    anything out to us, but I can maybe recall us saying

15    something are you seeing this too, are y'all

16    considering this too?

17         Q.  Do you know whether or not we have any

18    documents that were given to CDC staff or

19    contractors regarding the training on this COVID-19

20    channel?

21         A.  I don't recall.

22         Q.  Okay.  Did the meeting -- I think it was

23    from May 18th.  Let me look at the document for a

24    second.

25              Okay.  You had a meeting that she -- that

 1    Genelle Adrienne refers to on May 7, 2021, 11:27

 2    a.m.  "Hi, Carol following up from our meeting

 3    yesterday it looks like Monday May 17th at 12 will

 4    work for onboarding meeting."

 5            Do you know whether that onboarding

 6    meeting ever occurred for this channel?

 7        A.   I don't have any recollection of the

 8    onboarding meeting.

 9        Q.   And once again would you have a calendar

10    mark for that onboarding meeting, if it occurred?

11        A.   If I was invited I would.

12            MR. VECCHIONE:  And once again, I'll put

13    that in a letter to you, Counsel.

14            MS. SNOW:  We'll note that document

15    discovery has closed, but we'll take it under

16    advisement.

17            MR. VECCHIONE:  I got you.

18    BY MR. VECCHIONE:

19        Q.   And you can put Exhibit 10 aside.

20            Oh, you know, might need it for this, but

21    I don't know if you do.

22            The Reingold contractors.  Why did CDC

23    need contractors?  What were they doing?  Did they

24    have concern -- let me withdraw the question.

25            Why did CDC have the contractors, the

**CAROL CRAWFORD  11/15/2022**

```
 1    Reingold contractors, involved in this?
 2            MS. SNOW:  Objection.  Mischaracterizes
 3    testimony.
 4    BY MR. VECCHIONE:
 5        Q.  Was it Census?
 6            MS. SNOW:  Objection.  Vague.
 7    BY MR. VECCHIONE:
 8        Q.  Why were the Reingold contractors involved
 9    in all this?
10        A.  They were contractors working with Census.
11        Q.  Okay.  Did you know why they were
12    contractors and not Census directly?
13        A.  No.
14        Q.  Do you know if their duties involve
15    content moderation?
16        A.  I don't.
17        Q.  Do you know whether their duties involve
18    flagging or reporting on certain kinds of opinions
19    expressed by U.S. citizens?
20            MS. SNOW:  Objection.  Vague, calls for
21    speculation.
22    BY MR. VECCHIONE:
23        Q.  You can answer.
24        A.  I really don't know.  I wouldn't know what
25    they had them do.
```

```
 1            MR. VECCHIONE:  All right.  That's it for
 2   10.  I could go on to 11, and or we could break here
 3   and fix the sound.  You go -- you could have lunch.
 4   Decide what the witness --
 5            MR. GILLIGAN:  It's up to the witness to
 6   break.
 7            THE WITNESS:  Let's break.  Let's break.
 8            MR. VECCHIONE:  There you go.
 9            THE VIDEOGRAPHER:  Off record at 11:59.
10            (Lunch recess 11:59 a.m. - 12:51 p.m.)
11            THE VIDEOGRAPHER:  Back on record at
12   12:51.
13            MS. SNOW:  And, defense counsel, just like
14   to note that we've reestablished the Zoom connection
15   and shared a call-in phone number again, which is
16   being forwarded to plaintiffs' counsel pursuant to
17   the previous agreement that it not be shared, the
18   Zoom link not be shared beyond plaintiffs' counsel
19   or the Zoom, or the call recorded using the Zoom
20   call-in number.
21            MR. VECCHIONE:  That's fine.
22            (Plaintiffs' Exhibit 11 marked.)
23   BY MR. VECCHIONE:
24       Q.  All right.  Ms. Crawford, I have handed
25   you -- once again can you identify Exhibit 11 and
```

 1    then tell me what the subject matter of the -- what
 2    the subject line is, and then you can continue to
 3    read it.
 4         A.   Agenda item for CDC call this week.
 5    May 20th, '21.
 6              Okay.
 7         Q.   Can you tell me who Liz Lagone is?
 8         A.   My understanding is that Liz is on their
 9    Trust and Safety team, or the Misinformation team,
10    which I don't know what the official name of it is.
11         Q.   Meaning Facebook's?
12         A.   Yes, Facebook's.  Sorry.
13         Q.   And in these emails Ms. Lagone identified
14    the, quote, "Content Policies" of Facebook as
15    guiding which posts get removed; right?
16         A.   It says "we may reduce, remove or inform."
17         Q.   And I think she describes these policies
18    as evolving?
19         A.   Yes, I see that.
20         Q.   Okay.  Did you or anyone at the CDC
21    participate in the crafting of the content policy of
22    Facebook?
23         A.   No.
24         Q.   Did you or anyone at CDC contribute to the
25    terms of service or community standards of Facebook?

 1          A.   No.
 2          Q.   Any other policy at Facebook that they
 3    contributed to?
 4          A.   No.
 5          Q.   Did you do so at any other social media
 6    company?
 7          A.   No.
 8          Q.   Did you or anyone at CDC ever give input
 9    on what such a policy should look like?
10          A.   No.
11          Q.   Did you, or --
12          A.   I should clarify.
13          Q.   Go ahead.
14          A.   I'm speaking from my -- no one in my group
15    or my office.  I can't imagine anyone else did.
16          Q.   To your knowledge?
17          A.   Yes, yes.
18          Q.   You're only testifying to your knowledge.
19    I understand that.
20          A.   Yes.
21          Q.   Thank you.
22               Did you or anyone at the CDC either advise
23    or help Facebook on how to enforce or apply their
24    policies to any particular social media post?
25          A.   Not that I recall.

CAROL CRAWFORD  11/15/2022

Page 105

1      Q.  Same question for other social media.  Did
2   you ever -- did you or anyone at CDC help any other
3   social media company on how they should apply their
4   policies to -- toward a particular post?
5      A.  No.  We didn't -- I have never seen their
6   policies.
7      Q.  Did you or anyone at CDC ever discuss with
8   Ms. Lagone any manner relating to any enforcement of
9   the policies that she's discussing here?
10      MS. SNOW:  Objection.  Vague.
11  BY MR. VECCHIONE:
12      Q.  Well, she's discussing these policies
13  here.  Did you ever discuss with her their
14  development and enforcement?
15      A.  No.  We did not discuss the development of
16  their policies, or the enforcement of their
17  policies.  What we did provide was scientific
18  information that I did assume that they might use to
19  do those things.
20      Q.  Okay.  I'd like you to take a look at one
21  of -- she -- Payton Iheme lays out a number of items
22  that I think she says at May 19th, 4:19:  To help
23  with scoping on your end for Thursday, here's some
24  of the COVID content items that Liz will be flagging
25  for you the CDC team.

**CAROL CRAWFORD  11/15/2022**

```
 1              And here she seems to be flagging items
 2    for you at CDC.  And then she goes through them.
 3    And what did you do when they flagged some of these
 4    to you?  What -- why was she flagging those to you,
 5    and then what did you do in response?
 6              MS. SNOW:  Objection.  Compound.
 7    BY MR. VECCHIONE:
 8         Q.  You can answer.
 9         A.  So why were they flagging this to us?
10    First part.  They were wanting our feedback on
11    whether these things were true or false statements
12    that they were seeing.  Did the CDC have science
13    around this, did we have content on our website.
14              Can you refresh me on the second part of
15    the question?
16         Q.  And what did you do in response to the
17    flagging?
18         A.  Typically what we would do is try to
19    let -- if we knew, if we had something or we had
20    science on these items, we would point to it or
21    provide them an answer.  If we didn't, we wouldn't
22    provide it.
23              My recollection, this might have been one
24    of the first times they asked in this type of
25    format.  And I think we talked about that on the
```

CAROL CRAWFORD  11/15/2022

Page 107

1    call, like, who knew -- some of these people, I
2    thought, could help answer whether -- what we had on
3    these topics.
4         Q.  All right.  And you had -- and let's,
5    since you just pointed out, we'll just say --
6         A.  Mm-hmm (affirmative).
7         Q.  -- your response was:  Thanks for the
8    additional info.  And then you say you're going to
9    have these folks joining.
10        And you've got the Census team members
11   joining this.  Cynthia Jorgensen, director of Comms
12   for NCIRD.  What's that?
13        A.  National Center for Immunization and
14   Respiratory Diseases at CDC.
15        Q.  "And our joint information center
16   co-lead."  So is she that as well?  She's the joint
17   information center co-lead, or is that a different
18   person?
19        A.  She was serving both roles.  She -- we
20   deployed to the response, and she was -- at this
21   point in time was deployed as the co-lead for the
22   joint information center, but her regular job is the
23   ADCS.  So she had a lot of knowledge regarding this
24   topic.
25        Q.  And then you've got Rosie

CAROL CRAWFORD  11/15/2022

```
 1    Bretthauer-Mueller and Demi Haynes.  And they are
 2    co-leads for consumer vaccine content development.
 3              Is that content development on your
 4    website at CDC?
 5        A.  Yes.
 6        Q.  Okay.  And they say:  "I'm not going to
 7    have SME join."
 8              Is that subject matter experts?
 9        A.  Yes.
10        Q.  What are those?
11        A.  That would have been like an actual
12    scientist that studied these issues, or knew what
13    the science was on it.  When I -- I believe when I
14    scanned this I thought we probably had readily
15    answered -- we probably had a lot of this already
16    addressed on the website, and the content folks
17    would be able to point that out.  We didn't have to
18    have the expert on the call.
19        Q.  I have -- if you look at 11.
20        A.  Mm-hmm (affirmative).
21        Q.  "Is the claim 'COVID-19 manmade' false,
22    unproven, unsupported by evidence, or true?"
23              Do you know whether or not CDC ever
24    responded to that inquiry?
25        A.  I don't know for sure, but I doubt we
```

**CAROL CRAWFORD  11/15/2022**

```
 1   would have.
 2          Q.  And why do you think that?
 3          A.  I don't recall us having any information
 4   on this posted on our website.  I know it came up a
 5   lot, but I don't remember us having it like an FAQ
 6   on it.
 7          Q.  All right.
 8          A.  But I'm not an expert on all the content
 9   we had on the web.  I don't develop the content.
10          Q.  I understand.
11          A.  Okay.
12          Q.  I'm just -- I appreciate the information
13   and why you thought it.
14              I have a -- so this -- Census is now in.
15   Is this after the IAA you mentioned to me yesterday?
16   Earlier today.  It's not yesterday yet.  Before
17   lunch?
18          A.  Yes.
19          Q.  Okay.  So what is the -- what's your
20   understanding of what an interagency memo is, or an
21   interagency agreement is?
22          A.  I'm definitely not an expert on IAAs.  But
23   it's an agreement between two agencies to conduct
24   some kind of work between them.  Sometimes you're
25   given fundings to do it.  Usually you are.  I
```

**CAROL CRAWFORD  11/15/2022**

```
 1    don't -- I wasn't -- I didn't create the IAA, so I
 2    don't have a lot of details on what was in it.
 3           Q.  Have you seen it?
 4           A.  I do believe I saw it.
 5           Q.  Is it related just to COVID, or is it
 6    broader than that?
 7                MS. SNOW:  Objection.  Assumes facts not
 8    in evidence.
 9    BY MR. VECCHIONE:
10           Q.  Okay.  Is it related to COVID?
11           A.  I cannot say for sure what was stated in
12    the IAA, but we were only engaging on COVID
13    misinformation.  But we were learning about how they
14    operated a general misinformation team along the way
15    to --
16           Q.  How Census did?
17           A.  How Census did it, yes.
18           Q.  And did you -- was part of the IAA --
19    well, I'll ask it in two parts first.  Was part
20    of -- was the purpose of the IAA so that CDC could
21    learn what they did and perhaps replicate it?
22           A.  Was that the purpose of the IAA?  No, I
23    wouldn't say it.  I think that we were learning from
24    it to determine if we needed to do it.  I really
25    don't recall the wording in the IAA.
```

**CAROL CRAWFORD  11/15/2022**

```
 1          Q.  Okay.  What was your understanding of what
 2    the AII was about?
 3          A.  To let us partner with the Census to learn
 4    how they handled misinformation and help us with the
 5    COVID misinformation.  We were shorthanded.  They
 6    seemed to have more knowledge than we did.
 7          Q.  All right.  And do you know if the IAA is
 8    still in place?
 9          A.  Well, we haven't been working with Census
10    in quite some time.  I don't know the actual date on
11    the end of the IAA, though.
12          Q.  All right.  If you look at item eight of
13    the items flagged:  "COVID-19 vaccine cause bell's
14    palsy."  Do you see that?
15          A.  Yes.
16          Q.  Do you know whether you gave any input on
17    that question?
18          A.  I don't recall.
19          Q.  And how about item number nine:  "COVID-19
20    has 99.96% survival rate"?
21          A.  I don't remember what we said about that
22    one.
23          Q.  All right.
24              MR. VECCHIONE:  I will hand over these all
25    at once because I'm going to ask the same question
```

**CAROL CRAWFORD  11/15/2022**

```
 1   about them.
 2               MR. GILLIGAN:  31?
 3               MR. VECCHIONE:  12.  No, no, no, 12
 4   through 14, how about that?
 5               (Plaintiffs' Exhibit 12 and Exhibit 13
 6               marked.)
 7   BY MR. VECCHIONE:
 8        Q.  And you don't have to read through these.
 9   You can just look at them all at once.  I'll let
10   counsel look at them for a second, and then I'll ask
11   the question.
12               Now, I'll just represent to you what these
13   are, unless you can tell me you've seen them before.
14        A.  I haven't seen them before.
15        Q.  All right.  So Exhibit 12 is a scientific
16   paper on the relationship between Bell's palsy and
17   SARS CoV-2, as is 13.
18               Do you know whether or not in relationship
19   to Exhibit 11 and Bell's palsy, that whether or not
20   any of these scientific articles or others on Bell's
21   palsy were flagged by CDC to Facebook?
22               MS. SNOW:  Objection.  Calls for
23   speculation.  Lack of foundation.
24   BY MR. VECCHIONE:
25        Q.  You can answer, if you know.
```

**CAROL CRAWFORD  11/15/2022**

```
 1          A.  I wouldn't know.  I mean, I didn't flag
 2   them.
 3              (Plaintiffs' Exhibit 14 marked.)
 4   BY MR. VECCHIONE:
 5          Q.  Okay.  And then on 14, Plaintiffs'
 6   Exhibit 14, have you seen this before?
 7          A.  No.
 8          Q.  And this is another scientific paper on
 9   the percentage survival rate of COVID patients.
10              Do you know whether this was flagged by
11   CDC to Facebook or other social media?
12          A.  We didn't flag this, or specific things.
13   We provided CDC content.
14          Q.  All right.  And that means things that
15   either CDC had on its website, or it knew
16   internally?
17          A.  I think primarily it was things that were
18   on CDC's site, but I can't say that for sure.  I did
19   not, not -- none of the communicators answered the
20   questions directly.
21          Q.  Okay.
22          A.  Unless we had it on our website.
23          Q.  So what you do is would you refer them to
24   subject matter experts?
25          A.  Those questions would -- if they were on
```

**CAROL CRAWFORD  11/15/2022**

```
 1   an email, they would go, you know, we would -- I
 2   didn't.
 3        Q.  Right.
 4        A.  People in the response would ask the SMEs
 5   about them.  That's my understanding of what
 6   happened when they were circulated.
 7        Q.  So I'm trying to get the trail of how they
 8   get -- how Facebook or the other social media get
 9   information.  You're the contact point oftentimes.
10   They send you things like this?
11        A.  Mm-hmm (affirmative).
12        Q.  Then somebody -- and we've already
13   determined, you're not -- you don't do science,
14   you're a communicator, right?  And a tech person?
15   So where do you send this material to get those
16   answers if it's not on the website?  Because you've
17   told me if it's on the website we just send it over
18   to them.
19        A.  I didn't even always check to see if it
20   was on the website myself or in my office.  I would
21   let the communicator that was assigned to whatever
22   the area was.  For instance, Rosie on the Exhibit 11
23   was working with this area, and she would have the
24   contacts with the experts.
25        Q.  Okay.
```

CAROL CRAWFORD  11/15/2022

Page 115

```
 1         A.  I don't know what they -- how they got the
 2    answers back in every instance.
 3         Q.  Because you weren't always the person to
 4    send the answer back?
 5         A.  I sent the answers back, but I didn't
 6    collect them.  Usually they required multiple
 7    experts.
 8         Q.  Okay.  All right.  And in Exhibit 11
 9    again -- you can put 12 to 14 aside.  Do you know if
10    Cynthia Jorgensen and Rosie Bretthauer-Mueller and
11    Demi Haynes joined the meeting, as indicated?
12              MS. SNOW:  Objection.  Vague.
13              MR. VECCHIONE:  They're the people she's
14    going to bring in for the meeting.
15         A.  I think they probably did.  I don't know
16    if all three of them did.
17    BY MR. VECCHIONE:
18         Q.  And what is -- do you know what the role
19    is of a co-lead for consumer vaccine content
20    development is?
21         A.  She would help write all the materials on
22    vaccines that were on the website, or in a fact
23    sheet.
24         Q.  And do you recall this meeting taking
25    place?
```

```
 1        A.  I don't recall the specific meeting.  I do
 2   recall meetings such as -- like this.  I mean, maybe
 3   it's this one I have in my mind.  I don't know for
 4   sure.
 5        Q.  Well, if it's -- what was discussed at the
 6   meeting, to the best of your recollection?
 7        A.  Sometimes in these meetings they would ask
 8   do we know if this is true or false, which is what
 9   they were doing.  And then if we knew, the
10   communicators knew the answer, we would provide it.
11   If not, I would say, we would say, I'll have to get
12   back to you later, we'll talk to our SMEs.
13             And then that's why I was referring to not
14   going to have an SME going, but we can go back to
15   the group after the meeting if needed was the gist.
16        Q.  Do you have notes or other records of what
17   was said on the call?
18        A.  I didn't take notes.  I don't believe
19   notes were taken.
20        Q.  But once again, on a calendar you might
21   have that calendared?
22        A.  I would have -- the appointment would be
23   there, but it wouldn't necessarily say if Cynthia
24   joined or not.  She would have been invited.
25        Q.  All right.  And we discussed earlier today
```

## CAROL CRAWFORD  11/15/2022

```
 1    your conversations with at least Facebook, but some
 2    social media on misinformation.  And you said it was
 3    on -- I think you said it was on a general level,
 4    you couldn't remember anything specific.
 5              After looking at these documents, has
 6    anything changed in your response?  Do you remember
 7    any specific misinformation you discussed with the
 8    social media organizations around here, around 2021?
 9        A.  I mean, I remember seeing this list before
10    now that you've showed it, but I don't remember what
11    we sent back, or what we said on the phone
12    specifically about each of these items.
13        Q.  And did you -- did CDC -- when I say "you"
14    here I mean you or anyone you know at CDC.
15        A.  Mm-hmm (affirmative).
16        Q.  Ever monitor whether Facebook or other
17    social media company took down material that you
18    have indicated was false?
19        A.  I do think that Census was at least
20    periodically checking on things that they had
21    flagged, or they had seen come up.
22        Q.  Okay.  Thank you.  And why do you believe
23    that?
24        A.  Because I have vague recollections of them
25    mentioning it or asking it in the meetings, and I
```

**CAROL CRAWFORD  11/15/2022**

```
 1   believe that was in one of these exhibits.
 2        Q.  Got it.  That you reviewed during this
 3   deposition, or before?
 4        A.  In this one.
 5        Q.  Okay.  You can put Exhibit 11 aside.
 6        A.  Okay.
 7            (Plaintiffs' Exhibit 15 marked.)
 8   BY MR. VECCHIONE:
 9        Q.  And let's go to Exhibit 15.
10            MR. GILLIGAN:  Just a moment, Counsel,
11   before you ask your next question.
12            (REPORTER'S NOTE:  Mr. Gilligan conferring
13        with witness.)
14            MR. VECCHIONE:  The witness has conferred
15   with counsel.
16   BY MR. VECCHIONE:
17        Q.  And, again, I'd just ask you to identify
18   it by the subject of the re:  line and the date, and
19   then continue reviewing it.
20            MR. GILLIGAN:  Referring to Exhibit 15?
21   BY MR. VECCHIONE:
22        Q.  Referring to Exhibit 15.
23        A.  "It was this list, sorry.  Agenda item for
24   CDC call this week."  It was June 2nd, 2021.
25        Q.  Now, please take a look.
```

```
 1        A.  Okay.
 2        Q.  All right.  Now, I think the end of this
 3   email is pretty much the same as the one that was
 4   Exhibit 14; right?
 5        A.  It is.
 6        Q.  So let's just start with the email that's
 7   from Liz Lagone to you on May 24 at 1:57 p.m., and
 8   she ccs Carrie Adams at Facebook, it looks like,
 9   from the email.  Who's Carrie Adams?
10        A.  She was part of Liz -- of Payton's team,
11   now Carrie is my main point of contact at Facebook,
12   Payton has since left.
13        Q.  And can you tell me -- so she says on this
14   email:  "Thanks so much again for you and team's
15   help in debunking a few COVID-19 and vaccine
16   misinformation claims for us.  As a followup to our
17   meeting, please see the list of claims below with
18   notes from our conversation last Thursday morning."
19            So if this is Monday May 24th, is it fair
20   to say that the meeting was Thursday May 20th, if
21   that's the Thursday of the previous week?
22        A.  It appears that way to me too.
23        Q.  Okay.  So do you recall who met at that
24   meeting, and where it was?
25        A.  Well, as we were discussing on the other
```

CAROL CRAWFORD  11/15/2022

Page 120

```
1    exhibit, it was a phone conference, and I think that
2    Cynthia and Rosie and Demi may have attended.  I
3    can't say for sure all three of them attended, but I
4    know that they were at least two of them were
5    probably on the line.
6         Q.  All right.  And she's listed a number of
7    those items that we saw before that they had
8    questions about.  And the first one that she lists,
9    although it's not in the same order, she sent it to
10   you earlier; right?
11        A.  It does appear in a different order, yes.
12        Q.  But, she says:  "Is the claim, quote,
13   'COVID-19 is manmade' false, unproven, unsupported
14   by evidence or true?"  And the answer's:
15   Inclusive [sic] -- inconclusive; right?
16             And then she also goes on to say:  It's
17   probably from animals jumping to humans.
18             And my question here is she says:  The CDC
19   director in her testimony yesterday said being
20   manmade was technically possible because we did not
21   know the origin still.
22             And was that the CDC dir- --  I think I
23   saw Walensky in this email beforehand.  Is that your
24   understanding of who that is?
25        A.  In May that would be Walensky.
```

**CAROL CRAWFORD  11/15/2022**

1          Q.  Okay.  Now, why is Liz Lagone sending this
2     email to you about -- why is she sending this email
3     to you to confirm the conclusions below about the
4     COVID vaccine?
5                MS. SNOW:  Objection.  Calls for
6     speculation.
7     BY MR. VECCHIONE:
8          Q.  You can answer.
9          A.  I don't know why Liz specifically sent it
10    for sure.  But I -- because I just mentioned -- when
11    we were talking about the other exhibit -- that we
12    were communicators and not experts, there were
13    probably -- I'm sure we were saying we're pretty
14    sure this is correct.  We might have to go back and
15    check on stuff.  And I think she was trying to give
16    us something to go and follow up.
17               And I can see I said let's -- I'd like to
18    note that we have no scientific experts on the call
19    so these are our thoughts, but we'll definitely
20    check on this on our end.
21         Q.  Okay.  So you didn't -- but you didn't
22    respond that she had misheard anything on the
23    conversation; right?  You just said you needed to
24    check with scientists; right?
25         A.  Correct.  That's what I said in the email.

**CAROL CRAWFORD 11/15/2022**

```
 1          Q.   Okay.  And then I will just to -- later on
 2    the COVID-19 vaccine causes various things, these
 3    things had been proposed:  Alzheimer's, Prion's,
 4    cytokine storm.  And you respond inconclusive.  We
 5    don't know right now; right?  You just didn't have
 6    anything at hand?
 7          A.   That appears to be what we said on the
 8    call, and that Liz, in theory, wrote down what we
 9    said correctly.
10          Q.   Right.
11          A.   That's not clear from this chain.
12          Q.   And then --
13          A.   But how I'm interpreting it.
14          Q.   And then once again the survival rate,
15    they say it's inconclusive but it's a hard number to
16    prove, and -- correct, that's what she says?
17          A.   "Not able to debunk now, inconclusive.
18    Scientists would be hesitant to attach a correct
19    number to the survival rates," so.
20          Q.   Okay.  Yes.  And then it says "Note, this
21    claim is tied to the VAERS issue."
22               What's VAERS?
23          A.   VAERS is a Vaccine Adverse Events
24    Reporting system.
25          Q.   And is it your understanding that doctors
```

Case 3:22-cv-03580-WHO-TML/2022 Document 205-39 Filed 08/03/23 Page 184 of 349 PageID #: 11067

```
 1    around the country report adverse events for
 2    patients as a matter of course?
 3              MS. SNOW:  Objection.  Calls for
 4    speculation.
 5         A.  I'm not an expert on the system.
 6    BY MR. VECCHIONE:
 7         Q.  But the system, who puts the information
 8    there, do you know?
 9         A.  I actually believe anyone is able to
10    report an adverse event.  It doesn't have to only be
11    physicians.  It can be any of us that wanted to.
12         Q.  Okay.
13         A.  I believe.
14         Q.  Right.  And so it could be someone who
15    doesn't know whether it's connected to the vaccine,
16    or someone else?
17         A.  I think any kind of -- any kind of thing
18    can be reported.
19         Q.  Okay.  In this email do you know who the
20    science experts, the subject matter experts you
21    mention in your email, do you know who they were, or
22    who you checked with?
23         A.  No.  Because people deployed in and out of
24    the response, and I was not usually the person
25    asking the SMEs directly.  It was the communicators
```

**CAROL CRAWFORD  11/15/2022**

1   assigned to the topic group such as Rosie who was

2   the communicator for vaccines.  She was talking to

3   the SMEs.

4        Q.  All right.  And then would she talk --

5   could she talk directly to Facebook or the other

6   social media after that?

7        A.  Almost always she'd send back to me, and I

8   would consolidate responses and send them back.

9   Sometimes if I was out, Rosie would respond directly

10  with a copy to me or something.  I don't know that

11  that happened ever, but it might have.

12       Q.  All right.  Now, on May 24 at 1:57 she

13  does thank you for your and your team's help in

14  debunking a few COVID-19 and vaccine misinformation

15  claims; correct?

16       A.  Where do you see the thank you?

17       Q.  On May 24th, 2021 at 1:57.  The Bates

18  stamp at the bottom ends in 539.

19       A.  Sorry.  I'm on the wrong --

20       Q.  Yeah.

21       A.  Yeah, she does say that.  But then I note

22  that we haven't had scientific experts review this

23  yet right after she sent that to clarify.

24       Q.  All right.  But you were going to check

25  with them so that it could be debunked; correct?

**CAROL CRAWFORD  11/15/2022**

```
 1          A.  Correct.  If it was supposed to be
 2    debunked.
 3          Q.  If it --
 4          A.  Yes.
 5          Q.  Yes, if it was.  I thought -- I'm not
 6    seeing it now.  One second.
 7              Ah, here it is on the very first page of
 8    Exhibit 15.  Liz Lagone refers to a Sam.  "Also I
 9    meant to ask in my email earlier but I recall it was
10    either you or Sam mentioning that you could share a
11    transcript."  Who's Sam?
12          A.  I assume that was Sam with the Census
13    team.
14          Q.  Got it.  And have we talked about him
15    before?  Is he --
16          A.  We mentioned that he was one of the Census
17    folks.  I didn't remember his name until the
18    exhibits, but yes.
19          Q.  And do you know if the transcript of
20    Dr. Walensky was just her testimony to Congress, or
21    something else?
22          A.  In re-reading this, my recollection is is
23    that they asked about this, and several of us said I
24    think we heard her address this in the press event,
25    or maybe it was the testimony.  I'm not sure.  I
```

 1    guess it was the testimony because I was looking for

 2    the transcript, and we mentioned it.  And we were

 3    looking for it because that was the only thing that

 4    we knew of that might exist to help them with their

 5    question.

 6              MR. VECCHIONE:  All right.  You can put

 7    that aside.

 8              (Plaintiffs' Exhibit 16 marked.)

 9    BY MR. VECCHIONE:

10       Q.  And once again if you could just tell me

11    the subject line and the date, and then --

12              MS. SNOW:  And this is Exhibit 16?

13    BY MR. VECCHIONE:

14       Q.  Exhibit 16.

15       A.  "It was this list, sorry.  Agenda item for

16    the CDC call this week."  June 3rd.

17       Q.  Okay.  Now, let's go to the back again.

18    And Liz Lagone writes to you on June 1st, 2021,

19    8:49 p.m.:  "Hi, Carol, I hope you're well and had a

20    restful long weekend.  I want to follow up on my

21    below email and see if you needed any further

22    information or context about COVID-19 vaccine claims

23    below.  We'd love CDC's help in debunking."

24              And the next one from June 2nd, 2021 at

25    6:58, that's from you; right?

CAROL CRAWFORD  11/15/2022

```
 1          A.  Yes.

 2          Q.  And that's to Liz Lagone; right?

 3          A.  Yes.

 4          Q.  And what -- could you read what you say to

 5     her?

 6          A.  "Notes below on some.  I hope this helps.

 7     I will let you know when we have cleared points."

 8          Q.  And then stop there.

 9          A.  Okay.

10          Q.  Then "COVID-19 vaccines causing

11     magnetism."  And, surprisingly, "debunked."

12              Then you'll say "will have cleared TP

13     soon."  What's TP?

14          A.  Talking point.

15          Q.  How does a talking point get cleared?

16     Well, I'll withdraw that.  What is a talking point?

17          A.  Usually it's a bullet or a paragraph on

18     whatever the subject is that one could refer to.

19          Q.  And how does it get cleared?  What's the

20     process?

21          A.  I mean, I'm not sure why I was looking for

22     TP instead of web content.  I don't know if that was

23     just a mistype or not, but -- or maybe -- maybe it

24     was going to be a talking point.  But usually any

25     content that's going outside of the agency goes
```

**CAROL CRAWFORD  11/15/2022**

```
 1    through a very specific clearance process.  There
 2    was a clearance process for COVID.  I wasn't -- I
 3    rarely cleared things myself, but there -- many
 4    people have to sign off on content before it leaves
 5    the Agency.
 6         Q.  Got it.  And I'll just notice -- I'll just
 7    point out that the bottom about the COVID-19
 8    vaccines causing erectile dysfunction, again, you
 9    say "will have a cleared TP soon"; right?
10         A.  Yeah.  I believe thinking more about why I
11    said TP, we often provide media with talking points
12    when they ask questions.  And that was -- we were
13    also looking at things that we were providing to
14    media in addition to web content because that was
15    similar, there were similar questions coming.  So
16    perhaps that's why this says TP instead of web
17    content.
18         Q.  All right.
19         A.  I can't say for 100 percent sure, but I
20    think that might be likely.
21         Q.  And you use web content in other -- in
22    other of these points.  So my question there is with
23    respect to items 3, 4 and 6, which, I think if you
24    look at it, that's what they are.
25         A.  Mm-hmm (affirmative).
```

CAROL CRAWFORD  11/15/2022

Page 129

1        Q.  What does it mean that, quote, "web

2  content to debunk is in clearance"?

3        A.  Well, I think what we were referring to is

4  posting a more specific kind of FAQ or myth.  We had

5  a myths page where we would more directly address

6  the myth.  You know, sometimes answers to things

7  were buried in guidance or scientific papers, and we

8  were trying to make it easier for people to

9  understand the myths.  So I think this is in

10  reference to adding a myth or an FAQ to the site.

11        Q.  All right.  And then you said -- well, my

12  next question:  So what does CDC do to debunk the

13  claims that -- I'll make it more specific here.

14  What did CDC do to debunk each of these claims?

15  What process does it go through to debunk them?

16        A.  I can't -- I can't answer what the --

17  because that's a scientific process that I'm not

18  part of.

19        Q.  Okay.  So they give these questions to

20  you, and you send it out to a scientist or a subject

21  matter expert, let's call them.

22        A.  Mm-hmm (affirmative).

23        Q.  I take it -- I take it from the responses

24  there is a number of different CDC answers.  One is

25  inconclusive.  You say that a number of times.  They

1    didn't have the information at that time, is that

2    fair?

3         A.   That's my assumption of what was meant by

4    that.

5         Q.   Okay.  And sometimes they'd say

6    inconclusive, but give here's what we know now?

7         A.   Mm-hmm (affirmative).

8         Q.   And then in other times it's just

9    debunked.

10             What did you get from the subject matter

11   experts when they send that back?  Did they just

12   send back "debunked," or do they have some reference

13   or explanatory note?

14        A.   On -- I think it varied.  For this one I'm

15   not sure.  I don't remember if I saw all the

16   explanations, or if they were discussed in meetings

17   with the experts.  I've seen some that seemed to

18   have a little more description when I have asked it,

19   but -- or well, maybe when I was asking the SME they

20   might have given me, but I was really the one

21   discussing it directly with the SME.

22        Q.   Now you've also described already some

23   things they'd already done and put on your website?

24        A.   Yes.

25        Q.   All right.  So do you know if CDC

```
 1    conducted any experiment or processes to debunk any
 2    of these items?
 3         A.  I wouldn't know.
 4         Q.  Do you know whether they did surveys of
 5    the medical literature of the vaccines?
 6              MS. SNOW:  Objection.  Vague.
 7    BY MR. VECCHIONE:
 8         Q.  In order to debunk claims do you know
 9    whether they checked medical literature, or what
10    they reviewed?
11         A.  I wasn't part of the scientific process,
12    so I wouldn't even want to speculate.
13         Q.  So I think if you look at Exhibit 15.
14         A.  Yes.
15         Q.  Do you have it?  If you go to the
16    second-to-last page it's where they start.  And
17    Payton Iheme sends you this list of a number of
18    claims.  And the date of that is May 19th; right?
19         A.  Yes.
20         Q.  And then if you look at 16 by June 3rd at
21    2021, 2:57 you write about the last ones that you
22    hadn't told her about:  "Yes, they are debunked and
23    we will also have content on it soon"; correct?
24         A.  I see that, yes.
25         Q.  All right.  So that is about two weeks'
```

```
 1   time to debunk these claims that?

 2        A.   That seems like the dates, yes.

 3        Q.   So given that short time frame, would you

 4   agree with me that CDC didn't do any experiment to

 5   debunk these proposals?

 6             MS. SNOW:  Objection.  Mischaracterizes

 7   the documents and the testimony.

 8        A.   I feel like it took us two weeks to

 9   respond back to Facebook.  I don't think it was fair

10   to characterize it as the time it took CDC to

11   potentially collect science on this.

12   BY MR. VECCHIONE:

13        Q.   Thank you.  Do you know who -- when you

14   give your initial proposals to Facebook, when --

15   like the discussions we saw earlier where you said

16   those were our discussions but we have to check with

17   the subject matter experts, who in that

18   conversation, when you're meeting with them, who

19   makes those proposals?  Is that you, or is that one

20   of the co-chairs we mentioned?

21             MS. SNOW:  Objection.  Vague.

22        A.   What do you mean by proposals?

23   BY MR. VECCHIONE:

24        Q.   Well, they put together these matters to

25   be debunked; right?  And we saw -- and you can put
```

```
 1    15 next to 16.  And if you look at 15, as we
 2    discussed earlier, Liz Lagone sends you:  This is
 3    the conversation we had.  It's kind of --
 4              MR. GILLIGAN:  Which page?
 5              MR. VECCHIONE:  Page -- on page 15 [sic],
 6    second page.
 7              MR. GILLIGAN:  Thank you.
 8              MR. VECCHIONE:  Exhibit 15.
 9    BY MR. VECCHIONE:
10        Q.  So she says, and we've discussed this
11    before:  "Please confirm the conclusions I have
12    noted below based on our discussion."
13              So you had a discussion and she got these
14    impressions.  But who gave her these impressions?
15    In other words, who was the person in the room who
16    could say, nah, I don't think that's right, but
17    we'll get back to you with the subject matter
18    expert?
19        A.  I don't remember this call specifically in
20    any kind of detail, but I do believe it was one of
21    the first times they had sent us a list, and I think
22    that Cynthia and Rosie or Demi, who had a lot more
23    knowledge of the content, piped in mostly on what
24    they thought was available.
25        Q.  Okay.
```

```
 1          A.  But I believe we characterized it during

 2     the call that we would need the expert, and I

 3     followed up that way at the end.

 4          Q.  In the subsequent emails?

 5          A.  Yes.

 6          Q.  And then -- so then finally there is at

 7     the end:  "Yes, these are debunked" --

 8          A.  Mm-hmm (affirmative).

 9          Q.  -- and you'll "have content on it soon."

10              And that content, is that talking points,

11     or is that web content when you use that term?

12          A.  When I use what term?

13          Q.  Content.

14          A.  Web content, it could have been a FAQ on

15     the web, it could have been a myth, it could have

16     been a fact sheet on the web.  Anything on the

17     web --

18          Q.  All right.

19          A.  -- that was for consumers.

20          Q.  But you considered that debunked by the

21     CDC by June 3rd, 2021?

22              MS. SNOW:  Objection.  Vague.

23     BY MR. VECCHIONE:

24          Q.  Well, she says:  "Yes, they are debunked

25     and we will also have content on it soon" in
```

1    **Plaintiffs' Exhibit 16, June 3rd, 2021.**

2         A.   We reported to Facebook that they were

3    debunked at this time.

4              MR. VECCHIONE:   Thank you.   Exhibit 17.

5    You know what, take this one, too, because it will

6    be real quick, I hope.

7    BY MR. VECCHIONE:

8         **Q.   So I'll -- one more question on 16.   On**

9    **that June 3rd date where you said these are**

10   **debunked, who makes the final calls that they are**

11   **debunked before you send it Facebook?**

12        A.   The communicators or the SME that I'm

13   working with would decide if it was okay to send it

14   back to Facebook.   The communicator would get that

15   from the SME that they were working with.

16             For instance, my team posts the web, but I

17   don't know how every piece is exactly cleared, but

18   yet when they send it to us to post it there were

19   trusted people that send it to me, and we assume

20   that it's cleared and we post it.

21             It's very similar.   Rosie was also in

22   charge of clearing other things, and so she would

23   assure to me that she had discussed it with the SMEs

24   of authority.

25        **Q.   Okay.   And do you know of any, the names**

1    of any of these SMEs?

2         A.  No, not off the top of my head.  I mean,

3    people were in and out of the response, and I don't

4    recall.

5         Q.  All right.  I'll ask you to take a look at

6    Plaintiffs' Exhibit 16 again.

7         A.  Okay.

8         Q.  Can you read item seven, and the answer on

9    -- it's Bates stamped 533.  It's on the second page.

10        A.  Of which exhibit?

11        Q.  Exhibit 16.

12        A.  Of 533.

13        Q.  The bottom at the number is called a Bates

14   stamp.

15        A.  Oh, sorry.

16        Q.  That page, if you go up -- yeah, not

17   everybody knows that and I have to say that --

18             MR. GILLIGAN:  Nobody actually uses a

19   Bates stamp any more either.

20             MR. VECCHIONE:  What do they do?

21             MR. GILLIGAN:  They're all electronically

22   applied.

23             MR. VECCHIONE:  I gotcha.  I remember.

24   BY MR. VECCHIONE:

25        Q.  In any event, could you read item 7 from

CAROL CRAWFORD  11/15/2022

```
 1    the email that you sent?

 2         A.   "People who are receiving COVID-19

 3    vaccines are subject to medical experiments."

 4         Q.   And then the answer at 7(a)?

 5         A.   "Debunked.  CDC notes this likely stems

 6    from the vaccines only having EUA now and equating

 7    lack of full authorization as being involuntary part

 8    of a medical experiment."

 9         Q.   And WhatsApp EUA?

10         A.   Emergency use authorization.

11         Q.   All right.  And that's when the FTC -- FDA

12    has given an emergency use authorization for certain

13    medicines?

14         A.   This is not my area of expertise, but yes,

15    I believe that's --

16         Q.   That's your understanding?

17         A.   Yes.

18         Q.   So were you aware at this time that

19    vaccine mandates had been employed by governments,

20    employers and colleges as a condition of maintaining

21    employment or enrollment?

22              MS. SNOW:  Objection.  Assumes facts not

23    in evidence.

24    BY MR. VECCHIONE:

25         Q.   Have you ever heard of such a thing?
```

```
 1          A.  Yes.  I don't know --
 2          Q.  Does getting a vaccine as a requirement of
 3    maintaining employment or enrollment affect
 4    voluntariness?
 5               MS. SNOW:  Objection.  Calls for
 6    speculation, assumes facts not in evidence,
 7    argumentative.
 8          A.  This is really not my area of expertise of
 9    any account.  I don't have anything really to
10    provide on that.
11    BY MR. VECCHIONE:
12          Q.  Did you instruct Facebook to do anything
13    with debunked claims?
14          A.  No.
15          Q.  Did you have an understanding of what they
16    were going to do with any claims that the CDC said
17    were debunked?
18          A.  I knew that they had options, but I think
19    we also discussed on a previous exhibit, which is to
20    inform people, to maybe reduce it in the algorithm,
21    or to remove it.  I -- they probably had other
22    options, but I knew of at least those.
23               (Plaintiffs' Exhibit 17 presented.)
24          Q.  Thank you.  Exhibit 17.  And, again, just
25    tell me the subject line and the date.
```

```
 1          A.  "FB misinformation claims help debunking,"
 2    misspelled.  The date is 7/26/2021.
 3          Q.  So on July 26, 2021 it's Liz Langone to
 4    you again; right?
 5          A.  Yes.
 6          Q.  And she says:  "Our Misinformation Policy
 7    Team," meaning Facebook's do you believe?
 8          A.  Yes.
 9          Q.  "Has identified some claims that we were
10    hoping your team could help us understand if they
11    are false and can lead to harm"; right?
12          A.  Yes.
13          Q.  And she has spike proteins in COVID-19
14    vaccines, Guillain-Barre syndrome -- which I will
15    use GBS from now on as well -- is possible side
16    effect, and heart inflammation as a possible side
17    effect of all COVID-19 vaccines.
18               Those were the questions that she sent
19    you; right?
20          A.  Yes.
21          Q.  Do you know why she's asking you, or do
22    you have an understanding?  I'll withdraw it.
23               Do you have an understanding of why she's
24    asking you at CDC whether the claims are true or
25    false?
```

```
 1        A.   Because CDC would have credible health
 2   information about the claims or scientific
 3   information that would benefit their policy making
 4   is the way I understood it.
 5        Q.   Okay.  And she then asks you she was
 6   "wondering if your team was aware of any global
 7   source of truth/database for vaccine adverse effects
 8   including possibly vaccine-related deaths."
 9             Do you see that?
10        A.   Yes.
11        Q.   Did there ever come a time when WHO or
12   some foreign medical health agency differed with the
13   CDC on any of these vaccine topics that you recall?
14        A.   That's not my area of expertise, and I
15   don't recall any specifics.
16        Q.   Do you know whether on these three
17   requests that you did another response on debunking,
18   inconclusive, or not known like you did in the
19   previous one, exhibits we looked at?
20        A.   I don't remember what I specifically
21   answered with this.
22        Q.   Okay.
23        A.   I know generally what I -- how I handled
24   them, but not what I did with this.
25        Q.   Okay.  And generally how you handled them
```

```
 1    we've already discussed?
 2         A.   Yes.
 3         Q.   And you have nothing different to add on
 4    this particular request?
 5         A.   No.
 6              (Plaintiffs' Exhibit 18 presented.)
 7         Q.   Okay.  You can go to Exhibit 18.  And once
 8    again could you please give me the subject line and
 9    the date of Exhibit 18?
10         A.   Yes.  CrowdTangle COVID-19 reports.
11    7/20/21.
12         Q.   Okay.  And please take a look at it.
13         A.   I've scanned this one.
14         Q.   Who's -- at the top, at the very end, I
15    guess I should say the end, the very top?
16         A.   Mm-hmm (affirmative).
17         Q.   It's Carol Crawford to Tyler Woods.  Who
18    is that?
19         A.   Tyler Woods was a name on another exhibit.
20    I mentioned at that time I'm pretty sure that Tyler
21    Woods took over the reporting from Kelly Perron, and
22    that appears to be the case here.  There is a
23    transfer on the first page saying -- from Kelly
24    saying Tyler is going to be sending the reports in
25    the future.
```

```
 1          Q.  Okay.  And once again these are the
 2    CrowdTangle reports that I think we discussed at one
 3    point you were receiving biweekly?
 4          A.  Yes.
 5          Q.  And were you doing anything different with
 6    this information at this time than you've described
 7    to me earlier?
 8          A.  Not that I recall.
 9          Q.  Okay.  And at this time, June 9th, 2021,
10    are they reporting this to you for the same reasons
11    as you've described previously when we first
12    mentioned CrowdTangle?
13          A.  That's my recollection of it.
14          Q.  On the very last page, which is the
15    beginning of it, June 8th, 2021, 8:13 p.m.,
16    "vaccination lawsuits" --
17          A.  I see it.
18          Q.  -- highlighted.  Do you know what they are
19    referring to there?
20          A.  Sounds like the lawsuits around the
21    mandates that you mentioned previously.
22          Q.  Okay.  Like the OSHA mandate or CMS
23    mandates?
24          MS. SNOW:  Objection.  Assumes facts not
25    in evidence.  Calls for speculation.
```

```
 1          A.  I really am speculating.
 2   BY MR. VECCHIONE:
 3          Q.  You're not sure?
 4          A.  I don't know.  This is not really an area
 5   of my expertise.  This is simply a report of
 6   conversations that are occurring on social media.
 7          Q.  All right.  When you received it, did you
 8   have an understanding of what the vaccine lawsuits
 9   they were referring to were?
10          A.  I had a recollection of that from watching
11   the news in my personal life.
12          Q.  Okay.  On that same page "Deciding to Get
13   Vaccinated" she's highlighted.
14              Why does the CDC need to be updated on the
15   statements of public physicians?
16              MS. SNOW:  Objection.  Mischaracterizes
17   testimony and the document.
18   BY MR. VECCHIONE:
19          Q.  Why were you updated on those statements?
20          A.  Again, these are reports that characterize
21   the overall conversation of social media.  They are
22   not -- I don't believe these were picked out
23   specifically for CDC.  I think these are a report of
24   the trends of conversation on social media.
25          Q.  And I'd like you to turn to the next page
```

**CAROL CRAWFORD  11/15/2022**

1    where Tyler Woods takes over and he sends a June

2    22nd, 4:43 p.m. summary to you.

3         A.  Okay.

4         Q.  At the end of it it says:  "Let us know if

5    you have any questions or specific keywords/topics

6    you'd like us to explore in the next report.  As

7    always, please do not share."

8              Did there come a time that you shared

9    keywords or topics with Facebook that you wanted

10   them to check in?

11        A.  I don't recall doing it.

12        Q.  All right.  Turn to the first page of

13   Exhibit 18.  Once again, this is Tyler Woods to you?

14        A.  Yes.  Sorry.

15        Q.  Thank you.  The very, very mistake on my

16   instructions at the beginning.  You're to be

17   commended, because it usually happens a lot more

18   until now.

19              So the last, the last item that's

20   highlighted:  Door-to-door vaccines.  Do you know

21   whether he's referring to any public statements made

22   on this topic by any plaintiff in this case,

23   including Governor Mike Parson?

24        A.  I wouldn't know.

25              MR. VECCHIONE:  You can put that aside.

**CAROL CRAWFORD  11/15/2022**

```
 1              (Plaintiffs' Exhibit 19 marked.)
 2   BY MR. VECCHIONE:
 3        Q.  And once again please identify it to me by
 4   subject matter and date of Exhibit 19, and then
 5   please read it to yourself.
 6        A.  CrowdTangle COVID-19 reports, 8/18/21.  I
 7   didn't hear your last part of to yourself, what.
 8        Q.  Just read it to yourself.  In other words,
 9   you get to review the document but you don't have to
10   read it out loud?
11        A.  I'm sorry about that.  Okay.
12        Q.  I'm not caught up to you.
13             Okay.  So as we've discussed, this, once
14   again, is one of the CrowdTangle reports but that
15   Tyler Woods is now sending; correct?
16        A.  Yes.
17        Q.  Let's go back to the August 3rd exchange
18   on this.  So on August 3rd Tyler Woods writes to you
19   at 6:16 p.m.?
20        A.  Yes.
21        Q.  And once again the purpose of this you've
22   already testified to; it hasn't changed, why you're
23   getting these?
24        A.  Correct.
25        Q.  All right.  So did the CDC at this time
```

```
 1    have proof that, quote, "the recent uptick in
 2    hospitalizations and deaths is being driven by
 3    unvaccinated individuals"?
 4         A.   I'm not an expert in that area and I
 5    wouldn't be able to answer that question.
 6         Q.   All right.  Do you know whether subsequent
 7    evidence the CDC had supported that view?
 8         A.   I'm not an expert in this area, and I
 9    don't feel comfortable.  I don't know.
10         Q.   The email exchange that Tyler would send
11    you on July 20th, 2021, the Bates stamp number at
12    the bottom is 2440 of this document.
13         A.   I see it.
14         Q.   You there?  So, once again, when he sends
15    you material from CrowdTangle concerning allowing
16    people to return to religious services, that's
17    because it's appearing on CrowdTangle and not
18    because you asked for it?
19         A.   Correct.
20         Q.   And let's go to the first page here, but
21    I'll ask you to take a look at the August 17th
22    exchange.  Once again, Tyler Woods sending you the
23    CrowdTangle reports?
24         A.   Yes.
25         Q.   Now, by August 17th, 2021 are you still
```

Case 3:22-cv-01213-TAD-KDM Document 203-25 Filed 03/03/23 Page 186 of 660 PageID #: 11091

1   **using CrowdTangle for the same purposes you**

2   **discussed earlier?**

3        A.  Yes.  But this isn't about us using

4   CrowdTangle.  This is about them sending us

5   CrowdTangle reports.

6        **Q.  Okay.**

7        A.  But either way it's all the same purpose.

8   I just wanted to clarify that.

9        **Q.  Okay.  Because by now you may be using**

10  **CrowdTangle in a different way.  You might be**

11  **getting the summaries and going in directly?**

12       A.  Well, we had access to go in directly to

13  CrowdTangle and run in reports I think from early

14  2020.

15       **Q.  Okay.**

16       A.  And I mentioned that our research team, I

17  think, searched in it and looked in it to create

18  their reports, and I believe other teams did too.  I

19  did not personally.  These are reports that were

20  sent to us.  So that's different than the way you

21  stated it.

22       **Q.  I see.**

23       A.  I did not use these reports in any

24  different way than I have been saying in previous.

25       **Q.  But just to clarify.**

## CAROL CRAWFORD  11/15/2022

```
 1          A.   Yes.
 2          Q.   So these are reports from Facebook to you?
 3          A.   Yes.
 4          Q.   As we've discussed?
 5          A.   Yes.
 6          Q.   I might ask you if something's changed,
 7     but you've already testified to that.  But within
 8     CDC you had access to CrowdTangle, and created your
 9     own reports?
10          A.   That we could -- I don't know that we
11     created reports.  I know that we did searches in
12     CrowdTangle, the same way we do searches in other
13     social media and listening tools that we have to
14     create, to understand what's being discussed in the
15     environment, to update our communication material,
16     as I was explaining this morning.
17          Q.   Okay.  So on this particular one that
18     we're discussing, once again Facebook has sent you
19     their CrowdTangle summary.  And I-- the COVID 19
20     mandates at the bottom there that's highlighted.  It
21     says:  "On the other hand, many conservative
22     politicians are calling for an end to government
23     mandated restrictions and vaccinations."
24               And my question is do you know whether or
25     not there was any CrowdTangle information about
```

 1    either Attorney General Schmitt or Attorney General

 2    Landry in these CrowdTangle briefings?

 3         A.  I'm not -- I wouldn't even say I flipped

 4    open this -- every report.  I don't know.  I

 5    couldn't remember any of the details.

 6              They did often put pictures of the posts,

 7    of a post as examples.

 8         Q.  Oh, okay.

 9         A.  But I don't know.

10         Q.  That they're finding?  Sort of like that

11    that attachment we saw earlier where they were

12    asking you about the wording?  Like, in other words,

13    it wouldn't look like this.  It would be some

14    something they had taken off Facebook?

15         A.  Yeah.  But that was -- those samples I

16    feel like you're referencing are different.  This

17    would just be like they are saying a lot of people

18    are talking about COVID-19 mandates; they might put

19    a few example posts someone put in the slide deck to

20    show what they were talking about.

21         Q.  Got it.  Thank you.

22              MR. VECCHIONE:  Exhibit 20.

23              THE WITNESS:  After Exhibit 20, could we

24    take a short break?

25              MR. VECCHIONE:  Let's take one now.

**CAROL CRAWFORD  11/15/2022**

```
 1              THE WITNESS:  Could we take one now?
 2              THE VIDEOGRAPHER:  Off record at 2:06.
 3              (Recess 2:06 p.m. - 2:19 p.m.)
 4              THE VIDEOGRAPHER:  We are back on the
 5    record at 2:19.
 6              (Plaintiffs' Exhibit 20 marked.)
 7    BY MR. VECCHIONE:
 8         Q.  Okay.  Ms. Crawford, have you had a chance
 9    to look at Plaintiffs' Exhibit 20?
10         A.  I did.
11         Q.  All right.  And could you tell me the
12    subject line and who's it from, who's it to and what
13    the date is?
14         A.  Yes.  The subject is VAERS policy
15    consultation on 8/19, 2021.  The first email is from
16    me to Carrie Adams at Facebook.
17         Q.  All right.  What's your understanding of
18    why the CDC was asking to meet with the VAERS
19    experts for consultation about misinformation?
20         A.  I don't recall a lot of the details, but
21    VAERS, the topic of VAERS was an area that was
22    widely discussed on social media, and there was a
23    lot of areas of confusion about what VAERS data was.
24    There was myths about VAERS data, and there was
25    misinformation about VAERS data.  So it was always
```

CAROL CRAWFORD  11/15/2022

```
 1   one of the things that rose to the top in terms of
 2   volume of discussion of people were very confused
 3   about VAERS.
 4        Q.  And do you know whether this meeting ever
 5   took place?
 6        A.  I don't remember if the one we were
 7   discussing at this time took place and the Singapore
 8   team attended for sure.  But we did have a session
 9   with the VAERS experts with Facebook.
10        Q.  Okay.
11        A.  Probably as a result of this, I feel like
12   it might have dragged out a little bit after this
13   for a few weeks.
14        Q.  And do you know what was discussed at that
15   meeting?  First, did you attend it?
16        A.  I did attend it.
17        Q.  And do you recall what was discussed at
18   that meeting?
19        A.  We had one of the experts for VAERS,
20   and -- maybe it was two experts for VAERS and a
21   couple of their communication experts on the line
22   with Facebook's team.  I believe it was like their
23   misinformation and policy type team like that Liz
24   was part of, but I don't know who -- I don't
25   remember specifically who was on there.  And we
```

**CAROL CRAWFORD  11/15/2022**

 1   offered the SME just to answer their questions about

 2   what VAERS was and what it wasn't.

 3           And my recollection is they asked a lot of

 4   questions like, you know, what does -- what does --

 5   who can report something on VAERS and things like

 6   that during the session.

 7       **Q.  Okay.  Do you know who the subject matter**

 8   **experts on VAERS were at CDC?**

 9       A.  Goodness.  I'm just totally blanking on

10   their names.  I'm sorry.

11       **Q.  If you recall during the course of this**

12   **deposition, please let me know.**

13       A.  Okay.

14           MR. VECCHIONE:  We can move on to the next

15   document.

16           (Plaintiffs' Exhibit 21 marked.)

17       A.  Thank you.

18   BY MR. VECCHIONE:

19       **Q.  And once again if you could just read the**

20   **subject line, and then who -- what the date was and**

21   **then read it to yourself.**

22           MS. SNOW:  Is this for Exhibit 21?

23           MR. VECCHIONE:  21.

24       A.  Subject BOLO, CDC lab alert and

25   misinformation.  September 1st.  It's from me to

```
 1    Carrie Adams at Facebook.

 2            I have read it.

 3    BY MR. VECCHIONE:

 4        Q.  Okay.  So do you recall this email?

 5        A.  I do now that I'm seeing it, yes.

 6        Q.  What are you telling Adams in this email?

 7        A.  I can't see the attachment.  But there was

 8    a misinterpretation of a lab alert that we issued,

 9    and so I think we put together a deck -- a power

10    point or a two-page just saying what the facts were

11    about this lab alert.

12        Q.  Okay.  What is a lab alert?

13        A.  I don't know if this was a HAN alert or if

14    was some other kind of alert they sent straight to

15    laboratory.  So I don't remember the details.

16        Q.  What is a HAN alert?

17        A.  A health advisory alert.  We send it --

18    no, Network.  Health Advisory Network alert.  Sorry.

19        Q.  And you have:  "Carrie - BOLO."

20            What's BOLO?

21        A.  Be on the lookout.

22        Q.  Why were you concerned about this?

23        A.  Similar to all the other BOLOs, we still

24    thought it was good to point out if we had facts

25    around something that was widely circulating as a
```

Case 3:22-cv-01213-TAD-KDM Document 264-39 Filed 03/03/23 Page 145 of 340 PageID #: 11098

1    cause of misinformation to the platforms to assist

2    them in whatever they were going to do with their

3    policy or not do.  And this was one that was kind of

4    growing, and we had a lot of facts about it, and the

5    team was concerned about this, this

6    misunderstanding.

7         **Q.  Do you recall whether Facebook did**

8    **anything upon receiving this information from you?**

9         A.  I don't recall.

10        **Q.  How did you know that it was a small but**

11   **growing area of misinformation?**

12        A.  I vaguely recall that we ran some

13   Meltwater reports, and that people -- that

14   conversation regarding this topic -- Meltwater is

15   sort of like CrowdTangle but for all the

16   platforms -- and that the conversation around this

17   was growing.

18        **Q.  Got it.  Now, tell me about Meltwater.**

19   **Does it aggregate all the platforms and you search**

20   **across them?**

21        A.  Yes.  And social media listening tools are

22   used by every social media team, I believe.  I mean,

23   it's widely common practice, and, yes, it will

24   search.  The CrowdTangle can see more on the Meta

25   properties.  So it's nicer if you're just looking at

```
 1   Meta properties.  Meltwater gives you social media
 2   at large.  The Meta platforms, to clarify.
 3           Q.  Do you know what the nature of the
 4   misinterpretation was?  I know we don't have the
 5   attachment, but do you know?
 6           A.  I don't recall any longer.
 7               (Plaintiffs' Exhibit 22 marked.)
 8   BY MR. VECCHIONE:
 9           Q.  Go to Exhibit 22.  So what -- before we
10   look at that exhibit --
11           A.  Mm-hmm (affirmative).
12           Q.  -- when you said "be on the lookout," what
13   did you expect them to do once they were on the
14   lookout for Facebook?
15           A.  The same thing I have been describing.  I
16   knew that they had various options.  They could have
17   just used it to inform people.  They could have
18   considered it in their algorithm, I believe.  I did
19   understand that potentially removing posts was
20   something that they might do.
21           Q.  So if you could, just please identify
22   Exhibit 22 to me the same way by its re: line --
23           A.  Okay.
24           Q.  -- and its date and then read it to
25   yourself.
```

```
 1          A.   November 2nd, 2021.  Subject New Claims
 2    and Policy Updates Following EUA Authorization for 5
 3    to 11-year-olds.
 4               It's from me to a group, but I think
 5    primarily it was to Facebook.  Also -- never mind.
 6    I thought I missed part of the subject.  Sorry.
 7    Okay.
 8          Q.   All right.  So this is the first one
 9    that -- she actually signs off with Meta this time;
10    right?  So I guess whatever he did took place --
11          A.   I see that.
12          Q.   -- changed over by then.
13               All right.  The -- can you read the first
14    two paragraphs she writes to you on November 2nd,
15    1:22 p.m. into the record?
16          A.   Yes.  "Kristen, thanks so much for
17    confirming the ability for the claims in question
18    last week having the risk of causing vaccine
19    refusals.  And thank you all so much for your input
20    over the last week on our many questions about
21    vaccine misinformation relative to the EUA."
22          Q.   And second paragraph?
23          A.   (As read)  I wanted to share that as a
24    result of our work together, when the FDA give
25    emergency use authorization to the Pfizer vaccine
```

Case 3:22-cv-01213-TAD-KDM Document 250-25 Filed 03/03/23 Page 156 of 340 PageID #: 11101

```
 1   for children last week, we immediately updated our
 2   policies globally to remove false claims about the
 3   COVID-19 vaccine for children, e.g., the COVID
 4   vaccine is not safe for kids, we also launched a new
 5   feature on Instagram where accounts that repeatedly
 6   post content that violates our polices on COVID-19
 7   or vaccine misinformation may now lose the ability
 8   to be tagged or mentioned or may see pop-ups asking
 9   if they'd like to delete certain posts that violate
10   our policies.
11        Q.  And then she goes on to say:  Now we've
12   identified new claims; right?  And then she lists
13   them?
14        A.  Yes.
15        Q.  And she asks you could you tell her
16   whether the claim is false, and if believed this
17   claim could contribute to vaccine refusals; right?
18        A.  Yes.
19        Q.  All right.  And this is similar to the
20   other lists she had sent you earlier that we looked
21   at to be debunked or not?
22        A.  This is similar.  This time, though,
23   they -- I think -- I don't know if this is the first
24   time, but this added the whole "could this
25   contribute to vaccine refusals" element that I don't
```

Case 3:22-cv-03236-VAL-WML-VDA-cv-Document-205-357-Filed-08/15/23-Page 159 of 348 PageID #:
11102
CAROL CRAWFORD  11/15/2022

Page 158

```
 1   think we had on the last one.
 2        Q.  Okay.  What was your understanding of why
 3   she was reporting to you Meta's policies on
 4   childhood vaccines?
 5            MS. SNOW:  Objection.  Mischaracterizes
 6   the document.
 7   BY MR. VECCHIONE:
 8        Q.  You can answer.
 9        A.  Would you reask the question?
10        Q.  Yeah.  What was your understanding of why
11   she was telling you what Meta's policy was on
12   pediatric vaccines?
13        A.  Well, I don't know what -- why she was
14   doing it specifically because I can't speculate on
15   that, but I received it as a thank you for assisting
16   with the claims or the facts about this that we
17   could provide.
18        Q.  And then why did you think she was asking
19   you to tell her which claims were true and which
20   were false on that further list?
21            MS. SNOW:  Objection.
22        A.  Sorry?
23            MS. SNOW:  Mischaracterizes the document.
24   BY MR. VECCHIONE:
25        Q.  Okay.  You can answer.
```

Case 3:22-cv-01213-TAD-KDM Document 204-39 Filed 03/13/23 Page 199 of 348 PageID #: 11103

```
 1          A.   Ask the question again.
 2          Q.   Yeah.  What was your understanding of what
 3     Langone was asking -- why she was asking you to tell
 4     her which of these claims were true and which were
 5     false, and, as you said, which would lead to vaccine
 6     hesitancy?
 7          A.   It was still my interpretation that she
 8     was asking to inform their policies.  They were
 9     looking for CDC, who would have the scientific
10     facts, to provide them with scientific facts.
11          Q.   And didn't this email give you a pretty
12     good idea that when CDC said something was false
13     that Meta was going to take it down?
14          MS. SNOW:  Objection.  Calls for
15     speculation.
16     BY MR. VECCHIONE:
17          Q.   You can answer.
18          A.   I did not have a recollection of this
19     email, and -- when I think about the work we did,
20     but it definitely says here that they updated the
21     policy globally to remove additional false claims.
22          Q.   All right.  Upon getting your information;
23     correct?
24          A.   It doesn't say upon getting our
25     information.  It just says that when the FDA gave
```

```
 1   the emergency use authorization we immediately
 2   updated our policies.  It doesn't say upon getting
 3   our information.
 4        Q.  She goes on to say:  I wanted to share
 5   that as a result of our work together; right?
 6        A.  Yes.  But I assume this was -- I mean, I
 7   don't -- I'm reading it now.  I don't have memory of
 8   this email.  I'm interpreting it more of like the
 9   ongoing work for us to provide the facts to them.
10   It could have been something specific, but I don't
11   remember something specific regarding the -- this.
12        Q.  Do you know whether -- and then you say --
13   hang on.  I'll get back to it.
14            You then respond to her on 11/2.  I think
15   it's 2:54:26.  It's down to the second.  "Got it,
16   Liz.  I'm going to work on this one with some other
17   vaccine staff and take this one off of Kristen."
18            So who are the other vaccine staff?
19        A.  Kristen Nordlund is a press officer for
20   the National Center -- or at the time was a press
21   officer for the National Center for Immunization,
22   Respiratory Diseases where the vaccine work was, and
23   she was very involved in the COVID response.
24            And I don't see it in this chain, and I
25   cannot be sure, but what I think happened was that
```

**CAROL CRAWFORD  11/15/2022**

```
 1    Kristen helped on some questions regarding this in a
 2    previous set of emails or maybe a conversation.
 3         Q.  All right.  And then you say: "I hope we
 4    can do it by Monday."
 5             So it's going to take a little less than a
 6    week.  But you're going to hope to get back to her
 7    by then.  This is a Tuesday.
 8         A.  Yes.  I see that, yes.
 9         Q.  But then you say: "Thank you so much for
10    the feedback on what you've been able to do.  This
11    is very good to know."  Right?
12         A.  I do say that, yes.
13         Q.  So you're approving of her taking down the
14    COVID vaccine is not safe for kids off the Meta
15    platforms; right?
16             MS. SNOW:  Objection.  Mischaracterizes
17    document and testimony.
18    BY MR. VECCHIONE:
19         Q.  You can answer.
20         A.  I did not mean it generally.  I never felt
21    that my role, or CDC's role, was to determine what
22    to do with the scientific information that we
23    provided.  But I'm happy that providing the
24    scientific information led to less spread of
25    misinformation.  In this email I think what's what I
```

```
 1    was reflecting.

 2         Q.  So you were pleased that people who

 3    believed that the COVID vaccine was not safe for

 4    kids were taken off the platforms of Meta?

 5              MS. SNOW:  Objection.  Mischaracterizes

 6    testimony.

 7         A.  I don't think that's what she's saying in

 8    here.

 9    BY MR. VECCHIONE:

10         Q.  (As read)  We immediately updated our

11    policies globally to remove additional false claims

12    about COVID vaccine for children, e.g. the COVID

13    vaccine is not safe for kids.

14              That doesn't tell you that she's removing

15    those people from the platform?

16              MS. SNOW:  Objection.  Mischaracterizes

17    document.

18         A.  No.

19    BY MR. VECCHIONE:

20         Q.  What is she doing then?

21         A.  I understand that she's removing claims

22    that have -- that are not scientifically accurate.

23         Q.  Okay.  Well, let me put it another way.

24    People who post that statement will have that

25    statement removed from Meta; correct?
```

```
 1                MS. SNOW:  Objection.  It calls for
 2     speculation, mischaracterizes the document.
 3     BY MR. VECCHIONE:
 4          Q.  That was your understanding of this email;
 5     right?
 6          A.  I think we'd have to just look at what's
 7     written here.
 8          Q.  And it is in English; right?
 9                MS. SNOW:  Objection.
10                MR. GILLIGAN:  Argumentative.
11          A.  I don't think you're characterizing it
12     correctly.  Sorry.
13                (Plaintiffs' Exhibit 23 marked.)
14     BY MR. VECCHIONE:
15          Q.  Move on to Exhibit 23.  And once again I'd
16     like you to just read the subject line and the date,
17     and then read the rest to yourself.
18          A.  New claims and policy updates following
19     EAU authorization for 5 to 11-year olds.
20                This is on November 8th, 2021 from me to
21     Liz and some others at CDC.
22                Okay.
23          Q.  All right.  So once again in Exhibit 23
24     she's asking you a number of questions, particularly
25     number one was COVID-19 vaccines weaken the immune
```

1  system.  And then the same question she's asked

2  before:  "Is this false?  Could this lead to vaccine

3  refusals?"  Right?

4      A.  Yes.

5      Q.  And you've -- and you've responded,

6  "false"; right?  "COVID vaccination will help people

7  from getting COVID-19.  Adults and children may have

8  some side effects from vaccine which is normal signs

9  that their body is building protection.  These side

10  effects may affect their ability to do daily

11  activities but they should go away in a few days.

12  Some people have no side effects, and allergic

13  reactions are rare.  Learn how mRNA vaccines work."

14  Right?  That's your response to her?

15      A.  That I received from the content teams,

16  yes.

17          (Plaintiffs' Exhibit 24 marked.)

18  BY MR. VECCHIONE:

19      Q.  Okay.  I'm going to give you Exhibit 24.

20  I'll just represent to you this is a report about

21  European's Medicines Agency.

22          Do you know whether or not CDC looked to

23  other worldwide agencies' view of the vaccines in

24  order to inform Facebook on what was true and false?

25      A.  That's completely out of my expertise or

```
 1   knowledge.
 2           Q.  Have you seen this document before?
 3           A.  No.
 4           Q.  And you don't know whether it was used to
 5   formulate any response you gave to Ms. Lagone?
 6           A.  No.
 7               MS. SNOW:  Objection.  Asked and answered.
 8   BY MR. VECCHIONE:
 9           Q.  That's fine.  You said no.
10           A.  (Nods head.)
11           Q.  And then let's look at -- I think I tossed
12   my document aside.  Yeah.
13               I'll direct you to item number six that
14   you responded to Lagone about breast milk from
15   vaccinated parents, harmful to babies and children.
16               MR. GILLIGAN:  What document you referring
17   to again, John?
18               MR. VECCHIONE:  It's number 23.  It's
19   number six of the Lagone proposals.
20               MR. GILLIGAN:  Thank you.
21               MR. VECCHIONE:  You know what, I'm going
22   to let that -- we're going to move on.
23               MR. GILLIGAN:  Okay.  No objection.
24   BY MR. VECCHIONE:
25           Q.  All right.  We're going to Exhibit 26.
```

**CAROL CRAWFORD 11/15/2022**

```
 1    We're going to skip Exhibit 25.

 2              (Plaintiffs' Exhibit 26 marked.)

 3    BY MR. VECCHIONE:

 4        Q.  And once again I ask you to tell me what

 5    the subject line is, and the date, and then read it

 6    to yourself of Exhibit 26.

 7        A.  Vaccine misinformation questions for CDC.

 8    February 3rd, 2022.

 9              I have read it.  I didn't read all the

10    questions.

11        Q.  I got.  I'll direct you too.  So this is a

12    long email, so let's go by it in pieces.

13        A.  Mm-hmm (affirmative).

14        Q.  If you see Liz Lagone writes to you on

15    February 3rd, 2022 4:36; right?

16        A.  Yes.

17        Q.  The very front page.  She says:  Hi,

18    Carol.  And could you please read her paragraph

19    there?

20        A.  (As read) I hope your team are well and

21    staying healthy.  Thank you so much for the

22    information you provided on claims we asked about

23    last month.  Since we last spoke, I wanted to share

24    updates we made as a result of our work together.  I

25    also wanted to ask for your assessment of a few
```

```
 1   things, including three additional claims we've
 2   become aware of from our regular monitoring; how FDA
 3   EUA authorization for children under five might
 4   impact our policies; and three, CDC's insights
 5   regarding deaths from vaccines.  As always, please
 6   do let me know if it's easier to set up a time to
 7   talk.  Otherwise could we get input before
 8   February 9.
 9        Q.  Okay.  Time to talk through any of these
10   live; right?
11        A.  Excuse me?
12        Q.  I think you just --
13        A.  Oh, did I miss a sentence?
14        Q.  I think you just skipped.
15        A.  Sorry.  "Set up a time to talk through any
16   of these live."  I apologize.
17        Q.  So what was your understanding of what she
18   meant by as a result of our work together?
19        A.  I believe the result of the work together
20   is us providing the scientific information for the
21   questions that they were asking us periodically like
22   these in this email.
23        Q.  All right.  And if you'd look -- I'd ask
24   you to go to the back of the document, the very
25   back.  And the first at three, she says:  "COVID-19
```

Case 3:22-cv-01213-TAD-KDM Document 203-35 Filed 03/03/23 Page 208 of 660 PageID #: 11112

## CAROL CRAWFORD  11/15/2022

1   vaccines have caused thousands/millions of deaths."

2          And she says:  (As read) Under our current

3   policy, we remove posts that claim that COVID-19

4   vaccines kill people or lead to death.  We removed

5   these posts on the grounds that the claim is false

6   and that it's harmful because people believe it, it

7   might make them less likely to get vaccinated;

8   right?

9          A.  Yes.

10          Q.  And then she notes that:  In fact,

11   vaccines -- some people might have an adverse

12   reaction that leads to death; right?

13          MS. SNOW:  Objection.  Mischaracterizes

14   the document.

15          A.  I also can't --

16   BY MR. VECCHIONE:

17          Q.  Okay.

18          A.  I'm not a scientist.

19          Q.  I understand that.  But she's telling you

20   her understanding.  Putting millions and thousands

21   of deaths aside, we have this -- she's bringing to

22   you a problem now.

23          A.  Okay.  If you'd -- I lost where you're

24   reading from.

25          Q.  Okay.  So on the last page she says:  We

1    understand that in general COVID-19 vaccines do not

2    cause death.  However, we are aware that some deaths

3    have been linked to COVID-19 vaccination such as

4    detailed in this correspondence in The Lancet...

5    reporting death rates from TTS following AstraZeneca

6    vaccination in a number of countries.

7            And then she's saying we're going to

8    reconsider our policies, and she's asking you for

9    your advice; correct?

10       A.  She's asking us for scientific

11   information.

12       Q.  I'll ask you to go to the second page of

13   this document, which is Bates stamped 1684 at the

14   bottom.  And in the middle of the page under number

15   2 of the Claims about COVID vaccines for children

16   under five years of age.

17            And she says:  We understand the FDA is

18   considering giving emergency use authorization for

19   COVID-19 vaccine for children under five in coming

20   weeks.  We are considering how our existing policy

21   on COVID-19 vaccines (see below) should apply to

22   claims about children 6 months to 4 years once the

23   vaccine is approved for use.  Can you please assess

24   for each claim whether it is false for children in

25   this age range and if believed, likely to contribute

1    to vaccine hesitancy or refusal?

2           And then:  Please let us know if it's

3    easiest to set up a time to meet and discuss each

4    one.

5           And then she tells you what their policies

6    are; correct?

7        A.  No.  I don't -- I haven't interpreted any

8    of this as being the policies.  These are the

9    claims.

10       Q.  Okay.

11       A.  These are the things or -- they're saying

12   are these true or false or unknown.

13       Q.  Well, at the first one we read, though,

14   they -- she did tell you under our current policy,

15   remove posts that claim COVID-19 vaccines kill

16   people or lead to death; right?

17       A.  But the policy is not the same as the

18   claims.  The claims are the -- what she's asking us

19   about, which is I know that they're using our

20   scientific information to determine their policy,

21   but they're asking us about the science.

22       Q.  Okay.  And your response was:  "PS - the

23   update is very helpful.  Thank you for including

24   that."  Right?

25       A.  Yes.

**CAROL CRAWFORD  11/15/2022**

Page 171

```
 1           Q.  But and in this you don't respond on
 2    whether anything's debunked or not?
 3           A.  Yes.  I don't remember if we did or not.
 4           Q.  And what did you find helpful about this?
 5           A.  I think what I think is helpful for us is
 6    to have her ask us specifically what she needs input
 7    on.  So it's been helpful when she started just
 8    sending us the things she's wanting us to do.
 9           I also think it is helpful to know that
10    they're actually using the responses that we have in
11    some form or fashion because it takes time to put
12    them together.
13           Q.  Thank you.  You can put that aside.
14           A.  Okay.
15           (Plaintiffs' Exhibit 27 marked.)
16    BY MR. VECCHIONE:
17           Q.  And just again tell me the subject matter,
18    the date, and then read it to yourself.
19           A.  Okay.
20           MS. SNOW:  What exhibit is it?
21           MR. VECCHIONE:  Exhibit 27.
22           A.  Have five minutes to chat.  E: Vaccine
23    Misinformation questions for CDC February 4th, 2022.
24           Okay.
25           (Reporter clarifying exhibit number.)
```

**CAROL CRAWFORD  11/15/2022**

```
 1   BY MR. VECCHIONE:
 2        Q.  All right.  And I think this is the same,
 3   at least part of the email is the same, as the last
 4   one we looked at; right?
 5        A.  I agree.
 6        Q.  But there is a different chain on top of
 7   hers saying she -- the part where she says she hopes
 8   you and your team are well and staying healthy.
 9        A.  Can I see 26?
10        Q.  When you say on February 3rd at 5:21:
11   I'll talk to the vaccine program and see what I can
12   do -- or what we can do.  Excuse me.  You say:  I
13   will talk to the vaccine program and see what we can
14   do; right?
15        A.  Yes.
16        Q.  Is that to have a meeting on these
17   questions that she'd presented?
18        A.  Well, I mean, I guess it could have been a
19   meeting, but I was -- I was meeting -- I'll see if
20   they could -- it was a lot of claims she gave in
21   this email.
22        Q.  Right.
23        A.  And I was thinking I don't know that we're
24   going to be able to address all of these.  So I
25   think I was thinking I would talk to them and see if
```

**CAROL CRAWFORD  11/15/2022**

Page 173

```
 1    would even be willing to look at this many of them
 2    because she's asking for input on them within a
 3    couple of days.
 4         Q.  And it would be difficult to give input on
 5    all those questions that quickly?
 6         A.  I thought so.
 7         Q.  And do you know if this phone call
 8    occurred that you say at the very top of it in
 9    Exhibit 27?
10         A.  I don't know for sure.  I think that she
11    called, and I just said, look, I don't think that
12    we're going to be able to -- I was going out of
13    town.  I do remember that much.  I think I -- I
14    think she may have called, or I had emailed her
15    separately when we didn't catch up, and said I don't
16    think we're going to have it this quickly, it
17    probably will be when I return.
18              MR. VECCHIONE:  Aren't you glad you came?
19              MR. KUMAR:  Make myself useful, yeah.
20              (Plaintiffs' Exhibit 28 marked.)
21    BY MR. VECCHIONE:
22         Q.  And once again I'd ask you to read, for
23    Exhibit 28 read the subject line and the date and
24    read it to yourself.
25         A.  Okay.  COVID Misinfo Project.  3/23/2021.
```

**CAROL CRAWFORD  11/15/2022**

```
 1              Okay.
 2         Q.  Okay.  We have a new cast of characters.
 3    I'd like you to take a look at the bottom here, the
 4    March 18, 2021 portion of the email chain.
 5         A.  Yes.
 6         Q.  And that's from you to Stanley Onyimba at
 7    a Google -- it's ██  ███████@google.com and Jan
 8    Antonaros at -- ████████@google.com.
 9              Do you recognize those names?
10         A.  Yes.  And Stanley was the name I couldn't
11    remember when you asked me who my POCs were at
12    Google.
13         Q.  Okay.  Stanley.
14              So you wrote to them on March 18 -- well,
15    read that out loud to me what you wrote to them:
16    "Stanley/Jan"?
17         A.  (As read)  As I believe we discussed
18    previously, CDC is now working with Census to
19    leverage some of their infrastructure to help
20    identify and address COVID vaccine misinfo.  As I
21    understand it from the Census team, when they were
22    doing this for the Census project last year, they
23    met regularly with a Google/YouTube Trust team.  Is
24    it possible for us to start regular meetings on this
25    topic or maybe use our existing time?  Let us know
```

```
 1   if you want to discuss in more depth.
 2        Q.  All right.  So what did you mean by CDC is
 3   now working with Census to leverage some of their
 4   infrastructure to help identify and address COVID
 5   vaccine misinfo?
 6        A.  That was the work of the IAA with Census
 7   to help consult and work with us on the COVID
 8   misinformation information.  I just -- put COVID
 9   information one time.  That's what I'm referring to
10   here.  This is more specific.  This is when I refer
11   to infrastructure, I was referring to the fact that
12   Christopher ran those reports and looked for
13   misinformation on these areas for us.
14        Q.  All right.  And you refer to the Census
15   project last year in which they met -- meet
16   regularly with Google YouTube Trust team.
17            Was that a different project?
18        A.  That was their -- I believe this was the
19   2020 Census.
20        Q.  And that's what you think you're referring
21   to there?
22        A.  Yes.
23        Q.  Do you know whether or not the Census
24   engaged in content moderation with Google?
25        A.  I don't know.
```

**CAROL CRAWFORD  11/15/2022**

```
 1              MS. SNOW:  Objection.  Vague.
 2    BY MR. VECCHIONE:
 3         Q.  So and here I am not using censorship --
 4    anyways, still drawing objections.
 5              All right.  Let's take a look at
 6    March 23rd, 2021.  Jan Antonaros to you, and cc's
 7    Stanley Onyimba.  Can you read that response out
 8    loud?
 9         A.  Yes.  But before I do, I want to go back
10    to the clarification that she objected.  When you
11    asked me did Census do content moderation, I assumed
12    you meant for the Census project, and I answered for
13    that.
14         Q.  Okay.  How about for --
15         A.  I wondered if there was more vagueness
16    to --
17         Q.  And how about for the COVID-19 vaccine
18    project?
19         A.  Not to my knowledge either.
20         Q.  Okay.
21         A.  But I thought you were referring to their
22    project.
23         Q.  All right.  So please read Mr. Antonaros'
24    response to you.
25         A.  Hey, Carol -- or "Hi, Carol, Thank you for
```

 1  your patience as we identified the right colleagues
 2  from Google to pull into this effort.  Would it be
 3  possible to schedule a call for later this week to
 4  learn more about how the CDC and Census envision
 5  working together on this important topic."
 6      **Q.  What was your understanding of what**
 7  **Antonaros meant by the right colleague from Google**
 8  **to pull into this effort?**
 9      A.  I believe she was going to ask people on
10  their trust team, or whatever their name for their,
11  that kind of team is.
12      **Q.  Okay.  Did you -- do you know now or did**
13  **you know then who these people were and what their**
14  **titles were, or are?**
15      A.  No.  I mean, I might have known then.
16  They may have participated in the meeting.
17      **Q.  But you can't remember now?**
18      A.  But I don't know their names now.
19      **Q.  And what's your response to him?**
20      A.  "Sounds good to check in first -- would
21  Friday around 3:30 work?"
22      **Q.  All right.  And do you know whether or not**
23  **you had that call with him?**
24      A.  I don't remember.
25      **Q.  All right.  So you don't recall who was on**

```
 1    the call besides you, if it took place?
 2            MS. SNOW:  Objection.  Mischaracterizes
 3    testimony.
 4            A.  I --
 5            MS. SNOW:  Sorry.
 6            (Inaudible crosstalk.)
 7            MR. VECCHIONE:  I'll rephrase.
 8    BY MR. VECCHIONE:
 9            Q.  You don't recall whether the call happened
10    and who was on it?
11            A.  Correct.
12            Q.  All right.  And do you know whether you'd
13    have a calendar with that call on it, by any chance?
14            A.  If we had a call, we typically had a
15    calendar appointment.
16            Q.  Okay.  All right.  And what was -- you say
17    "sounds good to check in first."
18            What did you want to check in with him
19    for?  What were you -- what did you want to talk
20    about first?
21            A.  I mean, I'm doing this from reading the
22    email.  I think she's saying let's check in before
23    our regular meeting.
24            Q.  Okay.
25            A.  I think that's what -- I mean, that's how
```

```
 1   I interpreted the "check in first."
 2        Q.  And by this time were you already having
 3   regular meetings with Google like we've seen with
 4   Facebook?
 5        A.  Yeah.  This was in 2021.  So we had been
 6   meeting pretty regularly with Google by this time.
 7            MR. VECCHIONE:  Okay.  You can put that
 8   aside.
 9            (Plaintiffs' Exhibit 29 marked.)
10   BY MR. VECCHIONE:
11        Q.  Let's try Exhibit 29.  Same thing, read me
12   the subject line, the date, and then take a look at
13   it.
14        A.  Okay.  Okay.  Subject line's:  Followup on
15   misinformation, or misinfo conversation.  It's
16   4/5/2021.
17            THE WITNESS:  Can I see this?
18            MS. SNOW:  Yes.
19        A.  Okay.
20   BY MR. VECCHIONE:
21        Q.  All right.  So can you go to the very end,
22   I guess, the very last page, read what you said on
23   March 29 at 9:52.
24        A.  "Are you all open to using our regular 4pm
25   meetings to go over things with Census, or what is
```

1  preferred?  I wasn't clear how interested you all

2  were on this effort or who the players are on your

3  end."

4      Q.  So what were the regular 4:00 p.m.

5  meetings you refer to?

6      A.  I think -- because I still have a

7  4:00 p.m. meeting every other Monday with Google.  I

8  think that these were the same every-other-week

9  check-in meetings.  Sometimes we wouldn't have them.

10  Sometimes we would have them and discuss things.

11      Q.  Did you have similar regular meetings with

12  the other platforms we've been discussing, Face- --

13  Meta and Twitter?

14      A.  We -- you asked some of this earlier.

15      Q.  I did.

16      A.  The same answer.  So we had regular

17  meetings with Google, and we had regular meetings

18  with Meta.  Most -- you know, the frequency changed.

19  So, you know, I don't meet as often.  I mean, Google

20  we meet every other week.  Right now with Meta it's

21  more ad hoc.

22      Q.  Okay.

23      A.  We had had a regular meeting with

24  Pinterest for a short period of time, and we had my

25  memory was just more ad hoc meetings on occasion

**CAROL CRAWFORD  11/15/2022**

1  with Twitter.

2      Q.  So on the regular meetings with either

3  Google or Facebook?

4      A.  Mm-hmm (affirmative).

5      Q.  Well, let me ask the question this way.

6  From the CDC end, were the same people usually

7  attending those meetings with each social media?

8      A.  It could vary.  I mean, I was always -- I

9  mean, with Google, it was typically me and Fred

10 Smith, who's our technical lead, because often the

11 Google questions would be more about technical

12 implementations that we might have to work on.  We

13 were usually always on it.  Sometimes I would --

14 depending on the subject, I would bring in other

15 people.

16      With Meta, I was pretty much always on

17 there.  Jay typically listened in.  And then I would

18 bring people in depending on the subject.

19      Q.  All right.  And what were the -- were the

20 topics typically misinformation, or technical

21 subjects?

22      A.  They -- by and large, they were mostly

23 about things other than misinformation; though

24 misinformation was discussed in the meetings.  But

25 they were originated about getting our credible

**CAROL CRAWFORD  11/15/2022**

Page 182

```
 1   information out to our audiences and some of the
 2   examples I gave this morning.
 3        Q.  Okay.  And what did you mean by with we're
 4   going to check with -- "to go over things with
 5   Census, or what is preferred"?  What does that mean?
 6        A.  I don't -- I don't have direct memory of
 7   it.  I'm only assuming that -- what I recall doing
 8   is asking through this chain is like is it okay if
 9   we bring Census in?  Do you like -- what format is
10   best to talk about misinformation?
11             Maybe we didn't resolve it on this call
12   from the previous exhibit.  I can't say for sure
13   what I meant by it.
14        Q.  Okay.  And then could you read Onyimba's
15   response to you on that, following that on
16   March 29th?
17        A.  (As read)  We would like to follow up on
18   our discussion with your colleague, Cynthia, on
19   vaccine information a few months ago.  Specifically,
20   we plan to share a new list of common vaccine
21   misinformation claims and would love it if Cynthia
22   or other vaccine experts can join.  We can also save
23   a few minutes for me, you and Jan to discuss
24   potential next steps regarding Census, but will not
25   need the broader team for that discussion.
```

1          Q.  So who's Cynthia?

2          A.  Cynthia Jorgensen, which was on a previous

3    exhibit.  She was the -- I mean, at the time of the

4    other exhibits, she was the co-lead and the

5    associate director for communication.  I don't know

6    what role she was -- she was definitely the ACS

7    during this.  I don't know if he was in their JIC

8    during this period of time.

9          Q.  Do you know what vaccine information she

10   provided to Google?

11         A.  I don't recall specifically.  But they --

12   so they were trying to be sure that they had the

13   right information when someone Googled something.

14   When you Google COVID, for instance, there are these

15   little tabs that come up.  They'll say, like,

16   symptoms, treatment, vaccines.  And that content,

17   some of the things came from the CDC website.  So

18   from time to time they wanted to update information

19   like that, and would ask us to have an expert on

20   that could talk about it.

21         Q.  Got it.

22         A.  I don't remember this question, but I'm

23   sure that's what it's in reference to.

24         Q.  All right.  Do you know what Google did

25   with the list of common vaccine misinformation

1    claims?

2         A.   I don't remember the list of claims, or

3    what the format was or what they asked us about it.

4    Maybe if you have future exhibits I'll remember, but

5    I don't recall from this.

6         Q.   All right.  And then he says and -- "can

7    save a few minutes for you, me and Jan to discuss

8    potential next steps regarding the Census but will

9    not need the broader team for the discussion."

10            Is that your understanding that it's a

11   discussion about Census, or with Census, like are

12   they there?

13        A.   I don't know for sure what this was in

14   reference to.  But it -- I think that it is in

15   reference to discussing how to engage on an ongoing

16   basis about misinformation and the Census suggestion

17   that we have regular meetings with them just on that

18   topic.

19        Q.   I got it.  And you respond that you're

20   going to get those subject matter experts on the

21   next call?

22        A.   Yes.

23        Q.   I think I might as well add, and Census

24   won't be there, but you'll discuss how to engage

25   with them.  Is that the meaning of that, that they

CAROL CRAWFORD  11/15/2022

1   are not going to be at the next meeting but we'll

2   talk about them?

3          A.  That's my assumption.

4          Q.  Okay.

5          A.  I don't know if it's because they weren't

6   available, or if there was some reason we didn't

7   invite them.

8          Q.  Do you recall what your discussion with

9   Census was about Google at that time?

10         A.  I don't recall, but I still believe this

11  is just about how to engage more regularly about

12  misinformation, or whatever -- whatever Census had

13  done with Google and YouTube, should we have a

14  similar structure with CDC.  I believe that is what

15  is not resolved in these chains.

16         Q.  All right.  And then Mr. Onyimba asked you

17  another question on Friday April 2nd, 2021.

18         A.  Mm-hmm (affirmative).

19         Q.  He says:  "Thanks again for your time this

20  week.  Attached are some of the claims we discussed

21  for your reference," and they are not attached so we

22  can't see those.  But it says:  "On a separate but

23  related note would you happen to know if the CDC has

24  statistics on hospitalization or death for people in

25  the 40-49 age category who do not have underlying

Case 3:22-cv-03286-TAD-WHL/2022 Document 20-25 39 Filed 08/03/23 Page 185 of 349 PageID #: 11130

```
 1    health conditions or co-morbidities?"
 2            You see that?
 3        A.  Yes.
 4        Q.  Do you know why he was asking you that?
 5        A.  No, I don't know why he was asking me
 6    that.
 7        Q.  And you responded on April 5th that you
 8    couldn't respond over the weekend, but then you -- I
 9    think you sent him this chart?
10        A.  Yes.
11        Q.  What is that chart?
12        A.  I thought that this chart would answer his
13    question.  It's the -- it was from the CDC's data
14    tracker.  It's a chart on hospitalizations.
15        Q.  But it's a chart of people with asthma;
16    right?
17        A.  That's -- the link worked -- you could --
18    that's a drop-down where you can pick anything you
19    want I think I'd screenshot so he'd know what was
20    going to be on the link.
21        Q.  So you could pick without asthma if you
22    wanted?
23        A.  Yeah.  I think I just was showing him what
24    it was.
25        Q.  Okay.
```

1          A.  But the link was more interactive.

2          Q.  **Okay.  And so if he went there, if you go**

3     **to this website, theoretically he can take out**

4     **asthma and put in whatever age range he wants?**

5          A.  Mm-hmm (affirmative).  And you could pick

6     a different major category or an age.

7               MR. VECCHIONE:  Thank you.  Put that

8     aside.

9               (Plaintiffs' Exhibit 30 marked.)

10    BY MR. VECCHIONE:

11         Q.  **Plaintiffs' Exhibit 30.  Again, could you**

12    **just tell us the subject matter and the date and**

13    **then read it to yourself.**

14         A.  Subject:  Follow up on mis-info

15    conversation.  4/12/21.  4 -- yeah, 2021.  Sorry.

16              Okay.

17         Q.  **So would you agree with me that this is**

18    **also, if you look at Plaintiffs' Exhibit 29, that**

19    **bottom link you had sent is the same link, and then**

20    **there is just a new chain on the top of this?**

21         A.  Yes.

22         Q.  **And then you ask him:  "Can you give me an**

23    **idea what topics we'll be covering?  But yes, I'll**

24    **ask them to attend."**

25              **I guess we ought to read.  Could you**

1    please read to me what question he asked you?

2         A.  "For tomorrow's call would it be possible

3    to include Cynthia or other COVID-19 treatment SMEs

4    to follow up on some additional questions?"

5         Q.  And then you say:  "Can you give me an

6    idea of what topics we'll be covering?  But, yes,

7    I'll ask them to attend"?

8         A.  Yes.

9         Q.  Was this a BOLO meeting or a regular

10   meeting?  Like, was this for something that had just

11   occurred that you wanted to alert them to, or was

12   this a regular meeting?

13        A.  I don't believe this was a BOLO meeting

14   because I don't think we had started BOLO meetings

15   in April.  I think we started those in May.  I don't

16   know for sure, but I don't feel like that's what

17   this was.

18             I -- without that attachment, I don't

19   remember what it was, but it wasn't uncommon for

20   them to have just general questions about things and

21   ask us to bring people to a meeting to help go over

22   it.  Maybe they were trying to display something in

23   the search or whatever.  I just -- I don't remember

24   this context.

25             (Plaintiffs' Exhibit 31 marked.)

**CAROL CRAWFORD 11/15/2022**

```
 1   BY MR. VECCHIONE:

 2       Q.  All right.  Go to Exhibit 31.

 3       A.  Thank you.

 4       Q.  Once again for Exhibit 31 could you tell

 5   me the date and the subject matter line, and then

 6   read it to yourself.

 7       A.  Subject:  Omicron page.  Sent December 21,

 8   2021.

 9           Okay.

10       Q.  All right.  We can go to the back again,

11   the last page.  And you have an email exchange you

12   sent on December 21, 2021 at 10:38?

13       A.  Yes.

14       Q.  Who did you send it to?

15       A.  That's -- I -- probably to Jan and

16   Stanley.

17       Q.  Okay.  And why are you sending information

18   about Omicron-specific pages to them?

19       A.  Very similar to how I described how we've

20   been working with them.  This was a really big thing

21   at the time, and they are trying to also be sure

22   that people can find things in the search results,

23   and they were -- they were highlighting CDC content

24   and what they -- I call it the knowledge panel,

25   those little tabs on Google.
```

```
 1              So, if something big like this was
 2    happening I would let them know if we had new key
 3    pages that they were likely getting a high number of
 4    searches on.  And I'm pretty sure everyone was
 5    searching for Omicron around December of 2021.  So
 6    that is why I sent it to them so they would have
 7    awareness of this brand new piece of content, and
 8    because I was seeing this -- I know.  I have a
 9    point.
10         Q.  Right.
11         A.  This is a screenshot of what I call the
12    knowledge panel with the tabs, and it wasn't coming
13    up with the newer piece of content.  So I wanted to
14    alert them to it.
15         Q.  Okay.  So what you've cut and pasted I
16    think in there, says, like, coronavirus virus
17    disease, and then there is overview statistic
18    symptoms?
19         A.  Yes.
20         Q.  And then below it has the information on
21    variants.
22         A.  Mm-hmm (affirmative).
23         Q.  All right.  So let me understand this,
24    because I'm not quite sure I'm getting it.
25              You say: "I see our main Variant page."
```

CAROL CRAWFORD  11/15/2022

 1    That means CDC's variant page; right?

 2         A.  Yes.

 3         Q.  "Is coming up at the top of the

 4    Omicron/variant panel."

 5              What -- was that Google search?

 6         A.  Yes.

 7         Q.  Or what are you referring to then?

 8         A.  So this -- when you search Google, you

 9    would get -- this is a screenshot --

10         Q.  Got it.

11         A.  -- of the Google results.

12         Q.  Okay.

13         A.  This is not our site.  This is their site.

14    They have these little things that say overview

15    symptom -- I mean, statistic symptoms.  Some of

16    these were populated by CDC's content.  There was

17    one here that's cut off that said variants.

18         Q.  Got it.

19         A.  That was going to just the general

20    variants page.  But I know people were looking --

21    because we'd saw all the search terms, they were

22    looking for Omicron specifically, and I wanted to

23    make them aware that they may want to swap the links

24    out.

25         Q.  Okay.  And so you said:  "So I want to be

1    sure you were aware that this Omicron specific page

2    is maturing and I expect further updates."

3              What does that mean, the Omicron-specific

4    page is maturing?  The one at CDC?

5         A.  Yes.  This was our page, like -- you know,

6    this is pretty early in the Omicron, I believe, I

7    don't have the timetable in it, but -- so we're

8    always updating our web pages as situations changes.

9    So I don't think this -- at the time I sent it I had

10   just tons of concrete information, but it -- we were

11   going to add to it, and I thought it was a better

12   place to send people that were searching for

13   Omicron.

14        Q.  And what did you want them to do with it?

15        A.  Well, they have always been clear that the

16   search results are not something that they mess

17   with, but this part, the knowledge panel, is

18   something that they manually assembled and worked

19   with us on.  So I thought they might want to switch

20   this.  (Indicating.)

21        Q.  Got it.  And then he responds -- at least

22   it looks like Jan Antonaros responds to you; right?

23        A.  Jan does, yes.

24        Q.  "Thanks for heads up.  Our health team,

25   including our Chief Health Officer, is tracking U.S.

**CAROL CRAWFORD  11/15/2022**

```
 1    federal announcements today closely.  Stanley and I
 2    will take this back to our team."
 3              Do you know who the chief health officer
 4    was?
 5         A.  I think -- I think it may be Karen
 6    DeSalvo.
 7         Q.  Okay.
 8         A.  But on their end.  That's their chief
 9    health officer.  I think that's her title.
10         Q.  And when he says tracking U.S. federal
11    announcements today closely, does he mean on Google?
12    What does he mean by that, in your understanding?
13              MS. SNOW:  Objection.  Calls for
14    speculation.
15    BY MR. VECCHIONE:
16         Q.  What did you understand that term?
17         A.  I don't remember.  I'm guessing there was
18    some announcements then, but I don't recall.
19         Q.  Had Google been instructed by the CDC to
20    update following the CDC guidance?
21         A.  To update what?
22         Q.  To update their search engine, or for
23    their panels to follow the CDC guidance?
24              MS. SNOW:  Objection.  Compound.
25    BY MR. VECCHIONE:
```

1        Q.  You could answer if you understand.

2        A.  We did not instruct Google to update their

3  search engines, or their panels.  But I did suggest

4  that -- and he said about CDC guidance.  This was --

5  this wasn't about -- this was a consumer page about

6  what people would need to know about Omicron.  I --

7  it was more of just correcting what I thought was a

8  better link in the panels that we had provided input

9  on before.

10        Google is already -- has always made it

11  clear that the search engine is sacred.  There is

12  nothing we can say to have them fix their search

13  engine, or change their search engine to something

14  else.

15        Q.  All right.  But how about the panel

16  itself?  What -- I guess what I'm trying to

17  understand is what -- you send them this panel --

18  because apparently it's going to the wrong place on

19  the CDC -- if you put in certain search terms, it's

20  going to the wrong place on the CDC website?

21        A.  So I think what's hard to understand about

22  this is this is not a typical way that Google

23  presents things.  You will have to ask Google how

24  they considered when they added it.  But my

25  perception is that because of the substantial demand

```
 1    of searches for COVID, they added this that I call a

 2    knowledge panel.  I think they may have another word

 3    for it.  So that there is this layer before the

 4    search results come up, and it looks like this

 5    screenshot.

 6         Q.  What you're pointing --

 7         A.  But normally when you search, you don't

 8    get that on other topics.  I think they do have it

 9    for a few other topics, but I rarely run into it

10    when I do searches.

11         Q.  Okay.  And then on December 21st I think

12    Stanley Onyimba writes to you?

13         A.  Yes.

14         Q.  And he again said he explains how it's

15    working and what they are going to do; right?

16         A.  Yes.

17         Q.  And then he says again: "As Jan mentioned,

18    we are tracking announcements closely and will

19    continue to update our products to reflect the

20    latest guidance."

21              What did you understand that to mean?

22         A.  I think he is saying -- I -- gosh, I don't

23    remember what was happening the week of December 21.

24    There seems to be a reference to announcements that

25    I just, at this moment I'm not sure.  So I think I'm
```

```
 1   missing some context to what he's saying.
 2        Q.  And at the top?
 3        A.  Mm-hmm (affirmative).
 4        Q.  Then you say:  "Glad you all are
 5   tracking."  You sign off.
 6        A.  That would mean I'm glad you're watching
 7   what's happening, but I don't -- unfortunately, I
 8   can't remember what was happening that week that
 9   they're referencing.  But when they say reflect the
10   latest guidance, what I believe he's referring to is
11   what I said before is that we helped populate some
12   of these tabs.
13        Q.  You can put that aside.
14        A.  Okay.
15            (Plaintiffs' Exhibit 32 marked.)
16   BY MR. VECCHIONE:
17        Q.  Exhibit 32.  And once again I'll ask you
18   for Exhibit 32 to read the subject line and the
19   date, and then read it to yourself.
20        A.  Subject:  Request for problem accounts.
21   Sent April 9, 2021.
22            Okay.
23        Q.  All right.  This is from you to Todd
24   O'Boyle at the top.  And then it's from Todd O'Boyle
25   to you at the bottom, right, on April 8th, 2021?
```

```
 1          A.  Yes.

 2          Q.  Can you read what he writes to you, and

 3   then your response?

 4          A.  "Hi, Carol, I'm looking forward to setting

 5   up regular chats; my team has asked for examples of

 6   problematic content so we can examine trends.  All

 7   examples of misinformation are helpful, but in

 8   particular, if you have examples of fraud such as

 9   fraudulent COVID cures, fraudulent vaccine cards,

10   et cetera, that will be very helpful."

11              And I said:  "Yes, we will get back to you

12   early this week."

13          Q.  "Thanks for checking in"; right?

14              So did you -- had you talked to Todd

15   O'Boyle before this exchange?

16          A.  I don't recall.  But I think this is

17   around the time that Census was helping us, and I

18   believe I asked Todd, similar to I asked the other

19   ones, like:  Is there a good way that we should

20   start engaging on misinformation?  And this is

21   probably a followup to either that email or phone

22   call.

23          Q.  And so first, who's Todd O'Boyle?  And he

24   says at Twitter.com, so I assume he's at Twitter?

25          A.  Yes, Todd's at Twitter.  And I know he was
```

**CAROL CRAWFORD  11/15/2022**

Page 198

```
 1    a point of contact that I received for the topic of
 2    misinformation.  I don't know what his title was
 3    specifically.
 4         Q.  Okay.  Have you ever met him in person?
 5         A.  No.  And as a clarification, I think I
 6    called him Todd O'Brien when you asked me earlier
 7    who the POCs were.  Until I see this, I didn't
 8    remember his name correctly.
 9         Q.  So O'Boyle, different, yes.
10         A.  Yes.
11         Q.  That's fine.  At this time did you set up
12    regular meetings with Twitter?
13         A.  My memory is is that we never got regular
14    meetings with Twitter set up.  I mean, around this
15    time.  I know they participated in the BOLO
16    meetings, but I don't recall any kind of regular
17    schedule with them.  I don't remember many occasions
18    we actually got on a phone call and discussed
19    anything during COVID.  There was a couple, but not
20    many.
21         Q.  How many BOLO meetings did you have with
22    the social media companies from the beginning of
23    COVID to, say, now?
24         A.  I think that we only had two.  And then I
25    think that I sent one time a -- in lieu of a meeting
```

1    a PowerPoint.  And I didn't recall it but we sent

2    another PowerPoint regarding that lab issue that was

3    in a previous exhibit.

4         **Q.  Do you know who directed Mr. O'Boyle to**

5    **send misinformation on Twitter to you?**

6              MS. SNOW:  Objection.  Mischaracterizes

7    testimony.

8         A.  Say again.

9    BY MR. VECCHIONE:

10        **Q.  Excuse me.  Do you know who directed him**

11   **to ask you for examples of misinformation?**

12        A.  No.

13        **Q.  And do you know whether you sent him any?**

14        A.  No.

15        **Q.  Okay.**

16        A.  Could --

17        **Q.  Yeah, go ahead.**

18        A.  Can I get you to clarify?  What do you

19   mean by directed him to?

20        **Q.  I just wanted to -- I'll put it this way.**

21   **Todd O'Boyle was your point of contact with Twitter?**

22        A.  Yes.

23        **Q.  Was -- did you know of anyone over him**

24   **telling him to do things?**

25        A.  That's how I interpreted it.  No.

```
 1          Q.  He says that examples of misinformation
 2   are helpful, particularly fraud.  Do you know what
 3   he was doing that it would be helpful to him to get
 4   this information?
 5          A.  I don't remember the exact context of this
 6   email, but I believe, as I mentioned before, this
 7   was probably part of me saying how could we work
 8   together on misinformation.
 9              And it sounds like he's kind of wondering
10   what we're seeing that we want to bring up, and he's
11   asking for some examples.  This is how I'm reading
12   it now.  And it sounds familiar based on what we,
13   you know, my memory of this time.
14              MR. VECCHIONE:  You can put that aside.
15              (Plaintiffs' Exhibit 33 marked.)
16   BY MR. VECCHIONE:
17          Q.  Exhibit 33.  And once again please read
18   the subject matter and the date, and then read it to
19   yourself for Exhibit 33.
20          A.  Twitter CDC examples.  4-13-21 xlsx is the
21   extension.  4/14/2021.
22          Q.  Can you read his request to you, and then
23   your response?
24          A.  This is the same email from before.  "I'm
25   looking forward to setting up regular chats.  My
```

```
 1   team has asked for examples of problematic content
 2   so we can examine trends.  All examples of
 3   misinformation are helpful, but in particular, if
 4   you have examples of fraud such as fraudulent COVID
 5   cures, fraudulent vaccine cards, et cetera, that
 6   would be very helpful."
 7        Q.  And then this time you respond, though?
 8        A.  Yes.  I didn't recall if we sent them, but
 9   we did.
10        Q.  And what do you say?
11        A.  "The Census team put together this
12   spreadsheet with four examples.  Is this what you
13   had in mind?"
14        Q.  And then you have examples:  Vaccines
15   aren't FDA approved.  Fraudulent cures.  VAERS data
16   taken out of context and infertility; right?
17        A.  Yes.
18        Q.  What did you mean by the subject word --
19   what was your understanding of the subject "request
20   for problem accounts"?
21        A.  I don't know --
22        Q.  Okay.
23        A.  -- why the subject read that.  But what he
24   asked for in the email is for examples of
25   misinformation.
```

```
 1              Q.  Okay.  And when you met with him, did you
 2      have a spreadsheet like this?
 3              A.  I don't -- we, we sent him a spreadsheet.
 4      I don't remember meeting with Todd --
 5              Q.  Okay.
 6              A.  -- besides the BOLO meetings.  We might
 7      have, but I don't recall.
 8              Q.  And if -- and if you look at this email --
 9              A.  Mm-hmm (affirmative).
10              Q.  -- it has attachments?
11              A.  Yes.
12              Q.  And it's Twitter CDC examples.  So you've
13      attached the spreadsheet to this?
14              A.  Right.
15              Q.  Okay.
16              A.  I thought you were asking about when we
17      met with him --
18              Q.  No --
19              A.  -- did we have spreadsheets.
20              Q.  -- that's -- I was asking that.
21              A.  Okay.
22              Q.  Do you know who in the Census put this
23      spreadsheet together?
24              A.  I don't know for sure, but likely it was
25      Christopher.
```

```
 1          Q.  Christopher, remind me.
 2          A.  Lewitzke.
 3          Q.  Lewitzke, yes.  I got it.
 4          A.  Something close to that name.
 5          Q.  We discussed him earlier.  He appears on
 6     those emails?
 7          A.  Yes.
 8          Q.  Not a new guy?
 9          A.  No.  I feel like we're saying his name
10     wrong, though.
11          Q.  I think that's correct.  Lewitzke.
12              (Comment off the record.)
13     BY MR. VECCHIONE:
14          Q.  Do you know whether that Census team had
15     any medical professionals on it?
16          A.  No.
17          Q.  And what was the definition of fraudulent
18     cures?
19          A.  I don't remember what that was.
20          Q.  And what is the category:  Vaccines aren't
21     FDA approved?  Is that a claim, or is that a
22     statement about vaccines that you're making?  What
23     is that?
24          A.  I'm interpreting this whole list as things
25     that they saw that were being stated as
```

Case 3:22-cv-03223-TAD-MLH Document 20-45 Filed 08/13/23 Page 245 of 346 PageID #: 11148

```
 1    misinformation, that there were claims that vaccines

 2    aren't FDA approved.

 3          Q.  All right.  And as far as VAERS data taken

 4    out of context, is your understanding that that's

 5    the same problem we discussed earlier with VAERS

 6    reports?

 7          A.  Yes.

 8          Q.  All right.  It's not something different?

 9          A.  Yes.

10          Q.  Let me rephrase.  No, it's not something

11    different?

12          A.  I believe this VAERS data taken out of

13    context is the same kind of thing we were discussing

14    earlier.

15          Q.  Thank you.  And what do you believe

16    "infertility" is?

17          A.  I'm assuming this was people claiming that

18    getting the vaccines led to infertility.

19          Q.  Okay.  And why did you give this chart and

20    this information to Mr. O'Boyle?

21          A.  He asked for examples.  And I believe he

22    was asking for these examples in this email because

23    he was wondering what we would -- what would come up

24    in BOLO meetings, or what we would be discussing.  I

25    think he wanted some sense of what we would be
```

**CAROL CRAWFORD  11/15/2022**

```
 1   bringing to point out.  That's my memory of it.
 2        Q.  You can put that aside.
 3             MS. SNOW:  Can we take like a five-minute
 4   break?
 5             MR. VECCHIONE:  Sure, sure.  We have --
 6   we're -- I was cooking with gas, though, so, you
 7   know --
 8             (Comments off the record.)
 9             THE VIDEOGRAPHER:  Off the record at 3:37.
10             (Recess 3:37 p.m. - 3:51 p.m.)
11             THE VIDEOGRAPHER:  Back on record at 3:51.
12   BY MR. VECCHIONE:
13        Q.  And I will again direct the witness to
14   read the subject line and the date, and then read
15   this one.  And this one is a little more hefty.  You
16   may want to take a look through it.
17             MS. SNOW:  What exhibit?
18             MR. VECCHIONE:  Exhibit 34.
19             (Plaintiffs' Exhibit 34 marked.)
20        A.  Subject line is COVID Misinformation.
21   Sent 6/30/2021.
22             MS. SNOW:  Mine is stapled out of order, I
23   just realized.  I want to make sure, it might just
24   be mine, if you want to clarify.
25             MR. VECCHIONE:  Let's do the Bates stamps.
```

```
 1    The bottom right I have it ends 496, 497, 498, 499

 2    and 500.

 3              MS. SNOW:  I think I have all those.  They

 4    are just out of order.  I just want to make sure no

 5    one else's was.

 6              MR. VECCHIONE:  No, I appreciate that.

 7              MS. SNOW:  Yeah.

 8              MR. GILLIGAN:  Is Carol's right?

 9              MS. SNOW:  Yeah.

10         A.  Mine was correct.

11    BY MR. VECCHIONE:

12         Q.  Tell me when you're ready.

13         A.  I'm ready.

14         Q.  All right.  Can you identify Exhibit 34

15    for me?

16         A.  The subject line is COVID misinformation.

17    6/30/2021.

18         Q.  Do you recognize this document?

19         A.  This, yes, feels familiar to me.

20         Q.  And what is it?

21         A.  It's a discussion about accessing

22    Twitter's partner support portal where you can flag

23    information to be reviewed by Twitter.

24         Q.  Let's take a look.  As usual, these chains

25    start at the back.
```

```
 1          A.   Mm-hmm (affirmative).
 2          Q.   I think the first one in this chain is
 3    May 10, 2021 at 1:50 p.m. and is that from you to
 4    Todd O'Boyle?
 5          A.   Yes.
 6          Q.   And I think that we've seen this list of
 7    items before to other -- to other social media
 8    outlets about --
 9          A.   Yes.
10          Q.   And it's concerned -- it's mainly
11    concerned about shedding?
12          A.   And microchips.
13          Q.   And microchips.  And you attach sort of a
14    chart.  Could you tell us what that chart is?
15          A.   Just a table of example posts regarding
16    this, those two issues, vaccine shedding and
17    microchips.  It's not really a chart.  It's just
18    formatted in a table.
19          Q.   Okay.  Could you read what you say to him
20    right above the table?
21          A.   (As read)  We wanted to point out two
22    issues that we are seeing a great deal of misinfo
23    about, vaccine shedding and microchips.  These
24    are -- the below are just some example posts.  We do
25    plan to post something shortly to address vaccine
```

**CAROL CRAWFORD  11/15/2022**

Page 208

```
1   shedding, and I can send that link too.  Our Census
2   team copied here has much more info on it if needed.
3        Q.  Okay.  And so you have copied the Census
4   team that we've discussed earlier.
5        A.  Yes.
6        Q.  And then you say -- could you read what
7   you say next?
8        A.  (As read) We're -- also we're standing up
9   a BOLO COVID misinformation meeting and inviting all
10  tech platforms.  We are shooting for 12 p.m. on
11  Friday for our first meeting.  I'll include you on
12  the invite but if you'd like to propose an alternate
13  approach or would like me to include others, just
14  let me know.
15       Q.  All right.  Tell us.  We discussed a
16  little bit the BOLO meetings that you had with the
17  tech companies.  And this BOLO COVID meeting, is
18  this the first one?  Where does it stand amongst
19  those you've discussed?
20       A.  I -- without having the date --
21       Q.  Right.
22       A.  -- in front of me, I think this is in
23  reference to the very first meeting.
24       Q.  Okay.  And BOLO, we said, is be on the
25  lookout.  And this was -- you were sending this to
```

**CAROL CRAWFORD  11/15/2022**

```
 1    Mr. O'Boyle so that he would be on the lookout for

 2    these things appearing on Twitter?

 3         A.  Yes.

 4         Q.  Did you have a prior conversation with him

 5    about this before you sent it, do you know?

 6         A.  I don't think I had a prior conversation

 7    about vaccine shedding and microchips, and these are

 8    examples of that.  I mean, we saw on the other one

 9    we had sort of general conversations about how we

10    could -- how we should have meetings or not have

11    meetings.  And I probably asked about the BOLO, like

12    is the BOLO format, since it was used previously, a

13    good format.

14         Q.  Okay.  And what is that format?  So it's

15    just -- we've seen the previous one, you said to him

16    I'll include you on the invite, but if you'd like to

17    propose an alternative approach, or would like me to

18    include others, just let me know.

19              Did you have some view of whether Twitter

20    wanted to meet alone, or separately?  Is that what

21    that means?

22         A.  No.  But I had a view that I couldn't tell

23    if the platforms wanted to do the BOLO meetings the

24    way Census had done them for their own work, so I

25    was checking.
```

```
 1          Q.  Had you been at any -- invited to any of
 2    the Census BOLOs?
 3          A.  No.  I don't think they were doing BOLOs
 4    by the time that we were meeting.
 5          Q.  So they had done that for the Census?
 6          A.  That's my understanding.
 7          Q.  And it had been in relation to the 2020
 8    Census?
 9          A.  That's my understanding.
10          Q.  All right.  Did you talk to anyone at
11    Census about how they ran BOLO meetings?
12          A.  Yes.
13          Q.  Okay.  In order to create your own?
14          A.  Yes.
15          Q.  And what did they tell you?
16          A.  Well, they explained how they did it.  In
17    fact, they drafted the slide deck.  We talked about
18    this earlier.  They drafted it and showed me how
19    they thought that we should do it, and that it was
20    just we would give examples, we would give the
21    science, and then they --  people could follow up
22    separately.  I mean, I believe we changed some of
23    the format of the PowerPoint, what we did for CDC of
24    course, but they -- you know, they kind of told us
25    how they had done it in the past.
```

CAROL CRAWFORD  11/15/2022

Page 211

```
1          Q.  Okay.  Let's go to his response to you.
2              He says to you -- and here we see
3     Mr. Lewitzke's name spelled correctly; right?
4          A.  Yes.
5          Q.  Okay.  So Todd O'Boyle writes to you on
6     May 10, 2021 on Exhibit 34.  "Hi, Carol.  Thanks for
7     sharing this."
8              And you took that to mean your chart,
9     right, or table, you called it?
10         A.  Yes.
11         Q.  "Agree these are important trends to note.
12    A quick scan shows that at least some of these have
13    been previously reviewed and actioned.  I will now
14    ask the team to review the others."
15             What did you take that to mean?
16         A.  I don't know how Todd meant it
17    specifically, but I interpreted it as Twitter made
18    decisions about the areas of misinformation based on
19    whatever policy they had.
20         Q.  And he says:  "Carol, remind me:  Did you
21    have a chance to enroll in our partner support
22    portal?  In the future that's the best way to get a
23    spreadsheet like this reviewed."
24             So you mentioned that Partner Support
25    Portal.  What is that?
```

```
 1          A.  My understanding of it, and I don't
 2     believe I ever successfully got into it, but it's
 3     similar to what I described for Meta.  It's an
 4     offering where you log in and you can report
 5     misinformation or threats or problematic posted
 6     content in this portal, and it puts it in a system
 7     for review.
 8          Q.  Did you know what happened at Twitter to
 9     reports that were deemed actionable?
10          A.  I assume similar to Meta that they
11     probably had multiple options.  I am sure some were
12     removed.  I am sure some may have had -- were
13     flagged.  I see flags all the time on the Twitter
14     posts.  I am sure some were just maybe -- I don't
15     know what they do, but maybe they weren't
16     distributed as much on peoples' feeds.
17          Q.  Where do you see Twitter?  Do you have a
18     Twitter?
19          A.  Yeah.  I mean, my responsibility is social
20     media for CDC, so I do look at Twitter, and we have
21     Twitter accounts at CDC.
22          Q.  And CDC -- well, I'll just go back for one
23     second.  You -- prior -- on May 10 you were
24     discussing a Friday meeting that you'd invited
25     Mr. O'Boyle to.  And do you know whether that
```

CAROL CRAWFORD  11/15/2022

```
 1   meeting occurred?
 2        A.  I mean, I think we set up the first BOLO
 3   meeting in May.  And this was May 10th, and the
 4   Friday was there so I suspect it did occur.
 5        Q.  Okay.  And you said you didn't use the
 6   portal.  Did anyone else at CDC use the portal?
 7        A.  No, I don't -- I don't recall anyone else
 8   trying to get access besides myself.
 9        Q.  Had you talked to him about the partner
10   support portal beforehand, before this email chain?
11        A.  I don't remember.  I'm inferring from this
12   chain that perhaps not.
13        Q.  All right.  Had you talked to Census about
14   the portal?
15        A.  I don't recall if we discussed the Twitter
16   portal per se.  But I did know from discussions with
17   them that one technique I think that they used was
18   using portals to -- for their work to report
19   information.  I don't remember if we discussed
20   Twitter or not.
21        Q.  Okay.
22        A.  Or if it was all about Meta.
23        Q.  But it was your understanding that Census
24   did use such devices when offered?
25        A.  That, or they told me it was an option for
```

Case 3:2Case03:2288cv-TV0B880ML/20DoComent2025-39 FDatd 58Jd6/d/23 Pege245o0f3340 PageID #:
11158

```
 1    us.  I'm worried I'm mischaracterizing their work

 2    with very little actual memory on it.

 3         Q.  Okay.  And you respond to him:  "Todd, I

 4    don't think we have info on how to enroll, but we'd

 5    be happy to get on it if you'd send some info";

 6    right?

 7         A.  Yes.

 8         Q.  And he responds that -- on May 10th at

 9    8:51, he says he's happy to enroll you, and it

10    allows you a special, expedited reporting flow in

11    the Twitter Help Center.  That's the purpose of it.

12         A.  Yes, I see that.

13         Q.  What's the Twitter Help Center?

14         A.  The portal is part of their help center

15    somehow.  I mean, I'm not an expert, but I -- it's

16    seeming -- I think the screenshot might even show

17    how it's part of it.

18            No, it doesn't.  But I believe it's like a

19    link on the help center page.

20         Q.  And he says it worked very well with

21    Census colleagues last year; right?

22         A.  Well, there we go.

23         Q.  Yeah.

24         A.  That's why he came up with that.

25         Q.  Okay.  And did you give him a Twitter
```

 1    **account to enroll?**

 2        A.  I asked him -- I can see that I asked him

 3    does it have to be our official CDC account, or is

 4    it supposed to be personal.  And I gave him my

 5    personal one.

 6        **Q.  Okay.  And what was your problem with**

 7    **using -- did you have a technical problem with using**

 8    **it?  What happened?**

 9        A.  It was not a priority for me, for one.  I

10    wasn't thinking that we would probably want to use

11    this portal on a regular basis.  I thought that let

12    me just myself, instead of asking my staff to get

13    involved, I want to see what the portal is myself

14    because I wasn't able to look at the Meta portal

15    myself because you had to be administrator.

16            So I wanted to look at it and see what it

17    it looked like, but I -- it wasn't a priority.  So

18    every now and then I would try to get on it, and I

19    don't remember ever solving the problem.  All I know

20    is I think when I clicked it nothing happened, or I

21    didn't get drop-downs.  That's -- and I felt like

22    maybe I wasn't in the right place.

23        **Q.  Okay.**

24        A.  But I am --

25        **Q.  Okay.**

**CAROL CRAWFORD  11/15/2022**

Page 216

```
 1        A.   -- unclear of what exactly was wrong.
 2   Sorry.
 3        Q.   I got it.  But here's -- so then I see
 4   May 24th, 2021, 2:28 email from Christopher Lewitzke
 5   that I think Todd forwards it to you.  Is that how
 6   that works?  How does that page -- could you tell me
 7   what's happening on this page?
 8        A.   The way the reply works from the email
 9   it's unclear if I was copied or not, so I can't say.
10   But I definitely was copied on Todd's response to
11   Christopher.  I'm not sure if Christopher copied me
12   on his email to Todd, which is what I think you're
13   asking me.
14        Q.   Okay.  But on May 24th at least it looks
15   like Lewitzke sent a note to Todd?
16        A.   Mm-hmm (affirmative).  And then 30 minutes
17   later Todd hit reply with everyone on it.
18        Q.   Okay.  And Carol says I had -- (as read)
19   Carol and I had a sidebar, and I requested her
20   account be enrolled.  Your email reminds me that the
21   process should have been completed by now.  I'll
22   check with the team to make sure it's properly
23   enrolled.
24             And that's your recollection that's how it
25   occurred?
```

Case 3:22-cv-01213-TAD-KDM Document 265-29 Filed 03/03/23 Page 256 of 660 PageID #:
11161

```
 1          A.   That's my recollection.  I don't recall

 2     the sidebar, but I do know that I wanted it to be

 3     CDC people in these portals versus Census.  I felt

 4     like that was more appropriate.

 5          Q.   And remind me, who's Christopher Lewitzke?

 6          A.   He's a -- he's a Census contractor.

 7          Q.   Okay.  With this Reingold outfit we talked

 8     about?

 9          A.   Mm-hmm.

10          Q.   He says:  We want to have at least some

11     CDC accounts whitelisted.  What does whitelisted

12     mean?

13          A.   Let me read this.  I'm not sure.

14          Q.   You've never heard that term before?

15          A.   I have heard of whitelisted.  I don't

16     understand it in this context.

17          Q.   What was your understanding of whitelisted

18     meaning?

19          A.   Like my under -- my general understanding

20     of whitelisting is you can have kind of a list of

21     things that maybe -- of servers that are allowed or

22     not allowed is an example of a list of whitelist.

23          Q.   Okay.  And then do you know which Census

24     accounts had access to this portal?

25          A.   My memory was that none.  And I think this
```

```
 1    email supports my memory, and that Todd responding
 2    that I'm going to be the account that's enrolled.
 3        Q.   Oh.
 4        A.   For CDC.
 5        Q.   For CDC.
 6        A.   For CDC at least.
 7        Q.   But do you know which Census accounts?
 8        A.   Oh, no.
 9        Q.   Okay.
10        A.   I wouldn't have any knowledge of what they
11    did.
12        Q.   Okay.  And then let's read up to May 27th,
13    2021, 2:30.  And you say haven't seen anything come
14    through.  And then Todd says:  You should now be
15    up -- should be fully -- and period.  You should be
16    fully period, he says.
17            Then he says:  "When you visit the Twitter
18    help center logged in with your account you should
19    see additional reporting options."
20            Do you know what he meant by that?
21        A.   Yes.  This portal, like I think when
22    anyone goes to the health center -- help center, I
23    think there is, like, you can flag threats and
24    things, I believe.  I think he was saying I would
25    have had something more.  But I never could locate
```

CAROL CRAWFORD  11/15/2022

```
 1   that.
 2        Q.   Okay.  And you tell him:  "Hi, Todd.  I
 3   have been trying to enter info but I realize I have
 4   been unclear on where to enter them.  I went to
 5   /forms and there is a drop down on things to submit,
 6   but none of them seem relevant to misinformation.
 7   Am I in the right place?"
 8             So is that the problem you had?
 9        A.   I -- based on this email I think it was
10   one of the problems.  I don't -- I think at the
11   beginning I didn't get the links, I couldn't find it
12   on the help center.  There's probably additional
13   chains, I suspect, regarding this.
14        Q.   Okay.  But you don't recall what they
15   were?
16        A.   No.
17             MR. VECCHIONE:  All right.  Put that
18   aside.
19             (Plaintiffs' Exhibit 35 marked.)
20   BY MR. VECCHIONE:
21        Q.   35.  And once again for Exhibit 35 tell me
22   what the subject line is and what's the date at the
23   top.
24        A.   The subject line:  BOLO CDC lab alert
25   misinformation.  Sent September 2nd, 2021.
```

```
 1          Q.  And I think we've seen this alert before
 2   for another social media recipient, am I correct
 3   about that?
 4          A.  You're correct.
 5          Q.  All right.  Is this anything different
 6   than when you testified last time about this BOLO?
 7          A.  The only difference is this email is going
 8   to Twitter.
 9          Q.  Okay.  And what was your intent in telling
10   Twitter through O'Boyle to be on the lookout for
11   misinformation about PCR testing?
12          A.  I mean, I, again, I think CDC's role is to
13   provide the facts around issues.  We saw this
14   confusion about this alert brewing and more posts
15   were going up with confusion, and we thought it
16   would be a good idea to provide the platforms with
17   the facts before it became something bigger.
18          Q.  And what did you believe he'd do with the
19   information?
20          A.  I believed that they would consider it in
21   their -- I knew their policy teams or their trust
22   teams or misinfo teams, whatever they -- whatever
23   they called their teams, would evaluate it.
24          Q.  And perhaps remove it?
25          A.  I knew that removal was one of the options
```

**CAROL CRAWFORD  11/15/2022**

```
 1   that they had, yes.

 2              MR. VECCHIONE:  You can put that aside.

 3              (Plaintiffs' Exhibit 36 marked.)

 4   BY MR. VECCHIONE:

 5       Q.  Exhibit 36.  And once again, if you could,

 6   for Exhibit 36 tell me the date and the subject

 7   line, and then read it to yourself.

 8       A.  Subject:  Call or VC-Facebook weekly sync

 9   with CDC (CDC to invite other agencies as needed.)

10   And this was sent on April 15, 2021.

11       Q.  And then please read it to yourself.

12       A.  Okay.

13       Q.  All right.  Do you know who created the

14   meeting agenda there?

15       A.  I think Payton probably inserted these

16   agenda items because it was her appointment.

17       Q.  And what was on that agenda?

18       A.  New attendees intro, CDC needs/questions,

19   FB product updates/feedback requests. (COVID-HUB).

20   And then COVID-19 projects, and several are listed

21   CMU/FB data survey.  Update -- data survey update.

22   Excuse me.  Misinfo collab status.  Others.

23       Q.  Let's go through this.  What's COVID-HUB?

24       A.  I believe the COVID-HUB is what they

25   called when I mentioned you're on Facebook and you
```

CAROL CRAWFORD  11/15/2022

Page 222

```
 1    could search for COVID, they actually provided

 2    in-app content on COVID that they pulled from WHO,

 3    CDC and other sources and I believe they call that

 4    internally the COVID-HUB.

 5         Q.  All right.  And I think we have some new

 6    names here in the middle.  Let's see if we see most

 7    of them.  Kang-Xing Jin.  Do you know who that was?

 8         A.  Looks like a Facebook employee, but I

 9    don't recall.

10         Q.  And I think we've discussed Raena Saddler,

11    but I've forgotten.  Do you recall?

12         A.  I mean, she's with Facebook, or he is with

13    Facebook, but I don't know who they are.

14         Q.  All right.  And then she cc'd a number of

15    people.  Do you recognize any of those names besides

16    Liz Lagone?

17         A.  Yes, Airton, the first name.

18         Q.  Yeah.

19         A.  He was definitely with Facebook, and he

20    seemed to be an expert on like Facebook ads how to

21    run Facebook ads.

22              Julia Eisman is someone we talked to

23    regularly.  I think she's in, like, their public

24    relations type office.  She occasionally would be on

25    the calls with Payton.  Kate Thornton, I don't
```

 1    recall.  Carrie Adams, I mentioned is the new point

 2    of contact I have now.  And Ursula Phoenix Weir was

 3    -- is someone at CDC.  I assume that for this

 4    meeting she was probably deployed in a -- something

 5    that was related to what I thought was going to be

 6    discussed here.

 7        Q.  And what was her title?

 8        A.  Ursula's?

 9        Q.  Yeah.

10        A.  I'm not sure.  When people deploy into

11    something -- Ursula probably had several roles

12    during COVID, as many of us did.  I just don't -- I

13    can't tell why I invited her to this meeting from

14    looking at this.

15        Q.  Where was she normally?

16        A.  I believe -- I believe.  I believe she's

17    in the National Center for Birth Defects.

18        Q.  Now, the subject says "Call or VC," I

19    assume that's voice chat?

20        A.  Yes.

21        Q.  "Facebook weekly sync."  That's

22    synchronization with CDC?

23        A.  That's how I interpret sync, yes.

24        Q.  CDC to invite other agendas as -- agencies

25    as-needed.  Okay.

1          **What did you understand CDC needs**
2    **questions to be about in this agenda?**
3          A.   I think that that was often just listed.
4    I mean, it would just be if we had a question that
5    we needed, we wanted to ask Facebook about, or if we
6    had something that we -- was upcoming that we wanted
7    their assistance with or something.  I know, like,
8    for instance, Airton's on this because sometimes
9    we'd have technical questions about how to run an ad
10   or the live chat, that kind of -- that we talked
11   about earlier, how to make it work.
12         **Q.  All right.  And then the COVID-19**
13   **projects, she seems to have split them up.  Were**
14   **they split up this way within CDC or within**
15   **Facebook, to your knowledge?**
16         A.   No.  I think it's just a list of things
17   that were just put together in one area.  But I
18   don't recall.
19         **Q.  What's your understanding of CMU/FB?**
20         A.   I think this was -- oh, gosh.  I think
21   this was about some surveying that Facebook was
22   doing regarding COVID maybe, and they wanted to just
23   let us know they were doing it.  But I'm very fuzzy
24   on that, on the details of it.
25         **Q.  All right.  And is data and survey**

CAROL CRAWFORD  11/15/2022

Page 225

```
 1    separate?

 2         A.   I think that's all one update.  CMU at

 3    slash FB data survey update.  That's how I believe

 4    this to be.

 5         Q.   All right.  And misinformation.  "Misinfo"

 6    is misinformation?

 7         A.   "Collab status" is one thing.

 8         Q.   Oh, that's one thing?

 9         A.   Yeah.

10         Q.   Okay.  And "collab" is collaboration?

11         A.   Yes.

12         Q.   And then others, I take it, is everything

13    else?

14         A.   Yes.

15         Q.   So when this meeting took place do you

16    know if there is any notes or recordings of it?

17         A.   We didn't record them.  I don't -- like

18    I've been saying, I rarely took notes.  If something

19    was jotted down, it would have been in an email or a

20    Word doc.

21         Q.   Do you recall if all these agenda items

22    were discussed on this call?

23         A.   No.

24         Q.   What do you remember about that meeting?

25         A.   I don't remember the specific meeting at
```

```
 1   all.
 2              MR. VECCHIONE:  Okay.  You can put that
 3   aside.
 4              (Plaintiffs' Exhibit 37 marked.)
 5   BY MR. VECCHIONE:
 6        Q.  37.  And once again for Plaintiffs'
 7   Exhibit 37 please read the date and the subject line
 8   of, and then read it to yourself, please.
 9        A.  Subject line:  CDC "guides," in quotes,
10   and this week's meeting.  And that was sent on
11   4/29/2021.
12              Okay.
13        Q.  All right.  And can you identify what this
14   is?
15        A.  This is an email chain about -- that's
16   called "CDC 'Guides' and this week's meeting."
17        Q.  Okay.  And at this time -- I think we've
18   talked about biweekly meetings.  At this time could
19   you have been having weekly meetings with Facebook?
20        A.  We might have.  There definitely were
21   times that we were talking weekly.
22        Q.  All right.  Let's do it -- let's go to the
23   back, the last page.
24              She writes to you:  "Hi, Carol, we want to
25   flag a couple of items for you this week," right?
```

Case 3:22-cv-01213-TAD-KDM Document 205-39 Filed 03/03/23 Page 226 of 340 PageID #:
11171

1    And she says:  "Instagram Guides Promotion

2    Opportunity.  Our Instagram team is looking to run

3    promotion to amplify vaccine-related Instagram

4    Guides.  We saw that CDC has a great one on its

5    feed."  And then she provides a link; is that right?

6    Am I correct?  Did I read that correctly?

7        A.  Yes.

8        Q.  What is an Instagram Guides?  I --

9        A.  I honestly don't remember.  I noticed I

10   added our social lead to pipe in more of the guides.

11   I think it might have been like a reel, like the

12   little video snippets you can see on Instagram.  But

13   I honestly cannot remember what they were at the

14   time.

15       Q.  Okay.

16       A.  I don't know that Instagram guides still

17   exist.

18       Q.  Let's talk about it just for a moment,

19   though, because we talked about various types of

20   social media.  Instagram is usually like a photo and

21   then some words under it?

22       A.  That is one type of Instagram post, and

23   then there is more like a video version of it.

24       Q.  Okay.  And how long -- does the video run

25   a long time like YouTube, or is it short?

```
 1          A.  No, it's short.
 2          Q.  And then she says:  "The team is planning
 3     to launch an in-feed promotion of the Guides on
 4     Monday."
 5               What's an in-feed promotion?
 6          A.  If I'm not sure what they meant by in-feed
 7     promotion.  But what I'm -- as reading this at this
 8     moment, I believe they were -- it would, you know,
 9     it would get highlighted more often in a user's
10     feed.  They would -- the content would be promoted
11     more to the users in their scrolling.
12          Q.  Okay.  And then it says that this launch
13     in-feed promotion would run for three weeks, and the
14     anticipated reach is 60 to 80 percent of the people
15     in the U.S. on Instagram.
16               So that's 60 to 80 percent of the people
17     that -- the United States people on that platform,
18     is that your understanding?
19          A.  Yes.
20          Q.  And then she says:  (As read)  "We wanted
21     to know if the Guide above is up-to-date, or if
22     you'd be willing to update it (if needed) and if it
23     is something" you can include in the -- "we can
24     include in the promotion.  Happy to discuss further
25     if this is something you may be interested in, or if
```

 1    you have any questions."

 2             Did I read that correctly?

 3         A.   Yes.

 4         Q.   Who decides whether the guide is up to

 5    date or not?

 6         A.   That would be us because it's our post.

 7         Q.   Okay.

 8         A.   Like if the guide is like a story -- I

 9    called it a reel earlier, but a story is better for

10    Instagram.  It's something that CDC has posted, so

11    it's our content to update.

12         Q.   Got it.

13         A.   And I'll add, to clarify, I can see on the

14    url it says "/CDC gov."  So it's definitely

15    something we have posted, and if I'm incorrect about

16    the format of it I still can tell it's something

17    we've posted.

18         Q.   Okay.  Then also "FYI", which I think is

19    for your information, "we are hoping for an update

20    on our COVID-19 misinfo reporting, but that is not

21    ready for this week."

22             What did you -- did I read that correctly?

23         A.   You read it correctly.

24         Q.   And what did you take that to mean?

25         A.   I am not sure, but I'm -- it might have

**CAROL CRAWFORD  11/15/2022**

1  been about those CrowdTangle reports and sending

2  them to us.

3       **Q.  Can you read your response at 2:32 on the**

4  **same day, the 28th?**

5       A.  Read the whole response?

6       **Q.  Yeah.**

7       A.  Okay.  (As read) plus Jay to weigh in on

8  that guide.  I think he'll have the latest info.  I

9  think it would be great to get that kind of

10  promotion on it.  Thanks for offering.  I still hope

11  to get you some health equity info, but agree we can

12  pull that meeting down tomorrow.  Are you being

13  asked by the White House to do anything on

14  vaccine.gov or vaccinefinder?  If so, can you share

15  any plans in a nutshell via email?

16       **Q.  All right.  So, first, what's health**

17  **equity info?**

18       A.  I can't recall the context of why we were

19  discussing it, or what prompted me to write that.

20  But CDC had posted, I believe around this time,

21  information on health equity.  I'm thinking that we

22  either -- they wanted it, or we wanted to mention it

23  to them, but I don't recall which.

24       **Q.  And you asked about the White House.  You**

25  **asked her whether the White House is asking her to**

**CAROL CRAWFORD  11/15/2022**

 1   do anything on vaccine.gov or vaccinefinder.  What's

 2   "vaccinefinder"?

 3        A.  Vaccines.gov originally was called

 4   vaccinefinder.gov.  But we renamed it vaccine.gov or

 5   vaccines.gov when the vac- -- COVID vaccines came

 6   out.  But a lot of us still think of it as the

 7   "vaccinefinder site" because when you go to that

 8   site, in effect, the main thing it does is you can

 9   put in your ZIP code and find out where COVID

10   vaccines are offered.  So it helps you find the

11   vaccine.

12        Q.  Why did you suspect the White House was

13   asking her or Facebook to do something about that

14   site?

15        MS. SNOW:  Objection, calls for

16   speculation.

17   BY MR. VECCHIONE:

18        Q.  And you wrote down:  "Are you being asked

19   by the White House?"  You asked her that.  Why did

20   you do that?

21        A.  I --

22        MR. GILLIGAN:  You asked her why she

23   suspected something.

24   BY MR. VECCHIONE:

25        Q.  Why did you -- why did you ask whether the

1    White House had asked her to do anything?

2         A.   I don't remember specifically.  But it was

3    not uncommon because there was multiple major

4    agencies such as the White House working on things.

5    And so Payton had meetings with lots of federal

6    agencies, and we were -- the vaccine.gov site was

7    something CDC, HHS and the White House were

8    collaboratively working on.

9         So it might have been me just trying to

10   understand if we were about to promote vaccines.gov

11   on -- maybe it was in the guides; maybe I was just

12   trying to see if she knew something related to what

13   we were doing.  We did overlap from time to time and

14   ask Payton similar things.

15        Q.   So you knew that Facebook could also have

16   been being contacted by other agencies besides CDC?

17        A.   Yes.  They -- she -- I'm fairly confident

18   that she was speaking to several federal agencies

19   during the COVID response.

20        Q.   Including HHS?

21        A.   I believe so, yes.

22        Q.   And including the White House?

23        A.   I think.  I believe so, yes.  I don't -- I

24   didn't ask her her meeting schedule, but she often

25   would be up to date.

```
 1            Q.  Did she ever mention to you who her
 2   contact was at the White House?
 3            A.  No.
 4            Q.  Do you know that of your own knowledge
 5   from some other source?
 6            A.  No.
 7            Q.  Were you ever on a call with any of the
 8   agencies in the White House?
 9            A.  Yes.  Sometimes what I remember was that
10   when vaccines.gov was coming out, that was involving
11   multiple agencies including people at the White
12   House and the U.S. Design System team and HHS and
13   CDC, and I do believe there might have been some
14   joint calls to discuss some of the promotion of
15   vaccine.gov.
16            Q.  All right.  And U.S. Design are the people
17   who design the websites for the government?
18            A.  Yes.  I think in my mind when I say White
19   House, they are the people in the White House that
20   I'm talking about because that's my counterparts in
21   the White House are digital people.  I should have
22   clarified.  I should have clarified that earlier.
23            Q.  All right.  And do you know of anyone, any
24   names?
25            A.  There was several of them that were
```

```
 1    involved with vaccines.gov.
 2           Q.  Okay.  Do you recall any names?
 3           A.  I really don't.
 4           Q.  All right.  Did anyone from the White
 5    House, any office in the White House, direct you to
 6    engage with social media companies independent of
 7    your supervisor at the CDC?
 8           A.  No.
 9           Q.  All right.  Let's take a look at the next
10    one.  Payton to you on April 29 at 6:23.  Can you
11    read her response to you?
12           A.  (As read)  Thank you, Carol.  Regarding
13    vaccines.gov -- or vaccine.gov -- we haven't had any
14    specific requests from the White House on this.
15    We've been working at the state level on our vaccine
16    finders tools and promotions.  I also want to
17    followup on our COVID-19 misinfo reporting.  Our
18    team is looking to schedule a training with CDC and
19    Census colleagues who will be reporting content
20    through the tool.  It will cover Community
21    Standards, COVID-19 misinformation and harm policies
22    and a walkthrough of the reporting tool.
23           Q.  Let's stop there.
24           A.  Okay.
25           Q.  Did that training occur with CDC?
```

1          A.  To my recollection, that training never

2    occurred.  But I might not have been a part of it,

3    and that's why I don't recall it.

4          Q.  Do you recall whether or not Census was

5    involved in such a training?

6          A.  No, because I'm not sure that we had the

7    training, so I don't know who would have attended

8    it.

9          Q.  Okay.  And then could you continue reading

10   where you have the asterisks?

11         A.  "Could you share back some times that may

12   work to schedule?  We'll probably need 1.5 hours to

13   cover.  If needed, we can break the training up if a

14   longer block is hard to schedule."

15         Q.  All right.  And then you'll respond that

16   you'll check with Census; right?

17         A.  Yes.

18         Q.  But do you know whether or not you checked

19   with Census?

20         A.  No.

21         Q.  Do you recall anything more than what

22   you've told me about this training?

23         A.  I recall that when this -- well, can I ask

24   my -- can I ask counsel a question first?

25              MR. GILLIGAN:  Yes, you may.

**CAROL CRAWFORD  11/15/2022**

```
 1                (Witness conferring with counsel.)
 2                MR. VECCHIONE:  Let the record reflect
 3      that the witness has consulted with counsel.
 4      BY MR. VECCHIONE:
 5           Q.  Can you answer my question?
 6           A.  Oh.  Yes.  When we went through discovery,
 7      I was pulling documents for discovery, and I was
 8      asked if we had used the portal by I believe the CDC
 9      lawyer that I have been working with, and I could
10      not recall.
11                So I went through a lot of emails at that
12      time, and I concluded that my memory was correct
13      that we really did not use the portal more than the
14      one time that I mentioned earlier, and that's why I
15      don't believe the training occurred.  I don't have
16      any memory of going through the training, or setting
17      up the training.  But it's pos- -- I mean, I have a
18      lot of emails, but that was what I thought after I
19      did discovery.
20      BY MR. VECCHIONE:
21           Q.  Right.  And that's what you think now
22      sitting here?
23           A.  Yes.
24           Q.  All right.  Thank you.  You can put that
25      aside.
```

**CAROL CRAWFORD  11/15/2022**

```
 1          A.   Okay.
 2               (Plaintiffs' Exhibit 38 marked.)
 3     BY MR. VECCHIONE:
 4          Q.   And, again, for Exhibit 38 just tell me
 5     the date and the subject line, and then read it to
 6     yourself.
 7          A.   I'm sorry.  The subject, Wyoming issue.
 8     April 30th, 2021.  Okay.
 9          Q.   So let's start from the back again.
10               On April 23rd you write to Payton Iheme
11     again.  Can you write what you say to her?
12          A.   (As read)  The Wyoming Department of
13     Health mentioned to one of our groups that the
14     algorithms that Facebook and other social media are
15     apparently using to screen out postings by sources
16     of vaccine misinformation are also apparently
17     screening out valid public health messaging,
18     including Wyoming Health communications.  They were
19     looking for advice about how to work with social
20     media networks to ensure that verifiable information
21     sources are not blocked.  Do you have someone that
22     she could talk to -- sorry.  Do you have someone
23     that could perhaps talk to the state about this?
24          Q.   And then before you get a response you say
25     on top:  "Anything you all can do to help on this?"
```

1    I guess -- you say that five days later, is that why

2    you sent it again?

3         A.  They hadn't responded.

4         Q.  Okay.  Who decided what a verifiable

5    information source was at this time?

6         A.  I don't know.

7         Q.  Now, on April 28th at 6:37 you get an

8    email back from Adrien Genelle, I think or Genelle

9    Adrien.  Excuse me.

10        A.  Yes.

11        Q.  And she says that her colleague can solve

12   this problem?

13        MS. SNOW:  Objection, mischaracterizes

14   document.

15   BY MR. VECCHIONE:

16        Q.  Did she direct you to another person to

17   take care of the problem?

18        A.  She looped in another colleague to provide

19   additional guidance, or to connect directly with the

20   state health department that asked.

21        Q.  Okay.  And then you say, you tell her that

22   you don't have an email chain to loop anyone in

23   because it was received via meeting.  Do you know

24   what meeting it was received in?

25        A.  Yes.  Well, no, I don't know exactly which

**CAROL CRAWFORD  11/15/2022**

```
 1   meeting it was in, but it was just relayed to me
 2   during one of the COVID internal meetings that, hey,
 3   we got a call from Wyoming, do we know anyone to
 4   connect them with.
 5        Q.  And you connected to Holly Scheer?  Is
 6   that what you're doing there?
 7        A.  Yes.
 8        Q.  And do you know anything more about Eva
 9   Guidarini than what she states here about her?  Did
10   you ever deal with her?
11        A.  No.
12             MR. VECCHIONE:  You can put that aside.
13             Exhibit 39.  I believe they are all
14   one-pagers, and they are all stapled together, so
15   give me one moment.
16             (Plaintiffs' Exhibit 39 marked.)
17   BY MR. VECCHIONE:
18        Q.  Once again, could you just read the -- 39,
19   could you read the subject line and the date?
20        A.  Join with new info E:  Call or VC-Facebook
21   weekly sync with CDC (CDC to invite other agencies
22   as needed).  May 6, 2021.
23        Q.  Okay.  Tell me when you're ready.
24        A.  Oh, I'm ready.  I'm sorry.
25        Q.  And I think we've seen this meeting
```

 1    before, but I just want to make sure it's not a

 2    separate one.  Was -- this was just with Facebook;

 3    right?

 4         A.  This was.

 5         Q.  Okay.  And the -- and we've already

 6    discussed the items that were -- that were on the

 7    agenda; right?

 8         A.  We did.  But I'm just now noticing that

 9    the items in the agenda might be a cut-and-paste

10    from the same thing and maybe weren't updated

11    regularly.

12         Q.  I see.  That's my question.  All right.

13    So do you have any memory of this particular

14    meeting?

15         A.  I don't.

16         Q.  And you don't recall what was said one way

17    or another?

18         A.  Don't recall, excuse me?

19         Q.  Okay.

20         A.  I didn't catch -- I'm sorry.  I didn't

21    catch what you asked me.

22         Q.  Oh, oh.  Do you recall anything that was

23    said at that meeting?

24         A.  On May 6?  No.

25         Q.  And do you know if the format was in Zoom,

```
 1   or what the format, or Microsoft Teams, or in
 2   person, or?
 3        A.   It was always on either teams or they had
 4   BlueJeans that we used occasionally.
 5        Q.   Okay.  What's BlueJeans?
 6        A.   It's something like a Teams or a Zoom.
 7        Q.   Okay.  And, once again, do you know if
 8   there is any notes or record kept of the meeting?
 9        A.   I did not take any notes at the meeting
10   that I recall.  I mean, same answer I have been
11   giving.  If there were any, it was minor and they
12   would have been in Word or email.
13        Q.   Okay.
14             MR. VECCHIONE:  40.
15             MR. GILLIGAN:  I remember when everybody
16   just used Skype when it was simpler times.
17             (Plaintiffs' Exhibit 40 marked.)
18   BY MR. VECCHIONE:
19        Q.   Exhibit 40.  Once again the date and the
20   subject line, and then read it to yourself.
21        A.   Subject line:  COVID BOLO meetings on
22   misinformation, sent on May 10, 2021.
23             Okay.
24        Q.   All right.  Let's go back to the back page
25   of this that's Bates number 682.
```

**CAROL CRAWFORD  11/15/2022**

```
 1          A.   Okay.
 2          Q.   Now, this is -- I think we've said this
 3    date.   It's May 10th of 2021?
 4          A.   Yes.
 5          Q.   And you send to Facebook the COVID BOLO
 6    misinformation meeting request; right?
 7          A.   Yes.
 8          Q.   And could you please read that for me?
 9          A.   (As read)  We would like to establish
10    COVID BOLO meetings on misinformation and invite all
11    platforms to join the meetings.  We are aiming for
12    the first one on Friday at noon.  I know you were
13    considering a possible process on your end, but we
14    wanted to start here just as an interim first step.
15    Are there direct POCs on your end I should include
16    on the invite?  I'm happy to chat if better, thanks.
17          Q.   All right.  Now, so this is the first BOLO
18    meeting.  Does that comport with your recollection?
19          A.   This is a note that I'm about to send an
20    appointment for the first BOLO meeting and asking
21    them who to include.
22          Q.   All right.  And we've already said POCs --
23          A.   Yes.
24          Q.   -- are the point of contacts; right?
25          A.   Mm-hmm (affirmative).
```

```
 1          Q.  And you said:  "I know you are considering
 2     possible process on your end."
 3               What did you mean by that?
 4          A.  As I mentioned, that I was engaging with
 5     the platform saying what format would be best for us
 6     to talk about this.  And I think there were
 7     references in the exhibit a couple of times where
 8     they said they were thinking internally about what
 9     would be best.  So I think I was just referencing
10     that I knew that they were considering it as well.
11          Q.  Do you know what the topics -- did you
12     know what the topics for the BOLO were when you sent
13     this out?
14          A.  I don't know if I did or not.
15          Q.  All right.  Let's go to the next page back
16     where we have -- I believe this is from Jan
17     Antonaros to you, but he includes your email to him;
18     right?
19          A.  This -- the bottom part --
20          Q.  Mm-hmm (affirmative).
21          A.  -- is where I sent a similar note to
22     Google, which is Jan.
23          Q.  Okay.
24          A.  And I was telling her that we would like
25     to invite the digital platforms to attend the BOLO.
```

**CAROL CRAWFORD  11/15/2022**

 1    I think it was me sending the appointment or a

 2    heads-up that it was coming.  I can't -- it looks

 3    like maybe I -- this is an actual appointment.

 4          Q.  Okay.

 5          A.  But I tried to send each of them a

 6    personal note that we were doing it.

 7          Q.  And in this one you actually spelled out

 8    be on the lookout; right?

 9          A.  I did.

10          Q.  And was that because you hadn't discussed

11    it with them before, or did you have some concern

12    they wouldn't know what it was?

13          A.  I don't know why I didn't do it that time.

14          Q.  All right.  And there is Kevin Kane here

15    with the email address ███████@Google.com.  Who is

16    that?

17          A.  I don't remember Kevin, but this indicates

18    that he was from YouTube.

19          Q.  Okay.  And do you recall having

20    discussions with YouTube?

21          A.  YouTube would occasionally -- people from

22    YouTube would occasionally be on our regular

23    meetings, depending on what we talked about.  And

24    because YouTube has the most content, like, hosting,

25    they -- they were at the -- they were a part of the

CAROL CRAWFORD  11/15/2022

 1   BOLO meetings, I believe, that Kevin attended

 2   probably, or someone from YouTube did.

 3        **Q.  And you responded:  "Great.  I was going**

 4   **to ask about Kevin."**

 5        A.  Yeah.  Maybe I remembered who Kevin was at

 6   the time.

 7        **Q.  Okay.  And then finally the front page.**

 8        A.  That's a repeat of -- oh, no, that's not.

 9   I apologize.  I'm looking at the wrong one.

10        **Q.  And here you're sending this to the Google**

11   **folks?**

12        A.  Yes.

13        **Q.  Why don't you read it for the record?**

14        A.  "We would like to establish COVID BOLO

15   meetings on misinformation and invite all platforms

16   to join the meetings.  We were aiming for the first

17   one on Friday at noon.  We heard through the

18   grapevine that Kevin Cain at YouTube would want to

19   join.  Are there other POCs on your end I should

20   include on the invite?"

21        **Q.  All right.  You said YouTube.  Who's**

22   **YouTube related to, is it Google or Facebook?**

23        A.  YouTube is a Google property.

24        **Q.  Okay.**

25        A.  Or platform.

```
 1          Q.  And is it your recollection that you did
 2     have a meeting on Friday?
 3          A.  I think we did, but I don't have the exact
 4     date.  But I believe we had -- that's when we had
 5     the first BOLO meeting.
 6          Q.  All right.  And do you have any list of
 7     who actually showed up and was an attendee?
 8          A.  No.
 9          Q.  All right.  And, once again, it would be
10     on your calendar as far as if it happened?
11          A.  Now, to clarify I don't remember keeping a
12     list of who attended.  Maybe Census might have
13     because this is something they were arranging.  But
14     I don't recall it being sent to me.  It could have
15     been, but I don't believe so.
16          Q.  So they were helping you arrange this
17     because they'd done it before, this particular
18     meeting?
19          A.  Yes.  I mean, I mentioned that they
20     drafted the slides.
21          Q.  Right.
22          A.  And, you know, Chris participated in the
23     meeting.
24          Q.  Okay.  Chris.  Remind me his last name?
25          A.  Lewinsky, Lewitzke.
```

CAROL CRAWFORD  11/15/2022

```
 1          Q.  Lewitzke.  I'm glad he's not here because
 2   we've done terrible things to his name, and I
 3   apologize for that.  My name is Vecchione.  I have
 4   no excuses for this.
 5          All right.  I think you can put that
 6   aside.
 7          (Plaintiffs' Exhibit 41 marked.)
 8   BY MR. VECCHIONE:
 9          Q.  Let's go to Exhibit 41.  And once again
10   please tell me the headline, subject line, and the
11   date, and then read it to yourself.
12          A.  Subject, CDC COVID-19 BOLO meeting.
13   6/10/2021.
14          Q.  Okay.  So let's go back -- well, the first
15   item on here, it says "On Wednesday June 9, 2021 at
16   4:23 PM Crawford, Carol wrote."
17          Can you read that to -- into the record?
18          A.  Yes.
19          "We would like to invite digital platforms
20   to attend our third short 'Be On The Lookout'
21   meeting on COVID.  Let us know if you have questions
22   and feel free to forward this message to anyone in
23   your organization that should attend."
24          Q.  And did you send these out separately to
25   all the -- withdrawn.
```

1           You sent this particular one to Todd
2     O'Boyle at Twitter; right?
3           A.  The formatting of the email is odd.  But I
4     don't believe I did that.  I believe I had one
5     appointment and I blind copied everyone, so the
6     emails -- I think that's just because he replied, it
7     looks like it's just him.
8           Q.  Okay.  But you think when you sent these
9     out you sent them out to all the social media places
10    at once?
11          A.  I do.  And I think when we were looking at
12    the other exhibit I wondered the same thing, but I
13    think that was the situation.
14          Q.  All right.  That explains it for me.
15               And did you -- do you know if this meeting
16    in June, I think it would be, ever took place?
17          A.  I don't believe it did.  And this is a
18    morning question.  I'm starting to think maybe
19    Juneteenth was a new holiday we weren't expecting
20    that conflicted with the third BOLO meeting and
21    maybe that is why we didn't end up having it and we
22    sent the materials out via email.
23          Q.  All right.  And who tasked you with
24    sending out the BOLO messages?  Why were you doing
25    it?

```
 1         A.   Because I was the main person that was the

 2    CDC point of contact to talk to Facebook, Twitter

 3    and the platforms since our job was to lead digital

 4    media.

 5              MR. VECCHIONE:  Okay.  You can put that

 6    aside.

 7              (Plaintiffs' Exhibit 42 marked.)

 8    BY MR. VECCHIONE:

 9         Q.   Exhibit 42.

10              MR. VECCHIONE:  And I feel that someone

11    has added 43 in here, so I do apologize.  That's a

12    late addition.

13              MR. GILLIGAN:  I thought it was Carnac

14    time.

15              MR. VECCHIONE:  No.

16    BY MR. VECCHIONE:

17         Q.   So, once again, please just name the date

18    and the subject matter, and then take a look at it.

19         A.   Yeah.  Subject:  Booster shots, regarding

20    booster shots.  It was sent on 10/28/2021.

21              Okay.

22         Q.   All right.  Do you recognize this

23    document?

24         A.   Not specifically.

25         Q.   Can you describe what it is?
```

```
 1        A.   It's a conversation about some booster

 2   guidance updates that are occurring and some

 3   requests from Google to review some of the changes

 4   that they were considering on the search result

 5   pages.

 6        Q.   All right.  And the date is -- I think it

 7   starts, if you look at the last page, on

 8   September 30th, 2021.

 9        A.   Yes.

10        Q.   And that's from Stanley Onyimba to Fred

11   Smith.

12             Who is Fred Smith?  He's new.

13        A.   He's a direct -- he reports to me.  He was

14   the technical person I mentioned who usually

15   attended the Google meetings with me.  I was out of

16   town this date, so I wasn't on the email.

17        Q.   All right.  And he -- well, I think he

18   sends you the email?

19        A.   Yeah.

20        Q.   Just you're cc'd?

21        A.   Maybe.  I don't believe I was in town,

22   though --

23        Q.   Okay.

24        A.   -- when this was occurring.  I don't see

25   myself cc'd on Stanley's email to Fred.
```

```
 1         Q.  All right.  Why is -- do you have any
 2   knowledge why is Stanley Onyimba sending this to
 3   Fred?  What is the purpose of this?
 4         MS. SNOW:  Objection.  Calls for
 5   speculation.
 6         A.  Are you going to re-ask the question?
 7   BY MR. VECCHIONE:
 8         Q.  No.
 9         A.  I mean --
10         Q.  What's your understanding of why he's
11   sending this --
12         A.  Yes.
13         Q.  -- to CDC?
14         A.  Well, I don't -- because the screenshots
15   are not available that are attached or put in here,
16   I can't directly explain this, but sometimes on
17   those Google panels that I mentioned they would
18   highlight specific things like, they would -- they
19   would, you know, before the search results came up,
20   they would highlight a link.  And I think that they
21   were considering -- considering taking some words
22   that they saw on vaccines.gov and add it to that
23   panel, and they wanted to be sure it was right and
24   they were asking us.
25         Q.  All right.  And then Fred responds that it
```

```
 1   looks okay to him, but he's not the -- he's not an

 2   expert on this?

 3        A.  Correct.

 4        Q.  All right.  And so -- and then Mr. Smith

 5   writes -- now, after that -- after that, you know, I

 6   don't know, I'm going to go check with some people,

 7   Mr. Smith writes back:  "Hi, Stanley, I heard back

 8   from some folks.  No heartburn over the messages

 9   proposed.  Cheers, Fred."

10        Do you see that?

11        A.  Yes.

12        Q.  Did I read that correctly?

13        A.  Yes.

14        Q.  Do you know who "some folks" are?  Who did

15   he check with?

16        A.  I don't know who he checked with.

17        Q.  Okay.  And then the next -- I'm having a

18   hard time -- I can read the message.  Do you know

19   when that was sent, the next message up?

20        A.  The one from Jan and Megan?

21        Q.  Yeah.

22        A.  It looks like October 28, 2021.

23        Q.  So you go all the way up to the next -- on

24   page 1, and then you read down?

25        A.  That's what it appears, mm-hmm.
```

**CAROL CRAWFORD  11/15/2022**

Page 253

```
 1          Q.  All right.  Why don't you take -- so can
 2     you -- you came back, apparently, and emailed
 3     Antonio [sic] -- Jan and Stanley and the folks at
 4     Google on October 28th at 5:11; right?
 5          A.  Yes.
 6          Q.  Okay.  And you said:  "This looks good,
 7     thanks for checking," in the middle there?
 8          A.  Mm-hmm (affirmative).
 9          Q.  The next part?
10          A.  (As read)  Yes.  We can discuss the
11     pediatric vaccines early next week but let me give
12     you some general info:  ACIP is likely to vote on
13     this on November 2nd.  CDC is likely to start
14     posting final information on November 3rd...if that
15     helps to know.  There will be many updates so the
16     changes might span over a few days.  We are also
17     looking ahead and misinformation and hope to have a
18     BOLO type meeting later that week with the platforms
19     that are interested.
20          Q.  And who's ACIP?
21          A.  The Advisory Council for Immunization
22     Practices, I believe, I think that's right.
23          Q.  And do you know whether you had a BOLO
24     meeting for this?
25          A.  I don't -- I don't believe that we ever
```

```
 1   had one.
 2           Q.  So the email states that --
 3               You can put that aside.
 4               (Plaintiffs' Exhibit 43 marked.)
 5   BY MR. VECCHIONE:
 6           Q.  Let's go to -- yeah, let's go to the last,
 7   43.
 8               Once again for Exhibit 43 please state the
 9   subject matter line, and then the -- and who it --
10   what the date of it is?
11           A.  Subject:  Claims review.  6/29/2022.
12               I have read it.
13           Q.  Okay.  So can you read the -- well, who is
14   Rachel Gruner?
15           A.  She is my new point of contact at Google.
16   She replaced Jan Antonaros.
17           Q.  And who's Lindsay Steele?
18           A.  Lindsay Steele replaced Stanley.
19           Q.  Onyimba?
20           A.  "O".
21           Q.  Okay.  And they're both -- their emails
22   are here in the to line; right?
23           A.  Yes.
24           Q.  All right.  And if you could read the
25   after Hi, Carol, Hi, Fred from Rachel, what does she
```

 1    say here?

 2         A.   "The YouTube policy team is requesting

 3    evidence-based input on the claims below.  In the

 4    past, the CDC has reviewed COVID information claims

 5    and commented true or false plus any additional

 6    context needed."

 7         Q.   And then what are the claims?

 8         A.   (As read)  Claim:  High dosage of

 9    progesterone is a safe method of reversing chemical

10    abortion, in parentheses, mifepristone and

11    misoprostol.

12              Sorry.

13              (As read)  Claim:  High doses of

14    progesterone is an effective method of reversing

15    chemical abortion, in parentheses, mifepristone and

16    misoprostol.

17         Q.   All right.

18         A.   "Please let me know if you have questions

19    or concerns."

20         Q.   And then what -- how do you respond?

21         A.   "I'll check on this, but I think I'll

22    probably end up needing to refer you to another

23    agency.  I'll get back to you."

24         Q.   So this -- this -- is it your

25    understanding this didn't have anything to do with

CAROL CRAWFORD  11/15/2022

```
 1   COVID-19 or vaccines?

 2        A.  It definitely didn't have anything to do

 3   with COVID-19 or vaccines.

 4        Q.  Do you know why it was sent to you?

 5        A.  Well, as COVID's -- our focus is not

 6   solely on COVID.  We're focusing on other topics.  I

 7   think Rachel thought that we might be able to help

 8   with this topic as well.

 9        Q.  Okay.  Do you know who you sent it, what

10   agency you sent it to, if any?

11        A.  I -- I didn't know.  I called one of our

12   centers and asked if this was something that CDC

13   dealt with.  I didn't think that we did, and they

14   confirmed that we do not.  And I don't think they

15   had a suggestion on where to refer this to, but I

16   can't recall for sure.

17             MR. VECCHIONE:  All right.  I would like

18   to take a brief break and have the court reporter

19   put my last exhibit together and give you copies

20   and then --

21             MR. GILLIGAN:  There is a 44, too?

22             MR. VECCHIONE:  -- confer, confer with

23   counsel, and I think we'll be finishing up.

24             (Comments off the record.)

25             THE VIDEOGRAPHER:  Off the record at 5:07.
```

**CAROL CRAWFORD  11/15/2022**

```
  1                    (Recess 5:07 p.m. - 5:19 p.m.)

  2                    THE VIDEOGRAPHER:  Back on the record at

  3     5:19.

  4                    (Plaintiffs' Exhibit 44 marked.)

  5     BY MR. VECCHIONE:

  6          Q.  All right.  Ms. Crawford, this is going to

  7     be Exhibit 44.  And it will have -- once again, read

  8     the subject line and then tell me what the date was.

  9          A.  Subject:  "Themes that have been removed

 10     from misinform."  I am sure that was typo.

 11     3/10/2021.

 12                    Okay.

 13          Q.  All right.  Let's go to the back end of

 14     the exhibit.  And the first email chain is from

 15     March 10th, 2021 from you to Payton Iheme; is that

 16     correct?

 17          A.  Yes.

 18          Q.  And it says:  "Themes that have been

 19     removed for misinfo."  And I think we've established

 20     that's misinformation; correct?

 21          A.  Yes.

 22          Q.  And you say to her:  "We mentioned this on

 23     a call last week and you said you'd be sending

 24     something as other had asked -- is that available

 25     yet by chance?"
```

```
 1              What were you telling her?  What did you

 2     mean?

 3          A.   This is what I was referencing on a

 4     previous exhibit that one of our teams that was

 5     doing those vaccine confidence reports and those

 6     research reports, they were wondering if we -- if

 7     they had info on the -- on the types of posts that

 8     were removed and the themes because they were

 9     worried that we could only see the live posts and so

10     we wouldn't know if there was also confusion about

11     other areas that had been removed.

12          Q.   And she --

13          A.   I feel pretty confident that that is what

14     this is about.

15          Q.   And she responds to you.  "Are you looking

16     for types of COVID-19 misinfo we remove"; right?

17          A.   Yes.

18          Q.   "I think it may be worth a separate

19     meeting to have some of our leads discuss the

20     approach/what they are seeing and doing.  Would that

21     work?"  That's what you said?

22          A.   Yes.

23          Q.   And what are her leads; what was your

24     understanding?

25          A.   Just like I would bring people that were
```

```
 1   in charge of different areas, sometimes she would
 2   bring people that had more expertise.  Payton and I
 3   did not know everything in our respective
 4   organizations, so I assume it was a lead for
 5   something, someone in this area.
 6            Q.  All right.  And then you respond to her on
 7   March 10th at 9:24; correct?
 8            A.  Yes.
 9            Q.  "Yes."  And you say "you mentioned
10   that" -- is that White House?
11            A.  Yes.
12            Q.  "And HHS"?
13            A.  Yes.
14            Q.  "Had asked so you'd get it to us"; right?
15            A.  Yes.
16            Q.  "I think it is wanted as part of
17   analysis -- so are you thinking there is no
18   report/file to send?"
19                 Is that your question to her?
20            A.  Yes.
21            Q.  All right.  And what you say there is when
22   White House and HHS ask Facebook for this
23   information, they assumed that Facebook would
24   provide it to them; correct?
25                 MS. SNOW:  Objection.  Calls for
```

 1    speculation.

 2    BY MR. VECCHIONE:

 3            Q.   You can answer.

 4            A.   Well, I think it was poorly worded by

 5    myself and kind of typo maybe.  But what this was

 6    was I recall we asked on the meeting if they had

 7    this data, like, because we wanted it.  And I think

 8    she said, Oh, we did something like this for the

 9    White House or HHS.

10            This is my memory of it.

11            Q.   Okay.  This is one of your weekly

12    meetings, or a BOLO?

13            A.   I think it was at a weekly meeting.

14            Q.   All right.  And then the next thing she

15    says back to you is:  (As read)  It wasn't a report,

16    but rather a discussion.  We were setting up a

17    meeting with White House and HHS to discuss more

18    likely later this week or early next week.  Perhaps

19    the CDC rep could participate or HHS share out?

20            Is that what she says?

21            A.   Yes.

22            Q.   What does HHS share out mean?  That they'd

23    give it to you?

24            A.   Yes.  Oh.

25            MS. SNOW:  You're good.  You're good.

```
 1   BY MR. VECCHIONE:
 2        Q.  So let's clean up the record a little.
 3   What is an HHS share out?  Does that mean they give
 4   you whatever they are provided?
 5        A.  Yes.
 6        Q.  All right.  So it was your understanding
 7   that Facebook was having the same kind of meetings
 8   you were having with them with White House and HHS?
 9        A.  I don't know that in relation to this
10   email.  I was assuming that.  But I do think that
11   they did have meetings with the agencies.
12        Q.  And could you read what you respond to her
13   on May 10th at 9:30 a.m.?
14        A.  "Oh, I assumed it was a report.  Who at
15   HHS is in the meeting?"
16        Q.  And what did she respond to you at 9:32?
17        A.  (As read)  Josh Peck would be the HHS rep
18   once a meeting is confirmed based on that I see him
19   at a previous discussions or meetings with the White
20   House.
21        Q.  Do you know who he is?
22        A.  Yes.
23        Q.  Who is he?
24        A.  I don't know his specific title, but he, I
25   believe, during this time was running the HHS COVID
```

```
 1   communication marketing campaign.
 2        Q.  All right.  And did you interface with him
 3   in any of your work?
 4        A.  Yes.
 5        Q.  Would he be at these, any of your weekly
 6   meetings?
 7        A.  No.
 8        Q.  All right.  Would he be at your BOLO
 9   meeting?
10        A.  No.
11        Q.  All right.  Next at 9:36 she adds
12   something.  What does she say?
13        A.  (As read)  And of course we are using
14   CrowdTangle as well to visualize the current trends
15   as well.  Lauren has been working on that and can
16   give a refresher if needed.  I know she has been
17   sending reports as well.
18        Q.  And who's Lauren?
19        A.  Lauren is the one who's been -- sent those
20   biweekly CrowdTangle reports during this time frame.
21        Q.  Okay.  And then you respond to her at
22   9:43:56 seconds.  What do you say?
23        A.  (As read)  They want to see what you guys
24   proactively have removed that might not be in those
25   reports.  My guess is a short meeting with Lis
```

```
 1    Wilhelm on the vaccine confidence team is what is
 2    needed if Facebook is willing to do it.  Doesn't
 3    seem to me like that would be -- like it should be
 4    part of the White House HHS meeting.
 5         Q.  Who's Lis Wilhelm?
 6         A.  She is the group that was creating those
 7    vaccine confidence reports that was wondering if
 8    they had all the data reflected in them, and what
 9    the people were worried about, or confused about.
10    And she was thinking that if the data -- if we knew
11    the kinds of things that were removed, it might give
12    a fuller picture for those reports.
13         Q.  Okay.  And then you discuss a time for
14    another meeting, and I think it ends at -- this
15    chain ends at 3:10, 9:54 a.m.:  Let's plan on next
16    Thursday then.
17              Do you know whether you ever had that
18    meeting?
19         A.  I think we did.
20         Q.  And do you know what was discussed there?
21         A.  I think that the vaccine confidence team
22    came, and I don't -- and we discussed what they
23    might have that would give them that fuller picture.
24         Q.  You can put that aside.  I have got a few
25    followup questions.
```

**CAROL CRAWFORD  11/15/2022**

```
 1          A.   Okay.

 2          Q.   At any of your -- in flagging any material

 3     for any of the social media issues, themes, facts,

 4     whatever you flag, can you say whether or not you

 5     flagged any information from the Great Barrington

 6     Declaration?

 7          A.   I don't know what that is.

 8          Q.   Okay.  How about Jay Bhattacharya?

 9     Anything from him?

10          A.   I don't know who that is.

11          Q.   Marty Kulldorff.  Anything from him?

12          A.   I don't know who that is.

13          Q.   Aaron Kheriaty.  Anything from him?

14          A.   I don't know who that is.

15          Q.   Jim Hoft, or Gateway Pundit?

16          A.   I don't know who that is.

17          Q.   All right.  And Jill Hines?

18          A.   I don't know who she is.

19          Q.   All right.  And I think I have asked you

20     before, but bear with me.  Have you flagged anything

21     from Governor Michael Parson?

22          A.   I -- well, I may or may not have known the

23     name of the governor.  But I don't recall any

24     specific who posted anything we flagged.  That might

25     be a better way to answer these questions.
```

**CAROL CRAWFORD  11/15/2022**

```
1          Q.  Okay.  And that's --
2          A.  I don't remember anybody associated with
3     the example posts that we sent.
4          Q.  Okay.  And that would include -- I'm doing
5     this for the record, you understand.  I understand
6     your answer.
7          A.  Yes.
8          Q.  That would include Eric Schmitt, Jeff
9     Landry and John Bel Edwards?
10         A.  Yes.
11         Q.  Thank you.  And now, finally, on the BOLO
12    meetings, who ran the BOLO meetings?
13         A.  I ran the BOLO meetings.
14         Q.  In what manner?  How did you do it?
15         A.  I opened up the meeting, introduced
16    myself, gave context for why we were doing the BOLO
17    meeting in brief.  And then I believe that
18    Christopher went through the slide decks, and I
19    occasionally piped in on them.
20         Q.  Lewitzke?
21         A.  Yes.
22         Q.  And so he -- these slide decks, would they
23    be like the table you showed me or that we looked at
24    with examples of the shedding and the microchips in
25    the bloodstream?
```

CAROL CRAWFORD  11/15/2022

Page 266

```
 1        A.  They were similar to the table, but they
 2   were more like this is a theme, and then there'd be
 3   maybe a little info about what the theme was and
 4   then maybe a couple of example posts.  And then
 5   there would be a slide maybe with CDC links or
 6   information related to that theme.
 7        Q.  All right.
 8        A.  So it was more than just a table.  It had
 9   more context to it.
10        Q.  How long did the meetings go?
11        A.  They were short.  I mean, maybe they were
12   20 minutes.
13        Q.  And what did you and Mr. -- well, first,
14   what did you hope to accomplish by those meetings?
15        A.  The same thing that I've been referencing.
16   I mean, our goal is to be sure that credible
17   information about COVID was out there.  A lot of
18   people seek information on platforms.  We thought
19   that by giving the platform scientific information
20   it might help in our goals to being sure that
21   credible information could be found.
22        Q.  And uncredible information would not be
23   found; correct?
24            MS. SNOW:  Objection, mischaracterizes
25   testimony.
```

**CAROL CRAWFORD  11/15/2022**

```
 1   BY MR. VECCHIONE:
 2         Q.  You can answer.
 3         A.  I did want the credible information to be
 4   found in advance of the uncredible information.
 5         Q.  You at least wanted upgraded over --
 6         A.  Yes.
 7         Q.  -- uncredible information?
 8         A.  Yes.
 9         Q.  Do you recall anything anyone at any of
10   the social media platforms asked at any of these
11   BOLO meetings?
12         A.  They weren't able to ask questions during
13   the BOLO meetings.
14         Q.  Why was that?  Tell me how it ran.
15         A.  I think we talked about that this morning.
16   They are muted because the thought was they're
17   competitors, and they could ask questions
18   individually later.
19         Q.  Got it.  One second.
20             (Mr. Vecchione conferring with Mr. Sauer.)
21   BY MR. VECCHIONE:
22         Q.  Did they ask any questions individually
23   later that you recall?
24         A.  No, I don't think that they did.
25             MR. VECCHIONE:  All right.  I have no
```

**CAROL CRAWFORD  11/15/2022**

```
 1   further questions at this time.

 2            MS. SNOW:  Okay.  Nothing further.  No

 3   questions for defense.

 4            MR. VECCHIONE:  And you already said

 5   you'll read, right, at the beginning?

 6            MS. SNOW:  I said that at the beginning,

 7   so I didn't want to forget at the end.

 8            MR. VECCHIONE:  All right.

 9            THE VIDEOGRAPHER:  Okay.  I've got to ask

10   on the record, what about video copies for

11   everybody?  Anybody?

12            MR. SAUER:  We want video as soon as it's

13   available.

14            THE VIDEOGRAPHER:  So you want synced,

15   non-synced?

16            MR. SAUER:  I think synced syncs the video

17   to the transcript?

18            THE VIDEOGRAPHER:  Yes, I believe so.

19            MR. VECCHIONE:  And we -- I think what

20   we've been doing, we're going to do is give the

21   originals to her to put the record together, the

22   transcript together, the original exhibits.

23            MR. GILLIGAN:  The original exhibits, yes.

24            MR. SAUER:  So there should be -- that

25   stack of exhibits should go to the court reporter in
```

**CAROL CRAWFORD 11/15/2022**

```
 1   front of the witness.
 2            THE VIDEOGRAPHER:  Do you want a copy also
 3   for your group?
 4            MR. SAUER:  No, just one.  We're both
 5   plaintiffs.
 6            MR. VECCHIONE:  And there is no Exhibit.
 7   25 that's the one we skipped.  So don't be thinking
 8   it's lost.
 9            MS. SNOW:  But, yeah, we would like a copy
10   of the video as well.
11            THE VIDEOGRAPHER:  Okay.  A synced copy?
12            MS. SNOW:  Yes.
13            THE VIDEOGRAPHER:  So how about you, sir?
14            MR. GILLIGAN:  She's with us.
15            THE VIDEOGRAPHER:  So just one for each.
16            MS. SNOW:  Yeah.
17            THE VIDEOGRAPHER:  Got you.  Thank you.
18   And we are off the record at 5:33.
19            (Concluded at 5:33 p.m.)
20            (Signature reserved.)
21
22
23
24
25
```

CAROL CRAWFORD  11/15/2022

```
  1                    C E R T I F I C A T E

  2     STATE OF GEORGIA:

  3     DEKALB COUNTY:

  4               I, Maureen S. Kreimer, a Certified Court

  5     Reporter for the State of Georgia, before whom the

  6     foregoing deposition was taken, do hereby certify:

  7               That CAROL CRAWFORD, the witness whose

  8     deposition is hereinbefore set forth in pages 1 to 269,

  9     was duly sworn by me and that such deposition is a true

 10     record of the testimony given by the witness.

 11               I further certify that I am not related to

 12     any of the parties to this action by blood or marriage,

 13     and that I am in no way interested in the outcome of this

 14     matter.

 15               IN WITNESS HEREOF, I have hereunto set my

 16     hand this 18th day of November, 2022.

 17

 18

 19

 20

 21     _____

 22     MAUREEN S. KREIMER, CCR-B-1379

 23     Notary Public in and for the

 24     State of Georgia.  My Commission

 25     Expires August 14, 2024.
```

```
 1                        LEXITAS LEGAL

 2

 3   November 17, 2022

 4
     KYLA SNOW, ESQ.
 5   U.S. Department of Justice
     1100 L Street N.W.
 6   Washington, DC 29530

 7   IN RE: STATE OF MISSOURI ex rel. ERIC S. SCHMITT,
            Attorney General, et al. v. JOSEPH R.
 8          BIDEN, JR., in his official capacity as
            President of the United States, et al.
 9
     Dear Ms. Snow:
10
     Please find enclosed your copies of the deposition of
11   CAROL CRAWFORD taken on November 15, 2022 in the
     above-referenced case. Also enclosed is the original
12   signature page and errata sheets.

13   Please have the witness read your copy of the
     transcript, indicate any changes and/or corrections
14   desired on the errata sheets, and sign the signature
     page before a notary public.
15

16   Please return the errata sheets and notarized

17   signature page within 30 days to our office at 711 N

18   11th Street, St. Louis, MO 63101 for filing.

19

20   Sincerely,

21

22

23   Lexitas Legal

24

25   Enclosures
```

**CAROL CRAWFORD  11/15/2022**

Page 272

```
 1                        ERRATA SHEET
     Witness Name: CAROL CRAWFORD
 2   Case Name: STATE OF MISSOURI ex rel. ERIC S. SCHMITT,
               Attorney General, et al. v. JOSEPH R.
 3             BIDEN, JR., in his official capacity as
               President of the United States, et al.
 4   Date Taken: NOVEMBER 15, 2022

 5   Page #_____   Line #_____

 6   Should read:  _____

 7   Reason for change:  _____

 8

 9   Page #_____   Line #_____

10   Should read:  _____

11   Reason for change:  _____

12

13   Page #_____   Line #_____

14   Should read:  _____

15   Reason for change:  _____

16

17   Page #_____   Line #_____

18   Should read:  _____

19   Reason for change:  _____

20

21   Page #_____   Line #_____

22   Should read:  _____

23   Reason for change:  _____

24

25   Witness Signature:  _____
```

**CAROL CRAWFORD  11/15/2022**

```
 1    STATE OF _____)

 2

 3    COUNTY OF _____)

 4

 5    I, CAROL CRAWFORD, do hereby certify:

 6          That I have read the foregoing deposition;

 7          That I have made such changes in form

 8    and/or substance to the within deposition as might

 9    be necessary to render the same true and correct;

10          That having made such changes thereon, I

11    hereby subscribe my name to the deposition.

12          I declare under penalty of perjury that the

13    foregoing is true and correct.

14          Executed this _____ day of _____,

15    20___, at _____.

16

17

18

19                         _____

20                         CAROL CRAWFORD

21

22                         _____

23                         NOTARY PUBLIC

24    My Commission Expires:

25
```

**CAROL CRAWFORD 11/15/2022**

**A**

a.m 1:15
31:1,1
34:5 100:2
102:10
261:13
263:15
Aaron 6:6
8:15
264:13
Abbott 51:5
ability
10:24
88:11
156:17
157:7
164:10
able 75:23
108:17
122:17
123:9
146:5
161:10
172:24
173:12
215:14
256:7
267:12
abortion
255:10,15
above-re...
271:11
access 49:12
71:11
97:11,20
147:12
148:8
213:8
217:24
accessing
206:21
accomplish
88:24
266:14
account
138:9
215:1,3
216:20
218:2,18

accounts
4:18,21
157:5
196:20
201:20
212:21
217:11,24
218:7
accurate
27:15 89:4
162:22
ACIP 253:12
253:20
ACS 183:6
acting 32:6
action
270:12
actionable
212:9
actioned
211:13
activities
69:11
164:11
activity
41:3,4
74:6 75:17
actual
108:11
111:10
214:2
244:3
ad 180:21,25
224:9
Adams 119:8
119:9
150:16
153:1,6
223:1
ADCS 107:23
add 42:18
58:17 67:9
76:19 77:1
77:4 78:15
141:3
184:23
192:11
229:13
251:22

add-on 32:10
added 63:4,5
70:6 77:6
157:24
194:24
195:1
227:10
249:11
adding 55:21
61:11
76:18
82:17
129:10
addition
128:14
249:12
additional
45:24
48:22
78:10
107:8
159:21
162:11
167:1
188:4
218:19
219:12
238:19
255:5
address
23:21 29:1
38:14
83:11
87:16,21
88:8
125:24
129:5
172:24
174:20
175:4
207:25
244:15
addressed
108:16
adds 262:11
adjust 54:20
58:2 81:12
administ...
12:5

administ...
48:21
95:18
98:24
215:15
Adrien 86:12
238:8,9
Adrienne
100:1
ads 222:20
222:21
adults 46:4
164:7
advance
267:4
adverse
122:23
123:1,10
140:7
168:11
advice 169:9
237:19
advise 71:4
104:22
advisement
84:21
100:16
advisory
153:17,18
253:21
Affairs
12:23 13:8
13:10
14:10 15:4
19:9 32:7
32:18
Affairs'
12:19
affect 138:3
164:10
affirmative
16:3,25
17:12
19:18 23:9
39:17
40:24
41:23
43:15 44:7
45:21

62:25
67:11
107:6
108:20
114:11
117:15
128:25
129:22
130:7
134:8
141:16
155:11
166:13
181:4
185:18
187:5
190:22
196:3
202:9
207:1
216:16
242:25
243:20
253:8
age 169:16
169:25
185:25
187:4,6
agencies
92:2
109:23
221:9
223:24
232:4,6,16
232:18
233:8,11
239:21
261:11
agencies'
164:23
agency 11:19
15:17
95:19
127:25
128:5
140:12
164:21
255:23
256:10

**CAROL CRAWFORD  11/15/2022**

**agenda** 3:4
 103:4
 118:23
 126:15
 221:14,16
 221:17
 224:2
 225:21
 240:7,9
**agendas**
 223:24
**aggregate**
 154:19
**ago** 51:23
 56:21 96:6
 99:1
 182:19
**agree** 10:13
 49:19
 132:4
 172:5
 187:17
 211:11
 230:11
**agreed** 47:9
 57:14
 60:23
**agreement**
 31:11 71:6
 102:17
 109:21,23
**Ah** 125:7
**ahead** 31:5
 31:23
 67:16
 74:20
 81:16
 104:13
 199:17
 253:17
**AII** 111:2
**aiming**
 242:11
 245:16
**Airton**
 222:17
**Airton's**
 224:8
**al** 1:4,10

 271:7,8
 272:2,3
**alert** 4:1
 5:2 152:24
 153:8,11
 153:12,13
 153:14,16
 153:17,18
 188:11
 190:14
 219:24
 220:1,14
**algorithm**
 53:4,8
 138:20
 155:18
**algorithms**
 237:14
**alias** 23:16
**alleged**
 53:22 58:6
**allergic**
 164:12
**Alliance** 6:9
**allowed**
 77:10
 93:24 94:4
 94:9
 217:21,22
**allowing**
 146:15
**allows**
 214:10
**alternate**
 208:12
**alternative**
 209:17
**Alzheimer's**
 122:3
**amplific...**
 80:2,4
 81:17
**amplify**
 227:3
**analysis**
 259:17
**analyze**
 75:12
 80:13

**Anant** 7:2
 8:25
**Anant.ku...**
 7:4
**and/or**
 271:13
 273:8
**animals**
 120:17
**announce...**
 193:1,11
 193:18
 195:18,24
**answer** 10:3
 10:10,12
 35:1 46:22
 47:17
 54:11 69:5
 73:14
 76:25 78:6
 78:20 79:4
 79:18
 80:17,21
 80:23 90:2
 93:22 97:8
 101:23
 106:8,21
 107:2
 112:25
 115:4
 116:10
 121:8
 129:16
 136:8
 137:4
 146:5
 152:1
 158:8,25
 159:17
 161:19
 180:16
 186:12
 194:1
 236:5
 241:10
 260:3
 264:25
 265:6
 267:2

**answer's**
 120:14
**answered**
 41:8 74:13
 80:16
 82:20 99:8
 108:15
 113:19
 140:21
 165:7
 176:12
**answering**
 68:19
**answers**
 74:17
 114:16
 115:2,5
 129:6,24
**anti-vac...**
 55:6
**anticipated**
 228:14
**Antonaros**
 21:1 174:8
 176:6
 177:7
 192:22
 243:17
 254:16
**Antonaros'**
 176:23
**Antonio**
 253:3
**anybody**
 265:2
 268:11
**anymore**
 13:15
**anything's**
 171:2
**anyways**
 176:4
**apologies**
 33:16 96:7
**apologize**
 41:13
 86:24
 167:16
 245:9

 247:3
 249:11
**apparently**
 91:24
 194:18
 237:15,16
 253:2
**appear**
 120:11
**appearance**
 68:15
**APPEARANCES**
 6:1
**appearing**
 146:17
 209:2
**appears**
 25:10
 41:16 56:6
 77:14
 119:22
 122:7
 141:22
 203:5
 252:25
**applied**
 136:22
**apply** 104:23
 105:3
 169:21
**appointment**
 37:4,24,25
 44:14,23
 116:22
 178:15
 221:16
 242:20
 244:1,3
 248:5
**appointm...**
 30:13
**appreciate**
 27:20
 109:12
 206:6
**appreciated**
 55:20
**approach**
 76:17 77:3

**CAROL CRAWFORD  11/15/2022**

82:17
208:13
209:17
**approach...**
258:20
**approached**
29:18
**appropriate**
217:4
**approved**
169:23
201:15
203:21
204:2
**approving**
161:13
**April** 3:6
13:3,14
15:1 16:1
46:2 65:25
77:13
185:17
186:7
188:15
196:21,25
221:10
234:10
237:8,10
238:7
**AR** 42:6
**area** 114:22
114:23
137:14
138:8
140:14
143:4
146:4,8
150:21
154:11
224:17
259:5
**areas** 34:1
56:18
59:11 76:1
87:23
150:23
175:13
211:18
258:11

259:1
**argument...**
138:7
163:10
**arguments**
39:20
**arrange**
36:16 37:1
246:16
**arranged**
20:19
**arrangem...**
18:22
**arranging**
246:13
**ARTF** 42:1,3
**article** 3:6
3:7 4:7
7:19 53:19
**articles**
112:20
**as-needed**
223:25
**aside** 22:3
43:8 48:13
60:2 85:4
85:5 90:24
100:19
115:9
118:5
126:7
144:25
165:12
168:21
171:13
179:8
187:8
196:13
200:14
205:2
219:18
221:2
226:3
236:25
239:12
247:6
249:6
254:3
263:24

**asked** 14:11
42:21
46:14
69:10,22
75:3 77:4
80:16
81:17
82:20
98:19 99:2
99:6,7
106:24
125:23
130:18
146:18
152:3
164:1
165:7
166:22
174:11
176:11
180:14
184:3
185:16
188:1
197:5,18
197:18
198:6
201:1,24
204:21
209:11
215:2,2
230:13,24
230:25
231:18,19
231:22
232:1
236:8
238:20
240:21
256:12
257:24
259:14
260:6
264:19
267:10
**asking** 9:25
18:20 26:8
27:5 34:17
42:14,18

48:4,6
51:8 55:7
75:22 77:1
77:2 78:15
80:6,14
82:22
90:11
94:11
99:13
117:25
123:25
130:19
139:21,24
149:12
150:18
157:8
158:18
159:3,3,8
163:24
167:21
169:8,10
170:18,21
173:2
182:8
186:4,5
200:11
202:16,20
204:22
215:12
216:13
230:25
231:13
242:20
251:24
**asks** 46:18
65:18
79:13
96:25
140:5
157:15
**aspect** 83:17
**Aspinall**
92:5 97:5
**assembled**
192:18
**assess**
169:23
**assessment**
166:25

**assigned**
114:21
124:1
**assist** 154:1
**assistance**
17:7 224:7
**assistant**
50:24 61:7
63:11
**assistants**
86:15
**assisting**
158:15
**associate**
11:9,12
183:5
**associated**
37:24
265:2
**assume** 35:19
44:2 59:23
105:18
125:12
135:19
160:6
197:24
212:10
223:3,19
259:4
**assumed**
176:11
259:23
261:14
**assumes** 79:1
110:7
137:22
138:6
142:24
**assuming**
33:21
182:7
204:17
261:10
**assumption**
130:3
185:3
**assure** 49:4
135:23
**asterisks**

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 235:10 | 63:14 | 192:1 | 237:9 | 12:23 14:5 |
| **asthma** 46:4 | **Attorney** 1:4 | **awareness** | 238:8 | 18:4 19:22 |
| 186:15,21 | 6:2 149:1 | 25:5 26:14 | 241:24,24 | 19:23 24:5 |
| 187:4 | 149:1 | 35:18 | 243:15 | 25:14 |
| **AstraZeneca** | 271:7 | 190:7 | 247:14 | 28:18 |
| 169:5 | 272:2 | | 252:7,7 | 29:18,18 |
| **Atlanta** 1:18 | **attorney...** | ____ B ____ | 253:2 | 30:12 |
| 12:13 | 93:21 | **babies** | 255:23 | 34:14 42:4 |
| **attach** 46:12 | 94:20,22 | 165:15 | 257:2,13 | 45:7,13 |
| 122:18 | **attorneys** | **bachelor** | 260:15 | 51:1,16 |
| 207:13 | 8:10 | 12:11 | **back-** 12:15 | 59:8 63:11 |
| **attached** | **audiences** | **bachelor's** | **background** | 64:13 |
| 5:22 7:22 | 182:1 | 12:4 | 12:16 | 65:12 |
| 25:8 52:21 | **audio** 97:22 | **back** 11:24 | 59:24 | 69:12 70:1 |
| 60:19 61:1 | **August** | 13:7 22:19 | **Balog** 50:17 | 70:19 |
| 62:1 63:16 | 145:17,18 | 22:22 | **Barnes** 19:12 | 77:12 |
| 63:17 | 146:21,25 | 25:25 31:2 | **Barrington** | 79:21 |
| 185:20,21 | 270:25 | 41:18 56:8 | 264:5 | 80:19,25 |
| 202:13 | **authored** | 67:24 68:4 | **based** 97:10 | 81:5,9,14 |
| 251:15 | 46:20 | 69:13 | 133:12 | 83:13,22 |
| **attachment** | **authority** | 70:10,11 | 200:12 | 83:24 87:1 |
| 149:11 | 135:24 | 72:14 | 211:18 | 87:22 |
| 153:7 | **authoriz...** | 77:12,17 | 219:9 | 90:11 92:1 |
| 155:5 | 4:3,6 | 98:3 | 261:18 | 92:21,25 |
| 188:18 | 137:7,10 | 102:11 | **basis** 74:3,5 | 97:14 |
| **attachments** | 137:12 | 115:2,4,5 | 184:16 | 108:13 |
| 47:18 | 156:2,25 | 116:12,14 | 215:11 | 110:4 |
| 202:10 | 160:1 | 117:11 | **Bates** 124:17 | 116:18 |
| **attend** 68:18 | 163:19 | 121:14 | 136:9,13 | 117:22 |
| 151:15,16 | 167:3 | 124:7,8 | 136:19 | 118:1 |
| 187:24 | 169:18 | 126:17 | 146:11 | 123:9,13 |
| 188:7 | **available** | 130:11,12 | 169:13 | 128:10 |
| 243:25 | 45:25 | 132:9 | 205:25 | 133:20 |
| 247:20,23 | 68:18 72:4 | 133:17 | 241:25 | 134:1 |
| **attended** | 89:6 95:19 | 135:14 | **bear** 264:20 | 137:15 |
| 120:2,3 | 95:25 | 145:17 | **becoming** | 139:7 |
| 151:8 | 96:16 | 150:4 | 38:7 | 143:22 |
| 235:7 | 133:24 | 160:13 | **beginning** | 147:18 |
| 245:1 | 185:6 | 161:6 | 16:14,19 | 151:22 |
| 246:12 | 251:15 | 167:24,25 | 19:11 44:5 | 154:22 |
| 250:15 | 257:24 | 176:9 | 142:15 | 155:18 |
| **attendee** | 268:13 | 189:10 | 144:16 | 167:19 |
| 246:7 | **Avenue** 7:3 | 193:2 | 198:22 | 168:6 |
| **attendees** | **aware** 33:18 | 197:11 | 219:11 | 174:17 |
| 221:18 | 137:18 | 205:11 | 268:5,6 | 175:18 |
| **attending** | 140:6 | 206:25 | **behalf** 6:1,6 | 177:9 |
| 181:7 | 167:2 | 212:22 | 6:15 7:1 | 185:10,14 |
| **attention** | 169:2 | 226:23 | **Bel** 265:9 | 188:13 |
| 52:23 | 191:23 | 235:11 | **believe** | 192:6 |

**CAROL CRAWFORD  11/15/2022**

196:10
197:18
200:6
204:12,15
204:21
210:22
212:2
214:18
218:24
220:18
221:24
222:3
223:16,16
223:16
225:3
228:8
230:20
232:21,23
233:13
236:8,15
239:13
243:16
245:1
246:4,15
248:4,4,17
250:21
253:22,25
261:25
265:17
268:18
**believed**
157:16
162:3
169:25
220:20
**bell's** 3:6,8
111:13
112:16,19
112:20
**belong** 54:24
55:10
**benefit**
140:3
**best** 34:10
34:18
40:25
77:23
116:6
182:10

211:22
243:5,9
**better** 80:7
192:11
194:8
229:9
242:16
264:25
**beyond** 31:12
40:12
102:18
**Bhattach...**
6:6  8:15
264:8
**Biden** 1:7
8:5  271:8
272:3
**big** 34:17,23
189:20
190:1
**bigger**
220:17
**Birth** 223:17
**bit** 11:24
12:22
49:15
51:11
61:14
64:15
151:12
208:16
**biweekly**
52:5  57:6
57:12,13
57:16,19
57:21
60:22  62:1
142:3
226:18
262:20
**black** 62:5
**blacked** 44:8
**blanking**
21:2  152:9
**blind** 248:5
**block** 235:14
**blocked**
237:21
**blood** 270:12

**bloodstream**
265:25
**Bloomberg**
4:7
**BlueJeans**
241:4,5
**Board** 7:20
**body** 62:3
164:9
**bold** 62:9,11
62:13
64:19
**bolded** 62:6
62:7  63:20
63:23  64:6
64:8,10,21
65:8  66:4
**bolding** 64:1
64:2
**BOLO** 4:1  5:2
5:10,13
152:24
153:19,20
188:9,13
188:14
198:15,21
202:6
204:24
208:9,16
208:17,24
209:11,12
209:23
210:11
213:2
219:24
220:6
241:21
242:5,10
242:17,20
243:12,25
245:1,14
246:5
247:12
248:20,24
253:18,23
260:12
262:8
265:11,12
265:13,16

267:11,13
**BOLOs** 153:23
210:2,3
**Bonds** 19:10
32:13
**booster** 5:14
249:19,20
250:1
**Boosters** 4:7
**bottom** 44:19
65:13
124:18
128:7
136:13
146:12
148:20
169:14
174:3
187:19
196:25
206:1
243:19
**box** 6:4
23:15,17
**branch** 13:19
13:20,20
14:4,12,18
15:3,4,6
24:16  25:1
**branches**
13:18
**brand** 190:7
**break** 30:20
66:1,20
102:2,6,7
102:7
149:24
205:4
235:13
256:18
**breaking**
41:24
**breast**
165:14
**breathing**
41:11  42:9
**Bretthau...**
108:1
115:10

**brewing**
220:14
**brief** 2:12
2:15  39:9
39:11,13
39:24,25
43:21  44:9
256:18
265:17
**briefing**
68:17,21
68:23
**briefings**
149:2
**briefly**
11:25
**briefs** 39:18
**bring** 35:24
115:14
181:14,18
182:9
188:21
200:10
258:25
259:2
**bringing**
68:24
168:21
205:1
**Broadcast**
14:7
**broader**
39:16
110:6
182:25
184:9
**Brook** 92:5
**building** 6:3
21:24,25
164:9
**bullet** 39:21
82:2
127:17
**bunch** 27:25
**Bureau** 56:4
**buried** 129:7
**business**
12:4
**busy** 19:24

**CAROL CRAWFORD  11/15/2022**

| C | |
|---|---|
| **C** 23:7 270:1 | |
| 270:1 | |
| **Cain** 245:18 | |
| **calendar** | |
| 30:12 | |
| 84:15,19 | |
| 100:9 | |
| 116:20 | |
| 178:13,15 | |
| 246:10 | |
| **calendared** | |
| 116:21 | |
| **calendars** | |
| 30:10 | |
| **call** 3:5 5:4 | |
| 5:9 11:10 | |
| 19:4 27:22 | |
| 29:25 30:1 | |
| 30:4,8,9 | |
| 30:11 | |
| 36:15 | |
| 37:19,21 | |
| 38:1 44:15 | |
| 45:23 | |
| 51:17,19 | |
| 52:22 | |
| 56:20 57:3 | |
| 84:9 93:19 | |
| 102:19 | |
| 103:4 | |
| 107:1 | |
| 108:18 | |
| 116:17 | |
| 118:24 | |
| 121:18 | |
| 122:8 | |
| 126:16 | |
| 129:21 | |
| 133:19 | |
| 134:2 | |
| 173:7 | |
| 177:3,23 | |
| 178:1,9,13 | |
| 178:14 | |
| 182:11 | |
| 184:21 | |
| 188:2 | |
| 189:24 | |

190:11
195:1
197:22
198:18
221:8
222:3
223:18
225:22
233:7
239:3,20
257:23
**call-in** 31:8
31:15
102:15,20
**called** 17:19
17:21,22
69:1
136:13
173:11,14
198:6
211:9
220:23
221:25
226:16
229:9
231:3
256:11
**calling**
148:22
**calls** 20:19
29:20 30:5
35:24
76:21 78:3
83:7 85:1
86:21
89:25
93:18,20
101:20
112:22
121:5
123:3
135:10
138:5
142:25
159:14
163:1
193:13
222:25
231:15

233:14
251:4
259:25
**campaign**
262:1
**capacity** 1:8
271:8
272:3
**cards** 197:9
201:5
**care** 95:10
238:17
**Carnac**
249:13
**Carol** 1:13
2:3,7 8:4
9:5 11:3
22:24 34:5
45:22
51:22
63:15
68:14 73:4
74:25,25
84:4 100:2
126:19
141:17
166:18
176:25,25
197:4
211:6,20
216:18,19
226:24
234:12
247:16
254:25
270:7
271:11
272:1
273:5,20
**Carol's**
206:8
**Caroline**
45:12
**Carrie** 119:8
119:9,11
150:16
153:1,19
223:1
**case** 8:19

141:22
144:22
271:11
272:2
**cast** 174:2
**catch** 173:15
240:20,21
**category**
185:25
187:6
203:20
**caught**
145:12
**cause** 111:13
154:1
169:2
**caused** 168:1
**causes** 122:2
**causing**
78:11,13
127:10
128:8
156:18
**cc** 24:12
50:17 52:2
**cc'd** 222:14
250:20,25
**cc'ing** 27:1
86:16
**cc's** 176:6
**CCR-B-1379**
1:20
270:22
**ccrawfor...**
23:16
**ccs** 119:8
**CDC** 2:12,15
3:5 4:1,9
5:2,4,5,12
8:7 11:5,8
12:2,6,8
12:12,19
13:9 15:22
17:6,19
18:12
29:19
35:24 39:9
39:11
41:17 42:5

42:24
43:21 44:9
45:9 46:20
46:20
47:12
48:11,16
54:6,13
56:1,2,5
58:9,20
61:10
63:24 64:3
71:7,9,11
71:18,23
71:25
72:15 74:7
74:18
77:17 78:1
78:9,22
81:7 82:9
82:11 83:4
87:20
89:21 90:5
90:6,9
92:3,5
96:23
98:18 99:3
99:6,8,18
100:22,25
103:4,20
103:24
104:8,22
105:2,7,25
106:2,12
107:14
108:4,23
110:20
112:21
113:11,13
113:15
117:13,14
118:24
120:18,22
126:16
129:12,14
129:24
130:25
132:4,10
134:21
137:5

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 138:16 | 236:8 | 79:23 82:2 | 214:11,13 | 257:14 |
| 139:24 | 239:21,21 | 83:1,4,7 | 214:14,19 | 263:15 |
| 140:1,13 | 247:12 | 83:16,16 | 218:18,22 | **chains** |
| 143:14,23 | 249:2 | 83:19 | 218:22 | 185:15 |
| 145:25 | 251:13 | 86:20 87:1 | 219:12 | 206:24 |
| 146:7 | 253:13 | 87:5 90:16 | 223:17 | 219:13 |
| 148:8 | 255:4 | 96:22 99:3 | **centers** 1:17 | **chance** 38:24 |
| 150:18 | 256:12 | 101:5,10 | 6:15 7:6 | 66:20 91:3 |
| 152:8,24 | 260:19 | 101:12 | 7:12 35:10 | 150:8 |
| 159:9,12 | 266:5 | 107:10 | 256:12 | 178:13 |
| 163:21 | **CDC's** 11:14 | 109:14 | **certain** | 211:21 |
| 164:22 | 11:15,17 | 110:16,17 | 63:20 | 257:25 |
| 166:7 | 15:15,16 | 111:3,9 | 98:19 99:2 | **change** |
| 171:23 | 27:17 29:8 | 117:19 | 101:18 | 194:13 |
| 174:18 | 43:4 47:25 | 125:12,16 | 137:12 | 272:7,11 |
| 175:2 | 52:3 59:13 | 174:18,21 | 157:9 | 272:15,19 |
| 177:4 | 89:17 | 174:22 | 194:19 | 272:23 |
| 181:6 | 113:18 | 175:3,6,14 | **Certified** | **changed** |
| 183:17 | 126:23 | 175:19,23 | 270:4 | 61:14 |
| 185:14,23 | 161:21 | 176:11,12 | **certify** | 117:6 |
| 189:23 | 167:4 | 177:4 | 270:6,11 | 145:22 |
| 192:4 | 186:13 | 179:25 | 273:5 | 148:6 |
| 193:19,20 | 191:1,16 | 182:5,9,24 | **cetera** | 156:12 |
| 193:23 | 220:12 | 184:8,11 | 197:10 | 180:18 |
| 194:4,19 | **CDC-cred...** | 184:11,16 | 201:5 | 210:22 |
| 194:20 | 18:10 | 184:23 | **chain** 22:14 | **changeover** |
| 200:20 | **cell** 35:23 | 185:9,12 | 22:18,23 | 13:16 |
| 202:12 | 36:1,2,4,6 | 197:17 | 25:9 26:7 | **changes** 47:9 |
| 210:23 | **censorship** | 201:11 | 26:21 30:2 | 192:8 |
| 212:20,21 | 176:3 | 202:22 | 33:11 | 250:3 |
| 212:22 | **Census** 55:22 | 203:14 | 35:21 | 253:16 |
| 213:6 | 56:1,2,4 | 208:1,3 | 44:23 60:6 | 271:13 |
| 215:3 | 58:17 | 209:24 | 66:3 67:21 | 273:7,10 |
| 217:3,11 | 59:15 | 210:2,5,8 | 67:22 70:7 | **channel** 3:3 |
| 218:4,5,6 | 61:10,11 | 210:11 | 74:19 | 51:5 91:10 |
| 219:24 | 70:9 71:1 | 213:13,23 | 79:20 | 91:18,24 |
| 221:9,9,18 | 71:3,8,14 | 214:21 | 83:12 | 95:14,14 |
| 222:3 | 71:19,25 | 217:3,6,23 | 91:23 | 95:16,22 |
| 223:3,22 | 72:8,15,16 | 218:7 | 97:10,16 | 97:2 98:15 |
| 223:24 | 73:6,8,11 | 234:19 | 122:11 | 99:20 |
| 224:1,14 | 73:18,25 | 235:4,16 | 160:24 | 100:6 |
| 226:9,16 | 74:9,18 | 235:19 | 172:6 | **channels** |
| 227:4 | 75:1 76:3 | 246:12 | 174:4 | 52:12 |
| 229:10,14 | 76:11,19 | **center** 11:18 | 182:8 | 62:18 |
| 230:20 | 77:5,17,22 | 14:2 15:18 | 187:20 | **characte...** |
| 232:7,16 | 77:22 78:1 | 59:1 | 207:2 | 53:7 |
| 233:13 | 78:9,14,15 | 107:13,15 | 213:10,12 | 132:10 |
| 234:7,18 | 78:22 79:9 | 107:17,22 | 226:15 | 143:20 |
| 234:25 | 79:15,18 | 160:20,21 | 238:22 | **characte...** |

**CAROL CRAWFORD 11/15/2022**

134:1
characte...
163:11
characters
174:2
charge
135:22
259:1
chart 186:9
186:11,12
186:14,15
204:19
207:14,14
207:17
211:8
chat 4:11
171:22
223:19
224:10
242:16
chats 197:5
200:25
cheating
63:8
check 41:12
70:9
114:19
121:15,20
121:24
124:24
132:16
144:10
177:20
178:17,18
178:22
179:1
182:4
216:22
235:16
252:6,15
255:21
check-in
180:9
checked
123:22
131:9
235:18
252:16
checking

66:24
117:20
197:13
209:25
253:7
Cheers 252:9
Chelsey 63:5
63:11 65:1
chemical
255:9,15
chief 15:3
192:25
193:3,8
childhood
158:4
children
66:5 157:1
157:3
162:12
164:7
165:15
167:3
169:15,19
169:22,24
choice 66:9
Chris 246:22
246:24
Christopher
83:21
86:21,22
175:12
202:25
203:1
216:4,11
216:11
217:5
265:18
circulated
114:6
circulating
89:3
153:25
citizens
71:9,13,19
71:25
101:19
City 6:4
Civil 6:9
▮▮▮▮ 23:24

▮▮▮▮@CDC...
23:8,17
claim 108:21
120:12
122:21
157:16,17
168:3,5
169:24
170:15
203:21
255:8,13
claiming
204:17
claims 4:2,5
5:15
119:16,17
124:15
126:22
129:13,14
131:8,18
132:1
138:13,16
139:1,9,24
140:2
156:1,17
157:2,12
158:16,19
159:4,21
162:11,21
163:18
166:22
167:1
169:15,22
170:9,18
170:18
172:20
182:21
184:1,2
185:20
204:1
254:11
255:3,4,7
Claims_Help
3:15
clarific...
42:15
81:15
85:24
176:10

198:5
clarified
233:22,22
clarify
31:20 55:1
64:15
82:12 97:9
104:12
124:23
147:8,25
155:2
199:18
205:24
229:13
246:11
clarifying
171:25
clean 69:19
261:2
clear 9:21
26:1 40:10
52:8
122:11
180:1
192:15
194:11
clearance
128:1,2
129:2
cleared
127:7,12
127:15,19
128:3,9
135:17,20
clearing
135:22
clicked
215:20
Clifton 1:17
close 203:4
closed
100:15
closely
193:1,11
195:18
closer 78:14
CMS 142:22
CMU 225:2
CMU/FB

221:21
224:19
co-chairs
132:20
co-lead
107:16,17
107:21
115:19
183:4
co-leads
108:2
co-morbi...
186:1
code 231:9
codes 70:20
coincidence
24:21
collab
221:22
225:7,10
collabor...
225:10
collabor...
232:8
colleague
177:7
182:18
238:11,18
colleagues
177:1
214:21
234:19
collect
115:6
132:11
collective
79:25
colleges
137:20
come 32:11
66:18
72:14
117:21
140:11
144:8
183:15
195:4
204:23
218:13

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 146:9 | 124:2 | concern 54:6 | confirm | 243:1,10 |
| coming 27:18 | 135:14 | 54:13 | 96:25 | 250:4 |
| 128:15 | communic... | 63:24 | 121:3 | 251:21,21 |
| 169:19 | 53:10 | 100:24 | 133:11 | consolidate |
| 190:12 | 54:16 | 244:11 | confirmed | 90:22 |
| 191:3 | 113:19 | concerned | 256:14 | 124:8 |
| 233:10 | 116:10 | 81:7 | 261:18 | consult |
| 244:2 | 121:12 | 153:22 | confirming | 175:7 |
| commended | 123:25 | 154:5 | 156:17 | consulta... |
| 144:17 | 135:12 | 207:10,11 | conflicted | 150:15,19 |
| Comment | communities | concerning | 248:20 | consulted |
| 203:12 | 40:17 | 146:15 | confused | 236:3 |
| commented | 46:12 | concerns | 151:2 | consumer |
| 41:17 | community | 89:21 90:6 | 263:9 | 108:2 |
| 255:5 | 34:1 | 255:19 | confusion | 115:19 |
| comments | 103:25 | concluded | 29:6 54:19 | 194:5 |
| 41:6,12,14 | 234:20 | 236:12 | 56:18 58:1 | consumers |
| 41:15,20 | communit... | 269:19 | 59:11 76:1 | 134:19 |
| 97:24 98:2 | 3:10 | conclusions | 81:11 | contact |
| 205:8 | companies | 121:3 | 150:23 | 11:18 14:2 |
| 256:24 | 16:5 19:21 | 133:11 | 220:14,15 | 15:18 16:4 |
| Commission | 20:3,16 | concrete | 258:10 | 16:13,15 |
| 270:24 | 24:3 36:5 | 192:10 | Congress | 17:3,4,13 |
| 273:24 | 198:22 | condition | 125:20 | 17:17 |
| common | 208:17 | 10:23 | connect | 18:21 |
| 154:23 | 234:6 | 137:20 | 238:19 | 20:17,21 |
| 182:20 | company | conditions | 239:4 | 20:24 21:1 |
| 183:25 | 17:24,24 | 186:1 | connected | 21:7 35:4 |
| Comms 107:11 | 50:8 104:6 | conduct | 123:15 | 36:8 83:15 |
| communic... | 105:3 | 109:23 | 239:5 | 114:9 |
| 54:19 | 117:17 | conducted | connection | 119:11 |
| 81:13 | compare 44:4 | 131:1 | 102:14 | 198:1 |
| communic... | competitors | confer | consequence | 199:21 |
| 11:9,12 | 267:17 | 256:22,22 | 88:19 | 223:2 |
| 14:8 53:12 | compiles | conference | conserva... | 233:2 |
| 56:17 58:3 | 59:2 | 120:1 | 148:21 | 249:2 |
| 59:12 | completed | conferred | consider | 254:15 |
| 75:17 | 216:21 | 118:14 | 77:16 | contacted |
| 81:12 | completely | conferring | 88:14 | 24:2 |
| 148:15 | 164:25 | 118:12 | 220:20 | 232:16 |
| 151:21 | component | 236:1 | considered | contacts |
| 183:5 | 14:10 | 267:20 | 134:20 | 16:9,11 |
| 262:1 | comport | confidence | 155:18 | 17:16 |
| communic... | 242:18 | 59:9 72:4 | 194:24 | 18:18 20:2 |
| 12:6 13:21 | Compound | 81:1 258:5 | considering | 21:9 60:14 |
| 18:3 20:5 | 106:6 | 263:1,7,21 | 27:18 | 114:24 |
| 237:18 | 193:24 | confident | 99:16 | 242:24 |
| communic... | computer | 232:17 | 169:18,20 | content |
| 114:14,21 | 23:20 | 258:13 | 242:13 | 15:24 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 18:14 | 196:1 | 56:21 57:1 | **COPY.docx** | 227:6 |
| 29:22 43:7 | 200:5 | 81:24 | 3:23 | 229:2,22 |
| 45:24 46:3 | 201:16 | 82:22 83:2 | **coronavirus** | 229:23 |
| 46:16 47:8 | 204:4,13 | 83:3 84:25 | 27:16 | 252:12 |
| 47:13,20 | 217:16 | 87:19 | 190:16 | **correspo...** |
| 47:22 | 230:18 | 89:10 | **corporat...** | 169:4 |
| 51:25 | 255:6 | 119:18 | 35:18 | **Costello** |
| 52:24 53:8 | 265:16 | 121:23 | **correct** 22:1 | 51:5 |
| 65:15,16 | 266:9 | 132:18 | 23:10 28:1 | **council** |
| 75:18,20 | **continue** | 133:3 | 33:14 40:4 | 15:22 |
| 87:21 | 85:14 | 143:21,24 | 44:3 45:2 | 253:21 |
| 90:11 | 103:2 | 154:14,16 | 49:17 61:2 | **counsel** 1:16 |
| 101:15 | 118:19 | 161:2 | 65:9 89:2 | 6:1 7:21 |
| 103:14,21 | 195:19 | 179:15 | 97:1 | 9:1,8 10:5 |
| 105:24 | 235:9 | 187:15 | 121:14,25 | 10:9 21:15 |
| 106:13 | **Continued** | 209:4,6 | 122:16,18 | 22:5 31:7 |
| 108:2,3,16 | 2:25 3:25 | 250:1 | 124:15,25 | 31:9,9,13 |
| 109:8,9 | 4:24 6:25 | **conversa...** | 125:1 | 84:18 93:5 |
| 113:13 | **contractor** | 18:15 | 131:23 | 100:13 |
| 115:19 | 83:22 | 36:10 38:5 | 145:15,24 | 102:13,16 |
| 127:22,25 | 86:20 | 38:6 53:10 | 146:19 | 102:18 |
| 128:4,14 | 217:6 | 54:17 | 159:23 | 112:10 |
| 128:17,21 | **contractors** | 59:24 | 162:25 | 118:10,15 |
| 129:2 | 98:9,19 | 64:12 | 169:9 | 235:24 |
| 131:23 | 99:19 | 72:11 | 170:6 | 236:1,3 |
| 133:23 | 100:22,23 | 83:10 | 178:11 | 256:23 |
| 134:9,10 | 100:25 | 87:15 | 203:11 | **counterpart** |
| 134:11,13 | 101:1,8,10 | 117:1 | 206:10 | 87:4 |
| 134:14,25 | 101:12 | 143:6 | 220:2,4 | **counterp...** |
| 157:6 | **contribute** | 209:9 | 227:6 | 233:20 |
| 164:15 | 103:24 | **cooking** | 236:12 | **countries** |
| 175:24 | 157:17,25 | 205:6 | 252:3 | 169:6 |
| 176:11 | 169:25 | **coordina...** | 257:16,20 | **country** |
| 183:16 | **contributed** | 2:9 71:2 | 259:7,24 | 123:1 |
| 189:23 | 104:3 | **coordinator** | 266:23 | **COUNTY** 270:3 |
| 190:7,13 | **control** 1:17 | 35:9 | 273:9,13 | 273:3 |
| 191:16 | 6:15 7:6 | **copied** 208:2 | **correcting** | **couple** 83:19 |
| 197:6 | 7:12 88:12 | 208:3 | 194:7 | 84:1 |
| 201:1 | **controlled** | 216:9,10 | **correction** | 151:21 |
| 212:6 | 34:10 | 216:11 | 21:24 | 173:3 |
| 222:2 | 36:25 | 248:5 | **corrections** | 198:19 |
| 228:10 | **convene** | **copies** | 271:13 | 226:25 |
| 229:11 | 15:21 | 256:19 | **correctly** | 243:7 |
| 234:19 | **conversa...** | 268:10 | 55:16 | 266:4 |
| 244:24 | 4:13,15 | 271:10 | 83:23 | **course** 10:4 |
| **context** | 9:18 37:5 | **copy** 7:22 | 122:9 | 123:2 |
| 39:24 | 38:15 | 124:10 | 163:12 | 152:11 |
| 126:22 | 51:11,15 | 269:2,9,11 | 198:8 | 210:24 |
| 188:24 | 51:23 | 271:13 | 211:3 | 262:13 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| **court** 1:1 | 161:14 | 127:10 | 148:14 | 141:10 |
| 6:3  7:20 | 162:3,12 | 128:7 | 210:13 | 142:2,12 |
| 8:6  9:3,16 | 162:12 | 137:2 | **created** 13:3 | 145:6,14 |
| 256:18 | 164:6 | 139:13,17 | 61:5  73:25 | 146:15,17 |
| 268:25 | 169:15 | 141:10 | 148:8,11 | 146:23 |
| 270:4 | 173:25 | 145:6 | 221:13 | 147:1,4,5 |
| **courtesy** | 174:20 | 149:18 | **creating** | 147:10,13 |
| 52:1 | 175:4,7,8 | 157:3,6 | 48:16 | 148:8,12 |
| **CoV-2** 112:17 | 183:14 | 163:25 | 95:14 | 148:19,25 |
| **cover** 234:20 | 195:1 | 164:7 | 263:6 | 149:2 |
| 235:13 | 197:9 | 167:25 | **credible** | 154:15,24 |
| **coverage** | 198:19,23 | 168:3 | 89:1,5 | 230:1 |
| 76:16 | 201:4 | 169:1,3,19 | 90:12 | 262:14,20 |
| **covered** | 205:20 | 169:21 | 140:1 | **CRR** 1:20 |
| 93:21 | 206:16 | 170:15 | 181:25 | **cues** 9:17 |
| 94:19 | 208:9,17 | 176:17 | 266:16,21 | **cures** 197:9 |
| **covering** | 222:1,2 | 188:3 | 267:3 | 201:5,15 |
| 187:23 | 223:12 | 221:20 | **criteria** | 203:18 |
| 188:6 | 224:22 | 224:12 | 89:14,15 | **current** 11:4 |
| **COVID** 4:11 | 231:5,9 | 229:20 | **Cross-Ex...** | 15:10,12 |
| 5:1,10 | 232:19 | 234:17,21 | 2:4 | 16:1  18:23 |
| 16:14,15 | 239:2 | 247:12 | **crosstalk** | 18:24 |
| 16:16,17 | 241:21 | 256:1,3 | 178:6 | 168:2 |
| 16:19  17:3 | 242:5,10 | 258:16 | **Crowd** 60:7 | 170:14 |
| 17:10  18:2 | 245:14 | **COVID-HUB** | **CrowdTangle** | 262:14 |
| 18:12 | 247:21 | 221:19,23 | 2:17,19 | **currently** |
| 22:14 | 255:4 | 221:24 | 3:16,19 | 15:5 |
| 25:12 | 256:6 | 222:4 | 49:13,25 | **cut** 76:10,14 |
| 29:15 | 261:25 | **COVID_19** | 50:1,20 | 82:1,13 |
| 32:15 | 266:17 | 5:12 | 51:2,3,24 | 190:15 |
| 42:23 | **COVID's** | **crafting** | 51:25  52:7 | 191:17 |
| 46:11 | 256:5 | 103:21 | 52:22 | **cut-and-...** |
| 48:10,22 | **COVID-19** | **Crawford** | 59:17,19 | 240:9 |
| 49:13 | 2:11,18,20 | 1:13  2:3,7 | 59:21 | **CV19** 3:2 |
| 51:25 | 3:9,17,20 | 8:4  9:5,12 | 60:15 | 91:9,12 |
| 52:23  53:2 | 33:12  48:3 | 11:3  22:24 | 62:16 | **Cynthia** |
| 57:25 | 51:3  60:7 | 34:5 | 63:16 | 107:11 |
| 71:13  89:4 | 63:21 | 102:24 | 64:18 | 115:10 |
| 92:9 | 91:13,17 | 141:17 | 66:12 | 116:23 |
| 105:24 | 95:14 | 150:8 | 71:21 | 120:2 |
| 110:5,10 | 98:14 | 247:16 | 75:24 | 133:22 |
| 110:12 | 99:19 | 257:6 | 76:16  77:5 | 182:18,21 |
| 111:5 | 108:21 | 270:7 | 77:7,10,11 | 183:1,2 |
| 113:9 | 111:13,19 | 271:11 | 77:14 | 188:3 |
| 121:4 | 119:15 | 272:1 | 78:16,24 | **cytokine** |
| 128:2 | 120:13 | 273:5,20 | 79:7,8,11 | 122:4 |
| 148:19 | 122:2 | **create** 73:22 | 83:17 | |
| 157:3 | 124:14 | 110:1 | 91:22 | **D** |
| 160:23 | 126:22 | 147:17 | 97:11 | **D** 6:2 |

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| **daily** 164:10 | 237:5 | 167:5 | **deck** 73:20 | 120:2 |
| **dark** 62:5 | 239:19 | 168:1,21 | 76:5 | 133:22 |
| **data** 71:18 | 241:19 | 169:2 | 149:19 | **demonstr...** |
| 71:23 72:1 | 242:3 | **debunk** | 153:9 | 50:2 |
| 72:2 75:12 | 246:4 | 122:17 | 210:17 | **Dempsey** |
| 75:23 | 247:11 | 129:2,12 | **decks** 265:18 | 24:15 27:1 |
| 80:13 81:2 | 249:17 | 129:14,15 | 265:22 | 45:15,16 |
| 81:10 | 250:6,16 | 131:1,8 | **Declaration** | 45:19,20 |
| 150:23,24 | 254:10 | 132:1,5 | 264:6 | 57:3 |
| 150:25 | 257:8 | **debunked** | **declare** | **department** |
| 186:13 | 272:4 | 124:25 | 273:12 | 6:19 7:1,2 |
| 201:15 | **dated** 61:18 | 125:2 | **deemed** 212:9 | 7:8 8:18 |
| 204:3,12 | 63:1 | 127:11 | **Defects** | 8:23 25:11 |
| 221:21,21 | **dates** 49:18 | 130:9,12 | 223:17 | 25:16 |
| 224:25 | 132:2 | 131:22 | **defend** 10:6 | 237:12 |
| 225:3 | **day** 28:4 | 132:25 | **defendant** | 238:20 |
| 260:7 | 32:22 | 134:7,20 | 9:2 | 271:5 |
| 263:8,10 | 47:10 | 134:24 | **defendants** | **depending** |
| **date** 8:2 | 77:18 | 135:3,10 | 1:11 8:19 | 17:5,23 |
| 84:19 | 230:4 | 135:11 | 8:19,24 | 181:14,18 |
| 85:10,13 | 270:16 | 137:5 | 9:2 31:6 | 244:23 |
| 111:10 | 273:14 | 138:13,17 | **defending** | **deploy** |
| 118:18 | **days** 27:18 | 157:21 | 10:5 | 223:10 |
| 126:11 | 164:11 | 171:2 | **defense** | **deployed** |
| 131:18 | 173:3 | **debunking** | 102:13 | 61:15 |
| 135:9 | 238:1 | 3:15 | 268:3 | 107:20,21 |
| 138:25 | 253:16 | 119:15 | **definitely** | 123:23 |
| 139:2 | 271:17 | 124:14 | 109:22 | 223:4 |
| 141:9 | **DC** 6:12,21 | 126:23 | 121:19 | **deposed** 9:13 |
| 145:4 | 7:3 271:6 | 139:1 | 159:20 | **deposition** |
| 150:13 | **deal** 87:9 | 140:17 | 183:6 | 1:13 2:7 |
| 152:20 | 207:22 | **December** | 216:10 | 5:23 8:3,7 |
| 155:24 | 239:10 | 189:7,12 | 222:19 | 21:18 |
| 163:16 | **dealing** | 190:5 | 226:20 | 26:23 |
| 166:5 | 10:18 | 195:11,23 | 229:14 | 31:10,14 |
| 171:18 | 83:17 | **decide** 89:7 | 256:2 | 93:9 94:17 |
| 173:23 | **dealt** 256:13 | 89:10 | **definition** | 118:3 |
| 179:12 | **Dear** 271:9 | 102:4 | 203:17 | 152:12 |
| 187:12 | **death** 168:4 | 135:13 | **degrees** 12:9 | 270:6,8,9 |
| 189:5 | 168:12 | **decided** | **DEKALB** 270:3 | 271:10 |
| 196:19 | 169:2,5 | 57:18 74:4 | **delay** 28:7 | 273:6,8,11 |
| 200:18 | 170:16 | 238:4 | **delete** 75:15 | **depth** 175:1 |
| 205:14 | 185:24 | **decides** | 157:9 | **DeSalvo** |
| 208:20 | **deaths** 53:23 | 229:4 | **deleting** | 193:6 |
| 219:22 | 58:7 62:7 | **Deciding** | 75:17 | **describe** |
| 221:6 | 76:16 | 143:12 | **demand** | 249:25 |
| 226:7 | 82:18 | **decisions** | 194:25 | **described** |
| 229:5 | 140:8 | 89:2 | **Demi** 108:1 | 47:5 59:6 |
| 232:25 | 146:2 | 211:18 | 115:11 | 59:21,25 |

**CAROL CRAWFORD  11/15/2022**

96:13
130:22
142:6,11
189:19
212:3
describes
103:17
describing
55:16
155:15
description
2:5,6 50:3
95:23
130:18
design 11:19
233:12,16
233:17
design/c...
27:21
designer
40:14
desired
271:14
detail 32:13
73:14
133:20
detailed
51:24
169:4
details
110:2
149:5
150:20
153:15
224:24
determine
11:22
110:24
161:21
170:20
determined
114:13
determining
89:14
develop 59:5
109:9
developed
57:19 71:8
developing

42:13
56:17
development
11:17
105:14,15
108:2,3
115:20
device 35:24
devices
213:24
differed
17:22
140:12
difference
220:7
differences
17:15
different
23:14
44:21
47:21 65:3
77:9 78:24
79:8
107:17
120:11
129:24
141:3
142:5
147:10,20
147:24
149:16
172:6
175:17
187:6
198:9
204:8,11
220:5
259:1
difficult
97:6 173:4
difficulty
42:9
digital 11:8
12:6,25
13:19,24
13:25
14:12,14
14:17,20
14:24 15:3

15:11,14
32:16,17
43:3,4
83:24 87:2
233:21
243:25
247:19
249:3
dir- 120:22
direct 18:17
19:12,14
63:13
93:22
165:13
166:11
182:6
205:13
234:5
238:16
242:15
250:13
directed
80:19
199:4,10
199:19
directly
19:17 74:9
77:10
101:12
113:20
123:25
124:5,9
129:5
130:21
147:11,12
238:19
251:16
director
11:7,9,12
11:21
18:25 19:8
32:7 83:24
87:2
107:11
120:19
183:5
disclosure
7:21
discovery

100:15
236:6,7,19
discuss
66:11 74:2
76:4 77:24
80:1 84:6
84:9 95:11
105:7,13
105:15
170:3
175:1
180:10
182:23
184:7,24
228:24
233:14
253:10
258:19
260:17
263:13
discussed
19:22 30:8
38:8,10
53:11
57:25 58:4
59:10
60:13
62:17 72:7
77:20
78:11
81:10 83:9
83:13
116:5,25
117:7
130:16
133:2,10
135:23
138:19
141:1
142:2
145:13
147:2
148:4,14
150:22
151:14,17
174:17
181:24
185:20
198:18

203:5
204:5
208:4,15
208:19
213:15,19
222:10
223:6
225:22
240:6
244:10
263:20,22
discussing
37:14
58:10,12
64:17
79:24
82:25 83:5
105:9,12
119:25
130:21
148:18
151:7
180:12
184:15
204:13,24
212:24
230:19
discussion
49:12
52:11
58:15 59:3
133:12,13
151:2
182:18,25
184:9,11
185:8
206:21
260:16
discussions
18:8 64:19
132:15,16
213:16
244:20
261:19
disease 1:17
6:15 7:6
7:12
190:17
Diseases

**CAROL CRAWFORD 11/15/2022**

107:14
160:22
display
188:22
distributed
212:16
distribu...
52:19
58:17
61:14
62:22
District 1:1
1:1 8:5,6
distro 52:18
61:12
division 1:2
11:7,8,14
12:19,23
12:25 13:8
13:8,10,14
13:17,18
13:19,25
14:4,20,24
15:4,5,11
15:14 19:8
19:9 29:21
32:7,18
divisions
14:1
doc 225:20
doctors
122:25
document 3:9
21:16
25:23 33:8
41:22
47:15 49:7
54:9 67:20
76:23
78:18 86:6
91:4,6
94:9 96:1
99:23
100:14
143:17
145:9
146:12
152:15
158:6,23

161:17
162:17
163:2
165:2,12
165:16
167:24
168:14
169:13
206:18
238:14
249:23
documents
32:23
47:19
92:22
93:10
94:11
99:18
117:5
132:7
236:7
doing 9:19
14:2 29:15
38:14
57:21
100:23
116:9
142:5
144:11
158:14
162:20
174:22
178:21
182:7
200:3
210:3
224:22,23
232:13
239:6
244:6
248:24
258:5,20
265:4,16
268:20
domain 18:14
29:22
Door-to-...
144:20
dosage 255:8

doses 255:13
Double 62:10
doubt 56:22
108:25
Dr 6:6,6,6
125:20
draft 15:24
drafted
210:17,18
246:20
drafts 41:17
dragged
151:12
drawing
176:4
driven 146:2
drop 219:5
drop-down
186:18
drop-downs
215:21
due 84:8
duly 9:6
270:9
duties 11:13
15:13
32:10
101:14,17
duty 15:10
dysfunction
128:8

_____

E

E 5:9 45:4
171:22
239:20
270:1,1
e.g 157:3
162:12
earlier 24:6
60:23
92:23 93:8
109:16
116:25
120:10
125:9
132:15
133:2
142:7

147:2
149:11
157:20
180:14
198:6
203:5
204:5,14
208:4
210:18
224:11
229:9
233:22
236:14
early 17:10
19:21 20:1
22:15
147:13
192:6
197:12
253:11
260:18
easier 18:12
23:21
27:22
129:8
167:6
easiest
170:3
EAU 4:3,5
163:19
edit 42:2
editing
47:12,19
47:20
education
11:25
educational
52:25
Edwards
265:9
effect 38:12
139:16,17
231:8
effective
255:14
effectively
54:20
effects 54:1
58:8 65:5

76:6 140:7
164:8,10
164:12
effort 35:11
40:16
177:2,8
180:2
efforts 2:11
15:16
27:15
33:12 34:1
eight 111:12
Eisman
222:22
either 43:4
61:6 65:21
104:22
113:15
125:10
136:19
147:7
149:1
176:19
181:2
197:21
230:22
241:3
elderly 3:10
electronic
20:5,6
30:17
56:24
electron...
136:21
element
157:25
else's 206:5
email 4:1
5:2,10,15
18:3 20:5
22:14,18
23:2,3,7
23:12,13
23:15,21
24:3,12,19
25:3,18
27:11
28:21,23
30:17

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 33:11 34:6 | 201:24 | **emergency** | 77:23 78:1 | **errata** |
| 34:6 35:12 | 202:8 | 42:8,19 | 78:8 | 271:12,14 |
| 35:15,20 | 204:22 | 59:2 | 110:12 | 271:16 |
| 39:2,8 | 213:10 | 137:10,12 | 197:20 | 272:1 |
| 40:3,7,8 | 216:4,8,12 | 156:25 | 243:4 | **especially** |
| 43:20 | 216:20 | 160:1 | **engine** | 32:15 55:5 |
| 44:19,21 | 218:1 | 169:18 | 193:22 | **Esq** 6:2,8,17 |
| 44:23 45:1 | 219:9 | **emphasis** | 194:11,13 | 6:18 7:2,5 |
| 50:14 51:1 | 220:7 | 3:10 | 194:13 | 7:6,7,11 |
| 51:12,18 | 225:19 | **employed** | **engines** | 271:4 |
| 57:20 58:4 | 226:15 | 137:19 | 194:3 | **establish** |
| 60:6 62:3 | 230:15 | **employee** | **English** | 242:9 |
| 63:1 68:3 | 238:8,22 | 13:21 14:8 | 163:8 | 245:14 |
| 68:11 | 241:12 | 222:8 | **enroll** | **established** |
| 72:21,22 | 243:17 | **employees** | 211:21 | 77:7 |
| 72:22 73:4 | 244:15 | 97:19 98:8 | 214:4,9 | 257:19 |
| 73:25 75:8 | 248:3,22 | 98:18 | 215:1 | **et** 1:4,10 |
| 75:10 | 250:16,18 | **employers** | **enrolled** | 197:10 |
| 77:19 85:3 | 250:25 | 137:20 | 216:20,23 | 201:5 |
| 85:11,13 | 254:2 | **employment** | 218:2 | 271:7,8 |
| 85:15 | 257:14 | 11:4 12:1 | **enrollment** | 272:2,3 |
| 91:20 | 261:10 | 137:21 | 137:21 | **EUA** 137:6,9 |
| 92:24 | **emailed** | 138:3 | 138:3 | 156:2,21 |
| 96:20,20 | 173:14 | **enabled** 71:8 | **ensure** 33:17 | 167:3 |
| 98:16 | 253:2 | **enclosed** | 33:18 | **European's** |
| 114:1 | **emails** 2:8 | 271:10,11 | 237:20 | 164:21 |
| 119:3,6,9 | 2:10,12,15 | **Enclosures** | **enter** 219:3 | **Eva** 239:8 |
| 119:14 | 2:17,19,22 | 271:25 | 219:4 | **evaluate** |
| 120:23 | 3:1,2,4,11 | **ends** 124:18 | **entered** 71:3 | 220:23 |
| 121:2,2,25 | 3:13,14,16 | 206:1 | **enters** 26:22 | **event** 10:21 |
| 123:19,21 | 3:19,22 | 263:14,15 | **entire** 15:17 | 34:15 |
| 125:9 | 4:2,5,8,10 | **enforce** | **entity** 89:20 | 123:10 |
| 126:21 | 4:11,13,15 | 104:23 | **environment** | 125:24 |
| 137:1 | 4:17,18,20 | **enforcement** | 148:15 | 136:25 |
| 146:10 | 5:1,4,5,7 | 95:25 | **envision** | **events** |
| 150:15 | 5:8,12,14 | 105:8,14 | 177:4 | 122:23 |
| 153:4,6 | 5:17 21:3 | 105:16 | **epidemio...** | 123:1 |
| 159:11,19 | 32:6 61:17 | **engage** 74:2 | 12:16 | **eventually** |
| 160:8 | 67:22 79:6 | 74:4 77:16 | **equating** | 30:1 |
| 161:25 | 79:20 83:3 | 184:15,24 | 137:6 | **every-ot...** |
| 163:4 | 83:6 97:1 | 185:11 | **equity** | 180:8 |
| 166:12 | 97:6 99:11 | 234:6 | 230:11,17 | **everybody** |
| 167:22 | 103:13 | **engaged** | 230:21 | 136:17 |
| 172:3,21 | 134:4 | 52:23 | **erectile** | 241:15 |
| 174:4 | 161:2 | 175:24 | 128:8 | 268:11 |
| 178:22 | 203:6 | **engagement** | **Eric** 1:3 | **evidence** |
| 189:11 | 236:11,18 | 53:16 | 265:8 | 79:2 96:4 |
| 197:21 | 248:6 | 78:11,14 | 271:7 | 108:22 |
| 200:6,24 | 254:21 | **engaging** | 272:2 | 110:8 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 120:14 | 204:21,22 | 100:19 | 199:3 | **experiment** |
| 137:23 | 209:8 | 102:22,25 | 200:15,17 | 131:1 |
| 138:6 | 210:20 | 112:5,5,15 | 200:19 | 132:4 |
| 142:25 | 265:24 | 112:19 | 205:17,18 | 137:8 |
| 146:7 | **exchange** | 113:3,6 | 205:19 | **experiments** |
| **evidence...** | 16:14 40:3 | 114:22 | 206:14 | 137:3 |
| 255:3 | 145:17 | 115:8 | 211:6 | **expert** 50:21 |
| **evolving** | 146:10,22 | 118:5,7,9 | 219:19,21 | 108:18 |
| 103:18 | 189:11 | 118:20,22 | 221:3,5,6 | 109:8,22 |
| **ex** 1:3 271:7 | 197:15 | 119:4 | 226:4,7 | 123:5 |
| 272:2 | **excuse** 16:22 | 120:1 | 237:2,4 | 129:21 |
| **exact** 80:20 | 167:11 | 121:11 | 239:13,16 | 133:18 |
| 200:5 | 172:12 | 125:8 | 241:17,19 | 134:2 |
| 246:3 | 199:10 | 126:8,12 | 243:7 | 146:4,8 |
| **exactly** | 221:22 | 126:14 | 247:7,9 | 183:19 |
| 31:18 | 238:9 | 131:13 | 248:12 | 214:15 |
| 88:15 | 240:18 | 133:8 | 249:7,9 | 222:20 |
| 135:17 | **excuses** | 135:1,4 | 254:4,8 | 252:2 |
| 216:1 | 247:4 | 136:6,10 | 256:19 | **expertise** |
| 238:25 | **Executed** | 136:11 | 257:4,7,14 | 32:20 |
| **Examination** | 273:14 | 138:19,23 | 258:4 | 137:14 |
| 2:2 9:10 | **exhibit** 2:6 | 138:24 | 269:6 | 138:8 |
| **EXAMINAT...** | 2:7,8,10 | 141:6,7,9 | **exhibits** 2:5 | 140:14 |
| 2:1 | 2:12,15,17 | 141:19 | 5:21 118:1 | 143:5 |
| **examine** | 2:19,22 | 144:13 | 125:18 | 164:25 |
| 197:6 | 3:1,2,4,6 | 145:1,4 | 140:19 | 259:2 |
| 201:2 | 3:7,9,11 | 149:22,23 | 183:4 | **experts** |
| **examined** 9:6 | 3:13,14,16 | 150:6,9 | 184:4 | 108:8 |
| **example** | 3:19,22 | 152:16,22 | 268:22,23 | 113:24 |
| 15:21 | 4:1,2,5,7 | 155:7,9,10 | 268:25 | 114:24 |
| 64:21 | 4:8,10,11 | 155:22 | **exist** 13:15 | 115:7 |
| 79:12 | 4:13,15,17 | 163:13,15 | 48:19 | 121:12,18 |
| 149:19 | 4:18,20 | 163:23 | 126:4 | 123:20,20 |
| 207:15,24 | 5:1,2,4,5 | 164:17,19 | 227:17 | 124:22 |
| 217:22 | 5:7,8,10 | 165:25 | **existed** 12:7 | 130:11,17 |
| 265:3 | 5:12,14,15 | 166:1,2,6 | **existing** | 132:17 |
| 266:4 | 5:17 21:12 | 171:15,20 | 169:20 | 150:19 |
| **examples** | 21:14 22:5 | 171:21,25 | 174:25 | 151:9,19 |
| 90:22,22 | 22:8 30:22 | 173:9,20 | **expect** | 151:20,21 |
| 149:7 | 32:1 33:2 | 173:23 | 155:13 | 152:8 |
| 182:2 | 33:4 38:18 | 179:9,11 | 192:2 | 182:22 |
| 197:5,7,8 | 38:20 | 182:12 | **expectation** | 184:20 |
| 199:11 | 43:10 44:1 | 183:3 | 88:3 | **Expires** |
| 200:1,11 | 44:2 49:1 | 187:9,11 | **expected** | 270:25 |
| 200:20 | 49:4,5 | 187:18 | 34:16 | 273:24 |
| 201:1,2,4 | 60:3 62:2 | 188:25 | **expecting** | **explain** |
| 201:12,14 | 67:4,12,14 | 189:2,4 | 248:19 | 251:16 |
| 201:24 | 85:5,6 | 196:15,17 | **expedited** | **explained** |
| 202:12 | 91:1,7,8 | 196:18 | 214:10 | 78:25 79:7 |

**CAROL CRAWFORD  11/15/2022**

210:16
explaining
 148:16
explains
 195:14
 248:14
explanat...
 130:16
explanatory
 130:13
explore
 144:6
expressed
 101:19
extension
 200:21
extent 93:18
externally
 65:18
extreme
 42:18
extremely
 19:24

———————
       F
———————
F 270:1
Face- 180:12
Facebook 5:4
 16:5 18:11
 20:24
 22:14
 24:13,19
 25:10,12
 27:13
 29:17
 33:12
 34:15,23
 36:16,17
 36:25 37:6
 37:11
 40:14
 42:18
 44:18
 46:12
 48:16,17
 48:19
 49:13 50:6
 50:18
 54:23

55:10,14
57:6 58:12
60:11
61:22
62:18 63:3
63:5 64:11
71:2 73:22
74:8,10
77:25
78:22
79:19 80:8
80:14 82:9
82:10 83:4
83:7,18
86:4 87:14
87:16 88:3
88:20,24
89:16,22
90:7,19
91:23
95:18,20
98:20,24
99:2,7,8
103:14,22
103:25
104:2,23
112:21
113:11
114:8
117:1,16
119:8,11
124:5
132:9,14
135:2,11
135:14
138:12
144:9
148:2,18
149:14
150:16
151:9
153:1
154:7
155:14
156:5
164:24
179:4
181:3
221:25

222:8,12
222:13,19
222:20,21
223:21
224:5,15
224:21
226:19
231:13
232:15
237:14
240:2
242:5
245:22
249:2
259:22,23
261:7
263:2
Facebook's
 2:10 46:19
 103:11,12
 139:7
 151:22
fact 115:22
 134:16
 168:10
 175:11
 210:17
facts 58:2
 79:1 94:7
 96:3 110:7
 137:22
 138:6
 142:24
 153:10,24
 154:4
 158:16
 159:10,10
 160:9
 220:13,17
 264:3
fade 10:10
fair 38:20
 119:19
 130:2
 132:9
fairly
 232:17
fall 38:8
falling

53:14
false 106:11
 108:21
 116:8
 117:18
 120:13
 139:11,25
 157:2,16
 158:20
 159:5,12
 159:21
 162:11
 164:2,6,24
 168:5
 169:24
 170:12
 255:5
familiar
 85:22
 200:12
 206:19
FAQ 109:5
 129:4,10
 134:14
far 22:23
 65:8 204:3
 246:10
fashion
 171:11
fast 81:8
faster 28:9
fatality 3:9
FB 2:8 3:14
 139:1
 221:19
 225:3
FDA 137:11
 156:24
 159:25
 167:2
 169:17
 201:15
 203:21
 204:2
feature
 157:5
February
 16:19 18:5
 22:15 60:9

61:18
63:17
166:8,15
167:8
171:23
172:10
federal 92:2
 95:19
 193:1,10
 232:5,18
feed 54:25
 227:5
 228:10
feedback
 27:17
 106:10
 161:10
feeds 88:13
 212:16
feel 32:24
 95:22
 132:8
 146:9
 149:16
 151:11
 188:16
 203:9
 247:22
 249:10
 258:13
feels 206:19
fellow 24:6
felt 88:16
 161:20
 215:21
 217:3
female 26:11
 28:11
filing
 271:18
final 35:20
 135:10
 253:14
finally
 134:6
 245:7
 265:11
find 18:12
 70:21

**CAROL CRAWFORD 11/15/2022**

171:4
189:22
219:11
231:9,10
271:10
**finders**
234:16
**finding**
72:15
149:10
**fine** 82:15
93:14
96:19
102:21
165:9
198:11
**finish** 65:23
**finished**
67:15
**finishing**
256:23
**first** 9:6
17:21,22
18:2,9
22:22
25:20
33:11 39:7
45:25
49:20,24
51:25 56:1
56:8 67:21
67:23,25
91:21
106:10,24
110:19
120:8
125:7
133:21
141:23
142:11
144:12
146:20
150:15
151:15
156:8,13
157:23
167:25
170:13
177:20

178:17,20
179:1
197:23
207:2
208:11,18
208:23
213:2
222:17
230:16
235:24
242:12,14
242:17,20
245:16
246:5
247:14
257:14
266:13
**first-** 54:1
**fit** 47:23
**five** 32:8
167:3
169:16,19
171:22
238:1
**five-minute**
30:20
205:3
**fix** 102:3
**flag** 87:10
87:25
89:14
98:19 99:2
99:7,9,10
113:1,12
206:22
218:23
226:25
264:4
**flagged** 88:4
89:23
106:3
111:13
112:21
113:10
117:21
212:13
264:5,20
264:24

**flagging**
86:3 87:13
88:1,21,24
90:6
101:18
105:24
106:1,4,9
106:17
264:2
**flags** 212:13
**flipped**
149:3
**floor** 98:7
**flow** 214:10
**flu** 29:13,15
29:19,19
29:20
**focus** 256:5
**focuses** 45:9
**focusing**
32:16
256:6
**folks** 39:6
41:17
107:9
108:16
125:17
245:11
252:8,14
253:3
**follow** 82:15
121:16
126:20
182:17
187:14
188:4
193:23
210:21
**followed**
134:3
**following**
4:3,5
51:22
53:14
56:21
100:2
156:2
163:18
169:5

182:15
193:20
**follows** 9:7
**followup**
4:13,15
30:15
51:18
119:16
179:14
197:21
234:17
263:25
**football**
28:16
**Forbes** 53:19
**force** 42:5,5
**Ford** 7:5
**foregoing**
270:6
273:6,13
**foreign**
140:12
**forget** 268:7
**forgive** 21:1
**forgotten**
222:11
**form** 171:11
273:7
**format** 47:21
63:25
106:25
182:9
184:3
209:12,13
209:14
210:23
229:16
240:25
241:1
243:5
**formatted**
207:18
**formatting**
248:3
**forms** 219:5
**formulate**
165:5
**forth** 39:20
68:4 270:8

**forward**
35:17 46:1
49:15
59:15
197:4
200:25
247:22
**forwarded**
31:8 41:18
61:6,6
62:23
102:16
**forwarding**
44:22 61:7
**forwards**
216:5
**Foster** 7:11
**found** 266:21
266:23
267:4
**foundation**
112:23
**four** 201:12
**frame** 132:3
262:20
**fraud** 197:8
200:2
201:4
**fraudulent**
197:9,9
201:4,5,15
203:17
**Fred** 181:9
250:10,12
250:25
251:3,25
252:9
254:25
**free** 32:24
247:22
**frequency**
180:18
**frequent**
2:13,16
4:7 39:10
43:22
44:10
**Friday**
177:21

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 185:17 | 53:15 | **getting** | 121:15 | 46:25 56:8 |
| 208:11 | **gas** 205:6 | 18:10 | 129:19 | 67:16 |
| 212:24 | **Gateway** | 20:14 37:6 | 130:6 | 73:20 |
| 213:4 | 264:15 | 90:12 | 132:14 | 74:20 |
| 242:12 | **GBS** 139:15 | 138:2 | 141:8 | 81:16,25 |
| 245:17 | **Genelle** | 145:23 | 156:24 | 95:8,21 |
| 246:2 | 85:17 | 147:11 | 159:11 | 97:25 |
| **front** 32:23 | 96:21 | 159:22,24 | 164:19 | 102:2,3,8 |
| 33:2 | 100:1 | 160:2 | 173:4 | 104:13 |
| 166:17 | 238:8,8 | 164:7 | 187:22 | 114:1 |
| 208:22 | **general** 1:4 | 181:25 | 188:5 | 116:14 |
| 245:7 | 1:16 9:1 | 190:3,24 | 204:19 | 118:9 |
| 269:1 | 29:5 38:2 | 204:18 | 210:20,20 | 121:14,16 |
| **FTC** 137:11 | 38:17 46:6 | **Ghosh** 7:6 | 214:25 | 126:17 |
| **full** 52:21 | 46:7 54:15 | **Gilligan** | 239:15 | 129:15 |
| 74:15 76:1 | 64:19 | 6:17 8:22 | 253:11 | 131:15 |
| 81:11 | 75:13 | 8:22 66:25 | 256:19 | 136:16 |
| 137:7 | 83:10 | 67:3,6,9 | 260:23 | 141:7 |
| **fuller** | 110:14 | 84:20 | 261:3 | 145:17 |
| 263:12,23 | 117:3 | 85:24 91:6 | 262:16 | 146:20 |
| **fully** 44:17 | 149:1,1 | 93:19,25 | 263:11,23 | 147:12 |
| 218:15,16 | 169:1 | 94:5,24 | 268:20 | 155:9 |
| **fundings** | 188:20 | 95:5,9 | **given** 69:17 | 164:11 |
| 109:25 | 191:19 | 102:5 | 99:18 | 166:12 |
| **further** | 209:9 | 112:2 | 109:25 | 167:24 |
| 32:22,23 | 217:19 | 118:10,12 | 130:20 | 169:12 |
| 52:13 | 253:12 | 118:20 | 132:3 | 176:9 |
| 126:21 | 271:7 | 133:4,7 | 137:12 | 179:21,25 |
| 158:20 | 272:2 | 136:18,21 | 270:10 | 182:4 |
| 192:2 | **General's** | 163:10 | **gives** 155:1 | 187:2 |
| 228:24 | 6:2 | 165:16,20 | **giving** 49:13 | 188:21 |
| 268:1,2 | **generally** | 165:23 | 169:18 | 189:2,10 |
| 270:11 | 16:11 | 206:8 | 241:11 | 199:17 |
| **future** 80:1 | 17:14,15 | 231:22 | 266:19 | 211:1 |
| 141:25 | 38:11 | 235:25 | **glad** 173:18 | 212:22 |
| 184:4 | 48:11 | 241:15 | 196:4,6 | 214:22 |
| 211:22 | 56:15 | 249:13 | 247:1 | 221:23 |
| **fuzzy** 224:23 | 58:11 | 256:21 | **global** 140:6 | 226:22 |
| **FYI** 70:6 | 77:19 | 268:23 | **globally** | 231:7 |
| 229:18 | 89:11 | 269:14 | 157:2 | 241:24 |
| ――――――――― | 96:16 | **gist** 116:15 | 159:21 | 243:15 |
| **G** | 140:23,25 | **give** 11:11 | 162:11 | 247:9,14 |
| **gain** 71:11 | 161:20 | 22:6,6,10 | **go** 11:24 | 252:6,23 |
| **Gangolly** | **Gennelle** | 23:22 | 13:7,23 | 254:6,6 |
| 50:22,23 | 86:12 | 30:21 | 18:17 20:4 | 257:13 |
| **gaps** 54:18 | **Georgia** 1:18 | 38:22 | 22:22 | 266:10 |
| 56:18 58:1 | 7:20 12:10 | 66:20 | 23:18 31:5 | 268:25 |
| 81:3 | 12:11 | 79:12 91:3 | 31:23 33:3 | **goal** 33:23 |
| **garnered** | 270:2,5,24 | 104:8 | 41:21 44:5 | 88:25 |

CAROL CRAWFORD  11/15/2022

266:16
**goals** 266:20
**goes** 53:2
  65:1 106:2
  120:16
  127:25
  157:11
  160:4
  218:22
**going** 9:15
  10:6 17:25
  20:3 22:4
  34:13,16
  34:20 37:1
  37:1,11
  40:11 47:8
  50:21 51:2
  52:5 58:19
  60:14
  66:19
  77:16
  79:24 80:3
  88:18
  90:19 95:7
  107:8
  108:6
  111:25
  115:14
  116:14,14
  124:24
  127:24,25
  138:16
  141:24
  147:11
  154:2
  159:13
  160:16
  161:5,6
  164:19
  165:21,22
  165:25
  166:1
  169:7
  172:24
  173:12,12
  173:16
  177:9
  182:4
  184:20

185:1
186:20
191:19
192:11
194:18,20
195:15
218:2
220:7,15
223:5
236:16
245:3
251:6
252:6
257:6
268:20
**good** 9:12
  19:2 57:14
  75:1 76:12
  79:13,14
  85:24
  93:14
  153:24
  159:12
  161:11
  177:20
  178:17
  197:19
  209:13
  220:16
  253:6
  260:25,25
**Goodness**
  152:9
**Google** 16:6
  20:25
  174:7,12
  175:16,24
  177:2,7
  179:3,6
  180:7,17
  180:19
  181:3,9,11
  183:10,14
  183:24
  185:9,13
  189:25
  191:5,8,11
  193:11,19
  194:2,10

194:22,23
243:22
245:10,22
245:23
250:3,15
251:17
253:4
254:15
**Google/Y...**
  174:23
**Googled**
  183:13
**gosh** 195:22
  224:20
**gotcha**
  136:23
**gov** 229:14
**governance**
  15:23
**government**
  23:13,25
  33:19
  89:22 90:6
  96:22
  148:22
  233:17
**governments**
  137:19
**governor**
  144:23
  264:21,23
**grapevine**
  245:18
**graphic**
  15:17
**graphics**
  11:18 14:2
**great** 27:24
  74:12 87:9
  207:22
  227:4
  230:9
  245:3
  264:5
**greatly**
  27:19
**Griffis**
  18:25
**ground** 9:16

**grounds**
  168:5
**group** 14:4,7
  14:8,10
  41:16 45:6
  45:8 48:20
  48:20
  55:12,21
  55:22,24
  56:1,3,7
  56:11
  58:21
  59:16 61:5
  104:14
  116:15
  124:1
  156:4
  263:6
  269:3
**groups** 16:13
  18:22 46:3
  46:13,16
  52:25 54:2
  54:22,22
  54:23,24
  55:2,4,5,5
  55:6,7,11
  55:14 61:9
  96:14
  237:13
**growing**
  38:13
  154:4,11
  154:17
**Gruner**
  254:14
**guess** 43:25
  96:12
  126:1
  141:15
  156:10
  172:18
  179:22
  187:25
  194:16
  238:1
  262:25
**guessing**
  193:17

**guidance**
  129:7
  193:20,23
  194:4
  195:20
  196:10
  238:19
  250:2
**Guidarini**
  239:9
**guide** 228:21
  229:4,8
  230:8
**guidelines**
  15:25 65:4
**guides** 5:5
  226:9
  227:1,4,8
  227:10,16
  228:3
  232:11
**Guides'**
  226:16
**guiding**
  103:15
**Guillain...**
  139:14
**guy** 203:8
**guys** 262:23

---

**H**

**habit** 28:8
**HAN** 153:13
  153:16
**hand** 21:15
  22:4
  111:24
  122:6
  148:21
  270:16
**handed** 25:21
  102:24
**handle** 19:25
**handled**
  111:4
  140:23,25
**hang** 72:23
  73:2
  160:13

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| happen | 247:10 | 54:16 | 159:6 | 251:18,20 |
| 185:23 | heads 9:18 | 57:24 71:3 | 170:1 | highlighted |
| happened | 192:24 | 104:23 | hesitant | 62:4,5 |
| 13:12 83:2 | heads-up | 105:2,22 | 122:18 | 142:18 |
| 93:12 | 244:2 | 107:2 | hey 176:25 | 143:13 |
| 114:6 | health 7:1,2 | 111:4 | 239:2 | 144:20 |
| 124:11 | 7:8 45:6,8 | 115:21 | HHS 9:1,2 | 148:20 |
| 160:25 | 45:10,11 | 119:15 | 232:7,20 | 228:9 |
| 178:9 | 45:14 51:7 | 124:13 | 233:12 | highligh... |
| 212:8 | 63:21 89:1 | 126:4,23 | 259:12,22 | 189:23 |
| 215:8,20 | 89:2 140:1 | 139:1,10 | 260:9,17 | highlights |
| 246:10 | 140:12 | 164:6 | 260:19,22 | 52:22 |
| happening | 153:17,18 | 174:19 | 261:3,8,15 | 62:15 |
| 79:5 97:17 | 186:1 | 175:4,7 | 261:17,25 | Hines 6:7 |
| 190:2 | 192:24,25 | 188:21 | 263:4 | 8:15 |
| 195:23 | 193:3,9 | 214:11,13 | Hi 45:22 | 264:17 |
| 196:7,8 | 218:22 | 214:14,19 | 51:22 | history 12:1 |
| 216:7 | 230:11,16 | 218:18,22 | 63:15,15 | hit 32:15 |
| happens | 230:21 | 219:12 | 68:14 73:4 | 216:17 |
| 144:17 | 237:13,17 | 237:25 | 74:25 84:4 | hits 17:10 |
| happy 27:21 | 237:18 | 256:7 | 100:2 | HIV 46:4 |
| 45:23 | 238:20 | 266:20 | 126:19 | hoc 180:21 |
| 95:10 | healthcare | helped 161:1 | 166:17 | 180:25 |
| 161:23 | 53:16 58:5 | 196:11 | 176:25 | Hoft 264:15 |
| 214:5,9 | 66:5 | helpful | 197:4 | holiday |
| 228:24 | healthy | 51:20 52:3 | 211:6 | 248:19 |
| 242:16 | 166:21 | 53:10 59:7 | 219:2 | holidays |
| hard 10:16 | 172:8 | 170:23 | 226:24 | 84:8 |
| 20:13 | hear 10:16 | 171:4,5,7 | 252:7 | Holly 239:5 |
| 122:15 | 145:7 | 171:9 | 254:25,25 | honestly |
| 194:21 | heard 28:12 | 197:7,10 | high 6:3 | 227:9,13 |
| 235:14 | 97:22 | 200:2,3 | 42:22 | hope 68:14 |
| 252:18 | 125:24 | 201:3,6 | 53:15 | 70:5 |
| harm 139:11 | 137:25 | helping | 60:20 | 126:19 |
| 234:21 | 217:14,15 | 197:17 | 89:19 | 127:6 |
| harmful | 245:17 | 246:16 | 190:3 | 135:6 |
| 165:15 | 252:7 | helps 53:11 | 255:8,13 | 161:3,6 |
| 168:6 | heart 139:16 | 54:18 58:1 | high-pri... | 166:20 |
| Hatcher 40:7 | heartburn | 127:6 | 16:17 | 230:10 |
| 40:9,13 | 252:8 | 231:10 | high-risk | 253:17 |
| 42:7,17,21 | heavily | 253:15 | 2:13,16 | 266:14 |
| 43:18 | 90:20 | hereinbe... | 39:9 43:21 | hopefully |
| hate 41:11 | hefty 205:15 | 270:8 | 44:10 | 55:22 |
| Haynes 108:1 | held 8:7 | HEREOF | high-volume | hopes 172:7 |
| 115:11 | help 33:23 | 270:15 | 89:11 | hoping 73:19 |
| he'll 230:8 | 34:1,17 | hereto 7:23 | higher 53:9 | 88:23 |
| head 136:2 | 35:10 | hereunto | highlight | 139:10 |
| 165:10 | 37:12 | 270:15 | 29:23 | 229:19 |
| headline | 46:16 | hesitancy | 66:10 | hospital... |

**CAROL CRAWFORD  11/15/2022**

185:24
hospital...
 146:2
 186:14
hosting
 244:24
hour 66:19
hours 28:9
 28:19,19
 73:1,5
 235:12
House 230:13
 230:24,25
 231:12,19
 232:1,4,7
 232:22
 233:2,8,12
 233:19,19
 233:21
 234:5,5,14
 259:10,22
 260:9,17
 261:8,20
 263:4
Human 7:1,2
 7:8
humans
 120:17
Huxley 86:17
███████ @R...
 86:17

I
I-- 148:19
I-H-E-M-E
 20:25
IAA 71:3,5
 109:15
 110:1,12
 110:18,20
 110:22,25
 111:7,11
 175:6
IAAs 109:22
ID 24:22
idea 46:15
 159:12
 187:23
 188:6

220:16
ideally 46:2
identified
 24:6
 103:13
 139:9
 157:12
 177:1
identify
 27:14
 54:18
 67:20
 85:10  91:4
 102:25
 118:17
 145:3
 155:21
 174:20
 175:4
 206:14
 226:13
IDs 97:8
IFB 24:18
Iheme 20:25
 24:7,10
 26:8,25
 33:13
 35:12
 36:12,23
 43:18
 45:22
 50:16
 55:19  57:5
 57:11  58:5
 68:12
 72:20
 79:13  84:3
 86:11
 105:21
 131:17
 237:10
 257:15
Iheme's
 37:11
illness
 41:25
 42:23
imagine 37:8
 68:10

104:15
immediately
 157:1
 160:1
 162:10
immune 4:7
 163:25
Immuniza...
 107:13
 160:21
 253:21
impact 10:24
 167:4
implemen...
 181:12
important
 90:13 95:7
 177:5
 211:11
impressions
 133:14,14
improper
 95:6
improve
 53:12
in-app 222:2
in-depth
 32:16
in-feed
 228:3,5,6
 228:13
Inaudible
 178:6
include 42:9
 188:3
 208:11,13
 209:16,18
 228:23,24
 242:15,21
 245:20
 265:4,8
included
 54:1 58:14
 61:13
includes
 243:17
including
 65:14
 140:8

144:23
 167:1
 170:23
 192:25
 232:20,22
 233:11
 237:18
Inclusive
 120:15
inconclu...
 120:15
 122:4,15
 122:17
 129:25
 130:6
 140:18
incorrect
 229:15
Independ...
 7:3
independent
 234:6
INDEX 2:1
indicate
 271:13
indicated
 115:11
 117:18
indicates
 244:17
Indicating
 31:17
 192:20
individual
 8:14
individu...
 267:18,22
individuals
 146:3
Infection
 3:9
inferring
 213:11
infertility
 76:5
 201:16
 204:16,18
inflamma...
 139:16

influencers
 75:4 80:9
 81:20
info 5:9
 75:11,15
 80:13
 107:8
 208:2
 214:4,5
 219:3
 230:8,11
 230:17
 239:20
 253:12
 258:7
 266:3
inform
 103:16
 138:20
 155:17
 159:8
 164:24
information
 16:15
 18:10,12
 27:16
 34:21
 35:14
 36:23,24
 46:11
 48:22 51:9
 52:6 54:23
 54:24
 55:11 58:1
 59:1 61:4
 62:21
 64:20
 70:24
 71:12
 72:14 75:4
 75:16 79:7
 79:8 81:4
 87:20
 88:18 89:1
 89:4,6,18
 90:13,14
 90:16
 93:21
 98:20

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 107:15,17 | initially | instructed | 73:24 | 199:2 |
| 107:22 | 17:16 | 80:21 | 122:13 | 237:7 |
| 109:3,12 | initiated | 193:19 | 160:8 | issued 153:8 |
| 114:9 | 17:17 | instruct... | 203:24 | issues 3:1 |
| 123:7 | initiative | 40:14 | interrupt | 29:2 59:12 |
| 126:22 | 18:16,19 | instruct... | 9:24 32:24 | 66:11 |
| 130:1 | initiatives | 144:16 | interrupted | 85:12 87:8 |
| 140:2,3 | 27:17 | instructs | 98:8 | 108:12 |
| 142:6 | input 34:21 | 10:12 | intro 221:18 | 207:16,22 |
| 148:25 | 104:8 | intent 220:9 | introduce | 220:13 |
| 154:8 | 111:16 | interact... | 8:11 | 264:3 |
| 159:22,25 | 156:19 | 18:9 29:17 | introduced | item 3:4 |
| 160:3 | 167:7 | interactive | 265:15 | 28:24 |
| 161:22,24 | 171:6 | 187:1 | invite 98:11 | 103:4 |
| 166:22 | 173:2,4 | interagency | 185:7 | 111:12,19 |
| 167:20 | 194:8 | 71:6 | 208:12 | 118:23 |
| 169:11 | 255:3 | 109:20,21 | 209:16 | 126:15 |
| 170:20 | inquired | interest | 221:9 | 136:8,25 |
| 175:8,9 | 69:11 | 58:9 64:3 | 223:24 | 144:19 |
| 182:1,19 | inquiry | interested | 239:21 | 165:13 |
| 183:9,13 | 108:24 | 75:11 | 242:10,16 | 247:15 |
| 183:18 | inserted | 80:12 | 243:25 | items 27:10 |
| 189:17 | 221:15 | 180:1 | 245:15,20 | 30:15 58:5 |
| 190:20 | insights | 228:25 | 247:19 | 65:3 84:6 |
| 192:10 | 63:16 | 253:19 | invited | 88:21,24 |
| 200:4 | 65:15 | 270:13 | 100:11 | 105:21,24 |
| 204:20 | 167:4 | interesting | 116:24 | 106:1,20 |
| 206:23 | Instagram | 65:17 | 210:1 | 111:13 |
| 213:19 | 50:6 62:18 | interface | 212:24 | 117:12 |
| 220:19 | 157:5 | 262:2 | 223:13 | 120:7 |
| 229:19 | 227:1,2,3 | interim | inviting | 128:23 |
| 230:21 | 227:8,12 | 242:14 | 208:9 | 131:2 |
| 237:20 | 227:16,20 | internal | involuntary | 207:7 |
| 238:5 | 227:22 | 239:2 | 137:7 | 221:16 |
| 253:14 | 228:15 | internally | involve | 225:21 |
| 255:4 | 229:10 | 113:16 | 101:14,17 | 226:25 |
| 259:23 | instance | 222:4 | involved | 240:6,9 |
| 264:5 | 18:11 | 243:8 | 32:17 71:1 | |
| 266:6,17 | 114:22 | interpret | 98:14 | **J** |
| 266:18,19 | 115:2 | 223:23 | 101:1,8 | J 6:8 |
| 266:21,22 | 135:16 | interpre... | 160:23 | James 6:17 |
| 267:3,4,7 | 183:14 | 159:7 | 215:13 | 8:22 |
| infrastr... | 224:8 | interpreted | 234:1 | James.gi... |
| 174:19 | instigate | 50:23 | 235:5 | 6:23 |
| 175:4,11 | 17:13,16 | 170:7 | involving | Jan 21:1 |
| ingredients | instruct | 179:1 | 233:10 | 174:7 |
| 65:5 | 57:5,15 | 199:25 | issue 5:7 | 176:6 |
| initial 85:8 | 138:12 | 211:17 | 95:10 | 182:23 |
| 132:14 | 194:2 | interpre... | 122:21 | 184:7 |

**CAROL CRAWFORD  11/15/2022**

189:15
192:22,23
195:17
243:16,22
252:20
253:3
254:16
[blacked out] ...
174:8
**January**
49:16,18
49:21
50:14
55:18
**Jason** 7:14
8:9
**Jay** 8:14
24:15 25:5
26:14
45:19 57:3
57:3
181:17
230:7
264:8
**Jayanta** 6:6
**Jeff** 265:8
**Jefferson**
6:4
**Jen** 83:22
86:21
**Jennifer**
86:24
[blacked out] 45:18
[blacked out]
24:13
**JIC** 72:9,10
183:7
**JIC's** 72:6
**Jill** 6:6
8:15
264:17
**Jim** 264:15
**Jin** 222:7
**job** 107:22
249:3
**John** 6:2,8
8:13 67:1
165:17
265:9

**John.sau...**
6:5
**John.vec...**
6:13
**join** 5:8
14:1 70:5
75:3 108:7
182:22
239:20
242:11
245:16,19
**joined** 30:20
115:11
116:24
**joining**
107:9,11
**joint** 59:1
107:15,16
107:22
233:14
**Jorgensen**
107:11
115:10
183:2
**Joseph** 1:7
7:11 8:5
271:7
272:2
**Josh** 261:17
**jotted**
225:19
**JR** 1:7 271:8
272:3
**Julia** 222:22
**July** 139:3
146:11
**jump** 27:21
**jumping**
120:17
**June** 118:24
126:16,18
126:24
131:20
134:21
135:1,9
142:9,15
144:1
247:15
248:16

**Juneteenth**
248:19
**Justice** 6:19
8:18,23
271:5
_____
**K**
[blacked out] @...
244:15
**Kane** 244:14
**Kang-Xing**
222:7
**Karen** 193:5
**Kat** 35:6,9
37:2,4,20
**Kate** 222:25
**keep** 9:20,24
70:12
**keeping**
246:11
**keeps** 65:1
**Kelly** 50:25
51:1 52:1
60:11
61:22 63:3
63:15
64:23
141:21,23
**Kenya** 7:5
**kept** 38:3
241:8
**Kevin** 18:25
40:7,9,13
41:6
244:14,17
245:1,4,5
245:18
**Kevin's**
40:19
**key** 27:17
72:17
190:2
**keywords**
144:9
**keywords...**
144:5
**khatcher...**
40:7
**Kheriaty** 6:6

8:15
264:13
**kids** 157:4
161:14
162:4,13
**kill** 168:4
170:15
**kind** 36:9
38:15 52:6
72:9 75:24
90:15
109:24
123:17,17
129:4
133:3,20
153:14
154:3
177:11
198:16
200:9
204:13
210:24
217:20
224:10
230:9
260:5
261:7
**kinds** 98:19
101:18
263:11
**knew** 26:9
88:17 90:7
106:19
107:1
108:12
113:15
116:9,10
126:4
138:18,22
155:16
220:21,25
232:12,15
243:10
263:10
**know** 10:17
17:14,18
17:19
18:11 21:9
25:17

26:16 27:8
28:14,18
30:7,16
33:21
34:10 37:7
37:9,25
38:2,13
41:15 42:3
42:6,7,9
42:11,17
42:21,24
43:1,2,6
44:24
45:25 46:5
46:8,22
47:4,19
48:1,4,7,9
48:12,17
49:9 50:18
52:15
53:11
54:17
56:13,15
56:25 57:2
57:18
58:23,24
59:4,20
63:23 65:8
65:25 70:1
72:6,25
73:5,10,19
73:24 74:1
74:4,9
75:15,18
77:12,18
77:19,20
77:23,25
78:10,16
79:20 80:6
81:15 82:8
82:13,16
82:17,25
83:1,5,15
84:10
86:12,17
87:19 88:7
88:11,13
88:15
89:10,18

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| 89:19 | 144:4,20 | 208:14 | 111:6 | 153:15 |
| 90:21 | 144:24 | 209:5,18 | 133:23 | **lack** 112:23 |
| 91:23 | 146:6,9 | 210:24 | 165:1 | 137:7 |
| 93:15,24 | 148:10,11 | 211:16 | 176:19 | **Lagone** 103:7 |
| 94:4,9,24 | 148:24 | 212:8,15 | 189:24 | 103:13 |
| 94:25 | 149:4,9 | 212:25 | 190:12 | 105:8 |
| 95:24,25 | 151:4,14 | 213:16 | 192:17 | 119:7 |
| 96:1,10,12 | 151:24 | 215:19 | 195:2 | 121:1 |
| 96:18 97:7 | 152:4,7,12 | 217:2,23 | 218:10 | 125:8 |
| 97:8,18,20 | 153:13 | 218:7,20 | 224:15 | 126:18 |
| 98:10,12 | 154:10 | 221:13 | 233:4 | 127:2 |
| 98:13,18 | 155:3,4,5 | 222:7,13 | 251:2 | 133:2 |
| 99:17 | 157:23 | 224:7,23 | **known** 28:21 | 165:5,14 |
| 100:5,20 | 158:13 | 225:16 | 140:18 | 165:19 |
| 100:21 | 160:12 | 227:16 | 177:15 | 166:14 |
| 101:11,14 | 161:11 | 228:8,21 | 264:22 | 222:16 |
| 101:17,24 | 164:22 | 233:4,23 | **knows** 37:4 | **Lancet** 3:6,7 |
| 101:24 | 165:4,21 | 235:7,18 | 136:17 | 169:4 |
| 103:10 | 167:6 | 238:6,23 | **Kreimer** 1:20 | **Landry** 149:2 |
| 108:23,25 | 170:2,19 | 238:25 | 8:8 270:4 | 265:9 |
| 109:4 | 171:9 | 239:3,8 | 270:22 | **lane** 89:17 |
| 111:7,10 | 172:23 | 240:25 | **Kristen** | **Langone** |
| 111:16 | 173:7,10 | 241:7 | 156:16 | 139:3 |
| 112:18,25 | 174:25 | 242:12 | 160:17,19 | 159:3 |
| 113:1,10 | 175:23,25 | 243:1,11 | 161:1 | **language** |
| 114:1 | 177:12,13 | 243:12,14 | **Kulldorff** | 65:16 |
| 115:1,9,15 | 177:18,22 | 244:12,13 | 6:6 8:16 | **language...** |
| 115:18 | 178:12 | 246:22 | 264:11 | 65:20 |
| 116:3,8 | 180:18,19 | 247:21 | **Kumar** 7:2 | **large** 87:23 |
| 117:14 | 183:5,7,9 | 248:15 | 8:25,25 | 155:2 |
| 120:4,21 | 183:24 | 251:19 | 173:19 | 181:22 |
| 121:9 | 184:13 | 252:5,6,14 | **Kyla** 6:18 | **largely** |
| 122:5 | 185:5,23 | 252:16,18 | 8:17 271:4 | 52:25 |
| 123:8,15 | 186:4,5,19 | 253:15,23 | **Kyla.sno...** | **late** 33:16 |
| 123:19,21 | 188:16 | 255:18 | 6:24 | 36:7 |
| 124:10 | 190:2,8 | 256:4,9,11 | ▓▓ 97:7 | 249:12 |
| 125:19 | 191:20 | 258:10 | | **latest** 63:16 |
| 127:7,22 | 192:5 | 259:3 | **L** | 195:20 |
| 129:6 | 193:3 | 261:9,21 | **L** 6:20 271:5 | 196:10 |
| 130:6,25 | 194:6 | 261:24 | **lab** 4:1 5:2 | 230:8 |
| 131:3,4,8 | 197:25 | 262:16 | 152:24 | **launch** 48:2 |
| 132:13 | 198:2,15 | 263:17,20 | 153:8,11 | 48:5,7,8 |
| 135:5,17 | 199:4,10 | 264:7,10 | 153:12 | 228:3,12 |
| 135:25 | 199:13,23 | 264:12,14 | 199:2 | **launched** |
| 138:1 | 200:2,13 | 264:16,18 | 219:24 | 157:4 |
| 139:21 | 201:21 | **knowledge** | **labels** 76:18 | **launching** |
| 140:16,23 | 202:22,24 | 54:18 | 76:20 77:2 | 27:18 46:1 |
| 142:18 | 203:14 | 104:16,18 | 77:3 82:17 | **Lauren** 50:17 |
| 143:4 | 205:7 | 107:23 | **laboratory** | 50:19 52:1 |

CAROL CRAWFORD  11/15/2022

| | | | | |
|---|---|---|---|---|
| 52:17 | **let's** 10:13 | **letting** 48:7 | 206:16 | 183:25 |
| 262:15,18 | 13:7 16:18 | **level** 50:9 | 219:22,24 | 184:2 |
| 262:19 | 17:10 20:1 | 117:3 | 221:7 | 203:24 |
| **law** 95:25 | 22:17,22 | 234:15 | 226:7,9 | 207:6 |
| **lawsuits** | 25:13 | **leverage** | 237:5 | 217:20,22 |
| 142:16,20 | 26:20 | 174:19 | 239:19 | 224:16 |
| 143:8 | 38:20 39:4 | 175:3 | 241:20,21 | 246:6,12 |
| **lawyer** 236:9 | 46:25 | **Lewinsky** | 247:10 | **listed** 92:24 |
| **lawyers** 9:22 | 49:14 | 246:25 | 254:9,22 | 120:6 |
| 9:23 39:16 | 50:14 | **Lewitzke** | 257:8 | 221:20 |
| **lay** 9:15 | 51:21 56:8 | 83:21 | 272:5,9,13 | 224:3 |
| **layer** 195:3 | 60:8 65:13 | 86:22 | 272:17,21 | **listen** 31:10 |
| **lays** 105:21 | 69:19 | 203:2,3,11 | **line's** | 70:6 |
| **lead** 11:16 | 81:25 86:8 | 216:4,15 | 179:14 | **listened** |
| 24:16,25 | 97:25 | 217:5 | **link** 31:8,11 | 181:17 |
| 35:3 | 102:7,7 | 246:25 | 35:16 | **listening** |
| 139:11 | 107:4 | 247:1 | 48:21 | 31:13 50:4 |
| 159:5 | 118:9 | 265:20 | 102:18 | 52:10 72:3 |
| 164:2 | 119:6 | **Lewitzke's** | 186:17,20 | 90:21 |
| 168:4 | 121:17 | 211:3 | 187:1,19 | 148:13 |
| 170:16 | 126:17 | **Lexitas** 7:14 | 187:19 | 154:21 |
| 181:10 | 129:21 | 8:10 271:1 | 194:8 | **lists** 96:20 |
| 227:10 | 145:17 | 271:23 | 208:1 | 96:21 |
| 249:3 | 146:20 | **Liberties** | 214:19 | 120:8 |
| 259:4 | 149:25 | 6:9 | 227:5 | 157:12,20 |
| **leadership** | 165:11 | **lieu** 198:25 | 251:20 | **literature** |
| 11:14,15 | 166:12 | **life** 143:11 | **linked** 169:3 | 131:5,9 |
| 15:15,16 | 176:5 | **Lindsay** | **LinkedIn** | **litigation** |
| 15:19 | 178:22 | 254:17,18 | 16:6 | 92:23 |
| **leads** 168:12 | 179:11 | **line** 33:10 | **linking** | **little** 10:16 |
| 258:19,23 | 205:25 | 39:7 60:5 | 41:25 | 11:24 |
| **learn** 79:23 | 206:24 | 68:5 91:5 | **links** 191:23 | 12:22 38:2 |
| 110:21 | 211:1 | 103:2 | 219:11 | 39:15 |
| 111:3 | 218:12 | 118:18 | 266:5 | 49:15 63:8 |
| 164:13 | 221:23 | 120:5 | **Lis** 262:25 | 64:15 67:9 |
| 177:4 | 222:6 | 126:11 | 263:5 | 69:19 |
| **learning** | 226:22,22 | 138:25 | **list** 3:12,13 | 85:22 |
| 40:16 | 227:18 | 141:8 | 56:5 61:14 | 130:18 |
| 110:13,23 | 234:9,23 | 150:12 | 62:22 | 151:12 |
| **leaves** 128:4 | 237:9 | 151:21 | 96:20 | 161:5 |
| **led** 161:24 | 241:24 | 152:20 | 97:18 98:8 | 183:15 |
| 204:18 | 243:15 | 155:22 | 117:9 | 189:25 |
| **left** 119:12 | 247:9,14 | 163:16 | 118:23 | 191:14 |
| **legal** 7:14 | 254:6,6 | 166:5 | 119:17 | 205:15 |
| 7:14 8:9 | 257:13 | 173:23 | 126:15 | 208:16 |
| 8:10 271:1 | 261:2 | 179:12 | 131:17 | 214:2 |
| 271:23 | 263:15 | 189:5 | 133:21 | 227:12 |
| **Lepage** 63:5 | **letter** | 196:18 | 158:20 | 261:2 |
| 65:2 | 100:13 | 205:14,20 | 182:20 | 266:3 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| **live** 34:15 | 38:23 | 172:4 | 192:22 | 182:21 |
| 167:10,16 | 43:12  49:3 | 175:12 | 195:4 | **lunch** 102:3 |
| 224:10 | 49:4  50:14 | 215:17 | 216:14 | 102:10 |
| 258:9 | 52:13  58:1 | 265:23 | 222:8 | 109:17 |
| **Lives** 34:24 | 59:24  60:8 | **looking** | 244:2 | **Lynn** 87:3,4 |
| **Liz** 75:2 | 61:17  63:1 | 18:11  21:3 | 248:7 | |
| 80:3  103:7 | 63:9  70:20 | 32:1  40:15 | 252:1,22 | **M** |
| 103:8 | 74:11,24 | 55:24  56:8 | 253:6 | **magnetism** |
| 105:24 | 76:2  84:6 | 56:11 | **loop** 25:5 | 127:11 |
| 119:7,10 | 85:8  86:8 | 58:22 | 26:10,15 | **mail** 61:5 |
| 121:1,9 | 88:9  99:23 | 65:15 | 27:4 | **main** 76:15 |
| 122:8 | 104:9 | 72:19 | 238:22 | 83:16 |
| 125:8 | 105:20 | 74:16,17 | **looped** | 119:11 |
| 126:18 | 108:19 | 80:25 | 238:18 | 190:25 |
| 127:2 | 111:12 | 117:5 | **looping** 23:4 | 231:8 |
| 133:2 | 112:9,10 | 126:1,3 | 25:4  26:14 | 249:1 |
| 139:3 | 118:25 | 127:21 | **lose** 157:7 | **maintaining** |
| 151:23 | 128:24 | 128:13 | **lost** 168:23 | 137:20 |
| 160:16 | 131:13,20 | 154:25 | 269:8 | 138:3 |
| 163:21 | 133:1 | 159:9 | **lot** 17:25 | **major** 16:4 |
| 166:14 | 136:5 | 191:20,22 | 18:20 | 87:20 |
| 222:16 | 141:12 | 197:4 | 28:19 | 187:6 |
| **local** 76:16 | 146:21 | 200:25 | 40:11  59:5 | 232:3 |
| **locate** | 149:13 | 223:14 | 64:20  89:3 | **making** 18:11 |
| 218:25 | 150:9 | 227:2 | 107:23 | 68:15 |
| **log** 77:10,14 | 155:10 | 234:18 | 108:15 | 140:3 |
| 92:10,11 | 163:6 | 237:19 | 109:5 | 203:22 |
| 92:13 | 165:11 | 245:9 | 110:2 | **manage** 15:18 |
| 95:17 | 167:23 | 248:11 | 133:22 | 15:22,23 |
| 212:4 | 173:1,11 | 253:17 | 144:17 | 35:10 |
| **log-in** 79:10 | 174:3 | 258:15 | 149:17 | **management** |
| 92:1 | 176:5 | **lookout** | 150:20,23 | 15:24 |
| **logged** 92:5 | 179:12 | 153:21 | 152:3 | **mandate** |
| 92:15 | 187:18 | 155:12,14 | 154:4 | 142:22 |
| 218:18 | 202:8 | 208:25 | 172:20 | **mandated** |
| **long** 12:7 | 205:16 | 209:1 | 231:6 | 148:23 |
| 28:20,22 | 206:24 | 220:10 | 236:11,18 | **mandates** |
| 126:20 | 212:20 | 244:8 | 266:17 | 137:19 |
| 166:12 | 215:14,16 | **Lookout'** | **lots** 84:7 | 142:21,23 |
| 227:24,25 | 234:9 | 247:20 | 232:5 | 148:20 |
| 266:10 | 249:18 | **looks** 30:2 | **loud** 9:20 | 149:18 |
| **longer** 13:11 | 250:7 | 35:16 | 97:22,23 | **manmade** |
| 48:23 | **looked** 59:10 | 44:14,22 | 145:10 | 120:20 |
| 82:23 | 72:11 | 55:19 | 174:15 | **manmade'** |
| 155:6 | 95:16 | 61:25  62:1 | 176:8 | 108:21 |
| 235:14 | 140:19 | 76:4,10 | **Louis** 271:18 | 120:13 |
| **look** 20:1 | 147:17 | 98:17 | **Louisiana** | **manner** 105:8 |
| 21:14  33:6 | 157:20 | 100:3 | 1:1  8:6 | 265:14 |
| 37:23 | 164:22 | 119:8 | **love** 126:23 | **manually** |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 192:18 | 166:2 | 248:22 | 161:20 | 125:9 |
| **March** 13:4 | 171:15 | **matter** 8:4 | 172:18 | 130:3 |
| 13:14  15:2 | 173:20 | 94:3  103:1 | 175:2 | 167:18 |
| 16:1,20 | 179:9 | 108:8 | 177:15 | 176:12 |
| 18:6  34:5 | 187:9 | 113:24 | 178:21,25 | 177:7 |
| 40:4  43:23 | 188:25 | 123:2,20 | 180:19 | 182:13 |
| 44:1,25 | 196:15 | 129:21 | 181:8,9 | 211:16 |
| 46:25  47:7 | 200:15 | 130:10 | 182:3,5 | 218:20 |
| 61:12  63:2 | 205:19 | 132:17 | 183:3 | 228:6 |
| 63:14 | 219:19 | 133:17 | 191:15 | **media** 11:8 |
| 64:23 | 221:3 | 145:4 | 192:3 | 11:16  12:7 |
| 65:14,24 | 226:4 | 152:7 | 193:11,12 | 13:1,19,20 |
| 68:13  73:3 | 237:2 | 171:17 | 195:21 | 13:24,25 |
| 73:16 | 239:16 | 184:20 | 196:6 | 14:3,4,12 |
| 74:24  76:2 | 241:17 | 187:12 | 198:14 | 14:14,17 |
| 76:13 | 247:7 | 189:5 | 199:19 | 14:20,25 |
| 77:13 | 249:7 | 200:18 | 201:18 | 15:4,6,11 |
| 79:14  80:3 | 254:4 | 249:18 | 209:8 | 15:14,16 |
| 81:25  82:3 | 257:4 | 254:9 | 210:22 | 17:1,24,24 |
| 82:4  84:3 | **marketing** | 270:14 | 211:8,15 | 18:2  19:20 |
| 174:4,14 | 262:1 | **matters** 28:9 | 212:19 | 20:3,16 |
| 176:6 | **marriage** | 132:14 | 213:2 | 24:3,16,25 |
| 179:23 | 270:12 | **maturing** | 214:15 | 35:9  36:5 |
| 182:16 | **Martin** 6:6 | 192:2,4 | 217:12 | 43:3  50:3 |
| 257:15 | 8:16 | **Maureen** 1:20 | 220:12 | 52:10,11 |
| 259:7 | **Marty** 264:11 | 8:8  270:4 | 222:12 | 53:9  54:14 |
| **Margaret** | **mask** 29:2,3 | 270:22 | 224:4 | 54:17 |
| 45:4 | 29:5 | **mean** 13:19 | 229:24 | 57:25  59:3 |
| **mark** 33:18 | **masking** | 15:20  17:2 | 236:17 | 72:2,12 |
| 33:20,22 | 62:10 | 17:18,19 | 241:10 | 92:7  104:5 |
| 49:4 | 71:13 | 23:6  26:10 | 243:3 | 104:24 |
| 100:10 | **masks** 29:7 | 26:13 | 246:19 | 105:1,3 |
| **marked** 21:12 | 66:5 | 30:12 | 251:9 | 113:11 |
| 22:8  33:4 | **master's** | 32:17 | 258:2 | 114:8 |
| 38:18 | 12:4,11 | 39:24  50:7 | 260:22 | 117:2,8,17 |
| 43:10  49:1 | **match** 41:4 | 52:15  73:3 | 261:3 | 124:6 |
| 60:3  67:12 | **material** | 77:15  80:5 | 266:11,16 | 128:11,14 |
| 85:6  91:1 | 65:20  99:3 | 82:3  85:18 | **meaning** | 143:6,21 |
| 102:22 | 114:15 | 87:25 | 103:11 | 143:24 |
| 112:6 | 117:17 | 88:25  99:6 | 139:7 | 148:13 |
| 113:3 | 146:15 | 113:1 | 184:25 | 150:22 |
| 118:7 | 148:15 | 116:2 | 217:18 | 154:21,22 |
| 126:8 | 264:2 | 117:9,14 | **means** 113:14 | 155:1 |
| 145:1 | **materials** | 127:21 | 191:1 | 181:7 |
| 150:6 | 53:12 | 129:1 | 209:21 | 198:22 |
| 152:16 | 56:17  58:3 | 132:22 | **meant** 19:15 | 207:7 |
| 155:7 | 81:8,12 | 136:2 | 37:17 | 212:20 |
| 163:13 | 90:7 | 154:22 | 77:19 | 220:2 |
| 164:17 | 115:21 | 160:6 | 90:23 | 227:20 |

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| 234:6 | 172:19 | 116:7 | 48:23 | 259:9 |
| 237:14,20 | 177:16 | 117:25 | 83:10,14 | **mentioning** |
| 248:9 | 178:23 | 130:16 | 92:13 | 79:22 |
| 249:4 | 179:6 | 174:24 | 95:17 96:2 | 117:25 |
| 264:3 | 180:7,23 | 179:3,25 | 160:7 | 125:10 |
| 267:10 | 185:1 | 180:5,9,11 | 180:25 | **mess** 192:16 |
| **medical** | 188:9,10 | 180:17,17 | 182:6 | **message** |
| 131:5,9 | 188:12,13 | 180:25 | 198:13 | 33:24 36:4 |
| 137:3,8 | 188:21 | 181:2,7,24 | 200:13 | 36:7 |
| 140:12 | 198:25 | 184:17 | 205:1 | 247:22 |
| 203:15 | 202:4 | 188:14 | 214:2 | 252:18,19 |
| **medications** | 208:9,11 | 198:12,14 | 217:25 | **messages** |
| 10:23 | 208:17,23 | 198:16,21 | 218:1 | 28:25 |
| **medicine** | 210:4 | 202:6 | 236:12,16 | 248:24 |
| 12:16 | 212:24 | 204:24 | 240:13 | 252:8 |
| **medicines** | 213:1,3 | 208:16 | 260:10 | **messaging** |
| 137:13 | 221:14 | 209:10,11 | **mental** 63:21 | 29:13,14 |
| 164:21 | 223:4,13 | 209:23 | **mention** | 29:19 |
| **meet** 70:9 | 225:15,24 | 210:11 | 123:21 | 42:24 |
| 150:18 | 225:25 | 226:18,19 | 230:22 | 237:17 |
| 170:3 | 226:10,16 | 232:5 | 233:1 | **met** 119:23 |
| 175:15 | 230:12 | 239:2 | **mentioned** | 174:23 |
| 180:19,20 | 232:24 | 241:21 | 46:15 | 175:15 |
| 209:20 | 238:23,24 | 242:10,11 | 51:16 | 198:4 |
| **meeting** 2:23 | 239:1,25 | 244:23 | 54:15 | 202:1,17 |
| 5:6,13 | 240:14,23 | 245:1,15 | 62:22 | **Meta** 50:4,5 |
| 36:8,16,17 | 241:8,9 | 245:16 | 72:10 76:3 | 50:7,8 |
| 57:4 68:6 | 242:6,18 | 250:15 | 87:8 99:1 | 154:24 |
| 68:7,9,12 | 242:20 | 260:12 | 109:15 | 155:1,2 |
| 69:23 70:1 | 246:2,5,18 | 261:7,11 | 121:10 | 156:9 |
| 70:6 72:20 | 246:23 | 261:19 | 125:16 | 159:13 |
| 73:10 | 247:12,21 | 262:6 | 126:2 | 161:14 |
| 75:22 80:1 | 248:15,20 | 265:12,12 | 132:20 | 162:4,25 |
| 80:10 | 253:18,24 | 265:13 | 141:20 | 180:13,18 |
| 84:10,11 | 258:19 | 266:10,14 | 142:12,21 | 180:20 |
| 84:13,19 | 260:6,13 | 267:11,13 | 147:16 | 181:16 |
| 98:10,11 | 260:17 | **Megan** 252:20 | 157:8 | 212:3,10 |
| 99:22,25 | 261:15,18 | **Melissa** 7:7 | 195:17 | 213:22 |
| 100:2,4,6 | 262:9,25 | **Meltwater** | 200:6 | 215:14 |
| 100:8,10 | 263:4,14 | 154:13,14 | 211:24 | **Meta's** 158:3 |
| 115:11,14 | 263:18 | 154:18 | 221:25 | 158:11 |
| 115:24 | 265:15,17 | 155:1 | 223:1 | **method** 255:9 |
| 116:1,6,15 | **meetings** | **members** 84:7 | 236:14 | 255:14 |
| 119:17,20 | 5:10 17:8 | 107:10 | 237:13 | **mic** 10:18 |
| 119:24 | 18:17,18 | **memo** 109:20 | 243:4 | **Michael** |
| 132:18 | 18:20 | **memory** 18:9 | 246:19 | 264:21 |
| 151:4,15 | 20:18 | 25:15 29:5 | 250:14 | **Michelle** |
| 151:18 | 30:15 69:2 | 31:25 | 251:17 | 19:9,12 |
| 172:16,19 | 83:6 116:2 | 34:22 | 257:22 | 32:13 |

**CAROL CRAWFORD  11/15/2022**

microchips
  87:11
  90:15
  207:12,13
  207:17,23
  209:7
  265:24
Microsoft
  16:6 241:1
middle
  169:14
  222:6
  253:7
mifepris...
  255:10,15
Mike 144:23
milk 165:14
millions
  168:20
mind 9:24
  47:5 116:3
  156:5
  201:13
  233:18
mine 23:11
  87:4
  205:22,24
  206:10
minor 241:11
minute 43:12
  96:6 99:1
minutes 4:10
  171:22
  182:23
  184:7
  216:16
  266:12
mis-info
  4:13,15
  187:14
mischara...
  47:14 54:8
  57:8 76:22
  78:17 86:5
  89:24
  101:2
  132:6
  143:16
  158:5,23

161:16
162:5,16
163:2
168:13
178:2
199:6
238:13
266:24
mischara...
  214:1
misconce...
  89:12
misheard
  121:22
misinfo 3:1
  3:2 4:11
  55:25 56:9
  68:16 69:4
  74:14
  85:12 87:9
  91:9,15
  173:25
  174:20
  175:5
  179:15
  207:22
  220:22
  221:22
  225:5
  229:20
  234:17
  257:19
  258:16
misinform
  5:18
  257:10
misinfor...
  3:14 4:1,9
  5:1,3,11
  33:25
  37:12,14
  38:5,13
  56:9,12
  58:12,20
  58:22
  68:25 69:2
  69:11 71:4
  71:16
  72:18

74:14
77:21,22
83:12 84:5
84:12 86:3
87:14,17
87:24 88:8
91:15,18
91:25
98:14
103:9
110:13,14
111:4,5
117:2,7
119:16
124:14
139:1,6
150:19,25
151:23
152:25
154:1,11
156:21
157:7
161:25
166:7
171:23
175:8,13
179:15
181:20,23
181:24
182:10,21
183:25
184:16
185:12
197:7,20
198:2
199:5,11
200:1,8
201:3,25
204:1
205:20
206:16
208:9
211:18
212:5
219:6,25
220:11
225:5,6
234:21
237:16

241:22
242:6,10
245:15
253:17
257:20
misinter...
  153:8
  155:4
misoprostol
  255:11,16
missed 70:8
  96:8 156:6
missing 81:3
  196:1
Missouri 1:3
  6:1,2,4
  8:5 271:7
  272:2
misspelled
  139:2
mistake
  144:15
mistype
  127:23
misunder...
  154:6
mix 52:25
mm-hmm 16:3
  16:25
  17:12
  19:18 21:5
  23:9 39:17
  40:24
  41:23
  43:15 44:7
  45:21
  62:25
  63:18
  67:11
  107:6
  108:20
  114:11
  117:15
  128:25
  129:22
  130:7
  134:8
  141:16
  155:11

166:13
181:4
185:18
187:5
190:22
196:3
202:9
207:1
216:16
217:9
242:25
243:20
252:25
253:8
MO 271:18
moderation
  76:7 82:7
  82:8,11
  101:15
  175:24
  176:11
modules
  40:17
MOLA-DEF...
  3:21
MOLA-DEF...
  2:24
MOLA-DEF...
  4:4
MOLA-DEF...
  5:3
MOLA-DEF...
  4:2
MOLA-DEF...
  3:24
MOLA-DEF...
  3:18
MOLA-DEF...
  3:14
MOLA-DEF...
  3:12
MOLA-DEF...
  3:5
MOLA_DEF...
  2:18
MOLA_DEF...
  5:16
MOLA_DEF...
  4:11

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| MOLA_DEF... 4:9 | 2:14 | 88:17 | necessary 273:9 | 39:6 43:16 |
| MOLA_DEF... 4:17 | MOLA_DEF... 3:3 | 129:5,9 | need 34:20 | 50:15 |
| MOLA_DEF... 4:6 | moment 22:10 | 150:24 | 54:20 58:2 | 66:14 |
| MOLA_DEF... 5:15 | 38:22 49:3 | | 100:20,23 | 86:11 |
| MOLA_DEF... 3:15 | 74:22 86:9 | **N** | 134:2 | 156:1 |
| MOLA_DEF... 5:2 | 118:10 | N 7:6 271:17 | 143:14 | 157:4,12 |
| MOLA_DEF... 5:13 | 195:25 | N.W 6:10,20 | 182:25 | 163:18 |
| MOLA_DEF... 2:21 | 227:18 | 271:5 | 184:9 | 174:2 |
| MOLA_DEF... 5:11 | 228:8 | nah 133:16 | 194:6 | 182:20 |
| MOLA_DEF... 3:1 | 239:15 | name 8:8,8 | 235:12 | 187:20 |
| MOLA_DEF... 5:9 | Monday 63:1 | 8:17 11:2 | needed 20:18 | 190:2,7 |
| MOLA_DEF... 5:7 | 100:3 | 14:25 21:4 | 110:24 | 203:8 |
| MOLA_DEF... 5:6 | 119:19 | 86:12,19 | 116:15 | 221:18 |
| MOLA_DEF... 5:5 | 161:4 | 103:10 | 121:23 | 222:5 |
| MOLA_DEF... 4:22 | 180:7 | 125:17 | 126:21 | 223:1 |
| MOLA_DEF... 4:16 | 228:4 | 141:19 | 208:2 | 239:20 |
| MOLA_DEF... 4:19 | monitor 117:16 | 174:10 | 221:9 | 248:19 |
| MOLA_DEF... 4:14 | monitoring 167:2 | 177:10 | 224:5 | 250:12 |
| MOLA_DEF... 4:12 | MONROE 1:2 | 198:8 | 228:22 | 254:15 |
| MOLA_DEF... 5:19 | month 166:23 | 203:4,9 | 235:13 | newer 190:13 |
| MOLA_DEF... 2:14 | months 32:9 | 211:3 | 239:22 | news 13:20 |
| MOLA_DEF... 2:9 | 169:22 | 222:17 | 255:6 | 14:3,4 |
| MOLA_DEF... 2:17 | 182:19 | 246:24 | 262:16 | 53:25 58:7 |
| MOLA_DEF... 2:11 | morning 9:12 | 247:2,3 | 263:2 | 59:3 72:11 |
| MOLA_DEF... | 119:18 | 249:17 | needing 255:22 | 76:16 |
| | 148:16 | 264:23 | needs 73:6 | 143:11 |
| | 182:2 | 272:1,2 | 171:6 | news/com... 53:2 |
| | 248:18 | 273:11 | 224:1 | nicer 154:25 |
| | 267:15 | names 21:10 | needs/qu... 221:18 | nine 111:19 |
| | move 26:20 | 21:10 | Network 153:18,18 | nod 9:18 |
| | 38:20 46:1 | 25:17 | networks 237:20 | Nods 165:10 |
| | 152:14 | 83:21 | never 24:4 | noise 97:22 |
| | 163:15 | 135:25 | 47:5 85:1 | non-synced 268:15 |
| | 165:22 | 152:10 | 95:16 | noon 242:12 |
| | mRNA 164:13 | 174:9 | 105:5 | 245:17 |
| | multiple 115:6 | 177:18 | 156:5 | Nordlund 160:19 |
| | 212:11 | 222:6,15 | 161:20 | normal 9:18 |
| | 232:3 | 233:24 | 198:13 | 164:8 |
| | 233:11 | 234:2 | 217:14 | normally 19:25 |
| | muted 267:16 | National 107:13 | 218:25 | 28:23 |
| | myth 29:3 | 160:20,21 | 235:1 | 195:7 |
| | 129:4,6,10 | 223:17 | new 4:2,5 | 223:15 |
| | 134:15 | nature 18:7 | 5:8 6:9 | notarized 271:16 |
| | myths 29:1 | 155:3 | 14:3 29:2 | notary |
| | 75:16 | NCIRD 107:12 | | |
| | | NE 1:17 | | |
| | | necessarily 116:23 | | |

**CAROL CRAWFORD 11/15/2022**

270:23
271:14
273:23
note 5:21
25:10
26:11,22
31:6 33:17
97:22
100:14
102:14
118:12
121:18
122:20
124:21
130:13
185:23
211:11
216:15
242:19
243:21
244:6
noted 75:4
133:12
notes 30:10
30:14,14
38:2,2
56:19,22
84:24 85:2
116:16,18
116:19
119:18
127:6
137:5
168:10
225:16,18
241:8,9
notice 2:7
21:18,21
128:6
noticed
227:9
noticing
240:8
November
1:14 8:2
156:1,14
163:20
253:13,14
270:16

271:3,11
272:4
number 31:8
31:15
35:21 36:2
36:8 37:3
55:3,3
67:3
102:15,20
105:21
111:19
120:6
122:15,19
129:24,25
131:17
136:13
146:11
163:24,25
165:13,18
165:19
169:6,14
171:25
190:3
222:14
241:25
nutshell
230:15
■ 97:7
_____
**O**
O 254:20
O'Boyle
196:24,24
197:15,23
198:9
199:4,21
204:20
207:4
209:1
211:5
212:25
220:10
248:2
O'Brien 21:8
198:6
OADC 11:10
12:24
13:11,13
14:9 18:25

87:5
objected
176:10
objection
36:18
47:14 54:8
57:8 76:21
78:3,17
79:1 80:16
82:20 86:5
89:24
93:16 95:7
96:3 99:4
101:2,6,20
105:10
106:6
110:7
112:22
115:12
121:5
123:3
131:6
132:6,21
134:22
137:22
138:5
142:24
143:16
158:5,21
159:14
161:16
162:5,16
163:1,9
165:7,23
168:13
176:1
178:2
193:13,24
199:6
231:15
238:13
251:4
259:25
266:24
objections
10:9,10
176:4
objectives
11:22

occasion
98:21 99:1
180:25
occasional
17:4,9
29:16
30:15
occasion...
38:7 51:19
222:24
241:4
244:21,22
265:19
occasions
198:17
occur 64:22
213:4
234:25
occurred
13:13 40:3
84:12,14
100:6,10
173:8
188:11
213:1
216:25
235:2
236:15
occurring
143:6
250:2,24
occurs 54:17
October
252:22
253:4
OD 14:9
odd 95:23
248:3
offer 69:13
89:18
offered
57:13
152:1
213:24
231:10
offering
69:4 70:24
212:4
230:10

offerings
77:9
office 1:16
6:2 8:25
11:8,11
14:9 43:6
104:15
114:20
222:24
234:5
271:17
officer
160:19,21
192:25
193:3,9
official 1:8
96:14
103:10
215:3
271:8
272:3
oftentimes
114:9
oh 23:6
28:17
40:10
67:25
72:23
85:19
92:11
93:17
100:20
136:15
149:8
167:13
218:3,8
224:20
225:8
236:6
239:24
240:22,22
245:8
260:8,24
261:14
okay 12:12
13:2 14:12
14:19,21
14:24
15:19

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 20:12 | 101:11 | 171:24 | 235:9 | 100:9,12 |
| 21:14 | 103:6,20 | 173:25 | 237:1,8 | 102:25 |
| 23:12 24:5 | 105:20 | 174:1,2,13 | 238:4,21 | 111:25 |
| 24:18 25:2 | 108:6 | 176:14,20 | 239:23 | 112:9 |
| 25:19 | 109:11,19 | 177:12 | 240:5,19 | 116:20 |
| 26:12 27:8 | 110:10 | 178:16,24 | 241:5,7,13 | 122:14 |
| 27:13,24 | 111:1 | 179:7,14 | 241:23 | 126:10 |
| 28:13,24 | 113:5,21 | 179:14,19 | 242:1 | 141:7 |
| 29:12,24 | 114:25 | 180:22 | 243:23 | 142:1 |
| 30:3,7,23 | 115:8 | 182:3,8,14 | 244:4,19 | 144:13 |
| 32:25 | 117:22 | 185:4 | 245:7,24 | 145:3,13 |
| 35:20 | 118:5,6 | 186:25 | 246:24 | 145:21 |
| 36:20 38:9 | 119:1,23 | 187:2,16 | 247:14 | 146:14,22 |
| 38:21 | 121:1,21 | 189:9,17 | 248:8 | 148:18 |
| 39:15 | 122:1,20 | 190:15 | 249:5,21 | 152:19 |
| 42:21 43:8 | 123:12,19 | 191:12,25 | 250:23 | 155:13 |
| 43:9,13,23 | 126:17 | 193:7 | 252:1,17 | 163:15,23 |
| 44:4,16 | 127:9 | 195:11 | 253:6 | 166:4 |
| 46:10,18 | 129:19 | 196:14,22 | 254:13,21 | 169:22 |
| 46:25 47:2 | 130:5 | 198:4 | 256:9 | 173:22 |
| 47:5,12,17 | 133:25 | 199:15 | 257:12 | 189:4 |
| 47:24 | 135:13,25 | 201:22 | 260:11 | 196:17 |
| 48:14 50:7 | 136:7 | 202:1,5,15 | 262:21 | 200:17 |
| 50:11,22 | 140:5,22 | 202:21 | 263:13 | 219:21 |
| 51:14 | 140:25 | 204:19 | 264:1,8 | 221:5 |
| 52:13 56:5 | 141:7,12 | 207:19 | 265:1,4 | 226:6 |
| 56:7,19,23 | 142:1,9,22 | 208:3,24 | 268:2,9 | 239:18 |
| 60:21 | 143:12 | 209:14 | 269:11 | 241:7,19 |
| 61:17 | 144:3 | 210:13 | **older** 42:22 | 246:9 |
| 62:20 | 145:11,13 | 211:1,5 | 46:3 | 247:9 |
| 63:13 64:1 | 147:6,9,15 | 213:5,21 | **oldest** 22:19 | 248:10 |
| 64:7 65:23 | 148:17 | 214:3,25 | **olds** 4:3,6 | 249:17 |
| 66:19,22 | 149:8 | 215:6,23 | 163:19 | 254:8 |
| 66:23 67:9 | 150:8 | 215:25 | **Omicron** 4:17 | 257:7 |
| 67:16,17 | 151:10 | 216:14,18 | 189:7 | 261:18 |
| 68:7 70:14 | 152:7,13 | 217:7,23 | 190:5 | **one-** 39:25 |
| 70:22 | 153:4,12 | 218:9,12 | 191:22 | **one-pagers** |
| 73:13 | 155:23 | 219:2,14 | 192:1,6,13 | 239:14 |
| 74:23 | 156:7 | 220:9 | 194:6 | **ones** 9:23 |
| 78:20 | 158:2,25 | 221:12 | **Omicron-...** | 57:21 |
| 79:12 80:2 | 162:23 | 223:25 | 189:18 | 93:12 |
| 80:24 | 163:22 | 225:10 | 192:3 | 131:21 |
| 82:25 83:8 | 164:19 | 226:2,12 | **Omicron/...** | 197:19 |
| 85:25 | 165:23 | 226:17 | 191:4 | **ongoing** |
| 90:24 | 167:9 | 227:15,24 | **onboarding** | 33:19 |
| 95:20,24 | 168:17,23 | 228:12 | 97:1 100:4 | 160:9 |
| 96:7,17 | 168:25 | 229:7,18 | 100:5,8,10 | 184:15 |
| 97:12 | 170:10,22 | 230:7 | **once** 37:19 | **online** 89:12 |
| 99:22,25 | 171:14,19 | 234:2,24 | 84:24 | **Onyimba** |

**CAROL CRAWFORD  11/15/2022**

174:6
176:7
185:16
195:12
250:10
251:2
254:19
Onyimba's
182:14
open 149:4
179:24
opened
265:15
operated
110:14
operates
80:15
operations
11:17
opinions
101:18
opportun...
83:11
Opportunity
227:2
option 88:14
213:25
options
34:11
138:18,22
155:16
212:11
218:19
220:25
orally 39:22
order 30:21
120:9,11
131:8
164:24
205:22
206:4
210:13
organiza...
14:3 15:1
51:7
247:23
organiza...
33:24
37:12

117:8
259:4
origin
120:21
original
5:21,23
22:7 35:12
268:22,23
271:11
originally
36:23
231:3
originals
268:21
originated
181:25
OSHA 142:22
ought 187:25
outbreak
16:14
outcome
270:13
outfit 217:7
outlets
207:8
outline
11:25
outlined
27:19
outlining
25:11
Outlook
30:13
output 43:4
outside
127:25
overall
33:25
52:24
143:21
overlap
14:16 15:7
232:13
oversee
11:22
overview
3:11
190:17
191:14

P
p.m 1:15
47:1 61:19
64:24
68:13 70:4
76:3
102:10
119:7
126:19
142:15
144:2
145:19
150:3,3
156:15
180:4,7
205:10,10
207:3
208:10
257:1,1
269:19
P.O 6:4
packet 22:5
68:1
page 2:2,6
2:25 3:25
4:17,24
6:25 22:18
41:21
48:16
67:21,24
67:25
125:7
129:5
131:16
133:4,5,5
133:6
136:9,16
141:23
142:14
143:12,25
144:12
146:20
166:17
168:25
169:12,14
179:22
189:7,11
190:25
191:1,20

192:1,4,5
194:5
214:19
216:6,7
226:23
241:24
243:15
245:7
250:7
252:24
271:12,14
271:17
272:5,9,13
272:17,21
pages 52:24
189:18
190:3
192:8
250:5
270:8
palsy 3:7,8
111:14
112:16,19
112:21
pandemic
19:12
panel 189:24
190:12
191:4
192:17
194:15,17
195:2
251:23
panels
193:23
194:3,8
251:17
paper 39:19
112:16
113:8
papers 129:7
paragraph
127:17
156:22
166:18
paragraphs
156:14
pardon 54:21
parentheses

255:10,15
parents
165:15
Parson
144:23
264:21
part 14:22
22:19,23
25:9 26:6
26:20
32:18,19
36:16 48:1
56:25 59:1
59:8 60:22
70:7 81:23
92:7
106:10,14
110:18,19
119:10
129:18
131:11
137:7
145:7
151:24
156:6
172:3,7
192:17
200:7
214:14,17
235:2
243:19
244:25
253:9
259:16
263:4
participate
103:21
260:19
particip...
84:2
177:16
198:15
246:22
particular
20:20
63:24 64:3
89:7
104:24
105:4

**CAROL CRAWFORD  11/15/2022**

141:4
148:17
197:8
201:3
240:13
246:17
248:1
particul...
 64:11
 163:24
 200:2
parties 8:11
 31:11
 270:12
partner
 111:3
 206:22
 211:21,24
 213:9
partnering
 79:23
partnership
 84:5 87:5
partners...
 84:11
parts 13:25
 68:10
 110:19
pasted 76:10
 76:14 82:2
 82:13
 190:15
patience
 177:1
patients
 113:9
 123:2
Payton 20:25
 23:4 24:7
 24:10 25:3
 26:11,25
 27:5 28:11
 28:14,21
 30:4 35:12
 36:11
 37:14
 50:16,24
 63:11
 79:22

85:17
105:21
119:12
131:17
221:15
222:25
232:5,14
234:10
237:10
257:15
259:2
Payton's
 24:19
 86:14
 119:10
Payton/G...
 87:8
 ███████ @f...
 24:9
PCR 220:11
pdfs 41:6
Peck 261:17
pediatric
 158:12
 253:11
penalty
 273:12
people 15:22
 18:20
 20:14
 23:22 29:6
 39:5,20
 41:17
 42:22,23
 43:17 47:3
 48:22
 50:15 53:5
 54:16
 56:16
 59:23
 61:15
 68:24
 70:20 72:5
 83:19 88:9
 89:1 96:22
 96:22,23
 97:4,20
 98:11,21
 107:1

114:4
115:13
123:23
128:4
129:8
135:19
136:3
137:2
138:20
146:16
149:17
151:2
154:13
155:17
162:2,15
162:24
164:6,12
168:4,6,11
170:16
177:9,13
181:6,15
181:18
185:24
186:15
188:21
189:22
191:20
192:12
194:6
204:17
210:21
217:3
222:15
223:10
228:14,16
228:17
233:11,16
233:19,21
244:21
252:6
258:25
259:2
263:9
266:18
peoples'
 88:13 97:8
 212:16
percent
 46:13

69:25
128:19
 228:14,16
percentage
 113:9
perception
 194:25
performs
 15:6
period 23:13
 30:6 52:4
 54:15
 180:24
 183:8
 218:15,16
periodic
 17:4
periodic...
 117:20
 167:21
periods
 61:13
perjury
 273:12
Perron 50:25
 60:11,17
 61:22
 63:15
 141:21
person 20:10
 25:16
 50:20
 66:15 75:2
 79:16,18
 83:16 92:4
 107:18
 114:14
 115:3
 123:24
 133:15
 198:4
 238:16
 241:2
 249:1
 250:14
personal
 24:3 35:23
 62:12
 143:11

215:4,5
244:6
personally
 50:1 59:18
 90:10
 147:19
Pfizer
 156:25
Phoenix
 223:2
phone 20:14
 29:20,25
 30:1 31:14
 35:21 36:1
 36:6 44:14
 56:20
 86:20
 102:15
 117:11
 120:1
 173:7
 197:21
 198:18
photo 227:20
photos 54:2
physical
 39:19
physicians
 123:11
 143:15
pick 9:17
 186:18,21
 187:5
picked 46:23
 143:22
picture 76:1
 81:11
 263:12,23
pictures
 149:6
piece 135:17
 190:7,13
pieces 39:19
 166:12
Pinterest
 180:24
pipe 227:10
piped 133:23
 265:19

**CAROL CRAWFORD  11/15/2022**

place 12:19
23:18
95:21
111:8
115:25
151:5,7
156:10
178:1
192:12
194:18,20
215:22
219:7
225:15
248:16
places 248:9
plaintiff
6:1 144:22
plaintiffs
1:5 6:6
8:14 269:5
plaintiffs'
2:5 5:21
21:12 22:8
31:7,9,12
33:4 38:18
43:10 49:1
60:3 67:12
85:6 91:1
102:16,18
102:22
112:5
113:3,5
118:7
126:23
135:1
136:6
138:23
141:6
145:1
150:6,9
152:16
155:7
163:13
164:17
166:2
171:15
173:20
179:9
187:9,11

187:18
188:25
196:15
200:15
205:19
219:19
221:3
226:4,6
237:2
239:16
241:17
247:7
249:7
254:4
257:4
plan 34:15
70:5 73:6
84:8
182:20
207:25
263:15
planning
228:2
plans 230:15
platform
17:23 18:2
18:13
162:15
228:17
243:5
245:25
266:19
platforms
17:5 18:15
21:11
29:14
50:12 88:7
154:1,16
154:19
155:2
161:15
162:4
180:12
208:10
209:23
220:16
242:11
243:25
245:15

247:19
249:3
253:18
266:18
267:10
player 28:16
players
43:16
180:2
please 8:11
9:4 11:1
21:15
27:12
64:16
118:25
119:17
133:11
141:8,12
144:7
145:3,5
152:12
155:21
166:18
167:5
169:23
170:2
176:23
188:1
200:17
221:11
226:7,8
242:8
247:10
249:17
254:8
255:18
271:10,13
271:16
pleased
162:2
plus 46:4
230:7
255:5
PM 247:16
POC 35:3,4
POCs 174:11
198:7
242:15,22
245:19

point 20:24
28:10,22
31:20 35:3
61:11 83:1
89:5 92:22
99:11,13
106:20
107:21
108:17
114:9
119:11
127:14,15
127:16,24
128:7
142:3
153:10,24
190:9
198:1
199:21
205:1
207:21
223:1
242:24
249:2
254:15
pointed
89:16
107:5
pointing
88:2,16
89:20
90:18
195:6
points 3:23
20:17,20
21:1 39:21
60:20
63:20 82:2
127:7
128:11,22
134:10
polices
157:6
policies
15:24
103:14,17
104:24
105:4,6,9
105:12,16

105:17
157:2,10
158:3
159:8
160:2
162:11
167:4
169:8
170:5,8
234:21
policy 4:3,5
103:21
104:2,9
139:6
140:3
150:14
151:23
154:3
156:2
158:11
159:21
163:18
168:3
169:20
170:14,17
170:20
211:19
220:21
255:2
politicians
148:22
poorly 260:4
pop-ups
157:8
populate
196:11
populated
191:16
populations
3:10 45:24
46:6,7
portal 91:24
206:22
211:22,25
212:6
213:6,6,10
213:14,16
214:14
215:11,13

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 215:14 | 229:10,15 | 182:5 | 182:12 | 138:21 |
| 217:24 | 229:17 | **pregnant** | 183:2 | 151:11 |
| 218:21 | 230:20 | 46:4 | 199:3 | 173:17 |
| 236:8,13 | 264:24 | **preparation** | 209:15 | 189:15 |
| **portals** | **posting** | 93:9 94:15 | 258:4 | 197:21 |
| 213:18 | 129:4 | **presence** | 261:19 | 200:7 |
| 217:3 | 253:14 | 11:15,16 | **previously** | 209:11 |
| **portfolio** | **postings** | **present** 7:5 | 78:1 80:17 | 212:11 |
| 32:19 | 237:15 | 7:21 8:10 | 142:11,21 | 215:10 |
| **portion** | **posts** 35:18 | 18:1 26:2 | 174:18 | 219:12 |
| 80:20 | 53:1,14,22 | 37:16 73:6 | 209:12 | 221:15 |
| 174:4 | 58:6 81:4 | **presented** | 211:13 | 223:4,11 |
| **portions** | 89:8,14 | 7:21 | **primarily** | 235:12 |
| 64:8,10 | 90:16 | 138:23 | 113:17 | 245:2 |
| **pos-** 236:17 | 92:17 | 141:6 | 156:5 | 255:22 |
| **positions** | 103:15 | 172:17 | **primary** | **problem** 4:18 |
| 39:21 | 135:16 | **presents** | 20:24 | 4:21 |
| **positive** | 149:6,19 | 194:23 | **Prion's** | 168:22 |
| 63:22 | 155:19 | **President** | 122:3 | 196:20 |
| 66:16 | 157:9 | 1:9 271:8 | **prior** 13:16 | 201:20 |
| **possible** | 168:3,5 | 272:3 | 19:1,6 | 204:5 |
| 120:20 | 170:15 | **press** 125:24 | 29:15,19 | 215:6,7,19 |
| 139:15,16 | 207:15,24 | 160:19,20 | 58:4 209:4 | 219:8 |
| 174:24 | 212:14 | **presume** | 209:6 | 238:12,17 |
| 177:3 | 220:14 | 91:12 | 212:23 | **problematic** |
| 188:2 | 258:7,9 | **pretty** 34:16 | **priority** | 197:6 |
| 242:13 | 265:3 | 37:7 46:24 | 215:9,17 | 201:1 |
| 243:2 | 266:4 | 90:20 | **privilege** | 212:5 |
| **possibly** | **potential** | 119:3 | 93:22 | **problems** |
| 34:25 | 53:15 | 121:13 | 94:22 | 219:10 |
| 51:17 | 182:24 | 141:20 | **Priya** 50:22 | **proceed** 9:9 |
| 58:16 | 184:8 | 159:11 | 50:23 | **proceeding** |
| 140:8 | **potentially** | 179:6 | **proactively** | 7:22 |
| **post** 76:4 | 132:11 | 181:16 | 262:24 | **process** |
| 104:24 | 155:19 | 190:4 | **probably** | 10:14 |
| 105:4 | **power** 153:9 | 192:6 | 29:10 | 92:23 93:2 |
| 135:18,20 | **PowerPoint** | 258:13 | 30:13 | 127:20 |
| 149:7 | 199:1,2 | **Prevention** | 35:19 37:8 | 128:1,2 |
| 157:6 | 210:23 | 1:17 6:16 | 39:25 42:4 | 129:15,17 |
| 162:24 | **practice** | 7:6,12 | 56:16 61:1 | 131:11 |
| 207:25 | 93:13 | **previous** | 61:13 69:3 | 216:21 |
| 227:22 | 154:23 | 16:8 41:7 | 70:8 72:5 | 242:13 |
| 229:6 | **practices** | 67:22 68:4 | 82:13 | 243:2 |
| **post-vac...** | 34:18 | 102:17 | 83:13 | **processes** |
| 62:8 63:22 | 253:22 | 119:21 | 90:20 | 131:1 |
| 65:4 | **preference** | 138:19 | 108:14,15 | **produce** |
| **posted** 59:13 | 43:3 | 140:19 | 115:15 | 84:19 |
| 109:4 | **preferred** | 147:24 | 120:5,17 | **produced** |
| 212:5 | 180:1 | 161:2 | 121:13 | 46:3 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| product | 245:23 | 161:23 | 214:11 | 251:15 |
| 221:19 | proposal | 166:22 | 251:3 | 254:3 |
| products | 84:4 | 183:10 | purposes | 256:19 |
| 195:19 | proposals | 194:8 | 16:24 22:7 | 263:24 |
| professi... | 27:25 28:1 | 222:1 | 32:2 57:22 | 268:21 |
| 203:15 | 132:5,14 | 261:4 | 147:1 | puts 123:7 |
| progeste... | 132:19,22 | provides | pursuant | 212:6 |
| 255:9,14 | 165:19 | 11:14 | 7:19 21:21 | Putting |
| program | propose | 227:5 | 102:16 | 168:20 |
| 172:11,13 | 208:12 | providing | put 22:2 | |
| programs | 209:17 | 51:23 52:2 | 30:21 | Q |
| 71:8 | proposed | 54:13 | 32:23 | Q&A 34:10,25 |
| project 4:12 | 27:20 | 128:13 | 39:19 | 36:17,25 |
| 46:9,15 | 69:20 | 161:23 | 40:16 43:8 | 37:6 |
| 48:18 | 122:3 | 167:20 | 48:13 | Qs 70:10 |
| 55:23 | 252:9 | PS 170:22 | 52:15 60:1 | question |
| 70:16,18 | protection | public 12:5 | 85:4 90:24 | 10:1,3,11 |
| 173:25 | 164:9 | 12:19,23 | 92:20 93:5 | 14:23 |
| 174:22 | proteins | 13:8,10 | 100:12,19 | 39:15 41:9 |
| 175:15,17 | 139:13 | 14:10 15:4 | 115:9 | 48:15 |
| 176:12,18 | protocols | 18:13 19:9 | 118:5 | 66:25 |
| 176:22 | 65:4 | 29:22 32:7 | 126:6 | 67:19 |
| projects | prove 122:16 | 32:18 | 130:23 | 71:22 |
| 48:3,10 | provide | 33:25 | 132:24,25 | 73:15 |
| 221:20 | 11:15,18 | 143:15 | 144:25 | 74:21,22 |
| 224:13 | 15:15,15 | 144:21 | 149:6,18 | 75:5,7,13 |
| promote | 15:17 | 222:23 | 149:19 | 78:7,12,13 |
| 81:22 | 27:15 | 237:17 | 153:9 | 79:15,17 |
| 232:10 | 48:21 | 270:23 | 162:23 | 81:5 90:3 |
| promoted | 50:21 51:2 | 271:14 | 171:11,13 | 93:7,8,20 |
| 228:10 | 51:12,13 | 273:23 | 175:8 | 98:6,7 |
| promotion | 52:7 72:17 | publicly | 179:7 | 99:8 |
| 227:1,3 | 92:2 | 72:3 | 187:4,7 | 100:24 |
| 228:3,5,7 | 105:17 | publicly... | 194:19 | 105:1 |
| 228:13,24 | 106:21,22 | 59:9 | 196:13 | 106:15 |
| 230:10 | 116:10 | pull 177:2,8 | 199:20 | 111:17,25 |
| 233:14 | 128:11 | 230:12 | 200:14 | 112:11 |
| promotions | 138:10 | pulled 48:3 | 201:11 | 118:11 |
| 234:16 | 158:17 | 222:2 | 202:22 | 120:18 |
| prompted | 159:10 | pulling | 205:2 | 126:5 |
| 230:19 | 160:9 | 92:22 | 219:17 | 128:22 |
| proof 146:1 | 220:13,16 | 236:7 | 221:2 | 129:12 |
| properly | 238:18 | Pundit | 224:17 | 135:8 |
| 216:22 | 259:24 | 264:15 | 226:2 | 146:5 |
| properties | provided | purpose | 231:9 | 148:24 |
| 50:4,5,7,8 | 29:21 | 57:23 | 236:24 | 156:17 |
| 154:25 | 71:15 | 110:20,22 | 239:12 | 158:9 |
| 155:1 | 90:22 | 145:21 | 247:5 | 159:1 |
| property | 113:13 | 147:7 | 249:5 | 164:1 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 181:5 | question... | re-reading | 200:22 | 160:7 |
| 183:22 | 75:3 | 125:22 | 201:23 | 168:24 |
| 185:17 | quick 27:22 | reach 2:13 | 205:14,14 | 178:21 |
| 186:13 | 28:23 | 2:16 17:5 | 207:19,21 | 200:11 |
| 188:1 | 135:6 | 17:6 39:9 | 208:6,8 | 228:7 |
| 224:4 | 211:12 | 43:21 | 216:18 | 235:9 |
| 235:24 | Quicker | 44:10 | 217:13 | reads 22:20 |
| 236:5 | 23:23 | 228:14 | 218:12 | 23:20 |
| 240:12 | quickly | reaction | 221:7,11 | ready 206:12 |
| 248:18 | 173:5,16 | 168:12 | 226:7,8 | 206:13 |
| 251:6 | quite 111:10 | reactions | 227:6 | 229:21 |
| 259:19 | 190:24 | 164:13 | 228:20 | 239:23,24 |
| questioning | quote 103:14 | read 8:20 | 229:2,22 | real 135:6 |
| 31:21 | 120:12 | 22:10 23:2 | 229:23 | realize |
| questions | 129:1 | 25:4,20,21 | 230:3,5,7 | 219:3 |
| 4:9 10:1 | 146:1 | 27:8,11,13 | 234:11,12 | realized |
| 68:16,20 | quotes 226:9 | 46:19 | 237:5,12 | 41:6 |
| 69:5,5,10 | —————— | 52:17 | 239:18,19 | 205:23 |
| 69:14,20 | **R** | 65:22 | 241:20 | really 9:22 |
| 69:22 73:9 | R 1:7 8:5 | 68:11 70:3 | 242:8,9 | 12:7 29:9 |
| 73:19 | 270:1 | 85:14,15 | 245:13 | 32:15,16 |
| 74:13 75:1 | 271:7 | 91:3 103:3 | 247:11,17 | 38:13 64:5 |
| 79:18,25 | 272:2 | 112:8 | 252:12,18 | 92:21 |
| 113:20,25 | Rachel | 127:4 | 252:24 | 101:24 |
| 120:8 | 254:14,25 | 136:8,25 | 253:10 | 110:24 |
| 128:12,15 | 256:7 | 145:5,8,10 | 254:12,13 | 130:20 |
| 129:19 | Raena 222:10 | 152:19,21 | 254:24 | 138:8,9 |
| 139:18 | raise 95:10 | 153:2 | 255:8,13 | 143:1,4 |
| 144:5 | ran 154:12 | 155:24 | 257:7 | 189:20 |
| 152:1,4 | 175:12 | 156:13,23 | 260:15 | 207:17 |
| 156:20 | 210:11 | 162:10 | 261:12,17 | 234:3 |
| 161:1 | 265:12,13 | 163:16,17 | 262:13,23 | 236:13 |
| 163:24 | 267:14 | 166:5,9,9 | 268:5 | reask 14:22 |
| 166:7,10 | range 169:25 | 166:18,20 | 271:13 | 71:22 |
| 167:21 | 187:4 | 168:2 | 272:6,10 | 158:9 |
| 171:23 | rare 164:13 | 170:13 | 272:14,18 | reason 25:14 |
| 172:17 | rarely 21:8 | 171:18 | 272:22 | 36:20 76:8 |
| 173:5 | 128:3 | 173:22,23 | 273:6 | 82:7 185:6 |
| 181:11 | 195:9 | 173:24 | readily | 272:7,11 |
| 188:4,20 | 225:18 | 174:15,17 | 108:14 | 272:15,19 |
| 224:2,9 | rate 3:9 | 176:7,23 | reading | 272:23 |
| 229:1 | 111:20 | 179:11,22 | 26:13 | reasons 59:6 |
| 247:21 | 113:9 | 182:14,17 | 42:11 | 142:10 |
| 255:18 | 122:14 | 187:13,25 | 47:11 | recall 17:17 |
| 263:25 | rates 122:19 | 188:1 | 50:19 | 17:21 |
| 264:25 | 169:5 | 189:6 | 51:10 | 19:19 |
| 267:12,17 | re-ask 251:6 | 196:18,19 | 67:15 | 20:20 |
| 267:22 | re-evalu... | 197:2 | 70:12 75:8 | 21:10 |
| 268:1,3 | 76:7 | 200:17,18 | 77:2 91:22 | 29:11,17 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 30:5,14 | 198:16 | **recipient** | **record** 8:1 | 127:18 |
| 32:14 | 199:1 | 60:10,12 | 9:19,21 | 175:10,14 |
| 35:15 36:6 | 201:8 | 220:2 | 11:1 30:17 | 180:5 |
| 36:11 | 202:7 | **recognize** | 30:24 31:3 | 255:22 |
| 37:13 38:1 | 213:7,15 | 22:11 33:8 | 37:21 | 256:15 |
| 38:4,6,9 | 217:1 | 49:6 67:14 | 52:16 55:8 | **reference** |
| 38:11 39:2 | 219:14 | 67:21 | 69:19 | 34:14 |
| 39:13 | 222:9,11 | 97:19 | 92:19 93:1 | 55:15 69:3 |
| 46:23 | 223:1 | 174:9 | 97:24,25 | 70:2 79:22 |
| 51:11 57:4 | 224:18 | 206:18 | 98:1,2,3 | 80:11 |
| 57:17,20 | 225:21 | 222:15 | 102:9,11 | 81:14 |
| 58:10,11 | 230:18,23 | 249:22 | 150:2,5 | 129:10 |
| 61:11 | 234:2 | **recollec...** | 156:15 | 130:12 |
| 65:19,21 | 235:3,4,21 | 18:1,4 | 203:12 | 183:23 |
| 66:2,8 | 235:23 | 26:2 29:21 | 205:8,9,11 | 184:14,15 |
| 68:23,24 | 236:10 | 32:23 | 225:17 | 185:21 |
| 71:20 72:1 | 240:16,18 | 37:13,16 | 236:2 | 195:24 |
| 72:2 83:8 | 240:22 | 40:11 | 241:8 | 208:23 |
| 88:5 89:13 | 241:10 | 42:20 46:9 | 245:13 | **references** |
| 89:15 | 244:19 | 48:18 52:8 | 247:17 | 72:21 |
| 92:23 93:1 | 246:14 | 68:4 72:16 | 256:24,25 | 243:7 |
| 99:13,14 | 256:16 | 75:13 | 257:2 | **referencing** |
| 99:21 | 260:6 | 76:12 | 261:2 | 149:16 |
| 104:25 | 264:23 | 87:17 88:6 | 265:5 | 196:9 |
| 109:3 | 267:9,23 | 90:18 92:4 | 268:10,21 | 243:9 |
| 110:25 | **recalled** | 94:1,7 | 269:18 | 258:3 |
| 111:18 | 32:5 | 95:15 | 270:10 | 266:15 |
| 115:24 | **receive** | 96:13 | **recorded** | **referring** |
| 116:1,2 | 71:12 | 100:7 | 31:14 85:1 | 12:25 |
| 119:23 | **received** | 106:23 | 102:19 | 34:12 |
| 125:9 | 59:4 64:7 | 116:6 | **recordings** | 36:15 42:8 |
| 136:4 | 97:15 | 125:22 | 84:25 | 42:10 |
| 140:13,15 | 143:7 | 142:13 | 225:16 | 48:10 55:1 |
| 142:8 | 158:15 | 143:10 | **records** | 56:14 |
| 144:11 | 164:15 | 152:3 | 30:11,18 | 91:21 |
| 150:20 | 198:1 | 159:18 | 56:19 | 116:13 |
| 151:17 | 238:23,24 | 216:24 | 116:16 | 118:20,22 |
| 152:11 | **receiving** | 217:1 | **reduce** | 129:3 |
| 153:4 | 57:23 | 235:1 | 103:16 | 142:19 |
| 154:7,9,12 | 76:17 | 242:18 | 138:20 | 143:9 |
| 155:6 | 82:18 | 246:1 | **reel** 227:11 | 144:21 |
| 177:25 | 137:2 | **recollec...** | 229:9 | 165:16 |
| 178:9 | 142:3 | 117:24 | **reestabl...** | 175:9,11 |
| 182:7 | 154:8 | **Recommend** | 102:14 | 175:20 |
| 183:11 | **recess** 31:1 | 41:24 | **reevaluated** | 176:21 |
| 184:5 | 102:10 | **recommen...** | 82:6 | 191:7 |
| 185:8,10 | 150:3 | 29:10 | **refer** 39:12 | 196:10 |
| 193:18 | 205:10 | **reconsider** | 72:1,21 | **refers** 56:20 |
| 197:16 | 257:1 | 169:8 | 113:23 | 56:20 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 68:21 82:8 | 174:24 | 222:24 | 196:8 | 162:25 |
| 100:1 | 178:23 | **relation...** | 198:8,17 | 168:4 |
| 125:8 | 179:3,24 | 112:16,18 | 200:5 | 212:12 |
| **reflect** | 180:4,11 | **relative** | 202:4 | 257:9,19 |
| 195:19 | 180:16,17 | 65:16 | 203:19 | 258:8,11 |
| 196:9 | 180:23 | 156:21 | 213:11,19 | 262:24 |
| 236:2 | 181:2 | **relayed** | 215:19 | 263:11 |
| **reflected** | 184:17 | 45:23 | 225:24,25 | **removing** |
| 263:8 | 188:9,12 | 239:1 | 227:9,13 | 38:5 81:8 |
| **reflecting** | 197:5 | **relevant** | 232:2 | 88:13 |
| 162:1 | 198:12,13 | 219:6 | 233:9 | 155:19 |
| **refresh** | 198:16 | **religious** | 241:15 | 162:14,21 |
| 93:25 94:6 | 200:25 | 146:16 | 244:17 | **renamed** |
| 106:14 | 215:11 | **remember** | 246:11 | 231:4 |
| **refreshed** | 244:22 | 25:9 26:6 | 265:2 | **render** 273:9 |
| 31:24 | **regularly** | 38:1,7,12 | **remembered** | **reoorg** 19:6 |
| **refresher** | 21:11 37:8 | 41:3,20 | 68:3 245:5 | **reorg** 19:4 |
| 262:16 | 70:9 | 51:14 | **remembering** | **reorgani...** |
| **refusal** | 174:23 | 64:17 | 81:21 | 13:13,22 |
| 63:21 | 175:16 | 73:14 | **remind** 203:1 | 16:9 19:2 |
| 170:1 | 179:6 | 80:10 | 211:20 | **rep** 260:19 |
| **refusals** | 185:11 | 82:21 | 217:5 | 261:17 |
| 156:19 | 222:23 | 83:20 | 246:24 | **repeat** 12:21 |
| 157:17,25 | 240:11 | 84:13 89:9 | **reminds** | 67:19 |
| 164:3 | **Regulations** | 92:17,21 | 216:20 | 74:21 |
| **refusing** | 7:20 | 92:25 | **Remotely** | 245:8 |
| 53:17 58:6 | **Reingold** | 98:16,25 | 31:16 | **repeatedly** |
| **regarding** | 96:23 | 109:5 | **removal** | 157:5 |
| 57:16 | 100:22 | 111:21 | 220:25 | **rephrase** |
| 58:20 83:3 | 101:1,8 | 117:4,6,9 | **removals** | 10:2,11 |
| 99:19 | 217:7 | 117:10 | 75:5,7,12 | 78:7 90:3 |
| 107:23 | **rel** 1:3 | 125:17 | 80:13,15 | 178:7 |
| 154:14 | 271:7 | 130:15 | **remove** 33:25 | 204:10 |
| 160:11 | 272:2 | 133:19 | 37:12 | **replace** |
| 161:1 | **related** | 136:23 | 75:19 | 29:13 |
| 167:5 | 92:22 | 140:20 | 90:11 | 42:22 |
| 182:24 | 110:5,10 | 149:5 | 103:16 | **replaced** |
| 184:8 | 185:23 | 151:6,25 | 138:21 | 254:16,18 |
| 199:2 | 223:5 | 153:15 | 157:2 | **replicate** |
| 207:15 | 232:12 | 160:11 | 159:21 | 110:21 |
| 219:13 | 245:22 | 171:3 | 162:11 | **replied** |
| 224:22 | 266:6 | 173:13 | 168:3 | 248:6 |
| 234:12 | 270:11 | 174:11 | 170:15 | **reply** 34:6 |
| 249:19 | **relating** | 177:17,24 | 220:24 | 216:8,17 |
| **regular** | 105:8 | 183:22 | 258:16 | **report** 18:23 |
| 16:13 17:8 | **relation** | 184:2,4 | **removed** 5:18 | 18:24 19:1 |
| 74:3,5 | 210:7 | 188:19,23 | 75:25 76:6 | 19:6,12,14 |
| 107:22 | 261:9 | 193:17 | 81:2,4 | 19:17 |
| 167:2 | **relations** | 195:23 | 103:15 | 51:12 52:1 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 52:21 | 60:21 66:1 | 175:12 | **reserved** | 66:14 70:3 |
| 54:13 | 91:9,24 | 204:6 | 269:20 | 72:13 |
| 55:14 58:8 | 97:2 | 212:9 | **resolve** | 106:5,16 |
| 59:9 60:19 | 101:18 | 230:1 | 182:11 | 107:7,20 |
| 60:22,25 | 122:24 | 250:13 | **resolved** | 114:4 |
| 62:1,14 | 141:21 | 258:5,6 | 185:15 | 117:6 |
| 63:16 | 142:10 | 262:17,20 | **respect** | 123:24 |
| 64:18 | 158:3 | 262:25 | 128:23 | 136:3 |
| 65:15 | 169:5 | 263:7,12 | **respective** | 140:17 |
| 66:12 | 214:10 | **represent** | 259:3 | 160:23 |
| 76:16 81:1 | 218:19 | 8:12,14 | **Respiratory** | 164:14 |
| 81:3 91:25 | 229:20 | 9:1,2 | 107:14 | 165:5 |
| 95:22 | 234:17,19 | 112:12 | 160:22 | 170:22 |
| 96:15 | 234:22 | 164:20 | **respond** 28:3 | 176:7,24 |
| 98:19,23 | **reports** 2:18 | **represen...** | 121:22 | 177:19 |
| 99:3 123:1 | 2:20 3:17 | 8:18,23 | 122:4 | 182:15 |
| 123:10 | 3:20 49:13 | **request** 4:18 | 124:9 | 197:3 |
| 143:5,23 | 50:21 51:2 | 4:20 27:3 | 132:9 | 200:23 |
| 144:6 | 51:4,18,20 | 31:7 78:24 | 160:14 | 211:1 |
| 149:4 | 52:9,9,10 | 84:20 93:4 | 171:1 | 216:10 |
| 152:5 | 53:1,16,25 | 141:4 | 184:19 | 230:3,5 |
| 164:20 | 54:2,22 | 196:20 | 186:8 | 232:19 |
| 212:4 | 55:7 56:18 | 200:22 | 201:7 | 234:11 |
| 213:18 | 57:6,12,14 | 201:19 | 214:3 | 237:24 |
| 260:15 | 57:16,18 | 242:6 | 235:15 | **responses** |
| 261:14 | 57:23 58:5 | **requested** | 255:20 | 124:8 |
| **report/file** | 58:7,22,24 | 47:25 | 259:6 | 129:23 |
| 259:18 | 58:25 59:4 | 216:19 | 261:12,16 | 171:10 |
| **reported** | 59:14,17 | **requesting** | 262:21 | **responsi...** |
| 19:8 24:16 | 59:19,22 | 255:2 | **responded** | 212:19 |
| 92:16 | 60:7,18 | **requests** | 108:24 | **responsible** |
| 123:18 | 61:24 62:7 | 140:17 | 164:5 | 26:9 95:13 |
| 135:2 | 62:12 | 221:19 | 165:14 | **rest** 163:17 |
| **reporter** | 63:25 | 234:14 | 186:7 | **restful** |
| 1:19 9:4,8 | 66:17 | 250:3 | 238:3 | 126:20 |
| 9:16 | 71:16 72:3 | **required** | 245:3 | **restrict...** |
| 171:25 | 72:4 75:24 | 115:6 | **responding** | 148:23 |
| 256:18 | 77:11,13 | **requirement** | 27:3 28:8 | **result** |
| 268:25 | 81:1 | 138:2 | 218:1 | 151:11 |
| 270:5 | 141:10,24 | **reread** 74:19 | **responds** | 156:24 |
| **reporter's** | 142:2 | **rereading** | 192:21,22 | 160:5 |
| 5:21 8:8 | 143:20 | 91:19 | 214:8 | 166:24 |
| 26:22 | 145:6,14 | **research** | 251:25 | 167:18,19 |
| 97:22 | 146:23 | 59:2 72:6 | 258:15 | 250:4 |
| 118:12 | 147:5,13 | 72:9,10 | **response** | **results** |
| **reporting** | 147:18,19 | 81:1 | 2:11 4:7 | 189:22 |
| 3:3 7:20 | 147:23 | 147:16 | 33:12 59:2 | 191:11 |
| 51:24 | 148:2,9,11 | 258:6 | 59:6 61:15 | 192:16 |
| 58:10 | 154:13 | **reserve** 8:19 | 61:16 | 195:4 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 251:19 | 35:2 36:25 | 111:23 | 175:2,14 | 243:15,18 |
| **return** | 37:10,19 | 112:15 | 176:5,23 | 244:8,14 |
| 146:16 | 38:16,22 | 113:14 | 177:1,7,22 | 245:21 |
| 173:17 | 38:24 39:4 | 114:3,14 | 177:25 | 246:6,9,21 |
| 271:16 | 39:11,18 | 115:8 | 178:12,16 | 247:5 |
| **reversing** | 40:6,9,20 | 116:25 | 179:21 | 248:2,14 |
| 255:9,14 | 40:22 41:1 | 119:2,4 | 180:20 | 248:23 |
| **review** 5:15 | 41:1,5,19 | 120:6,10 | 181:19 | 249:22 |
| 8:20,20 | 41:21 | 120:15 | 183:13,24 | 250:6,17 |
| 38:25 | 42:12,16 | 121:23,24 | 184:6 | 251:1,23 |
| 47:25 | 43:2,4,17 | 122:5,5,10 | 185:16 | 251:25 |
| 93:10 | 45:15,20 | 123:14 | 186:16 | 252:4 |
| 124:22 | 46:8 48:1 | 124:4,12 | 189:2,10 | 253:1,4,22 |
| 145:9 | 48:9 49:6 | 124:23,24 | 190:10,23 | 254:22,24 |
| 211:14 | 49:14,15 | 126:6,25 | 191:1 | 255:17 |
| 212:7 | 49:22,24 | 127:2 | 192:22 | 256:17 |
| 250:3 | 53:13,17 | 128:9,18 | 194:15 | 257:6,13 |
| 254:11 | 54:21 60:1 | 129:11 | 195:15 | 258:16 |
| **reviewed** | 60:5,8,13 | 130:25 | 196:23,25 | 259:6,14 |
| 93:11,24 | 60:15 61:3 | 131:18,25 | 197:13 | 259:21 |
| 94:4,10,14 | 61:9 62:4 | 132:25 | 201:16 | 260:14 |
| 118:2 | 62:5,7 | 133:16 | 202:14 | 261:6 |
| 131:10 | 63:4 64:14 | 134:18 | 204:3,8 | 262:2,8,11 |
| 206:23 | 66:6,13 | 136:5 | 206:1,8,14 | 264:17,19 |
| 211:13,23 | 67:14,18 | 137:11 | 207:20 | 266:7 |
| 255:4 | 68:11,21 | 139:4,11 | 208:15,21 | 267:25 |
| **reviewing** | 69:15 71:7 | 139:19 | 210:10 | 268:5,8 |
| 31:24 | 72:14 74:2 | 143:7 | 211:3,9 | **risk** 42:23 |
| 97:10 | 75:2 76:2 | 144:12 | 213:13 | 156:18 |
| 118:19 | 77:25 79:9 | 145:25 | 214:6,21 | **risks** 53:15 |
| **right** 8:20 | 79:16,17 | 146:6 | 215:22 | **Road** 1:17 |
| 9:15 10:22 | 81:7,16,25 | 150:11,17 | 219:7,17 | **role** 11:13 |
| 11:1 15:10 | 85:14 86:2 | 156:8,10 | 220:5 | 12:18 15:1 |
| 16:24 | 86:9,16,22 | 156:13 | 221:13 | 16:1,8 |
| 17:10 | 87:7,11 | 157:12,17 | 222:5,14 | 18:23,24 |
| 19:11,19 | 88:19,23 | 157:19 | 224:12,25 | 24:24 32:8 |
| 20:1 21:19 | 89:13 | 159:22 | 225:5 | 40:19 |
| 21:23 22:2 | 91:12,17 | 160:5 | 226:13,22 | 86:13 |
| 22:13,19 | 92:3,19 | 161:3,11 | 226:25 | 115:18 |
| 23:1 24:6 | 93:3,14 | 161:15 | 227:5 | 161:21,21 |
| 24:19,23 | 95:9,13 | 163:5,8,23 | 230:16 | 183:6 |
| 25:7 26:5 | 96:20 97:2 | 164:3,6,14 | 233:16,23 | 220:12 |
| 26:20 27:1 | 97:4,18 | 165:25 | 234:4,9 | **roles** 15:5 |
| 27:24 28:3 | 98:6 99:12 | 166:15 | 235:15,16 | 31:25 |
| 28:6 30:1 | 102:1,24 | 167:10,23 | 236:21,24 | 107:19 |
| 30:19 | 103:15 | 168:8,12 | 240:3,7,12 | 223:11 |
| 31:23 | 107:4 | 170:16,24 | 241:24 | **rollout** 53:3 |
| 32:21 | 109:7 | 172:2,4,14 | 242:6,17 | **room** 97:23 |
| 33:13 34:2 | 111:7,12 | 172:22 | 242:22,24 | 133:15 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| rose 151:1 | SARS-CoV-2 | 24:12 26:5 | 223:18 | 167:20 |
| Rosie 107:25 | 3:7,8 | 33:16,17 | 227:1 | 169:10 |
| 114:22 | Sauer 6:2 | 33:23 34:5 | 228:2,12 | 170:20 |
| 115:10 | 26:22 | 40:8,10,23 | 228:20 | 266:19 |
| 120:2 | 30:19 | 41:24 42:8 | 229:14 | scientif... |
| 124:1,9 | 267:20 | 44:9 45:22 | 238:11 | 162:22 |
| 133:22 | 268:12,16 | 47:8 48:2 | 247:15 | scientist |
| 135:21 | 268:24 | 51:3,21,22 | 257:18 | 108:12 |
| rotate 28:25 | 269:4 | 52:3,25 | 260:15,20 | 129:20 |
| round 31:20 | save 182:22 | 53:13,19 | scan 85:20 | 168:18 |
| routinely | 184:7 | 55:3,4,21 | 211:12 | scientists |
| 77:17 | saw 45:16 | 63:5,14,15 | scanned | 121:24 |
| rudely 98:7 | 94:13 | 63:17 | 108:14 | 122:18 |
| rules 7:19 | 98:22 | 65:14 | 141:13 | scope 19:25 |
| 9:16 | 110:4 | 72:23 73:4 | schedule | scoping |
| run 77:11 | 120:7,23 | 74:12,14 | 177:3 | 105:23 |
| 147:13 | 130:15 | 80:12 82:6 | 198:17 | screen |
| 195:9 | 132:15,25 | 87:7 91:9 | 232:24 | 237:15 |
| 222:21 | 149:11 | 96:21 | 234:18 | screening |
| 224:9 | 191:21 | 103:16 | 235:12,14 | 237:17 |
| 227:2,24 | 203:25 | 105:22 | Scheer 239:5 | screenshot |
| 228:13 | 209:8 | 119:13 | Schmitt 1:3 | 186:19 |
| running | 220:13 | 120:12,18 | 149:1 | 190:11 |
| 261:25 | 227:4 | 122:16,20 | 265:8 | 191:9 |
| | 251:22 | 128:16 | 271:7 | 195:5 |
| **S** | saying 38:11 | 133:10 | 272:2 | 214:16 |
| S 1:3,20 7:5 | 51:12 | 134:24 | school 12:3 | screenshots |
| 270:4,22 | 75:10,11 | 139:6 | science | 251:14 |
| 271:7 | 76:9 83:23 | 144:4 | 106:12,20 | scrolling |
| 272:2 | 98:21 | 148:21 | 108:13 | 228:11 |
| s-- 174:7 | 99:14 | 159:20,25 | 114:13 | se 213:16 |
| S.W 7:3 | 121:13 | 166:17 | 123:20 | search 53:8 |
| sacred | 141:23,24 | 167:25 | 132:11 | 154:19,24 |
| 194:11 | 147:24 | 168:2,25 | 170:21 | 188:23 |
| Saddler | 149:17 | 169:17 | 210:21 | 189:22 |
| 222:10 | 153:10 | 172:7 | sciences | 191:5,8,21 |
| safe 157:4 | 162:7 | 184:6 | 12:16 | 192:16 |
| 161:14 | 169:7 | 185:19,22 | scientific | 193:22 |
| 162:3,13 | 170:11 | 190:16 | 87:20 | 194:3,11 |
| 255:9 | 172:7 | 193:10 | 105:17 | 194:12,13 |
| safety 33:24 | 178:22 | 195:17 | 112:15,20 | 194:19 |
| 68:25 | 195:22 | 197:24 | 113:8 | 195:4,7 |
| 103:9 | 196:1 | 200:1 | 121:18 | 222:1 |
| Sam 86:16,19 | 200:7 | 211:2,20 | 124:22 | 250:4 |
| 125:8,10 | 203:9 | 214:9,20 | 129:7,17 | 251:19 |
| 125:11,12 | 218:24 | 216:18 | 131:11 | searched |
| samples | 225:18 | 217:10 | 140:2 | 147:17 |
| 149:15 | 243:5 | 218:14,16 | 159:9,10 | searches |
| SARS 112:17 | says 22:23 | 218:17 | 161:22,24 | 77:12 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 148:11,12 | 111:14 | 99:15 | 244:5 | 190:6 |
| 190:4 | 114:19 | 106:12 | 247:24 | 192:9 |
| 195:1,10 | 119:17 | 117:9 | 259:18 | 196:21 |
| searching | 121:17 | 125:6 | sending | 198:25 |
| 190:5 | 124:16 | 153:5 | 35:13 | 199:1,13 |
| 192:12 | 126:21 | 190:8 | 44:18 79:6 | 201:8 |
| season 29:19 | 131:24 | 200:10 | 87:22 | 202:3 |
| second 14:22 | 140:9 | 207:22 | 121:1,2 | 205:21 |
| 33:6 72:24 | 142:17 | 258:20 | 141:24 | 209:5 |
| 73:2 99:24 | 146:13 | seek 266:18 | 145:15 | 216:15 |
| 106:14 | 147:22 | seen 21:16 | 146:22 | 219:25 |
| 112:10 | 153:7 | 47:4,5 | 147:4 | 221:10 |
| 125:6 | 154:24 | 50:2 88:17 | 171:8 | 226:10 |
| 133:6 | 156:11 | 105:5 | 189:17 | 238:2 |
| 136:9 | 157:8 | 110:3 | 208:25 | 241:22 |
| 156:22 | 160:24 | 112:13,14 | 230:1 | 243:12,21 |
| 160:15 | 161:8 | 113:6 | 244:1 | 246:14 |
| 169:12 | 166:14 | 117:21 | 245:10 | 248:1,8,9 |
| 212:23 | 169:21 | 130:17 | 248:24 | 248:22 |
| 267:19 | 172:9,11 | 165:2 | 251:2,11 | 249:20 |
| second-t... | 172:13,19 | 179:3 | 257:23 | 252:19 |
| 131:16 | 172:25 | 207:6 | 262:17 | 256:4,9,10 |
| secondhand | 179:17 | 209:15 | sends 64:23 | 262:19 |
| 54:1,22 | 185:22 | 218:13 | 131:17 | 265:3 |
| 55:7 | 186:2 | 220:1 | 133:2 | sentence |
| seconds | 190:25 | 239:25 | 144:1 | 29:12 |
| 262:22 | 198:7 | selected | 146:14 | 41:25 |
| section | 211:2 | 97:20 98:9 | 250:18 | 167:13 |
| 14:15 | 212:13,17 | Seman 45:12 | sense 204:25 | separate |
| see 10:13 | 214:12 | send 35:21 | sent 41:7,16 | 66:3 |
| 21:3 22:23 | 215:2,13 | 55:20,20 | 52:9 62:24 | 185:22 |
| 24:9 26:25 | 215:16 | 57:7,11,13 | 66:2 73:21 | 225:1 |
| 34:4 35:4 | 216:3 | 114:10,15 | 73:22 | 240:2 |
| 44:11 | 218:19 | 114:17 | 77:13 | 258:18 |
| 45:15 | 222:6,6 | 115:4 | 115:5 | separately |
| 46:21 | 227:12 | 124:7,8 | 117:11 | 173:15 |
| 49:22 | 229:13 | 129:20 | 120:9 | 209:20 |
| 51:21 | 232:12 | 130:11,12 | 121:9 | 210:22 |
| 53:24 54:4 | 240:12 | 135:11,13 | 124:23 | 247:24 |
| 63:10 65:6 | 250:24 | 135:18,19 | 133:21 | September |
| 65:13 66:7 | 252:10 | 146:10 | 137:1 | 3:7 152:25 |
| 70:10 | 258:9 | 153:17 | 139:18 | 219:25 |
| 72:25 73:5 | 261:18 | 189:14 | 147:20 | 250:8 |
| 75:24 | 262:23 | 192:12 | 148:18 | series 79:5 |
| 86:19 | seeing 69:10 | 194:17 | 153:14 | served 32:8 |
| 92:14 | 71:16,25 | 199:5 | 157:20 | servers |
| 96:24 | 72:17 | 208:1 | 186:9 | 217:21 |
| 97:16 | 76:15 87:9 | 214:5 | 187:19 | service |
| 103:19 | 87:19 93:1 | 242:5,19 | 189:7,12 | 103:25 |

**CAROL CRAWFORD  11/15/2022**

services 7:1
  7:2,9
  11:19
  146:16
serving 32:6
  107:19
session
  151:8
  152:6
set 82:21
  84:5,11
  161:2
  167:6,15
  170:3
  198:11,14
  213:2
  270:8,15
setting
  34:17
  197:4
  200:25
  236:16
  260:16
seven 136:8
severe 41:25
  42:23
  53:25 58:8
share 51:25
  65:18
  71:18,21
  71:23
  125:10
  144:7
  156:23
  160:4
  166:23
  182:20
  230:14
  235:11
  260:19,22
  261:3
shared 31:12
  33:18
  51:18 72:8
  102:15,17
  102:18
  144:8
sharing 54:2
  72:2,2

84:5,11
  211:7
she'd 124:7
  172:17
shedding
  87:10
  90:15
  207:11,16
  207:23
  208:1
  209:7
  265:24
sheet 115:23
  134:16
  272:1
sheets
  271:12,14
  271:16
Shelley
  25:15
shooting
  208:10
Shopkorn
  83:23
  86:24
short 33:5
  132:3
  149:24
  180:24
  227:25
  228:1
  247:20
  262:25
  266:11
shorthanded
  111:5
shortly
  207:25
shot 29:13
shots 5:15
  249:19,20
show 52:11
  81:3 88:12
  149:20
  214:16
showed 44:1
  117:10
  210:18
  246:7

265:23
showing
  186:23
shown 94:8
  94:10,21
  94:25 95:3
shows 53:5
  211:12
sic 19:13
  21:8 24:13
  120:15
  133:5
  253:3
side 54:1
  58:8 65:5
  76:5 80:2
  80:4 81:18
  139:15,16
  164:8,9,12
sidebar
  216:19
  217:2
sign 8:20
  128:4
  196:5
  271:14
signature
  269:20
  271:12,14
  271:17
  272:25
signs 42:9
  42:19
  156:9
  164:8
Silling 7:14
  8:9
Silver 45:4
similar
  18:14
  44:22
  46:17
  59:24
  128:15,15
  135:21
  153:23
  157:19,22
  180:11
  185:14

189:19
  197:18
  212:3,10
  232:14
  243:21
  266:1
simpler
  241:16
simply 143:5
Sincerely
  271:20
Singapore
  151:7
sir 269:13
site 113:18
  129:10
  191:13,13
  231:7,8,14
  232:6
sites 46:19
sitting 43:2
  236:22
situation
  248:13
situations
  192:8
six 32:8
  165:13,19
skip 166:1
skipped
  167:14
  269:7
Skype 241:16
slash 225:3
slide 149:19
  210:17
  265:18,22
  266:5
slides
  246:20
slightly
  47:21 65:3
small 95:15
  154:10
SME 108:7
  116:14
  130:19,21
  135:12,15
  152:1

SMEs 114:4
  116:12
  123:25
  124:3
  135:23
  136:1
  188:3
Smith 181:10
  250:11,12
  252:4,7
snippets
  227:12
Snow 6:18
  8:17,17
  10:7 30:23
  31:4,6,18
  33:3 36:18
  47:14 54:8
  57:8 76:21
  78:3,17
  79:1 80:16
  80:23
  82:20 86:5
  89:24
  93:16,18
  93:20 94:2
  94:6,11,14
  94:17,19
  96:3,7
  99:4
  100:14
  101:2,6,20
  102:13
  105:10
  106:6
  110:7
  112:22
  115:12
  121:5
  123:3
  126:12
  131:6
  132:6,21
  134:22
  137:22
  138:5
  142:24
  143:16
  152:22

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 158:5,21 | 150:22 | 118:23 | **speaking** | 249:24 |
| 158:23 | 154:21,22 | 124:19 | 17:14 | **specifics** |
| 159:14 | 155:1 | 126:15 | 20:13 | 27:19 |
| 161:16 | 181:7 | 136:15 | 104:14 | 38:12 |
| 162:5,16 | 198:22 | 144:14 | 232:18 | 140:15 |
| 163:1,9 | 207:7 | 145:11 | **special** | **speculate** |
| 165:7 | 212:19 | 152:10 | 214:10 | 28:22 |
| 168:13 | 220:2 | 153:18 | **specific** | 37:15 90:9 |
| 171:20 | 227:10,20 | 156:6 | 29:10 30:5 | 131:12 |
| 176:1 | 234:6 | 158:22 | 30:9 35:15 | 158:14 |
| 178:2,5 | 237:14,19 | 163:12 | 57:4 82:21 | **speculating** |
| 179:18 | 248:9 | 167:15 | 83:14 | 70:23 |
| 193:13,24 | 264:3 | 178:5 | 84:13 88:5 | 143:1 |
| 199:6 | 267:10 | 187:15 | 92:1 | **speculation** |
| 205:3,17 | **software** | 216:2 | 113:12 | 76:22 78:4 |
| 205:22 | 71:8 | 237:7,22 | 116:1 | 89:25 |
| 206:3,7,9 | **Sokler** 87:3 | 239:24 | 117:4,7 | 101:21 |
| 231:15 | 87:4 | 240:20 | 128:1 | 112:23 |
| 238:13 | **solely** 256:6 | 255:12 | 129:4,13 | 121:6 |
| 251:4 | **solve** 238:11 | **sort** 65:1 | 144:5 | 123:4 |
| 259:25 | **solving** | 69:13 | 160:10,11 | 138:6 |
| 260:25 | 215:19 | 149:10 | 175:10 | 142:25 |
| 266:24 | **somebody** | 154:15 | 192:1 | 159:15 |
| 268:2,6 | 114:12 | 207:13 | 225:25 | 163:2 |
| 269:9,12 | **something's** | 209:9 | 234:14 | 193:14 |
| 269:16 | 148:6 | **sound** 102:3 | 251:18 | 231:16 |
| 271:4,9 | ▆▆▆▆▆ ... | **sounds** | 261:24 | 251:5 |
| **social** 11:16 | 174:7 | 142:20 | 264:24 | 260:1 |
| 12:6 15:6 | **soon** 55:22 | 177:20 | **specific...** | **spelled** |
| 15:16 17:1 | 88:18 | 178:17 | 56:13 | 211:3 |
| 19:20 20:3 | 127:13 | 200:9,12 | 58:11 | 244:7 |
| 20:16 24:3 | 128:9 | **source** 140:7 | 68:23 | **spike** 139:13 |
| 24:16,25 | 131:23 | 233:5 | 77:18 | **split** 45:20 |
| 35:9 36:5 | 134:9,25 | 238:5 | 79:21 89:9 | 224:13,14 |
| 50:3 52:10 | 268:12 | **sourced** | 90:12 | **spoke** 18:2 |
| 52:11 53:8 | **sorry** 3:12 | 46:20 | 117:12 | 21:8 36:11 |
| 54:14,17 | 3:13 13:4 | **sources** | 121:9 | 66:8 |
| 57:25 59:3 | 14:5 28:6 | 46:24 59:5 | 133:19 | 166:23 |
| 72:2,12 | 28:17 | 222:3 | 140:20 | **spoken** 33:14 |
| 90:21 92:7 | 32:14 | 237:15,21 | 143:23 | 64:11 |
| 104:5,24 | 63:10 | **span** 253:16 | 151:25 | **spread** |
| 105:1,3 | 67:17,17 | **Spanish** | 158:14 | 161:24 |
| 113:11 | 67:25 | 65:16,20 | 171:6 | **spreadsheet** |
| 114:8 | 73:15 | 70:24 | 182:19 | 201:12 |
| 117:2,8,17 | 74:21 | **speak** 10:15 | 183:11 | 202:2,3,13 |
| 124:6 | 85:21 | 20:15 27:9 | 191:22 | 202:23 |
| 143:6,21 | 93:17 96:7 | 29:9 | 198:3 | 211:23 |
| 143:24 | 96:8 | **speakers** | 211:17 | **spreadsh...** |
| 148:13 | 103:12 | 97:23 | 232:2 | 202:19 |

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| spring 17:11 | 131:16 | 272:3 | 68:5 85:12 | submit 219:5 |
| 20:1 68:15 | 174:24 | statistic | 91:5,9 | subscribe |
| Spur 4:7 | 197:20 | 190:17 | 103:1,2 | 273:11 |
| St 271:18 | 206:25 | 191:15 | 108:8 | subsequent |
| stack 268:25 | 237:9 | statistics | 113:24 | 134:4 |
| staff 18:21 | 242:14 | 185:24 | 118:18 | 146:6 |
| 18:21 | 253:13 | status | 123:20 | substance |
| 99:18 | started 12:2 | 221:22 | 126:11 | 273:8 |
| 160:17,18 | 16:12,13 | 225:7 | 127:18 | substantial |
| 215:12 | 18:5 25:25 | staying | 129:20 | 194:25 |
| stamp 124:18 | 32:16 61:7 | 166:21 | 130:10 | successful |
| 136:14,19 | 77:12 | 172:8 | 132:17 | 53:1 |
| 146:11 | 171:7 | Steele | 133:17 | successf... |
| stamped | 188:14,15 | 254:17,18 | 137:3 | 212:2 |
| 136:9 | starting | stems 137:5 | 138:25 | Sudevi 7:6 |
| 169:13 | 66:18 | step 242:14 | 141:8 | suggest 42:1 |
| stamps | 248:18 | steps 182:24 | 145:4 | 57:21 |
| 205:25 | starts 44:25 | 184:8 | 150:12,14 | 194:3 |
| stand 208:18 | 250:7 | stop 70:13 | 152:7,20 | suggesting |
| standards | state 1:3 | 127:8 | 152:24 | 56:6 |
| 103:25 | 6:1 8:4 | 234:23 | 156:1,6 | suggestion |
| 234:21 | 11:1 12:11 | stories | 163:16 | 87:18 |
| standing | 25:2,11,16 | 76:18,20 | 166:5 | 184:16 |
| 72:6 208:8 | 234:15 | 82:18 | 171:17 | 256:15 |
| standpoint | 237:23 | storm 122:4 | 173:23 | Suite 6:11 |
| 34:19 | 238:20 | story 3:8 | 179:12,14 | summaries |
| Stanley | 254:8 | 229:8,9 | 181:14,18 | 72:12 |
| 174:6,10 | 270:2,5,24 | straight | 184:20 | 147:11 |
| 174:13 | 271:7 | 153:14 | 187:12,14 | summarized |
| 176:7 | 272:2 | strategists | 189:5,7 | 60:20 62:2 |
| 189:16 | 273:1 | 47:9 | 196:18,20 | summarizes |
| 193:1 | stated 39:22 | strategy | 200:18 | 65:3 |
| 195:12 | 110:11 | 11:22 | 201:18,19 | summarizing |
| 250:10 | 147:21 | Street 6:3 | 201:23 | 61:23 |
| 251:2 | 203:25 | 6:10,20 | 205:14,20 | summary 40:1 |
| 252:7 | statement | 271:5,18 | 206:16 | 53:9 59:5 |
| 253:3 | 37:11 | stress 41:25 | 219:22,24 | 60:17,25 |
| 254:18 | 162:24,25 | string 43:20 | 221:6,8 | 61:24 |
| Stanley's | 203:22 | 44:6 83:3 | 223:18 | 62:17,19 |
| 250:25 | statements | 83:6 | 226:7,9 | 63:19 72:7 |
| Stanley/Jan | 106:11 | structure | 237:5,7 | 144:2 |
| 174:16 | 143:15,19 | 185:14 | 239:19 | 148:19 |
| stapled | 144:21 | studied | 241:20,21 | supervisor |
| 205:22 | states 1:1 | 108:12 | 247:10,12 | 234:7 |
| 239:14 | 1:10 | stuff 121:15 | 249:18,19 | support |
| start 11:24 | 228:17 | subject 2:8 | 254:9,11 | 15:17 |
| 55:22 | 239:9 | 33:10 39:7 | 257:8,9 | 27:14 |
| 58:19 | 254:2 | 43:19 44:9 | subjects | 33:19,25 |
| 119:6 | 271:8 | 51:3 60:5 | 181:21 | 206:22 |

**CAROL CRAWFORD  11/15/2022**

211:21,24
213:10
**supported**
146:7
**supports**
218:1
**supposed**
125:1
215:4
**Supreme** 6:3
**sure** 14:13
33:21 37:9
40:21
44:24
46:13,24
48:12
55:13
61:12
64:17,19
64:22
68:19 69:1
69:6,25
73:24 75:2
79:15
80:11
82:13
88:25
96:18
108:25
110:11
113:18
116:4
120:3
121:10,13
121:14
125:25
127:21
128:19
130:15
141:20
143:3
151:8
160:25
173:10
182:12
183:12,23
184:13
188:16
189:21

190:4,24
192:1
195:25
202:24
205:5,5,23
206:4
212:11,12
212:14
216:11,22
217:13
223:10
228:6
229:25
235:6
240:1
251:23
256:16
257:10
266:16,20
**surface**
68:16 69:4
**surprisi...**
127:11
**survey**
221:21,21
224:25
225:3
**surveying**
224:21
**surveys**
131:4
**survival**
111:20
113:9
122:14,19
**suspect**
56:16 72:7
213:4
219:13
231:12
**suspected**
231:23
**suspense**
67:10
**swap** 191:23
**swear** 9:4
**switch**
192:19
**sworn** 9:6

270:9
**symptom**
191:15
**symptoms**
183:16
190:18
191:15
**sync** 5:4
221:8
223:21,23
239:21
**synced**
268:14,16
269:11
**synchron...**
223:22
**syncs** 268:16
**syndrome**
139:14
**system** 15:24
44:21
92:14
122:24
123:5,7
164:1
212:6
233:12
**systems**
17:14

_____
**T**
_____
**T** 270:1,1
**table** 207:15
207:18,20
211:9
265:23
266:1,8
**tabs** 183:15
189:25
190:12
196:12
**tactics**
27:20
**tag** 88:9
**tagged** 157:8
**take** 18:16
21:14
30:20 33:5
33:6 35:22

38:23
43:12,12
47:22 49:3
60:8 61:17
74:11,24
84:20 85:2
86:8
100:15
105:20
116:18
118:25
129:23,23
135:5
136:5
141:12
146:21
149:24,25
150:1
159:13
160:17
161:5
174:3
176:5
179:12
187:3
193:2
205:3,16
206:24
211:15
225:12
229:24
234:9
238:17
241:9
249:18
253:1
256:18
**taken** 76:7
82:7
116:19
149:14
162:4
201:16
204:3,12
270:6
271:11
272:4
**takes** 144:1
171:11

**talk** 9:21
20:19
21:11 37:9
39:4 49:14
69:1 72:4
77:20
116:12
124:4,5
167:7,9,15
172:11,13
172:25
178:19
182:10
183:20
185:2
210:10
227:18
237:22,23
243:6
249:2
**talked** 37:7
43:17
54:14
61:10
106:25
125:14
197:14
210:17
213:9,13
217:7
222:22
224:10
226:18
227:19
244:23
267:15
**talking** 3:22
18:5 19:19
53:5 72:5
78:22 83:1
83:20
121:11
124:2
127:14,15
127:16,24
128:11
134:10
149:18,20
226:21

**CAROL CRAWFORD  11/15/2022**

233:20
**Tangle** 60:7
**target** 45:23
**task** 42:5,5
**tasked**
  248:23
**team** 41:12
  45:23
  51:24
  52:22 59:2
  66:18
  68:16,17
  69:1 72:10
  74:14
  75:11 76:7
  77:5,15,17
  78:16 82:7
  82:9,11
  84:7 87:2
  90:16 92:7
  103:9,9
  105:25
  107:10
  110:14
  119:10
  125:13
  135:16
  139:7,10
  140:6
  147:16
  151:8,22
  151:23
  154:5,22
  166:20
  172:8
  174:21,23
  175:16
  177:10,11
  182:25
  184:9
  192:24
  193:2
  197:5
  201:1,11
  203:14
  208:2,4
  211:14
  216:22
  227:2

228:2
233:12
234:18
255:2
263:1,21
**team's** 68:19
  69:5 80:12
  119:14
  124:13
**teams** 27:9
  27:13 52:3
  52:10
  68:25
  80:25
  147:18
  164:15
  220:21,22
  220:22,23
  241:1,3,6
  258:4
**tech** 114:14
  208:10,17
**technical**
  181:10,11
  181:20
  215:7
  224:9
  250:14
**technically**
  120:20
**technique**
  213:17
**technolo...**
  34:19
**technology**
  16:5
**tee** 75:5
**telephone**
  64:12
**telephonic**
  20:8,12
**telephon...**
  20:15
**tell** 20:4
  30:3 32:24
  33:10
  36:20
  43:19
  55:17

67:23
72:24
84:15 85:9
85:10 86:2
87:13
103:1,7
112:13
119:13
126:10
138:25
150:11
154:18
157:15
158:19
159:3
162:14
166:4
170:14
171:17
187:12
189:4
206:12
207:14
208:15
209:22
210:15
216:6
219:2,21
221:6
223:13
229:16
237:4
238:21
239:23
247:10
257:8
267:14
**telling**
  89:23
  153:6
  158:11
  168:19
  199:24
  220:9
  243:24
  258:1
**tells** 55:17
  170:5
**term** 11:11

39:21
87:25
134:11,12
193:16
217:14
**terms** 25:13
  43:5 64:18
  69:10
  98:25
  103:25
  151:1
  191:21
  194:19
**terrible**
  247:2
**testified**
  9:7 65:11
  96:5
  145:22
  148:7
  220:6
**testify**
  10:24
**testifying**
  104:18
**testimony**
  47:15 54:9
  57:9 64:2
  65:7 76:22
  89:25
  101:3
  120:19
  125:20,25
  126:1
  132:7
  143:17
  161:17
  162:6
  178:3
  199:7
  266:25
  270:10
**testing**
  63:21
  220:11
**texting**
  36:10
**TF** 42:5
**Thakral**

25:15
**thank** 10:20
  15:7 22:2
  24:23 27:7
  28:12
  31:18 32:4
  32:21
  48:25
  50:13
  55:17
  64:23
  66:24 67:6
  67:10
  69:17
  83:25
  84:22
  85:21
  90:25
  96:21
  104:21
  117:22
  124:13,16
  132:13
  133:7
  135:4
  138:24
  144:15
  149:21
  152:17
  156:19
  158:15
  161:9
  165:20
  166:21
  170:23
  171:13
  176:25
  187:7
  189:3
  204:15
  234:12
  236:24
  265:11
  269:17
**thanks** 66:13
  107:7
  119:14
  156:16
  185:19

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 192:24 | 12:7 16:17 | **think** 10:3 | 133:16,21 | 218:21,23 |
| 197:13 | 30:21 | 16:19 | 138:18 | 218:24 |
| 211:6 | 38:11 | 21:17 23:7 | 142:2 | 219:9,10 |
| 230:10 | 46:17 | 23:8 28:20 | 143:23 | 220:1,12 |
| 242:16 | 54:19 58:2 | 28:20 32:8 | 147:13,17 | 221:15 |
| 253:7 | 58:24 62:5 | 37:24 | 153:9 | 222:5,10 |
| **theme** 266:2 | 62:6 64:10 | 38:14 39:5 | 156:4 | 222:23 |
| 266:3,6 | 64:19 66:9 | 40:3,12,17 | 157:23 | 224:3,16 |
| **themes** 5:17 | 79:24 | 43:16,23 | 158:1,18 | 224:20,20 |
| 52:11 | 83:12 | 46:2,14 | 159:19 | 225:2 |
| 53:14 59:3 | 88:12 89:3 | 48:6,7 | 160:14,25 | 226:17 |
| 59:10 | 90:8 91:25 | 49:18 | 161:25 | 227:11 |
| 62:17 | 99:7,9 | 50:15,19 | 162:7 | 229:18 |
| 72:17 | 105:19 | 52:14 63:7 | 163:6,11 | 230:8,9 |
| 75:18,25 | 106:11 | 63:12 | 165:11 | 231:6 |
| 76:15 | 113:12,14 | 66:16 69:3 | 167:12,14 | 232:23 |
| 87:20 | 113:17 | 69:6,9,22 | 171:5,5,9 | 233:18 |
| 90:19 | 114:10 | 75:1,14 | 172:2,25 | 236:21 |
| 257:9,18 | 117:20 | 77:1 79:10 | 173:10,11 | 238:8 |
| 258:8 | 122:2,3 | 79:13,14 | 173:13,14 | 239:25 |
| 264:3 | 128:3,13 | 80:24 | 173:16 | 242:2 |
| **theoreti...** | 129:6 | 81:21,23 | 175:20 | 243:6,9 |
| 187:3 | 130:23 | 82:12 | 178:22,25 | 244:1 |
| **theory** 122:8 | 135:22 | 83:23 | 180:6,8 | 246:3 |
| **thereon** | 151:1 | 86:14 | 184:14,23 | 247:5 |
| 273:10 | 152:5 | 88:10,10 | 186:9,19 | 248:6,8,11 |
| **they'd** 76:4 | 167:1 | 90:12 | 186:23 | 248:13,16 |
| 130:5,23 | 170:11 | 91:19,20 | 188:14,15 | 248:18 |
| 157:9 | 171:8 | 91:21 | 190:16 | 250:6,17 |
| 246:17 | 179:25 | 92:16 97:5 | 192:9 | 251:20 |
| 260:22 | 180:10 | 99:22 | 193:5,5,9 | 253:22 |
| **thing** 25:20 | 181:23 | 103:17 | 194:21 | 255:21 |
| 34:4 35:2 | 182:4 | 105:22 | 195:2,8,11 | 256:7,13 |
| 49:24 | 183:17 | 106:25 | 195:22,25 | 256:14,23 |
| 65:10 | 188:20 | 109:2 | 197:16 | 257:19 |
| 123:17 | 189:22 | 110:23 | 198:5,24 | 258:18 |
| 126:3 | 191:14 | 113:17 | 198:25 | 259:16 |
| 137:25 | 194:23 | 115:15 | 203:11 | 260:4,7,13 |
| 155:15 | 199:24 | 117:3,19 | 204:25 | 261:10 |
| 179:11 | 203:24 | 119:2 | 206:3 | 263:14,19 |
| 189:20 | 209:2 | 120:1,22 | 207:2,6 | 263:21 |
| 204:13 | 217:21 | 121:15 | 208:22 | 264:19 |
| 225:7,8 | 218:24 | 123:17 | 209:6 | 267:15,24 |
| 231:8 | 219:5 | 125:24 | 210:3 | 268:16,19 |
| 240:10 | 224:16 | 128:20,23 | 213:2,17 | **thinking** |
| 248:12 | 232:4,14 | 129:3,9 | 214:4,16 | 28:14 64:5 |
| 260:14 | 247:2 | 130:14 | 215:20 | 69:7 |
| 266:15 | 251:18 | 131:13 | 216:5,12 | 128:10 |
| **things** 9:20 | 263:11 | 132:9 | 217:25 | 172:23,25 |

**CAROL CRAWFORD  11/15/2022**

215:10
230:21
243:8
259:17
263:10
269:7
third 247:20
248:20
Thombley 7:7
Thornton
222:25
thought 52:2
65:17 88:6
90:10
91:21
97:10,15
97:17
107:2
108:14
109:13
125:5
133:24
153:24
156:6
173:6
176:21
186:12
192:11,19
194:7
202:16
210:19
215:11
220:15
223:5
236:18
249:13
256:7
266:18
267:16
thoughts
27:20 70:8
121:19
thousands
34:25
168:20
thousand...
168:1
threats
91:25

92:18
98:22
212:5
218:23
three 13:18
13:23
14:15
27:25
31:12
92:16,17
115:16
120:3
140:16
167:1,4,25
228:13
Thursday
73:6 84:7
84:9,11
105:23
119:18,20
119:21
263:16
tie 10:19
tied 122:21
time 8:2
17:25
19:24
20:13
28:10,18
28:20 29:3
29:8 30:6
32:5 36:6
36:12 37:8
37:15 38:6
38:10
39:18
40:12
42:25
49:15 52:4
54:15
58:13 59:8
61:7,13
65:2,21
68:7,17
71:2 73:11
77:7 78:9
89:12
90:17
92:13,16

97:12
107:21
111:10
130:1
132:1,3,10
135:3
137:18
140:11
141:20
142:6,9
144:8
145:25
151:7
156:9
157:22,24
160:20
167:6,9,15
170:3
171:11
174:25
175:9
179:2,6
180:24
183:3,8,18
183:18
185:9,19
189:21
192:9
197:17
198:11,15
198:25
200:13
201:7
210:4
212:13
220:6
226:17,18
227:14,25
230:20
232:13,13
236:12,14
238:5
244:13
245:6
249:14
252:18
261:25
262:20
263:13

268:1
timeline
16:18
timelines
29:11
timely 27:15
times 29:1
65:19
72:18
106:24
129:25
130:8
133:21
226:21
235:11
241:16
243:7
timetable
192:7
timing 70:1
title 11:6
193:9
198:2
223:7
261:24
titled 3:9
titles
177:14
today 10:24
21:19
27:22 93:9
94:9,10,13
94:22 95:1
95:3
109:16
116:25
193:1,11
Today's 8:2
Todd 21:7
196:23,24
197:14,18
197:23
198:6
199:21
202:4
207:4
211:5,16
214:3
216:5,12

216:15,17
218:1,14
219:2
248:1
Todd's
197:25
216:10
told 12:20
12:22
14:15 26:4
63:9 73:5
78:1 82:1
86:25 97:5
114:17
131:22
210:24
213:25
235:22
tomorrow
27:22
230:12
tomorrow's
188:2
tons 192:10
tool 50:4
234:20,22
tools 90:21
148:13
154:21
234:16
top 36:15
39:8 41:5
47:7 52:23
136:2
141:14,15
151:1
172:6
173:8
187:20
191:3
196:2,24
219:23
237:25
topic 107:24
124:1
144:22
150:21
154:14
174:25

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 177:5 | 141:23 | 215:18 | 249:2 | 84:2 |
| 184:18 | travel 46:14 | trying 17:6 | Twitter's | 106:18 |
| 198:1 | 48:20 | 26:1 29:25 | 206:22 | 178:14 |
| 256:8 | traveler's | 34:15 | Twitter.com | 181:9,17 |
| topics 54:14 | 45:10,10 | 36:22 | 197:24 | 181:20 |
| 77:24 | travelers | 39:23 40:2 | two 3:1 | typo 257:10 |
| 107:3 | 2:13,16 | 78:21 79:4 | 20:25 22:7 | 260:5 |
| 140:13 | 39:10 | 89:5 114:7 | 58:24 77:9 | |
| 144:9 | 43:22 | 121:15 | 83:20 84:7 | U |
| 181:20 | 44:10 45:6 | 129:8 | 85:12 87:8 | U.S 6:19 7:1 |
| 187:23 | 45:8,13 | 183:12 | 87:23 | 7:2,8 8:5 |
| 188:6 | 46:5 54:23 | 188:22 | 89:11 | 65:16 71:9 |
| 195:8,9 | treatment | 189:21 | 92:16,17 | 71:12,19 |
| 243:11,12 | 183:16 | 194:16 | 109:23 | 71:24 |
| 256:6 | 188:3 | 213:8 | 110:19 | 101:19 |
| tossed | trends | 219:3 | 120:4 | 192:25 |
| 165:11 | 143:24 | 232:9,12 | 131:25 | 193:10 |
| totally | 197:6 | TTS 169:5 | 132:8 | 228:15 |
| 152:9 | 201:2 | Tuesday | 151:20 | 233:12,16 |
| town 173:13 | 211:11 | 61:18 | 156:14 | 271:5 |
| 250:16,21 | 262:14 | 161:7 | 198:24 | unanswered |
| TP 127:12,13 | tried 244:5 | turn 10:17 | 207:16,21 | 70:11 |
| 127:22 | true 106:11 | 143:25 | two-page | unclear |
| 128:9,11 | 108:22 | 144:12 | 40:1 | 216:1,9 |
| 128:16 | 116:8 | turn.io 70:7 | 153:10 | 219:4 |
| track 71:9 | 120:14 | 70:15 | two-week | uncommon |
| tracker | 139:24 | Turner 35:6 | 66:1 | 188:19 |
| 186:14 | 158:19 | 37:2,20 | Tyler 66:15 | 232:3 |
| tracking | 159:4 | Twitter 16:5 | 141:17,19 | uncredible |
| 192:25 | 164:24 | 21:7,9 | 141:20,24 | 266:22 |
| 193:10 | 170:12 | 180:13 | 144:1,13 | 267:4,7 |
| 195:18 | 255:5 | 181:1 | 145:15,18 | underlying |
| 196:5 | 270:9 | 197:24,25 | 146:10,22 | 185:25 |
| trail 114:7 | 273:9,13 | 198:12,14 | type 16:11 | understand |
| training | trust 68:25 | 199:5,21 | 40:13 | 10:1,3,4 |
| 98:13,16 | 103:9 | 200:20 | 106:24 | 10:14,15 |
| 99:19 | 174:23 | 202:12 | 151:23 | 14:13 |
| 234:18,25 | 175:16 | 206:23 | 222:24 | 36:21,22 |
| 235:1,5,7 | 177:10 | 209:2,19 | 227:22 | 41:2 57:24 |
| 235:13,22 | 220:21 | 211:17 | 253:18 | 78:21,21 |
| 236:15,16 | trusted | 212:8,13 | typed 26:16 | 79:5 92:15 |
| 236:17 | 135:19 | 212:17,18 | types 20:2 | 104:19 |
| transcript | truth/da... | 212:20,21 | 99:2 | 109:10 |
| 5:23 8:21 | 140:7 | 213:15,20 | 227:19 | 129:9 |
| 125:11,19 | truthfully | 214:11,13 | 258:7,16 | 139:10 |
| 126:2 | 10:24 | 214:25 | typical | 148:14 |
| 268:17,22 | try 9:21 | 218:17 | 194:22 | 155:19 |
| 271:13 | 106:18 | 220:8,10 | typically | 162:21 |
| transfer | 179:11 | 248:2 | 52:10 57:2 | 168:19 |

**CAROL CRAWFORD 11/15/2022**

169:1,17
174:21
190:23
193:16
194:1,17
194:21
195:21
217:16
224:1
232:10
265:5,5
understa...
14:6 24:10
26:17
35:13
36:14
37:10
40:21 41:1
42:17
44:20 64:8
69:8 74:17
79:19 80:8
95:17
96:11
103:8
109:20
111:1
114:5
120:24
122:25
137:16
138:15
139:22,23
143:8
150:17
158:2,10
159:2
163:4
167:17
168:20
177:6
184:10
193:12
201:19
204:4
210:6,9
212:1
213:23
217:17,19

224:19
228:18
251:10
255:25
258:24
261:6
understood
91:20
140:4
undertaking
69:12
unfolding
3:8
unfortun...
196:7
unit 40:15
40:15
42:13 45:9
United 1:1,9
228:17
271:8
272:3
units 40:15
46:11
47:21,23
48:19,21
University
12:10,10
unknown
170:12
unmarked
67:8
unproven
108:22
120:13
unsupported
108:22
120:13
unvaccin...
146:3
up-to-date
228:21
upcoming
224:6
update 59:12
75:16
148:15
170:23
183:18

193:20,21
193:22
194:2
195:19
221:21,21
225:2,3
228:22
229:11,19
updated
143:14,19
157:1
159:20
160:2
162:10
240:10
updates 4:3
4:5 156:2
163:18
166:24
192:2
250:2
253:15
updates/...
221:19
updating
192:8
upgraded
267:5
uptick 146:1
urgency 48:4
url 229:14
Ursula 223:2
223:11
Ursula's
223:8
use 15:20
18:13 29:2
29:4,5
35:23 36:2
39:20
40:17 59:5
67:8 70:20
71:7 96:15
105:18
128:21
134:11,12
137:10,12
139:15
147:23

156:25
160:1
169:18,23
174:25
213:5,6,24
215:10
236:13
useful
173:19
user 24:22
97:8
user's 228:9
users 27:15
54:2 89:6
228:11
uses 55:4
136:18
usual 206:24
usually 93:8
98:22
109:25
115:6
123:24
127:17,24
144:17
181:6,13
227:20
250:14

_____

**V**

_____

v 271:7
272:2
vac- 231:5
vaccinated
143:13
165:15
168:7
vaccination
53:3 62:12
66:4,6
71:13
142:16
164:6
169:3,6
vaccinat...
53:1
148:23
vaccine 4:8
53:17,25

58:6,8
59:9,12
63:21 65:4
65:5 70:24
72:4 76:17
81:1,22,23
82:18
87:10
108:2
111:13
115:19
119:15
121:4
122:2,23
123:15
124:14
126:22
137:19
138:2
140:7,13
143:8
156:18,21
156:25
157:3,4,7
157:17,25
159:5
160:17,18
160:22
161:14
162:3,12
162:13
164:2,8
166:7
169:19,23
170:1
171:22
172:11,13
174:20
175:5
176:17
182:19,20
182:22
183:9,25
197:9
201:5
207:16,23
207:25
209:7
231:11

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 234:15 | 231:3,5 | **vary** 181:8 | 106:7 | 196:16 |
| 237:16 | 232:10 | **VC** 5:4,9 | 110:9 | 199:9 |
| 258:5 | 233:10 | 223:18 | 111:24 | 200:14,16 |
| 263:1,7,21 | 234:1,13 | **VC-Facebook** | 112:3,7,24 | 203:13 |
| **vaccine-...** | 251:22 | 221:8 | 113:4 | 205:5,12 |
| 52:24 | **VAERS** 3:22 | 239:20 | 115:13,17 | 205:18,25 |
| 53:22 58:7 | 122:21,22 | **VECCHIOINE** | 118:8,14 | 206:6,11 |
| 140:8 | 122:23 | 10:8 | 118:16,21 | 219:17,20 |
| 227:3 | 150:14,18 | **Vecchione** | 121:7 | 221:2,4 |
| **vaccine.gov** | 150:21,21 | 2:4 6:8 | 123:6 | 226:2,5 |
| 230:14 | 150:23,24 | 8:13,13 | 126:6,9,13 | 231:17,24 |
| 231:1,4 | 150:25 | 9:11 21:13 | 131:7 | 236:2,4,20 |
| 232:6 | 151:3,9,19 | 22:4,9 | 132:12,23 | 237:3 |
| 233:15 | 151:20 | 26:24 | 133:5,8,9 | 238:15 |
| 234:13 | 152:2,5,8 | 30:19 31:5 | 134:23 | 239:12,17 |
| **vaccinef...** | 201:15 | 31:16,22 | 135:4,7 | 241:14,18 |
| 230:14 | 204:3,5,12 | 33:1,5,7 | 136:20,23 | 247:3,8 |
| 231:1,2,7 | **vague** 36:18 | 36:19 | 136:24 | 249:5,8,10 |
| **vaccinef...** | 36:21 | 38:19 | 137:24 | 249:15,16 |
| 231:4 | 48:23 78:3 | 43:11 | 138:11 | 251:7 |
| **vaccines** 3:7 | 96:13 99:4 | 47:16 | 143:2,18 | 254:5 |
| 3:8 64:20 | 101:6,20 | 48:25 49:2 | 144:25 | 256:17,22 |
| 70:21 86:3 | 105:10 | 54:10 | 145:2 | 257:5 |
| 87:14 | 115:12 | 57:10 60:1 | 149:22,25 | 260:2 |
| 89:12 | 117:24 | 60:4 67:2 | 150:7 | 261:1 |
| 115:22 | 131:6 | 67:5,11,13 | 152:14,18 | 267:1,20 |
| 124:2 | 132:21 | 76:24 78:5 | 152:23 | 267:21,25 |
| 127:10 | 134:22 | 78:19 79:3 | 153:3 | 268:4,8,19 |
| 128:8 | 176:1 | 80:18 81:6 | 155:8 | 269:6 |
| 131:5 | **vaguely** | 82:24 | 158:7,24 | **verbal** 9:17 |
| 137:3,6 | 154:12 | 84:18,22 | 159:16 | **verifiable** |
| 139:14,17 | **vagueness** | 84:23 85:4 | 161:18 | 237:20 |
| 144:20 | 176:15 | 85:7 86:1 | 162:9,19 | 238:4 |
| 158:4,12 | **valid** 237:17 | 86:7 90:1 | 163:3,14 | **version** |
| 163:25 | **variant** | 91:2,8,11 | 164:18 | 227:23 |
| 164:13,23 | 190:25 | 93:4,6,23 | 165:8,18 | **versus** 8:5 |
| 167:5 | 191:1 | 94:3,8,13 | 165:21,24 | 217:3 |
| 168:1,4,11 | **variants** | 94:16,18 | 166:3 | **video** 21:18 |
| 169:1,15 | 190:21 | 94:21 95:2 | 168:16 | 54:3 |
| 169:21 | 191:17,20 | 95:6,12 | 171:16,21 | 227:12,23 |
| 170:15 | **varied** | 96:5,9 | 172:1 | 227:24 |
| 183:16 | 130:14 | 97:25 98:5 | 173:18,21 | 268:10,12 |
| 201:14 | **variety** 88:8 | 99:5 | 176:2 | 268:16 |
| 203:20,22 | **various** | 100:12,17 | 178:7,8 | 269:10 |
| 204:1,18 | 54:24 | 100:18 | 179:7,10 | **video-re...** |
| 231:5,10 | 55:11 | 101:4,7,22 | 179:20 | 8:3 |
| 253:11 | 122:2 | 102:1,8,21 | 187:7,10 | **videogra...** |
| 256:1,3 | 155:16 | 102:23 | 189:1 | 7:14 8:1,9 |
| **vaccines...** | 227:19 | 105:11 | 193:15,25 | 9:3,9 |

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| 30:24 31:2 | **want** 23:6 | 160:4 | **way** 22:18 | 76:15 |
| 31:17 98:1 | 27:11 29:1 | 166:23,25 | 42:1 71:12 | 121:13 |
| 98:3 102:9 | 33:17,18 | 183:18 | 99:10 | 148:18 |
| 102:11 | 34:9 36:24 | 186:22 | 110:14 | 165:22,25 |
| 150:2,4 | 46:18 47:4 | 188:11 | 119:22 | 166:1 |
| 205:9,11 | 55:25 | 190:13 | 134:3 | 169:7 |
| 256:25 | 68:18 | 191:22 | 140:4 | 172:23 |
| 257:2 | 70:12 | 199:20 | 147:7,10 | 173:12,16 |
| 268:9,14 | 76:19 | 204:25 | 147:20,24 | 182:3 |
| 268:18 | 77:16,24 | 207:21 | 148:12 | 192:7 |
| 269:2,11 | 78:24 79:9 | 209:20,23 | 155:22 | 200:10 |
| 269:13,15 | 80:7 85:22 | 215:16 | 162:23 | 203:9 |
| 269:17 | 126:20 | 217:2 | 181:5 | 205:6 |
| **VIDEOTAPED** | 131:12 | 224:5,6,22 | 194:22 | 208:8,8 |
| 1:13 | 175:1 | 228:20 | 197:19 | 256:6 |
| **view** 29:8 | 176:9 | 230:22,22 | 199:20 | 268:20 |
| 146:7 | 178:18,19 | 242:14 | 209:24 | 269:4 |
| 164:23 | 186:19 | 251:23 | 211:22 | **we've** 31:7 |
| 209:19,22 | 191:23,25 | 259:16 | 216:8 | 33:14 47:4 |
| **viewpoint** | 192:14,19 | 260:7 | 224:14 | 60:13 |
| 71:12,24 | 200:10 | 267:5 | 240:16 | 66:14,19 |
| **viewpoints** | 205:16,23 | **wanting** | 252:23 | 78:11 |
| 71:9,19,24 | 205:24 | 106:10 | 264:25 | 102:14 |
| **violate** | 206:4 | 171:8 | 270:13 | 114:12 |
| 157:9 | 215:10,13 | **wants** 66:21 | **ways** 2:13,16 | 133:10 |
| **violates** | 217:10 | 187:4 | 39:9 43:21 | 141:1 |
| 157:6 | 226:24 | **warning** 4:7 | 44:10 | 145:13 |
| **virus** 190:16 | 234:16 | 42:8,19 | 81:13 | 148:4 |
| **visit** 218:17 | 240:1 | **Washington** | 87:16 88:8 | 157:11 |
| **visual** 11:19 | 245:18 | 6:12,21 | **we'll** 21:3 | 167:1 |
| **visualize** | 262:23 | 7:3 271:6 | 48:2 55:21 | 179:3 |
| 262:14 | 267:3 | **wasn't** 37:21 | 84:20 | 180:12 |
| **voice** 223:19 | 268:7,12 | 81:7 96:15 | 95:10 | 189:19 |
| **volume** 53:9 | 268:14 | 110:1 | 100:14,15 | 207:6 |
| 89:20 | 269:2 | 128:2 | 107:5 | 208:4 |
| 151:2 | **wanted** 18:13 | 131:11 | 116:12 | 209:15 |
| **voluntar...** | 31:6,19,20 | 152:2 | 121:19 | 220:1 |
| 138:4 | 48:22 | 180:1 | 133:17 | 222:10 |
| **vote** 253:12 | 51:25 | 188:19 | 185:1 | 226:17 |
| **vs** 1:6 | 66:12 | 190:12 | 187:23 | 229:17 |
| | 68:16 | 194:5 | 188:6 | 234:15 |
| **W** | 77:23 | 215:10,14 | 235:12 | 239:25 |
| **W** 6:3 | 82:16 | 215:17,22 | 256:23 | 240:5 |
| **Wait** 10:10 | 87:10 | 250:16 | **we're** 21:24 | 242:2,22 |
| **Walensky** | 98:23 | 260:15 | 21:24 36:7 | 247:2 |
| 120:23,25 | 123:11 | **watching** | 39:16 | 257:19 |
| 125:20 | 144:9 | 143:10 | 45:23 | 268:20 |
| **walkthrough** | 147:8 | 196:6 | 49:15 | **weaken** |
| 234:22 | 156:23 | **wave** 46:1 | 54:19 | 163:25 |

**CAROL CRAWFORD 11/15/2022**

| | | | | |
|---|---|---|---|---|
| **wear** 29:6 | 195:23 | **WhatsApp** | 9:24  22:6 | **words** 52:14 |
| **web** 11:15 | 196:8 | 70:17,19 | 31:19  33:1 | 55:4  64:21 |
| 12:6  15:6 | 197:12 | 70:25 | 66:20 | 133:15 |
| 15:21,21 | 226:25 | 137:9 | 80:21 | 145:8 |
| 15:23 | 229:21 | **White** 230:13 | 93:22 | 149:12 |
| 87:21 | 253:11,18 | 230:24,25 | 102:4,5,7 | 227:21 |
| 109:9 | 257:23 | 231:12,19 | 118:13,14 | 251:21 |
| 127:22 | 260:18,18 | 232:1,4,7 | 149:23 | **work** 11:5,21 |
| 128:14,16 | **week's** 2:23 | 232:22 | 150:1 | 11:22  12:2 |
| 128:21 | 5:6  68:6 | 233:2,8,11 | 179:17 | 14:1  19:25 |
| 129:1 | 76:5 | 233:18,19 | 205:13 | 25:12 |
| 134:11,14 | 226:10,16 | 233:21 | 236:1,3 | 33:19 |
| 134:15,16 | **weekend** | 234:4,5,14 | 269:1 | 34:20,23 |
| 134:17 | 126:20 | 259:10,22 | 270:7,10 | 35:22  36:8 |
| 135:16 | 186:8 | 260:9,17 | 270:15 | 40:12  73:7 |
| 192:8 | **weekly** 5:4 | 261:8,19 | 271:13 | 100:4 |
| **website** | 68:9  69:2 | 263:4 | 272:1,25 | 109:24 |
| 15:15,23 | 221:8 | **whitelist** | **witnesses** | 156:24 |
| 45:10 | 223:21 | 217:22 | 49:23 | 159:19 |
| 47:20,22 | 226:19,21 | **whitelisted** | **women** 46:4 | 160:5,9,16 |
| 59:13 | 239:21 | 217:11,11 | **wondered** | 160:22 |
| 106:13 | 260:11,13 | 217:15,17 | 176:15 | 164:13 |
| 108:4,16 | 262:5 | **whitelis...** | 248:12 | 166:24 |
| 109:4 | **weeks** 27:18 | 217:20 | **wonderful** | 167:18,19 |
| 113:15,22 | 51:23 | **wide** 55:24 | 55:20 | 175:6,7 |
| 114:16,17 | 56:21  84:8 | 56:7,11 | **wondering** | 177:21 |
| 114:20 | 132:8 | 58:21 | 75:15  81:2 | 181:12 |
| 115:22 | 151:13 | 59:15 | 140:6 | 200:7 |
| 130:23 | 169:20 | **widely** | 200:9 | 209:24 |
| 183:17 | 228:13 | 150:22 | 204:23 | 213:18 |
| 187:3 | **weeks'** | 153:25 | 258:6 | 214:1 |
| 194:20 | 131:25 | 154:23 | 263:7 | 224:11 |
| **websites** | **weigh** 230:7 | **widespread** | **Woods** 66:15 | 235:12 |
| 233:17 | **Weir** 223:2 | 29:1 | 141:17,19 | 237:19 |
| **Wednesday** | **went** 12:3 | **Wilhelm** | 141:21 | 258:21 |
| 247:15 | 63:8  70:11 | 263:1,5 | 144:1,13 | 262:3 |
| **week** 3:5 | 187:2 | **willing** | 145:15,18 | **worked** 24:15 |
| 46:2  48:2 | 219:4 | 35:10 | 146:22 | 40:25 |
| 65:14  68:8 | 236:6,11 | 173:1 | **word** 15:20 | 75:23 |
| 103:4 | 265:18 | 228:22 | 19:2  74:15 | 186:17 |
| 118:24 | **weren't** 81:8 | 263:2 | 85:3  195:2 | 192:18 |
| 119:21 | 115:3 | **withdraw** | 201:18 | 214:20 |
| 126:16 | 185:5 | 74:22 | 225:20 | **Worker-c...** |
| 156:18,20 | 212:15 | 100:24 | 241:12 | 55:5 |
| 157:1 | 240:10 | 127:16 | **worded** 260:4 | **workers** |
| 161:6 | 248:19 | 139:22 | **wording** | 53:17  58:6 |
| 177:3 | 267:12 | **withdrawn** | 42:14,15 | 66:5 |
| 180:20 | **Western** 1:1 | 247:25 | 110:25 | **working** 12:5 |
| 185:20 | 8:6 | **witness** 9:4 | 149:12 | 27:9,14 |

**CAROL CRAWFORD  11/15/2022**

28:19
56:17
58:19
70:17
77:21  80:8
84:4  87:5
89:22
101:10
111:9
114:23
135:13,15
174:18
175:3
177:5
189:20
195:15
232:4,8
234:15
236:9
262:15
**works** 22:18
24:15
44:20
216:6,8
**World** 51:7
**worldwide**
164:23
**worried**
34:24
214:1
258:9
263:9
**worth** 88:16
89:20
258:18
**wouldn't**
53:7
101:24
106:21
110:23
113:1
116:23
131:3,12
144:24
146:5
149:3,13
180:9
218:10
244:12

258:10
**Wright** 50:17
**write** 23:23
39:18  43:7
55:18
115:21
131:21
230:19
237:10,11
**writes** 36:23
74:25  84:4
126:18
145:18
156:14
166:14
195:12
197:2
211:5
226:24
252:5,7
**writing** 93:5
**written** 7:22
163:7
**wrong** 41:1
96:16
124:19
194:18,20
203:10
216:1
245:9
**wrote** 26:13
34:6  87:11
122:8
174:14,15
231:18
247:16
**WY** 5:7
**Wyoming**
237:7,12
237:18
239:3

——————
**X**
**xlsx** 200:20

——————
**Y**
**Y** 22:24  34:6
**y'all** 99:15
**yeah** 12:22

22:15
25:22
28:12
44:18  55:9
67:2  74:8
75:9  78:8
85:16
86:19  90:5
92:12  94:2
94:16
95:21
124:20,21
128:10
136:16
149:15
158:10
159:2
165:12
173:19
179:5
186:23
187:15
199:17
206:7,9
212:19
214:23
222:18
223:9
225:9
230:6
245:5
249:19
250:19
252:21
254:6
269:9,16
**year** 4:3,6
174:22
175:15
214:21
**years** 12:3
169:16,22
**yellow** 70:7
**yesterday**
100:3
109:15,16
120:19
**Young** 11:3
**youth** 45:24

**YouTube**
175:16
185:13
227:25
244:18,20
244:21,22
244:24
245:2,18
245:21,22
245:23
255:2
█ 97:7

——————
**Z**
█ 35:6
**ZIP** 70:20
231:9
**Zoom** 7:7,11
31:8,11,13
102:14,18
102:19,19
240:25
241:6
**Zuckerberg**
33:22

——————
█
35:7
**@CDC.gov**
35:8

——————
**1**
**1** 2:7  5:21
21:12,14
40:15  55:3
55:4
252:24
270:8
**1.5** 235:12
**1/26/21** 2:17
**1:22** 156:15
**1:50** 207:3
**1:57** 119:7
124:12,17
**10** 3:2  91:1
91:7,8,10
100:19
102:2
207:3

211:6
212:23
241:22
**10(B)** 7:19
**10/28/2021**
249:20
**10/28/21**
5:14
**10:09** 31:1,3
**10:38** 189:12
**100** 46:13
69:25
128:19
**102** 3:4
**10th** 63:17
213:3
214:8
242:3
257:15
259:7
261:13
**11** 3:4  102:2
102:22,25
108:19
112:19
114:22
115:8
118:5
**11-year**
163:19
**11-year-...**
156:3
**11/2** 160:14
**11/2/21** 4:2
**11/8/21** 4:5
**11:27** 100:1
**11:51** 98:1
**11:53** 98:4
**11:59** 102:9
102:10
**1100** 6:20
271:5
**112** 3:6,7
**113** 3:9
**118** 3:11
**11th** 271:18
**123** 6:  100:3
112:3,3,5
112:15

**CAROL CRAWFORD  11/15/2022**

| | | | | |
|---|---|---|---|---|
| 115:9 | 271:3 | 150:6,9 | 207:3 | 237:10 |
| 208:10 | **171** 4:10 | 266:12 | 211:6 | **24** 4:7 5:22 |
| **12/21/21** | **173** 4:11 | 273:15 | 216:4 | 28:9 63:17 |
| 4:17 | **179** 4:13 | **200** 4:20 7:3 | 218:13 | 119:7 |
| **12:51** 102:10 | **17th** 61:18 | **20036** 6:12 | 219:25 | 124:12 |
| 102:12 | 100:3 | **2019** 16:20 | 221:10 | 164:17,19 |
| **1225** 6:10 | 146:21,25 | **202** 6:14 | 237:8 | **241** 5:10 |
| **126** 3:13 | **18** 3:16 12:2 | **202-353-...** | 239:22 | **2440** 146:12 |
| **13** 3:7 112:5 | 141:6,7,9 | 6:22 | 241:22 | **247** 5:12 |
| 112:17 | 144:13 | **2020** 16:21 | 242:3 | **249** 5:14 |
| **138** 3:14 | 174:4,14 | 16:22 | 247:15 | **24th** 119:19 |
| **14** 3:9 112:4 | **187** 4:15 | 17:11 18:6 | 250:8 | 124:17 |
| 113:3,5,6 | **188** 4:17 | 20:2 22:15 | 252:22 | 216:4,14 |
| 115:9 | **18th** 99:23 | 34:5 38:8 | 257:15 | **25** 166:1 |
| 119:4 | 270:16 | 43:24 | **2022** 1:14 | 269:7 |
| 270:25 | **19** 3:19 | 77:13 | 8:2 13:3,4 | **254** 5:15 |
| **141** 3:16 | 21:25 | 147:14 | 13:14 15:2 | **257** 5:17 |
| **145** 3:19 | 145:1,4 | 175:19 | 16:2 166:8 | **25th** 49:21 |
| **151** 1:14 3:11 | 148:19 | 210:7 | 166:15 | 50:14 |
| 8:2 64:23 | **196** 4:18 | **20201** 7:3 | 171:23 | 65:24 |
| 65:14 | **19th** 6:10 | **2021** 3:6,7 | 270:16 | **26** 4:8 5:22 |
| 118:7,9,20 | 105:22 | 49:16,19 | 271:3,11 | 49:18 |
| 118:22 | 131:18 | 60:9 61:18 | 272:4 | 139:3 |
| 125:8 | **1st** 63:2,14 | 68:13 | **2024** 270:25 | 165:25 |
| 131:13 | 126:18 | 73:16 82:1 | **205** 5:1 | 166:2,6 |
| 133:1,1,5 | 152:25 | 85:13 | **20th** 103:5 | 172:9 |
| 133:8 | ——— | 91:10 | 119:20 | **269** 270:8 |
| 221:10 | **2** | 100:1 | 146:11 | **26th** 55:18 |
| 271:11 | **2** 2:8 22:5,8 | 117:8 | **21** 2:7 4:1 | **27** 4:10 |
| 272:4 | 32:1,3 | 118:24 | 21:24 60:9 | 171:15,21 |
| **150** 3:22 | 40:15 55:4 | 124:17 | 103:5 | 173:9 |
| **152** 4:1 | 169:15 | 126:18,24 | 152:16,22 | **27th** 44:25 |
| **155** 4:2 | **2/3/22** 4:8 | 131:21 | 152:23 | 47:1 |
| **16** 3:13 | **2/4/22** 4:10 | 134:21 | 189:7,12 | 218:12 |
| 61:18 | **2/7/20** 2:8 | 135:1 | 195:23 | **28** 4:11 |
| 126:8,12 | **2:06** 150:2,3 | 139:3 | **219** 5:2 | 173:20,23 |
| 126:14 | **2:07** 76:3 | 142:9,15 | **21st** 195:11 | 252:22 |
| 131:20 | 82:1,4 | 146:11,25 | **22** 2:8 4:2 | **28th** 230:4 |
| 133:1 | **2:18** 84:3 | 150:15 | 155:7,9,22 | 238:7 |
| 135:1,8 | **2:19** 150:3,5 | 156:1 | **221** 5:4 6:3 | 253:4 |
| 136:6,11 | **2:28** 216:4 | 163:20 | **226** 5:5 | **29** 4:13 |
| **1600** 1:17 | **2:30** 218:13 | 174:4 | **22nd** 144:2 | 179:9,11 |
| **163** 4:5 | **2:32** 230:3 | 176:6 | **23** 4:5 | 179:23 |
| **164** 4:7 | **2:42** 68:13 | 179:5 | 163:13,15 | 187:18 |
| **166** 4:8 | **2:54:26** | 185:17 | 163:23 | 234:10 |
| **1684** 169:13 | 160:15 | 187:15 | 165:18 | **29530** 6:21 |
| **17** 3:14 | **2:57** 131:21 | 189:8,12 | **237** 5:7 | 271:6 |
| 135:4 | **20** 3:22 | 190:5 | **239** 5:8 | **29th** 182:16 |
| 138:23,24 | 149:22,23 | 196:21,25 | **23rd** 176:6 | **2nd** 118:24 |

**CAROL CRAWFORD  11/15/2022**

126:24
156:1,14
185:17
219:25
253:13

---

**3**

**3** 2:10  32:1
33:2,4
55:3,4,6
128:23
**3/10/2021**
257:11
**3/10/21** 5:17
**3/23/2021**
173:25
**3/23/21** 4:11
**3/30/20** 2:15
**3/31/20** 2:12
**3/31/21** 2:22
**3/5/20** 2:10
**3:01** 47:1
**3:08** 70:4
**3:10** 263:15
**3:16** 73:4
74:12
**3:22-cv-...**
1:5
**3:30** 70:6
177:21
**3:30-4:30**
44:9
**3:35** 27:5
**3:37** 205:9
205:10
**3:51** 205:10
205:11
**30** 4:15  47:7
187:9,11
216:16
271:17
**30th** 43:23
68:13  73:3
73:16
74:24
79:14  80:3
237:8
250:8
**31** 4:17

112:2
188:25
189:2,4
**31st** 40:4
44:1  76:3
76:13
81:25  82:3
82:4  84:3
**32** 4:18
196:15,17
196:18
**33** 2:10  4:20
200:15,17
200:19
**34** 5:1  12:3
205:18,19
206:14
211:6
**35** 5:2
219:19,21
219:21
**36** 5:4  221:3
221:5,6
**37** 5:5  226:4
226:6,7
**38** 2:12  5:7
237:2,4
**39** 5:8
239:13,16
239:18
**3rd** 46:2
126:16
131:20
134:21
135:1,9
145:17,18
166:8,15
172:10
253:14

---

**4**

**4** 2:12  38:18
38:20  44:1
49:4
128:23
169:22
187:15
**4-13-21**
200:20

**4/12/21** 4:15
187:15
**4/14/2021**
200:21
**4/14/21** 4:20
**4/15/21** 5:4
**4/29/2021**
226:11
**4/29/21** 5:5
**4/30/21** 5:7
**4/5/2021**
179:16
**4/5/21** 4:13
**4/9/21** 4:18
**4:00** 180:4,7
**4:19** 105:22
**4:23** 247:16
**4:36** 166:15
**4:43** 144:2
**40** 5:10
241:14,17
241:19
**40-49** 185:25
**41** 5:12
247:7,9
**42** 5:14  67:5
249:7,9
**43** 2:15  5:15
249:11
254:4,7,8
**44** 5:17,22
256:21
257:4,7
**450** 6:11
**49** 2:17
**496** 206:1
**497** 206:1
**498** 206:1
**499** 206:1
**4pm** 179:24
**4th** 171:23

---

**5**

**5** 2:15  4:10
34:5  43:10
156:2
163:19
**5-11** 4:3,6
**5/10/21** 3:2

5:10
**5/20/21** 3:4
**5/26/21** 2:19
**5/6/21** 3:1
5:8
**5:07** 256:25
257:1
**5:11** 253:4
**5:19** 257:1,3
**5:21** 172:10
**5:26** 66:14
**5:33** 1:15
269:18,19
**5:47** 63:14
**@CDC.gov**
24:14
**500** 206:2
**533** 136:9,12
**539** 124:18
**5th** 186:7

---

**6**

**6** 2:17  49:1
49:4,5
85:13
128:23
169:22
239:22
240:24
**6/10/2021**
247:13
**6/10/21** 5:12
**6/2/21** 3:11
**6/29/2022**
254:11
**6/29/22** 5:15
**6/3/21** 3:13
**6/30/2021**
205:21
206:17
**6/30/21** 5:1
**6:16** 145:19
**6:19** 64:24
**6:23** 234:10
**6:37** 238:7
**6:58** 126:25
**60** 2:19
228:14,16
**63101** 271:18

**65** 42:24
**65101** 6:4
**67** 2:22
**682** 241:25
**696-6775** 6:5

---

**7**

**7** 2:19  60:3
100:1
136:25
**7(a)** 137:4
**7/20/21** 3:16
141:11
**7/26/2021**
139:2
**7/26/21** 3:14
**7:38** 73:16
80:3
**7:46** 74:24
79:14
**711** 271:17

---

**8**

**8** 2:22  67:12
67:14  85:4
85:5
**8.15_AH_...**
3:23
**8/18/21** 3:19
145:6
**8/19** 150:15
**8/19/21** 3:22
**8:13** 142:15
**8:39** 60:9
**8:49** 126:19
**8:51** 214:9
**8:55** 34:5
**80** 228:14,16
**800-number**
11:17
15:18
**85** 3:1
**869-5210**
6:14
**877** 6:5
**899** 6:4
**8th** 142:15
163:20
196:25

---

**CAROL CRAWFORD  11/15/2022**

| 9 |
|---|
| **9** 2:4  3:1 |
| 85:6  167:8 |
| 196:21 |
| 247:15 |
| **9/1/21** 4:1 |
| **9/3/21** 5:2 |
| **9:00** 61:19 |
| **9:24** 1:15 |
| 8:3  259:7 |
| **9:30** 261:13 |
| **9:32** 261:16 |
| **9:36** 262:11 |
| **9:43:56** |
| 262:22 |
| **9:52** 179:23 |
| **9:54** 263:15 |
| **9:57** 30:25 |
| 31:1 |
| **91** 3:2 |
| **99.96** 111:20 |
| **9th** 142:9 |

# EXHIBIT C

Case 3:23-cv-03996-TLT   Document 1   Filed 08/16/23   Page 2 of 60

# YouTube's Community Guidelines

When you use YouTube, you join a community of people from all over the world. The guidelines below help keep YouTube fun and enjoyable for everyone.

If you see content that you think violates these guidelines, report it.

These policies apply to all types of content on our platform, including, for example, unlisted and private content, comments, links, Community posts, and thumbnails. This list isn't complete.



## Spam & deceptive practices

The YouTube Community is one that's built on trust. Content that intends to scam, mislead, spam, or defraud other users isn't allowed on YouTube.

- Spam, deceptive practices, & scams policies
- Impersonation policy
- External links policy
- Fake engagement policy
- Playlists policy
- Additional policies



## Sensitive content

We hope to protect viewers, creators, and especially minors. That's why we've got rules around keeping children safe, sex & nudity, and self harm. Learn what's allowed on YouTube and what to do if you see content that doesn't follow these policies.

- Nudity & sexual content policies
- Thumbnails policy
- Child safety policy
- Suicide, self-harm, and eating disorders policy
- Vulgar language policy



## Violent or dangerous content

Hate speech, predatory behavior, graphic violence, malicious attacks, and content that promotes harmful or dangerous behavior isn't allowed on YouTube.

- Harmful or dangerous content policies
- Violent or graphic content policies
- Violent criminal organizations policy
- Hate speech policy
- Harassment & cyberbullying policies



## Regulated goods

Certain goods can't be sold on YouTube. Find out what's allowed—and what isn't.

- Sale of illegal or regulated goods or services policies
- Firearms policy

Case 3:21-cv-03080-VC Document 44-3 Filed 08/16/23 Page 376 of 660



# Misinformation

Certain types of misleading or deceptive content with serious risk of egregious harm are not allowed on YouTube. This includes certain types of misinformation that can cause real-world harm, like promoting harmful remedies or treatments, certain types of technically manipulated content, or content interfering with democratic processes.

- Misinformation policies
- Elections misinformation policies
- COVID-19 medical misinformation policies
- Vaccine misinformation policy

 Get creator tips for YouTube policies and guidelines.

**Please take these rules seriously**. If a YouTube creator's on- and/or off-platform behavior harms our users, community, employees or ecosystem, we may respond based on a number of factors including, but not limited to, the egregiousness of their actions and whether a pattern of harmful behavior exists. Our response will range from suspending a creator's privileges to account termination.

# EXHIBIT D



Our commitments ⌄     Product features ⌄     User settings ⌄     Rules and policie

OUR COMMITMENTS

# How does YouTube address misinformation?

With billions of people visiting us every day - whether they're looking to be informed, to catch up on the latest news, or to learn more about the topics they care about, we have a responsibility to connect people to high-quality content. So the most important thing we can do is increase the good and decrease the bad. That's why we address misinformation on our platform based on our "4 Rs" principles: we remove content that violates our policies, reduce recommendations of borderline content, raise up authoritative sources for news and information, and reward trusted creators. Learn more about how we treat misinformation on YouTube.



 **YouTube**

Our commitments ⌄    Product features ⌄    User settings ⌄    Rules and policie

As detailed in our Community Guidelines, YouTube does not allow misleading or deceptive content that poses a serious risk of egregious harm. When it comes to misinformation, we need a clear set of facts to base our policies on. For example, for COVID-19 medical misinformation policies, we rely on expert consensus from both international health organizations and local health authorities.

Our policies are developed in partnership with a wide range of external experts as well as YouTube Creators  We enforce our policies consistently using a combination of content reviewers and machine learning to remove content that violates our policies as quickly as possible

## Related articles

### Supporting political integrity

READ MORE
### Community Guidelines

READ MORE
### News and information

READ MORE



# EXHIBIT E

# Medical misinformation policy

YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation that contradicts local health authorities' (LHAs) or the World Health Organization's (WHO) guidance about specific health conditions and substances. This policy includes the following categories:

- Prevention misinformation
- Treatment misinformation
- Denial misinformation

**Note:** YouTube's medical misinformation policies are subject to change in response to changes to guidance from health authorities or WHO. There may be a delay between new LHAs/WHO guidance and policy updates, and our policies may not cover all LHA/WHO guidance related to specific health conditions and substances.

## What this policy means for you

**Don't post content on YouTube if it includes any of the following:**

**Prevention misinformation:** We do not allow content that promotes information that contradicts health authority guidance on the prevention or transmission of specific health conditions, or on the safety, efficacy or ingredients of currently approved and administered vaccines.

**Treatment misinformation:** We do not allow content that promotes information that contradicts health authority guidance on treatments for specific health conditions, including promotion of specific harmful substances or practices that have not been approved by local health authorities or the World Health Organization as safe or effective, or that have been confirmed to cause severe harm.

**Denial misinformation:** We do not allow content that denies the existence of specific health conditions.

These policies apply to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube. This isn't a complete list.

**Prevention misinformation**

Harmful substances & practices as prevention methods ⌄

Guaranteed prevention misinformation ⌄

Vaccine misinformation ⌄

Transmission information ⌄

**Treatment misinformation**

Harmful substances & practices as treatment methods ⌄

Guaranteed treatment misinformation ⌄

Harmful alternative methods & discouragement of professional treatment ⌄

**Denial misinformation**

- Content that denies the existence of COVID-19 or that people have died from COVID-19.
  - Examples:
    - Denial that COVID-19 exists
    - Claims that people have not died or gotten sick from COVID-19
    - Claims that there have not been cases or deaths in countries where cases or deaths have been confirmed by local health authorities or the WHO

## Educational, documentary, scientific or artistic content

We may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content discussing the results of a specific medical study, or showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

YouTube also believes people should be able to share their own experiences, including personal experiences with vaccinations, for example. This means we may make exceptions for content in which creators describe firsthand experiences from themselves or their family. At the same time, we recognize there is a difference between sharing personal experiences and promoting misinformation. To address this balance, we will still remove content or channels if they include other policy violations or demonstrate a pattern of promoting medical misinformation.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

---

Need more help?
Try these next steps:

 **Post to the help community**
Get answers from community members

# EXHIBIT F

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | |
| Defendants. | **JURY TRIAL DEMAND** |

///
///
///
///
///
///

1

Plaintiff Robert F. Kennedy, Jr., alleges as follows:

## **INTRODUCTION**

1. This complaint concerns the freedom of speech and the extraordinary steps the United States government has taken under the leadership of Joe Biden to silence people it does not want Americans to hear.

2. Mr. Kennedy is not the only victim of this censorship campaign, which is unprecedented in American history. But he is a high-profile victim, especially since he is now challenging President Biden for the Democratic Party's presidential nomination.

3. Mr. Kennedy often speaks at length about topics people would like to ignore, including the negative health effects of toxic chemicals and potential safety concerns about the COVID-19 shots (as well as other vaccines that have been developed since Congress gave the pharmaceutical industry immunity from product liability claims).

4. YouTube often removes videos of Mr. Kennedy's comments from its public platform. It usually relies on its "medical misinformation" policies to justify the action. It has relied on the policies several times to censor interviews and speeches given by Mr. Kennedy during the 2024 presidential campaign, including a speech he gave at Saint Anselm College in New Hampshire, the state that hosts America's first primary. On information and belief, it did so based on statements from the Biden Administration about what information to censor. It will continue to do so throughout the presidential campaign, especially as the primary elections get closer.

5. These actions are unlawful. The U.S. Supreme Court has said that "the right to think is the beginning of freedom" and that "speech must be protected from the government because speech is the beginning of thought." Those principles apply both when the government directly regulates speech and when, as here, it works behind the scenes to censor its critics through otherwise private actors. Plaintiffs bring

COMPLAINT                                                                    CASE NO. _____

this action to protect those principles and to preserve their ability to communicate with Americans on matters of public concern.

## PARTIES, JURISDICTION AND VENUE

6. Mr. Kennedy resides in New York.

7. Defendant Google LLC is a limited liability company formed under Delaware law that has its corporate headquarters in Mountain View, California.

8. Defendant YouTube, LLC, is a limited liability company formed under Delaware law that has its corporate headquarters in San Bruno, California.

9. YouTube, LLC, is a wholly owned subsidiary of Google LLC, which Google acquired in 2006. On information and belief, Google LLC has complete ownership and control over YouTube's operations. At minimum, Google LLC acts in concert with YouTube, LLC, in running YouTube's business, particularly as it relates to the unlawful actions alleged in this Complaint. Thus, Google LLC and YouTube, LLC, are proper defendants in this case and are referred to interchangeably as "Google" and "YouTube."

10. The Court has jurisdiction over this case under 42 U.S.C. § 1983 and 28 U.S.C. § 1331, given the federal questions it raises. Venue is proper under 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

11. YouTube was started in 2005 by former PayPal executives who thought people would enjoy having a place to share their own videos. It was an instant success, so successful, in fact, that Google abandoned its own nascent video service and instead purchased YouTube for $1.65 billion less than a year after it launched. Since then, YouTube has become one of the most visited websites in the world and YouTube is one of the world's most valuable media companies, with annual revenue that dwarfs the money earned by television networks.

12. This success has made YouTube a popular place to generate and view

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

3

COMPLAINT                                        CASE NO. _____

new content, particularly content related to public affairs. For example, in March 2016, YouTube announced that, between April 2015 and March 2016, viewers had consumed roughly 110 million hours of election-related content on YouTube, much of which was viewed on mobile devices. Kate Stanford, the director of YouTube's advertiser marketing at the time, made much of that, saying: "Voter decisions used to be made in living rooms, in front of televisions. Today, they're increasingly made in micro-moments, on mobile devices."

13. Political candidates seized on this development, spending millions of dollars in advertising and original content on YouTube during the 2016 presidential election. That continued in 2020 and it will only increase during the 2024 campaign, especially as more political commentators (Meghyn Kelly and Tucker Carlson, for example) leave network and cable television to broadcast directly to Americans through the Internet and social media platforms.

14. Thus, YouTube has become an important platform for political discourse in America, a digital town square that voters trust as a place to get news and opinions about the issues of the day, a place where people can communicate about matters of public concern.

15. Mr. Kennedy is a lawyer, a son of former Attorney General Robert F. Kennedy and a nephew of former President John F. Kennedy.

16. Mr. Kennedy is seeking the Democratic Party's nomination for president. He has filed the necessary paperwork with the Federal Election Commission and is taking steps to qualify for the ballot in the early primary states, including New Hampshire. He declared his candidacy on April 19, 2023.

17. Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. He accepted an invitation to speak about that and other issues at Saint Anselm College in March. His speech, which was viewed as a political

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

COMPLAINT                                                    CASE NO. _____

speech and attended by several prominent New Hampshire Democrats including the chairman of New Hampshire's Democratic Party, lasted nearly two hours. It centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, an issue he has fought about for years and which, in recent years, caused him to question the increasing numbers of vaccines American children must take.

18. Mr. Kennedy's criticism and questioning of the pharmaceutical industry over vaccines has been deemed controversial by some people, including government officials whose funding depends on the pharmaceutical industry. But he spoke intelligently about his views for years, free of censorship, and with people like the former Comedy Central host Jon Stewart who disagree with him, reflecting the principle, fundamental to American democracy, that more speech is better than less speech, especially when it comes to political speech.

19. That fundamental principle is under attack. It seems to have started after Big Tech companies like Google, Facebook and Twitter blamed themselves for the election of Donald Trump as president in 2016. Moreover, in 2018, Congress passed, and the president signed into law, the Cybersecurity and Infrastructure Security Agency Act of 2018. This law created a new agency, the Cybersecurity and Infrastructure Security Agency ("CISA"), within the Department of Homeland Security to protect America from cyber threats. According to CISA, its mission "requires effective coordination and collaboration among a broad spectrum of government and private sector organizations." These organizations include YouTube and CISA's mission apparently includes removing speech about issues of public concern that the federal government deems dangerous.

20. The coordination and collaboration between YouTube and the federal government included developing misinformation policies like the one YouTube has used, and will continue to use, to censor statements that Mr. Kennedy makes in the 2024 presidential campaign. For example, YouTube removed video of Mr. Kennedy's

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

5

March 2023 speech at Saint Anselm's New Hampshire Institute of Politics that had been posted on the platform by Manchester Public Television. The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before."

21. YouTube doubled down on the decision, saying that it "removed the [Kennedy speech] for violating our policies on COVID-19 vaccine misinformation …. While we do allow content with educational, documentary, scientific or artistic context, such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context." A true and correct copy of YouTube's "COVID-19 medical misinformation" policy is attached as **Exhibit "A."** A true and correct copy of its "vaccine misinformation" policy is attached as **Exhibit "B."** These policies are referred to collectively as YouTube's medical misinformation policies.

22. Of course, only a portion of Mr. Kennedy's Manchester speech dealt with his views about vaccines or COVID-19. Much of the speech focused on the DNC's attempt to strip New Hampshire of its slot in the primary calendar, as well as Kennedy's history of environmental activism, including his successful efforts to clean up the Hudson River. YouTube removed everything.

23. This was not an isolated incident. Since Mr. Kennedy declared his candidacy, YouTube has removed other videos of him speaking, including interviews he did with Jordan Peterson and Joe Rogan. Again, although YouTube has cited its medical misinformation policies to justify these decisions, it has removed the entire video of Mr. Kennedy speaking.

24. This trend will continue throughout the 2024 campaign. Unlike other tech companies—notably Facebook and Instagram (both owned by Facebook parent Meta) and Twitter (now owned by Elon Musk)—YouTube has not treated Mr. Kennedy differently now that he is a political candidate. If anything, Mr. Kennedy's candidacy,

COMPLAINT            CASE NO. _____

and the issues of public concern he speaks about, have made him an even bigger target for the public/private censorship regime that Google and YouTube are an integral part of.

25.     This censorship campaign prevents Mr. Kennedy's message from reaching millions of voters. It also makes it harder for groups that are supporting his campaign to amplify his message through public sources.

26.     The decisions to censor Mr. Kennedy on these matters of public concern were not made by YouTube, acting of its own accord, but as part of the partnership between YouTube and federal government officials, including the Biden White House, to censor dissenting views that started during the COVID-19 pandemic. As documents discovered by two state attorneys general show, federal officials, including White House officials Rob Flaherty and Clarke Humphrey, were the ones who directed tech companies to remove statements Mr. Kennedy made about the government's COVID policies. For example, a true and correct copy of an email showing Ms. Humphrey's demand that one tech company, Twitter, remove one of Mr. Kennedy's posts on January 22, 2021, is attached as **Exhibit "C."**

27.     Although this email targeted Twitter, White House and other government officials repeatedly worked with the big tech companies, including YouTube, to censor Mr. Kennedy during 2021 and 2022. Indeed, by July 2021, the White House press secretary was calling on the tech platforms to ban Mr. Kennedy completely and, on information and belief, YouTube was working behind the scenes with CISA and other government officials to do just that. It is reasonable to believe that this partnership, and the related White House pressure campaign, increased after Mr. Kennedy challenged President Biden for the Democratic Party's nomination.

28.     YouTube plays an especially important role in this public/private censorship regime. Whether it is through advertising, interviews, or raw footage, YouTube provides people—especially political candidates—with unfettered access to

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

7

COMPLAINT                                          CASE NO. _____

the American public. YouTube is not simply a tool of communication, like a telephone or a social media app. It is not simply a publisher like *The New York Times* or *The Wall Street Journal.* It is a place for people to view, to listen, and to learn about whatever they want. For the most part, they can do that without registering and without paying anything.[1] They can simply log onto the platform and watch. Thus, YouTube is the digital equivalent of the town square. It is a platform for speech. And YouTube has monetized that role, earning billions of dollars for Google in the process.

29.     With that reach comes responsibility, though. YouTube may own its website. In that sense, youtube.com is private property. But, by allowing the public to post videos there, YouTube turned youtube.com into a public forum of some sort. Whether it is a traditional public forum, a limited public forum or something else does not matter. It cannot exclude people from the platform based on their viewpoint. It cannot decide which speech people hear. It cannot do that itself and it especially cannot do that, as it has with Plaintiffs, based on a public/private partnership in which YouTube relies on the government to decide what information to censor.

30.     The Ninth Circuit Court of Appeals has historically construed the state action doctrine liberally, echoing Justice William Brennan's view that, "[i]f the Fourteenth Amendment is to have its intended effect as a restraint on the abuse of state power, courts must be sensitive to the manner in which state power is exercised. In an era of active government intervention to remedy social ills, the true character of the State's involvement in, and coercive influence over, the activities of private parties, often through complex and opaque regulatory frameworks, may not always be apparent. But if the task that the Fourteenth Amendment assigns to the courts is thus rendered more burdensome, the courts' obligation to perform that task faithfully, and

---

[1] There are also private areas of YouTube, but the speech Google censored that is at issue in this case was available to anybody.

COMPLAINT                                                    CASE NO. _____

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

consistently with the constitutional purpose, is rendered more, not less, important."

31.    Those words echo today. This will be the last presidential election before America's 250th birthday. Much has changed since 1776. The country's demand for freedom of speech—especially political speech—should not be one of them.

## FIRST CLAIM FOR RELIEF

### (Injunctive Relief under 42 U.S.C. § 1983/State Action Doctrine)

32.    Mr. Kennedy incorporates paragraphs 1 through 29 of this Complaint as though set forth fully herein.

33.    When Mr. Kennedy speaks about the federal government's COVID-19 policies, as he has in the Manchester speech and in interviews on the campaign trail, he is engaging in speech on matters of public concern that are protected by the First Amendment.

34.    Although YouTube is a private (non-governmental) party, it violated Mr. Kennedy's First Amendment rights when it removed videos of his political speech, as alleged above, in several ways.

35.    *First*, there is a sufficiently close nexus between YouTube and the federal government such that YouTube's actions may be fairly treated as that of government itself. For example, although it cited its own COVID vaccine misinformation policies when censoring Mr. Kennedy, the policies rely entirely on government officials to decide what information gets censored. They say that YouTube does not allow people to say anything "that contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19." These policies are subject to change, but only "in response to changes to global or local health authorities' guidance on the virus." In other words, the government provides the rules that guide YouTube's enforcement of the medical misinformation policies.

36.    *Second*, YouTube's medical misinformation policies were developed as part of a joint enterprise between YouTube and federal government officials to

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

prevent Americans from hearing people like Mr. Kennedy who disagreed with the government's policy decisions. YouTube had no obligation to act as the government's censor. But, after the creation of CISA and especially after President Biden took office, YouTube decided to partner with the federal government to censor dissenting voices about COVID-19. In this way, the federal government insinuated itself into such a position of interdependence with YouTube that they can be deemed joint participants in the censorship regime. This partnership consists of a complex and deeply intertwined process between the federal government and YouTube—but led by the government, which plays an outsized role in the decision—about what information is "dangerous" and which speakers (especially Mr. Kennedy) need to be silenced.

37.     Again, these are not conclusory allegations but facts that have been revealed in other litigation against Big Tech platforms, including emails from early 2021 in which Biden White House officials discussed alleged vaccine misinformation and "ways the White House (and our COVID experts) can partner [with the tech companies] in product work." A true and correct copy of one such email is attached as **Exhibit "D."** This partnership has targeted Mr. Kennedy from day one of the Biden Administration but, on information and belief, it has increased since Kennedy challenged the president politically.

38.     When engaging in this partnership, YouTube did not act in good faith, to promote its own business, but to fulfill the government's objective of preventing people from hearing Kennedy's comments. It was fulfilling the government's censorship goals. It will continue to do that. Indeed, YouTube is the only one of the Big Tech platforms that is still censoring Mr. Kennedy during his political campaign.

39.     *Third*, the federal government has ensured that YouTube cooperate in its censorship campaign by publicly demanding that it do so, by accusing it of killing people when it does not cooperate, and by threatening to take away certain legal protections that YouTube has under federal law (namely immunity under section 230

10

of the Communications Decency Act). Indeed, YouTube bases its right to censor people on section 230. Thus, a federal law—section 230—is the very source of authority through which tech censorship occurs, a situation in which the Supreme Court has found state action to exist.

40.     Through this public and private pressure, the federal government has offered such significant encouragement, both overt and covert, that YouTube's decision to censor Mr. Kennedy's political speech must be deemed to have been made by the government itself, including Kennedy's political opponent, President Biden. Under these circumstances, YouTube is a state actor and it violated Mr. Kennedy's First Amendment rights by engaging in viewpoint discrimination, as alleged above.

41.     In addition, at least with respect to the fully public aspects of its platform, YouTube operates as a public forum, the digital equivalent of a town square. As such, it cannot remove protected speech, especially political speech, based on its viewpoint. Furthermore, any viewpoint-neutral rules must be narrowly tailored to leave open ample alternative channels for communication. YouTube admittedly does not comply with these rules.

42.     YouTube's medical misinformation policies also violate the First Amendment on their face because they are overbroad and vague. Indeed, the policies give YouTube and its government partners unfettered discretion to decide what information they censor, including when they say the speech lacks "context." Thus, the policies violate both the overbreadth and void-for-vagueness doctrines.

43.     Unlike other technology companies, YouTube has refused to remove its misinformation policies and has refused to stop censoring Mr. Kennedy during his political campaign. Thus, there is a substantial likelihood that it will continue censoring Mr. Kennedy, preventing his political message from reaching millions of American voters.

44.     Mr. Kennedy will be irreparably harmed if the Court does not grant

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

11

injunctive relief prohibiting YouTube from censoring him during his political campaign. He brings this action to seek such relief and to prohibit YouTube from enforcing its unconstitutional medical misinformation policies against him while he is seeking political office.

## SECOND CLAIM FOR RELIEF

## (Declaratory Judgment under 28 U.S.C. § 2201)

45.     Mr. Kennedy incorporates paragraphs 1 through 29 of this Complaint as though set forth fully herein.

46.     Mr. Kennedy contends that YouTube's medical misinformation policies are unconstitutional on their face and as applied to him during his presidential campaign because they are impermissibly vague and overbroad and because they give unnamed government officials, who the policies depend entirely on, the unfettered discretion to decide what information gets removed from YouTube.

47.     On information and belief, Defendants contend that YouTube's medical misinformation policies are constitutional on their face and as applied to Mr. Kennedy.

48.     Mr. Kennedy desires a judicial declaration that YouTube's medical misinformation policies are unconstitutional on their face for the reasons alleged above.

49.     Under 28 U.S.C. § 2201, a judicial determination of these issues is necessary and appropriate because such a declaration will clarify the parties' rights and obligations, permit them to have certainty regarding those rights and potential liability, and avoid a multiplicity of actions.

## PRAYER FOR RELIEF

Wherefore, Mr. Kennedy prays for relief as follows.

1. For an order declaring that Defendants violated Mr. Kennedy's rights under the First Amendment when they used information from, and partnered with, federal

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

12

COMPLAINT                                      CASE NO. _____

government officials, including those who work for Mr. Kennedy's political opponent, to censor his political speech.

2. For an order requiring that YouTube restore any videos of Mr. Kennedy's political speech that it has removed during the 2024 presidential campaign.

3. For an order declaring YouTube's medical misinformation policies to be unconstitutional on their face, and as applied to Mr. Kennedy during his presidential campaign, and for an injunction prohibiting Defendants from further enforcing them.

4. For costs and legal fees under 42 U.S.C. § 1988.

5. For such other relief as the Court deems proper.

DATED:  August 2, 2023                    JW HOWARD/ATTORNEYS, LTD.

By: _____
     John W. Howard
     Scott J. Street
     Andrew G. Nagurney
     Attorneys for Plaintiff
     ROBERT F. KENNEDY, JR.

COMPLAINT                                              CASE NO. _____

# **JURY TRIAL DEMAND**

Mr. Kennedy requests a trial by jury on all claims for which it is available.

DATED:  August 2, 2023          JW HOWARD/ATTORNEYS, LTD.

By: _____

John W. Howard
Scott J. Street
Andrew G. Nagurney
Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

14

COMPLAINT                                    CASE NO. _____

**EXHIBIT A**

# COVID-19 medical misinformation policy

The safety of our creators, viewers, and partners is our highest priority. We look to each of you to help us protect this unique and vibrant community. It's important you understand our Community Guidelines, and the role they play in our shared responsibility to keep YouTube safe. **Take the time to carefully read the policy below**. You can also check out this page for a full list of our guidelines.

YouTube doesn't allow content about COVID-19 that poses a serious risk of egregious harm.

YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19. This is limited to content that contradicts WHO or local health authorities' guidance on:

- Treatment
- Prevention
- Diagnosis
- Transmission
- The existence of COVID-19

**Note**: YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus. There may be a delay between new LHA/WHO guidance and policy updates given the frequency with which this guidance changes, and our policies may not cover all LHA/WHO guidance related to COVID-19.

Our COVID-19 policies were first published on May 20, 2020.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes any of the following:

**Treatment misinformation**:

- Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment such as consulting a doctor or going to the hospital
- Content that claims that there's a guaranteed cure for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19
- Claims that Hydroxychloroquine is an effective treatment for COVID-19
- Categorical claims that Ivermectin is an effective treatment for COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Other content that discourages people from consulting a medical professional or seeking medical advice

**Prevention misinformation**: Content that promotes prevention methods that contradict local health authorities or WHO.

- Claims that there is a guaranteed prevention method for COVID-19
  - Claims that any medication or vaccination is a guaranteed prevention method for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the prevention of COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO

- Claims that an approved COVID-19 vaccine will cause death, infertility, miscarriage, autism, or contraction of other infectious diseases
- Claims that an approved COVID-19 vaccine will contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal products
- Claims that an approved COVID-19 vaccine will contain substances or devices meant to track or identify those who've received it
- Claims that COVID-19 vaccines will make people who receive them magnetic
- Claims that an approved COVID-19 vaccine will alter a person's genetic makeup
- Claims that COVID-19 vaccines do not reduce risk of serious illness or death
- Claims that any vaccine causes contraction of COVID-19
- Claims that a specific population will be required (by any entity except for a government) to take part in vaccine trials or receive the vaccine first
- Content that promotes the use of unapproved or homemade COVID-19 vaccines
- Instructions to counterfeit vaccine certificates, or offers of sale for such documents

**Diagnostic misinformation**: Content that promotes diagnostic information that contradicts local health authorities or WHO.

- Claims that approved COVID-19 tests are dangerous or cause negative physical health effects
- Claims that approved COVID-19 tests cannot diagnose COVID-19

**Transmission misinformation**: Content that promotes transmission information that contradicts local health authorities or WHO.

- Content that claims that COVID-19 is not caused by a viral infection
- Content that claims COVID-19 is not contagious
- Content that claims that COVID-19 cannot spread in certain climates or geographies
- Content that claims that any group or individual has immunity to the virus or cannot transmit the virus

**Content that denies the existence of COVID-19:**

- Denial that COVID-19 exists
- Claims that people have not died or gotten sick from COVID-19
- Claims that the death rate of COVID-19 is equal to or less than that of the common cold or seasonal flu
- Claims that COVID-19 is equal to or less transmissible than the common cold or seasonal flu
- Claims that the symptoms of COVID-19 are never severe

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Denial that COVID-19 exists
- Claims that people have not died from COVID-19
- Claims that any vaccine is a guaranteed prevention method for COVID-19
- Claims that a specific treatment or medicine is a guaranteed cure for COVID-19
- Claims that hydroxychloroquine saves people from COVID-19
- Promotion of MMS (Miracle Mineral Solution) for the treatment of COVID-19

6/20/23, 11:01 AM
Case 3:23-cv-03880-TLT Document 6-9 Filed 08/02/23 Page 402 of 660
COVID-19 medical misinformation policy - YouTube Help

- Claims that certain people have immunity to COVID-19 due to their race or nationality
- Encouraging taking home remedies instead of getting medical treatment when sick
- Discouraging people from consulting a medical professional if they're sick
- Content that claims that holding your breath can be used as a diagnostic test for COVID-19
- Videos alleging that if you avoid Asian food, you won't get the coronavirus
- Videos alleging that setting off fireworks can clean the air of the virus and will prevent the spread of the virus
- Claims that COVID-19 is caused by radiation from 5G networks
- Videos alleging that the COVID-19 test is the cause of the virus
- Claims that countries with hot climates will not experience the spread of the virus
- Claims that COVID-19 vaccines kill people who receive them
- Claims that COVID-19 vaccines are a means of population reduction
- Videos claiming that COVID-19 vaccines contain fetal tissue
- Claims that the flu vaccine causes contraction of COVID-19
- Claims that the flu is more contagious than COVID-19
- Claims that COVID-19 vaccines cause contraction of other infectious diseases or makes people more vulnerable to contraction of other infectious diseases
- Claims that COVID-19 vaccines contain a microchip or tracking device
- Claims that achieving herd immunity through natural infection is safer than vaccinating the population
- Claims that COVID-19 never causes serious symptoms or hospitalization
- Claims that the death rate from the seasonal flu is higher than the death rate of COVID-19
- Claims that people are immune to the virus based on their race
- Claims that children cannot or do not contract COVID-19
- Claims that there have not been cases or deaths in countries where cases or deaths have been confirmed by local health authorities or the WHO

## Educational, documentary, scientific or artistic content

We may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

## Need more help?

Try these next steps:

**Post to the help community**
Get answers from community members

**EXHIBIT B**

# Vaccine misinformation policy



YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO). This is limited to content that contradicts local health authorities' or the WHO's guidance on vaccine safety, efficacy, and ingredients.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes harmful misinformation about currently approved and administered vaccines on any of the following:

- **Vaccine safety:** content alleging that vaccines cause chronic side effects, outside of rare side effects that are recognized by health authorities

- **Efficacy of vaccines:** content claiming that vaccines do not reduce transmission or contraction of disease

- **Ingredients in vaccines:** content misrepresenting the substances contained in vaccines

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Claims that vaccines cause chronic side effects such as:
  - Cancer
  - Diabetes
  - Other chronic side effects
- Claims that vaccines do not reduce risk of contracting illness
- Claims that vaccines contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal byproducts
- Claims that vaccines contain substances or devices meant to track or identify those who've received them
- Claims that vaccines alter a person's genetic makeup
- Claims that the MMR vaccine causes autism
- Claims that vaccines are part of a depopulation agenda

- Claims that the flu vaccine causes chronic side effects such as infertility
- Claims that the HPV vaccine causes chronic side effects such as paralysis

## Educational, scientific, artistic, or testimonial content

YouTube may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

YouTube also believes people should be able to share their own experiences, including personal experiences with vaccinations. This means we may make exceptions for content in which creators describe firsthand experiences from themselves or their family. At the same time, we recognize there is a difference between sharing personal experiences and promoting misinformation about vaccines. To address this balance, we will still remove content or channels if they include other policy violations or demonstrate a pattern of promoting vaccine misinformation.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

## Additional resources

More information on vaccines, including their safety and efficacy, can be found below.

**Health Authority Vaccine Information:**

- Centers for Disease Control and Prevention (CDC)    (US)
- European Vaccination Information Portal    (EU)
- National Health Service    (UK)
- World Health Organization vaccine safety    (Global)
- World Health Organization vaccine preventable diseases    (Global)

**Additional Vaccine Information:**

- American Academy of Pediatrics    (US)
- GAVI, the Vaccine Alliance    (Global)
- UNICEF    (Global)

## Need more help?
Try these next steps:

**Post to the help community**
Get answers from community members

# EXHIBIT C

| From: | ████████@twitter.com] |
|---|---|
| Sent: | 1/23/2021 1:08:36 AM |
| To: | Humphrey, Clarke EOP/WHO ████████@who.eop.gov] |
| CC: | ████████@twitter.com]; Flaherty, Robert EOP/WHO ████████@who.eop.gov] |
| Subject: | [EXTERNAL] Re: Flagging Hank Aaron misinfo |

Thanks. We recently escalated this.

On Fri, Jan 22, 2021 at 8:05 PM Humphrey, Clarke EOP/WHO ████████ @who.eop.gov> wrote:
Hey folks —

Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP:

>https://twitter.com/RobertKennedyJr/status/1352748139665645569<

And then if we can keep an eye out for tweets that fall in this same ~genre that would be great.

Thanks!
Clarke

--

████████

Twitter, Inc. | Public Policy
@TwitterGov & @Policy

Case 1:23-cv-03880-TWT Document 66-9 Filed 08/02/23 Page 26 of 60

# EXHIBIT D

| | |
|---|---|
| **From:** | Flaherty, Rob EOP/WHO [█████@who.eop.gov] |
| **Sent:** | 4/16/2021 4:25:15 PM |
| **To:** | Flaherty, Rob EOP/WHO [█████@who.eop.gov]; Slavitt, Andrew M. EOP/WHO [█████@who.eop.gov]; [█████@twitter.com]; [█████@twitter.com]; [█████@twitter.com]; █████@twitter.com |
| **CC:** | Fitzpatrick, Kelsey V. EOP/WHO [█████@who.eop.gov]; █████ (HHS/OASH) █████@hhs.gov] |

| | |
|---|---|
| **Subject:** | Twitter Vaccine Misinfo Briefing |
| **Location:** | ████████████████ |

| | |
|---|---|
| **Start:** | 4/21/2021 2:00:00 PM |
| **End:** | 4/21/2021 3:00:00 PM |
| **Show Time As:** | Tentative |

**Recurrence:** (none)

White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, the tangible effects seen from recent policy changes, what interventions are currently being implemented in addition to previous policy changes, and ways the White House (and our COVID experts) can partner in product work.



Hi there,

█████ is inviting you to a scheduled ZoomGov meeting.

# Join Zoom Meeting

| | |
|---|---|
| Phone one-tap: | US: ████████████████ or ████████████ |
| Meeting URL: | ████████████████████ |
| Meeting ID: | ████████ |
| Passcode: | ██████ |

## Join by Telephone

For higher quality, dial a number based on your current location.
Dial:
US: ████████████████

MOLA_DEFSPROD_00006846

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ROBERT F. KENNEDY, JR.

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

John W. Howard, Scott J. Street, JW Howard/Attorneys, 600 West Broadway, Ste. 1400, San Diego, CA 92101 (619) 234-2842

## DEFENDANTS

GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation

County of Residence of First Listed Defendant    Santa Clara
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II.   BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

|   | | |
|---|---|---|
| 1 | U.S. Government Plaintiff | ×3  Federal Question *(U.S. Government Not a Party)* |
| 2 | U.S. Government Defendant | 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III.   CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.   NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | | 480 Consumer Credit |
| | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | | **PRISONER PETITIONS** | 462 Naturalization Application | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | | | 863 DIWC/DIWW (405(g)) | |
| 196 Franchise | ×440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | 540 Mandamus & Other | | | |
| 245 Tort Product Liability | 448 Education | 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V.   ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ×1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from Another District *(specify)* | 6 Multidistrict Litigation–Transfer | 8 Multidistrict Litigation–Direct File |

## VI.   CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983, 28 USC 2201 and First Amendment to the US Constitution

Brief description of cause:
Declaratory and injunctive relief to prevent censorship of political speech under state action doctrine.

## VII.   REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.    **DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    Yes    No

## VIII.   RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE    DOCKET NUMBER

## IX.   DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only)    SAN FRANCISCO/OAKLAND    × SAN JOSE    EUREKA-MCKINLEYVILLE

**DATE** 08/02/2023    **SIGNATURE OF ATTORNEY OF RECORD**    

JS-CAND 44 (rev. 10/2020)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II. Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

    (1) United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

    (2) United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

    (3) Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

    (4) Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the six boxes.

    (1) Original Proceedings. Cases originating in the United States district courts.

    (2) Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

    (3) Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

    (4) Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

    (5) Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

    (6) Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

    (8) Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

    Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

    Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

    Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX. Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California ▼

|  |  |
|---|---|
| ROBERT F. KENNEDY, JR. | ) |
|  | ) |
|  | ) |
|  | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| GOOGLE, LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation | ) |
|  | ) |
|  | ) |
|  | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* GOOGLE LLC, a Delaware corporation
901 Cherry Avenue
San Bruno, CA 94066

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
John W. Howard
Scott J. Street
JW Howard/Attorneys, LTD.
600 West Broadway, Ste. 1400
San Diego, CA 92101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date: _____      _____
                           *Server's signature*

                           _____
                           *Printed name and title*

                           _____
                           *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California ▼

| | |
|---|---|
| ROBERT F. KENNEDY, JR. | ) <br> ) <br> ) <br> ) |
| *Plaintiff(s)* | ) |
| v. | )    Civil Action No. |
| GOOGLE, LLC, a Delaware corporation, and <br> YOUTUBE, LLC, a Delaware corporation | ) <br> ) <br> ) <br> ) |
| *Defendant(s)* | ) <br> ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* YOUTUBE, LLC
901 Cherry Avenue
SAn Bruno, CA 94066

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: John W. Howard
Scott J. Street
JW Howard/Attorneys, LTD.
600 West Broadway, Ste. 1400
San Diego, CA 92101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*

was received by me on *(date)*

☐ I personally served the summons on the individual at *(place)*

on *(date)* ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

, a person of suitable age and discretion who resides there,

on *(date)* , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* , who is

designated by law to accept service of process on behalf of *(name of organization)*

on *(date)* ; or

☐ I returned the summons unexecuted because ; or

☐ Other *(specify):*

My fees are $ for travel and $ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.

Date:

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT G

Scott J. Street (SBN 258962)
**JW HOWARD/ATTORNEYS, LTD.**
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
**JW HOWARD/ATTORNEYS, LTD.**
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 5:23-cv-03880-NC |
| Plaintiff, | [Assigned to the Hon. Nathanael Cousins] |
| vs. | **APPLICATION FOR TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | |
| Defendants. | [Filed concurrently with Declarations of Robert F. Kennedy, Jr., Amaryllis Kennedy and Scott J. Street; [Proposed] TRO and [Proposed] OSC lodged concurrently] |

///

///

///

///

APPLICATION FOR TRO AND MEMO. OF POINTS & AUTHORITIES          CASE NO. 5:23-cv-03880-NC

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

**PLEASE TAKE NOTICE** that Plaintiff Robert F. Kennedy, Jr., hereby applies to the Court for an order temporarily restraining Defendants Google LLC and YouTube, LLC, from using their "medical misinformation" policies to remove videos of Mr. Kennedy's speech on matters of public concern from YouTube during the 2024 presidential campaign. Mr. Kennedy also applies to the Court for an order to show cause regarding the issuance of a preliminary injunction for the same relief pending a trial on the merits.

This application is made pursuant to Rule 65 of the Federal Rules of Civil Procedure. It is based on this application, the concurrently filed memorandum of points and authorities and declarations signed by Mr. Kennedy, Amaryllis Kennedy and Scott J. Street, as well any further evidence and argument as may be presented.

There is good cause to grant this relief. The First Amendment prohibits the government from censoring Mr. Kennedy based on the content of his speech. The First Amendment, buttressed by the state action doctrine, also prohibits the government from using a third party like Google to censor Mr. Kennedy. That is what happened here and what warrants this extraordinary relief.

DATED:  August 9, 2023            JW HOWARD/ATTORNEYS, LTD.

By:  */s Scott J. Street*
    John W. Howard
    Scott J. Street
    Andrew G. Nagurney
    Attorneys for Plaintiff
    ROBERT F. KENNEDY, JR.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

APPLICATION FOR TRO AND MEMO. OF POINTS & AUTHORITIES            CASE NO. 5:23-cv-03880-NC

# TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………….………8

II.     FACTS……………………………………………………………………9

III.    LEGAL STANDARD…………………………………………………...12

IV.     ARGUMENT…………………………………………………………….13

     A.      The State Action Doctrine Applies When the Government Tells
         Google What Information to Censor, Especially Under These
         Circumstances…………………………………………………………13

     B.      Kennedy Is Likely to Prevail on the Merits. …………………….…..18

     C.      Even Temporary First Amendment Violations Cause Irreparable
         Harm…………………………………………………………………22

     D.      The Balance of Harms Strongly Supports Granting the Application…...22

     E.      The Court Should Set an Expedited Hearing and, if Necessary, Allow
         Limited Discovery Before Entering a Preliminary Injunction…………23

V.      CONCLUSION……………………………………………………...24

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A.C.L.U. of Nev. v. City of Las Vegas*,
    466 F.3d 784 (9th Cir. 2006)……………………………………….…19

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) …………………………………….……..12

*Am. LegalNet, Inc. v. Davis*,
    673 F. Supp. 2d 1063 (C.D. Cal. 2009) ………………………………….23

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) ………………………………………………….……9

*Berger v. City of Seattle*,
    569 F.3d 1029 (9th Cir. 2009) ……………………………………..…..21

*Beshear v. Butt*,
    863 F. Supp. 913 (E.D. Ark. 1994) …………………………………..…..20

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ……………………………………………….……19

*Broderick v. Oklahoma*,
    413 U.S. 601 (1972). ……………………………………………….……21

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ………………………………………………….……14

*Bullfrog Films, Inc. v. Wick*,
    847 F.2d 502 (9th Cir. 1988) …………………………………………21

*Butler v. Ala. Judicial Inquiry Comm'n*,
    111 F. Supp. 2d 1224 (M.D. Ala. 2000). …………………….…………20

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) …………………………….……..……..22

4

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

*Elrod v. Burns*,

    427 U.S. 347 (1976) …………………………..…………….22

*Flores v. Bennett*,

    635 F. Supp. 3d 1020 (E.D. Cal. 2022). …………………………………22, 23

*Foti v. City of Menlo Park*,

    146 F.3d 629 (9th Cir. 1998) …………………………………………21

*Grayned v. City of Rockford*,

    408 U.S. 104 (1972). …………………………………………………21

*Goichman v. Rheuban Motors, Inc.*,

    682 F.2d 1320 (9th Cir. 1982) …………………………..……………..15

*Howerton v. Gabica*,

    708 F.2d 380 (9th Cir. 1983) ……………………..…..…………….13, 15

*Index Newspapers, LLC v. City of Portland*,

    474 F. Supp. 3d 1113 (D. Or. 2020) ………………………………..…….12

*Kirtley v. Rainey*,

    326 F.3d 1088 (9th Cir. 2003) …………………………………..……13

*Lee v. Katz*,

    276 F.3d 550 (9th Cir. 2002) …………………………………..…….14

*Lugar v. Edmondson Oil Co.*,

    457 U.S. 922 (1982). ……………………………………..…..14, 18

*Manhattan Cmty. Access Corp. v. Halleck*,

    -- U.S. --, 139 S. Ct. 1921 (2019)…………………………..…….13

*McIntyre v. Ohio Elections Comm'n*,

    514 U.S. 334 (1995)…………………………………………………19

*Mills v. Alabama*,

    384 U.S. 214 (1966)…………………………………………………19

*Missouri et al. v. Biden et al.*,

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

No. 3:22-cv-01213-TAD-KDM……………………………….………..11

*Missouri v. Biden*,

-- F. Supp. 3d --, 2023 WL 4335270 (W.D. La. July 4 2023)…………...…11, 16

*New York Times Company v. Sullivan*,

376 U.S. 254 (1964)………………………………………………...…20

*O'Handley v. Padilla*,

579 F. Supp. 3d 1163 (N.D. Cal. 2022)………………………………..15, 17-18

*Rawson v. Recovery Innovations, Inc.*,

975 F.3d 742 (9th Cir. 2020)……………………………………...…14, 18

*Recycle for Change v. City of Oakland*,

856 F.3d 666 (9th Cir. 2017)…………………………………...………19

*Reed v. Town of Gilbert, Ariz.*,

576 U.S. 155 (2015)………………………………………..………..19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,

515 U.S. 819 (1995)………………………………………………13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

240 F.3d 832 (9th Cir. 2001)……………………………………...………12

*Thalheimer v. City of San Diego*,

645 F.3d 1109 (9th Cir. 2011)………………………………….……..12

*Thornton v. Kroger Co.*,

No. CIV 20-1040 JB/JFR, 2022 WL 488932 (D.N.M. Feb. 17, 2022)….…..…18

*U.S. WeChat Users Alliance v. Trump*,

488 F. Supp. 3d 912 (2020)………………………………..……………12-13

*Warsoldier v. Woodford*,

418 F.3d 989 (9th Cir. 2005)……………………………..………………22

*Winter v. Natural Resources Defense Council, Inc.*,

555 U.S. 7 (2008)……………………………………..………………12

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

6

**Statutes and Codes**                                                               **Page(s)**

47 U.S.C. § 230(c)(1)………………………………………….…..…..……..23

**Other**

Alexander M. Bickel, *The Morality of Consent* 62 (2d ed. 1975)…………………20, 22

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

APPLICATION FOR TRO AND MEMO. OF POINTS & AUTHORITIES         CASE NO. 5:23-cv-03880-NC

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The Supreme Court has made clear that, when it comes to the political process, content-based restrictions on speech are never allowed. They stifle speech. They distort the marketplace of ideas. They prevent the robust debate on which American democracy depends.

That principle is being undermined in the 2024 campaign. Robert F. Kennedy, Jr., is an accomplished lawyer, the son of an attorney general, the nephew of a president. He is challenging Joe Biden for the Democratic Party's presidential nomination. Yet Mr. Kennedy is regularly censored in the media, including on YouTube, which has removed videos of his speeches and interviews.

The First Amendment clearly prohibits the government from censoring Mr. Kennedy. But that does not end the analysis. The First Amendment, combined with the state action doctrine, also bars a private party like Google (which owns YouTube) from censoring Mr. Kennedy when it relies on a government policy to do so.

That is the case here. Google cites its "vaccine misinformation policy" when it removes videos of Kennedy from YouTube. That policy looks entirely to the government to decide what to censor. It does not permit speech that "contradicts" the government's statements or which the government deems dangerous. Thus, the government's beliefs provide the rule of decision. That alone satisfies the state action doctrine and causes the misinformation policy to violate the First Amendment.

That is not the only reason, though. As documents discovered in other litigation have revealed, Google worked with the federal government during the COVID-19 pandemic to create, implement and enforce the vaccine misinformation policy. They described their relationship as a "partnership" in which Google shared the government's censorship goals. A public-private partnership to combat speech that the government does not want Americans to hear violates the First Amendment,

JW HOWARD/ ATTORNEYS, LTD.<br>600 WEST BROADWAY, SUITE 1400<br>SAN DIEGO, CALIFORNIA 92101

especially when done in the coercive environment created by the Biden Administration.

Americans may agree with Mr. Kennedy's views. They may disagree with them. They may select Kennedy as the Democratic Party's nominee or reject him at the ballot box. Whatever the case, our Constitution requires that voters have an unfettered chance to hear Mr. Kennedy speak. That is the only way they can make an educated decision when exercising their right to vote.

We instinctively think of the First Amendment as protecting the speaker. But it is the *listener* for whom the Founders wrote the First Amendment. "The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). That is why speech matters.

Using government policies to remove Mr. Kennedy's political speech from YouTube violates that principle, especially when those decisions flow from a partnership that Google embraced and through which it carried out its common goal of censoring speech the government does not want Americans to hear. And, unless the Court acts, Google will continue to engage in this unconstitutional action during the 2024 campaign. The danger to political discourse cannot be overstated.  Therefore, the Court should issue an order preliminary enjoining Google from removing any videos of Mr. Kennedy based on its medical misinformation policies.

## II.    FACTS

Mr. Kennedy is a lawyer, a son of former Attorney General Robert F. Kennedy and a nephew of former President John F. Kennedy. Mr. Kennedy is seeking the Democratic Party's nomination for president, having declared his candidacy on April 19, 2023. Declaration of Scott J. Street, dated August 9, 2023 ("Street Decl."), ¶ 3.

Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the

Nation" primary. *Id.* He accepted an invitation to speak about that and other issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March. *Id.* His speech, which was viewed as a political speech and attended by several prominent New Hampshire Democrats, including the chairman of New Hampshire's Democratic Party, lasted nearly two hours. *Id.*, ¶¶ 3-4. It centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, a danger he has fought for years and which, in recent years, caused him to question the increasing number of vaccines American children are required to take. *Id.*, ¶ 4.

Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. *Id.*, ¶ 5. Google removed it. *Id.* The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." *Id.*, Exh. A.

Mr. Kennedy complained about the action, particularly since his comments about vaccine safety only consumed a portion of the NHIOP speech (in other parts he spoke about his environmentalism and legal work fighting corporate polluters, among other things). *Id.,* ¶ 6. Google refused to change its position. It said it "removed the [Kennedy speech] for violating our policies on COVID-19 vaccine misinformation …. While we do allow content with educational, documentary, scientific or artistic context, such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context." *Id.*, Exh. B.

Google has removed other videos of Kennedy since he announced his candidacy on April 19, including interviews he did with Jordan Peterson and Joe Rogan. Declaration of Robert f. Kennedy, Jr., dated August 8, 2023 ("RFK Decl."), ¶ 4; Declaration of Amaryllis Kennedy, dated August 8, 2023 ("A. Kennedy Decl."), ¶¶ 4-5, Exh. A. Again, although Google cited its vaccine misinformation policy to justify these decisions, it removed the entire video. *Id.*

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Mr. Kennedy complained to Google about these matters. A. Kennedy Decl., ¶ 8. But unlike Facebook and Twitter, Google has continued to use its misinformation policies (primarily the vaccine policy) to remove Kennedy's political speech from YouTube. RFK Decl., ¶ 4.  It will continue to do so throughout the 2024 campaign. Indeed, despite repeated requests from his campaign, Google has not allowed Kennedy to control the biographical information that it displays for him in response to user searches, something it gives to other political candidates. A. Kennedy Decl., ¶ 8.

This is just one of the many obstacles that Mr. Kennedy has had to deal with during the campaign. But it has a huge impact. During the early stages of the 2016 campaign—say between April 2015 and March 2016—YouTube users consumed roughly 110 million hours of election-related content on YouTube, much of which was viewed on mobile devices. Street Decl., Exh. E. Kate Stanford, the director of YouTube's advertiser marketing at the time, made much of that, saying: "Voter decisions used to be made in living rooms, in front of televisions. Today, they're increasingly made in micro-moments, on mobile devices." *Id.*

Thus, YouTube has become an important platform for political campaigns, especially when it comes to raw content like candidate interviews and speeches, which used to be seen primarily on television. RFK Decl., ¶¶ 5-6; A. Kennedy Decl., ¶¶ 6-8. YouTube is an especially important platform for Mr. Kennedy, who many mainstream media outlets have simply refused to cover and who congressional Democrats recently tried to censor (at a hearing on censorship, no less). *Id.*; Street Decl., ¶ 32, Exhs. Q, R.

Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign. A. Kennedy Decl., ¶ 8. It refused. *Id.* That led to the filing of this case. It comes on the heels of a similar case that was filed in Louisiana by two state attorneys general, *Missouri et al. v. Biden et al.*, No. 3:22-cv-01213-TAD-KDM (the "State AG Censorship Case"). On July 4, Judge Terry Doughty issued a lengthy decision that enjoins federal government

officials from coercing technology companies to censor the government's critics. Street Decl., ¶ 12. The injunction does not bind the technology companies themselves, though, and thus does not prohibit Google from continuing to censor Mr. Kennedy based on the misinformation policies it developed with the government. *Id.*

The government appealed the decision in the State AG Censorship Case to the Fifth Circuit Court of Appeals, which will hear argument tomorrow. *Id.*, ¶ 13.

## III.   **LEGAL STANDARD**

The same standard that governs requests for a preliminary injunction applies to applications for a temporary restraining order. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The moving party usually "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). But in this context, "the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government [or, here, a third party accused of engaging in state action] to justify the restriction." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011).

There is also a lower standard that the Ninth Circuit has used to grant temporary relief when the moving party raises "serious questions going to the merits" and shows that "the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). Courts in this circuit often use the "serious questions" test instead of the *Winter* test when the case involves First Amendment rights. *See, e.g., Index Newspapers, LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1125 (D. Or. 2020) (applying serious questions test, instead of *Winter*, to grant TRO in First Amendment case brought by media); *U.S. WeChat Users*

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1  *Alliance v. Trump*, 488 F. Supp. 3d 912, 916 (2020) (applying serious questions test to
2  grant injunction in First Amendment case brought by people using WeChat app).

3  **IV.  ARGUMENT**

4        The Court should grant the application because Google violates the First
5  Amendment when it removes video of Mr. Kennedy based on misinformation policies
6  that rely entirely on the government to decide what speech to censor and because the
7  public and private interests at stake weigh heavily in favor of allowing robust debate
8  on these matters of public concern.

9        **A. The State Action Doctrine Applies When the Government Tells Google**
10            **What Information to Censor, Especially Under These Circumstances.**

11       As explained below, there is no doubt that Google's medical misinformation
12  policies would violate the First Amendment if they were issued by the government.
13  After all, they make distinctions about which speech is allowed on YouTube based on
14  the speech's content. "It is axiomatic that the government may not regulate speech
15  based on its substantive content or the message it conveys." *Rosenberger v. Rector &*
16  *Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Thus, Google's primary argument
17  will be that, unlike the government, *it* can decide which speech to allow, or not allow,
18  on YouTube based on its content. It is wrong.

19       A "private entity is not ordinarily constrained by the First Amendment …."
20  *Manhattan Cmty. Access Corp. v. Halleck*, -- U.S. --, 139 S. Ct. 1921, 1930 (2019).
21  But it may be sued for violating a person's constitutional rights under certain
22  circumstances. Under Ninth Circuit law, "there is no specific formula for defining
23  state action." *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983) (quotations
24  omitted). But the court recognizes "at least four different criteria, or tests, used to
25  identify state action: (1) public function; (2) joint action; (3) government compulsion
26  or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th
27  Cir. 2003) (cleaned up).

28

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

1  Whatever test is used, this analysis is "necessarily fact-bound …." *Lugar v.*
2  *Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). It focuses on deciding whether
3  "seemingly private behavior may be fairly treated as that of the State itself."
4  *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)
5  (quotations omitted).

6  *Brentwood* represented a sea change in the Supreme Court's state action
7  jurisprudence. It stopped the narrowing of the doctrine that had developed since the
8  1980s and moved the doctrine back to the functional analysis that Justice Brennan had
9  urged in cases like *Blum v. Yaretsky*, 457 U.S. 991, 1013 (1982) (Brennan and
10  Marshall, JJ., dissenting). The Ninth Circuit did the same thing. For example, in *Lee v.*
11  *Katz*, 276 F.3d 550 (9th Cir. 2002), the court reversed a district court's decision that
12  found no state action in a case brought by preachers against a private party (the
13  "OAC") who leased land (the "Commons") from the City of Portland. The OAC had
14  occasionally excluded the preachers from preaching on the land, a plaza near
15  Portland's basketball arena. The City played no role in excluding the preachers from
16  the property: the OAC, a private entity, made that decision for its own reasons. *Id.* at
17  552-53. But the court "conclude[d] that, in regulating speech within the Commons, the
18  OAC performs an exclusively and traditionally public function within a public
19  forum." *Id.* at 557. That satisfied the state action doctrine.

20  Similarly, in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir.
21  2020), the Ninth Circuit reversed a grant of summary judgment for the defendant, a
22  private entity that operated a private hospital, which the plaintiff sued after he was
23  involuntarily committed at the hospital. The Court emphasized that, "[a]t bottom, the
24  inquiry is always whether the defendant has exercised power possessed by virtue of
25  state law and made possible only because the wrongdoer is clothed with the authority
26  of state law." *Id.* at 748 (quotations omitted). And it concluded that the private health
27  care workers could potentially be held liable as state actors because a "county

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

28

prosecutor played an outsized role in the duration of [the plaintiff's] detention" at the private facility. *Id.* at 754.

Other examples abound, including a case in which the Ninth Circuit found a private towing company to be a state actor because it acted "at the behest of a police officer," *Goichman v. Rheuban Motors, Inc.*, 682 F.2d 1320, 1322 (9th Cir. 1982), and a case in which the Ninth Circuit found potential joint action between a landlord and police officers based on their joint and repeated efforts to evict one of the landlord's tenants, *Howerton*, 708 F.2d at 385.

Google's actions in removing Kennedy's speeches and interviews from YouTube satisfy several of these state action tests. First, Mr. Kennedy has obtained evidence that government officials were the ones who directed Google and other technology companies to censor him. Street Decl., Exhs. F-P. They did so not as part of a one-way information sharing agreement like the one involved in *O'Handley v. Padilla*, 579 F. Supp. 3d 1163 (N.D. Cal. 2022), affirmed 62 F.4th 1145 (9th Cir. 2023), but through a deeply intertwined partnership in which the government tells Google what information (and, in Kennedy's case, who) to censor and Google delivers. Street Decl., Exhs. F-P.

Judge Doughty discussed this alliance of government and corporate power in the State AG Censorship Case when he applied the state action doctrine to enjoin government officials from working with technology companies to remove alleged misinformation from social media. For example, with respect to Google/YouTube, Judge Doughty described several acts of coordination that raised constitutional problems, including:

- An April 21, 2021, meeting between YouTube officials and White House advisers Rob Slavitt and Andrew Flaherty about "general trends seen around vaccine misinformation, the effects of YouTube's efforts to combat misinformation, interventions YouTube was trying, and ways the

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

15

White House can 'partner' [with YouTube] in product work." *Missouri v. Biden*, -- F. Supp. 3d --, 2023 WL 4335270, at *9 (W.D. La. July 4 2023).

- An April 22, 2021, email in which Flaherty recapped the prior day's meeting and said that the White House's efforts to remove alleged COVID misinformation from YouTube was "'shared at the highest (and I mean the highest) levels of the White House.'" *Id.* at *10.

- Regular meetings between Google/YouTube executives and White House officials about removing alleged COVID misinformation from YouTube, as they had done with other "platform partners" like Facebook and Twitter. *Id.*

- Emails sent between the Surgeon General's office and Google/YouTube about the Surgeon General's goal "to stop the spread of misinformation" in cyberspace, in response to which "YouTube eventually adopted a new policy on combatting COVID-19 misinformation and began providing federal officials with updates on YouTube's efforts to combat the misinformation." *Id.* at *15.

- A July 30, 2021, meeting between Google/YouTube executives and officials from the Surgeon General's office in which "Google and YouTube reported to Office of the Surgeon General what actions they were taking following the Surgeon General's health advisory on misinformation." *Id.*

- A September 14, 2021, meeting between Google/YouTube executives, White House adviser Flaherty and the Surgeon General's office "to discuss" the new vaccine misinformation policy policy that the executives and the government developed. *Id.*

Judge Doughty also described how the CDC and Census Bureau have regular

meetings with Google/YouTube about removing alleged medical misinformation which "continue[ ] to the present day." *Id.* at *22. And he discussed the role that FBI agent Elvis Chan plays in the public-private censorship project. Chan, who is based in the FBI's field office in San Francisco, testified that the FBI is part of an "industry working group" that includes Google/YouTube and which works with federal agencies to remove alleged misinformation online. *Id.* at *27-28. Chan said that these meetings occurred throughout 2022 and "will continue through the 2024 election cycle." *Id.* at *28.

Judge Doughty had no problem finding these actions to constitute state action, and to violate the First Amendment, because at least some of the government officials "either exercised or provided significant encouragement, which resulted in the possible suppression of Plaintiffs' speech." *Id.* at *42; *see also id.* at *48 (emphasizing that both White House officials and tech executives referred to themselves as "'partners' and 'on the same team' in their efforts to censor disinformation, such as their efforts to censor 'vaccine' hesitancy"). Indeed, Judge Doughty concluded that federal government officials "aligned themselves with and partnered with" third parties like Google "to avoid Government involvement with free speech" that would clearly violate the First Amendment. *Id.* at *52.

This is exactly the type of conduct that the state action doctrine was designed to prevent. We are not the only ones who think so. Despite affirming the dismissal of a censorship lawsuit brought against Twitter, the Ninth Circuit acknowledged that "[a] constitutional problem would arise if [a technology company like] Twitter had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *O'Handley*, 62 F.4th at 1159. That is exactly what Google is doing to Mr. Kennedy.

In fact, Google's actions are worse than the actions alleged in *O'Handley*. It is using a policy that it developed in connection with (and in response to demands from) the incumbent government to silence one of the government's most prominent critics,

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

someone who is targeting the corrupt merger of state and corporate power and who
has vowed to dismantle the corporate/administrative state if elected.

Google's actions would satisfy even the strictest of the state action tests: the
"rule of decision" test discussed in *Lugar*. After all, Google's medical misinformation
policies rely *entirely* on the government. Street Decl., Exhs. C, D. They prohibit
speech that "contradicts" government statements and which the government deems
dangerous *Id.* The vaccine misinformation policy itself appears to have been written
jointly by Google and government officials (and in response to government demands
for it) during the summer of 2021. Street Decl., Exhs. F-K. Even if Google itself
decides when to remove such dissent—and, in Mr. Kennedy's case, the evidence
suggests otherwise—that does not matter, as "a single act of independent judgment
does not fully insulate a private party from constitutional liability when the party is
otherwise deeply intertwined with the government …." *O'Handley*, 579 F. Supp. 3d at
1158 n.2 (citing *Rawson*); *cf. Thornton v. Kroger Co.*, No. CIV 20-1040 JB/JFR, 2022
WL 488932, at *61 (D.N.M. Feb. 17, 2022) (noting that state action cases often
involve "a substantial degree of cooperative action" or showing that state and private
actors "shared a common, unconstitutional goal" (quotations omitted)).

Moreover, the State AG Censorship Case has already uncovered evidence of
White House officials pressuring technology companies to censor Kennedy. Street
Decl., Exh. P. This started within days of President Biden's inauguration. *Id.*
Discovery will likely reveal more of this, including evidence that the White House's
targeting of Mr. Kennedy for censorship increased after he challenged the president.

Thus, Mr. Kennedy is likely to prevail on his argument that Google can be held
liable under the state action doctrine for removing his speech based on its content.

**B. Kennedy Is Likely to Prevail on the Merits.**

Mr. Kennedy is also likely to prevail on his claim that the act of removing his
speech from YouTube because of its content violates the First Amendment.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Under the First Amendment, the government "has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quotations omitted). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (quotations omitted). A law is content based if it "draws distinctions based on the message a speaker conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017). Such restrictions are "presumptively invalid" and can be upheld only if they represent "the least restrictive means of furthering a compelling government interest." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006).

 Viewpoint discrimination that occurs in the political process is especially noxious. The First Amendment "affords the broadest protection" possible to political speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966). "Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Buckley v. Valeo*, 424 U.S. 1, 52-53 (1976) (per curiam).

It does not matter that some people may find the affected speech to be dangerous, misleading, or even false (although the comments that Mr. Kennedy makes that usually get censored are true statements or opinions that the government says are misleading or lack "context"). "The social interest that the First Amendment vindicates is … the interest in the successful operation of the political process, so that

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

the country may be better able to adopt the course of action that conforms to the wishes of the greatest number, whether or not it is wise or is founded in truth." Alexander M. Bickel, *The Morality of Consent* 62 (2d ed. 1975) (hereafter "Bickel"). Echoing that principle, "the Supreme Court has relied on the strong presumption that First Amendment protections have little to do with the caliber and quality of the speech involved, but … with the broad protection of the speech itself in order to encourage a robust exchange of ideas in political campaigns for elected office." *Butler v. Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1238 (M.D. Ala. 2000).

Thus, in *Butler*, a court invalidated a judicial canon that prohibited candidates from disseminating "true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person." *Id.* at 1233. The court noted the "difficulties [that] arise in ascertaining when the dissemination of 'true information' should be deemed 'deceiving or misleading'" including the fact that "[w]hat is 'deceiving or misleading' to one reasonable person may not necessarily be 'deceiving or misleading' to another reasonable person." *Id.* at 1237. Similarly, in *Beshear v. Butt*, 863 F. Supp. 913, 916-17 (E.D. Ark. 1994), a court found that a judicial canon that prohibited candidates from "announcing views on disputed legal or political issues" was "substantially overbroad and vague" and thus violated the First Amendment. (Cleaned up.)

And, of course, in *New York Times Company v. Sullivan*, 376 U.S. 254, 271 (1964), the Supreme Court held that the First Amendment guarantees the right to lie, saying: "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." That is true especially in the political process and "even though the utterance contains 'half-truths' and 'misinformation.'" *Id.* at 273.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

The government-guided censorship of Mr. Kennedy on YouTube violates these settled principles. It is content-based discrimination of speech that does not satisfy strict scrutiny. *See Berger v. City of Seattle,* 569 F.3d 1029, 1050-52 (9th Cir. 2009) (explaining why strict scrutiny governs this analysis). Regardless of the reason Google and its government partners cite for censoring people who disagree with the government about medical issues, their misinformation policies are unconstitutionally vague because they do not "give a person of ordinary intelligence a reasonable opportunity to know what is prohibited" and because they encourage "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Indeed, although Google often removes high-profile videos of Mr. Kennedy from YouTube, such as the Rogan and Peterson interviews, it does not remove them all. A. Kennedy Decl., ¶ 4. That arbitrary enforcement undermines the misinformation policies' supposed necessity and creates a chilling effect that the Supreme Court has applied the vagueness doctrine strictly to avoid. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988); *see also Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (noting that "when First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required").

The misinformation policies also violate the overbreadth doctrine, as their "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broderick v. Oklahoma*, 413 U.S. 601, 612 (1972). This interest is particularly acute here as Google does not just use its misinformation policies to remove government dissent from YouTube: it reserves the right to sanction the people who post the speech. Street Decl., Exhs. C, D. And it has removed content, including Kennedy's NHIOP speech, because it "was raw footage and did not provide sufficient context." *Id.*, Exh. D. Thus, the policies will likely be used to censor constitutionally protected speech during the 2024 campaign.

In sum, Mr. Kennedy will likely prevail on his argument that the medical

misinformation policies that Google developed with the government, and which Google has cited to remove Kennedy's political speech from YouTube, violate the First Amendment. At minimum, there are serious questions about the constitutionality of Google's actions in this censorship partnership which, given the political context, justify preliminary injunctive relief.

### C. Even Temporary First Amendment Violations Cause Irreparable Harm.

There is no dispute that Mr. Kennedy will suffer irreparable harm if the Court does not order Google to stop using its government-induced misinformation policies to censor Kennedy during his political campaign. Nor could there be. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (noting that irreparable injury is often presumed when plaintiff alleges a "colorable First Amendment claim"). "Even a temporary restriction on speech an even for minimal periods of time constitutes irreparable injury." *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1045 (E.D. Cal. 2022).

### D. The Balance of Harms Strongly Supports Granting the Application.

Finally, the balance of equities tips sharply in Mr. Kennedy's favor, as does the public interest. "The Ninth Circuit has consistently recognized the significant public interest in upholding First Amendment principles." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *see also* Bickel at 61 (explaining that "it is the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech"). Moreover, Kennedy has shown that the censorship of him on YouTube hurts his political campaign. RFK Decl., ¶¶ 5-6; A. Kennedy Decl., ¶¶ 6-8.

By contrast, Google will not suffer any harm if the Court enjoins it from enforcing the government-induced medical misinformation policies against Mr. Kennedy during his political campaign. After all, Google cannot be held liable for

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

content posted on YouTube. 47 U.S.C. § 230(c)(1). The only possible harm that Google could cite is the federal government's interest in encouraging Americans to do what it recommends about medical matters but "[t]he Supreme Court has established that the government may not proscribe speech merely because it offends someone or because it contains an unpopular viewpoint." *Flores*, 635 F. Supp. 3d at 1038.

### E. The Court Should Set an Expedited Hearing and, if Necessary, Allow Limited Discovery Before Entering a Preliminary Injunction.

If the Court has any doubts about the propriety of the requested injunction, it should give Mr. Kennedy the chance to conduct limited discovery regarding the state action issues discussed above. *See Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009) (explaining when courts find "good cause" to grant discovery in connection with motion for preliminary injunction).

The discovery would be targeted to a few subjects and would include:

- Communications between Google/YouTube executives and Executive Branch officials (especially White House, Surgeon General and CDC officials) about the new vaccine misinformation policy adopted by Google during the summer of 2021.

- Communications between Google/YouTube executives and Executive Branch officials about alleged misinformation spread by Mr. Kennedy.

- Communications between Google/ YouTube executives and Executive Branch officials about removing any videos of Mr. Kennedy from YouTube.

- Communications between Google/YouTube executives and Executive Branch officials about Mr. Kennedy's speech at the NHIOP and any other political speeches or interviews he has done during 2023.

Street Decl., ¶¶ 28-30. This discovery could be done quickly and would shed even more light on the public-private partnership that has been used to censor Mr.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

23

Kennedy during the past two years and which, if not stopped, will be used in an unprecedented manner to prevent Americans from hearing what a viable presidential candidate says about matters of public concern.

**V.** **CONCLUSION**

For the foregoing reasons, Mr. Kennedy respectfully requests that the Court grant the application and issue the requested TRO or an order to show cause about why Google should not be enjoined from using its misinformation policies to remove Kennedy's speech on matters of public concern from YouTube during the 2024 campaign.

DATED: August 9, 2023        JW HOWARD/ATTORNEYS, LTD.

By: */s Scott J. Street*
       John W. Howard
       Scott J. Street
       Andrew G. Nagurney
       Attorneys for Plaintiff
       ROBERT F. KENNEDY, JR.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 5:23-cv-03880-NC |
| Plaintiff, | [Assigned to the Hon. Nathanael Cousins] |
| vs. | |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | **DECLARATION OF SCOTT J. STREET** |
| Defendants. | |

///
///
///
///
///
///

1

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

## <u>DECLARATION OF SCOTT J. STREET</u>

I, Scott J. Street, declare as follows:

1.      I am an attorney duly licensed to practice before all courts in the state of California and before this Court. I am a partner with the law firm JW Howard/Attorneys, Ltd., counsel of record to Plaintiff Robert F. Kennedy, Jr., in this matter. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so.

2.      I am submitting this declaration in support of Mr. Kennedy's application for an order temporarily restraining Defendants Google LLC and YouTube, LLC, from enforcing their "medical misinformation" policies to remove videos of Mr. Kennedy's speech on matters of public concern from YouTube during the 2024 presidential campaign. Mr. Kennedy also applies to the Court for an order to show cause regarding the issuance of a preliminary injunction for the same relief pending a trial on the merits.

3.      Mr. Kennedy is seeking the Democratic Party's nomination for president, having declared his candidacy on April 19, 2023. Before announcing his campaign, Mr. Kennedy took a strong stance against the Democratic National Committee's effort to strip New Hampshire of its "First in the Nation" primary. He accepted an invitation to speak about that and other issues at Saint Anselm College's New Hampshire Institute of Politics ("NHIOP") in March.

4.      Mr. Kennedy's NHIOP speech, which I attended, was viewed as a political speech and was attended by several prominent New Hampshire Democrats including the chairman of New Hampshire's Democratic Party. It lasted nearly two hours and centered on Mr. Kennedy's concerns about the corrupt merger of corporate and state power, an issue he has fought about for years and which, in recent years, caused him to question the increasing numbers of vaccines American children must take.

2

5.      Manchester Public Television posted a video of Mr. Kennedy's speech on YouTube. Google removed it. The station's director said: "YouTube will not allow us to post the video because of controversial vaccination content. MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before." A true and correct copy of a news article that reported on the matter on March 6, 2023, is attached as **Exhibit "A."**

6.      Mr. Kennedy complained about the action, particularly since his comments about vaccine safety only consumed a portion of the NHIOP speech (in other parts he spoke about his environmentalism and legal work fighting corporate polluters, among other things). Google refused to change its position. It said it "removed the [Kennedy speech] for violating our policies on COVID-19 vaccine misinformation …. While we do allow content with educational, documentary, scientific or artistic context, such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context." A true and correct copy of a news report from March 8, 2023, about this matter and which contains Google's statement is attached as **Exhibit "B."**

7.      A true and correct copy of YouTube's "Vaccine misinformation policy" is attached as **Exhibit "C."**

8.      A true and correct copy of YouTube's "COVID-19 medical misinformation policy" is attached as **Exhibit "D."**

9.      For ease of reference, I refer to the policies reflected in Exhibits C and D as the "medical misinformation policies."

10.     During the past few election cycles, YouTube has played an especially important role in the political process. Attached to this declaration as **Exhibit "E"** is a true and correct copy of an article written by YouTube's director of advertiser marketing, Kate Stanford, in March 2016 titled "How Political Ads and Video Content Influence Voter Opinion" which discussed that development.

DECLARATION OF SCOTT J. STREET                                    CASE NO. 5:23-cv-03880-NC

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

11.     Mr. Kennedy has repeatedly asked Google to stop applying its misinformation policies to censor him during the presidential campaign. It has refused. That led to the filing of this case.

12.     A similar censorship case was filed in Louisiana by two state attorneys general, *Missouri et al. v. Biden et al.*, No. 3:22-cv-01213-TAD-KDM (the "State AG Censorship Case"). On July 4, Judge Terry Doughty issued a lengthy decision that enjoins federal government officials from coercing technology companies to censor the government's critics. The injunction does not bind the technology companies themselves, though, and thus does not prohibit Google from continuing to censor Mr. Kennedy based on the misinformation policies.

13.     The government appealed the decision in the State AG Censorship Case to the Fifth Circuit Court of Appeals. It will hear oral argument in the case this week.

14.     I have reviewed much of the evidence that was produced during the State AG Censorship Case, including documents that were produced and deposition testimony that was taken in that case. The evidence sheds light on the partnership that Google and Executive Branch officials developed to remove speech from people like Mr. Kennedy who disagree with Executive Branch officials about COVID-19, vaccines, and other matters of public concern.

15.     Attached to this declaration as **Exhibit "F"** is a true and correct copy of an email sent by White House official Rob Flaherty to Google executives, among other people, on April 22, 2021, which was produced in the State AG Censorship Case.

16.     Attached to this declaration as **Exhibit "G"** is a true and correct copy of sworn discovery responses provided by the Executive Branch officials in the State AG Censorship Case, which were signed by Max Lesko, Chief of Staff in the Office of the Surgeon General ("OSG") on December 16, 2022.

17.     Attached to this declaration as **Exhibit "H"** is a true and correct copy of

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

excerpts from the deposition of Eric Waldo, an OSG official, which was taken in the State AG Censorship Case.

18.     Attached to this declaration as **Exhibit "I"** is a true and correct copy of the document that was marked as Exhibit 8 to Waldo's deposition transcript.

20.     Attached to this declaration as **Exhibit "J"** is a true and correct copy of the document that was marked as Exhibit 31 to Waldo's deposition transcript.

22.     Attached to this declaration as **Exhibit "K"** is a true and correct copy of the document that was marked as Exhibit 47 to Waldo's deposition transcript.

23.     Attached to this declaration as **Exhibit "L"** is a true and correct copy of excerpts from the deposition of Carol Crawford, an official from the Centers for Disease Control, which was taken in the State AG Censorship Case.

24.     Attached to this declaration as **Exhibit "M"** is a true and correct copy of the document that was marked as Exhibit 40 to Crawford's deposition transcript.

25.     Attached to this declaration as **Exhibit "N"** is a true and correct copy of the document that was marked as Exhibit 43 to Crawford's deposition transcript.

26.     Attached to this declaration as **Exhibit "O"** is a true and correct copy of excerpts from the deposition of Elvis Chan, an agent of Federal Bureau of Investigation, which was taken in the State AG Censorship Case.

27.     Attached to this declaration as **Exhibit "P"** is a true and correct copy of an email exchange between Mr. Flaherty, the White House official, and Twitter executives about Mr. Kennedy that occurred between January 22 and 23, 2021.

28.     To my knowledge, neither Google nor YouTube were subpoenaed in the State AG Censorship Case. None of their executives were deposed. No White House officials were deposed in the State AG Censorship Case either.

29.     Although we have already obtained evidence that, in my opinion, is sufficient to satisfy the state action doctrine with respect to Google's enforcement of the medical misinformation policies, if given the chance we would seek additional

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

discovery in this case and in connection with Mr. Kennedy's request for issuance of a preliminary injunction. The discovery would be targeted to Google and would include: (a) Communications between Google/YouTube executives and Executive Branch officials (especially White House, Surgeon General and CDC officials) about the new COVID-19 misinformation policies adopted by Google during the summer of 2021; (b) Communications between Google/YouTube executives and Executive Branch officials about alleged misinformation spread by Mr. Kennedy; (c) Communications between Google/ YouTube executives and Executive Branch officials about removing any videos of Mr. Kennedy from YouTube; and (d) Communications between Google/YouTube executives and Executive Branch officials about Mr. Kennedy's speech at the NHIOP and his interview with Jordan Peterson.

30.     We would also seek discovery about the creation of YouTube's original COVID-19 misinformation policy, which was first posted in May 2020. And we would seek information about the partnership between Google and the White House about suppressing speech about the COVID-19 vaccines specifically, including documents regarding an April 21, 2021, meeting between Google executives and White House officials that was described in Judge Doughty's decision in the State AG Censorship Case. I could not obtain a copy of those emails because they were filed under seal.

31.     I believe this discovery could be completed within the next month.

32.     Mr. Kennedy's presidential campaign has been gaining momentum, having raised millions of dollars, and generated impressive poll numbers, despite his being ignored by much of the mainstream media and disavowed by the Democratic National Committee and most Democratic members of Congress (who tried to censor his testimony at a Congressional hearing on censorship). The campaign is expected to heat up after Labor Day. That is why Mr. Kennedy is seeking preliminary injunctive relief now.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

33.     Defendants' agent will be served with the summons and complaint this week. My office separately served the registered agent with the complaint last week. The case has also received significant attention in the press. Thus, I believe that Defendants are prepared to litigate the case and can do so on an expedited basis. Although Defendants have not yet appeared in the case, my office will personally serve Defendants' registered agent with copies of the application for a temporary restraining order and all supporting papers this week.

34.     I understand that the Court usually hears law and motion matters on Wednesdays. I will be traveling during the week of August 28. I will also be attending an oral argument in the Ninth Circuit Court of Appeals on September 14. I could appear for argument on Mr. Kennedy's application for preliminary relief on August 23, September 6, or September 13, or any other Wednesday during September.

Under penalty of perjury, under the laws of the United States of America, I declare that the foregoing is true and correct. Executed this 9th day of August 2023, at Pasadena, California.

Scott J. Street

DECLARATION OF SCOTT J. STREET                              CASE NO. 5:23-cv-03880-NC

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# EXHIBIT A





NEWS

Politics
(https://nhjournal.com/category/politics/)

## RFK, Jr's NHIOP Speech Banned From YouTube

Posted to Politics (https://nhjournal.com/category/politics/) March
06, 2023 by Michael Graham
(https://nhjournal.com/michaelgraham/)

Jason Cote has a simple mission at Manchester Public TV. "Proudly bringing
MANCHESTER to your television: open government, free expression,
education, arts, activities," as it says on the station's website
(https://www.manchestertv.org/).

For Cote, the station's executive director, achieving that goal often involves broadcasting political speeches from the
New Hampshire Institute of Politics. For example, MPTS shared New Hampshire Journal's GOP candidate debates
with viewers last year.

But when the station tried to post its video of Robert F. Kennedy, Jr's NHIOP speech on its YouTube channel,
something happened Cote had never experienced before.

"YouTube will not allow us to post the video because of controversial vaccination content," Cote told NHJournal.
"MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before.

"First time for everything, I guess," he added.

According to a message from YouTube sent to Cote, the media platform declared RFK, Jr.'s speech "medical
misinformation" and would not allow it to be posted.

"YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation
about currently administered vaccines that are approved and confirmed to be safe and effective by local health
authorities and by the World Health Organization," the YouTube message read.

A spokesperson for YouTube responded to NHJournal's requests with assurances a statement would be forthcoming,
but it failed to respond by late Monday night.

NHIOP Executive Director Neil Levesque was puzzled by YouTube's decision.

"This was a political and public policy speech that YouTube has censored."

RFK, Jr. is well known for advocating views often labeled "conspiracy theories," including his suggestion that
childhood diseases like autism are linked to vaccines. He also spread the debunked conspiracy
(https://clevelandmagazine.com/in-the-cle/politics/articles/robert-f-kennedy-jr-nut-job) that the 2004 presidential
election was stolen from John Kerry.

His views on vaccines have gotten him banned from social media in the past. In 2021, he was blocked from Instagram



However unorthodox his views, RFK, Jr. was still welcomed by some of the biggest names in the New Hampshire Democratic Party, including state party chair Ray Buckley and Senate Minority Leader Donna Soucy (D-Manchester). If they could sit and hear what the possible 2024 presidential candidate had to say, why not voters across the state, Cote asked.

"We only try to help the Manchester citizens be the most educated about all views and opinions that we can."

## More from New Hampshire Journal

**EXHIBIT B**



Patch

# Bedford, NH

Subscribe

News Feed | Neighbor Posts | Local Businesses | Events

Politics & Government

# RFK Jr. Suing Over YouTube Ban Of NH IOP Speech

Kennedy spoke of his environmental causes and belief that the expanded regime of childhood vaccines was contributing to autism.

 **New Hampshire Journal,** News Partner

Posted Wed, Mar 8, 2023 at 8:41 pm ET

 Reply

ADVERTISEMENT



An attorney for Robert F. Kennedy Jr. tells NHJournal the potential 2024 presidential candidate plans to sue YouTube over its decision to ban his recent speech at the prestigious New Hampshire Institute of Politics (NHIOP) from its video platform. (NH Journal)

## By Michael Graham, NH Journal

ADVERTISEMENT

ADVERTISEMENT

An attorney for Robert F. Kennedy Jr. tells NHJournal the potential 2024 presidential candidate plans to sue YouTube over its decision to ban his recent speech at the prestigious New Hampshire Institute of Politics (NHIOP) from its video platform.

"We will be filing suit," said John Howard, a legal adviser to Kennedy.

---

Find out what's happening in Bedfordwith free, real-time updates from Patch.

Your email address | Subscribe

---

Kennedy spoke at the NHIOP last Friday, recounting his efforts on behalf of environmental causes and his suspicions regarding the expanded regime of childhood vaccines he suggests are linked to increased cases of autism in children.

The Institute, based on the campus of St. Anselm College, is a must-stop destination for politicians considering a run for the White House. Asked by NHJournal if he had any plans to challenge President Joe Biden in the Democratic primary, Kennedy said "I'm thinking about it."

ADVERTISEMENT

ADVERTISEMENT

Manchester Public Television often broadcasts political speeches from the NHIOP venue to its viewers, as well as posts them on the station's YouTube channel. The possibility of a Kennedy challenge to President Joe Biden is particularly newsworthy given the DNC's decision to strip New Hampshire of its First in the Nation primary status.

But when MPTS executive director Jason Cote attempted to post RFK's remarks, he received a message that the content was being blocked.

ADVERTISEMENT

"YouTube will not allow us to post the video because of controversial vaccination content," Cote told NHJournal. "MPTS has recorded more than 100 wonderful NHIOP events, and I cannot recall this happening before.

"First time for everything, I guess," he added.

On Wednesday, a spokesperson for YouTube confirmed to NHJournal the speech was banned from the platform.

"We removed the content for violating our policies on COVID-19 vaccine misinformation. Our policies are enforced for everyone, regardless of the speaker's political views," the spokesperson said in a statement. "While we do allow content with educational, documentary, scientific or artistic context,

ADVERTISEMENT

such as news reports, the content we removed from this channel was raw footage and did not provide sufficient context."

Kennedy's attorney said they are taking the matter to court.

"Justice Anthony Kennedy said the right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought," said Howard. "We should keep those principles in mind. YouTube may not be the government, but its actions have all the signs of government censorship. The people of New Hampshire—all Americans, really—deserve to hear from people who seek their vote."

Alphabet, the parent company of YouTube and Google, is already under scrutiny from Congress over its uneven — some say politically biased — application of content restrictions on its platforms. Alphabet CEO Sundar Pichai has been subpoenaed by the House Judiciary Committee to answer accusations regarding "the federal government's reported collusion with Big Tech to suppress free speech."

ADVERTISEMENT

While Kennedy is viewed as a longshot presidential candidate, he garnered praise from Granite State Democrats for intervening on behalf of the state's FITN primary. On the eve of the Democratic National Committee's vote to strip New Hampshire of its place at the front of the 2024 line, Kennedy published an open letter to the DNC urging it "not to interfere in New Hampshire's plan to hold the nation's first primary.

"My Uncle Jack spoke to voters in Dover on the eve of the 1960 New Hampshire primary. He said that 'We Democrats realize that the days when presidential candidates can be nominated in smoke-filled rooms, by political leaders and party bosses, have forever passed from the scene.' He said 'that no man has

ADVERTISEMENT

won a national election who was unwilling to test his candidacy with the people.'

"I echo those thoughts," Kennedy wrote.

Some of New Hampshire's top Democrats turned out for his NHIOP speech, including state party chairman Ray Buckley and state Senate minority leader Donna Soucy (D-Manchester).

Best-selling author Marianne Williamson has announced her candidacy in the 2024 Democratic presidential primary. She is scheduled to make campaign appearances across the Granite State [between March 8 -13](#).

ADVERTISEMENT

Polls consistently show a majority of Granite State Democrats would prefer to back someone other than Biden as their party's nominee. And while no prominent local Democrats have endorsed Kennedy or Williamson, some have expressed dissatisfaction with Biden.

Asked if he wants Biden to run again, former N.H. Speaker of the House Steve Shurtleff (D-Penacook) told the AP, "In my heart of hearts, no. I think a lot of people just don't want to say it."

---

*This story was originally published by the NH Journal, an online news publication dedicated to providing fair, unbiased reporting on, and analysis of, political news of interest to New Hampshire. For more stories from the NH Journal, visit [NHJournal.com](#).*

♡ Thank   💬 Reply   ↪ Share                                    ⚑

---

**More from Bedford**

ADVERTISEMENT

Community Corner | 3h

🍹 **Fecal Bacteria Alert: NH Beaches + Hike The New Hollow Fairy Trail**

---

Arts & Entertainment | 1d

**Events: Bedford Garden Club's Mum Sale; Corn Hole; Zero Waste Store**

---

Community Corner | 14h

🍹 **Kayla Stoll 18 Under 18 Award + Senator Ricciardi Budget Wins**

ADVERTISEMENT

## Latest News Nearby

1. 📍 Concord, NH News
   **Fatal Car Crash; Teen Dies In Boating Accident; More: PM Patch NH**

2. 📍 Bedford, NH News
   🍹 **Fecal Bacteria Alert: NH Beaches + Hike The New Hollow Fairy Trail**

3. 📍 Across America, US News
   **Help Patch Recognize Outstanding Community Leaders Across The Country**

4. 📍 Concord, NH News
   **New York Teen Dies In Crescent Lake Boating Crash: NH State Police**

ADVERTISEMENT

Find out what's happening in your
community on the Patch app

**Corporate Info**

About Patch

Careers

**Partnerships**

Advertise on Patch

**Support**

FAQs

Contact Patch

Community Guidelines

Posting Instructions

    

Terms of Use    Privacy Policy

© 2023 Patch Media. All Rights Reserved.

Do Not Sell My Personal Information

ADVERTISEMENT

**EXHIBIT C**

Case 2:23-cv-03885-LMG-LDW Document 1-30 Filed 08/09/23 Page 463 of 660

# Vaccine misinformation policy



YouTube doesn't allow content that poses a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO). This is limited to content that contradicts local health authorities' or the WHO's guidance on vaccine safety, efficacy, and ingredients.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes harmful misinformation about currently approved and administered vaccines on any of the following:

- **Vaccine safety:** content alleging that vaccines cause chronic side effects, outside of rare side effects that are recognized by health authorities

- **Efficacy of vaccines:** content claiming that vaccines do not reduce transmission or contraction of disease

- **Ingredients in vaccines:** content misrepresenting the substances contained in vaccines

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to external links in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Claims that vaccines cause chronic side effects such as:
  - Cancer
  - Diabetes
  - Other chronic side effects
- Claims that vaccines do not reduce risk of contracting illness
- Claims that vaccines contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal byproducts
- Claims that vaccines contain substances or devices meant to track or identify those who've received them
- Claims that vaccines alter a person's genetic makeup
- Claims that the MMR vaccine causes autism
- Claims that vaccines are part of a depopulation agenda

- Claims that the flu vaccine causes chronic side effects such as infertility
- Claims that the HPV vaccine causes chronic side effects such as paralysis

## Educational, scientific, artistic, or testimonial content

YouTube may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

YouTube also believes people should be able to share their own experiences, including personal experiences with vaccinations. This means we may make exceptions for content in which creators describe firsthand experiences from themselves or their family. At the same time, we recognize there is a difference between sharing personal experiences and promoting misinformation about vaccines. To address this balance, we will still remove content or channels if they include other policy violations or demonstrate a pattern of promoting vaccine misinformation.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

## Additional resources

More information on vaccines, including their safety and efficacy, can be found below.

**Health Authority Vaccine Information:**

- Centers for Disease Control and Prevention (CDC)    (US)
- European Vaccination Information Portal    (EU)
- National Health Service    (UK)
- World Health Organization vaccine safety    (Global)
- World Health Organization vaccine preventable diseases    (Global)

**Additional Vaccine Information:**

- American Academy of Pediatrics    (US)
- GAVI, the Vaccine Alliance    (Global)
- UNICEF    (Global)

## Need more help?

Try these next steps:

**Post to the help community**
Get answers from community members

**EXHIBIT D**

# COVID-19 medical misinformation policy

The safety of our creators, viewers, and partners is our highest priority. We look to each of you to help us protect this unique and vibrant community. It's important you understand our Community Guidelines, and the role they play in our shared responsibility to keep YouTube safe. **Take the time to carefully read the policy below**. You can also check out this page for a full list of our guidelines.

YouTube doesn't allow content about COVID-19 that poses a serious risk of egregious harm.

YouTube doesn't allow content that spreads medical misinformation that contradicts local health authorities' (LHA) or the World Health Organization's (WHO) medical information about COVID-19. This is limited to content that contradicts WHO or local health authorities' guidance on:

- Treatment
- Prevention
- Diagnosis
- Transmission
- The existence of COVID-19

**Note**: YouTube's policies on COVID-19 are subject to change in response to changes to global or local health authorities' guidance on the virus. There may be a delay between new LHA/WHO guidance and policy updates given the frequency with which this guidance changes, and our policies may not cover all LHA/WHO guidance related to COVID-19.

Our COVID-19 policies were first published on May 20, 2020.

## What this policy means for you

### If you're posting content

Don't post content on YouTube if it includes any of the following:

**Treatment misinformation**:

- Content that encourages the use of home remedies, prayer, or rituals in place of medical treatment such as consulting a doctor or going to the hospital
- Content that claims that there's a guaranteed cure for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the treatment of COVID-19
- Claims that Hydroxychloroquine is an effective treatment for COVID-19
- Categorical claims that Ivermectin is an effective treatment for COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Other content that discourages people from consulting a medical professional or seeking medical advice

**Prevention misinformation**: Content that promotes prevention methods that contradict local health authorities or WHO.

- Claims that there is a guaranteed prevention method for COVID-19
  - Claims that any medication or vaccination is a guaranteed prevention method for COVID-19
- Content that recommends use of Ivermectin or Hydroxychloroquine for the prevention of COVID-19
- Claims that Ivermectin and Hydroxychloroquine are safe to use in the prevention of COVID-19
- Claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or WHO

6/20/23, 11:01 AM
Case 2:23-cv-03885... COVID-19 medical misinformation policy - YouTube Help
Case 2:23-cv-03885-LMG-LDW Document 87-19 Filed 08/04/23 Page 468 of 660

- Claims that an approved COVID-19 vaccine will cause death, infertility, miscarriage, autism, or contraction of other infectious diseases
- Claims that an approved COVID-19 vaccine will contain substances that are not on the vaccine ingredient list, such as biological matter from fetuses (e.g. fetal tissue, fetal cell lines) or animal products
- Claims that an approved COVID-19 vaccine will contain substances or devices meant to track or identify those who've received it
- Claims that COVID-19 vaccines will make people who receive them magnetic
- Claims that an approved COVID-19 vaccine will alter a person's genetic makeup
- Claims that COVID-19 vaccines do not reduce risk of serious illness or death
- Claims that any vaccine causes contraction of COVID-19
- Claims that a specific population will be required (by any entity except for a government) to take part in vaccine trials or receive the vaccine first
- Content that promotes the use of unapproved or homemade COVID-19 vaccines
- Instructions to counterfeit vaccine certificates, or offers of sale for such documents

**Diagnostic misinformation**: Content that promotes diagnostic information that contradicts local health authorities or WHO.

- Claims that approved COVID-19 tests are dangerous or cause negative physical health effects
- Claims that approved COVID-19 tests cannot diagnose COVID-19

**Transmission misinformation**: Content that promotes transmission information that contradicts local health authorities or WHO.

- Content that claims that COVID-19 is not caused by a viral infection
- Content that claims COVID-19 is not contagious
- Content that claims that COVID-19 cannot spread in certain climates or geographies
- Content that claims that any group or individual has immunity to the virus or cannot transmit the virus

**Content that denies the existence of COVID-19:**

- Denial that COVID-19 exists
- Claims that people have not died or gotten sick from COVID-19
- Claims that the death rate of COVID-19 is equal to or less than that of the common cold or seasonal flu
- Claims that COVID-19 is equal to or less transmissible than the common cold or seasonal flu
- Claims that the symptoms of COVID-19 are never severe

This policy applies to videos, video descriptions, comments, live streams, and any other YouTube product or feature. Keep in mind that this isn't a complete list. Please note these policies also apply to [external links](#) in your content. This can include clickable URLs, verbally directing users to other sites in video, as well as other forms.

## Examples

Here are some examples of content that's not allowed on YouTube:

- Denial that COVID-19 exists
- Claims that people have not died from COVID-19
- Claims that any vaccine is a guaranteed prevention method for COVID-19
- Claims that a specific treatment or medicine is a guaranteed cure for COVID-19
- Claims that hydroxychloroquine saves people from COVID-19
- Promotion of MMS (Miracle Mineral Solution) for the treatment of COVID-19

- Claims that certain people have immunity to COVID-19 due to their race or nationality
- Encouraging taking home remedies instead of getting medical treatment when sick
- Discouraging people from consulting a medical professional if they're sick
- Content that claims that holding your breath can be used as a diagnostic test for COVID-19
- Videos alleging that if you avoid Asian food, you won't get the coronavirus
- Videos alleging that setting off fireworks can clean the air of the virus and will prevent the spread of the virus
- Claims that COVID-19 is caused by radiation from 5G networks
- Videos alleging that the COVID-19 test is the cause of the virus
- Claims that countries with hot climates will not experience the spread of the virus
- Claims that COVID-19 vaccines kill people who receive them
- Claims that COVID-19 vaccines are a means of population reduction
- Videos claiming that COVID-19 vaccines contain fetal tissue
- Claims that the flu vaccine causes contraction of COVID-19
- Claims that the flu is more contagious than COVID-19
- Claims that COVID-19 vaccines cause contraction of other infectious diseases or makes people more vulnerable to contraction of other infectious diseases
- Claims that COVID-19 vaccines contain a microchip or tracking device
- Claims that achieving herd immunity through natural infection is safer than vaccinating the population
- Claims that COVID-19 never causes serious symptoms or hospitalization
- Claims that the death rate from the seasonal flu is higher than the death rate of COVID-19
- Claims that people are immune to the virus based on their race
- Claims that children cannot or do not contract COVID-19
- Claims that there have not been cases or deaths in countries where cases or deaths have been confirmed by local health authorities or the WHO

## Educational, documentary, scientific or artistic content

We may allow content that violates the misinformation policies noted on this page if that content includes additional context in the video, audio, title, or description. This is not a pass to promote misinformation. Additional context may include countervailing views from local health authorities or medical experts. We may also make exceptions if the purpose of the content is to condemn, dispute, or satirize misinformation that violates our policies. We may also make exceptions for content showing an open public forum, like a protest or public hearing, provided the content does not aim to promote misinformation that violates our policies.

## What happens if content violates this policy

If your content violates this policy, we'll remove the content and send you an email to let you know. If we can't verify that a link you post is safe, we may remove the link.

If this is your first time violating our Community Guidelines, you'll likely get a warning with no penalty to your channel. If it's not, we may issue a strike against your channel. If you get 3 strikes within 90 days, your channel will be terminated. You can learn more about our strikes system here.

We may terminate your channel or account for repeated violations of the Community Guidelines or Terms of Service. We may also terminate your channel or account after a single case of severe abuse, or when the channel is dedicated to a policy violation. You can learn more about channel or account terminations here.

# Need more help?

Try these next steps:

**Post to the help community**
Get answers from community members

**EXHIBIT E**



# How Political Ads and Video Content Influence Voter Opinion

**Written by**
Kate Stanford

**Published**
March 2016

**Topics**
Video, Government & Education, Advertising

There are so many major moments that lead up to Election Day: debates, caucuses, primaries. But the moments that matter most won't make major headlines. They'll happen quietly and quickly in micro-moments, when undecided voters become decided voters, often by going online.



V oter decisions used to be made in living rooms, in front of televisions. Today, they're increasingly made in [micro-moments](#), on mobile devices. Election micro-moments happen when voters turn to a device to learn about a candidate, event, or issue.

Today's voters want a quick way to catch up on the latest elections buzz and they've found it in online video. Since April 2015, people have watched more than 110 million hours of candidate- and issues-related content on YouTube. That's 100X the amount of time it would take to watch all content ever aired on CNN, C-Span, MSNBC, and Fox News combined.[1] Whether voters are looking for a debate sound bite, instructions on how to vote, or Stephen Colbert's latest burn, they turn to YouTube.

Since April 2015, people have watched more than 110 million hours of candidate- and issues-related content on YouTube. That's 100X the amount of time it would take to watch all content ever aired on CNN, C-Span, MSNBC, and Fox News combined.

In fact, searches for election-related content on YouTube have grown by nearly 4X since presidential candidates started making their announcements last April.[2] And voters of all ages—not just young people—turn to YouTube in their [I-want-to-know moments](#). While 59% of people who turn to online video to learn more about the candidates are under the age of 35, one in four are over the age of 45.[3]

So, how can candidates win these micro-moments to win in November? As the season heats up, here are three ways all candidates—whether they're running for a local seat, Congress, or the presidency—can meet voters in their micro-moments:

# 1. Be there: What online video trends reveal about voter micro-moments

[Being there](#) for voters in critical micro-moments means knowing what they're looking for. To get a map of voter wants and needs when it comes to video, we use [Google Trends](#) and [filter by YouTube](#).

Here's a look at the trending topics since the presidential candidates launched their campaigns in April 2015 and how much search volume has grown on those topics.

Top Video Search Trends for Political Issues

Source: Google data, U.S., YouTube search interest in top issues, April 2015–February 2016.

| Political Issue | Increase in searches since April 2015 |
| --- | --- |
| Refugees | +224% |
| Immigration | +51% |
| Gun Control | +27% |
| Economy | +22% |
| Health Care | +10% |

As you look at what voters want, ask yourself: Do I have the video content to answer their queries? Are my videos showing up for voters experiencing micro-moments on YouTube?

In Nevada, Hillary Clinton's campaign answered "yes" to both of those questions. First, her campaign created a moving video ad about the second issue on the list above: immigration. Then, the campaign used standard targeting features to try to reach voters who might be interested in the issue:



Thanks to the TrueView "skip" button, campaigns can get immediate feedback: Did viewers skip the ad, or choose to watch it? Based on that feedback, campaigns are able to adjust TrueView ads midflight. As The Wall Street Journal noted recently from the perspective of the Ted Cruz campaign, TrueView ads "offer the closest parallel to the power to persuade voters offered by classic TV ads, but allow for much better targeting."

## 2. Be useful and quick: How candidates' video content helps when micro-moments happen

Timing is everything when it comes to micro-moments. Voters don't just want the right content—they want it right now. While micro-moments can happen at any time, we see spikes in interest around key decision-making moments. Take the Iowa caucuses, for example, when voters went to YouTube to get informed: Watch Time Trends for Videos Related to the Iowa Caucuses



Watch Time Trends for Videos
Related to the Iowa Caucuses

Iowa
caucuses:
Feb. 1

● Video Watch Time

Source: Google data, U.S., classification as a
candidate-related "Iowa caucuses" video was
based on public data such as headlines, tags, etc.,
and may not account for every such video available
on YouTube, January 15–February 7, 2016.

1/15/16    1/20/16    1/25/16    1/30/16    2/5/16

The chart above shows watch time before, during, and after the Iowa
caucuses. The first major spike was driven by people coming to YouTube
to catch up on video of recent debates and town halls. The second was
driven by people watching Donald Trump's caucus speech. Both are
micro-moments experienced by voters en masse.

But it's not just political events, like debates and caucuses, that are
shaping election watch time trends. Timely, cultural conversations
spark voter micro-moments, too. For example, the week after same-
sex marriage was legalized, watch time for related videos grew by 23X
compared to the average of the three weeks prior: Watch Time Trends for
Videos Related to Same-Sex Marriage



Watch Time Trends for Videos
Related to Same-Sex Marriage

Same-sex marriage legalized
Jun. 26

● Video Watch Time

Source: Google data, U.S., classification as a
candidate and issues-related "same-sex
marriage" video was based on public data
such as headlines, tags, etc., and may not
account for every such video available on
YouTube, June 2015–July 2015.

6/16/15          7/1/15          7/11/15

Some candidates are getting out in front of these micro-moments with event- or issue-related content, combined with more targeted ads. In an effort to get out the vote, Donald Trump's "Find Your Iowa Caucus Location" video and Bernie Sanders' "How to Caucus in Iowa" explained to Iowans how to register and caucus:





The Trump and Sanders campaigns knew voters would head to YouTube to ask "how to caucus" ahead of Iowa, and they were ready with two simple videos that offered step-by-step instructions. Talk about a decision-making moment: These videos could have meant the difference between showing up for your candidate on caucus day or staying home.

### 3. Be Influential: Who influences voter opinion in micro-moments

We've talked about understanding what voters are looking for in election micro-moments and when those moments occur most. But who carries the most sway in these moments? More than half of daily YouTube users ages 18–49 say their personal opinions (including politics) have been influenced by YouTube creators.[4]

Savvy politicians have taken advantage of YouTube creators' influence, taking interviews with them or partnering on videos to share in the dialogue. Six YouTube creators interviewed President Obama after his last two State of the Union addresses. And this election season, politicians are acting more like creators themselves. For example, Marco Rubio published several videos that are more in the style of creator Casey Neistat's "Ask Me Anything" videos than typical campaign TV ads:



Creators are, ultimately, master listeners. The most influential creators on YouTube listen for audience questions and create content that answers them. The most influential politicians on YouTube do, too.

At a time when politicians and pundits are asking, "Do Political TV Ads Still Work?," YouTube trends show that online video is now table stakes for political campaigns. In our connected world, video works hardest when it answers a need or want that voters experience in election micro-moments.

These micro-moments might occur before, during, or after a debate or in reaction to a cultural event. They might happen when voters need a question answered fast, like "how to caucus in Iowa." Politicians can have extra influence in micro-moments by working alongside creators or taking a page out of their playbooks, as Marco Rubio did.

Micro-moments are shaping the electorate in 2016. I, for one, can't wait to find out which candidate won the most micro-moments—who met the most voters in their decision-making moments on YouTube. We'll find out on November 8.

*Dive into the data to learn more about voter micro-moments with The Presidential Elections on YouTube - Trends Report 2016.*

## Sources

1 Google data, U.S., classification as election "candidates" and "issues" was based on public data such as headlines and tags, and may not account for every such video available on YouTube. Content broadcast by CNN, C-SPAN, Fox News, and MSNBC was estimated by adding the number of days since their first broadcast. April 2015–February 2016.

2 Google data, U.S., YouTube search interest related to election candidates and issues, April 2015–February 2016.

3 Google/Ipsos Connect, Google Elections Omnibus, U.S. adults 18+, n=2,022, January 2016.

4 Google/Ipsos Connect, "The YouTube Generation" study", U.S., 18–49 year-olds, n=1,125, November 2015

**EXHIBIT F**

| From: | Flaherty, Rob EOP/WHO |
| --- | --- |
| Sent: | 4/22/2021 12:05:16 AM |
| To: | @google.com]; @google.com]; @google.com]; @google.com; @google.com; @google.com; @google.com] |
| CC: | Slavitt, Andrew M. EOP/WHO @who.eop.gov]; Humphrey, Clarke EOP/WHO @who.eop.gov]; Fitzpatrick, Kelsey V. EOP/WHO @who.eop.gov] |
| Subject: | Following Up on Today's Conversation |

All – Thanks again for the conversation today.

We'll look out for the top trends that you've seen in terms of misinformation around the vaccine.

To recap: As we move away from a supply problem toward a demand problem, we remain concerned that Youtube is "funneling" people into hesitance and intensifying people's hesitancy. We certainly recognize that removing content that is unfavorable to the cause of increasing vaccine adoption is not a realistic – or even good – solution. But we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. This is a concern that is shared at the highest (and I mean highest) levels of the WH, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out.

Just before we were meeting, this article from Buzzfeed popped, highlighting the Youtube misinformation that is spreading through the Vietnamese community. I think this brings up a question that I had in our first meeting about your capabilities around misinformation in non-english-speaking communities. Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages – how your enforcement has differed in languages and what your road map to improvement is.

A couple of other things it would be good to have from you all:

•    As mentioned up top, the top trends that you're seeing in terms of misinformation/hesitance inducing content (Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing)

•    A deeper dive on reduction and its effectiveness. It's helpful that you mentioned that watch time is your key metric. I believe you said you reduced watch time by 70% on "borderline" content, which is impressive. Obviously, the term "borderline" is moveable, but taking it for what it is: How does that track with vaccine-related content specifically (removing the "UFO stuff"). What has the comparative reduction in watch time on "borderline" vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?

•    I appreciated your unequivocal response that you are not recommending anti-vaccine content and you are lifting authoritative information in both search and recommendations to all audiences.  Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a "strike" still being recommended and shown in prominent search positions?

•    I feel like I am not coming away with a very clear picture of how you're measuring the effectiveness of uplifting authoritative information. I obviously buy the theory – but how did you arrive on info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? What are you doing mechanically to boost the authoritative information? When you have relevant influencers speak to experts,  I imagine (hope?) it's not just putting the content out there and that you're recommending it to people for whom it would be most relevant. How does that work?

•    What are the general vectors by which people see the "borderline" content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?

We are excited to continuing partnering with you on this work as we have via                    but we want to make sure that the work extends to the broader problem. Needless to say, in a couple of weeks when we're having trouble

MOLA_DEFSPROD_00018147

getting people to get vaccinated, we'll be in the barrel together here. We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly?

Looking forward to more conversation.

-Rob

**Rob Flaherty**
Director of Digital Strategy
The White House
Cell:

**EXHIBIT G**

**OSG**. Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, OSG responds that the following meetings took place with the Social-Media Platforms relating to Misinformation:

- On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Slavitt from the White House met remotely with Nick Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg. Misinformation may have been discussed.

- On July 12, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG met remotely with Lauren Culberton and Todd Boyle from Twitter. Kyla Fullenwider from U.S. Digital Response was invited and may have also attended. The meeting provided notice of the upcoming OSG Advisory and a high-level view of what issues OSG would be prioritizing in the Advisory.

- On July 14, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG met remotely with Kevin Kane from YouTube, Jan Antonaros from Google, and Ariel Altman from YouTube. The meeting provided notice of the upcoming OSG Advisory and a high-level view of what issues OSG would be prioritizing in the Advisory.

- On July 16, 2021, from 3:00 pm to 3:30 pm ET, Eric Waldo from OSG and Kyla Fullenwider from U.S. Digital Response met remotely with Payton Iheme and Justine Isola from Facebook. Kate Thornton and Brian Rice from Facebook were invited and may have also attended. The meeting discussed the newly issued OSG Advisory.

- On July 23, 2021, from 1:30 pm to 2:00 pm ET, Dr. Vivek Murthy and Eric Waldo from OSG, and D.J. Patil (who OSG understands to be a then part-time consultant

supporting the Office of Science Technology and Policy) met remotely with Nick Clegg and (very likely) Brian Rice from Facebook. The meeting discussed a recent e-mail from Mr. Clegg to Dr. Murthy concerning recent public comments by the Administration about Facebook.

- On July 30, 2021, from 2:00 pm to 2:30 pm ET, Eric Waldo from OSG met with Kevin Kane from YouTube, Lauren Kelly from Google, and Jan Antonaros from Google. The topics discussed included YouTube/Google following up on the announcement of the OSG Advisory to share more of the work it was doing around health mis- and disinformation.

- As indicated by MOLA_DEFSPROD_00007276, on August 10, 2021, there was a call between Eric Waldo from OSG, Robert Flaherty from EOP, and personnel from Facebook that discussed, as stated in the document, "an operation [Facebook] uncovered that is related to vaccine misinformation."

- As indicated by MOLA_DEFSPROD_00007455, on or about September 14, 2021, there was a call between Eric Waldo from OSG and Kevin Kane and Jan Antonaros from Google/YouTube. As stated in the document, the purpose was "a brief meeting to discuss a new policy we are working on as well as provide an update on our overall efforts to combat harmful COVID-19 misinformation on the platform."

- As indicated by MOLA_DEFSPROD_00007398, on November 22, 2021, from 4:00 to 4:30 pm ET, there was a virtual meeting attended by Tericka Lambert, other ASPA personnel, personnel from Fors Marsh Group (a contractor for ASPA), personnel from OSG, and Google/YouTube personnel. This meeting briefly touched on misinformation among other topics.

CONFIDENTIAL

The above list reflects OSG's identification to date, based on reasonably diligent efforts, of meetings that took place with the Social-Media Platforms relating to Misinformation and the included participants. OSG is not aware of specific additional meetings with the Social-Media Platforms relating to Misinformation, but it is possible that the above list is not exhaustive.

      **NIAID.** Subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, NIAID responds that no meetings took place with the Social-Media Platforms relating to Misinformation. NIAID has identified two possible meetings to discuss the potential participation by the NIAID director in U.S. Government efforts to publicize health information and provide COVID-19 and vaccine education via social media, which are not responsive to the Interrogatory, but are identified in the documents being produced in response to Plaintiffs' First Requests For Production to Defendants:

- Facebook approached NIAID in March 2020 to discuss public service announcements and ads, Facebook's CV19 hub, and an interview between Dr. Fauci and Mark Zuckerberg; NIAID scheduled the interview between Dr. Fauci and Mr. Zuckerberg (which aired on Facebook Live)
- NIAID was invited to, but did not attend, a meeting scheduled for March 4, 2021, to discuss possible Facebook Live interviews with celebrities/influencers related to COVID-19 vaccines

      Further, in accordance with the Court's September 6, 2022 Order, subject to and without waiving any of the foregoing objections, and based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery, including consultation with Dr. Fauci and review of Dr. Fauci and NIAID staff e-mail records, NIAID responds on behalf of Dr. Fauci in his role as Director of NIAID as follows: NIAID has not identified any communications, written or

CONFIDENTIAL

## <u>VERIFICATION</u>

I, Max Lesko, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the interrogatory response of the Office of the Surgeon General to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories dated July 18, 2022, Common Interrogatories Numbers 1-5 and Additional Interrogatories Numbers 1-3, contained in the Responses of the Office of the Surgeon General, is true and correct, to the best of my knowledge.

Dated: December ___16___, 2022

*Max Lesko*

_____

Max Lesko

Chief of Staff

Office of the Surgeon General

**EXHIBIT H**

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF LOUISIANA
 2                     MONROE DIVISION

 3

 4   THE STATE OF MISSOURI, et al.,

 5        Plaintiffs,

 6   vs.                          Case No.
                                  3:22-cv-01213-TAD-KDM
 7   JOSEPH R. BIDEN, JR., et al.,

 8        Defendants.

 9

10

11

12

13

14      VIDEORECORDED VIDEOCONFERENCED DEPOSITION
                   OF ERIC WALDO
15                 DECEMBER 22, 2022

16

17

18

19

20

21

22

23

24

25
```

```
 1   And all of them had -- you know, had an opportunity
 2   to improve how they were handling this issue.  And
 3   our job was to raise this as an issue so folks
 4   could know about it and hopefully take steps to --
 5   to ameliorate the situation.
 6           Q.    Yeah.  And that -- those taking steps
 7   to ameliorate would include social media platforms,
 8   correct?
 9           A.    Correct.  But I would again
10   highlight, you know, when you think about our --
11   the advisory but also the work we were doing, the
12   -- the community toolkit, we recognize that we did
13   call for an all-society approach, and we recognize
14   that there are multiple ways to stop or lessen the
15   spread or damage of misinformation, including
16   individuals and others.  You know, it's -- it's not
17   just -- it wasn't just a technology company issue
18   or a social media issue.
19           Q.    Are you aware who devised that phrase
20   all-of-society approach to describe the advisory --
21   or the advisory --
22           A.    I'm not --
23           Q.    -- recommendations?
24           A.    I'm not aware.
25           Q.    Scrolling down in Exhibit 3, the next
```

```
 1    bullet point talks about meeting on July 30th, 2021
 2    between yourself and representatives of
 3    Google/YouTube, correct?
 4         A.    That is correct.
 5         Q.    And the interrogatory responses
 6    supplied as topics discussed included in
 7    YouTube/Google, following up on the announcement of
 8    the OSG advisory to share and work the work it was
 9    doing around health mis- and disinformation,
10    correct?
11         A.    That's correct.
12         Q.    What do you remember being said about
13    that in this phone call or Zoom call?
14         A.    It was a Zoom call.  I think it was
15    really just the YouTube and Google teams saying,
16    hey, we agree that this is a really important
17    issue, and here's all the things that -- that we
18    are working on about it.  So it was -- it was them
19    informing us of the steps they are currently
20    taking.
21         Q.    And I believe you said part of the
22    follow-up call with Facebook was to ask them to,
23    you know, give a report on any steps they would be
24    taking in response to the health advisory, correct?
25         A.    Correct.
```

ERIC WALDO  12/22/2022

```
 1          Q.    And is that what's going on here with
 2   -- with YouTube as well, to ask them, okay, we've
 3   issued a health advisory.  What are you guys doing
 4   about it?
 5          A.    I think they -- they asked for the
 6   call.  So this was a little different.  They asked
 7   for the call on their own to share with us what
 8   they were doing.  I think they -- from a government
 9   affairs perspective, public affairs people were
10   trying to say, hey, look, you know, we agree with
11   you, and we want to let you know all the things
12   we're doing.
13          Q.    Did the report --
14          A.    And, again, I think --
15          Q.    Go ahead.
16          A.    And I would think, right, we had
17   first had that first call to let them know the
18   report was coming out.  The report came out.  They
19   looked at it, and then they said, hey, we've looked
20   at it.  Let us tell you, you know, what we're
21   doing.
22          Q.    And in the first call you had
23   mentioned, I think, that you advised them that
24   there would be some potential recommendations for
25   them, right?
```

```
 1        A.    That there were recommendations for
 2   -- I think they -- certainly within the advisory
 3   there are recommendations for what social media
 4   companies can do.
 5        Q.    And then in the follow-up call, they
 6   came back to you and said, okay, we've read the
 7   advisory and here are steps that we are taking or
 8   plan to take in response to the issues raised in
 9   the advisory?
10        A.    I don't recall specifically, but that
11   was -- the general tone was let us tell you what
12   we're doing about this issue.  I didn't -- I didn't
13   get the impression that it was new things.  I got
14   the impression that it was work that they were
15   already doing.
16        Q.    What did they report to you?
17        A.    I don't really remember, but I think
18   it was generally saying, hey, we have a -- you
19   know, we have a team that does -- that works on
20   this issue.  Like we're -- you know, it's important
21   to us.  Like we're thinking about how we're
22   addressing it.
23              Just it was, I think, more of a
24   process call of saying, you know, we want you to
25   know this is on our agenda.
```

1           Q.     So did they, for example, report that

2      they had adopted new policies to address

3      misinformation on YouTube?

4           A.     I don't recall.

5           Q.     Or did they give indication they were

6      taking more steps to kind of remove more harmful

7      information on YouTube?

8           A.     I don't recall if there was a new.  I

9      recall them telling us what they were currently

10     doing to address that.  So I -- and some of these

11     calls I experienced as them -- you know, they read

12     the advisory and said, yeah, we are doing that.

13     Thanks.  You may not know all the things we're

14     doing, so let us share with you what we're doing.

15          Q.     And you don't -- you don't remember

16     whether they, you know, advised you of kind of new

17     policies, like, hey, you raised an issue for us,

18     and -- and here's are some things we're going to do

19     to respond to it?

20          A.     I don't recall.  I think I would

21     remember because if it was the something new, I

22     feel like we would have shared it or probably done

23     something like put it in a fact sheet to say, look,

24     because of this report, these many new things are

25     happening.

**ERIC WALDO  12/22/2022**

Page 122

```
 1          Q.     Did you do that for any of them?  Did
 2     you issue any fact sheets saying, you know, here
 3     are some positive developments that came out of the
 4     health advisory?
 5          A.     I don't remember.  I don't think so.
 6     The only time that could have happened would have
 7     been when we did the -- that -- what I keep calling
 8     the community toolkit, but I don't recall -- I do
 9     remember Twitter tweeted something in support of
10     Dr. Murthy's advisory.
11               So when we launched on whatever, the
12     15th or 16th, the Twitter policy handle I think
13     either retweeted or quote tweeted and said
14     something like, we agree.  This does call -- we do
15     need an all-society approach, and here's what we're
16     doing.  So that's my one recollection.
17          Q.     And we talked earlier about how there
18     was a particular focus on Facebook on July 15th and
19     16th, and you mentioned that, I think, Jennifer
20     Psaki mentioned Facebook specifically in the press
21     conference and President Biden said "They're
22     killing people," the next day.
23               Do you know why the White House
24     thought a particular focus on Facebook was
25     appropriate?
```

**ERIC WALDO  12/22/2022**

```
 1   of -- something they discovered.  I think it ended
 2   up being like a foreign entity was doing work on
 3   Facebook, spreading -- I don't know if it -- what
 4   type of misinformation, but they were letting us
 5   know that they discovered it.
 6         Q.    Do you know why they thought to brief
 7   you guys on that?
 8         A.    I do not --
 9               MS. CHUZI:  Objection.  Calls for
10   speculation.
11               THE WITNESS:  I don't know why.
12         Q.    (BY MR. SAUER)  Scrolling down
13   another bullet point, there's a reference to a
14   September 14th meeting between yourself and Kevin
15   Kane and Jan Antonaros at Google/YouTube, correct?
16         A.    That is what the document says,
17   correct.
18         Q.    Yeah.  And do you recall that meeting
19   or phone call?
20         A.    Not really.  That's actually a few
21   days before my first child was born, so I don't --
22   I -- I vaguely remember this.
23         Q.    You had other matters on your mind at
24   that time?
25         A.    I -- I did.
```

```
 1              Q.     It -- it -- it -- it says the purpose
 2     was a brief meeting to discuss a new policy we are
 3     working on as well as provide and update on our
 4     overall efforts to combat harmful COVID-19
 5     misinformation on the platform, right?
 6              A.     That's what it says, yes.
 7              Q.     So this would have been, I take it, a
 8     kind of second update by them to you following the
 9     health advisory of stuff they're doing to combat
10     harmful COVID-19 misinformation through YouTube,
11     correct?
12              A.     That's correct.
13              Q.     So first, they provided that update,
14     I think, on the July 30th meeting that we talked
15     about above, correct?
16              A.     Yes.
17              Q.     And then they --
18              A.     Correct.
19              Q.     Sorry.  And they followed up again on
20     September 14th of another update of, you know, kind
21     of telling the Surgeon General's office what they
22     were doing to fight misinformation?
23              A.     That's correct.
24              Q.     Do you know what it was -- it says
25     they gave some kind of update on overall efforts to
```

```
 1    combat harmful COVID-19 misinformation on the
 2    platform.  Do you know what those efforts were?
 3         A.    I don't recall.
 4         Q.    Do you remember anything specific
 5    about what YouTube and Google were doing in this
 6    time frame to kind of remove or -- or reduce the
 7    spread of misinformation?
 8         A.    I don't recall.
 9         Q.    It also says that they were -- the
10    meeting was to discuss a new policy we were working
11    on.  Do you remember that?
12         A.    I do not.
13         Q.    Do you know what new -- was that a
14    new policy that related to misinformation?
15         A.    I'm not sure.
16         Q.    Or a new policy related to something
17    unrelated?
18         A.    I don't recall.
19         Q.    You remember YouTube and Google
20    raising anything that was unrelated to the health
21    advisory about this information and these two
22    calls?
23         A.    I don't recall.
24         Q.    So you don't know whether other
25    topics came up or if they were just focused on
```

1    health misinformation following the advisory?

2         A.    I'm not certain.  I don't recall.

3         Q.    Do you remember anything specific

4    that was said in this call on September 14th?

5         A.    I do not.

6         Q.    Did you say anything?

7         A.    I mean, I would have, in general,

8    been -- tried to greet them, asked them how they

9    were doing, and certainly asked them, you know, be

10   -- expressed some sort of feeling of, you know,

11   interest in what they wanted to share.

12        Q.    Okay.  But do you remember saying

13   anything in response to what they did share about a

14   new policy and update on overall efforts to combat

15   harmful misinformation?

16        A.    I do not.

17        Q.    Going down a little further, last

18   bullet point here refers to a meeting on

19   November 22nd, 2021.  It mentions that personnel

20   from OSG were involved in this meeting.  Do you

21   remember -- were you involved in this meeting?  Do

22   you know?

23        A.    I don't think so.  I do not believe

24   so.  If I was on it -- if I was in the meeting, I

25   would have identified it.

1  focused, given your personal situation at the time,

2  but do you know whether there was a briefing on

3  this?

4      A.   I do not.

5      Q.   Do you know whether Facebook talked

6  to, you know, Courtney, Rob Flaherty, DJ Patil

7  about this in your absence?

8      A.   I do not.

9      Q.   Exhibit 31.  Do you remember this

10 e-mail from the Google/YouTube team in

11 September 29th?

12     A.   So I would have been on paternity

13 leave during this time.

14     Q.   Okay.  And in this e-mail, they

15 report back to you and Nancy S. Negron about --

16     A.   Negron.

17     Q.   Yeah, who's she?

18     A.   Nancy Negron was my deputy director

19 of engagement.

20     Q.   And they report back about having a

21 COVID-19 vaccine misinfo policy that allows them to

22 remove a limited list of verified false claims

23 about COVID vaccines, right?

24     A.   Yes, that's what the e-mail says.

25     Q.   And they also report back to you guys

**ERIC WALDO  12/22/2022**

```
 1   that they're introducing a new policy that
 2   prohibits content that includes harmful
 3   misinformation about the safety, efficacy, and
 4   ingredients for the vaccines, right?
 5         A.    Yes, that's what the e-mail says.
 6         Q.    Is this an unsolicited e-mail or are
 7   they responding to some kind of communication or
 8   request from you guys, do you know?
 9         A.    I'm not positive, but it would appear
10   to be an unsolicited e-mail.
11         Q.    I know that you had said earlier that
12   you reached out to Facebook, Twitter, and YouTube
13   in the aftermath of the health advisory that --
14   to -- to see what steps they were taking.  Is that
15   response to that request for information?
16         A.    Could be.  I'm not certain, to be
17   honest with you.  But based on both my departure --
18   and I think I had had an out-of-office at this
19   moment, which may have led them to add Nancy.
20   Nancy was also just coming on, and I don't think
21   her HHS e-mail had been set up yet, but I'm not --
22   I'm not positive.
23         Q.    Let's look at Exhibit 32.  Can you
24   see this one on screen share?
25         A.    Yes, I see this note.
```

```
 1                   THE VIDEOGRAPHER:  The time is 3:41
 2    p.m. Central Standard Time.  We are back on the
 3    record.
 4          Q.    (BY MR. SAUER)  Mr. Waldo, you're
 5    aware that on March 3rd the Surgeon General's
 6    office issued a Request For Information about
 7    social media misinformation.  You recall that?
 8          A.    Yes.
 9          Q.    Yeah.  And here on the screens share,
10    I'm showing you Exhibit 42 that I previously
11    e-mailed your counsel.  (Technical difficulty) this
12    the RFI --
13          A.    That's correct.
14          Q.    -- on here, right?  Yeah.  Called
15    Impact of Health Misinformation on the Digital
16    Information Environment in the United States
17    Through the COVID-19 Pandemic Request for
18    Information, right?
19          A.    That's correct.
20          Q.    And were you involved in formulating
21    this RFI at all?
22          A.    I was involved in meetings where the
23    -- where there was a discussion about whether or
24    not to do this RFI or for the overall strategy
25    around -- around this data by -- with -- with the
```

**ERIC WALDO  12/22/2022**

```
 1   team, yes.
 2        Q.   Overall strategy.  What overall
 3   strategy was there with -- regarding this RFI?
 4        A.   I'm sorry, I didn't say strategy
 5   about this RFI.  Strategy whether or not there was
 6   going to be additional data requests to make and
 7   how to make them.
 8        Q.   Oh.  You mean additional data
 9   requests.  What do you mean by that?
10        A.   I mean -- I shouldn't say additional.
11   I think there was a question of whether or not we
12   were going to -- going to make questions, you know,
13   ask for -- given that the -- given the
14   conversations with Facebook and others, was there
15   something more constructive we could do around
16   helping researchers have a better understanding of
17   what's happening in this community.  And so
18   ultimately, the RFI was -- was determined as the
19   path forward.
20        Q.   Okay.  So were there other paths
21   forward (technical difficulty) Surgeon General's
22   office --
23             (A discussion was held off the
24   record.)
25        Q.   (BY MR. SAUER)  Were there other
```

1  paths forward about COVID-19 misinformation that

2  the Surgeon General's office did or was this the

3  only one at this time?

4          MS. CHUZI:  Objection.  To the extent

5  that question calls for information covered by the

6  deliberative process privilege, I will instruct the

7  witness not to answer.

8          THE WITNESS:  On the advice of

9  counsel, I will not answer the question.

10     Q.   (BY MR. SAUER)  I'm not asking about

11  deliberations.  I'm asking if there were actions

12  taken.  Did the Surgeon General's office do

13  anything other than RFI to address issues of COVID

14  misinformation in this time frame?

15     A.   Not to my knowledge.

16     Q.   Scrolling down, were you involved in

17  formulating, you know, kind of what kind of

18  information to ask for here in the RFI?

19     A.   No.

20     Q.   Who was involved in formulating kind

21  of the specific types of information to ask for?

22     A.   I think Kyla was the primary driver

23  on the RFI from a content expert perspective.

24     Q.   That's Kyla Fullenwider?

25     A.   That's correct.

```
 1          Q.    Do you know if she had input from
 2   Renee DiResta or other academics in formulating the
 3   RFI?
 4          A.    I do not.
 5          Q.    Do you know -- do you know who she --
 6   who she would have worked with in formulating it?
 7          A.    I do not.
 8          Q.    Do you know if anyone besides Kyla
 9   had any input into what information to ask for?
10          A.    I know that Kyla was running these
11   ideas by Max Lesko from an -- more of a process,
12   getting Dr. Murthy's input perspective.  More or
13   less of a content expertise perspective.  But I
14   think she certainly ran this by Max.
15          Q.    And that was to get Dr. Murthy's
16   approval on the approach taken?
17          A.    I believe so, yes.
18          Q.    Do you know if Dr. Murthy provided
19   input on the content of the RFI, asked for this
20   information, that kind of thing?
21          A.    I'm not certain.
22          Q.    Anyone else you know of besides
23   Dr. Murthy, Max Lesko, and Kyla Fullenwider
24   involved in the formulation of the RFI?
25          A.    Not to my knowledge.
```

```
 1          Q.    What is Kyla's role in the Surgeon

 2   General's office in this time frame?  I remember

 3   she's in US Digital Response.  Is she a -- an

 4   employee of the Surgeon General's office by now or

 5   what's her formal role?

 6          A.    I'm not certain how -- what was the

 7   mechanism for how she was employed out of HHS, but

 8   I know she was doing work on behalf of the Surgeon

 9   General.

10          Q.    The RFI here on the -- I think it's

11   on the second page of the document -- asks for

12   information about technology platforms, correct?

13          A.    What page are you on, sir?

14          Q.    Second page of the document, here

15   down in the bottom right, column number 2,

16   Information about Technology Platforms.

17          A.    Yes.  That's correct.

18          Q.    And it asks number 3:  Information

19   about how widespread COVID-19 misinformation is on

20   individual technology platforms including general

21   search engines, content sharing platforms, social

22   media platforms, e-commerce platforms, crowdsourced

23   platforms, and instant messaging systems, correct?

24          A.    That's correct.

25          Q.    Were there discussions -- general
```

**ERIC WALDO  12/22/2022**

**Page 341**

1   search engines, that's like Google, right?

2        A.    I assume so.

3        Q.    What's a content sharing platform?

4   Is that like Reddit?

5        A.    I'm not certain.  I don't -- I'm not

6   sure what the technical definition is there, but

7   it --

8        Q.    Do you know what kind of platform --

9        A.    Because that seems -- that seems

10  different than social media.

11       Q.    Yeah, what kind of platforms are they

12  referring to there, do you know?

13       A.    I do not.

14       Q.    It goes on to say social media

15  platforms, then e-commerce platforms.  What are

16  those?

17       A.    I presume places where you -- where

18  e-commerce occurs so...

19       Q.    eBay, Amazon, places like that?

20       A.    I think -- I definitely would think

21  Amazon, yeah.

22       Q.    What -- were there discussions that

23  you're aware of about COVID misinformation being

24  shared on e-commerce platforms?

25       A.    I recall at some point in the rollout

**ERIC WALDO  12/22/2022**

```
 1   Kyla sharing with me just from a factual
 2   perspective that on sites like Amazon it was
 3   possible to also spread health mis- and
 4   disinformation based on promotion of, you know,
 5   certain -- I think the algorithm could promote if
 6   you like this, buy this, and maybe promoting
 7   conspiracy theories.
 8         Q.    So conspiracy theories about COVID or
 9   other conspiracy theories?
10         A.    I think it was about COVID but I
11   don't truly recall.
12         Q.    Okay.  What are crowdsourced
13   platforms?
14         A.    I'm not sure what the technical
15   definition is of a crowdsourced platform.
16         Q.    Do you know what platforms are being
17   referred to there in that -- in that phrase?
18         A.    As I said just now, I don't know what
19   crowdsourced platforms means in the context of this
20   document.
21         Q.    So one of the things that's asked for
22   here is aggregate data and analysis on the
23   prevalence of COVID-19 misinformation on individual
24   platforms including exactly how many users saw or
25   may have been exposed to instances of COVID-19
```

```
 1   misinformation, right?
 2        A.    Yes, that's what the RFI says on that
 3   paragraph.
 4        Q.    Is that the kind of data that you
 5   guys have been asking Facebook for in the meetings
 6   in 2021 where you talked about data transparency?
 7        A.    It appears to be a version of that,
 8   yes.
 9        Q.    Scrolling down here at number 5, it
10   says information about the sources of COVID-19
11   misinformation.  Do you see that?
12        A.    I do see that.
13        Q.    And it asks for information about the
14   major sources of COVID-19 misinformation associated
15   with exposure, correct?
16        A.    That is what 5 sub bullet A says,
17   correct.
18        Q.    What does "associated with exposure"
19   mean there?
20        A.    It says -- I'm not sure technically.
21   It says information about COVID -- resources about
22   COVID-19 misinformation.  Information about the
23   major sources of COVID-19 misinformation associated
24   with exposure.  I don't -- let's see, does it have
25   the definition in there further down?
```

```
 1          Q.    I don't recall.  I guess up here it
 2    says --
 3          A.    Sorry.  I was trying to look.  Yes.
 4          Q.    Seeing content in news feeds and
 5    exposure.
 6          A.    Yeah, okay.  So it seems to be saying
 7    that information associated with seeing the content
 8    in news feeds and search results are
 9    algorithmically nominated content.
10          Q.    It goes on under little I there to
11    say:  By source, we mean both specific public
12    actors that are providing misinformation as well as
13    components of specific platforms that are driving
14    exposure to misinformation, correct?
15          A.    Yes, that's what the document says.
16          Q.    So the RFI is actually seeking
17    information about specific speakers or posters on
18    social media platforms that spread misinformation,
19    right?
20          A.    I'm not sure, because earlier, you
21    highlighted that it talks about aggregate data and
22    I'm pretty sure the document also talks about
23    anonymity.
24          Q.    So you think that specific public
25    actors does not refer to specific people who spread
```

**ERIC WALDO  12/22/2022**

1    -- provide misinformation?

2         A.    It may, but I'm pretty sure in this

3    document there's some sort of caveat about having

4    to submit anonymized data.

5         Q.    **Okay.  That would be an indicator of**

6    **people who are reviewing it, right, the people**

7    **exposed to the misinformation, right?**

8         A.    I'm sorry.  Say again, sir.

9         Q.    **Doesn't the anonymized data refer to**

10   **the users who are exposed, not the public actors**

11   **who are providing this information?**

12        A.    I'm not sure.  If you can bring up

13   that portion of the document, I'm happy to take a

14   look.  But I'm pretty sure in general when the

15   federal government does requests for information

16   like this, there are various stipulations that have

17   to be made to -- for -- to ensure that there's

18   anonymized data.

19        Q.    **Let me ask you this.  I believe there**

20   **was a plan expressed by the Surgeon General's**

21   **office to render any comments received in response**

22   **of this information public, right, to publicly post**

23   **them?**

24        A.    Are you asking -- can you repeat the

25   question?  It sounded like a statement.

ERIC WALDO  12/22/2022

Page 346

```
 1          Q.    Did the -- did the Surgeon General's
 2   office announce that it would publicly post all the
 3   comments received in response to this RFI?
 4          A.    I don't know.
 5          Q.    Was there a -- do you recall a policy
 6   of that?
 7          A.    I don't know.  In my other life
 8   working in government for, like, noticing common
 9   rule making, which I'm sure you know from your law
10   school days, there was requirements about public --
11   making public comments, but I'm not sure if that
12   refers to RFIs as well.
13          Q.    Let me ask this.  Do you know whether
14   the comments received in response to this RFI have
15   ever been published?
16          A.    I'm -- I'm not aware of whether they
17   have or not.
18          Q.    And we submitted a FOIA request for
19   them months ago and haven't received any yet.  Are
20   you aware of that?
21          A.    I am not.
22          Q.    So you don't know whether the Surgeon
23   General's office ever made these -- the comments it
24   received public?
25                MS. CHUZI:  Objection.  Asked and
```

```
1         Q.    And here, for example in Exhibit 45,
2    there's an e-mail from Max Lesko to Nick Clegg and
3    Brian Rice and someone else at Facebook with a
4    letter from the U.S. Surgeon General attached,
5    correct?
6         A.    Yes, that's an e-mail from Max Lesko
7    to Nick Clegg, Brian Rice, and Nathaniel Gleicher.
8         Q.    And it indicates that he's attached a
9    letter from Surgeon General Murthy to Mark
10   Zuckerberg, right?
11        A.    That's correct.
12        Q.    And he says -- also says:  Let me
13   know if I can be helpful with respect to the
14   request for information which has been sent to the
15   Federal Register and expect to receive submissions
16   in the coming days.  Correct?
17        A.    Yes, that's what Max has written to
18   -- to those individuals.
19        Q.    And so the Surgeon General's office
20   e-mailed a link to the RFI to Facebook and also
21   attached a letter directly from Surgeon General
22   Murthy to Mark Zuckerberg, right?
23        A.    That is what the e-mail says, yes.
24        Q.    And then Exhibit 46.  And this is --
25   is this actually the letter from Surgeon General
```

```
 1    Murthy to Mark Zuckerberg dated March 3rd, 2022
 2    that Max Lesko e-mailed?
 3         A.    It would appear so.
 4         Q.    Yeah, let me put it on the screen
 5    share.  And the purpose of this letter is to
 6    encourage Facebook to participate in the RFI,
 7    right?
 8         A.    It's -- it says:  I am writing today
 9    to request that your company contribute to the RFI.
10         Q.    So he's encouraging Facebook to
11    contribute to the RFI, right?
12         A.    He's definitely asking him to do so,
13    yes.
14         Q.    And he says:  Given that a large
15    proportion of health misinformation is spread
16    through technology platforms, my Advisory includes
17    a call for technology companies to join this
18    broader effort to create a safer, healthier
19    information environment, right?
20         A.    Yes, that's what -- that's an
21    accurate reading of that portion of the letter.
22         Q.    And he requests responses from
23    companies about the extent and spread of COVID-19
24    misinformation on your platforms, policies to
25    address COVID-19 misinformation, and their
```

ERIC WALDO  12/22/2022

1   effectiveness, sources of COVID-19 misinformation

2   and so forth, right?

3          A.    That's an accurate reading of that

4   portion of the letter.

5          Q.    **Were you involved in drafting the**

6   **letter?  I think you probably were still on**

7   **paternity leave at this time, right?**

8          A.    Yeah.  As I mentioned, this letter is

9   dated March 3rd and I was still on paternity leave.

10  So I was not involved in the drafting of this

11  letter.

12         Q.    **Did Max Lesko send similar letters to**

13  **other social media platforms?**

14         A.    I think so.

15         Q.    **Yeah.  I mean, I don't want to put**

16  **six more exhibits in front of you, but would you**

17  **agree that he sent a very similar, basically**

18  **identically phrased letter to Google, LinkedIn,**

19  **Twitter, YouTube, and Microsoft all on that same**

20  **day, March 3rd, 2022?**

21         A.    I don't know if he did, but if you --

22  I don't have any reason to disbelieve that he did,

23  so.  That, I believe was the plan.

24         Q.    **Let's just very briefly, I'm going to**

25  **e-mail those to your counsel and I'll pull them up**

**ERIC WALDO  12/22/2022**

```
 1   real quick.
 2              And you said you're aware that that
 3   was the plan, right?
 4       A.    I think I became aware after I got
 5   back that that happened.  I wasn't part of the
 6   planning process.
 7       Q.    Here on the screen share, I'm showing
 8   you Exhibit 47.  Similar letter to Sundar Pichai of
 9   Google from Surgeon General Murthy about the RFI
10   dated March 3rd, correct?
11       A.    Yes, that's the date of the letter.
12              Sir, if you're -- okay.  Sorry.
13       Q.    Exhibit 48, yeah, -- similar
14   letter --
15       A.    Thank you.
16       Q.    -- to the CEO of LinkedIn about the
17   RFI encouraging them to participate, correct?
18       A.    It's a letter asking -- informing
19   them and requesting that they participate in the
20   RFI.
21       Q.    In fact, these letters kind of all
22   have exactly the same text, right?  Is that your
23   understanding?
24       A.    You're moving the letters up and down
25   very quickly but I don't have any reason to believe
```

1    they're not virtually the same.

2         Q.    Exhibit 49, similar letter to

3    Twitter, right, and Parag Agrawal, who was then the

4    CEO of Twitter?

5         A.    Yes, it appears to be the same

6    functional letter.  I'm not having much of an

7    opportunity to review it.  But I don't have any

8    reason to believe it's not the same overall text

9    requesting that they participate in the RFI.

10        Q.    Exhibit 50, same letter to Microsoft

11   -- I'm sorry, YouTube, I apologize.  Same letter to

12   YouTube, correct?

13        A.    You're okay.  Yes, sir, I'm only

14   looking at part of the letter that you're sharing

15   and I can't actually review all of it in the way

16   that we're doing it right now.  But it appears to

17   be the same form of a letter asking for a request

18   -- requesting that -- informing them about the RFI

19   and requesting that they participate.

20        Q.    And then finally, Exhibit 51, similar

21   letter to Microsoft, correct?

22        A.    That looks like it's to the Microsoft

23   corporation.  Right now, I'm only being exposed to

24   the first couple of lines.  But it looks -- the

25   first -- overall, it seems to be the same letter

```
 1    requesting that they participate in the RFI.
 2         Q.    Did all of those companies that got
 3    the letter, did they all participate, do you know?
 4         A.    I don't know.
 5         Q.    Do you know if Facebook submitted
 6    anything?
 7         A.    I think so.  But I'm not positive.
 8         Q.    How about Google?
 9         A.    I don't know.
10         Q.    How about Twitter?
11         A.    I don't know.
12         Q.    How about Microsoft?
13         A.    I don't know.
14         Q.    Shortly after the RFI was issued, the
15    Surgeon General gave an interview to GQ Magazine,
16    right?  Does that ring a bell?
17         A.    It does not.
18         Q.    So you weren't -- let me -- let me
19    show Exhibit 52 on the screen share.  Does this
20    dazzling picture of Surgeon General Murthy jog your
21    memory?
22         A.    It does not.
23         Q.    So you don't recall him giving an
24    interview to GQ Magazine on March 11th of 2022?
25         A.    I do not.
```

**ERIC WALDO  12/22/2022**

```
 1                    NOTARIAL CERTIFICATE

 2

 3        I, Tammie A. Heet, Registered Professional

 4   Reporter, certified Shorthand Reporter for the

 5   State of Illinois, and Certified Court Reporter for

 6   the state of Missouri and a duly commissioned

 7   Notary Public within and for the States of Missouri

 8   and Illinois, do hereby certify that the witness

 9   whose testimony appears in the foregoing deposition

10   was duly sworn by me; that the testimony of said

11   witness was taken by me to the best of my ability

12   and thereafter reduced to printing under my

13   direction; that I am neither counsel for, related

14   to, nor employed by any of the parties to the

15   action in which this deposition was taken, and

16   further that I am not a relative or employee of any

17   attorney or counsel employed by the parties

18   thereto, nor financially or otherwise interested in

19   the outcome of the action.

20

21

22        _____
          Tammie A. Heet, RPR, CSR, CCR

23

24

25
```

# EXHIBIT I

| From: | Kevin Kane |
| Sent: | 7/9/2021 12:36:47 PM |
| To: | Waldo, Eric (HHS/OASH) |
| CC: | Kyla Fullenwider |
| Subject: | Re: Connecting with Dr. Murthy's office |

Thank you! Look forward to speaking with you then.
Best,
Kevin

On Fri, Jul 9, 2021 at 10:28 AM Waldo, Eric (HHS/OASH) ‹                    › wrote:

Sorry about that! Moving too fast. Will update.

**From:** Kevin Kane ‹
**Sent:** Friday, July 9, 2021 9:28 AM
**To:** Waldo, Eric (HHS/OASH) ‹
**Cc:**                    Kyla Fullenwider
**Subject:** Re: Connecting with Dr. Murthy's office

Thanks Eric -

The invite you sent was for 3:30-4:15, and unfortunately some of my colleagues won't be able to make it then.
Any chance we could meet 3:00-3:30 (ET) on the 14th?

Thanks again, and hope you have a good weekend!

Kevin

On Thu, Jul 8, 2021 at 5:30 PM Waldo, Eric (HHS/OASH)                    wrote:

Great. Just send you a zoom!

**From:** Kevin Kane ‹
**Sent:** Thursday, July 8, 2021 8:35 AM
**To:** Waldo, Eric (HHS/OASH) ‹
**Cc:**                    Kyla Fullenwider
**Subject:** Re: Connecting with Dr. Murthy's office

Good Morning Eric -

How about we shoot for 3:00-3:30pm (ET) on Wednesday, July 14?

Thanks,

Kevin

On Wed, Jul 7, 2021 at 5:11 PM Waldo, Eric (HHS/OASH) ██████████ wrote:

Hi Kevin,

Thanks so much for your note. Would love to have more of your colleagues join.

I'm traveling with Dr. Murthy for part of next week so it's a bit tight. Here are some options:

Wednesday, July 14: 2:45pm-4:15pm ET; 5pm-6pm ET

Thursday, July 15: 4:15pm-5pm ET

If none of those work, I have some time on Friday, July 16 and we can always discuss the following week.

Thanks so much!

Eric

**From:** Kevin Kane ██████████

**Sent:** Wednesday, July 7, 2021 4:51 PM

**To:** Waldo, Eric (HHS/OASH) ██████████

**Cc:** ██████████ Kyla Fullenwider ██████████

**Subject:** Re: Connecting with Dr. Murthy's office

Hi Eric -

It's great to e-meet you as well. If possible, I wanted to include a few of my colleagues for this conversation and see if you had any availability next Wednesday or Thursday to meet. Would you happen to have any time open either of those days? If not, I'm more than happy to find another day that would work for you.

Thank you for reaching out and look forward to speaking with you soon!

Best Regards,

Kevin

On Tue, Jul 6, 2021 at 9:49 AM Waldo, Eric (HHS/OASH)                    wrote:

Hi Alexandra and Kevin,

I hope this finds you well. I'm Dr. Murthy's Director of Engagement and I wanted to reach out.

As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond. I know you and your teams are working hard and thinking deeply about this issue. We'd love to chat over zoom to connect and discuss what's on the horizon for our teams.

Is there a good time this week to connect? Happy to work with whomever on your team to coordinate calendars.

Thanks so much!

Eric

Eric W. Waldo [He/Him]
Director of Engagement
Office of the U.S. Surgeon General, Dr. Vivek Murthy
U.S. Department of Health & Human Services

--

Kevin Kane | Government Affairs & Public Policy Manager,
YouTube |

--



--

Kevin Kane | Government Affairs & Public Policy Manager,
YouTube |

--



Kevin Kane | Government Affairs & Public Policy Manager,
YouTube |

**EXHIBIT J**

| From: | Kevin Kane ▮▮▮ @google.com] | | |
|---|---|---|---|
| Sent: | 9/29/2021 12:56:30 PM | | |
| To: | Waldo, Eric (HHS/OASH) ▮ | @hhs.gov]▮ | ▮@gmail.com |
| CC: | Jan Antonaros ▮ ▮@google.com] | | |
| Subject: | YouTube Vaccine Policy Announcement | | |

Good Afternoon -

I'm writing to share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation.

Today we have a COVID-19 Vaccine misinfo policy which allows us to remove a limited list of verified false claims about COVID-19 vaccines.

We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines that are approved and confirmed to be safe and effective by local health authorities and by the World Health Organization (WHO).

You can learn more about the announcement we made here and a detailed overview of our policy in our help center here.

Please let me know if you have any questions.

Best Regards,
Kevin

--

Kevin Kane || Government Affairs & Public Policy Manager,

YouTube || ▮ @google.com || ▮

MOLA_DEFSPROD_00007422

**EXHIBIT K**



**OFFICE OF THE SURGEON GENERAL**
March 3, 2022

Sundar Pichai
Chief Executive Officer
Google, Inc.



Dear Mr. Pichai,

I hope this letter finds you well.

As you know, the proliferation of health misinformation during the pandemic has been both extensive and dangerous. Over the last year I've spoken with health care and public health workers across the country about how health misinformation is harming their ability to care for patients, contributing to burnout, and posing a growing threat to the nation's health. It is clear that we must do everything we can to address this threat. We also owe a debt of action to the doctors, nurses, and public health professionals who have sacrificed so much for us throughout this pandemic.

To this end, my office issued a Surgeon General's Advisory on Health Misinformation in July 2021, calling for action across all sectors of society to address the spread of health misinformation. Given that a large proportion of health misinformation is spread through technology platforms, my Advisory includes a call for technology companies to join this broader effort to create a healthier, safer information environment.

My office is launching an initiative to deepen our understanding of the spread of COVID-19 misinformation, the role the information environment played in societal response to the pandemic, and its implications for future public health emergencies. We are issuing a public *Request for Information (RFI)* to gather and share data and research on health misinformation during the COVID-19 pandemic, including the unique role that technology and social media platforms play in the dissemination of critical health information during a public health emergency. We will share what we learn through the RFI directly with the public at surgeongeneral.gov/RFI.

I am writing today to request that your company contribute to the RFI. To date, our collective understanding of the nature of misinformation that is spreading online is incomplete which in turn hinders our nation's ability to implement a robust, effective response. Specifically, I am requesting responses from companies about the extent and spread of COVID-19 misinformation on their technology platforms, policies to address COVID-19 misinformation and their effectiveness, sources of COVID-19 misinformation, and information about the sale of unproven COVID-19 products or services.

I hope that all of us – researchers, companies, members of the health care community, civic leaders, families, and concerned Americans alike – can work together to protect people's right to make decisions about health based on accurate information. I remain confident that through our collective efforts, we can address the harms of health misinformation and safeguard the health of the nation.

Thank you for your cooperation and partnership on this critical public health matter.

Sincerely,

Vivek Murthy, MD, MBA
Surgeon General of the United States

MOLA_DEFSPROD_00007478

**EXHIBIT L**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF LOUISIANA
 2                        MONROE DIVISION

 3      STATE OF MISSOURI ex
        rel. ERIC S. SCHMITT,
 4      Attorney General,
        et al.,
 5                                 No. 3:22-cv-01213-TAD-KDM
            Plaintiffs,
 6
        vs.
 7
        JOSEPH R. BIDEN, JR.,
 8      in his official capacity

 9      as President of the United

10      States, et al.,

11          Defendants.

12

13        THE VIDEOTAPED DEPOSITION OF CAROL CRAWFORD

14                   November 15, 2022

15                9:24 a.m. to 5:33 p.m.

16

                    Office of General Counsel
17        Centers for Disease Control and Prevention
                    1600 Clifton Road NE
18                    Atlanta, Georgia

19
        Reporter:
20            Maureen S. Kreimer, CCR-B-1379, CRR

21

22

23

24

25
```

1    I interpreted the "check in first."

2        Q.  And by this time were you already having

3    regular meetings with Google like we've seen with

4    Facebook?

5        A.  Yeah.  This was in 2021.  So we had been

6    meeting pretty regularly with Google by this time.

7            MR. VECCHIONE:  Okay.  You can put that

8    aside.

9            (Plaintiffs' Exhibit 29 marked.)

10   BY MR. VECCHIONE:

11       Q.  Let's try Exhibit 29.  Same thing, read me

12   the subject line, the date, and then take a look at

13   it.

14       A.  Okay.  Okay.  Subject line's:  Followup on

15   misinformation, or misinfo conversation.  It's

16   4/5/2021.

17           THE WITNESS:  Can I see this?

18           MS. SNOW:  Yes.

19       A.  Okay.

20   BY MR. VECCHIONE:

21       Q.  All right.  So can you go to the very end,

22   I guess, the very last page, read what you said on

23   March 29 at 9:52.

24       A.  "Are you all open to using our regular 4pm

25   meetings to go over things with Census, or what is

```
 1    preferred?  I wasn't clear how interested you all
 2    were on this effort or who the players are on your
 3    end."
 4         Q.  So what were the regular 4:00 p.m.
 5    meetings you refer to?
 6         A.  I think -- because I still have a
 7    4:00 p.m. meeting every other Monday with Google.  I
 8    think that these were the same every-other-week
 9    check-in meetings.  Sometimes we wouldn't have them.
10    Sometimes we would have them and discuss things.
11         Q.  Did you have similar regular meetings with
12    the other platforms we've been discussing, Face- --
13    Meta and Twitter?
14         A.  We -- you asked some of this earlier.
15         Q.  I did.
16         A.  The same answer.  So we had regular
17    meetings with Google, and we had regular meetings
18    with Meta.  Most -- you know, the frequency changed.
19    So, you know, I don't meet as often.  I mean, Google
20    we meet every other week.  Right now with Meta it's
21    more ad hoc.
22         Q.  Okay.
23         A.  We had had a regular meeting with
24    Pinterest for a short period of time, and we had my
25    memory was just more ad hoc meetings on occasion
```

CAROL CRAWFORD 11/15/2022

```
 1   with Twitter.
 2        Q.  So on the regular meetings with either
 3   Google or Facebook?
 4        A.  Mm-hmm (affirmative).
 5        Q.  Well, let me ask the question this way.
 6   From the CDC end, were the same people usually
 7   attending those meetings with each social media?
 8        A.  It could vary.  I mean, I was always -- I
 9   mean, with Google, it was typically me and Fred
10   Smith, who's our technical lead, because often the
11   Google questions would be more about technical
12   implementations that we might have to work on.  We
13   were usually always on it.  Sometimes I would --
14   depending on the subject, I would bring in other
15   people.
16             With Meta, I was pretty much always on
17   there.  Jay typically listened in.  And then I would
18   bring people in depending on the subject.
19        Q.  All right.  And what were the -- were the
20   topics typically misinformation, or technical
21   subjects?
22        A.  They -- by and large, they were mostly
23   about things other than misinformation; though
24   misinformation was discussed in the meetings.  But
25   they were originated about getting our credible
```

CAROL CRAWFORD  11/15/2022

Page 241

```
 1    or what the format, or Microsoft Teams, or in
 2    person, or?
 3         A.  It was always on either teams or they had
 4    BlueJeans that we used occasionally.
 5         Q.  Okay.  What's BlueJeans?
 6         A.  It's something like a Teams or a Zoom.
 7         Q.  Okay.  And, once again, do you know if
 8    there is any notes or record kept of the meeting?
 9         A.  I did not take any notes at the meeting
10    that I recall.  I mean, same answer I have been
11    giving.  If there were any, it was minor and they
12    would have been in Word or email.
13         Q.  Okay.
14              MR. VECCHIONE:  40.
15              MR. GILLIGAN:  I remember when everybody
16    just used Skype when it was simpler times.
17              (Plaintiffs' Exhibit 40 marked.)
18    BY MR. VECCHIONE:
19         Q.  Exhibit 40.  Once again the date and the
20    subject line, and then read it to yourself.
21         A.  Subject line:  COVID BOLO meetings on
22    misinformation, sent on May 10, 2021.
23              Okay.
24         Q.  All right.  Let's go back to the back page
25    of this that's Bates number 682.
```

CAROL CRAWFORD  11/15/2022

```
 1        A.   Okay.

 2        Q.   Now, this is -- I think we've said this

 3   date.  It's May 10th of 2021?

 4        A.   Yes.

 5        Q.   And you send to Facebook the COVID BOLO

 6   misinformation meeting request; right?

 7        A.   Yes.

 8        Q.   And could you please read that for me?

 9        A.   (As read)  We would like to establish

10   COVID BOLO meetings on misinformation and invite all

11   platforms to join the meetings.  We are aiming for

12   the first one on Friday at noon.  I know you were

13   considering a possible process on your end, but we

14   wanted to start here just as an interim first step.

15   Are there direct POCs on your end I should include

16   on the invite?  I'm happy to chat if better, thanks.

17        Q.   All right.  Now, so this is the first BOLO

18   meeting.  Does that comport with your recollection?

19        A.   This is a note that I'm about to send an

20   appointment for the first BOLO meeting and asking

21   them who to include.

22        Q.   All right.  And we've already said POCs --

23        A.   Yes.

24        Q.   -- are the point of contacts; right?

25        A.   Mm-hmm (affirmative).
```

CAROL CRAWFORD  11/15/2022

Page 243

 1          Q.  And you said:  "I know you are considering
 2     possible process on your end."
 3               What did you mean by that?
 4          A.  As I mentioned, that I was engaging with
 5     the platform saying what format would be best for us
 6     to talk about this.  And I think there were
 7     references in the exhibit a couple of times where
 8     they said they were thinking internally about what
 9     would be best.  So I think I was just referencing
10     that I knew that they were considering it as well.
11          Q.  Do you know what the topics -- did you
12     know what the topics for the BOLO were when you sent
13     this out?
14          A.  I don't know if I did or not.
15          Q.  All right.  Let's go to the next page back
16     where we have -- I believe this is from Jan
17     Antonaros to you, but he includes your email to him;
18     right?
19          A.  This -- the bottom part --
20          Q.  Mm-hmm (affirmative).
21          A.  -- is where I sent a similar note to
22     Google, which is Jan.
23          Q.  Okay.
24          A.  And I was telling her that we would like
25     to invite the digital platforms to attend the BOLO.

CAROL CRAWFORD  11/15/2022

Page 244

```
 1    I think it was me sending the appointment or a
 2    heads-up that it was coming.  I can't -- it looks
 3    like maybe I -- this is an actual appointment.
 4         Q.  Okay.
 5         A.  But I tried to send each of them a
 6    personal note that we were doing it.
 7         Q.  And in this one you actually spelled out
 8    be on the lookout; right?
 9         A.  I did.
10         Q.  And was that because you hadn't discussed
11    it with them before, or did you have some concern
12    they wouldn't know what it was?
13         A.  I don't know why I didn't do it that time.
14         Q.  All right.  And there is Kevin Kane here
15    with the email address ███████@Google.com.  Who is
16    that?
17         A.  I don't remember Kevin, but this indicates
18    that he was from YouTube.
19         Q.  Okay.  And do you recall having
20    discussions with YouTube?
21         A.  YouTube would occasionally -- people from
22    YouTube would occasionally be on our regular
23    meetings, depending on what we talked about.  And
24    because YouTube has the most content, like, hosting,
25    they -- they were at the -- they were a part of the
```

1    BOLO meetings, I believe, that Kevin attended

2    probably, or someone from YouTube did.

3        **Q.  And you responded:  "Great.  I was going**

4    **to ask about Kevin."**

5        A.  Yeah.  Maybe I remembered who Kevin was at

6    the time.

7        **Q.  Okay.  And then finally the front page.**

8        A.  That's a repeat of -- oh, no, that's not.

9    I apologize.  I'm looking at the wrong one.

10       **Q.  And here you're sending this to the Google**

11   **folks?**

12       A.  Yes.

13       **Q.  Why don't you read it for the record?**

14       A.  "We would like to establish COVID BOLO

15   meetings on misinformation and invite all platforms

16   to join the meetings.  We were aiming for the first

17   one on Friday at noon.  We heard through the

18   grapevine that Kevin Cain at YouTube would want to

19   join.  Are there other POCs on your end I should

20   include on the invite?"

21       **Q.  All right.  You said YouTube.  Who's**

22   **YouTube related to, is it Google or Facebook?**

23       A.  YouTube is a Google property.

24       **Q.  Okay.**

25       A.  Or platform.

CAROL CRAWFORD  11/15/2022

```
 1          Q.  And is it your recollection that you did
 2    have a meeting on Friday?
 3          A.  I think we did, but I don't have the exact
 4    date.  But I believe we had -- that's when we had
 5    the first BOLO meeting.
 6          Q.  All right.  And do you have any list of
 7    who actually showed up and was an attendee?
 8          A.  No.
 9          Q.  All right.  And, once again, it would be
10    on your calendar as far as if it happened?
11          A.  Now, to clarify I don't remember keeping a
12    list of who attended.  Maybe Census might have
13    because this is something they were arranging.  But
14    I don't recall it being sent to me.  It could have
15    been, but I don't believe so.
16          Q.  So they were helping you arrange this
17    because they'd done it before, this particular
18    meeting?
19          A.  Yes.  I mean, I mentioned that they
20    drafted the slides.
21          Q.  Right.
22          A.  And, you know, Chris participated in the
23    meeting.
24          Q.  Okay.  Chris.  Remind me his last name?
25          A.  Lewinsky, Lewitzke.
```

Case 3:22-cv-01213-VLB Document 203-17 Filed 08/09/23 Page 542 of 660 PageID #: 11198

```
 1   had one.
 2        Q.  So the email states that --
 3            You can put that aside.
 4            (Plaintiffs' Exhibit 43 marked.)
 5   BY MR. VECCHIONE:
 6        Q.  Let's go to -- yeah, let's go to the last,
 7   43.
 8            Once again for Exhibit 43 please state the
 9   subject matter line, and then the -- and who it --
10   what the date of it is?
11        A.  Subject:  Claims review.  6/29/2022.
12            I have read it.
13        Q.  Okay.  So can you read the -- well, who is
14   Rachel Gruner?
15        A.  She is my new point of contact at Google.
16   She replaced Jan Antonaros.
17        Q.  And who's Lindsay Steele?
18        A.  Lindsay Steele replaced Stanley.
19        Q.  Onyimba?
20        A.  "O".
21        Q.  Okay.  And they're both -- their emails
22   are here in the to line; right?
23        A.  Yes.
24        Q.  All right.  And if you could read the
25   after Hi, Carol, Hi, Fred from Rachel, what does she
```

```
 1   say here?

 2        A.   "The YouTube policy team is requesting

 3   evidence-based input on the claims below.  In the

 4   past, the CDC has reviewed COVID information claims

 5   and commented true or false plus any additional

 6   context needed."

 7        Q.   And then what are the claims?

 8        A.   (As read)  Claim:  High dosage of

 9   progesterone is a safe method of reversing chemical

10   abortion, in parentheses, mifepristone and

11   misoprostol.

12             Sorry.

13             (As read)  Claim:  High doses of

14   progesterone is an effective method of reversing

15   chemical abortion, in parentheses, mifepristone and

16   misoprostol.

17        Q.   All right.

18        A.   "Please let me know if you have questions

19   or concerns."

20        Q.   And then what -- how do you respond?

21        A.   "I'll check on this, but I think I'll

22   probably end up needing to refer you to another

23   agency.  I'll get back to you."

24        Q.   So this -- this -- is it your

25   understanding this didn't have anything to do with
```

1    COVID-19 or vaccines?

2         A.   It definitely didn't have anything to do

3    with COVID-19 or vaccines.

4         Q.   Do you know why it was sent to you?

5         A.   Well, as COVID's -- our focus is not

6    solely on COVID.  We're focusing on other topics.  I

7    think Rachel thought that we might be able to help

8    with this topic as well.

9         Q.   Okay.  Do you know who you sent it, what

10   agency you sent it to, if any?

11        A.   I -- I didn't know.  I called one of our

12   centers and asked if this was something that CDC

13   dealt with.  I didn't think that we did, and they

14   confirmed that we do not.  And I don't think they

15   had a suggestion on where to refer this to, but I

16   can't recall for sure.

17             MR. VECCHIONE:  All right.  I would like

18   to take a brief break and have the court reporter

19   put my last exhibit together and give you copies

20   and then --

21             MR. GILLIGAN:  There is a 44, too?

22             MR. VECCHIONE:  -- confer, confer with

23   counsel, and I think we'll be finishing up.

24             (Comments off the record.)

25             THE VIDEOGRAPHER:  Off the record at 5:07.

CAROL CRAWFORD 11/15/2022

**Page 270**

```
 1                     C E R T I F I C A T E

 2      STATE OF GEORGIA:

 3      DEKALB COUNTY:

 4                 I, Maureen S. Kreimer, a Certified Court

 5      Reporter for the State of Georgia, before whom the

 6      foregoing deposition was taken, do hereby certify:

 7                 That CAROL CRAWFORD, the witness whose

 8      deposition is hereinbefore set forth in pages 1 to 269,

 9      was duly sworn by me and that such deposition is a true

10      record of the testimony given by the witness.

11                 I further certify that I am not related to

12      any of the parties to this action by blood or marriage,

13      and that I am in no way interested in the outcome of this

14      matter.

15                 IN WITNESS HEREOF, I have hereunto set my

16      hand this 18th day of November, 2022.

17

18

19

20

21      _____

22      MAUREEN S. KREIMER, CCR-B-1379

23      Notary Public in and for the

24      State of Georgia.  My Commission

25      Expires August 14, 2024.
```

# EXHIBIT M

CONFIDENTIAL

PLAINTIFF'S EXHIBIT 40

| | |
|---|---|
| From: | Crawford, Carol Y. (CDC/OD/OADC) [redacted] |
| Sent: | 5/10/2021 12:42:50 PM |
| To: | Stanley Onyimba [redacted]@google.com]; Jan Antonaros [redacted]@google.com] |
| Subject: | COVID BOLO meetings on misinformation |

We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. We have heard through the grapevine that Kevin Cain at YouTube would want to join. Are there other POCs on your end I should include on the invite?

| From: | Crawford, Carol Y. (CDC/OD/OADC) |
|---|---|
| Sent: | 5/11/2021 3:55:11 PM |
| To: | Jan Antonaros ▓▓@google.com]; Kevin Kane ▓▓@google.com] |
| Subject: | RE: COVID 19 BOLO Meeting |

Great – I was going to ask about Kevin at 4. ☺

**From:** Jan Antonaros ▓▓@google.com>
**Sent:** Tuesday, May 11, 2021 3:51 PM
**To:** Crawford, Carol Y. (CDC/OD/OADC) ▓▓@cdc.gov>; Kevin Kane ▓▓@google.com>
**Subject:** Re: COVID 19 BOLO Meeting

Hi Carol, Could you please add +Kevin Kane from our YouTube team to the call below? Thank you!

Jan Fowler Antonaros
Google Government Affairs and Public Policy
25 Mass Ave NW, 9th FL
Washington, DC 20001
▓▓@google.com
Android Mobile ▓▓

On Tue, May 11, 2021 at 3:25 PM Crawford, Carol Y. (CDC/OD/OADC) ▓▓@cdc.gov> wrote:

We would like to invite digital platforms to attend a short "Be On The Lookout" meeting on COVID. Let us know if you have questions and feel free to forward this message to anyone in your organization that should attend.

Thank you.

Carol Crawford
Chief, Digital Media Branch
Division of Public Affairs
OADC
▓▓@cdc.gov
▓▓

Join ZoomGov Meeting

▓▓

Dial by your location

CONFIDENTIAL

| From: | Crawford, Carol Y. (CDC/OD/OADC) |
|---|---|
| **Sent**: | 5/10/2021 12:44:41 PM |
| **To**: | Payton Iheme [@fb.com]; Genelle Adrier [@fb.com] |
| **Subject**: | COVID BOLO Misinformation meetings |

We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. I know you were considering possible process on your end, but we wanted start here just as interim first step. Are there direct POCs on your end I should include on the invite?   Happy to chat if better.

THANKS!

**EXHIBIT N**

CONFIDENTIAL

PLAINTIFF'S
EXHIBIT

43

| | |
|---|---|
| **From:** | Crawford, Carol Y. (CDC/OD/OADC) ___ |
| **Sent:** | 6/29/2022 6:01:54 PM |
| **To:** | Rachel Gruner ___ @google.com]; Smith, Fred (CDC/OD/OADC) ___ @cdc.gov]; Lindsay Steele ___ @google.com] |
| **Subject:** | RE: Claims review |

I'll check on this but I think I'll probably end up needing to refer you to another agency. I'll get back to you.

**From:** Rachel Gruner ___ @google.com>
**Sent:** Wednesday, June 29, 2022 4:38 PM
**To:** Crawford, Carol Y. (CDC/OD/OADC) ___ @cdc.gov>; Smith, Fred (CDC/OD/OADC ___ @cdc.gov>; Lindsay Steele ___ @google.com>
**Subject:** Claims review

Hi Carol and Fred,

The YouTube Policy team is requesting evidence-based input on the claims below. In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed.

**CLAIM:** High doses of progesterone is a **safe** method of reversing chemical abortion (mifepristone & misoprostol)
**CLAIM:** High doses of progesterone is an **effective** method of reversing chemical abortion (mifepristone & misoprostol)

Please let me know if you have any questions or concerns.

Thanks, Rachel

--

The linked...

**Rachel Gruner, MPH**
Health Outreach Lead, Google
___@google.com

MOLA_DEFSPROD_00001556

# EXHIBIT O

```
 1         IN THE UNITED STATES DISTRICT COURT

 2      FOR THE WESTERN DISTRICT OF LOUISIANA

 3               MONROE DIVISION

 4               ---o0o---

 5

 6
     STATE OF MISSOURI, et al.,      )
 7                                   )
                     Plaintiff,      )
 8                                   )
          vs.                        )    Case No.
 9                                   )    3:22-cv-01213
     JOSEPH R. BIDEN, JUNIOR, et     )    -TAD-KDM
10   al.,                            )
                                     )
11                   Defendants.     )
                                     )
12

13

14

15               ---o0o---

16         TUESDAY, NOVEMBER 29, 2022

17   ZOOM VIDEOTAPED DEPOSITION OF ELVIS CHAN

18               ---o0o---

19

20

21

22

23

24   REPORTER: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

25
```

**ELVIS CHAN  11/29/2022**

Page 23

```
 1    But I understand that Mr. Sur is defending the
 2    deposition, not Mr. Berger.  So if you've got an
 3    issue, I don't mind if you guys want to talk about
 4    it, but I don't want to have multiple -- multiple
 5    attorneys objecting and instructions being started.
 6    Can we proceed on that basis from now on?
 7            MR. SUR:  We intend to do so.  There my be
 8    some exceptional circumstances that warrant a
 9    different approach, but that's how we expect to
10    proceed.
11            MR. SAUER:  I am fine to hear that.  You
12    know, if things come up that raise an issue, you
13    know, we can -- we can raise them.  But, yeah,
14    anyway, all right.  I mean, to be clear, you know,
15    any law enforcement privilege is held by the
16    government, not by Mr. Chan's personal capacity,
17    and Mr. Sur is the one who is there to represent
18    the government today.
19        Q.    So -- but anyway, okay.  Mr. Chan, or
20    Agent Chan, who do you recall on the social media
21    platform side participating in these -- in these
22    working group meetings that you have been
23    testifying about from 2020 and 2022?
24        A.    The companies that I remember attending
25    the meetings are Facebook; Microsoft; Google;
```

1    Twitter; Yahoo!, which may have been known as

2    Verizon Media at the time; Wikimedia Foundation and

3    Reddit.

4         **Q.   Do you remember any others at this time?**

5         A.   I think I listed seven.  I -- those were,

6    like, the regular participants that I can remember.

7         **Q.   How about on the U.S. government side,**

8    **what agencies were represented at these meetings?**

9         A.   At these meetings, CISA is the host and

10   facilitator for the meeting.  They also invite

11   another component of Department of Homeland

12   Security called Intelligence and Analysis, I&A, so

13   DHS I&A I know attends.  The Office of the Director

14   of National Intelligence, ODNI, attends.  And then

15   from the FBI there is typically a representative

16   from the FBI's Foreign Influence Task Force, which

17   you will hear me abbreviate as FITF regularly.  And

18   then I attend from FBI San Francisco when I am

19   available.

20        **Q.   And why are you included in particular?**

21        A.   The reason that I attend these meetings is

22   because the way the FBI works is FBI field offices

23   are responsible for maintaining the day-to-day

24   relationships with the companies that are

25   headquartered in their area of responsibility,

```
 1   which I may occasionally abbreviate to AOR.  And
 2   all of the companies that have been listed, with
 3   the exception of Microsoft, are all headquartered
 4   in FBI San Francisco's territory.
 5       Q.   Now, where is Microsoft headquartered?
 6       A.   They are headquartered in Redmond,
 7   Washington.
 8       Q.   And then on the CISA side in particular,
 9   what individuals participate in these meetings?
10       A.   Typically there are senior-level -- what I
11   believe are senior-level officials.  The two that I
12   specifically remember are Matt Masterson and Brian
13   Scully.
14       Q.   Is that Matt Masterson, did you say?
15       A.   Yeah.  Yeah, Matthew Masterson and Brian
16   Scully are the two regular attendees.  And they are
17   usually -- one or both of them -- one -- either one
18   of them is usually emceeing the meeting.
19       Q.   So Brian Scully, do you know him
20   personally?
21       A.   I know him just through work.
22       Q.   Okay.  In what connection at work?
23       A.   And I only know -- I only know
24   Mr. Masterson through work as well.
25       Q.   When you say you know him through work,
```

```
 1    did you work together on anything other than these
 2    meetings?
 3         A.    So we have met -- I want to say I have met
 4    in person with each of those individuals, twice in
 5    person; but they are primarily through either the
 6    preparatory calls for these meetings that they are
 7    hosting or the meetings themselves.
 8         Q.    So you work with CISA in preparatory calls
 9    for these industry working group meetings?
10         A.    Yes.
11         Q.    And in that connection, you've met Brian
12    Scully and Matt Masterson, correct?
13         A.    Yes.
14         Q.    And Brian Scully is involved in kind of
15    leading or emceeing these meetings; is that right?
16              MR. SUR:  Objection; vague.
17         Q.    BY MR. SAUER:  Or is he the -- is he the
18    leader of the meeting when it convenes?
19         A.    For the 2020 election cycle, Mr. Masterson
20    was the primarily -- he was primarily the
21    facilitator.  Ahead of the 2022 midterm elections,
22    Mr. Scully has been the primary facilitator.
23         Q.    Was that because Mr. Masterson left CISA
24    in the -- in the intervening time?
25         A.    Yes.
```

Case 3:2Case 3:23-cv-03836OM72D2ocDant 276457 9 Filede0809/233 Page 258 of 359 PageID #:
10087
**ELVIS CHAN  11/29/2022**

Page 27

```
 1      Q.    Do you know where he works now?

 2      A.    Yes.  I believe he works at Microsoft now.

 3      Q.    Do you -- do you interact with him now as

 4  a representative of a -- of a tech company?

 5            MR. SUR:  Objection; vague.

 6            THE WITNESS:  I have only interacted with

 7  him on two occasions.  One was when he showed up at

 8  one of the more recent industry meetings ahead of

 9  the 2022 midterm elections.  That is when I

10  discovered that he went to Microsoft.  And then I

11  asked him to send me his new contact information

12  during the call, and then he sent me an email and

13  provided me with his new contact information.

14      Q.    BY MR. SAUER:  You work with CISA on these

15  industry working group meetings to help prepare

16  them, what's the nature of your involvement in

17  preparing for these meetings?  Do you kind of set

18  the agenda or -- you know, what's your involvement?

19            MR. SUR:  Objection; vague and compound

20  and implicates the deliberative process privilege.

21            MR. SAUER:  Let me rephrase the question.

22      Q.    Are you involved in preparing for these

23  meetings?

24      A.    No.  I participate in the preparation

25  meetings, but I do not provide any agenda items.
```

```
 1        Q.   Do you remember anyone else at CISA
 2   besides Mr. Scully and Mr. Masterson who
 3   participates in these meetings?
 4        A.   I don't recollect any other people's names
 5   at this time.
 6        Q.   Were there others who participated in --
 7   but you just don't remember who they were?
 8        A.   Yes, that is correct.
 9        Q.   Okay.  Let me -- do you still have Exhibit
10   1 on the screen in front of you, your thesis?
11        A.   Yes.
12        Q.   Okay.  Let me ask -- let's turn back to
13   that for a little while.  And if we could, I am
14   going to scroll ahead to your abstract on Page v.
15   Can you see that clearly, Roman numeral v.
16             MR. SUR:  Roman numeral v.  Okay.
17             THE WITNESS:  Yes, I see it now.
18        Q.   BY MR. SAUER:  And can you see it also on
19   the screen share as well as on the iPad?  I want to
20   make sure you can see the document in both places
21   as we go forward today.
22        A.   I can see the bottom half of one
23   paragraph, and then -- wait, now -- now I see --
24   yeah, I see the bottom paragraph of the --
25        Q.   Actually, can I -- can I direct your
```

**ELVIS CHAN 11/29/2022**

```
 1    attention this sentence here in your abstract that
 2    I am highlighting?  I guess, actually, for context,
 3    if you see above -- actually, just focus on that
 4    sentence.  "This" -- you say, "This thesis finds
 5    that the Russians shifted their tactics from 2016
 6    to 2020," right?
 7        A.   Correct.
 8        Q.   And then you say, "Still, the U.S.
 9    government and social media companies effectively
10    impeded their influence campaigns primarily through
11    information sharing and account takedowns,
12    respectively," correct?
13        A.   Correct.
14        Q.   What do you mean by "information sharing"
15    here?
16        A.   So "information sharing" is meant --
17    there -- as I mentioned previously, there are two
18    types of information that the U.S. government,
19    specifically the FBI, shares with the social media
20    companies.  The first type of information, the
21    strategic information, which discusses the tools,
22    tactics or processes, shortened to be TPPs, used by
23    the Russians.
24             The second type of information shared by
25    the U.S. government is tactical information.  And
```

```
 1   when I mean tactical information, I specifically
 2   mean indicators or selectors.  And both of those
 3   are a term of art within the cybersecurity
 4   industry.  And indicators or selectors include IP
 5   addresses, email accounts, social media accounts,
 6   well, website domain names, and, like, file hash
 7   values.
 8        Q.   Sorry.  Say the last thing.  What kind of
 9   hash values?
10        A.   File, like electronic file hash values.
11        Q.   Okay.  And so, yeah, I take it the
12   strategic information is kind of high-level advice
13   to the social media platforms about, you know, the
14   kinds of -- kinds of campaigns the Russians might
15   be conducting; is that fair to say?
16             MR. SUR:  Objection; lacks foundation.
17             THE WITNESS:  I would not -- I would not
18   characterize the information we share as advice.
19        Q.   BY MR. SAUER:  Okay.  Then in that case it
20   is sort of -- is it high-level general information
21   about what FBI understands the Russians are
22   engaging in when it comes to social media influence
23   campaigns?
24             MR. SUR:  Objection; lacks foundation.
25             THE WITNESS:  Yes.
```

## ELVIS CHAN  11/29/2022

```
 1      Q.   BY MR. SAUER:  And then -- go ahead.
 2   Sorry.  Go ahead.
 3      A.   I can provide an example if that would be
 4   illustrative.
 5      Q.   That would be super helpful.  Please do.
 6      A.   I had the 2020 elections, through our
 7   investigation of the Internet Research Agency, we
 8   discovered that they were trying to set up a base,
 9   as it were, or set up offices in western Africa.
10   We shared this type of strategic information with
11   the social media companies.  They were able to use
12   whatever detection methods they have to discover
13   that there were Russian troll farms being set up
14   specifically in Ghana and Nigeria.
15      Q.   Okay.  And so you mentioned earlier that
16   tactical -- that would be strategic information?
17      A.   That would be strategic.  To summarize, an
18   example would be we believe the Russian troll
19   farms, specifically the Internet Research Agency,
20   is trying to make inroads in western Africa.
21      Q.   Got you.  And then tactical information
22   would be much more specific.  Here are specific --
23   I think you said IP addresses, websites, social
24   media accounts, that are actually -- the FBI has
25   concluded are being operated by the Russians.  Is
```

```
 1    that what tactical information is?
 2        A.   That is correct.
 3        Q.   So there is -- and so is there information
 4    sharing from the FBI to social media platforms
 5    providing that kind of specific tactical-level
 6    information?
 7        A.   Yes, there is.
 8        Q.   And I think your -- that then the timeline
 9    in your thesis goes on specifically with
10    "information sharing and account takedowns."  Does
11    "account takedowns" refer to the social media
12    platforms kind of taking down those social media
13    accounts where the FBI identifies them as being
14    operated by Russian actors?
15             MR. SUR:  Objection; lacks foundation.
16             THE WITNESS:  So the FBI shares
17    information with the social media companies, no
18    strings attached, so that the social media
19    companies can protect their platforms as they deem
20    appropriate.  And from what I have observed and
21    what they have told me when we have provided them
22    with high confidence of Russian selectors, that
23    they have been able to discover fake Russian
24    accounts and take them down.
25        Q.   BY MR. SAUER:  So you don't control what
```

1  they do, correct?

2     A.   I do not control what they do.

3     Q.   But you provide them with information that

4  they don't have about the source of certain -- you

5  called them selectors or social media accounts,

6  correct?

7     A.   Correct.

8     Q.   And when you provide them with that

9  information, they take it and they pull down those

10  accounts, at least sometimes, fair to say?

11          MR. SUR:  Objection; lacks foundation.

12          THE WITNESS:  If I can clarify, what they

13  do is they take the information that we share, they

14  validate it through their own means.  And then if

15  they determine that these are accounts being

16  operated by Russian state-sponsored actors, then

17  they have taken them down.

18     Q.   BY MR. SAUER:  Oh, okay.  And then -- and

19  that's, I -- I take it, part of the point of your

20  sharing the information with them, right?  So that

21  they can assess and evaluate and then ultimately,

22  if they agree with your conclusion, take them down,

23  correct?

24     A.   Correct.

25     Q.   In other words, the purpose of the

**ELVIS CHAN  11/29/2022**

**Page 34**

1   information sharing on the FBI's side is to have

2   the inauthentic Russian accounts taken down so that

3   they are not influencing political discourse in the

4   United States, correct?

5           MR. SUR:  Objection; lacks foundation,

6   calls for speculation.

7           THE WITNESS:  I would characterize it as

8   the FBI provides information to these companies so

9   that they can protect their platforms as they deem

10  appropriate, and they can take whatever actions

11  they deem appropriate without any suggestion or

12  interference from the FBI.

13      Q.   BY MR. SAUER:  But my question's a little

14  different, which is what -- my question is:  Part

15  of the purpose from the FBI's perspective is to

16  give them the tools to assess and potentially take

17  down accounts that the FBI has deemed to be

18  inauthentic, correct?

19          MR. SUR:  Objection; lacks foundation,

20  calls for speculation.

21      Q.   BY MR. SAUER:  You may answer.

22      A.   So I would say -- inauthentic -- so my

23  focus is on Russian state-sponsored, -controlled

24  accounts.  And so whether the companies take them

25  down or not, it's their own choice.

1    Q.   Right, but is it your purpose in giving

2  them the information that the FBI believes or has

3  concluded that they are Russian-operated accounts,

4  is it your purpose to equip them to take them down

5  if they end up agreeing with your assessment?

6         MR. SUR:  Objection; lacks foundation,

7  calls for speculation.

8         THE WITNESS:  My purpose is to share the

9  information with them so that they can protect

10  their platforms as they deem appropriate.

11    Q.   BY MR. SAUER:  And one way to protect

12  their platforms is to take down these accounts,

13  correct?

14    A.   That is correct.

15    Q.   And, in fact, that's what you say here in

16  this sentence, right?  You say that, "the U.S.

17  government and social media companies effectively

18  impeded their influence campaigns...through

19  information sharing and account takedowns," right?

20    A.   I said that.  You can see -- I put

21  "respectively" because it was the U.S. government,

22  specifically the FBI, sharing information; and it

23  was the social media companies doing the account

24  takedowns.

25    Q.   Right.  And the joint result of that was

**ELVIS CHAN  11/29/2022**

**Page 36**

```
 1    effectively impeding Russian influence campaigns,
 2    correct?
 3        A.   Correct.
 4        Q.   And -- and that's FITF's goal, right?  To
 5    effectively impede Russian influence campaigns,
 6    right?
 7             MR. SUR:  Objection; lacks foundation,
 8    calls for speculation.
 9             THE WITNESS:  Yeah, FITF -- my
10    understanding of FITF's goal is to counter malign
11    foreign-influence campaigns.
12        Q.   BY MR. SAUER:  Does that include
13    effectively impeding their influence campaigns, as
14    you say in your thesis?
15        A.   Yes.
16        Q.   Does that include doing so through account
17    takedowns by information sharing with social media
18    platforms?
19             MR. SUR:  Objection; lacks foundation,
20    mischaracterizes the testimony.
21             THE WITNESS:  Yeah, I believe you're
22    mischaracterizing.  So like I said before, the FBI
23    shares information with no strings attached and no
24    expectations to -- for the companies.  And the
25    companies, they can protect their own platforms.
```

```
 1            MR. SAUER:  I am going to jump ahead to
 2   page little Roman xvii.
 3            You can see there, Indraneel, it's going
 4   to be on Page 19 of the PDF.  See that?
 5            MR. SUR:  Yep.  Yeah, we're on it.
 6       Q.   BY MR. SAUER:  Okay.  I believe this is a
 7   kind of summary section of your thesis.  You talk
 8   about in this paragraph here that begins with, "The
 9   U.S. government's response," that I have
10   highlighted; do you see that?
11       A.   Yes.
12       Q.   And you say, "The U.S. government's
13   response to the Russian influence campaign appeared
14   more robust before the 2020 elections than in the
15   2016 or 2018 elections," correct?
16       A.   Correct.
17       Q.   And then in the next sentence, you say,
18   "The most important actions taken by the U.S.
19   government may have been the information sharing
20   with the social media companies to expose Russia's
21   different operations and shut down its accounts,"
22   correct?
23       A.   Correct.
24       Q.   So the information sharing was done, "To
25   expose Russia's different operations and shut down
```

**ELVIS CHAN  11/29/2022**

```
 1    its accounts," right?

 2        A.   Correct.

 3        Q.   And then "its" refers to Russia, right?

 4    So (as read) "to expose Russia's different

 5    operations and shut down Russia's accounts,"

 6    correct?

 7        A.   Correct.

 8        Q.   I am going to jump ahead a few pages to

 9    Page xxii.

10             MR. SAUER:  And, Indraneel, if you're

11    following on your iPad, that's going to be Page 24

12    of the PDF.

13        Q.   There's a reference here in the

14    acknowledgments where you refer to, "My colleagues

15    back at headquarters who were in the trenches with

16    me as we worked to protect the 2020 elections."

17    See that?

18        A.   Yes.

19        Q.   Okay.  What are you talking about there

20    where it says (as read), "in the trenches with you

21    as you worked to protect the 2020 elections"?

22        A.   I'm referring to my colleagues

23    specifically at the Foreign Influence Task Force

24    who participated in the meetings with me, who

25    provided briefings to the companies and who
```

Case 3:2Case:3:23-cv-03836M12D28cDcoment276351-7 Filed 08/09/23 3 Page 3576 of 669 PageID #:
10099
ELVIS CHAN  11/29/2022

Page 39

```
 1   coordinated the information sharing.
 2       Q.   And so you said you had meetings with the
 3   companies.  What meetings did you have?
 4       A.   We had -- let me be more clear.  I hosted
 5   meetings, bilateral meetings between each of the
 6   companies I mentioned and the Foreign Influence
 7   Task Force.
 8            And we would also bring in field offices
 9   that had investigations related to malign foreign
10   influence by state-sponsored actors.  We would also
11   bring in field offices that had cyber
12   investigations.  And when I mean cyber
13   investigations, I mean state-sponsored actors that
14   the FBI was investigating that we believe were
15   capable of hack-and-dump campaigns that we observed
16   in the 2016 election.
17       Q.   Okay.  Let me unpack that a bit.
18            First of all, you said there were meetings
19   with social media companies, between you and social
20   media companies during the 2020 election cycle,
21   correct?  Is that what we're talking about?
22       A.   Yes, that is correct.
23       Q.   Now, did those meetings also continue in
24   the 2022 election cycle?
25       A.   Yes.  They occur at roughly a quarterly
```

Case 3:23-cv-03836-TLT Document 276-17 Filed 08/09/23 Page 479 of 659 PageID #:
**ELVIS CHAN 11/29/2022**

Page 40

```
 1    cadence.
 2         Q.   And then do they -- does the cadence
 3    increase as elections get close?
 4         A.   Yes, they do.  And --
 5         Q.   Now, does that become monthly as the
 6    election nears and then weekly very close to the
 7    elections?
 8         A.   Ahead of the 2020 elections, that is
 9    correct.  Ahead of the 2022 elections, we moved it
10    from quarterly to monthly, and then we just had one
11    meeting a week ahead of the midterm elections.
12         Q.   I'm sorry.  You said you had one weekly
13    meeting ahead of the midterm elections?
14         A.   Right.  We had one meeting a week before
15    the midterm elections.
16         Q.   Oh, and how long was the -- how long was
17    that period of weekly meetings?  Was that, like,
18    the month before or the three months before?
19         A.   No.  Just the week before the election
20    itself.
21         Q.   Oh, okay.  There was one weekly meeting,
22    right, the week before the election?
23         A.   Yeah.  There was -- yeah.  So there was a
24    monthly meeting in October; and then we had another
25    meeting out of -- you know, out of cadence the week
```

**Page 41**

```
 1   before the election, so the end of October.
 2       Q.   And then are these meetings going back to
 3   quarterly now that the election has passed?
 4       A.   That is correct.
 5       Q.   And so you're -- you'll have quarterly
 6   meetings with the social media companies going
 7   forward until the 2024 election cycle gets closer?
 8       A.   That is what I anticipate.
 9       Q.   And then as that election gets closer,
10   then you'll move to monthly and eventually weekly a
11   couple years from now, or in the fall of 2024; is
12   that fair to say?
13            MR. SUR:  Objection; calls for
14   speculation.
15            THE WITNESS:  That is what I anticipate.
16       Q.   BY MR. SAUER:  Let me ask you this:  What
17   social media companies are involved in these
18   meetings?
19            MR. SUR:  Objection; vague.
20            THE WITNESS:  Currently or in 2020?
21       Q.   BY MR. SAUER:  Well, let's start with
22   2020.  I'd like to know both.  Let's start with
23   2020, please.
24       A.   So for the 2020 elections, we regularly
25   met with Facebook, Google, Twitter, Yahoo!, Reddit
```

```
 1    they take it very seriously.  And I would say that
 2    to the best of their ability, they are very careful
 3    before doing account takedowns.
 4        Q.   BY MR. SAUER:  I think that ties back into
 5    something you said earlier, which was in 2016 they
 6    really didn't do any account takedowns, fair to
 7    say?
 8        A.   That is correct.
 9        Q.   And it -- and I take it they may have had
10    a -- I -- we may be speculating here, if you know.
11    Do you know if that was because they have a
12    financial incentive to leave those accounts up
13    because it increases their ad revenues?
14             MR. SUR:  Objection; calls for
15    speculation.
16             THE WITNESS:  I wouldn't even begin to
17    speculate.  I don't know why.
18        Q.   BY MR. SAUER:  Let me ask you this:  Why
19    did things change, in your view?  I take it in 2018
20    and 2020 there were many more account takedowns,
21    right?
22        A.   So there are two parts to your question.
23    Why do I think they did it?  I can provide you with
24    my personal opinion.
25        Q.   Okay.
```

Case 3:22-cv-01213-TAD-KDM Document 267-5 Filed 03/09/23 Page 152 of 659 PageID #: 10176

1      A.   My -- I believe pressure from Congress,

2 specifically HPSCI and SSCI, may have had a part of

3 it.

4           And then also because I believe that they

5 felt that this may have damaged their brands, but

6 that is my personal opinion.

7      Q.   Okay.  Well, let me ask you this:  When

8 you say "pressure from Congress" and you mentioned

9 HPSCI and SSCI, what are HPSCI and SSCI?  Are

10 those -- are those committees?

11     A.   I'm sorry.  HPSCI is the -- the House

12 Permanent Select Committee on Intelligence.  And

13 SSCI is the Senate Select Committee on

14 Intelligence.

15     Q.   Starting with the House Permanent Select

16 Committee on Intelligence, what kind of pressure

17 did they put on the social media platforms to, you

18 know, engage more aggressively in account

19 takedowns?

20     A.   They compelled -- I don't know if they

21 compelled.  They requested the CEOs for the

22 companies that I mentioned, the -- to testify in

23 front of their committee.

24     Q.   And so they kind of brought in Mark

25 Zuckerberg and Jack Dorsey and Sundar Pichai and

Page 117

```
 1    had them testify in front of Congress?

 2        A.    That is correct.

 3        Q.    And that happened -- that happened once or

 4    it happened multiple times?

 5        A.    To my knowledge, that happened more than

 6    once.

 7        Q.    And you believe that that -- that that

 8    kind of scrutiny and public pressure from Congress,

 9    in your view, motivated them to be more aggressive

10    in the account takedowns?

11            MR. SUR:  Objection; lacks foundation,

12    calls for speculation.

13            THE WITNESS:  That is just my personal

14    opinion.

15        Q.    BY MR. SAUER:  Yeah.  What is the basis

16    for your opinion?  Has anyone at a social media

17    platform ever made a comment to you that would

18    reflect that -- that view?

19        A.    I would say yes.  And the types of

20    comments that I have received are that staffers

21    from both of those committees have visited with

22    those companies.  And while they would not reveal

23    the types of discussions that they had with these

24    House and Senate staffers, they would indicate that

25    they had to prepare very thoroughly for these types
```

1    of meetings and that it was -- they indicated that

2    it felt like a lot of pressure.

3        **Q.  "They" is representatives of social media**

4    **platforms?**

5        A.   Yeah.  The social media companies that

6    were visited.

7        **Q.   What -- what social media companies were**

8    **visited by these HPSCI and SSCI staffers?**

9        A.   To my knowledge, it was the three

10   companies that I've mentioned, which include

11   Facebook, Google and Twitter.

12       **Q.   And Facebook, Google and -- Facebook,**

13   **Google and Twitter employees all told you that they**

14   **experienced these visits from congressional**

15   **staffers as exercising a lot of pressure on them?**

16       A.   That was how I interpreted their comments.

17       **Q.   And then you infer from that that their**

18   **changes in takedown policies resulted from that**

19   **kind of pressure from Congress?**

20       A.   That is my personal opinion.

21            If I can add, I think some of -- some of

22   what was discussed -- I'm interpreting what -- some

23   of what was discussed.  But what the -- the

24   staffers would come and talk to us either before or

25   after they met with those three companies.  And so

 1    what was discussed with us was legislation that
 2    they were thinking about doing, and them asking for
 3    our opinion.
 4        Q.   Uh-huh.  When you say "legislation that
 5    they were thinking about doing," what do you mean?
 6        A.   Legislation that either HPSCI or SSCI was
 7    thinking about doing.
 8        Q.   So HPSCI and SSCI, these committees on
 9    intelligence, their staffers would be communicating
10    to the social media platforms Facebook, Twitter and
11    Google or YouTube that they intended to try and
12    pass legislation?
13        A.   So I inferred that because that is what
14    they discussed with me personally.
15        Q.   That is what they, the social media
16    platforms, discussed with you, correct?
17        A.   No, no.  That is what HPSCI and SSCI
18    discussed with me when they were coming to these
19    meetings.
20        Q.   Oh, did you -- were you in on these
21    meetings?  Like, were you included in the meetings
22    with the congressional staffers?
23        A.   So I and FBI San Francisco personnel would
24    meet with the congressional staffers, typically
25    before they met or after they met with the social

```
 1
                    DEPOSITION OFFICER'S CERTIFICATE
 2     STATE OF CALIFORNIA      )

 3                              ) ss.

 4     COUNTY OF SAN FRANCISCO)

 5

 6             I, Balinda Dunlap, hereby certify:

 7             I am a duly qualified Certified Shorthand

 8     Reporter in the State of California, holder of

 9     Certificate Number CSR 10710 issued by the Certified Court

10     Reporters' Board of California and which is in full

11     force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12             I am authorized to administer oaths or

13     affirmations pursuant to California Code of Civil

14     Procedure, Section 2093(b) and prior to being examined,

15     the witness was first duly sworn by me.  (Fed. R. Civ.

16     P. 28(a)(a)).

17             I am not a relative or employee or attorney or

18     counsel of any of the parties, nor am I a relative or

19     employee of such attorney or counsel, nor am I

20     financially interested in this action.  (Fed. R. Civ. P.

21     28).

22             I am the deposition officer that

23     stenographically recorded the testimony in the foregoing

24     deposition and the foregoing transcript is a true record

25                              / / /
```

**ELVIS CHAN  11/29/2022**

Page 311

```
 1    of the testimony given by the witness.  (Fed. R. Civ. P.
 2    30(f)(1)).
 3             Before completion of the deposition, review of
 4    the transcript [   ] was [   ] was not requested.  If
 5    requested, any changes made by the deponent (and
 6    provided to the reporter) during the period allowed, are
 7    appended hereto.  (Fed. R. Civ. P. 30(e)).
 8
 9    Dated:
10
11                        _____
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT P**

**From:** ████████████████@twitter.com]
**Sent:** 1/23/2021 1:08:36 AM
**To:** Humphrey, Clarke EOP/WHO ████████████@who.eop.gov]
**CC:** ████████████████@twitter.com]; Flaherty, Robert EOP/WHO ████████████@who.eop.gov]
**Subject:** [EXTERNAL] Re: Flagging Hank Aaron misinfo

Thanks. We recently escalated this.

On Fri, Jan 22, 2021 at 8:05 PM Humphrey, Clarke EOP/WHO ████████████@who.eop.gov> wrote:
Hey folks —

Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP:

>https://twitter.com/RobertKennedyJr/status/1352748139665645569<

And then if we can keep an eye out for tweets that fall in this same ~genre that would be great.

Thanks!
Clarke
--

████████████████
Twitter | Public Policy
@TwitterGov & @Policy

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 5:23-cv-03880-NC |
| Plaintiff, | [Assigned to the Honorable Nathanael Cousins] |
| vs. | **DECLARATION OF ROBERT F. KENNEDY, JR.** |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | |
| Defendants. | |

///
///
///
///
///
///

1

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

## DECLARATION OF ROBERT F. KENNEDY, JR.

I, Robert F. Kennedy, Jr. declare as follows:

1.     I am the plaintiff in this matter, a member of the Democratic Party and a candidate for President of the United States. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so.

2.     I am submitting this declaration in support of my application for a temporary restraining order or, in the alternative, an order to show cause regarding the issuance of a preliminary injunction, prohibiting Defendants Google LLC and YouTube, LLC, from using its COVID-19 and vaccine misinformation policies to censor videos of me speaking on matters of public concern during my campaign.

3.     I have spoken regularly about the safety and efficacy of vaccines over the past decade. Videos of my comments were often posted on YouTube. To my knowledge, none of those videos were removed from YouTube until the COVID-19 pandemic. Indeed, to my knowledge, I was not censored on YouTube until 2021, after Joe Biden took office and after Google adopted a new policy, dubbed the "vaccine misinformation policy." That is the policy that Google has cited most frequently during the past two years when removing videos of my speech on matters of public concern.

4.     Facebook and Twitter stopped censoring me after I declared my presidential candidacy. Google did not. Although Google does not censor all videos of me, it has removed several high-profile speeches and interviews I gave, including my pre-announcement speech at the New Hampshire Institute of Politics and interviews I gave to Joe Rogan and Jordan Peterson.

5.     Google's actions have created a chilling effect surrounding my campaign. I often hear from people who say they posted a video of me speaking that Google then removed from YouTube. Although some wear that as a badge of honor, others say that Google's actions have deterred them from posting other content related to me.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

6.      This censorship, and the chilling effect it creates, have created hurdles for my campaign. Those hurdles would be great under ordinary circumstances, but they are even greater given that I am challenging an incumbent president whose administration, according to evidence gathered in other cases, targeted me specifically. I believe this censorship will increase as the primaries get closer and that injunctive relief is the only thing that will prevent voters from having an unfettered chance to hear my views before they cast their ballots.

Under penalty of perjury, under the laws of the United States of America, I declare that the foregoing is true and correct. Executed this 8th day of August 2023, at North Sandwich, New Hampshire.

_____

Robert F. Kennedy, Jr.

DECLARATION OF ROBERT F. KENNEDY, JR.                    CASE NO. 5:23-cv-03880-NC

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| ROBERT F. KENNEDY, JR., | Case No. 5:23-cv-03880-NC |
|---|---|
| Plaintiff, | [Assigned to the Honorable Nathanael Cousins] |
| vs. | **DECLARATION OF AMARYLLIS KENNEDY** |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | |
| Defendants. | |

///

///

///

///

///

///

///

1

JW HOWARD/ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

## DECLARATION OF AMARYLLIS KENNEDY

I, Amaryllis Kennedy, declare as follows:

1.      I am over the age of 18 and a senior adviser for Team Kennedy, the organization formed by my father-in-law, Robert F. Kennedy, Jr., to support his campaign for President of the United States. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so.

2.      I am submitting this declaration in support of Bobby's application for a temporary restraining order or, in the alternative, an order to show cause regarding the issuance of a preliminary injunction, prohibiting Defendants Google LLC and YouTube, LLC, from using its COVID-19 and vaccine misinformation policies to censor videos of him speaking on matters of public concern during the campaign.

3.      Bobby has spoken regularly about the safety and efficacy of vaccines over the past decade. To my knowledge, he was not censored on YouTube until 2021, after Google adopted a new policy, dubbed the "vaccine misinformation policy." That is the policy that Google has cited most frequently during the past two years when removing videos his speech on matters of public concern, including speeches he has made, and interviews he has given, during his political campaign.

4.      Although Google does not censor all videos of Bobby speaking, it has removed several high-profile speeches and interviews he has given during the campaign, including a speech at the New Hampshire Institute of Politics and interviews he gave to Joe Rogan and Jordan Peterson.

5.      For example, attached to this declaration as **Exhibit "A"** is a true and correct copy of an email one of Bobby's supporters sent the campaign after Google removed his posting of the Rogan interview. The campaign receives similar reports from people on a near daily basis.

6.      Google's actions have created a chilling effect surrounding the campaign. I often hear from people who say that Google's actions have deterred them from

2

1 posting content about Bobby. The chilling effect is particularly bad because Google
2 uses its vaccine misinformation policy to remove entire speeches and interviews,
3 much of which have nothing to do with vaccines.

4     7.     This censorship, and the chilling effect it creates, have created hurdles for
5 the campaign. Since the mainstream media has largely avoided covering Bobby, the
6 campaign relies heavily on ordinary people who post and share videos of Bobby
7 speaking on matters of public concern. YouTube is by far the largest platform for
8 sharing such videos. And I suspect that Google's censorship of Bobby's speech will
9 increase after Labor Day, as the campaign gets into full swing and the primaries draw
10 closer.

11     8.     The campaign has repeatedly asked Google to stop censoring Bobby's
12 speech on matters of public concern during the political campaign. It has refused. It
13 insists that it has the right censor Bobby, even as a political candidate. That is not all.
14 As a general matter, Google allows public figures to control the "Google Knowledge"
15 box that appears on the right side of an internet page, or the top of the page when
16 viewing it on a mobile device, in response to a search result. However, despite
17 repeated requests to Google, the campaign has not been allowed to control the box for
18 Bobby. Thus, the knowledge box contains several pieces of inaccurate information
19 about Bobby. I believe this is indicative of Google's general hostility to Bobby's
20 campaign and an example of why Google will not change its behavior unless a court
21 orders it to.

22     Under penalty of perjury, under the laws of the United States of America, I
23 declare that the foregoing is true and correct. Executed this 8th day of August 2023, at

24 

27                    Amaryllis Kennedy

3

DECLARATION OF AMARYLLIS KENNEDY.                 CASE NO. 5:23-cv-03880-NC

JW HOWARD/ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

EXHIBIT "A"



---------- Forwarded message ---------

Date: Sat, Jun 17, 2023 at 11:35
Subject: Re:  YouTube removed your content

They rejected my appeal:



Hi ▮▮▮▮

We have reviewed your appeal for the following:

**Video:** RFK Jr on Rogan - Pfizer COVID Vaccine Trial

We reviewed your content carefully, and have confirmed that it violates our medical misinformation policy. We know this is probably disappointing news, but it's our job to make sure that YouTube is a safe place for all.

### How does this impact your content

- We won't be putting your content back up on YouTube.

- If your appeal was for a warning, you will not be given another warning in the future.

- If your appeal was for a strike, the strike will remain on your channel.

You can find more information about warnings and strikes at the YouTube Help Center.

Thanks,
The YouTube team





-------- Forwarded message --------
From: **YouTube** <no-reply@youtube.com>
Date: Sat, Jun 17, 2023 at 8:38 AM
Subject: 📹 YouTube removed your content

Hi

Our team has reviewed your content, and, unfortunately, we think it violates our **medical misinformation policy**. We've removed the following content from YouTube:

**Video:** RFK Jr on Rogan - Pfizer COVID Vaccine Trial

We know that this might be disappointing, but it's important to us that YouTube is a safe place for all. If content breaks our rules, we remove it. If you think we've made a mistake, you can appeal and we'll take another look. Keep reading for more details.

## How your content violated the policy

YouTube doesn't allow claims about COVID-19 vaccinations that contradict expert consensus from local health authorities or the World Health Organization (WHO).

LEARN MORE

## How this affects your channel

3

Because it's the first time, this is just a warning. If it happens again, your channel will get a strike and you won't be able to do things like upload, post, or live stream for 1 week.

## What to do next

We want to help you stay on YouTube, so please:

- Make sure you understand YouTube's Community Guidelines and strikes basics.

- Review your content with our policies in mind. If after reviewing your content you think we made a mistake, let us know. You can appeal this decision here.

Sincerely,

The YouTube Team

Help Center · Email options

You have received this email to update you on actions related to your YouTube account.

Was this email helpful? Yes  |  No



© 2023 Google LLC d/b/a YouTube, 901 Cherry Ave, San Bruno, CA 94066



4

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN 301894)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., | Case No. 5:23-cv-03880-NC |
| Plaintiff, | [Assigned to the Hon. Nathanael Cousins] |
| vs. | |
| GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, | **[PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION** |
| Defendants. | |

///

///

///

///

///

1

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# ORDER

Having considered the application for a temporary restraining order filed by Plaintiff Robert F. Kennedy, Jr., and all related documents and argument, and good cause appearing, the Court orders as follows:

1.      The application is granted.

2.      Defendants Google LLC and YouTube, LLC, and all their agents and employees are temporarily enjoined from using either the "Vaccine misinformation policy" or the "COVID-19 medical misinformation policy" to remove videos of Mr. Kennedy's speech from YouTube.

3.      The Court also orders Defendants to show cause why a preliminary injunction should not be issued enjoining them and their agents and employees from using either the "Vaccine misinformation policy" or the "COVID-19 medical misinformation policy" to remove videos of Mr. Kennedy's speech from YouTube while he is a candidate for president of the United States and pending a trial on the merits in this action.

4.      Mr. Kennedy shall serve a copy of this Order plus all supporting pleadings and papers on Defendants by _____, 2023.

5.      The hearing on the OSC re issuance of a preliminary injunction shall be scheduled for _____, 2023, at _____. It will be held at _____. Defendants shall file their opposition papers by _____, 2023. Mr. Kennedy shall file his reply papers by _____, 2023.

IT IS SO ORDERED.

Dated: _____          _____

                                                             U.S. MAGISTRATE JUDGE

TRO AND OSC RE ISSUANCE OF PRELIMINARY INJUNCTION                    CASE NO. 5:23-cv-03880-NC

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
Andrew G. Nagurney (SBN
301894)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff,
ROBERT F. KENNEDY, JR.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT F. KENNEDY, JR., <br><br> Plaintiff, <br><br> vs. <br><br> GOOGLE LLC, a Delaware corporation, and YOUTUBE, LLC, a Delaware corporation, <br><br> Defendants. | Case No. 5:23-cv-03880-NC <br><br> [Assigned to the Hon. Nathanael Cousins] <br><br> **CERTIFICATE OF SERVICE** <br><br> [Filed concurrently with Application for TRO; MP&A, Dec. of Robert F. Kennedy, Jr., Dec. of Amaryllis Kennedy and Dec. of Scott J. Street; [Proposed] TRO and [Proposed] OSC lodged concurrently] |

///

///

///

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On August 9, 2023, I caused the:

1. APPLICATION FOR TEMPORARY RESTRAININGN ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
2. DEC. OF SCOTT J. STREET
3. DEC. OF ROBERT F. KENNEDY, JR.
4. DEC. OF AMARYLLIS KENNEDY
5. [PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION

to be filed and served via personal service by Knox Attorney Service upon BECKY DEGEORGE, the agent for service for Google LLC and YouTube LLC, located at 2710 Gateway Oaks Drive, Sacramento, CA 95833.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on August 9, 2023 at San Diego, California.

/s/ Dayna Dang
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com

# EXHIBIT H

**Pages 1 - 53**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge Presiding

```
ROBERT F. KENNEDY, JR.,        )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. C 23-03880 TLT
                               )
GOOGLE LLC, a Delaware         )
corporation, and YOUTUBE, LLC,)
a Delaware corporation,        )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Monday, August 21, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
        JW HOWARD/ATTORNEYS
        201 South Lake Avenue, Suite 303
        Pasadena, California  91101
        **BY:  SCOTT J. STREET**
        **ATTORNEY AT LAW**

For Defendant:
        MUNGER, TOLLES & OLSON LLP
        560 Mission Street - 27th Floor
        San Francisco, California  94105
        **BY:  JONATHAN H. BLAVIN**
        **JULIANA MARIKO YEE**
        **ATTORNEYS AT LAW**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

<u>**Monday - August 21, 2023**</u>                                    **9:56 a.m.**

                    **P R O C E E D I N G S**

                         **---oOo---**

        **THE CLERK:**  Now calling Case Number 23-cv-03880,

Kennedy, Jr. versus Google, LLC, et al.

     Counsel, will you please come forward to the podium and

state your appearances, beginning with the plaintiff.

        **ATTORNEY STREET:**  Good morning, Your Honor.  Scott

Street for the plaintiff, Mr. Kennedy.

        **THE COURT:**  Good morning.

        **ATTORNEY BLAVIN:**  Good morning, Your Honor.  Jonathan

Blavin for defendants Google and YouTube.

        **ATTORNEY YEE:**  Good morning, Your Honor.  Juliana Yee

on behalf of Google and YouTube.

        **THE COURT:**  Good morning.  And pleasure to meet you

all.  And I'm glad that there were safe travels coming from

Burbank as well as the streets of San Francisco.  So pleasure

to see everyone.

     All right.  This matter is before the Court for an

application of a temporary restraining order.  Plaintiff has

filed an application for a prospective temporary restraining

order to enjoin Google and YouTube from using its

misinformation policies during the 2024 presidential campaign.

     Counsel, if you'll please approach, I'm going to have some

general rules.  Those of you who are going to be presenting to

1    the Court should approach the podium so that you can be heard

2    by the Court as well as our court reporter.  Thank you.

3          For those who may be unfamiliar with this Court, I will

4    generally give a recitation of what I believe the facts to be

5    and allow you to provide correction during your presentation.

6          I will also have a list of questions and some I will

7    intermittently pose to you.  Please understand if I'm asking

8    these questions, these are questions that are relevant to my

9    ultimate decision.

10         I've read all of the briefing as well as the cases that

11   you've recited in your briefing, and I'm very clear in terms of

12   the standard of a temporary restraining order.

13         So, counsel, I'll note that the Court will have as one of

14   its first questions is why is this an emergency given the lapse

15   of time?  So please take that into consideration.

16         Now, on January 23rd, 2021, Twitter, not YouTube, removed

17   a tweet from Mr. Kennedy's Twitter account.  The takedown was

18   precipitated by an e-mail sent before from Clarke Humphrey of

19   the White House office flagging the tweet and asked if we can

20   get moving on the process for having it removed.  This is based

21   on the motion and declaration filed by Mr. Street.

22         This is a fact that I believe supports documentation of

23   *Missouri v. Biden*, but I want to note that Mr. Kennedy had

24   filed a motion to intervene and I believe that motion was

25   denied on January 10th, 2023, by the District Court Western

1     Division of Louisiana, Monroe Division.

2        Now the facts that are relevant to this case are as

3     follows and those of which the Court is asked to consider.

4     Mr. Kennedy announced his candidacy on April 19th, 2023.  He

5     spoke earlier, a month prior, at Saint Amselm College in

6     New Hampshire Institute of Politics on March -- in March of

7     2023.  I do -- I would like to know the actual date.

8        The speech centered around Mr. Kennedy's concern about the

9     merger of corporate and state power as it related to vaccines

10     that children are asked to take.

11        He spoke about the environmental and legal work fighting

12     corporate polluters.  And this is based on the motion pages 9

13     through 10, and counsel, Mr. Street's declaration paragraph 4.

14        Manchester Public Television posted a video of the speech,

15     and YouTube removed it.  This is according to the declaration

16     filed by Mr. Street.

17        Once again, Mr. Kennedy announced his candidacy a month

18     later on April 19th, 2023.  And he's seeking the Democratic

19     Party's nomination for President.  He has filed the necessary

20     paperwork within the Federal Election Commission and is taking

21     steps to qualify for the ballot in early primary states

22     including New Hampshire.

23        Now then YouTube removed a video of an interview with

24     podcast host Jordan Peterson and comedian Joe Rogan after he

25     announced his candidacy.  On June 17th, YouTube removed the

1   video titled "RFK on Joe Rogan, Pfizer COVID Vaccine Trial,"

2   and this is based upon the declaration in Exhibit A, Amaryllis

3   Kennedy.

4       Kennedy does not identify what video interview with Jordan

5   Peterson was taken down, the topics of the interview, what date

6   it was posted, or what date it was taken down.

7       On the 4th of July, 2023, the decision in *Missouri v.*

8   *Biden* was filed.  The appeal was filed on July 6th, 2023.

9   Defendant's motion to stay during appeal was denied on

10  July 10th.  Oral arguments for the appeal were held on

11  August 10th, 2023.

12      Plaintiff filed his complaint on August 8th, 2023, and his

13  TRO application on August 9th, 2023.

14      Now then, counsel, I invite you to share any additional

15  facts that you believe are relevant to the Court in making this

16  final decision and whether to grant a TRO.

17      There are standards of which the Court would like to know

18  which do you feel are the appropriate standards to apply,

19  keeping in mind that *Missouri v. Biden* at best is persuasive.

20  *O'Handley v. Weber* found at 62 F.4th 1143, decided in 2023 by

21  our Ninth Circuit, is the case that the Court will follow.  And

22  the Court would like to know which of the tests in that case

23  you feel is appropriate.

24      What date in March of 2023 did Mr. Kennedy give his

25  speech?  What date did Manchester Public Television post

1   Mr. Kennedy's speech?  On what date was Mr. Kennedy's speech

2   taken down by YouTube?  How many other videos of Mr. Kennedy

3   have been taken down by YouTube, if any?  And please precisely

4   indicate the date and the content.

5       Twitter, who is not a party to this case, allegedly

6   removed a video of Mr. Kennedy on January 23rd, '21.  Was this

7   video also posted to YouTube, and did YouTube remove it?

8       Now, I do have other questions.  And we'd like to start

9   with under which test for determining a state actor does

10  plaintiff suggest in controlling this case and why in terms of

11  the decision that I will be making today?

12      So, counsel, I have a number of other questions, but those

13  are kind of the broad stroke.  Please correct me on any facts

14  that I may have stated in error.  Speak as slowly as possible

15  for our court reporter.  And, please, I ask that neither party

16  speak over one another so we have a clear record.

17      **ATTORNEY STREET:**  Okay.  Thank you, Your Honor.  And

18  thank you for obviously putting a lot of time into this.

19      I know it was done on short notice, and thank you for

20  indulging my efforts to get here in person so -- which

21  fortunately were successful.

22      **THE COURT:**  You're welcome.  And as you can tell from

23  your binder behind you, every page has been read.

24      **ATTORNEY STREET:**  I appreciate that, by you and by me.

25  Thank you, Your Honor.

1    There were a lot of questions that the Court posed.  So

2  I'm going to start with the question that Your Honor -- the

3  last question that you asked, which is which test applies here.

4    And I want to emphasize that under -- that both the Ninth

5  Circuit and the Supreme Court have said that the tests are

6  really guides to use in determining whether private action --

7  otherwise private action is, quote, fairly attributable to the

8  state.  That's the standard that the Supreme Court laid out in

9  the *Brentwood* -- in the *Brentwood* case in 2002.  And the Ninth

10  Circuit has mentioned that several times including in *O'Handley*

11  and in the *Rawson v. Recovery* case that we cited in our brief.

12    Of the tests that are used, I think here the joint action

13  and the nexus tests are the most on point because of the

14  significant parent coordination between Google, YouTube, and

15  the government in developing particularly the vaccine

16  misinformation policy, which is the one that has been cited

17  when removing my speech -- my client's speech from YouTube.

18    That policy was drafted and the evidence that was

19  developed in *Missouri v. Biden* case showed that that policy was

20  developed by Google in 2020 -- I believe 2021 in response to

21  the government's demands for it.

22    **THE COURT:**  If I could interrupt, and I apologize

23  because I want to make sure our record is clear.  You indicated

24  that the joint action test along with the nexus test which has

25  two separate tests under nexus, under the nexus test.

1   **ATTORNEY STREET:**  Yes.

2   **THE COURT:**  And please identify which one.

3   With regards to the user agreement, and you misspoke and

4   said your speech as opposed to Mr. Kennedy's speech.  Did

5   Mr. Kennedy sign the user agreement when he became a consumer

6   on the free YouTube platform?  Did he sign the user agreement

7   or agreed to it electronically?

8   **ATTORNEY STREET:**  Well, as a -- as a user, yes, he

9   signed it.  But the issue in this case, Your Honor, is not

10  YouTube taking down videos posted by Mr. Kennedy, but

11  YouTube -- YouTube taking down videos of Mr. Kennedy's speech

12  posted by third parties, including Manchester Public

13  Television, including the individual whose name was redacted

14  but we included the e-mail with our filing.

15  And so what that has done is, irrespective of

16  Mr. Kennedy's post to YouTube themselves, Google's actions have

17  created this chill effect where they have said essentially to

18  third parties, including independent media, if you post videos

19  of this man, this political candidate talking about these

20  issues, your video is liable to be removed and you could be

21  punished, given a strike, for violating our policy.

22  And so that's -- and I want to pull back for a second,

23  Your Honor, to emphasize that what we're here for today is not

24  just to protect my client, Mr. Kennedy's, rights but to protect

25  the political process itself.

1    **THE COURT:**  I understand.  But you've now mentioned

2  third parties, and does Mr. Kennedy have standing to represent

3  those unknown third parties?

4    **ATTORNEY STREET:**  Yes.  In this context, Your Honor,

5  in the political process, the Supreme Court's made very clear

6  that where First Amendment rights are concerned and what the

7  plaintiff is alleging is a chilling effect on speech, a

8  plaintiff like Mr. Kennedy, who has clearly a concrete interest

9  in this relief, has standing to pursue such relief.

10    We cited those cases in our brief, and I think they're

11  especially appropriate in this context of the presidential

12  campaign.

13    **THE COURT:**  I don't know if you answered my earlier

14  question with regards to the joint action and nexus test.  I

15  indicated that there are two versions of the nexus test.  And

16  do you plan to address both or just one?

17    **ATTORNEY STREET:**  I do plan to address both,

18  Your Honor.  I just want to make sure that I have them -- I

19  have them both so I don't -- I don't discuss them in a

20  contrary -- contrary fashion.

21    So that the nexus test, the first one is the pervasive

22  entwinement between public officials and the government, which

23  I think is shown here by the evidence that's been developed in

24  the *Missouri v. Biden* case, the interaction between Google and

25  government officials in drafting the policy that it's been

1   using to remove my client's speech.

2      But the other one I think is even more appropriate, which

3   is the government encouragement that's discussed in the

4   *O'Handley* case at page 1158.  And this really gets into -- and

5   I think that second aspect of the nexus test overlaps with the

6   joint action test.  You can see that in *O'Handley*.  It

7   discusses the facts -- factors under each interchangeably.

8      And this is where, in *O'Handley*, the Ninth Circuit was

9   very, very clear, Your Honor, that a constitutional problem

10  would arise if Twitter had agreed to serve as an arm of the

11  government thereby fulfilling the state's censorship goals.

12     Now that wasn't satisfied in *O'Handley*, Your Honor,

13  because the only allegation in *O'Handley* was that a government

14  agency was flagging tweets that the government believed

15  violated a preexisting policy developed by Twitter to try to

16  protect the sanctity of its platform in the civic process.

17     Here you don't have information -- you don't have flagging

18  the one-way channel of communication that the Ninth Circuit

19  discussed in *O'Handley*.  Here you have actually evidence that

20  Google developed this policy in response to government demands

21  for it in apparent collaboration with government officials in

22  writing it -- in writing it, at least that's what the evidence

23  from the *Missouri v. Biden* case suggests.

24     And the policy itself is based entirely on what the

25  government says.  The policy says you cannot disagree with what

1     the government says about these issues.

2         And so that's why I think this case goes far beyond what

3 the Ninth Circuit was dealing with in *O'Handley* and satisfies

4 really both the nexus and the joint action test.

5         And more importantly, Your Honor, really shows that this

6 policy that Google developed, it's not its own policy.  It may

7 not have been compelled by the government to adopt it, but it's

8 a policy that looks entirely to the government to decide which

9 information to remove.  And I think under the Supreme --

10         **THE COURT:**  So you agree that they were not compelled,

11 that Google was not compelled by the government.  Do you agree

12 with that?

13         **ATTORNEY STREET:**  Well, I haven't seen evidence yet to

14 say that they were compelled.  I know that that was shown in

15 the *Missouri v. Biden* case.

16         **THE COURT:**  And again, *Missouri v. Biden* is persuasive

17 authority, not controlling, and *O'Handley* is the case that we

18 are concerned about.

19         **ATTORNEY STREET:**  That is true, Your Honor, and I will

20 note, though, that the *Missouri v. Biden* case had an

21 evidentiary record that did not exist in the *O'Handley* case or

22 any of the other what I'll call censorship cases that were

23 litigated in this court.

24         In fact, I think it's interesting that the allegations

25 that were deemed implausible in *O'Handley* and similar cases,

1    the court developed -- the parties developed actually an

2    evidentiary record in the *Missouri v. Biden* case which showed

3    exactly what the Ninth Circuit said was implausible in these

4    prior technology companies.

5        And I think that's very important because that's -- it was

6    the record in that case that convinced the judge,

7    Judge Doughty, and I think what convinced the Fifth Circuit

8    that there was coercion.

9        We may develop that here, I don't know yet, and I don't

10   want to argue coercion without having a good faith basis to do

11   that.  I think on the record we've established already, though,

12   Your Honor, we have satisfied the joint action and nexus tests.

13   We have shown that Google's policy is fairly attributable to

14   the government.  And we have shown that in the political

15   process where the Supreme Court has always said more speech is

16   better than less speech, that we have satisfied the burden.

17       And that brings me back to the first question that the

18   Court asked about what is the emergency here?  Now --

19       **THE COURT:**  No, my first question was actually -- I'm

20   going to go back to my questions because I need these answered.

21       What date in March of 2023 did Mr. Kennedy give his

22   speech?

23       **ATTORNEY STREET:**  So the date -- I should know this

24   since I was there.  If I remember correctly the date, it was

25   March 3rd of 2023.

1    **THE COURT:**  All right.  And on what date did

2  Manchester Public Television post his speech?

3    **ATTORNEY STREET:**  The same day.

4    **THE COURT:**  The same day.

5    And on what date was the video taken down?

6    **ATTORNEY STREET:**  As I recall, the same date or one

7  day later.  Not simultaneously but within a day or two.

8    **THE COURT:**  How many other videos by Mr. Kennedy have

9  been taken down by YouTube, if you know?

10    **ATTORNEY STREET:**  I know of at least half a dozen.

11    **THE COURT:**  And can you identify that half dozen?

12    **ATTORNEY STREET:**  Three of them were identified in

13  our -- in our moving papers.  There was an interview with

14  Jordan Peterson that was posted and removed.  There was -- and

15  it was reported on publicly.  There was a podcast that

16  Mr. Kennedy did with Joe Rogan that was taken down.

17    And then I have since -- which is referred to in our

18  moving papers -- and then I have since heard, received numerous

19  e-mails, communications from other people who said -- who told

20  me they have had similar content removed --

21    **THE COURT:**  Well, no.

22    (Simultaneous colloquy.)

23    **THE COURT:**  -- I want to know the actual.  So far I

24  know of two.  And one was with comedian Joe Rogan.  And the

25  date of that of which it was removed was what?

1    **ATTORNEY STREET:**  I don't have the date offhand,

2    Your Honor.  I can look for that.

3    **THE COURT:**  All right.

4    **ATTORNEY STREET:**  I believe it was in early July.

5    **THE COURT:**  And then with regards to podcast host

6    Jordan Peterson, what day was this one taken down?

7    **ATTORNEY STREET:**  Let me --

8    **THE COURT:**  What was the date of the interview and

9    what day was it taken down?  The date of the interview with

10   comedian Joe Rogan, and what date was that taken down?

11   **ATTORNEY STREET:**  That is not something I don't have

12   at the top of my head, Your Honor.  So I have to look through

13   my files to see if I have that.

14   **THE COURT:**  All right.  And then going back to my

15   earlier question, because it's in your declaration, Twitter was

16   not a party to this case, allegedly removed a video of

17   Mr. Kennedy on January 23rd, 2021.  Was this video also posted

18   to YouTube, and did YouTube remove it?

19   **ATTORNEY STREET:**  That question I don't have an answer

20   to, Your Honor, but I would be happy to look and find out.

21   **THE COURT:**  And then is the video of Mr. Kennedy at

22   the college in New Hampshire still available to view online

23   outside of YouTube?

24   **ATTORNEY STREET:**  I have not looked so I do not know

25   the answer to that.  I know it is not available through

1    Manchester Public Television.

2          **THE COURT:**  All right.  Then that brings us to the

3    topic that you want to address now, which is what grounds do

4    you allege which makes this an urgent request?  And was there

5    any correlation between this request and its urgency driven by

6    in any way the appeal taken in *Missouri v. Biden*?

7          **ATTORNEY STREET:**  Well, the urgency, Your Honor, is

8    twofold.  First off, the Ninth Circuit and Supreme Court have

9    always -- always recognized that First Amendment harms are

10   different than other harms.  And so as a general matter, they

11   have applied these doctrines flexibly, recognizing that ongoing

12   harms are actionable and that any chilling of speech is

13   irreparable and --

14         **THE COURT:**  But we waited from March to August.  So

15   I'm just trying to understand.

16         **ATTORNEY STREET:**  Sure.  Sure.  And I understand.  I'm

17   going to tell you as a practical matter what -- what the reason

18   for the delay, if there was a delay, was Mr. Kennedy believed

19   strongly that during his political campaign, the technology

20   companies would stop censoring him, recognizing the settled --

21   settled principles that more speech, not enforced silence,

22   rules in the political process.

23         Twitter and Facebook, in fact, changed the way they deal

24   with him and have stopped censoring him during his presidential

25   campaign.  Google has not, despite repeated requests.

1    We believed after -- and going back to the *Missouri v.*
2    *Biden* case, Your Honor noted that Mr. Kennedy moved to
3    intervene in that case.  That motion was denied, but he
4    subsequently filed a lawsuit against the federal officials who
5    were also named in that case.  And he filed that case in
6    Louisiana this spring.
7        And the judge, Judge Doughty in Louisiana, enforced --
8    issued an order essentially saying that the same injunction
9    that was issued in the State Attorney General case would apply
10   to protect Mr. Kennedy, given the overlapping issues.
11       So --
12           **THE COURT:**  Okay.  Well, I'm just trying to get some
13   clarity for areas that were a little foggy for me.  And I have
14   no ego invested in this so I want to make sure I get this right
15   and I'm clear.
16       The speech was early March of 2023.  Mr. Kennedy announced
17   his candidacy in April.  But the urgency, as you're describing
18   it, and the delay and his treatment by others have some nexus
19   to this case, and I'm just trying to allow you to tease that
20   out.
21       And then I may turn to Google after we get through a
22   couple of other questions that I have and give you an
23   opportunity to see if you can locate the dates I asked about
24   earlier.  But go ahead.
25           **ATTORNEY STREET:**  Sure.  Well, the truth is,

1    Your Honor, I don't know why Google removes some of my client's
2    speeches and not others.
3        **THE COURT:**  Well, I'm just looking at the timeline and
4    the urgency question.
5        **ATTORNEY STREET:**  I understand.  I understand.
6        So but that plays into my answer because it is my client
7    and his campaign have repeatedly reached out to Google to
8    prevent this from happening.
9        It doesn't -- he doesn't get censored completely, but
10   certain high-profile speeches and interviews do get censored.
11       And so we realized really in late July or early August
12   that Google was not changing its policies.  And in fact in the
13   last three days, Google has actually amended its misinformation
14   policies.  It really blended the vaccine misinformation and the
15   medical misinformation policies to prohibit all kinds of speech
16   on medical matters, including vaccines, abortion, cancer
17   screenings, and the like.
18       So it's become clear to us in the last month that Google
19   is, unlike Facebook and Twitter which have pulled back from the
20   censorship of people on their platforms, Google was actually
21   doing more censoring.  And that will likely continue during
22   Mr. Kennedy's presidential campaign.
23       And the damage that would be done to the political
24   process, if that's allowed to continue, would be irreparable.
25       **THE COURT:**  All right.  Let me ask three very precise

1    questions.  Then I'm going to turn to counsel on behalf of

2    Google to see if some of these dates and information or

3    questions I've asked can be resolved.

4        What authority does plaintiff have for the proposition

5    that defendants may not rely on local health authorities

6    informing their own medical misinformation policy?

7        Second question, and, again, going back to my earlier one:

8    Under which tests for determining a state actor does plaintiff

9    suggest is controlling and why?

10       And what irreparable harm will plaintiff suffer if the TRO

11   is not granted since we're talking about a video that was

12   uploaded prior to his announcement of his candidacy and then

13   one with a podcast host and the other with a comedian?

14       Please respond.

15       **ATTORNEY STREET:**  Well, with respect to the first

16   question, Your Honor, there is no evidence on this record that

17   Google has anybody making independent decisions about how to

18   apply its misin-- at least its medical misinformation policies.

19   The policies themselves depend entirely on government sources.

20       And so I guess in a hypothetical world, could they do

21   that?  Sure.  But in this situation, the record we have before

22   us, we have no record of independent decision-making.  Instead

23   we have a policy that was drafted in response to government

24   demands for it and collaboration with government -- government

25   sources, and a policy that looks on its face entirely to the

1  government to decide what is -- what is false, what is

2  misleading, what is damaging.  And that is exactly what I think

3  the state action doctrine was designed to prevent.

4       And I actually want to go -- I want to mention a case that

5  we cited in our reply brief, Your Honor, called *Brown v.*

6  *Hartlage* which 41 years ago dealt with a similar situation.

7  The government of Kentucky addressing alleged false

8  information -- false and misleading information by a political

9  candidate in an election.  And the Supreme Court said it's not

10 up to the government to decide what is true and what is false,

11 what is misleading in a political campaign.

12      Obviously this situation is different because there's a

13 private party involved, but you have a private party relying

14 entirely on government sources.  And so what that means is that

15 triggers constitutional scrutiny.  And that's what's

16 significant here.

17      Now to the Court's -- to the Court's other two questions.

18 I think -- again I think that in this case, at least on the

19 record we have right now, the joint action and nexus tests are

20 the most appropriate, but I would also say that we need to

21 remember that in Supreme Court's view stated in the *Brentwood*

22 case, what we're always looking for is whether seemingly

23 private action is, quote, fairly attributable to the

24 government.

25      And so regardless of whether we're using one test or

1    another applying aspects of different tests, I think that has

2    been -- that has been satisfied here.

3        And the danger to the political process, not just to my

4    client's presidential campaign, but the danger to the political

5    process of allowing Google to even selectively remove speech on

6    matters of public concern during a presidential campaign is

7    significant and would grossly affect the campaign itself.

8        **THE COURT:**  All right.  Does YouTube, as a private

9    company offering both free and paid services, have a right to

10   decide what's published or not published on their website?  Do

11   they have that right?

12       **ATTORNEY STREET:**  Well, if they were a publisher,

13   Your Honor, they would have that right, but they're not a

14   publisher.  And we went through this several pages in our -- in

15   our reply brief talking about the differences between

16   technology companies, Internet companies of today, and

17   publishers like the *New York Times* or private parties that are,

18   you know, putting in a newsletter, in the *PG&E* case, in their

19   billing statements.

20       And in fact, there's -- and the most fundamental reason

21   that Google/YouTube is not a publisher is, unlike publishers,

22   they take no responsibility for the content that's posted on

23   their platform.  And as a matter of law, they cannot be held

24   liable for that.

25       So that's an important -- that's an important distinction,

1   Your Honor, and one that distinguishes this case from the *Miami*

2   *Herald* case, *PG&E* case, and the *Hurley* cases that we discussed

3   in our brief.

4          **THE COURT:**  And, again, Mr. Kennedy did agree to

5   YouTube's terms and services when creating his account.  And

6   this issue from your perspective is going beyond his particular

7   account?

8          **ATTORNEY STREET:**  This does go beyond his particular

9   account.  And I would also say, Your Honor, that an agreement

10  cannot be used to circumvent the Constitution.

11     I think that would need to look at -- address each

12  question in the appropriate constitutional framework, and here

13  that weighs strongly in his favor.

14         **THE COURT:**  And so he agreed to the user agreement

15  which included misinformation language and other third parties

16  that they were all on notice and they could either accept or

17  decline that service.  Would that be fair?

18         **ATTORNEY STREET:**  I don't know if it's fair or not,

19  but what I know is that it can't be -- whether you agree to

20  boilerplate terms of service in a user agreement or not, I

21  don't think that even a private party can use those policies to

22  violate individuals' constitutional rights and to create a

23  chilling effect on speech in the political process.

24         **THE COURT:**  Thank you.

25     All right.  Counsel, the same questions are posed to you.

1    I will probably have a couple of additional questions with

2    regards to YouTube's user policy.  And if you can recite the

3    relevant portions.  And could YouTube be found liable by

4    private parties for not addressing information, therefore is

5    there any coercive nature that can be imposed by anyone?

6        If you know how many people died of COVID-19 by the end of

7    January 2021, and whether there's any dispute about the number

8    of citizens that were impacted by COVID-19.

9        And how does YouTube make decisions on what videos

10   violates its misinformation policies?

11       How are YouTube's misinformation policies enforced?

12       And if Mr. Kennedy plans on posting videos that violates

13   the terms and services or policies, how would that be addressed

14   in the future given the lifeline of COVID-19 as it stands now?

15       And if you need me to repeat any of the previous questions

16   posed to counsel, let me know and I'll go back and recite those

17   questions as well with regards to how many videos of

18   Mr. Kennedy were taken down and if you happen to know the

19   chronology of events.

20       **ATTORNEY BLAVIN:**  Thank you, Your Honor.

21       I'll start with Your Honor's questions relating to the

22   videos taken down and the timing with respect to them.

23       I think the record is unclear precisely when the video of

24   the Saint Amselm speech was taken down.  I don't have any

25   reason to dispute that it was within a short period of time of

1   the speech given on March 3rd, but there's nothing in the

2   record in this case at least in terms of the declarations that

3   have been submitted which identify the specific date.

4           **THE COURT:**  But it's definitely before he announced

5   his campaign?

6           **ATTORNEY BLAVIN:**  Yes, I know that's for sure.  I

7   think it was attempted to be reposted I believe on March 6th.

8   It was at that point not permitted.  So it was certainly within

9   a very close time frame of when it was posted to the site.

10          As to the Seth Rogan -- I'm sorry, the video with the

11  comedian Mr. Rogan, not Seth Rogan, not somebody else, and

12  Mr. Kennedy, I believe the record demonstrates that -- and this

13  is attached as an exhibit I believe to the A Kennedy

14  declaration, the takedown communications with Mr. Kennedy, I

15  believe it's identified as June 17th, 2023, in an e-mail from

16  YouTube to the recipients:  We've reviewed your content.  We

17  think it violates our medical misinformation policies and it's

18  been removed.

19          So I think we have a June 17th date for that.

20          With respect to the Peterson video, as Your Honor noted,

21  they don't identify the specific video at issue.  So I just

22  don't think it's clear from the record what that video was or

23  when it was removed.

24          **THE COURT:**  Thank you.

25          **ATTORNEY BLAVIN:**  Unless Your Honor has any more

1   questions about those specific issues, I'm happy to go to

2   Your Honor's questions relating to the applicable test and how

3   it applies here in the Ninth Circuit decision in *O'Handley*.

4           **THE COURT:** All right. And with regards to the

5   comedian Joe Rogan's video, you believe that that may be a

6   family member of the Kennedy family, or at least the same last

7   name, sharing the same last name as Mr. Kennedy?

8               **ATTORNEY BLAVIN:** Are you referencing, Your Honor --

9           **THE COURT:** The June 17th, 2023.

10          **ATTORNEY BLAVIN:** Oh, yes, I believe that was sent

11  to -- it's redacted, I believe the "To" line, but from my

12  understanding of the declaration it was sent to Mr. Kennedy's

13  relative.

14          **THE COURT:** Thank you.

15      And then if you'll proceed under which test for

16  determining a state actor, do you believe, is controlling and

17  why?

18              **ATTORNEY BLAVIN:** So the Ninth Circuit's decision in

19  *O'Handley*, as Your Honor correctly identified, is controlling

20  here.

21      Plaintiffs, in their motion papers, didn't identify

22  specifically which test would apply. As we indicated in our

23  opposition, we think if there's going to be any test which

24  would apply, it would be either the nexus test or the joint

25  action test.

1    Plaintiff's counsel today said that they are in fact in

2    agreement on that, that those would be the two applicable

3    tests.  And those tests are very demanding as the Ninth Circuit

4    made absolutely clear in *O'Handley*.

5    With respect to the nexus test, just to flesh it out,

6    Your Honor, the Ninth Circuit said, as Your Honor indicated,

7    there's two subparts to that test which could apply, the first

8    one being the State cannot, quote, threaten adverse action to

9    coerce a private party into performing a particular act.

10    And just to pause on that for a second, because I think

11    counsel conceded today that there's absolutely no evidence at

12    all that the federal government coerced Google in this instance

13    to either adopt a medical misinformation policy, much less to

14    apply that policy specifically to Mr. Kennedy's content.

15    In fact, there's absolutely nothing in the record

16    regarding any communications or even knowledge of the federal

17    government with respect to Mr. Kennedy's particular posts that

18    are at issue in this case or a request to take them down.

19    And that's very different from *O'Handley* where you had the

20    plaintiff's specific content, a request from the government to

21    remove that content, and the Ninth Circuit nonetheless said

22    that that did not constitute a state action under the nexus

23    test.

24    The second element of the nexus test is whether the state

25    uses positive incentives such that they, quote, overwhelm the

1   private party and essentially compel the party to act in a

2   certain way.

3          And just to pause on that, Your Honor, I don't think

4   there's anything in the record indicating any positive

5   incentives from the state to Google, much less one that would

6   essentially compel Google to act in a particular way.

7          With respect to the joint action test, the Ninth Circuit

8   said that the party -- the government, that is, has to so far

9   insinuate itself into a position of interdependence with the

10  private party that it must be recognized as a joint participant

11  in the challenged activity or significantly involve itself in

12  the private party's actions and decision-making in a complex

13  and deeply intertwined process.

14         And, again, in the Ninth Circuit decision in *O'Handley*,

15  based on the allegations of the complaint, the court found that

16  neither of those tests were satisfied.

17         And just to quickly summarize what those allegations were,

18  because I think they demonstrate, if anything, substantially

19  more government involvement than what we have in this case.

20  There Twitter allegedly established an expedited review process

21  for posts that were specifically flagged by state officials.

22  It removed 98 percent of the 300 posts that were flagged by the

23  state, including one specifically involving the plaintiff's

24  content.  And third, Twitter allegedly worked -- or the

25  government worked in partnership with social media companies to

1    develop more efficient reporting procedures for potential

2    misinformation.

3          Nonetheless the Ninth Circuit held that Twitter exercised

4    its own independent judgment in adopting its policies and

5    enforcing them, and the mere fact that you have information

6    sharing in cooperation between the government and the private

7    party does not establish state action.

8          And the Ninth Circuit specifically noted, because I know

9    plaintiffs have indicated this during today's argument,

10   plaintiff's counsel and also in their reply brief, that, well,

11   if there's a shared mission or objective between the private

12   party and the government, that could somehow satisfy the joint

13   action test.

14         Actually the Ninth Circuit specifically rejected that in

15   *O'Handley*.  The Ninth Circuit said that, quote, private and

16   state actors were generally aligned in a mission to limit the

17   spread of misleading election information...does not transform

18   private conduct into state action.

19         Moreover, Your Honor, courts in this district, both before

20   and after *O'Handley*, have rejected near identical claims.

21         And I want to direct Your Honor's attention to the *Hart v.*

22   *Facebook* decisions from Judge Breyer which plaintiff's counsel

23   did not address during today's argument or in their reply

24   brief.

25         There, similar to here, there was a motion to dismiss

1    which was granted by Judge Breyer.  Then the plaintiffs took

2    all of the discovery they could find from the *Missouri v. Biden*

3    proceeding and filed a motion for leave to amend their

4    complaint, and said, look, we have enough now based upon this

5    discovery to state a claim and to establish state action under

6    either of *O'Handley*'s test.

7         And Judge Breyer considered all of that evidence,

8    including Carol Crawford's CDC deposition testimony, which has

9    been submitted to Your Honor.  We provided the entire

10   transcript including e-mails from Mr. Flaherty of the

11   White House to Facebook and Twitter.  And if anything, and

12   Your Honor can see this in the declaration I submitted, those

13   communications were even more aggressive from the state than

14   anything that we have here.

15        And nonetheless Judge Breyer said under *O'Handley*, even

16   taking all of this evidence into account from the *Missouri v.*

17   *Biden* proceeding, that it does not satisfy the *O'Handley* test.

18   And I think that's exactly right, Your Honor, and I think that

19   analysis squarely applies here.

20        Other decisions such as the *Federal Agency of News* case we

21   cite from Judge Koh involving Facebook, she held that the mere

22   fact that there was allegedly a partnership between government

23   and law enforcement agencies and Facebook to deal with Russian

24   misinformation on the platform did not satisfy either of these

25   state actions.

1    So there's a host of authority on this which plaintiff's

2    counsel has not addressed.

3    And I'll pause there to see if Your Honor has any

4    questions on the test.  But I would like to go through the

5    specific evidence that plaintiff's counsel has put forward

6    because they make assertions regarding that evidence, but the

7    actual evidence itself does not bear out what they're saying.

8    **THE COURT:**  All right.  That would be helpful since

9    the plaintiff is indicating they will suffer irreparable harm

10   if this TRO is not granted and it will have a chilling effect

11   on speech.

12   **ATTORNEY BLAVIN:**  Yes, Your Honor.

13   So if you look at the actual documents and materials that

14   plaintiff's counsel has put forward to establish state action

15   here, they formed the three buckets:  One, 2021 meetings with

16   the Surgeon General's office.  Second, an April 22nd, 2021,

17   e-mail from Rob Flaherty of the White House to Google.  And

18   three, meetings between the CDC and major online platforms in

19   2021, at which vaccine misinformation was occasionally

20   addressed.

21   Now if you actually look at the record here, two things

22   are absolutely clear.  First, none of these communications

23   offer any evidence of coercion which I think plaintiff has

24   conceded now, nor do they establish any sort of overwhelming

25   positive incentives to establish the nexus test.

1   But, two, with respect to the joint action test, what

2   these documents show and testimony shows is that Google was

3   already and independently crafting and developing its own

4   policies at the time it was talking with the government.

5   There's no evidence at all to state that Google somehow only

6   did this as a result of its discussions with the government.

7   So, for example, if you look at the communications with

8   the office of the Surgeon General, Eric Waldo testified in his

9   deposition that the government perceived Google to have

10  independently decided to limit vaccine-related misinformation

11  without any prompting by the government.

12  He describes his meetings with Google as saying what

13  Google was already doing to address these issues, and that's at

14  pages 119 through 121 of his deposition, which is attached as

15  Street Declaration Exhibit H, and he says the same thing at

16  page 129.

17  With respect to the White House communications, the

18  communications from Rob Flaherty, this is again the April 22nd,

19  2021 e-mail, Flaherty, in that e-mail, never directs Google to

20  take any particular action with respect to a medical

21  misinformation policy, whether with a carrot or a stick.  Just

22  the opposite, Flaherty acknowledges, and this is quoting from

23  his e-mail, that, quote, removing content that is unfavorable

24  to the cause of increasing vaccine adoption is not a realistic

25  or even a good solution.

1    So basically he's saying we're not saying to do this,

2    we're not even recommending to do that, it may not be the right

3    thing.  And that's exactly what he's accusing Google of doing

4    in this case.

5    With respect to the communications as to the CDC, we

6    provided Your Honor with a complete copy of Carol Crawford's

7    deposition testimony, and again this is the testimony that

8    Judge Breyer also considered in the *Hart v. Facebook* case.

9    And in that deposition testimony, which Mr. Kennedy only

10   provides excerpts for, we provided Your Honor with the entire

11   transcript, at pages -- page 105 of the deposition to 106, she

12   states in that deposition that no one at the CDC had crafted

13   the content policy of any social media company or even gave

14   input on what such a policy should look like.

15   So I think, Your Honor, collectively when you look at all

16   of this evidence, it doesn't even establish, you know, what

17   plaintiff's counsel has stated here today that somehow Google

18   just adopted this policy in response to the communications with

19   the government.

20   If anything, it shows that Google was independently

21   exercising its own judgment that these were important policies

22   to adopt, the government shared that objective, and that's

23   exactly what the Ninth Circuit in *O'Handley* rejected as

24   sufficient to satisfy the joint action test.

25   Now, if I could respond to an additional argument which

1    plaintiff's counsel made today regarding the fact that, well,

2    the fact that Google and YouTube made reference government

3    policies, you know, with respect to vaccine -- you know,

4    information, with respect to COVID-19, et cetera, that that

5    somehow would convert Google into a state actor.

6        And of course relying on the expertise of particular

7    agencies and individuals if they're in the government or

8    outside the government would not be sufficient to satisfy

9    either of *O'Handley*'s joint -- either of *O'Handley*'s state

10   action tests.

11       And I think in *O'Handley* itself, again, you had the

12   government that was specifically flagging for Twitter a post

13   that it thought constituted election misinformation.  And

14   Twitter was relying upon that expertise in terms of looking at

15   those posts itself and making its own independent judgment.  So

16   that can't be enough.

17       But beyond that, if you actually look at Exhibit D to the

18   Street declaration, and this is I believe the vaccine

19   misinformation policy, it specifically says that Google looks

20   to WHO and -- the World Health Organization, WHO, and local

21   health agencies in terms of identifying, you know, proper

22   information related to these policies.

23       So it's not even the federal government that Google was

24   looking to, and that's a big disconnect in that argument.  It's

25   looking to other regulatory agencies.

1    And then finally, Your Honor, on this point, you know,

2    even if, you know, there was allegedly some sort of government

3    pressure, which I think plaintiff's has counsel conceded there

4    wasn't even, the fact is he doesn't identify -- the plaintiff

5    doesn't identify any particular state action as to his content.

6    And the Supreme Court in the *Blum v. Yaretsky* case made

7    clear that the government must compel, quote, the specific

8    conduct of which the plaintiff complains.

9    And both in the *Hart* decision from Judge Breyer, his first

10   decision, and in the *Federal Agency of News* case from

11   Judge Koh, they both independently dismiss the claims at issue

12   because even though there may have been generalized discussions

13   relating to Russian misinformation, or in *Hart*, again, medical

14   misinformation between the government and the private party,

15   there was nothing to show that there was a specific

16   communication or pressure relating to any particular piece of

17   content of the plaintiff.

18   And I think as Your Honor correctly identified here, all

19   that they have with respect to Mr. Kennedy's own content is an

20   e-mail that a White House official sent more than two years ago

21   to a different company, Twitter.

22   And even if there was that type of evidence here, under

23   *O'Handley* it makes clear that even if the government tells you,

24   hey, we think this information should be removed, and then the

25   company exercises its own independent judgment and decides to

1    remove that, that cannot satisfy the state action doctrine.

2        And then finally on these legal issues, Your Honor, we've

3    heard frequently today that Mr. Kennedy is a political

4    candidate during the 2024 presidential election and that that

5    somehow should change the analysis.  But it doesn't.  The fact

6    that you're running for office doesn't excuse you from

7    satisfying the demanding requirements of the state action

8    doctrine.  And there's nothing, there's no authority at all

9    that somehow a looser standard were to apply when you have a

10   political candidate at issue.

11       **THE COURT:**  And just for clarity and closure, please

12   address the plaintiff's position on standing.  And then also

13   the, just for clarity, because I know you've woven it into your

14   argument, how YouTube's misinformation policies are enforced

15   and how does YouTube make decisions on what videos violate its

16   medical misinformation policies?

17       **ATTORNEY BLAVIN:**  Yes, Your Honor.  I'm sorry.  Could

18   you repeat that first question again?  I just want to make sure

19   I have that right.

20       **THE COURT:**  The first one was standing.

21       **ATTORNEY BLAVIN:**  Yes.

22       **THE COURT:**  Address plaintiff's argument on standing.

23   And then the next is how are YouTube's misinformation policies

24   enforced and how does YouTube make decisions on what videos

25   violates its medical information policies.

1    On standing, we're looking at causation and

2  redressability.

3    **ATTORNEY BLAVIN:**  Yes.  So with respect to the

4  standing arguments, I think -- and these were, I think,

5  interjected a little bit in the reply brief.  There were

6  various cases citing with respect to, you know, you can have

7  standing if there's a general chilling effect, et cetera,

8  et cetera.

9    All of those cases, Your Honor, address the particular

10  issue of where the government is taking direct action on the

11  plaintiff.  And I think the briefs were speaking a little bit

12  past each other because Google has not made a standing argument

13  here with respect to this content.  So there's no state action

14  to begin with.  So there's nothing to analyze under the First

15  Amendment in terms of whether or not there's standing.

16    In the *Brown* case, which plaintiff's counsel referenced,

17  again that involved a state actor taking action with respect to

18  a particular political candidate's content, not a private

19  party.

20    So the mere fact that Mr. Kennedy feels that he's

21  suffering a chilling effect on future content or that other

22  third parties may feel that they don't want to upload his

23  content, none of that is relevant for purposes of First

24  Amendment standing because there's no state action to begin

25  with.  And that really ends the inquiry.  There's not a

1   question of standing.  There's just a question of state action.

2   And without a state action, there's no potential violation of

3   Mr. Kennedy's First Amendment rights.

4       With respect to the application and development of

5   YouTube's own policies and their applications to Mr. Kennedy, I

6   want to pause here because I think Your Honor raised this

7   question in the context of your discussion with plaintiff's

8   counsel on Google's own rights here.  And I think that's

9   important to emphasize.

10      Google has its own First Amendment rights in terms of

11  deciding what content is appropriate to appear on its platform

12  or not.  So plaintiff's counsel actually have it backwards.  If

13  the Court were to issue an injunction here, that wouldn't

14  preserve plaintiff's rights.  It would actually violate

15  Google's First Amendment rights.  And that's exactly what

16  Judge Breyer held in the District Court in the *O'Handley*

17  decision.

18      He made clear that:

19          An online platform, quote, has important First

20          Amendment rights that would be jeopardized by a court

21          order telling it what content moderation policies to adopt

22          and how to enforce those policies.  The Court will issue

23          no such order.

24      And Judge Breyer's decision, as he noted, was consistent

25  with Supreme Court and Ninth Circuit precedent.  The Supreme

1   Court going back to the *Miami Herald v. Tornillo* case made

2   absolutely clear.  And again this case, just to be clear, it

3   involved political candidates.  The issue was whether or not

4   the government could force a newspaper to carry the content of

5   a political candidate to respond.  And the Supreme Court said

6   no, the treatment of public issues and public officials,

7   whether fair or unfair, constitute the exercise of editorial

8   control and judgment which is protected by the First Amendment.

9       The Eleventh Circuit, in the *NetChoice* case, this was

10  versus the Attorney General of Florida, similarly held that

11  online platforms have this First Amendment right.  The Eleventh

12  Circuit specifically said, quote, when a platform selectively

13  removes what it perceives to be incendiary political rhetoric,

14  pornographic content, or public health misinformation, it

15  conveys a message and thereby engages in speech within the

16  meaning of the First Amendment.

17      And the statute there also dealt with political candidate

18  speech.  The Florida statute limited the ability of platforms

19  to remove content of political candidates.  The Eleventh

20  Circuit confirmed the District Court's decision that that would

21  violate the platform's First Amendment rights.

22      So if anything, the injunction here that's being proposed

23  would violate Google's First Amendment rights, not plaintiff's

24  First Amendment rights, which demonstrates that the irreparable

25  harm would be suffered by Google and the balance of equities

1    sharply tip in Google's favor.

2        With respect to the policies themselves and their

3    enforcement, I think the record is clear here that the policies

4    were developed independently by Google, just looking at the

5    communications with the government, and Google exercised its

6    own independent judgment of what those policies would be, as we

7    went over the evidence before.

8        And as to the application of those policies, it's not in

9    the record, Your Honor, specifically how those policies are

10   applied, but I think if you look at the communications such as

11   Exhibit D to the A. Kennedy declaration, it says, "Our team has

12   reviewed your content, and unfortunately we think it violates

13   our medical misinformation policy."

14       So there's a team at Google that uses their own

15   independent judgment in reviewing content and determining

16   whether it violates the policies and to remove that content if

17   it does.

18       And, again, that's Google's First Amendment right to do

19   that, as Judge Breyer held, as the Eleventh Circuit held, and

20   several other decisions have held as well, referenced in our

21   papers.

22       I can address Your Honor's additional questions, and I

23   apologize if I miss anything.  So please interject at any point

24   in time.

25       I think you asked with respect to the harm that COVID had

1    been causing during the pandemic, you know, how many people may

2    have died back in 2021 as a result of COVID when these policies

3    were being adopted and how many people, you know, have died at

4    this point.

5        I know at least the latter, I think it's very well

6    publicly settled though I'm not sure if it's in the docket,

7    although we did noted this in our brief.  At this point over a

8    million people have died in the United States from COVID-19

9    back in 2021.

10        I don't have the specific figures, Your Honor, and I'm

11    happy to supplement the record if that would be helpful.  But I

12    think we knew that, you know, at that point close to half a

13    million back in 2021 may have passed away from COVID.

14        And again this isn't in the record, and I'm just relying

15    upon my colleague, Ms. Yee, looking for some of this

16    information from public sources.  We're happy to supplement.

17        But I think what this will demonstrate is that this was a

18    serious public health emergency.  I think it remains a serious

19    public health issue.  There's discussion all the time of new

20    variants coming up or even happening in San Francisco right

21    now, a mini-surge of COVID.  So these are incredibly important

22    issues that remain important public health issues.

23        And if you look at, you know, the question of would an

24    injunction be in the public interest, I think the answer is

25    absolutely not.  Besides the fact that such an injunction would

1    violate Google's First Amendment rights so it would causes

2    irreparable harm to Google, and if the First Amendment

3    demonstrates what's in the public interest, an injunction would

4    do exactly the opposite.  But forcing Google to carry medical

5    vaccine misinformation on YouTube is absolutely against the

6    public interest.

7         As the Surgeon General letter that is attached to the

8    Street declaration, Exhibit K, states, "The proliferation of

9    health misinformation during the pandemic has been both

10   extensive and dangerous and poses a growing threat to the

11   nation's health."

12        The Ninth Circuit in the *Doe v. San Diego Unified School*

13   *District* case, which we cited in our papers with respect to the

14   public interest, that involved the question of an injunction to

15   enjoin the San Diego School District's vaccine mandate.  And

16   what the Ninth Circuit said is the public interest weighs

17   strongly in favor of denying the injunction.

18        And the court noted that the record indicates that

19   vaccines are safe and effective at preventing the spread of

20   COVID-19 and that a mandate is therefore likely to promote the

21   health and safety of school students and staff as well as the

22   broader community.

23        So if anything, the Surgeon General itself has recognized

24   forcing Google to carry this type of medical misinformation,

25   vaccine-related misinformation would be directly contrary to

1    the public interest in this matter.

2            **THE COURT:**  All right.  Thank you.

3        Now then, plaintiff, based on the fact that the defendants

4    indicate that they did not rely on local health authorities

5    informing their medical information policy but were guided by

6    the expertise of those in the community, regulatory agencies,

7    and local health authorities, your response?

8            **ATTORNEY STREET:**  Well, that's still -- those are

9    still government actors, Your Honor.  And I think that it's

10   what's helpful from the record, that entry record that was

11   developed in the *Missouri v. Biden* case is that the evidence of

12   communications between these technology companies like Google,

13   Facebook, and Twitter, and government authorities while writing

14   these policies shows that there is something more than --

15   there's something more than Google having, say, a team of

16   doctors who are writing a policy.

17           **THE COURT:**  Do you have information to support that

18   assertion?

19           **ATTORNEY STREET:**  I'm sorry?

20           **THE COURT:**  Do you have information to support that

21   assertion that it's beyond their independent evaluation?

22           **ATTORNEY STREET:**  Well, there's no evidence in the

23   record that there's been an independent evaluation.  And I

24   think -- and this is my point as to the evidence that was

25   developed in *Missouri v. Biden*.

1    In the previous cases that Google's counsel cited that

2  were decided in this district, those cases were dismissed

3  because the judges in those cases decided that, well, it's

4  implausible to believe that Google or Facebook or Twitter are

5  working with the government or communicating with the

6  government and writing these policies.

7    And the relevance of the record, the evidence that was

8  gathered in *Missouri v. Biden* case is that in fact that is what

9  was happening.

10    Now this case may -- you know, we're still at an early

11  stage, and so I don't think that is the only issue that matters

12  here.  In fact, I think what's far more important in this case,

13  Your Honor, is the content of the policies, the misinformation

14  policies themselves.  They prohibit speech that contradict

15  government sources.  They change -- by their terms, they change

16  not when Google changes its mind, but when the government

17  changes its mind about these subjects.

18    And I'm glad that my colleague mentioned, you know, the

19  interest in -- Google's interest in promoting public -- you

20  know, what it calls public health, which is fine.  But

21  promoting public health, that's something that the government

22  does, and that's an inherently governmental action.

23    And if you're a publisher, say, you're the *New York Times*

24  or whoever else, and you want to write articles, write

25  editorials as a publisher that also promote public health, that

43

1    say, you know, the government is right, we think this is
2    important, we think people like Kennedy are quacks and aren't
3    to be listened to, aren't to be trusted, that's fine.  But a
4    publisher takes responsibility for what it publishes.  Under
5    the law, it has an obligation to do that.

6        Google does not.  Google disclaims responsibility for
7    anything.  It is not -- it is not a publisher.  And so I think
8    as to the balance of harms, there is no harm to Google in
9    issuing this injunction.  Which I would note, Your Honor, we've
10   actually narrowed substantially to only apply to speech from my
11   client, Mr. Kennedy, on issues related to his presidential
12   campaign.

13       And that's important because what's happening here is when
14   Google takes down a speech or a video content of Mr. Kennedy
15   speaking, it's not just removing what it claims to be or what
16   the government claims to be misinformation about medical
17   information, it's also removing political speech.  That's the
18   importance of that speech in New Hampshire that was taken down
19   back in March.

20       I was at that speech.  At least half of it had nothing to
21   do with medical information whatsoever.  It was Mr. Kennedy,
22   you know, talking about his environmental record, his
23   childhood.

24       So that's -- that's the issue here.  When you're removing
25   political speech, there is a chilling effect, and that does

1  damage the political process.

2      **THE COURT:**  So that brings me to a question.  Are you

3  indicating that the only objectionable portion was any

4  reference to the vaccines, that he didn't say anything else in

5  any of these speeches that may violate other policies, just the

6  medical policy standing alone, just the medical policy?

7      **ATTORNEY STREET:**  That is the only policy that

8  YouTube -- and if you look at the exhibit to my declaration

9  that attached a news article with YouTube's explanation, that's

10  the policy that they --

11      **THE COURT:**  No.  My question to you is, is it your

12  position there's nothing else in those speeches that could be

13  found as objectionable or violating any service agreement?

14      **ATTORNEY STREET:**  Well, correct, because I don't

15  think -- I don't think the discussion of Mr. Kennedy's

16  environmental record, like say with the Hudson River CAPERs,

17  is -- I wouldn't even claim -- I don't think they would even

18  claim that that's -- that that's misinformation.

19      **THE COURT:**  Well, the March one is not as relevant as

20  the April -- anything post-April since that is kind of the

21  linchpin of where you begin in your arguments.  And so I'm just

22  trying to have some clarity about what encompasses this TRO and

23  what does not.

24      **ATTORNEY STREET:**  Well, I'd say what encompasses this

25  TRO, Your Honor, is that -- and I think we spelled this out in

1    the order -- it's just that we're asking for the Court to order

2    Google to not remove speech of Mr. Kennedy's on matters of

3    public concern during his campaign.

4        Now if he ceases to be a presidential candidate, then

5    maybe that's a different situation.  But I think that given --

6    given the importance of my client's criticism of the government

7    on certain issues, including public health policy, it's

8    impossible to carve one out.  It's impossible to say, well, you

9    know, this certain information violates our policies, we'll

10   take this down.

11       And I think that's actually why we've seen, Your Honor,

12   that Google is not removing all of the content that's posted

13   regarding Mr. Kennedy.  It just happens to be certain -- you

14   know, certain -- certain content.

15       But that doesn't -- that doesn't change the analysis

16   because it still creates the chilling effect.  And some of the

17   videos they have taken down again have been some of the most

18   widely viewed videos, including the New Hampshire speech, the

19   Rogan interview, and the Peterson interview.  Which I checked

20   my notes and I don't -- I don't have the date.  I know that it

21   was in either June or July, but I apologize, I don't have the

22   specific date.

23       **THE COURT:**  All right.  Thank you.

24       Anything further?

25       **ATTORNEY BLAVIN:**  Yeah, Your Honor.  If you wouldn't

1    mind, I'll briefly go through just a last set of points here.

2         First with respect to the issue of whether only a portion

3    of the speech was removed and other parts of the speech may not

4    have been offending Google's policies, it's not Google's

5    obligation to edit the video.  If the video violates its

6    medical misinformation policies, its vaccine-related

7    misinformation policies, it can remove that video.

8         Now if plaintiffs want to or anyone else wants to edit the

9    video to take out the part of the video that's violating its

10   policies, of course they are free to do so.

11        And, again, as Your Honor recognized, Mr. Kennedy, as he

12   acknowledges, has his videos up on Twitter, or X as it's now

13   called, has his videos up on Facebook.  There's several other

14   videos of him up on YouTube.  He just acknowledge, yeah, if the

15   videos don't violate those policies, generally they stayed up.

16   So that's just a fact that I wanted to make sure that was clear

17   in the record.

18        With respect to the reliance on government experts, I mean

19   it can't be the fact that you rely on a government agency for

20   their expertise would automatically convert you into a state

21   actor when you're exercising your own independent judgment in

22   adopting a policy and enforcing it.  And plaintiff cites no

23   authority to support that.

24        And more so, as noted before, the specific government

25   agencies that are referenced in the policies are not even the

1    federal government.  It's WHO and local health authorities.  So

2    there's a disconnect there.

3        With regards to plaintiff's counsel's argument that, well,

4    none of these other courts that have dismissed these cases,

5    again on the pleadings without any discovery whatsoever,

6    considered *Missouri v. Biden*.

7        Well, as I noted, Your Honor, that's just wrong.

8    Judge Breyer considered substantial evidence from *Missouri v.*

9    *Biden* including a significant amount of evidence that's in

10   front of your court and held that there was no state action

11   whatsoever.

12       And then briefly, Your Honor, with respect to, you know,

13   the alleged harm Mr. Kennedy would suffer from these handful of

14   videos being removed, Google also has, besides its First

15   Amendment rights, as we noted in our papers, Google has a

16   strong interest in its own content moderation policies

17   maintaining users' trusts and expectations in the platforms.

18       We've submitted to Your Honor several of those policies,

19   and they emphasized that the safety of our creators, viewers,

20   and partners is our highest priority.

21       So an injunction that would force Google to carry this

22   content would not only violate the First Amendment, but it

23   would harm its own efforts to make sure that it has a safe

24   platform in which potentially dangerous medical and vaccine

25   misinformation does not exist on it.

1    And then briefly, Your Honor, just on the issue of, you

2    know, plaintiffs have suggested that, you know, there could be

3    more out there that they just don't have.

4    Again, Your Honor, all of these cases have been dismissed

5    on the pleadings, including the *O'Handley* case which had

6    significant evidence in it, the *Hart* case, *Federal Agency of*

7    *News* case.

8    Courts do not allow discovery to determine if you have a

9    claim.  And plaintiff here has already had access to

10   substantial discovery from the *Missouri v. Biden* case,

11   including communications between government officials and

12   Google employees, deposition transcripts, government discovery

13   responses.  All that would happen with enabling any discovery

14   where there's absolutely no basis to issue a TRO would be a

15   fishing expedition from Google to see if the plaintiff has a

16   claim.

17   And Google's motion to dismiss is due on August 30th.  We

18   plan to file that motion on or before that date.  And we think

19   Your Honor should rule on that motion which we think is clear

20   based upon the record submitted here and the allegations of the

21   complaint that the complaint here is facially deficient, does

22   not come close to stating a claim.  We believe the Court should

23   dismiss that complaint on its face without permitting any

24   potential discovery from Google in the interim.

25           **THE COURT:**  Anything further?

1     **ATTORNEY STREET:**  The only thing I would add,

2     Your Honor, is that the Supreme Court and the Ninth Circuit,

3     indeed all federal courts in this country, have a very proud

4     history of protecting dissenting viewpoints, protecting

5     government dissent, especially in the political process, and

6     that's what this case comes down to.

7          Now, obviously we're dealing with it in a modern context

8     of you have huge companies that control what the Supreme Court

9     has called the, you know, modern public square, and that's a

10    new development.

11         But I would urge the Court to read the court's -- Supreme

12    Court's state action cases very, very closely.  And I'd also

13    ask the Court to think about the Ninth Circuit's reasoning in

14    the *O'Handley* case.  And in the context of the Supreme Court's

15    admonition, what we're really looking at is whether seemingly

16    private behavior is fairly attributable to the state.

17         And I think that the Ninth Circuit -- if the Ninth Circuit

18    had believed these cases never had merit, can't possibly be

19    brought, they would have said so.  It actually said to the

20    contrary, that there is a situation we can envision in which

21    private action could be deemed state action, and I think this

22    is that case.

23         And I think that the importance of protecting the

24    political process while minimizing any harm to Google who is

25    not a publisher, cannot be held liable for what my client says

1    on YouTube, weighs in favor of granting the relief.

2        **THE COURT:**  All right.  Thank you.

3        And I'm glad that you brought the Court back to *O'Handley*,

4    and I'm going to recite for the record the items that I'm going

5    to take under submission and based on what I've heard whether

6    the evidence and arguments fall short of state action.

7        And then taking a look at the guidelines in *O'Handley*,

8    whether a private entity's conduct amounts to state action,

9    namely, was the alleged constitutional violation caused by an

10   exercise of some right or privilege created by the state or by

11   a rule of conduct imposed by the state or by a person for whom

12   the state is responsible.

13       When I look at nexus test one, whether there is pervasive

14   entwinement of public institutions and public officials in the

15   private actor's composition and workings, that's the first

16   question that I would be looking at when I analyze this issue

17   in reflection based upon all of the arguments of counsel.

18       Number two seems to have been conceded with regards to the

19   nexus test, whether government officials have exercised

20   coercive power or provided such significant encouragement,

21   either overt or covert, that the choice must in law be deemed

22   to be that of the state; whether the government officials

23   threaten adverse action to coerce the private party into

24   performing a particular act or encouraged by using positive

25   incentives that overwhelm the private party and essentially

1    compel them to act.  Counsel has conceded that that does not

2    apply.

3        The joint action test, a plaintiff can show joint action

4    either by proving the existence of a conspiracy or by showing

5    that the private party was a willful participant in joint

6    action with the state or its agents.

7        Counsel is arguing that relying upon WHO and local

8    authorities and regulatory agencies and any public health

9    officials, that that somehow entwines and becomes a joint

10   action.

11       With regards to the remaining issues, the Court finds that

12   there's nothing to show that there's any coercion or

13   retaliation, and the evidence falls short of dates and nexus to

14   the actions that were taken by Google.

15       So I'm going to be focused on two questions in reflection.

16   It does not appear that, based upon what I've heard thus far,

17   would warrant discovery at this stage.

18       We do have a further case management conference scheduled

19   for September 12th, 2024.  And I can give you anticipated dates

20   that you may be assigned based on my calendar so that you can

21   begin your planning.  And when you have your joint conference

22   with regards to your case management conference, you can at

23   least determine whether these dates are suitable to your

24   calendar.

25       The first available trial date is March 17th, 2025.  So I

1    want you to know that.  Final pretrial conference would thereby

2    take place on February 13th, 2025.  And joint pretrial

3    statements would be due January 30th, 2025.

4         Now then we are going to reserve the date of November 7,

5    2023, at 2:00 p.m., that's an in-person hearing for motion for

6    preliminary injunction and motion to dismiss.

7         I believe the briefing schedule has already been uploaded

8    for you.  We will provide you with additional dates such as

9    close of discovery.  Fact discovery would be August 30th, 2024.

10   Expert disclosure September 30th, 2024.  Rebuttal expert

11   disclosure October 21st, 2024.  And close of expert discovery

12   November 11th, '24.  Last day to file dispositive motions would

13   be December 10th, '24.

14        This is a tentative schedule.  And the Court will place

15   the tentative schedule on ECF so that you can review it.  It

16   will be a standalone document that will indicate tentative

17   trial schedule.

18        Of course, these dates will fall off if the Court denies

19   the motion for preliminary injunction and/or the TRO.  And also

20   if the Court grants the motion to dismiss, any later dates that

21   come after November 7th would fall off the Court's calendar.

22        All right.  So we will post the tentative schedule so that

23   when you meet and confer, you will have the dates that are

24   convenient to the Court's calendar.

25        Thank you both for being so amazingly prepared and making

1    it through some inclement weather.  And it was a pleasure

2    meeting each of you.  Thank you.

3              **ATTORNEY STREET:**  Thank you, Your Honor.

4              **ATTORNEY BLAVIN:**  Thank you, Your Honor.

5              **THE COURT:**  This matter is concluded.

6                   (Proceedings adjourned at 11:13 a.m.)

7                          ---oOo---

1

2

3              **CERTIFICATE OF REPORTER**

4        I certify that the foregoing is a correct transcript

5 from the record of proceedings in the above-entitled matter.

6

7 DATE:   Thursday, August 24, 2023

8

9

10

11          *Kelly Shainline*

12        Kelly Shainline, CSR No. 13476, RPR, CRR
              U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT I

| | |
|---|---|
| **From:** | Scott James Street |
| **To:** | Blavin, Jonathan; John Howard |
| **Cc:** | Yee, Juliana; White, Helen; Scott, Carson J. |
| **Subject:** | RE: Kennedy, Jr. v. Google |
| **Date:** | Friday, September 8, 2023 2:22:07 PM |

Jonathan,

For some reason this message did not get to my main inbox. Combine that with my travel over the past 10 days and I missed it until now.

In any event, yes, we would agree to stipulate that the judge's denial of the TRO was tantamount to the denial of a preliminary injunction. Please send me the stipulation you propose. That would allow us to move forward on those issues in just one court.

Also, since the pace of the campaign continues to pick up, we plan to file an emergency motion for an injunction pending appeal in the Ninth Circuit under Circuit Rule 27-1. Please let me know if your clients will oppose that, as I assume they will. We intend to file that motion by Monday, if not sooner. That motion will ask the Ninth Circuit to set an expedited briefing schedule and hold oral argument on October 4 in Pasadena, when it will hear argument in a case that raises similar issues (and in which we are also co-counsel).

We can also discuss scheduling issues after we get the stipulation filed.

Best,

Scott

---

**From:** Blavin, Jonathan <Jonathan.Blavin@mto.com>
**Sent:** Thursday, August 31, 2023 2:18 PM
**To:** Scott James Street <sstreet@jwhowardattorneys.com>; John Howard <johnh@jwhowardattorneys.com>
**Cc:** Yee, Juliana <Juliana.Yee@mto.com>; White, Helen <Helen.White@mto.com>; Scott, Carson J. <Carson.Scott@mto.com>
**Subject:** Kennedy, Jr. v. Google

(Sending again with fixed email addresses)

Counsel,

We have received the notice of your appeal of the TRO denial to the Ninth Circuit. As you may be aware, such orders are ordinarily not appealable unless they are "tantamount to the denial of a preliminary injunction." *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020). On the current record, the Ninth Circuit would lack jurisdiction given that there are already-scheduled PI proceedings in the district court. *See Givens v. Newsom*, 830 F. App'x 560, 561 (9th Cir.

2020).

We would be open to stipulating/jointly requesting that the district court convert the denial of the TRO into a denial of a preliminary injunction to enable your client to pursue the current appeal. If you would like to file such a joint request, please let us know and we would be happy to prepare a draft for your review. Otherwise, we would request that you voluntarily dismiss the appeal (and if not, we intend to proceed to move to dismiss the appeal).

Happy of course to discuss as well if that would be helpful. Best, Jonathan

**Jonathan H. Blavin** (he/him/his) | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel: 415.512.4011 | jonathan.blavin@mto.com | bio

*** *NOTICE* ***
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

# EXHIBIT J

JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
JULIANA M. YEE (State Bar No. 304564)
Juliana.Yee@mto.com
CARSON SCOTT (State Bar No. 339868)
Carson.Scott@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:      (415) 512-4077

HELEN E. WHITE (*pro hac vice*)
Helen.White@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:     (202) 220-1100
Facsimile:      (202) 220-2300

Attorneys for Defendants
Google LLC and YouTube, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT F. KENNEDY, JR.,<br><br>  Plaintiff,<br><br>  vs.<br><br>GOOGLE LLC AND YOUTUBE, LLC,<br><br>  Defendant. | Case No. 3:23-cv-03880<br><br>**JOINT STIPULATED REQUEST AND [PROPOSED] ORDER TO CONVERT ORDER DENYING TEMPORARY RESTRAINING ORDER TO DENIAL OF PRELIMINARY INJUNCTION** |

JOINT STIPULATED REQUEST AND [PROPOSED] ORDER TO CONVERT ORDER DENYING TEMPORARY
RESTRAINING ORDER TO DENIAL OF PRELIMINARY INJUNCTION

1         <u>**JOINT STIPULATION TO CONVERT ORDER DENYING TEMPORARY**</u>

2       <u>**RESTRAINING ORDER TO A DENIAL OF A PRELIMINARY INJUNCTION**</u>

3         Plaintiff Robert F. Kennedy, Jr. ("Plaintiff") and Defendants Google LLC and YouTube,

4  LLC ("Defendants") (collectively, the "Parties"), by and through their respective counsel, hereby

5  stipulate as follows:

6         WHEREAS, Plaintiff applied for a temporary restraining order on August 9, 2023 (Dkt.

7  No. 7);

8         WHEREAS, Defendants opposed that application for a temporary restraining order (Dkt.

9  No. 26);

10         WHEREAS, after this Court held a hearing at which both sides were heard, considered the

11  filings and record, including Plaintiff's application and materials filed in support of that

12  application, and Defendants' opposition and supporting materials, this Court issued an order

13  denying Plaintiff's application for a temporary restraining order on August 23, 2023 (Dkt. No. 32);

14         WHEREAS, this Court's order denying the application for temporary restraining order also

15  denied Plaintiff's request for expedited discovery in support of a future motion for a preliminary

16  injunction (Dkt. No. 32);

17         WHEREAS, on August 21, 2023 this Court issued a Tentative Case Management and

18  Scheduling Order setting a briefing schedule on Google's motion to dismiss filed on August 30,

19  2023 and Plaintiff's anticipated preliminary injunction motion on September 25, 2023 (Dkt. No.

20  30);

21         WHEREAS, on August 29, 2023, Plaintiff filed a notice of appeal of the August 23, 2023

22  order denying the application for a temporary restraining order (Dkt. No. 33);

23         WHEREAS, on September 1, 2023, the Court of Appeal for the Ninth Circuit issued an

24  order stating that "[o]rdinarily, an appeal does not lie from the denial of an application for a

25  temporary restraining order" because "such appeals are considered premature and are disallowed

26  in the interests of avoiding uneconomical piecemeal appellate review." Order, *Kennedy v. Google*,

27  No. 23-16141 (9th Cir. Sept. 1, 2023). The Court then ordered Plaintiff to file "[w]ithin 21 days"

28  "a statement explaining why the appeal should not be dismissed for lack of jurisdiction or move

for voluntary dismissal of the appeal." *Id.*;

WHEREAS, given that this Court addressed the merits in considering Plaintiff's temporary restraining order ("TRO") application, and concluded that Plaintiff is not likely to prevail on the merits or suffer irreparable harm, Plaintiff contends that the denial of its application for a TRO is tantamount to a denial of a motion for a preliminary injunction and Defendants do not oppose;

WHEREAS, the denial of a motion for a preliminary injunction is appealable under 28 U.S.C. § 1292(a)(1);

WHEREAS, judicial economy favors converting the denial of a temporary restraining order into a denial of a preliminary injunction in order to avoid needlessly duplicative briefing in this Court and to facilitate appellate review;

IT IS THEREFORE STIPULATED that, subject to the Court's approval:

1.     This Court's August 23, 2023 order denying the temporary restraining order (Dkt. No. 32) is hereby converted into an order denying a preliminary injunction, without any effect to the remainder of the order;

2.     All deadlines related to the motion for a preliminary injunction are hereby vacated; and

3.     None of the aforementioned orders shall impact the briefing schedule on Google's motion to dismiss (Dkt. No. 30).

DATED: September 11, 2023

**JW HOWARD/ATTORNEYS, LTD.**          **MUNGER, TOLLES & OLSON LLP**

*/s/ Scott J. Street*                              */s/ Jonathan H. Blavin*
Scott J. Street, CSB #258962                Jonathan H. Blavin, CSB #230269
201 South Lake Avenue, Suite 303      560 Mission Street, 27th Floor
Pasadena, CA 91101                             San Francisco, CA 94105
T: 213-205-2800                                   T: 213-683-9100

*Attorneys for Plaintiff*                       *Attorneys for Defendants*

JOINT STIPULATED REQUEST AND [PROPOSED] ORDER TO CONVERT ORDER DENYING TEMPORARY
RESTRAINING ORDER TO DENIAL OF PRELIMINARY INJUNCTION

**[PROPOSED] ORDER**

Pursuant to the Parties' Stipulation, and for good cause shown, this Court orders as follows:

1. This Court's August 23, 2023 order denying the temporary restraining order (Dkt. No. 32) is hereby converted into an order denying a preliminary injunction;

2. All deadlines related to the motion for a preliminary injunction are hereby vacated; and

3. None of the aforementioned orders shall impact the briefing schedule on Google's motion to dismiss (Dkt. No. 30).

DATED:  September 12 th, 2023



DENIED

Judge Trina L. Thompson

JOINT STIPULATED REQUEST AND [PROPOSED] ORDER TO CONVERT ORDER DENYING TEMPORARY RESTRAINING ORDER TO DENIAL OF PRELIMINARY INJUNCTION

**ATTESTATION**

I, Jonathan H. Blavin, am the ECF user whose ID and password are being used to file this document. In compliance with Local Rule 5-1(i)(3), I hereby attest that all other signatories listed have concurred in this filing.

*/s/ Jonathan H. Blavin*
Jonathan H. Blavin

JOINT STIPULATED REQUEST AND [PROPOSED] ORDER TO CONVERT ORDER DENYING TEMPORARY
RESTRAINING ORDER TO DENIAL OF PRELIMINARY INJUNCTION