**No. 23-16141**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Robert F. Kennedy, Jr.,

*Plaintiff-Appellant*,

vs.

Google LLC, and YouTube, LLC,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-03880
Hon. Trina Thompson

**REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION FOR
INJUNCTION PENDING APPEAL; SUPPL. DECL. OF SCOTT J. STREET**

Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

*Attorneys for Robert F. Kennedy, Jr.*

**INTRODUCTION**

Robert F. Kennedy, Jr., is running for president of the United States. He is a serious candidate, earning the support of nearly twenty percent of Democrats in recent national polls. He could garner even more support by running as a third-party candidate in the general election, as some have suggested.

The primaries will start in just a few months. The campaign is heating up. But Google, which owns the two biggest search engines in the world—one of which is the streaming video site YouTube—has doubled down on its censorship of Kennedy's political speech.[1] In fact, Google recently adopted a new "medical misinformation" policy that prohibits people from disagreeing with public health officials' positions on a host of topics, including COVID-19, vaccines, and abortion.

This censorship campaign is unprecedented. And, as the Fifth Circuit Court of Appeals concluded in a similar case, *State of Missouri et al. v. Biden et al.*, -- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) (per curiam), it arose in response to demands from executive branch officials—especially the White House and Surgeon General's office—that technology companies censor their critics, including Kennedy, who President Biden accused of "killing people" by criticizing

---

[1] Unless noted otherwise, defined terms have the meaning given to them in the Motion.

2

public health orthodoxy. That alone is sufficient to trigger the state action doctrine and subject Google's misinformation policy to constitutional scrutiny. Google's policy also looks entirely to government officials to determine what information gets removed from YouTube. If public health officials say something is false, misleading, or dangerous (whatever that means), it gets removed. If they change their mind, then the speech can resume on YouTube. Thus, on its face, Google's medical misinformation policy is fairly attributable to the government.

Nothing in Google's opposition shows otherwise. For example, Google contends that *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), precludes relief here. In fact, this is precisely the case the Court warned about in *O'Handley* when it said "[a] constitutional problem would arise if" a technology company "had agreed to serve as an arm of the government, thereby fulfilling the State's censorship goals." *Id.* at 1159. The record developed in *Biden*—some of which Kennedy has included here and which included evidence of public/private censorship on YouTube—shows just that.

This is an emergency matter. In politics, every day of campaigning matters. That is why the Court has found the balance of equities and the public interest to warrant injunctive relief when it results in the protection of political speech. Given that Google cannot be held liable for speech posted on YouTube, no countervailing interests outweigh them. Therefore, the Court should grant the motion.

3

**ARGUMENT**

**A.    The Motion Raises Serious Questions About the Constitutionality of Google's Medical Misinformation Policy.**

The focus of this motion—and the case in general—is Mr. Kennedy's allegation that Google worked with executive branch officials to censor the government's critics through a medical misinformation policy that looks entirely to the government to decide what speech gets censored on YouTube.

Google does not deny using its medical misinformation policy to censor Kennedy's speech. Nor could it: Google proudly removed Kennedy's first political speech in New Hampshire, as well as high-profile interviews he did with Joe Rogan and Jordan Peterson, from YouTube. Street Decl., Exhs. A-B, RFK Decl., ¶ 4; A. Kennedy Decl., ¶¶ 4-5, Exh. A. Its counsel said during the oral argument below that Google will continue doing that, even if it results in the censorship of Kennedy's political speech—including speech that has nothing to do with public health—and that "if plaintiffs want to or anyone else wants to edit the video to take out the part of the video that's violating its policies, of course they are free to do so." Supplemental Declaration of Scott J. Street, dated Sept. 18, 2023 ("Suppl. Street Decl."), Exh. B at 46:8-10.)

Of course, that is precisely the type of self-censorship that the First Amendment prohibits. *See, e.g., Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020) (concluding that plaintiff "and her colleagues are

4

likely to succeed in showing that defendant's actions have violated and continue to violate their First Amendment rights because, among other unconstitutional effects, they result in self-censorship and the chilling of First Amendment expression"). That is why Google falls back on the conventional wisdom that the First Amendment does not apply to private parties. Courts have long rejected that conventional wisdom, instead taking a flexible approach to determine whether private action was attributable to the State. Motion, at 31-34.

The Court seemed to pull back from that approach in its social media cases. Motion, at 38-39. That is why *O'Handley* was so important. Contrary to Google's argument, it does not preclude relief here. *O'Handley* focused on the one-way sharing of information: in that case, a government agency notified Twitter of tweets that it believed violated a pre-existing Twitter policy. 62 F.4th at 1158. The Court emphasized that the government "did nothing more than make a request with no strings attached. Twitter complied with the request under the terms of its own content moderation policy and using its own independent judgment." *Id.*

The Fifth Circuit distinguished *O'Handley* in *Biden*, saying: "To the Ninth Circuit, there was no indication—whether via tone, content, or otherwise—that the state would retaliate against inaction given the insubstantial relationship." 2023 WL 5821788, at *22. And, critically, it noted that, "unlike *O'Handley*, the officials" involved in the interactions between the government and tech companies

5

in that case, "were not simply flagging posts with 'no strings attached,' … they did much, much more." *Id.* at *23 (citation omitted).

So here. This case involves the same actions as *Biden*. It focuses on the same policies, notably the medical misinformation policies that America's biggest technology companies developed during the COVID-19 pandemic. *See id.* at *2-5 (focusing on interactions between White House/Surgeon General officials, which started "in early 2021" and "continue[ ] to this day"). The only difference between this case and *Biden* is that this case named a technology company as a defendant while the plaintiffs only sued government officials in *Biden*.

That makes this case more (not less) important and more (not less) urgent. In fact, with Justice Alito having stayed the *Biden* decision while the Administration seeks emergency relief in the Supreme Court, *see Murthy v. Missouri*, No. 23A243 (Sept. 14, 2023), the Court should act on this case now.

Google should have recognized that. In fact, its counsel also believed the Court should hear this matter now. Dist. Ct. ECF 40. Instead, it tried to minimize *Biden* by calling that a "coercion" case and by arguing that Kennedy "concede[d] that there was no evidence of coercion here …." Opposition at 15. That distorts *Biden* and the record below. *Biden* applied both the "coercion" and the "encouragement" tests. 2023 WL 5821788, at *19-24. As to the latter, the Fifth Circuit concluded that "[b]y pushing changes to the platforms' policies through

6

their expansive relationship with and informal oversight over the platforms, the [executive branch] officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards. Instead, they were encouraged by the officials' imposed standards." *Id.* at *24.[2]

That is what Mr. Kennedy has alleged and produced evidence of. Street Decl., Exhs. F-O. That is also why the terms of Google's medical misinformation policy matter so much. The policy does not reflect Google's independent standards. It reflects the government's standards. It resulted from the government's demand for it. That is what triggers constitutional scrutiny. And the fact that a Google employee may make an independent decision about what speech to remove from YouTube for violating the misinformation policy—although there is no evidence of that in the record yet—does not change the analysis, as "a single act of independent judgment does not fully insulate a private party from constitutional liability when the party is otherwise deeply intertwined with the government …." *O'Handley*, 62 F.4th at 1158 n.2

Furthermore, Kennedy did not concede that this case cannot meet the coercion test: his counsel merely stated that, in *Biden*, most of the evidence of

---

[2] The "platforms" discussed in *Biden* included Google/YouTube.

coercion stemmed from interactions between executive branch officials and Facebook, whereas the evidence at this stage suggested that Google executives embraced their role in the executive branch's censorship project. Suppl. Street Decl., Exh. B at 12:5-11. That helps Kennedy's case. Coercion is difficult to show in a state action case because courts do not want to chill government officials' ability to advocate and persuade. *See O'Handley*, 62 F.4th at 1158 (distinguishing "between attempts to convince and attempts to coerce"). By contrast, as *O'Handley* recognized, state action is easier to prove when the private party embraced its role and agreed with the government's unconstitutional motives.

## B.    The Equities Support Relief.

Google's argument regarding the equities also lacks merit. It chides Mr. Kennedy for waiting until August to seek injunctive relief. But "[t]his rationale of denial due to delay is not applicable in the context of an alleged First Amendment violation where each passing day may constitute a separate and cognizable infringement on the First Amendment." *Dow Jones & Co. v. Kaye*, 90 F. Supp. 2d 1347, 1362 (S.D. Fla. 2000) (cleaned up). And, as noted before, Mr. Kennedy provided a compelling reason for his decision to seek injunctive relief in August because, unlike Facebook and Twitter, Google continued to censor his speech on matters of public concern during his political campaign and despite his repeated requests that they stop. RFK Decl., ¶¶ 7-10; A. Kennedy Decl., ¶¶ 8-10.

Furthermore, Google will not suffer any harm if the Court orders it not to remove videos of Kennedy's speech from YouTube during his presidential campaign. As explained in the Motion, Google's reliance on *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241 (1974), and its progeny is misplaced because, unlike the speakers in those cases, Google is not a publisher. It does not take any responsibility for the speech that appears on YouTube and, as a matter of law, cannot be held liable for that content. Motion, at 49-51 (discussing these cases). It would be illogical to conclude, on the one hand, that Google has no responsibility for the content posted on YouTube because it is not a publisher while, on the other hand, denying a prominent political candidate an injunction against censorship on YouTube because Google says it does not want to be affiliated with his message.

The fact that Mr. Kennedy can use other platforms to get his message out does not change this analysis. This Court "has repeatedly found irreparable harm to plaintiffs even where a speech restriction left them free to speak in other ways." *Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1128 (E.D. Cal. 2016) (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009), and *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827-28 (9th Cir.2013)). That makes sense, as "timing is of the essence in politics and a delay of even a day or two may be intolerable." *Klein*, 584 F.3d at 1208 (cleaned up).

YouTube is not a bit player in American politics. It is a primary source for political content. Street Decl., Exhs. E-1, E-2. Allowing Google to censor a major presidential candidate on YouTube because the incumbent government disagrees with his views would set a dangerous precedent and undermine the principle of open debate upon which American democracy depends.

### C. The Court Has Discretion to Grant Relief Now.

A district court's denial of a motion for a temporary restraining order is ordinarily not appealable. But such an order is appealable when "denial of all relief was implied in the trial judge's denial of a temporary restraining order." *Miller v. Lehman*, 736 F.2d 1268, 1269 (9th Cir. 1984) (per curiam). That is the case here as the district court explicitly considered the merits and concluded that, under *O'Handley*, Mr. Kennedy was unlikely to prevail in showing that Google's medical misinformation policy resulted from state action. Dist. Ct. ECF 32 at 5-8.

True, the district court denied the parties' request to certify the TRO decision as being tantamount to the denial of a preliminary injunction. Dist. Ct. ECF 41. It may have done that so it can consider the Fifth Circuit's new *Biden* decision. Regardless, whoever loses the preliminary injunction hearing on November 7 will appeal. Thus, this Court will have to consider these issues soon.

10

Given the speed with which *Biden* is moving through the Supreme Court, the Court should exercise its discretion to decide the matter now.[3]

Indeed, the government's application for an emergency stay in the Supreme Court—which Justice Alito granted—shows exactly why the Court should consider this matter now. The government argued that *Biden*, while not enjoining the technology companies, "has grave implications for the platforms themselves, which on the Fifth Circuit's logic are state actors subject to suits for violating the First Amendment." Suppl. Street Decl., Exh. A, at 14.

## CONCLUSION

The court will have to consider these issues soon. There is little reason to rest on the formality of the distinction between a TRO and a preliminary injunction when time truly is of the essence. Therefore, the motion should be granted.

Respectfully submitted,

Date: September 18, 2023

JW HOWARD/ATTORNEYS, LTD.

_____*/s/ Scott J Street*_____
Scott J. Street

*Attorneys for Robert F. Kennedy, Jr.*

---

[3] The amended complaint combined the first and second counts from the original complaint into one count. Dist. Ct. ECF 42. The relief sought did not change.

## SUPPLEMENTAL DECLARATION OF SCOTT J. STREET

I, Scott J. Street, declare as follows:

1.      I am an attorney duly licensed to practice law before all courts in the state of California and before this Court. I am a partner with the law firm JW Howard/Attorneys, Ltd., counsel of record to Appellant Robert F. Kennedy, Jr., in this action. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so.

2.      I am submitting this declaration in support of Mr. Kennedy's emergency motion for an injunction pending appeal that would temporarily prohibit Defendants Google LLC and YouTube, LLC, from enforcing their "medical misinformation" policies to remove videos of Mr. Kennedy's speech on matters of public concern from YouTube during the 2024 presidential campaign. This supplemental declaration addresses issues that have occurred since we filed the motion last week.

3.      Most notably, late last week, the Solicitor General filed an emergency application to stay the Fifth Circuit's decision in a similar censorship case, which is now docketed in the United States Supreme Court as *Murthy v. Missouri*, No. 23A243 (filed Sept. 14, 2023). A true and correct copy of the Solicitor General's application is attached as Exhibit "A."

12

4.     Justice Alito granted the government's request for an immediate stay of the Fifth Circuit's decision. That strongly suggests that the Supreme Court will grant *certiorari* in the case.

5.     Since filing the motion, I have also obtained a copy of the transcript from the oral argument on Mr. Kennedy's application for a temporary restraining order in the district court. A true and correct copy of it is attached as Exhibit "B."

6.     Last week, we also filed a First Amended Complaint for Mr. Kennedy, which mooted Google's original motion to dismiss. Contrary to what Google argued in its opposition to the instant motion, the complaint did not drop any claims. It combined the first two counts from the original complaint into a single count that seeks declaratory and injunctive relief prohibiting the enforcement of Google's recently amended medical misinformation policy. It also added a claim under the California Constitution, which provides broader relief than the First Amendment.

Under penalty of perjury, under the laws of the United States of America, I declare that the foregoing is true and correct. Executed this 18th day of September 2023 at Pasadena, California.

Scott J. Street

# EXHIBIT A

No. 23A-_____
_____
_____


IN THE SUPREME COURT OF THE UNITED STATES

_____


VIVEK H. MURTHY, U.S. SURGEON GENERAL, ET AL.,
APPLICANTS

v.

MISSOURI, ET AL.

_____


APPLICATION FOR A STAY OF THE INJUNCTION ISSUED BY
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

_____


ELIZABETH B. PRELOGAR
  Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217


_____
_____

**PARTIES TO THE PROCEEDING**

Applicants (defendants-appellants below) are Surgeon General Vivek H. Murthy and Chief Engagement Officer for the Surgeon General, Katharine Dealy, along with their directors, administrators and employees; White House Press Secretary, Karine Jean-Pierre; Counsel to the President, Edward N. Siskel; White House Partnerships Manager, Aisha Shah; Special Assistant to the President, Sarah Beran; Administrator of the United States Digital Service within the Office of Management and Budget, Mina Hsiang; White House National Climate Advisor, Ali Zaidi; White House Senior COVID-19 Advisor, formerly Andrew Slavitt; Deputy Assistant to the President and Director of Digital Strategy, formerly Rob Flaherty; White House COVID-19 Director of Strategic Communications and Engagement, Dori Salcido; White House Digital Director for the COVID-19 Response Team, formerly Clarke Humphrey; Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team, formerly Benjamin Wakana; Deputy Director for Strategic Communications and External Engagement for the White House COVID-19 Response Team, formerly Subhan Cheema; White House COVID-19 Supply Coordinator, formerly Timothy W. Manning; and the Chief Medical Advisor to the President, formerly Dr. Anthony S. Fauci, along with their directors, administrators and employees; the Centers for Disease Control and Prevention (CDC), and specifically the following employees: Carol Y. Crawford, Chief of the

ii

Digital Media Branch of the CDC Division of Public Affairs; Jay
Dempsey, Social-Media Team Leader, Digital Media Branch, CDC Di-
vision of Public Affairs; and Kate Galatas, CDC Deputy Communica-
tions Director; and the Federal Bureau of Investigation (FBI), and
specifically the following employees:  Section Chief, FBI Foreign
Influence Task Force, formerly Laura Dehmlow; and Elvis M. Chan,
Supervisory Special Agent of Squad CY-1 in the FBI San Francisco
Division.*

----

    *    All individual defendants were sued in their official
capacities and their successors, if any, have automatically been
substituted in their respective places.  See Sup. Ct. R. 35.3;
Fed. R. App. P. 43(c)(2); Fed. R. Civ. P. 25(d).
    The following defendants are not applicants here because the
court of appeals reversed the entry of injunctive relief against
them:  the Department of Health and Human Services (HHS); the
National Institute of Allergy and Infectious Diseases (NIAID);
Xavier Becerra, Secretary of HHS; Dr. Hugh Auchincloss, Director
of NIAID; Yolanda Byrd, HHS Digital Engagement Team; Christy Choi,
HHS Office of Communications; Ashley Morse, HHS Director of Digital
Engagement; Joshua Peck, HHS Deputy Assistant Secretary, Deputy
Digital Director of HHS (formerly Janell Muhammed); along with
their secretaries, directors, administrators, and employees;
United States Census Bureau, Jennifer Shopkorn, Census Bureau Sen-
ior Advisor for Communications, Division Chief for the Communica-
tions Directorate, and Deputy Director of the Census Bureau Office
of Faith Based and Neighborhood Partnerships, along with their
secretaries, directors, administrators and employees; the United
States Department of Justice, along with its secretary, director,
administrators, and employees; the Cybersecurity and Infrastruc-
ture Security Agency (CISA); Jen Easterly, Director of CISA; Kim
Wyman, Senior Cybersecurity Advisor and Senior Election Security
Leader; Lauren Protentis; Geoffrey Hale; Allison Snell; Brian
Scully, officials of CISA; the United States Department of Homeland
Security (DHS); Alejandro Mayorkas, Secretary of Homeland Secu-
rity; Robert Silvers, Under-Secretary of the Office of Strategy,
Policy and Plans; Samantha Vinograd, Senior Counselor for National
Security in the Office of the Secretary for DHS, along with their
secretary, directors, administrators, and employees; the United
States Department of State (State Department); Leah Bray, Acting

iii

Respondents (plaintiffs-appellees below) are the State of Missouri; the State of Louisiana; Dr. Aaron Kheriaty; Dr. Martin Kulldorff; Jim Hoft; Dr. Jayanta Bhattacharya; and Jill Hines.

## RELATED PROCEEDINGS

United States District Court (W.D. La.):

Missouri v. Biden, No. 22-cv-1213 (July 4, 2023)

United States Court of Appeals (5th Cir.):

Missouri v. Biden, No. 22-30531 (Nov. 15, 2022)

In re Vivek H. Murthy, No. 22-30697 (Feb. 24, 2023)

Missouri v. Biden, No. 23-30445 (Sept. 8, 2023)

---

Coordinator of the State Department's Global Engagement Center (GEC); Alexis Frisbie, State Department Senior Technical Advisor and Member of the Technology Engagement Team at the GEC; Daniel Kimmage, Acting Coordinator of the GEC, along with their secretary, directors, administrators, and employees.

The following defendants are not applicants here because the district court did not enter injunctive relief against them: Joseph R. Biden, Jr., President of the United States; the Food and Drug Administration; the Department of the Treasury; the Department of Commerce; Erica Jefferson; Michael Murray; Wally Adeyamo; Steven Frid; Brad Kimberly; Kristen Muthig; the Disinformation Governance Board; and Nina Jankowicz.

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 23A-_____

VIVEK H. MURTHY, U.S. SURGEON GENERAL, ET AL.,
APPLICANTS

v.

MISSOURI, ET AL.

_____

APPLICATION FOR A STAY OF THE INJUNCTION ISSUED BY
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

_____

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants Vivek H. Murthy, U.S. Surgeon General, et al., respectfully applies for a stay of a preliminary injunction issued on July 4, 2023, by the United States District Court for the Western District of Louisiana (App., infra, 1a-162a, 176a), as modified by the Fifth Circuit (id. at 178a-252a), pending the filing and disposition of the government's forthcoming petition for a writ of certiorari and any further proceedings in this Court. The government also respectfully requests an administrative stay while the Court considers this application.

This application concerns an unprecedented injunction installing the United States District Court for the Western District of Louisiana as the superintendent of the Executive Branch's communications with and about social-media platforms -- including

senior White House officials' speech addressing some of the most salient public issues of the day. The lower courts held that federal officials had transformed the private platforms' content-moderation decisions into state action and violated the First Amendment by urging platforms to remove COVID-19 misinformation, highlighting the risk of disinformation from foreign actors, and responding to the platforms' inquiries about matters of public health. The courts then entered a sweeping preliminary injunction governing thousands of federal officials' and employees' speech concerning any content posted on any social-media platform by anyone. That injunction flouts bedrock principles of Article III, the First Amendment, and equity.

First, respondents lack Article III standing. Respondents are five individual social-media users and two States. The Fifth Circuit held that they have standing because their posts have been moderated by social-media platforms. But respondents failed to show that those actions were fairly traceable to the government or redressable by injunctive relief. To the contrary, respondents' asserted instances of moderation largely occurred before the allegedly unlawful government actions. The Fifth Circuit also held that the state respondents have standing because they have a "right to listen" to their citizens on social media. App., infra, 204a. But the court cited no precedent for that boundless theory, which would allow any state or local government to challenge any alleged violation of any constituent's right to speak.

Second, the Fifth Circuit's decision contradicts fundamental First Amendment principles.  It is axiomatic that the government is entitled to provide the public with information and to "advocate and defend its own policies."  Board of Regents v. Southworth, 529 U.S. 217, 229 (2000).  A central dimension of presidential power is the use of the Office's bully pulpit to seek to persuade Americans -- and American companies -- to act in ways that the President believes would advance the public interest.  President Kennedy famously persuaded steel companies to rescind a price increase by accusing them of "ruthless[ly] disregard[ing]" their "public responsibilities."  John F. Kennedy Presidential Library & Museum, News Conference 30 (Apr. 11, 1962), perma.cc/M7DL-LZ7N.  President Bush decried "irresponsible" subprime lenders that shirked their "responsibility to help" distressed homeowners.  The White House, President Bush Discusses Homeownership Financing (Aug. 31, 2007), perma.cc/DQ8B-JWN4.  And every President has engaged with the press to promote his policies and shape coverage of his Administration.  See, e.g., Graham J. White, FDR and the Press (1979).

Of course, the government cannot punish people for expressing different views.  Nor can it threaten to punish the media or other intermediaries for disseminating disfavored speech.  But there is a fundamental distinction between persuasion and coercion.  And courts must take care to maintain that distinction because of the drastic consequences resulting from a finding of coercion:  If the

4

government coerces a private party to act, that party is a state actor subject "to the constraints of the First Amendment." <u>Manhattan Cmty. Access Corp.</u> v. <u>Halleck</u>, 139 S. Ct. 1921, 1933 (2019). And this Court has warned against expansive theories of state action that would "eviscerate" private entities' "rights to exercise editorial control over speech and speakers on their properties or platforms." <u>Id.</u> at 1932.

The Fifth Circuit ignored those principles. It held that officials from the White House, the Surgeon General's office, and the FBI coerced social-media platforms to remove content despite the absence of even a single instance in which an official paired a request to remove content with a threat of adverse action -- and despite the fact that the platforms declined the officials' requests routinely and without consequence. Indeed, the Fifth Circuit suggested that <u>any</u> request from the FBI is inherently coercive merely because the FBI is a powerful law enforcement agency. And the court held that the White House, the FBI, and the CDC "significantly encouraged" the platforms' content-moderation decisions -- and thus transformed those decisions into state action -- on the theory that officials were "entangled" in the platforms' decisions. App., <u>infra</u>, 235a. The court did not define that novel standard, but found it satisfied primarily because platforms requested and relied upon CDC's guidance on matters of public health.

The implications of the Fifth Circuit's holdings are startling. The court imposed unprecedented limits on the ability of

5

the President's closest aides to use the bully pulpit to address matters of public concern, on the FBI's ability to address threats to the Nation's security, and on the CDC's ability to relay public-health information at platforms' request.  And the Fifth Circuit's holding that platforms' content-moderation decisions are state action would subject those private actions to First Amendment constraints -- a radical extension of the state-action doctrine.

Third, the lower courts' injunction violates traditional equitable principles.  An injunction must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  Califano v. Yamasaki, 442 U.S. 682, 702 (1979).  Here, however, the injunction sweeps far beyond what is necessary to address any cognizable harm to respondents:  Although the district court declined to certify a class, the injunction covers the government's communications with all social-media platforms (not just those used by respondents) regarding all posts by any person (not just respondents) on all topics.  And it forces thousands of government officials and employees to choose between curtailing their interactions with (and public statements about) social-media platforms or risking contempt should the district court conclude that they ran afoul of the Fifth Circuit's novel and ill-defined concepts of coercion and significant encouragement.

The district court's injunction has been stayed during the Fifth Circuit proceedings, and the Fifth Circuit extended an administrative stay through Monday, September 18, to allow the gov-

ernment to seek relief from this Court. If allowed to take effect, the injunction would impose grave and irreparable harms on the government and the public. In contrast, a continued stay pending further proceedings in this Court would impose no cognizable harm on respondents. The Court should therefore stay the injunction in full pending the filing and disposition of the government's forth-coming petition for a writ of certiorari. At a minimum, the Court should stay the injunction insofar as it applies beyond any content posted by the individual respondents themselves.

To expedite further proceedings, the government intends to file a petition for a writ of certiorari by October 13, 2023. If the Court wishes to expedite matters further, it could construe this application as a petition for a writ of certiorari and grant the petition without further briefing. See, e.g., Harrington v. Purdue Pharma, L.P., No. 23A87 (Aug. 10, 2023).

### STATEMENT

1. Social-media platforms allow billions of people to share content instantaneously around the globe. Cf. Twitter, Inc. v. Taamneh, 143 S. Ct. 1206, 1216 (2023). The unprecedented scope and speed of social-media communications has obvious benefits. But it also carries significant hazards, including the use of social media platforms to recruit terrorists, harm children, and spread misinformation and disinformation.[1]

---

[1] See, e.g., Radicalization: Social Media and The Rise of Terrorism: Hearing Before the Subcomm. on Nat'l Sec. of the H.

7

Social-media platforms have long sought to address those hazards -- and thereby preserve the value of their products -- by adopting and enforcing content-moderation policies. C.A. ROA 21,943-21,961. In March 2020, for example, Twitter amended its content-moderation policies in response to the COVID-19 pandemic "to address content that goes directly against guidance from authoritative sources of global and local public health information." Id. at 22,539.

The federal government also has sought to mitigate those hazards, including by calling attention to potentially harmful content so platforms can apply their content-moderation policies. For example, the FBI routinely shares information with platforms about accounts that appear to be used by covert foreign malign actors to influence the American public or by foreign terrorist organizations to recruit supporters. C.A. ROA 23,859-23,860, 23,866. And during the acute phase of the pandemic, the CDC alerted platforms to "COVID-19 misinformation narratives that CDC has identified" as "prevalent" online. Id. at 23,097.

Senior government officials likewise have spoken publicly about the harms that can arise from the rapid spread of falsehoods through social media. In May 2021, for example, the White House

---

Comm. on Oversight & Gov't Reform, 114th Cong., 1st Sess. (2015); Protecting Our Children Online: Hearing Before the S. Comm. on the Judiciary, 118th Cong., 1st Sess. (2023); Disinformation Nation: Social Media's Role in Promoting Extremism & Misinformation: Virtual Joint Hearing Before the Subcomm. on Consumer Prot. & Commerce of the H. Comm. on Energy & Commerce, 117th Cong., 1st Sess. (2021).

Press Secretary expressed the President's view that social-media platforms have a "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections." The White House, Press Briefing (May 5, 2021), https://perma.cc/4ZGE-N9QL. But she also emphasized that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address * * * disinformation" and "misinformation." Ibid.

2. Respondents' operative complaint names 67 federal entities and officials and characterizes their communications with and about social-media platforms as a "sprawling federal 'Censorship Enterprise.'" C.A. ROA 25,119. After allowing extensive discovery, the district court granted respondents' motion for a preliminary injunction. App., infra, 1a-155a.

The district court concluded that seven groups of government defendants "coerced" or "significantly encouraged" social-media platforms to moderate speech on the companies' platforms, in violation of the First Amendment. App., infra, 95a-116a. The court enjoined those defendants, as well as hundreds of thousands of unnamed employees of the defendant agencies, from engaging in ten types of communications regarding content moderation, such as "communication of any kind with social-media companies urging, encouraging, pressuring, or inducing" the "removal, deletion, suppression, or reduction of content"; "urging" those companies "to

9

change their guidelines for removing" content; and "flagging content or posts" for potential removal. _Id._ at 159a-160a. The injunction also contained a series of carveouts that purported to permit the government to inform social-media companies of postings involving "criminal activity," "national security threats," and certain other categories of content. _Id._ at 160a-161a.

3. The government appealed and sought a stay pending appeal. The Fifth Circuit granted an administrative stay and expedited the appeal. App., _infra_, 177a-178a. After briefing and argument, the court vacated the preliminary injunction in part and modified the terms of what it left in place. _Id._ at 179a-252a.

a. The Fifth Circuit found that individual respondents have Article III standing on the theory that the platforms' past moderation of their posts and accounts caused respondents "ongoing harm" because they now "self-censor" their social-media activity. App., _infra_, 196a-197a. The court also found "a substantial risk" that the individual respondents' injuries "will reoccur" because platforms "continue[] to enforce a robust general misinformation policy" and the government "continue[s] to be in regular contact with" the platforms. _Id._ at 197a-198a. The court found that respondent States have standing, reasoning that the past removal of content posted by a state legislator, a state agency, and a county implicated the States' "'right' to speak," _id._ at 203a (citation omitted), and that the States have a right "to listen to their citizens" on social media, _id._ at 204a.

10

b.   On the merits, the Fifth Circuit held that the private platforms' decisions to moderate content constituted "state action" subject to the First Amendment.  App., <u>infra</u>, 206a-240a. The court explained that state action exists "when a private party is coerced or significantly encouraged by the government to such a degree that its 'choice'  * * *  'must in law be deemed to be that of the'" government.  <u>Id.</u> at 206a (citation omitted).

The Fifth Circuit stated that "coercion" means "the government compelled the decision by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply."  App., <u>infra</u>, 218a.  But the court held that even absent a threat of punishment, coercion may be found by an unspecified weighting of four factors:  "(1) word choice and tone"; "(2) the recipient's perception"; "(3) the presence of authority"; and "(4) whether the speaker refers to adverse consequences."  <u>Id.</u> at 218a-219a.  The court also stated that "significant encouragement" means the government "exercise[d] active, meaningful control over the private party's decision."  <u>Id.</u> at 218a.  But the court then held that such "control" could be established by mere "entanglement in a party's independent decision-making."  <u>Ibid.</u>[2]

Applying those standards, the Fifth Circuit found that officials from the White House and the Office of the Surgeon General

_____

[2]   The Fifth Circuit also stated that "significant encouragement" could be established by "direct involvement in carrying out the decision," App., <u>infra</u>, 209a, but made no finding of such involvement on the facts here.

11

engaged in both coercion and significant encouragement. App., _infra_, 220a-232a. The court asserted that White House officials made threats to social-media companies, though it did not cite any communication threatening any specific action. See _id._ at 221a-222a. The court also found that its four-factor test weighed in favor of finding coercion, especially in light of officials' "tone" and "demeanor." _Id._ at 222a. And the court found significant encouragement because officials "entangled themselves in the platforms' decision-making processes" by engaging in frequent communications and requests for information. _Id._ at 230a.

The Fifth Circuit found the FBI's communications both coercive and significantly encouraging even though it acknowledged that the FBI did not "reference adverse consequences" in allegedly "urg[ing] the platforms to take down content." App., _infra_, 232a-233a. The court reasoned that the FBI has "inherent authority" as a law-enforcement agency and that platforms must have "perceived the FBI's messages as threats" because they sometimes removed the relevant content. _Id._ at 233a-234a.

As for the CDC, the Fifth Circuit acknowledged that its "requests for removal were not coercive." App., _infra_, 235a. But the court nonetheless found that CDC officials engaged in significant encouragement because they provided advice on COVID-related misinformation, which the court characterized as making the platforms "dependen[t]" on the CDC in applying their content-

12

moderation policies.  <u>Id.</u> at 236a.[3]

c.  On the equities, the Fifth Circuit found that respondents likely will suffer irreparable harm because federal officials continue to communicate with social-media companies.  App., <u>infra</u>, 241a-242a.  The court acknowledged that an injunction could impair the government's legitimate interest "in engaging with social-media companies, including on issues such as misinformation and election interference," as well as "the Executive Branch's ability to 'persuade' the American public."  <u>Id.</u> at 242a.  But the court believed it could "address[]" those "legitimate concerns" by "modifying the scope of the injunction."  <u>Id.</u> at 243a.  The court did not otherwise address or weigh harms to the public interest.

d.  The court of appeals acknowledged that the district court's original injunction was both vague and overbroad, and accordingly vacated nine of the ten prohibitions and rewrote the remaining prohibition to read:

> Defendants, and their employees and agents, shall take no actions, formal or informal, directly or indirectly, to coerce or significantly encourage social-media companies to remove, delete, suppress, or reduce, including through altering their algorithms, posted social-media content containing protected free speech.  That includes, but is not limited to, compelling the platforms to act, such as by intimating that some form of punishment will follow a failure to comply with any request, or supervising, directing, or otherwise meaningfully controlling the social-media companies' decision-making processes.

---

[3]  The Fifth Circuit found that the remaining enjoined defendants did not engage in coercion or significant encouragement, and thus reversed the injunction as to them.  App., <u>infra</u>, 237a-238a, 252a.

13

App., _infra_, 249a; see _id._ at 243a-247a.  The court rejected the government's request to limit any relief to conduct seeking the removal or suppression of the respondents' own content, holding that broader relief was appropriate because "[t]he harms that radiate from [the challenged] conduct extend far beyond just [respondents]; it impacts every social-media user."  _Id._ at 250a.

4.  The court of appeals "extended the administrative stay for ten days following the date [of its decision] pending an application to" this Court.  App., _infra_, 252a.  Accordingly, the administrative stay will last through September 18, 2023.

**ARGUMENT**

The government respectfully requests that this Court stay the preliminary injunction, as modified by the court of appeals, pending the filing and disposition of the government's forthcoming petition for a writ of certiorari.  Such a stay is warranted if there is "(1) 'a reasonable probability' that this Court will grant certiorari, (2) 'a fair prospect' that the Court will then reverse the decision below, and (3) 'a likelihood that irreparable harm will result from the denial of a stay.'"  _Maryland_ v. _King_, 567 U.S. 1301, 1302 (2012) (Roberts, C.J., in chambers) (brackets and citation omitted).  All of those requirements are met here.

**I.  THIS COURT WILL LIKELY GRANT CERTIORARI**

This Court will likely grant certiorari because the Fifth Circuit's decision adopts a novel and disruptive conception of the state-action doctrine, affirms an unprecedented injunction that

14

trenches on the separation of powers, and conflicts with the de-
cisions of other courts of appeals.

First, the Fifth Circuit held that federal officials' inter-
actions with private social-media platforms transformed a broad
swath of the platforms' content-moderation decisions into state
action subject to the First Amendment. That holding has signifi-
cant implications for officials at all levels of government, many
of whom routinely engage with or speak about social-media plat-
forms. It also has grave implications for the platforms them-
selves, which on the Fifth Circuit's logic are state actors subject
to suits for violating the First Amendment. This Court has re-
cently granted certiorari or emergency relief to address other
important questions about the application of the First Amendment
and the state-action doctrine to social-media platforms. See
Lindke v. Freed, 143 S. Ct. 1780 (No. 22-611); O'Connor-Ratcliff
v. Garnier, 143 S. Ct. 1779 (No. 22-324); NetChoice, LLC v. Paxton,
142 S. Ct. 1715 (2022) (No. 21A720). The same result is warranted
here.

Second, the Fifth Circuit relied on its novel view of the
state-action doctrine to affirm an injunction that raises serious
separation-of-powers concerns by installing a single district
judge as the overseer of the Executive Branch's communications
with and about social-media companies. Under the injunction, the
Surgeon General, the White House Press Secretary, and many other
senior presidential aides risk contempt if their public statements

15

on matters of policy cross the ill-defined lines drawn by the Fifth Circuit. CDC officials run the same risk if they accurately answer platforms' questions about public health. And FBI agents risk being haled into court if they flag content posted by terrorists or disinformation disseminated by covert malign foreign actors. That unprecedented injunction should not be permitted to take effect without this Court's review.

Third, the Fifth Circuit's decision conflicts with the decisions of other courts of appeals. At times, the Fifth Circuit purported to align itself with its sister circuits. See, e.g., App., infra, 214a-217a. And at a high level of generality, it is uncontroversial that a nominally private decision is state action if the government "has exercised coercive power or has provided such significant encouragement * * * that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). But the Fifth Circuit cited no prior decision finding state action, or a violation of the First Amendment, on remotely comparable facts. And its novel interpretations of coercion and significant encouragement squarely conflict with decisions of other courts of appeals.

For example, the Fifth Circuit acknowledged (App., infra, 228a) that this case is "strikingly similar" to O'Handley v. Weber, 62 F.4th 1145 (9th Cir. 2023), petition for cert. filed, No. 22-1199 (June 8, 2023). There, as here, the relevant government agency regularly collaborated with the platforms, had access to a

16

"partner support portal" whereby state officials could readily
bring specific content to the platforms' attention, and frequently
suggested removal of false or misleading content.  Id. at 1153-
1154.  Yet O'Handley found no state action, reasoning that the
fact that platforms "allegedly removed 98 percent of the posts
flagged by the [State] does not suggest that the companies ceded
control over their content-moderation decisions to the State and
thereby became the government's private enforcers."  Id. at 1156.
Instead, the court explained, "[i]t merely shows that these private
and state actors were generally aligned in their missions to limit
the spread of misleading election information."  Id. at 1156-1157.

That reasoning is irreconcilable with the holding below.
O'Handley held that "coercion" requires "threat[s] to prosecute,"
"threat[s] [of] adverse action," or "equivalent threat[s]," 62
F.4th at 1157, whereas the Fifth Circuit held that "tone" and
authority can be sufficient, App., infra, 229a.  O'Handley further
held that "significant encouragement" transforms private action
into state action only when the government uses "positive incen-
tives [to] overwhelm the private party and essentially compel the
party to act in a certain way." 62 F.4th at 1158.  Here, in
contrast, the Fifth Circuit held that mere "entanglement" is suf-
ficient.  App., infra, 235a.

The Fifth Circuit's approach also cannot be squared with other
appellate decisions.  The D.C. Circuit, for example, held that the
Attorney General and a Department of Justice commission did not

17

violate the First Amendment when they sent a letter to media dis-
tributors stating that they had "received testimony alleging that
your company is involved in the sale or distribution of pornogra-
phy" and offering an opportunity to respond before the commission
drafted "its final report section on identified distributors."
Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011, 1013 (1991) (Sil-
berman, J.), cert. denied, 503 U.S. 950 (1992).  The D.C. Circuit
explained that government officials may "vigorously criticize a
publication" and that "the government's criticism or effort to
embarrass the distributor" does not implicate the First Amendment
so long as "the government threatens no sanction."  Id. at 1015-
1016.  The Second and Tenth Circuits have reached similar holdings.
See, e.g., National Rifle Ass'n of Am. v. Vullo, 49 F.4th 700, 717
(2d Cir. 2022), petition for cert. filed, No. 22-842 (Feb. 7,
2023);  VDARE Found. v. Colorado Springs, 11 F.4th 1151, 1157
(10th. Cir. 2021), cert. denied, 142 S. Ct. 1208 (2022);  X-Men
Sec., Inc. v. Pataki, 196 F.3d 56, 68-72 (2d Cir. 1999).

## II.  THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

If this Court grants certiorari, it will likely vacate the
injunction because respondents lack Article III standing, their
First Amendment claims lack merit, and the injunction is overbroad.

### A.  Respondents Lack Article III Standing

Federal courts are limited to resolving only "Cases" or "Con-
troversies."  U.S. Const. Art. III, § 2.  "The doctrine of standing
implements this requirement by insisting that a litigant 'prove

18

that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'"  Carney v. Adams, 141 S. Ct. 493, 498 (2020) (citation omitted).  Respondents cannot satisfy those requirements.

1.  As the Fifth Circuit recognized (App., infra, 194a-195a), the individual respondents largely assert injury based on platforms' past moderation of respondents' social-media activity. Those incidents cannot support standing for at least two reasons.

First, most of those incidents are not traceable to the government because they occurred in 2020 or early 2021, before much of the challenged conduct occurred.  For example, respondents have focused on the "Great Barrington Declaration," App., infra, 195a, which was published in October 2020 and subject to content moderation beginning that same month.  C.A. ROA 1191.  The Fifth Circuit acknowledged that chronological problem, noting that the platforms adopted COVID-related "content-moderation policies in early 2020" without government involvement.  App., infra, 199a.  The court nonetheless held that respondents had shown that subsequent moderation decisions can be "traced to government-coerced enforcement of those policies."  Id. at 200a.  But the court relied solely on the district court's finding that the government's challenged actions affected the platforms' content-moderation activities as a general matter; the Fifth Circuit did not even purport to find that the government caused any platform to take action with respect

19

to any content posted by respondents that the platform would not otherwise have taken.

Second, even if respondents' past injuries were traceable to the government's actions, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief"; a plaintiff must instead show a "real and immediate threat of repeated injury." O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974); see Los Angeles v. Lyons, 461 U.S. 95, 101-108 (1983). Respondents were thus required to show that they face an immediate threat of content-moderation actions that the platforms would not take but for the government's challenged conduct.

The Fifth Circuit sought to avoid that requirement by holding that "prior censorship  * * *  has caused [respondents] to self-censor" today. App., infra, 196a-197a. But "respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013). The Fifth Circuit also stated that respondents' injuries "will reoccur," but that conclusion was based solely on the court's findings that (1) the platforms "continue[] to enforce a robust general misinformation policy," and (2) the government "continue[s] to be in regular contact with social-media platforms." App., infra, 197a-198a. As the court recognized, the platforms' policies are not attributable to the government. Id. at 199a. And neither the Fifth Circuit nor respondents even attempted to

20

connect the government's "regular contact" with any content that respondents have posted or wish to post. Respondents thus failed to establish any "real and immediate threat of repeated injury" that is fairly traceable to governmental action. O'Shea, 414 U.S. at 496. Or, viewed another way, an injunction against the government will not redress any future injuries to respondents resulting from the platforms' content moderation.

2. As for the state respondents, the Fifth Circuit relied on a handful of past incidents involving the moderation of content posted by state officials or entities, as well as on an injury to the States' purported right "to listen to their citizens" on social media. App., infra, 204a. Neither theory has merit.

The first suffers from the same flaw as the individual respondents' theory: A handful of years-old injuries cannot confer standing to seek sweeping forward-looking relief, given that the States have not identified any "real and immediate threat of repeated injury." O'Shea, 414 U.S. at 496. Moreover, the Fifth Circuit did not identify any evidence tying those past episodes to any federal action or otherwise establishing that any injury was fairly traceable to the federal government.

The second theory -- based on the States' "right to listen" to its residents on social media -- is equally meritless. This Court has sometimes "referred to a First Amendment right to 'receive information and ideas.'" Kleindienst v. Mandel, 408 U.S. 753, 762 (1972) (citation omitted). But it has relied on that

right to authorize suits only by intended recipients with some connection to the speaker. See, e.g., Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-757 (1976) (prohibition on advertising the price of prescription drugs challenged by consumers); Mandel, 408 U.S. at 762 (plaintiff professors planned to "hear, speak, and debate with [the invited speaker] in person" at a university conference). Respondents have established no such relationship here, and the Fifth Circuit's theory, if accepted, would confer standing on any government official who expresses a desire to receive a constituent's speech. That is exactly the sort of "boundless theory of standing" that this Court has consistently rejected. Already, LLC v. Nike, Inc., 568 U.S. 85, 99 (2013).

### B. Respondents' First Amendment Claims Lack Merit

It is undisputed that the content-moderation decisions at issue in this case were made by private social-media companies, such as Facebook and YouTube. It likewise is undisputed that the First Amendment "can be violated only by conduct that may be fairly characterized as 'state action.'" Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982); see Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928 (2019). The critical premise of the Fifth Circuit's decision was thus that the government coerced or significantly encouraged the platforms' content-moderation decisions and thereby transformed those decisions into state action subject to the First Amendment. App., infra, 207a-219a, 239a.

22

The implications of that holding are startling. If the platforms were state actors when they moderated respondents' content, respondents could have secured, on First Amendment grounds, injunctions compelling the platforms to restore content that they had chosen to delete. Cf. Adickes v. S.H. Kress & Co., 398 U.S. 144, 171 (1970) (allowing claims against private party under 42 U.S.C. 1983 where the State "compelled" and "commanded" the private action). This Court recently warned against state-action theories that would "eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms" by subjecting those choices "to the constraints of the First Amendment." Halleck, 139 S. Ct. at 1932-1933. And the Court has emphasized that "[c]areful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar, 457 U.S. at 936. The Fifth Circuit's decision exceeds those limits by applying federal constitutional constraints to the decisions of private social-media companies regarding the content appearing on their own platforms.

As explained below, under a proper application of this Court's precedents, the content-moderation decisions at issue here are not state action. The actions of a private party may "be fairly attributable to the [government]," Lugar, 457 U.S. at 937, when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert," over the pri-

vate decision "that the choice must in law be deemed to be that of the [government]," Blum, 457 U.S. at 1004.  But neither coercion nor significant encouragement is present here.  And respondents' First Amendment claims suffer from additional defects, including that the state respondents do not have First Amendment rights.

> **1.   The Fifth Circuit erred in finding state action based on coercion**

a.   This Court has explained that unconstitutional coercion with respect to speech requires, at a minimum, an actual "threat of invoking legal sanctions [or] other means of coercion, persuasion, and intimidation."  Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963).  "Mere approval of or acquiescence in the initiatives of a private party is not sufficient."  Blum, 457 U.S. at 1004.  Generalized pressure likewise is insufficient; the government must compel "the specific conduct of which the plaintiff complains."  Ibid. (emphasis added).

In Bantam Books, for example, the Court found coercion when a state agency identified certain publications as "objectionable" in notices to distributors; asked for their "'cooperation in removing the listed and other objectionable publications'"; emphasized the agency's "duty to recommend to the Attorney General prosecution of purveyors of obscenity"; assured distributors that "'[c]ooperative action will eliminate the necessity of our recommending prosecution'"; and followed up by having a police officer visit to assess compliance.  372 U.S. at 62-63 & n.5 (citation

24

omitted).

In <u>Blum</u>, by contrast, the Court found no state action when private nursing homes transferred certain Medicaid patients to facilities offering lower levels of care, even though the "nursing homes in [the State were] extensively regulated," 457 U.S. at 1004; those regulations placed pressure (backed by "a range of penalties") on nursing homes to discharge or transfer patients, see <u>id.</u> at 1009; and the State was obliged to review and "approve or disapprove continued payment of Medicaid benefits" following a transfer, <u>id.</u> at 1010. Notwithstanding those general pressures, the Court explained that the nursing homes' specific "decision[s] to discharge or transfer particular patients" were not state action because they "ultimately turn[ed] on medical judgments made by private parties," <u>id.</u> at 1008.

b. As applied here, the lessons of this Court's state-action precedents are clear: In order for a platform's content-moderation decision to be deemed state action, the government must have compelled that "specific conduct," <u>Blum</u>, 457 U.S. at 1004 -- not simply sought to influence the platform's content-moderation activities in general. And even when "government officials" specifically "request that a private intermediary not carry a third party's speech," they do not violate the First Amendment "so long as the officials do not threaten adverse consequences if the intermediary refuses to comply." <u>O'Handley</u>, 62 F.4th at 1158.

The Fifth Circuit entirely failed to heed the first of those

25

lessons:  It conducted a wide-ranging audit of federal officials'
dealings with social-media platforms, but did not even purport to
conclude that those officials had coerced any of the specific
content-moderation decisions (including the adoption of any spe-
cific moderation policy) that injured respondents.  And the court
compounded that error by adopting a novel and unjustified inter-
pretation of the type of "coercion" that can justify a finding of
state action.  The court at times appeared to recognize that co-
ercion requires the government to at least "intimat[e] that some
form of punishment will follow a failure to comply."  App., infra,
218a.  Yet the court went on to adopt and apply a far looser
understanding that could be met even absent such threats.

The Fifth Circuit's treatment of the FBI makes that error
especially plain.  The court stated that the FBI "regularly met
with the platforms," "frequently alerted the social media compa-
nies to misinformation," and "urged the platforms to take down
content."  App., infra, 232a.  The court acknowledged that the
FBI's communications were not "threatening in tone or manner" and
did not "reference adverse consequences."  Id. at 232a-233a.  But
the court nonetheless held that the FBI engaged in impermissible
coercion -- converting the platforms' independent decisions into
state action -- simply because the FBI is a law-enforcement agency
with some unspecified "authority over the platforms" and because
the platforms sometimes complied with its requests.  Id. at 233a.
That reasoning would mean that the FBI -- and any other law-

enforcement agency -- could never ask <u>anyone</u> for <u>anything</u> without transforming the recipient of the request into a state actor.

The Fifth Circuit's conclusion that the White House's actions were coercive was equally flawed. The court cited White House "requests" to "remove posts 'ASAP' and accounts 'immediately,' and to 'slow down' or 'demote' content" in what the court viewed as a "persistent and angry" tone. App., <u>infra</u>, 221a (brackets omitted). Missing is any intimation that any sanction would follow a failure to act on those requests. The same is true of every one of the quoted follow-up communications. See <u>ibid.</u>

The Fifth Circuit believed that White House "[o]fficials threw out the prospect of legal reforms and enforcement actions" and made "promises of legal regime changes, enforcement actions, and other unspoken threats." App., <u>infra</u>, 221a-222a. The only statement cited in support of that assertion contains no such threats. See <u>id.</u> at 221a (referencing "low-bar things you guys can do to make people like me * * * think you're taking action") (brackets omitted). The court instead appeared to be referencing an April 25, 2022, press conference at which the Press Secretary, asked to comment on the sale of Twitter, responded that "[n]o matter who owns or runs Twitter, the President has long been con-cerned about the power of large social media platforms," "has long argued that tech platforms must be held accountable for the harms they cause," and "has been a strong supporter of fundamental re-forms to achieve that goal, including reforms to Section 230,

27

enacting antitrust reforms, requiring more transparency, and more." C.A. ROA 784-785; see App., _infra_, 188a-189a. Those statements cannot plausibly be characterized as a threat of adverse action tied to specific acts of content moderation. And the fact that those off-the-cuff, general statements were the Fifth Circuit's _strongest_ evidence of coercive threats only underscores that this case is nothing like _Bantam Books_.

What is more, the record shows that platforms routinely declined to remove content flagged by federal officials, yet neither respondents nor the Fifth Circuit suggested that any federal official imposed any sanction in retaliation for platforms' refusal to act as the government requested. See, _e.g._, C.A. ROA 23,234-23,235, 23,240-23,243, 23,245-23,256 (emails declining to remove flagged content). Indeed, the district court cited testimony that the platforms rejected _half_ of the FBI's suggestions. _Id._ at 26,561; see App., _infra_, 107a, 191a. And Twitter entirely ceased enforcement of its COVID-19 misinformation policy in November 2022, yet suffered no retaliation. C.A. ROA 22,536.

Rather than any pattern of coercive threats backed by sanctions, the record reflects a back-and-forth in which the government and platforms often shared goals and worked together, sometimes disagreed, and occasionally became frustrated with one another, as all parties articulated and pursued their own goals and interests during an unprecedented pandemic. Senior government officials -- including the President, the White House Press Secretary, and the

28

Surgeon General -- believed that the platforms were enabling the spread of misinformation that was causing preventable deaths. App., infra, 186a-187a.  They said so publicly, and in strong terms.  Ibid.  And government officials sought to understand the platforms' efforts to fight misinformation and flag content that violated the platforms' own policies.  Id. at 182a-184a.  The platforms, in turn, sought to address officials' concerns and may well have been motivated by a desire to avoid public criticism. Id. at 184a-185a.  But that sort of successful use of the bully pulpit has never been regarded as violating the First Amendment or transforming private action into state action.  As Judge Silberman observed, "[w]e know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content."  Penthouse, 939 F.2d at 1016 (brackets and citation omitted).

c.  Lacking evidence of any threatened adverse action, the Fifth Circuit found coercion by applying a four-factor test developed by other circuits.  App., infra, 222a.  Whatever the value of those factors as a tool for identifying coercive threats, the Fifth Circuit badly erred by loosely applying those factors to find state action where no such threats occurred.

The Fifth Circuit first relied on the "tone" or "demeanor" of some of the White House statements.  App., infra, 222a.  But the strong language used to criticize the platforms and request action does not make those statements coercive.  The government is enti-

29

tled to forcefully "advocate and defend its own policies." Board
of Regents v. Southworth, 529 U.S. 217, 229 (2000). And government
officials are entitled to express their views -- including their
view that certain speech is false or harmful -- in strong terms.
See Penthouse, 939 F.2d at 1015; see also, e.g., Presidential
Proclamation No. 7725, Protection From Pornography Week, 2003, 68
Fed. Reg. 61,603, 61,603 (Oct. 28, 2003) ("Pornography can have
debilitating effects on communities, marriages, families, and
children.").

The Fifth Circuit next relied on the platforms' "perception"
of the relevant government statements. App., infra, 222a. But as
the court elsewhere acknowledged, the coercion inquiry is an ob-
jective one that depends on whether a "reasonable person" would
construe the government's conduct as a threat. Id. at 249a. And
even considering the platforms' perceptions, the court erred in
finding coercion merely because "the platforms were influenced by
the officials' demands." Id. at 224a. Influence is also the
natural result of successful persuasion, so the fact that the
platforms often "complied with" the government's "removal re-
quests" is "immaterial." O'Handley, 62 F.4th at 1159. And the
fact that the platforms frequently rebuffed the government, see p.
27, supra, further undermines any suggestion that the government
was engaged in coercion rather than persuasion.

The Fifth Circuit's third factor was "the presence of author-
ity." App., infra, 222a. Such authority may be relevant when

30

there is an actual threat; if the speaker lacks authority to impose any adverse consequences, the threat cannot be coercive. But "[a]gencies are permitted to communicate in a non-threatening manner with the entities they oversee without creating a constitutional violation." O'Handley, 62 F.4th at 1163.

Finally, the Fifth Circuit's fourth factor -- "whether the speaker refers to adverse consequences," App., infra, 222a -- is at best a watered-down version of the correct inquiry: whether the speaker actually threatened adverse consequences for noncompliance, either implicitly or explicitly. And here the Fifth Circuit failed to identify any instance of such a threat.

### 2. The Fifth Circuit erred in finding state action based on significant encouragement

The Fifth Circuit correctly recited (App., infra, 206a) this Court's statement in Blum that state action may exist when the government "has provided such significant encouragement" for a private decision "that the choice must in law be deemed to be that of the [government]," 457 U.S. at 1004. But this Court did not make "significant encouragement" a lesser, far-easier-to-satisfy alternative to coercion. Instead, it merely recognized that offers of positive incentives ("significant encouragement"), like threats of negative consequences ("coercive power"), may overwhelm a private party's independent judgment. Ibid.; see O'Handley, 62 F.4th at 1157-1158. As the Ninth Circuit recognized, therefore, "significant encouragement" does not exist merely because the govern-

ment urges a private party to act in a particular way -- even repeatedly or in strong terms.  Instead, the sort of "significant encouragement" sufficient to transform private conduct into state action occurs only through "the State's use of positive incentives to overwhelm the private party and essentially compel the party to act in a certain way."  O'Handley, 62 F.4th at 1158.

The Fifth Circuit did not find that anything like that oc-curred here.  Instead, the court adopted a far broader definition of state action, holding that "significant encouragement" can be established merely by a government official's "entanglement in a party's independent decision-making."  App., infra, 209a.  That was error.

As a threshold matter, the Fifth Circuit explained that its conception of "entanglement" requires a much lower "level of in-tegration" than required by this Court's "joint action test" for state action.  App., infra, 209a n.11; cf. Lugar, 457 U.S. at 941. At the same time, the Fifth Circuit did not identify any other elements required to satisfy its conception of the "significant encouragement" test.  If accepted, therefore, the court's formu-lation would render the joint-action test entirely superfluous because the watered-down "significant encouragement" test would always be satisfied first.

The Fifth Circuit's novel "entanglement" standard is also vastly overbroad.  This case illustrates the point.  The court found significant encouragement by the FBI based solely on the

32

court's view that the platforms accepted an FBI recommendation to change their terms of service "to capture 'hack-and-leak' content." App., _infra_, 234a; see _id._ at 191a. The Fifth Circuit's opinion thus threatens to transform any private entity that accepts a government recommendation into a state actor.

Similarly, the Fifth Circuit held that "the CDC was entangled in the platforms' decision-making processes" because "the platforms asked CDC officials to decide whether certain claims were misinformation," which led to a closer working relationship in which "the platforms came to _heavily rely_ on the CDC" to provide public health information that informed the platforms' content-moderation decisions. App., _infra_, 235a-236a (brackets omitted). The Fifth Circuit cited no precedent for its conclusion that if private companies _choose_ to follow advice from the government (including advice they solicited), the companies thereby become state actors. To the contrary, this Court has emphasized that "[a]ction taken by private entities with the mere approval or acquiescence of the [government] is not state action." _American Mfrs. Mut. Ins. Co._ v. _Sullivan_, 526 U.S. 40, 52 (1999).

Finally, the Fifth Circuit's finding of state action was misplaced even under its watered-down "entanglement" standard because the court did not find that the government had any involvement in "the _specific_ conduct of which the plaintiff complains." _Blum_, 457 U.S. at 1004 (emphasis added). The court concluded that the relevant officials were entangled in the platforms' content-

33

moderation decisions in general, but it cited no evidence that the government had any role in any specific decision to moderate content posted by respondents.  Cf. App., infra, 230a-232a (White House and Surgeon General's office); id. at 234a (FBI); id. at 235a-236a (CDC).

### 3.  Respondents' First Amendment claims fail for additional reasons

From its erroneous premise that the private platforms' content-moderation decisions were "state actions," the Fifth Circuit concluded that the government "likely violated the First Amendment."  App., infra, 239a.  But a finding of state action means only that the action is subject to constitutional scrutiny -- not that there automatically was a constitutional violation. Even if the platforms' content-moderation activities were deemed state action, therefore, respondents would also have to establish the elements of a substantive First Amendment claim.

Of course, if the government had actually coerced the platforms to suppress speech, that coercion would plainly violate the platforms' First Amendment rights.  Cf. Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 258 (1974).  But a conclusion that the platforms were state actors would not necessarily mean that the platforms' content-moderation decisions violated respondents' First Amendment rights; instead, that is a substantive question of First Amendment law and the answer could depend on the nature of the platform and the details of the particular decision.  Cf.

34

<u>Minnesota Voters Alliance</u> v. <u>Mansky</u>, 138 S. Ct. 1876, 1885-1886 (2018) (describing state actors' authority to limit speech depending on the type of forum).  The Fifth Circuit failed to analyze that question because it incorrectly assumed that a finding of state action alone established a First Amendment violation.

Finally, whatever the merits of the individual respondents' underlying First Amendment claims, the state respondents' claims fail for an additional, independent reason:  The States lack First Amendment rights.  "The Free Speech Clause of the First Amendment constrains governmental actors and protects private actors." <u>Halleck</u>, 139 S. Ct. at 1926.  The States thus have no basis for asserting a First Amendment claim.  Cf. <u>United States</u> v. <u>American Library Ass'n</u>, 539 U.S. 194, 210-211 (2003) (plurality opinion) (noting this issue without resolving it).

### C. The Injunction Is Overbroad

Even if respondents had standing and some likelihood of success on the merits, the injunction entered by the lower courts is vastly overbroad.  Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." <u>Gill</u> v. <u>Whitford</u>, 138 S. Ct. 1916, 1933-1934 (2018).  Principles of equity reinforce that constitutional limit:  Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." <u>Califano</u> v. <u>Yamasaki</u>, 442 U.S. 682,

35

702 (1979); see United States v. Texas, 143 S. Ct. 1964, 1985-1986 (2023) (Gorsuch, J., concurring in the judgment). Here, that means that any injunctive relief must be limited to government actions targeting respondents' social-media accounts and posts.

The injunction here flouts those principles. It covers thousands of federal officers and employees, and it applies to communications with and about all social-media platforms (not just those used by respondents, see App., infra, 158a n.2) regarding content moderation with respect to all posts by any person (not just respondents) on all topics (including national security and criminal matters, which even the district court recognized were improper to include, see id. at 160a-161a).

The Fifth Circuit attempted to justify that sweeping relief on the ground that an injunction may incidentally benefit nonparties "if such breadth is necessary to give prevailing parties the relief to which they are entitled." App., infra, 249a-250a (citation omitted). But the court did not find -- and could not plausibly have found -- that the breadth of its injunction was needed to provide full relief to respondents. Instead, the court reasoned that "[t]he harms that radiate from [the government's alleged] conduct extend far beyond just [respondents]" and affect "every social-media user." Id. at 250a. That is a non sequitur. Whether a defendant's conduct also might have harmed other nonparties has no bearing on whether party-specific relief will fully redress the plaintiffs' injuries.

At a minimum, therefore, this Court should stay the injunction to the extent it extends beyond government action specifically targeting content posted by the individual respondents. An injunction so limited would largely or entirely eliminate any harm that respondents might face without burdening a vast universe of government actions lacking any connection to respondents.

## III. THE EQUITIES OVERWHELMINGLY FAVOR A STAY

The government and public would suffer irreparable harm if the preliminary injunction took effect. Respondents, in contrast, would suffer no cognizable injury -- much less irreparable harm -- if the current stay were extended.

### A. The Injunction Would Irreparably Harm The Government And Undermine The Public Interest

If not stayed, the injunction would impose grave harms on the government and the public. See Nken v. Holder, 556 U.S. 418, 435 (2009) (harms to government and public "merge"). One of the central duties and prerogatives of the President and the senior officials who serve as his proxies is to speak to the public on matters of public concern, and they must have the latitude to do so forcefully at times. But the injunction subjects many such communications to a risk of contempt.

Consider, for example, a statement from the White House podium that the President urges platforms not to disseminate misinformation about a recent natural disaster circulating online -- and the platforms comply. Cf. App., infra, 187a, 222a, 227a. Or

37

suppose the Press Secretary says that the President condemns the role that social media has played in harming teenagers' mental health, calls on platforms to exercise greater responsibility, and mentions the possibility of legislative reforms. Cf. id. at 188a-189a. Those statements might be viewed as coercion or significant encouragement under the Fifth Circuit's novel understanding of those concepts. Even the potential for the injunction to be construed to limit the communication of the Administration's views on issues of public consequence could chill such communications. That "intrusion by a federal court into the workings of a coordinate branch of government" irreparably harms the Executive Branch and raises serious separation-of-powers concerns. INS v. Legalization Assistance Project, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

The injunction's effects on the other affected entities are likewise profoundly damaging. The Fifth Circuit's reasoning suggests that the CDC would risk contempt if it answered platforms' inquiries about scientific matters to allow the platforms to make informed content-moderation decisions. Cf. App., infra, 235a-236a. And given the court's suggestion that any request from a law-enforcement agency is inherently coercive, see id. at 232a-233a, the FBI would likewise need to tread carefully in its interactions with social-media companies, potentially eschewing communications that protect national security, public safety, or the security of federal elections. For example, particularly in the

38

early stages of an investigation, law-enforcement officials may be uncertain whether a social-media post involves unprotected criminal activity (such as a true threat). But the injunction leaves them guessing what quantum of certainty they must possess before they can inform social-media companies about the post, potentially leading to disastrous delays. This Court has observed that even the "fear of being sued" can "'dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties.'" Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) (brackets and citation omitted). The fear of being held in contempt is no less damaging.

All of those harms are aggravated by the injunction's broad, general terms. Cf. Fed. R. Civ. P. 65(d). The injunction relies on contestable and indeterminate legal terminology to describe its prohibitions: The government may not "coerce or significantly encourage" platforms with respect to "protected free speech." App., infra, 248a. The legal meaning of "coercion" and "significant encouragement" in this context is at the very heart of the parties' dispute; and what constitutes "protected free speech" has been hotly disputed since the Founding. Yet the Fifth Circuit's decision compels government officials -- including senior White House officials and FBI agents -- to parse those concepts and tailor their speech accordingly, on pain of contempt.

39

**B.    The Injunction Is Unnecessary To Prevent Irreparable In-jury To Respondents**

Although First Amendment injuries may be irreparable when they occur, Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion), a plaintiff seeking a preliminary injunction still must make "a clear showing," Winter, 555 U.S. at 22, that such injuries are "imminent," Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 74 (2020) (per curiam) (Kavanaugh, J., concurring). Neither the district court nor the Fifth Circuit substantiated any finding that respondents face ongoing or imminent irreparable in-jury.  The Fifth Circuit found that respondents "are likely to suffer an irreparable injury" because they "sufficiently demon-strated that their First Amendment interests are either threatened or impaired."  App., infra, 241a.  But that is circular, and the court did not cite anything in the record to support the conclusion that an injunction is necessary to prevent any imminent First Amendment injury to respondents.  The court stated (id. at 242a) that "the officials' challenged conduct has not stopped," but that is not a finding that these respondents are likely to suffer im-minent harm.

That is particularly true given the relatively brief duration of a further stay, if granted.  To facilitate this Court's prompt resolution of this case, the government will file a petition for a writ of certiorari by October 13, 2023 -- nearly two months early, and in time to allow the Court to hear the case this Term

40

in the ordinary course. And to the extent the Court wishes to further expedite matters, it could construe this application as a petition for a writ of certiorari, grant the petition and a stay, and set the case for argument. See, e.g., Harrington v. Purdue Pharma, L.P., No. 23A87 (Aug. 10, 2023) (No. 23-124). If the court takes that course, the government respectfully suggests the following questions presented: (1) Whether respondents have Article III standing; (2) Whether the government's challenged conduct transformed private social-media companies' content-moderation decisions into state action and violated respondents' First Amendment rights; and (3) Whether the terms and breadth of the preliminary injunction are proper.

**CONCLUSION**

This Court should stay the preliminary injunction pending the disposition of the government's petition for a writ of certiorari. At a minimum, the Court should stay the injunction to the extent it extends beyond actions specifically targeting content posted by individual respondents.

Respectfully submitted.

ELIZABETH B. PRELOGAR
Solicitor General

SEPTEMBER 2023

## APPENDIX

District court opinion granting preliminary injunction
(July 4, 2023) ........................................ 1a

District court judgment entering preliminary injunction
(July 4, 2023) ...................................... 156a

District court opinion denying stay
(July 10, 2023) ..................................... 163a

District court judgment denying stay
(July 10, 2023) ..................................... 176a

Court of appeals order granting administrative stay
(July 14, 2023) ..................................... 177a

Court of appeals opinion affirming in part, reversing
in part, vacating in part, and modifying preliminary
injunction (September 8, 2023) ...................... 179a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| **STATE OF MISSOURI, ET AL.** | **CASE NO.  3:22-CV-01213** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JOSEPH R. BIDEN JR., ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## MEMORANDUM RULING ON REQUEST
## FOR PRELIMINARY INJUNCTION

At issue before the Court is a Motion for Preliminary Injunction [Doc. No. 10] filed by Plaintiffs.[1] The Defendants[2] oppose the Motion [Doc. No. 266]. Plaintiffs have filed a reply to the opposition [Doc. No. 276]. The Court heard oral arguments on this Motion on May 26, 2023 [Doc. No. 288]. Amicus Curiae briefs have been filed in this proceeding on behalf of Alliance Defending Freedom,[3] the Buckeye Institute,[4] and Children's Health Defense.[5]

---

[1] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty ("Kheriaty"), Dr. Martin Kulldorff ("Kulldorff"), Jim Hoft ("Hoft"), Dr. Jayanta Bhattacharya ("Bhattacharya"), and Jill Hines ("Hines").

[2] Defendants consist of  President Joseph R Biden ("President Biden"), Jr, Karine Jean-Pierre ("Jean-Pierre"), Vivek H Murthy ("Murthy"), Xavier Becerra ("Becerra"), Dept of Health & Human Services ("HHS"), Dr. Hugh Auchincloss ("Auchincloss"),  National Institute of Allergy & Infectious Diseases ("NIAID"), Centers for Disease Control & Prevention ("CDC"),  Alejandro Mayorkas ("Mayorkas"), Dept of Homeland Security ("DHS"),  Jen Easterly ("Easterly"), Cybersecurity & Infrastructure Security Agency ("CISA"), Carol Crawford ("Crawford"), United States Census Bureau ("Census Bureau"), U. S. Dept of Commerce ("Commerce"), Robert Silvers ("Silvers"), Samantha Vinograd ("Vinograd"), Ali Zaidi ("Zaidi"), Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Stuart F. Delery ("Delery"),  Aisha Shah ("Shah"),  Sarah Beran ("Beran"),  Mina Hsiang ("Hsiang"), U. S. Dept of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Laura Dehmlow ("Dehmlow"), Elvis M. Chan ("Chan"), Jay Dempsey ("Dempsey"),  Kate Galatas ("Galatas"), Katharine Dealy ("Dealy"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), Joshua Peck ("Peck"), Kym Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), Jennifer Shopkorn ("Shopkorn"), U. S. Food & Drug Administration ("FDA"), Erica Jefferson ("Jefferson"), Michael Murray ("Murray"), Brad Kimberly ("Kimberly"), U. S. Dept of State ("State"), Leah Bray ("Bray"), Alexis Frisbie ("Frisbie"), Daniel Kimmage ("Kimmage"), U. S. Dept of Treasury ("Treasury"), Wally Adeyemo ("Adeyemo"), U. S. Election Assistance Commission ("EAC"),  Steven Frid ("Frid"), and Kristen Muthig ("Muthig").

[3] [Doc. No. 252]

[4] [Doc. No. 256]

[5] [Doc. No. 262]

## I.     INTRODUCTION

> I may disapprove of what you say, but I would defend to the death
> your right to say it.
>
>                                   Evelyn Beatrice Hill, 1906, *The Friends of Voltaire*

This case is about the Free Speech Clause in the First Amendment to the United States Constitution. The explosion of social-media platforms has resulted in unique free speech issues— this is especially true in light of the COVID-19 pandemic. If the allegations made by Plaintiffs are true, the present case arguably involves the most massive attack against free speech in United States' history. In their attempts to suppress alleged disinformation, the Federal Government, and particularly the Defendants named here, are alleged to have blatantly ignored the First Amendment's right to free speech.

Although the censorship alleged in this case almost exclusively targeted conservative speech, the issues raised herein go beyond party lines. The right to free speech is not a member of any political party and does not hold any political ideology. It is the purpose of the Free Speech Clause of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of the market, whether it be by government itself or private licensee. *Red Lion Broadcasting Co., v. F.C.C.*, 89 S. Ct. 1794, 1806 (1969).

Plaintiffs allege that Defendants, through public pressure campaigns, private meetings, and other forms of direct communication, regarding what Defendants described as "disinformation," "misinformation," and "malinformation," have colluded with and/or coerced social-media platforms to suppress disfavored speakers, viewpoints, and content on social-media platforms. Plaintiffs also allege that the suppression constitutes government action, and that it is a violation

3a

of Plaintiffs' freedom of speech under the First Amendment to the United States Constitution. The

First Amendment states:

> Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof: **or abridging the freedom of speech**, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. (emphasis added).

First Amendment, U.S. Const. amend. I.

The principal function of free speech under the United States' system of government is to invite dispute; it may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. *Texas v. Johnson*, 109 S. Ct. 2533, 2542–43 (1989). Freedom of speech and press is the indispensable condition of nearly every other form of freedom. *Curtis Pub. Co. v. Butts*, 87 S. Ct. 1975, 1986 (1967).

The following quotes reveal the Founding Fathers' thoughts on freedom of speech:

> For if men are to be precluded from offering their sentiments on a matter, which may involve the most serious and alarming consequences, that can invite the consideration of mankind, reason is of no use to us; the freedom of speech may be taken away, and dumb and silent we may be led, like sheep, to the slaughter.

George Washington, March 15, 1783.

> Whoever would overthrow the liberty of a nation must begin by subduing the free acts of speech.

Benjamin Franklin, *Letters of Silence Dogwood*.

> Reason and free inquiry are the only effectual agents against error.

Thomas Jefferson.

The question does not concern whether speech is conservative, moderate, liberal, progressive, or somewhere in between. What matters is that Americans, despite their views, will not be censored or suppressed by the Government. Other than well-known exceptions

3

to the Free Speech Clause, all political views and content are protected free speech.

The issues presented to this Court are important and deeply intertwined in the daily lives of the citizens of this country.

## II.    FACTUAL BACKGROUND

In this case, Plaintiffs allege that Defendants suppressed conservative-leaning free speech, such as: (1) suppressing the Hunter Biden laptop story prior to the 2020 Presidential election; (2) suppressing speech about the lab-leak theory of COVID-19's origin; (3) suppressing speech about the efficiency of masks and COVID-19 lockdowns; (4) suppressing speech about the efficiency of COVID-19 vaccines; (5) suppressing speech about election integrity in the 2020 presidential election; (6) suppressing speech about the security of voting by mail; (7) suppressing parody content about Defendants; (8) suppressing negative posts about the economy; and (9) suppressing negative posts about President Biden.

Plaintiffs Bhattacharya and Kulldorff are infectious disease epidemiologists and co-authors of The Great Barrington Declaration ("GBD"). The GBD was published on October 4, 2020.  The GBD criticized lockdown policies and expressed concern about the damaging physical and mental health impacts of lockdowns. They allege that shortly after being published, the GBD was censored on social media by Google, Facebook, Twitter, and others. Bhattacharya and Kulldorff further allege on October 8, 2020 (four days after publishing the GBD), Dr. Frances Collins, Dr. Fauci, and Cliff Lane proposed together a "take down" of the GBD and followed up with an organized campaign to discredit it.[6]

Dr. Kulldorff additionally alleges he was censored by Twitter on several occasions because of his tweets with content such as "thinking everyone must be vaccinated is scientifically flawed,"

---

[6] [Doc. No. 10-3 and 10-4]

4

that masks would not protect people from COVID-19, and other "anti-mask" tweets.[7] Dr. Kulldorff (and Dr. Bhattacharya[8]) further alleges that YouTube removed a March 18, 2021 roundtable discussion in Florida where he and others questioned the appropriateness of requiring young children to wear facemasks.[9] Dr. Kulldorff also alleges that LinkedIn censored him when he reposted a post of a colleague from Iceland on vaccines, for stating that vaccine mandates were dangerous, for posting that natural immunity is stronger than vaccine immunity, and for posting that health care facilities should hire, not fire, nurses.[10]

Plaintiff Jill Hines is Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization. Hines alleges she was censored by Defendants because she advocated against the use of masks mandates on young children. She launched an effort called "Reopen Louisiana" on April 16, 2020, to expand Health Freedom Louisiana's reach on social media. Hines alleges Health Freedom Louisiana's social-media page began receiving warnings from Facebook. Hines was suspended on Facebook in January 2022 for sharing a display board that contained Pfizer's preclinical trial data.[11] Additionally, posts about the safety of masking and adverse events from vaccinations, including VAERS data and posts encouraging people to contact their legislature to end the Government's mask mandate, were censored on Facebook and other social-media platforms. Hines alleges that because of the censorship, the reach of Health Freedom Louisiana was reduced from 1.4 million engagements per month to approximately 98,000. Hines also alleges that her personal Facebook page has been censored and restricted for posting content

---

[7] [Doc. No. 10-4]
[8] [Doc. No. 10-3]
[9] [Id.]
[10] [Id.]
[11] [Doc. No. 10-12]

that is protected free speech. Additionally, Hines alleges that two of their Facebook groups, HFL Group and North Shore HFL, were de-platformed for posting content protected as free speech.[12]

Plaintiff Dr. Kheriaty is a psychiatrist who has taught at several universities and written numerous articles. He had approximately 158,000 Twitter followers in December 2021 and approximately 1,333 LinkedIn connections. Dr. Kheriaty alleges he began experiencing censorship on Twitter and LinkedIn after posting content opposing COVID-19 lockdowns and vaccine mandates. Dr. Kheriaty also alleges that his posts were "shadow banned," meaning that his tweets did not appear in his follower's Twitter feeds. Additionally, a video of an interview of Dr. Kheriaty on the ethics of vaccine mandates was removed from YouTube.[13]

Plaintiff Jim Hoft is the owner and operator of The Gateway Pundit ("GP"), a news website located in St. Louis, Missouri. In connection with the GP, Hoft operates the GP's social-media accounts with Twitter, Facebook, YouTube, and Instagram. The GP's Twitter account previously had over 400,000 followers, the Facebook account had over 650,000 followers, the Instagram account had over 200,000 followers, and the YouTube account had over 98,000 followers.

The GP's Twitter account was suspended on January 2, 2021, again on January 29, 2021, and permanently suspended from Twitter on February 6, 2021. The first suspension was in response to a negative post Hoft made about Dr. Fauci's statement that the COVID-19 vaccine will only block symptoms and not block the infection. The second suspension was because of a post Hoft made about changes to election law in Virginia that allowed late mail-in ballots without postmarks to be counted. Finally, Twitter issued the permanent ban after the GP Twitter account posted video footage from security cameras in Detroit, Michigan from election night 2020, which showed two delivery vans driving to a building at 3:30 a.m. with boxes, which were alleged to

---

[12] [Id.]
[13] [Doc. No. 10-7]

contain election ballots. Hoft also alleges repeated instances of censorship by Facebook, including warning labels and other restrictions for posts involving COVID-19 and/or election integrity issues during 2020 and 2021.

Hoft further alleges that YouTube censored the GP's videos. YouTube removed a May 14, 2022 video that discussed voter integrity issues in the 2020 election. Hoft has attached as exhibits copies of numerous GP posts censored and/or fact checked. All of the attached examples involve posts relating to COVID-19 or the 2020 election.

In addition to the allegations of the Individual Plaintiffs, the States of Missouri and Louisiana allege extensive censorship by Defendants. The States allege that they have a sovereign and proprietary interest in receiving the free flow of information in public discourse on social-media platforms and in using social-media to inform their citizens of public policy decisions. The States also claim that they have a sovereign interest in protecting their own constitutions, ensuring their citizen's fundamental rights are not subverted by the federal government, and that they have a quasi-sovereign interest in protecting the free-speech rights of their citizens. The States allege that the Defendants have caused harm to the states of Missouri and Louisiana by suppressing and/or censoring the free speech of Missouri, Louisiana, and their citizens.

The Complaint,[14] Amended Complaint,[15] Second Amended Complaint,[16] and Third Amended Complaint[17] allege a total of five counts. They are:

> Count One – Violation of the First Amendment against all Defendants.

> Count Two – Action in Excess of Statutory Authority against all Defendants.

---

[14] [Doc. No. 1]
[15] [Doc. No. 45]
[16] [Doc. No. 84]
[17] [Doc. No. 268]

Count Three – Violation of the Administrative Procedure Act against HHS, NIAID, CDC, FDA, Peck, Becerra, Murthy, Crawford, Fauci, Galatas, Waldo, Byrd, Choi, Lambert, Dempsey, Muhammed, Jefferson, Murry, and Kimberly.

Count Four – Violation of the Administrative Procedure Act against DHS, CISA, Mayorkas, Easterly, Silvers, Vinograd, Jankowicz, Masterson, Protentis, Hale, Snell, Wyman, and Scully.

Count Five – Violation of the Administrative Procedure Act against the Department of Commerce, Census Bureau, Shopkorn, Schwartz, Molina-Irizarry, and Galemore.

Plaintiffs also ask for this case to be certified as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). For the reasons discussed herein, it is only necessary to address Count One and the Plaintiffs' request for class action certification in this ruling.

The following facts are pertinent to the analysis of whether or not Plaintiffs are entitled to the granting of an injunction.[18]

Plaintiffs assert that since 2018, federal officials, including Defendants, have made public statements and demands to social-media platforms in an effort to induce them to censor disfavored speech and speakers. Beyond that, Plaintiffs argue that Defendants have threatened adverse consequences to social-media companies, such as reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny/enforcement, increased regulations, and other measures, if those companies refuse to increase censorship. Section 230 of the Communications Decency Act shields social-media companies from liability for actions taken on their websites, and Plaintiffs argue that the threat of repealing Section 230 motivates the social-media companies to comply with Defendants' censorship requests. Plaintiffs also note that Mark Zuckerberg

---

[18] The Factual Background is this Court's interpretation of the evidence. The Defendants filed a 723-page Response to Findings of Fact [Doc. No. 266-8] which contested the Plaintiffs' interpretation or characterizations of the evidence. At oral argument, the Defendants conceded that they did not dispute the validity or authenticity of the evidence presented.

("Zuckerberg"), the owner of Facebook, has publicly stated that the threat of antitrust enforcement is "an existential threat" to his platform.[19]

### A. White House Defendants[20]

Plaintiffs assert that by using emails, public and private messages, public and private meetings, and other means, the White House Defendants have "significantly encouraged" and "coerced" social-media platforms to suppress protected free speech posted on social-media platforms.

(1) On January 23, 2021, three days after President Biden took office, Clarke Humphrey ("Humphrey"), who at the time was the Digital Director for the COVID-19 Response Team, emailed Twitter and requested the removal of an anti-COVID-19 vaccine tweet by Robert F. Kennedy, Jr.[21] Humphrey sent a copy of the email to Rob Flaherty ("Flaherty"), former Deputy Assistant to the President and Director of Digital Strategy, on the email and asked if "we can keep an eye out for tweets that fall in this same genre." The email read, "Hey folks-Wanted to flag the below tweet and am wondering if we can get moving on the process of having it removed ASAP."[22]

(2) On February 6, 2021, Flaherty requested Twitter to remove a parody account linked to Finnegan Biden, Hunter Biden's daughter and President Biden's granddaughter. The request stated, "Cannot stress the degree to which this needs to be resolved immediately," and "Please remove this account immediately."[23] Twitter suspended the parody account within forty-five minutes of Flaherty's request.

---

[19] [Doc. No. 212-3, citing Doc. No. 10-1, at 202]
[20] White House Defendants consists of President Joseph R. Biden ("President Biden"), White House Press Secretary Karine Jean-Pierre ("Jean-Pierre"), Ashley Morse ("Morse"), Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Stuart F. Delery ("Delery"), Mina Hsiang ("Hsiang"), and Dr. Hugh Auchincloss (Dr. Auchincloss)
[21] [Doc. No. 174-1, Exh. A. at 1]
[22] [Id. at 2]
[23] [Doc. No. 174-1, Exh. A. at 4]

(3)     On February 7, 2021, Twitter sent Flaherty a "Twitter's Partner Support Portal" for expedited review of flagging content for censorship. Twitter recommended that Flaherty designate a list of authorized White House staff to enroll in Twitter's Partner Support Portal and explained that when authorized reporters submit a "ticket" using the portal, the requests are "prioritized" automatically. Twitter also stated that it had been "recently bombarded" with censorship requests from the White House and would prefer to have a streamlined process. Twitter noted that "[i]n a given day last week for example, we had more than four different people within the White House reaching out for issues."[24]

(4)     On February 8, 2021, Facebook emailed Flaherty, and Humphrey to explain how it had recently expanded its COVID-19 censorship policy to promote authoritative COVID-19 vaccine information and expanded its efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines, and vaccines in general. Flaherty responded within nineteen minutes questioning how many times someone can share false COVID-19 claims before being removed, how many accounts are being flagged versus removed, and how Facebook handles "dubious," but not "provably false," claims.[25] Flaherty demanded more information from Facebook on the new policy that allows Facebook to remove posts that repeatedly share these debunked claims.

(5)     On February 9, 2021, Flaherty followed up with Facebook in regard to its COVID-19 policy, accusing Facebook of causing "political violence" spurred by Facebook groups by failing to censor false COVID-19 claims, and suggested having an oral meeting to discuss their policies.[26] Facebook responded the same day and stated that "vaccine-skeptical" content does not

---

[24] [Doc. No. 174-1 at 3]
[25] [Id. at 5–8]
[26] [Id. at 6–8]

violate Facebook's policies.[27] However, Facebook stated that it will have the content's "distribution reduced" and strong warning labels added, "so fewer people will see the post."[28] In other words, even though "vaccine-skeptical" content did not violate Facebook's policy, the content's distribution was still being reduced by Facebook.

Facebook also informed Flaherty that it was working to censor content that does not violate Facebook's policy in other ways by "preventing posts discouraging vaccines from going viral on our platform" and by using information labels and preventing recommendations for Groups, Pages, and Instagram accounts pushing content discouraging vaccines. Facebook also informed Flaherty that it was relying on the advice of "public health authorities" to determine its COVID-19 censorship policies.[29] Claims that have been "debunked" by public health authorities would be removed from Facebook. Facebook further promised Flaherty it would aggressively enforce the new censorship policies and requested a meeting with Flaherty to speak to Facebook's misinformation team representatives about the latest censorship policies.[30] Facebook also referenced "previous meetings" between the White House and Facebook representatives during the "transition period" (likely referencing the Biden Administration transition).[31]

(6)     On February 24, 2021, Facebook emailed Flaherty about "Misinfo Themes" to follow up on his request for COVID and vaccine misinformation themes on Facebook. Some of the misinformation themes Facebook reported seeing were claims of vaccine toxicity, claims about the side effects of vaccines, claims comparing the COVID vaccine to the flu vaccine, and claims downplaying the severity of COVID-19. Flaherty responded by asking for details about

---

[27] [Id.]
[28] [Id.]
[29] [Id.]
[30] [Id. at 6]
[31] [Id. at 5]

Facebook's actual enforcement practices and for a report on misinformation that was not censored. Specifically, his email read, "Can you give us a sense of volume on these, and some metrics around the scale of removal for each? Can you also give us a sense of misinformation that might be falling outside your removal policies?"[32] Facebook responded that at their upcoming meeting, they "can definitely go into detail on content that doesn't violate like below, but could 'contribute to vaccine hesitancy.'"[33]

(7)     On March 1, 2021, Flaherty and Humphrey (along with Joshua Peck ("Peck"), the Health and Human Services' ("HHS") Deputy Assistant Secretary) participated in a meeting with Twitter about misinformation. After the meeting, Twitter emailed those officials to assure the White House that Twitter would increase censorship of "misleading information" on Twitter, stating "[t]hanks again for meeting with us today. As we discussed, we are building on 'our' continued efforts to remove the most harmful COVID-19 'misleading information' from the service."[34]

(8)     From May 28, 2021, to July 10, 2021, a senior Meta executive reportedly copied Andrew Slavitt ("Slavitt"), former White House Senior COVID-19 Advisor, on his emails to Surgeon General Murthy ("Murthy"), alerting them that Meta was engaging in censorship of COVID-19 misinformation according to the White House's "requests" and indicating "expanded penalties" for individual Facebook accounts that share misinformation.[35] Meta also stated, "We think there is considerably more we can do in '*partnership*' with you and your team to drive behavior."[36]

---

[32] [Doc. No. 214-9 at 2–3]
[33] [Id.]
[34] [Doc. No. 214-10 at 2, Jones Declaration, #10, Exh. H] SEALED DOCUMENT
[35] [Doc. No. 71-4 at 6–11]
[36] [Id. at 10] (emphasis added)

(9)     On March 12, 2021, Facebook emailed Flaherty stating, "Hopefully, this format works for the various teams and audiences within the White House/HHS that may find this data valuable."[37] This email also provided a detailed report and summary regarding survey data on vaccine uptake from January 10 to February 27, 2021.[38]

(10)     On March 15, 2021, Flaherty acknowledged receiving Facebook's detailed report and demanded a report from Facebook on a recent Washington Post article that accused Facebook of allowing the spread of information leading to vaccine hesitancy. Flaherty emailed the Washington Post article to Facebook the day before, with the subject line: "You are hiding the ball," and stated "I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content as you define it – is playing a role."[39]

After Facebook denied "hiding the ball," Flaherty followed up by making clear that the White House was seeking more aggressive action on "borderline content."[40] Flaherty referred to a series of meetings with Facebook that were held in response to concerns over "borderline content" and accused Facebook of deceiving the White House about Facebook's "borderline policies."[41] Flaherty also accused Facebook of being the "top driver of vaccine hesitancy."[42] Specifically, his email stated:

> I am not trying to play 'gotcha' with you.  We are gravely concerned that your service is one of the top drivers of vaccine hesitancy-period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on.

---

[37] [Doc. No. 174-1 at 9]
[38] [Id.]
[39] [Id. at 11]
[40] [Id. at 11–12]
[41] [Id.]
[42] [Id. at 11]

This would all be a lot easier if you would just be straight with us.[43]

In response to Flaherty's email, Facebook responded, stating: "We obviously have work to do to gain your trust…We are also working to get you useful information that's on the level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable."[44]

Slavitt, who was copied on Facebook's email, responded, accusing Facebook of not being straightforward, and added more pressure by stating, "internally, we have been considering our options on what to do about it."[45]

(11)    On March 19, 2021, Facebook had an in-person meeting with White House officials, including Flaherty and Slavitt.[46] Facebook followed up on Sunday, March 21, 2021, noting that the White House had demanded a consistent point of contact with Facebook, additional data from Facebook, "Levers for Tackling Vaccine Hesitancy Content," and censorship policies for Meta's platform WhatsApp.[47] Facebook noted that in response to White House demands, it was censoring, removing, and reducing the virality of content discouraging vaccines "that does not contain actionable misinformation."[48] Facebook also provided a report for the White House on the requested information on WhatsApp policies:

> You asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include the additional changes that were approved last week and that we will be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines that do not contain actionable misinformation.[49]

---

[43] [Id. at 11]
[44] [Id. at 11]
[45] [Id. at 10]
[46] [Id. at 15]
[47] [Id.]
[48] [Id. at 15]
[49] [Id. at 15]

On March 22, 2021, Flaherty responded to this email, demanding more detailed information and a plan from Facebook to censor the spread of "vaccine hesitancy" on Facebook.[50] Flaherty also requested more information about and demanded greater censorship by Facebook of "sensational," "vaccine skeptical" content.[51] He also requested more information about WhatsApp regarding vaccine hesitancy.[52] Further, Flaherty seemingly spoke on behalf of the White House and stated that the White House was hoping they (presumably the White House and Facebook) could be "partners here, even if it hasn't worked so far."[53] A meeting was scheduled the following Wednesday between Facebook and White House officials to discuss these issues.

On April 9, 2021, Facebook responded to a long series of detailed questions from Flaherty about how WhatsApp was censoring COVID-19 misinformation. Facebook stated it was "reducing viral activity on our platform" through message-forward limits and other speech-blocking techniques.[54] Facebook also noted it bans accounts that engage in those that seek to exploit COVID-19 misinformation.[55]

Flaherty responded, "I care mostly about what actions and changes you are making to ensure you're not making our country's vaccine hesitancy problem worse," accusing Facebook of being responsible for the Capitol riot on January 6, 2021, and indicating that Facebook would be similarly responsible for COVID-related deaths if it did not censor more information.[56] "You only

---

[50] [Id.]
[51] [Id.]
[52] [Id.]
[53] [Id. at 14]
[54] [Id. at 17]
[55] [Id. at 17]
[56] [Id. at 17–21]

did this, however, after an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform."[57]

(12)    On April 14, 2021, Flaherty demanded the censorship of Fox News hosts Tucker Carlson and Tomi Lahren because the top post about vaccines that day was "Tucker Carlson saying vaccines don't work and Tomi Lahren stating she won't take a vaccine."[58] Flaherty stated, "This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with Tucker Carlson saying it does not work'… then…I'm not sure it's reduction!"[59]

Facebook promised the White House a report by the end of the week.[60]

(13)    On April 13, 2021, after the temporary halt of the Johnson & Johnson vaccine, the White House was seemingly concerned about the effect this would have on vaccine hesitancy. Flaherty sent to Facebook a series of detailed requests about how Facebook could "amplify" various messages that would help reduce any effects this may have on vaccine hesitancy.[61]

Flaherty also requested that Facebook monitor "misinformation" relating to the Johnson & Johnson pause and demanded from Facebook a detailed report within twenty-four hours. Facebook provided the detailed report the same day.[62] Facebook responded, "Re the J & J news, we're keen to amplify any messaging you want us to project about what this means for people."[63]

(14)    Facebook responded to a telephone call from Rowe about how it was censoring information with a six-page report on censorship with explanations and screen shots of sample posts of content that it does and does not censor. The report noted that vaccine hesitancy content

---

[57] [Id. at 17]
[58] [Id. at 22]
[59] [Id. at 22]
[60] [Id. at 23]
[61] [Id. at 30–31]
[62] [Id. at 31]
[63] [Id. at 31–32]

does not violate Facebook's content-moderation policies, but indicated that Facebook still censors this content by suppressing it in news feeds and algorithms.[64] Other content that Facebook admitted did not violate its policy but may contribute to vaccine hesitancy are: a) sensational or alarmist vaccine misrepresentation; b) disparaging others based on the choice to or not to vaccinate; c) true but shocking claims or personal anecdotes; d) discussing the choice to vaccinate in terms of personal or civil liberties; and e) concerns related to mistrust in institutions or individuals.[65] Facebook noted it censors such content through a "spectrum of levers" that includes concealing the content from other users, "de-boosting" the content, and preventing sharing through "friction."[66] Facebook also mentioned looking forward to tomorrow's meeting "and how we can hopefully partner together."[67]

Other examples of posts that did not violate Facebook's policies but would nonetheless be suppressed included content that originated from the Children's Health Defense, a nonprofit activist group headed by Robert F. Kennedy, Jr. (labeled by Defendants as one of the "Disinformation Dozen").[68]

(15) On April 14, 2021, Slavitt emailed Facebook executive Nick Clegg ("Clegg") with a message expressing displeasure with Facebook's failure to censor Tucker Carlson. Slavitt stated, "Not for nothing but the last time we did this dance, it ended in an insurrection."[69] The subject line was "Tucker Carlson anti-vax message."[70] Clegg responded the same day with a detailed report about the Tucker Carlson post, stating that the post did not qualify for removal under Facebook

---

[64] [Id. at 24–25]
[65] [Id.]
[66] [Id. at 24–25]
[67] [Id. at 24]
[68] [Id. at 25–27]
[69] [Id. at 34]
[70] Id. at 33]

18a

policy but that the video was being labeled with a pointer to authoritative COVID-19 information, not being recommended to people, and that the video was being "*demoted.*"[71]

After Brian Rice ("Rice") of Facebook forwarded the same report on the Tucker Carlson post to Flaherty on April 14, 2021, Flaherty responded to Rice wanting a more detailed explanation of why Facebook had not removed the Tucker Carlson video and questioning how the video had been "demoted" since there were 40,000 shares.[72] Flaherty followed up six minutes later alleging Facebook provided incorrect information through Crowd Tangle.[73]

Two days later, on April 16, 2021, Flaherty demanded immediate answers from Facebook regarding the Tucker Carlson video.[74] Facebook promised to get something to him that night. Facebook followed up on April 21, 2021, with an additional response in regard to an apparent call from Flaherty ("thanks for catching up earlier").[75] Facebook reported the Tucker Carlson content had not violated Facebook's policy, but Facebook gave the video a 50% demotion for seven days and stated that it would continue to demote the video.[76]

(16)    On April 21, 2021, Flaherty, Slavitt, and other HHS officials, met with Twitter officials about "Twitter Vaccine Misinfo Briefing." The invite stated the White House would be briefed by Twitter on vaccine information, trends seen generally about vaccine information, the tangible effects seen from recent policy changes, what interventions were being implemented, previous policy changes, and ways the White House could "partner" in product work.[77]

---

[71] [Id. at 36]
[72] [Id. at 33–34]
[73] [Id.]
[74] [Id. at 33]
[75] [Id.]
[76] [Id. at 33, 36]
[77] [Doc. No. 71-7 at 86].

Twitter discovery responses indicated that during the meeting, White House officials wanted to know why Alex Berenson ("Berenson") had not been "kicked off" Twitter.[78] Slavitt suggested Berenson was "the epicenter of disinfo that radiated outwards to the persuadable public."[79] Berenson was suspended thereafter on July 16, 2021, and was permanently de-platformed on August 28, 2021.[80]

(17)    Also on April 21, 2021, Flaherty, Slavitt, and Fitzpatrick had a meeting with several YouTube officials. The invitation stated the purpose of this meeting was for the White House to be briefed by YouTube on general trends seen around vaccine misinformation, the effects of YouTube's efforts to combat misinformation, interventions YouTube was trying, and ways the White House can "partner" in product work.[81]

In an April 22, 2021, email, Flaherty provided a recap of the meeting and stated his concern that misinformation on YouTube was "shared at the highest (and I mean the highest) levels of the White House."[82] Flaherty indicated that the White House remains concerned that YouTube is "funneling people into hesitancy and intensifying people's vaccine hesitancy."[83] Flaherty further shared that "we" want to make sure YouTube has a handle on vaccine hesitancy and is working toward making the problem better.[84] Flaherty again noted vaccine hesitancy was a concern that is shared by the highest ("and I mean the highest") levels of the White House.[85]

Flaherty further indicated that the White House was coordinating with the Stanford Internet Observatory (which was operating the Virality Project): "Stanford" has mentioned that it's recently

---

[78] [Doc. No. 212-14 at 2–5]
[79] [Id.]
[80] [Doc. No. 212-14, Exh. J, at 2–5]
[81] [Doc. No. 212-15, Exh. K, at 1–4] SEALED DOCUMENT
[82] [Doc. No. 174-1 at 39-40]
[83] [Id.]
[84] [Id.]
[85] [Doc. No. 174-1 at 39–40]

Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you're seeing."[86] Flaherty praised YouTube for reducing distribution of content: "I believe you said you reduced watch time by 70% on borderline content, which is impressive."[87] However, Flaherty followed up with additional demands for more information from YouTube. Flaherty emphasized that the White House wanted to make sure YouTube's work extends to the broader problem of people viewing "vaccine-hesitant content."[88] Flaherty also suggested regular meetings with YouTube ("Perhaps bi-weekly") as they have done with other "platform partners."[89]

(18)    On April 23, 2021, Flaherty sent Facebook an email including a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" ("the Brief"), which indicated that Facebook plays a major role in the spread of COVID vaccine misinformation and found that Facebook's policy and enforcement gaps enable misinformation to spread.[90] The Brief recommended much more aggressive censorship of Facebook's enforcement policies and called for progressively severe penalties. The Brief further recommended Facebook stop distributing anti-vaccine content in News Feed or in group recommendations. The Brief also called for "warning screens" before linking to domains known to promote vaccine misinformation.[91] Flaherty noted sending this Brief was not a White House endorsement of it, but "this is circulating around the building and informing thinking."[92]

On May 1, 2021, Facebook's Clegg sent an email to Slavitt indicating Facebook and the White House met recently to "share research work."[93] Clegg apologized for not catching and

---

[86] [Id. at 39]
[87] [Id.]
[88] [Doc. No. 214-1 at 39–40]
[89] [Id. at 39–40]
[90] [Doc. No. 214-14 at 2–3]
[91] [Id.]
[92] [Doc. No. 214-14 at 2–3, Jones Declaration]
[93] [Doc. No. 214-1]

censoring three pieces of vaccine content that went viral and promised to censor such content more aggressively in the future:

> I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral, and this has exposed gaps in our operational and technical process.

Notably, these three pieces of information did not violate Facebook's policies. Clegg told Slavitt that Facebook teams had spent the past twenty-four hours analyzing gaps in Facebook and were making several changes next week.[94]

Clegg listed—in bold—demands that the White House had made in a recent meeting and provided a response to each. The demands were: a) address Non-English mis/disinformation circulating without moderation; b) do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation; c) monitor events that host anti-vaccine and COVID disinformation; and d) address twelve accounts that were responsible for 73% of vaccine misinformation.[95] Facebook noted that it was scrutinizing these accounts and censoring them whenever it could, but that most of the content did not violate Facebook's policies.[96] Facebook referred to its new policy as their "Dedicated Vaccine Discouraging Entities."[97] Facebook even suggested that too much censorship might be counterproductive and drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more

---

[94] [Doc. No. 214-1 at ¶ 116].
[95] [Doc. No. 174-1 at 41–42]
[96] [Doc. No. 174-1 at 41–42].
[97] [Id.]

counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a 'cover-up.'"[98]

(19)     On May 5, 2021, then-White House Press Secretary Jen Psaki ("Psaki") publicly began pushing Facebook and other social-media platforms to censor COVID-19 misinformation. At a White House Press Conference, Psaki publicly reminded Facebook and other social-media platforms of the threat of "legal consequences" if they do not censor misinformation more aggressively. Psaki further stated: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19 vaccinations and elections."[99] Psaki linked the threat of a "robust anti-trust program" with the White House's censorship demand. "He also supports better privacy protections and a robust anti-trust program. So, his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometime life-threatening information, is not going out to the American public."[100]

The next day, Flaherty followed up with another email to Facebook and chastised Facebook for not catching various COVID-19 misinformation. Flaherty demanded more information about Facebook's efforts to demote borderline content, stating, "Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quicky?"[101] Flaherty also criticized Facebook's efforts to censor the "Disinformation Dozen":

---

[98] [Id. at 42]
[99] [Doc. No. 266-6 at 374]
[100] [Id.]
[101] [Doc. No. 174-1 at 41]

"Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo-dozen – they're being deemed as not dedicated – so it feels like that problem likely coming over to groups."[102]

Things apparently became tense between the White House and Facebook after that, culminating in Flaherty's July 15, 2021 email to Facebook, in which Flaherty stated: "Are you guys fucking serious? I want an answer on what happened here and I want it today."[103]

(20) On July 15, 2021, things became even more tense between the White House, Facebook, and other social-media platforms. At a joint press conference between Psaki and Surgeon General Murthy to announce the Surgeon General's "Health Advisory on Misinformation,"[104] Psaki announced that Surgeon General Murthy had published an advisory on health misinformation as an urgent public health crisis.[105] Murthy announced: "Fourth, we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms."[106]Psaki further stated, "We are in regular touch with these social-media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team," and "We're flagging problematic posts for Facebook that spread disinformation."[107]

Psaki followed up by stating that the White House's "asks" include four key steps by which social-media companies should: 1) measure and publicly share the impact of misinformation on

---

[102] [Id.]
[103] [Id. at 55]
[104] [Doc. No. 210-1 at 16 (Waldo Depo, Exh. 10)]
[105] [Id. at 162]
[106] [Doc. No. 10-1 at 370]
[107] [Id. at 376–77]

their platforms; 2) create a robust enforcement strategy; 3) take faster action against harmful posts; and 4) promote quality information sources in their feed algorithms.[108]

The next day, on July 16, 2021, President Biden, after being asked what his message was to social-media platforms when it came to COVID-19, stated, "[T]hey're killing people."[109] Specifically, he stated "Look, the only pandemic we have is among the unvaccinated, and that they're killing people."[110] Psaki stated the actions of censorship Facebook had already conducted were "clearly not sufficient."[111]

Four days later, on July 20, 2021, at a White House Press Conference, White House Communications Director Kate Bedingfield ("Bedingfield") stated that the White House would be announcing whether social-media platforms are legally liable for misinformation spread on their platforms and examining how misinformation fits into the liability protection granted by Section 230 of the Communications Decency Act (which shields social-media platforms from being responsible for posts by third parties on their sites).[112] Bedingfield further stated the administration was reviewing policies that could include amending the Communication Decency Act and that the social-media platforms "should be held accountable."[113]

(21)     The public and private pressure from the White House apparently had its intended effect. All twelve members of the "Disinformation Dozen" were censored, and pages, groups, and accounts linked to the Disinformation Dozen were removed.[114]

---

[108] [Id. at 377–78]
[109] [Doc. No. 10-1 at 370]
[110] [Id. at 436–37]
[111] [Doc. No. 10-1 at 446]
[112] [Doc. No. 10-1 at 477–78]
[113] [Id.]
[114] [Doc. No. 10-1 at 483–85]

Twitter suspended Berenson's account within a few hours of President Biden's July 16, 2021 comments. [115] On July 17, 2021, a Facebook official sent an email to Anita B. Dunn ("Dunn"), Senior Advisor to the President, asking for ways to "get back into the White House's good graces" and stated Facebook and the White House were "100% on the same team here in fighting this."[116]

(22)    On November 30, 2021, the White House's Christian Tom ("Tom") emailed Twitter requesting that Twitter watch a video of First Lady Jill Biden that had been edited to make it sound as if the First Lady were profanely heckling children while reading to them.[117] Twitter responded within six minutes, agreeing to "escalate with the team for further review."[118] Twitter advised users that the video had been edited for comedic effect. Tom then requested Twitter apply a "Manipulated Media" disclaimer to the video.[119] After Twitter told Tom the video was not subject to labeling under its policy, Tom disputed Twitter's interpretation of its own policy and added Michael LaRosa ("LaRosa"), the First Lady's Press Secretary, into the conversation.[120] Further efforts by Tom and LaRosa to censor the video on December 9, 13, and 17 finally resulted in the video's removal in December 2021.[121]

(23)    In January 2022, Facebook reported to Rowe, Murthy, Flaherty, and Slavitt that it had "labeled and demoted" vaccine humor posts whose content could discourage vaccination.[122] Facebook also reported to the White House that it "labeled and 'demoted' posts suggesting natural immunity to a COVID-19 infection is superior to vaccine immunity."[123] In January 2022, Jesse

---

[115] [Doc. No. 214-12 at 2–5]
[116] [Doc. No. 174-1 at 49]
[117] [Doc. No. 174-1 at 59–67]
[118] [Id.]
[119] [Id.]
[120] [Id.]
[121] [Id. at 59–67]
[122] [Doc. No. 71-3 at 10–11]
[123] [Doc. No. 71-3 at 10–11]

Lee ("Lee") of the White House sent an email accusing Twitter of calling the President a liar in regard to a Presidential tweet.[124]

At a February 1, 2022, White House press conference, Psaki stated that the White House wanted every social-media platform to do more to call out misinformation and disinformation, and to uplift accurate information.[125]

At an April 25, 2022, White House press conference, after being asked to respond to news that Elon Musk may buy Twitter, Psaki again mentioned the threat to social-media companies to amend Section 230 of the Communications Decency Act, linking these threats to social-media platforms' failure to censor misinformation and disinformation.[126]

On June 13, 2022, Flaherty demanded Meta continue to produce periodic COVID-19 insight reports to track COVID-19 misinformation, and he expressed a concern about misinformation regarding the upcoming authorization of COVID-19 vaccines for children under five years of age. Meta agreed to do so on June 22, 2022.[127]

(24)    In addition to misinformation regarding COVID-19, the White House also asked social-media companies to censor misinformation regarding climate change, gender discussions, abortion, and economic policy. At an Axios event entitled "A Conversation on Battling Misinformation," held on June 14, 2022, the White House National Climate Advisor Gina McCarthy ("McCarthy") blamed social-media companies for allowing misinformation and disinformation about climate change to spread and explicitly tied these censorship demands with threats of adverse legislation regarding the Communications Decency Act.[128]

---

[124] [Doc. No. 174-1 at 69]
[125] [Doc. No. 10-1 at 501–2]
[126] [Id. at 62–63, ¶¶ 193–197]
[127] [Doc. No. 71-3 at 5–6]
[128] [Doc. No. 214-15]

On June 16, 2022, the White House announced a new task force to target "general misinformation" and disinformation campaigns targeted at women and LBGTQI individuals who are public and political figures, government and civic leaders, activists, and journalists.[129] The June 16, 2022, Memorandum discussed the creation of a task force to reel in "online harassment and abuse" and to develop programs targeting such disinformation campaigns.[130] The Memorandum also called for the Task Force to confer with technology experts and again threatened social-media platforms with adverse legal consequences if the platforms did not censor aggressively enough.[131]

On July 8, 2022, President Biden signed an Executive Order on protecting access to abortion. Section 4(b)(iv) of the order required the Attorney General, the Secretary of HHS, and the Chair of the Federal Trade Commission to address deceptive or fraudulent practices relating to reproductive healthcare services, including those online, and to protect access to accurate information.[132]

On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter to one of President Biden's tweets about gas prices.[133]

(25)    On August 23, 2021, Flaherty emailed Facebook requesting a report on how Facebook intended to promote the FDA approval of the Pfizer vaccine. He also stated that the White House would appreciate a "push" and provided suggested language.[134]

---

[129] [Doc. No. 214-15[
[130] [Id.]
[131] [Doc. No. 214-16]
[132] [Doc. No. 214-18]
[133] [Doc. No. 174-1 at 68]
[134] [Id.]

28a

### B. Surgeon General Defendants[135]

Surgeon General Murthy is the Surgeon General of the United States. Eric Waldo ("Waldo") is the Senior Advisor to the Surgeon General and was formerly Chief Engagement Officer for the Surgeon General's office. Waldo's Deposition was taken as part of the allowed Preliminary Injunction-related discovery in this matter.[136]

(1)     Waldo was responsible for maintaining the contacts and relationships with representatives of social-media platforms. Waldo did pre-rollout calls with Twitter, Facebook, and Google/YouTube before the Surgeon General's health advisory on misinformation was published on July 15, 2021.[137] Waldo admitted that Murthy used his office to directly advocate for social-media platforms to take stronger actions against health "misinformation" and that those actions involved putting pressure on social-media platforms to reduce the dissemination of health misinformation.[138] Surgeon General Murthy's message was given to social-media platforms both publicly and privately.[139]

(2)     At a July 15, 2021 joint press conference between Psaki and Murthy, the two made the comments mentioned previously in II A(19), which publicly called for social-media platforms "to do more" to take action against misinformation super-spreaders.[140] Murthy was directly involved in editing and approving the final work product for the July 15, 2021 health advisory on misinformation.[141] Waldo also admitted that Murthy used his "bully pulpit" to talk about health misinformation and to put public pressure on social-media platforms.[142]

---

[135] Surgeon General Defendants consists of Dr. Vivek H. Murthy ("Murthy") and Katharine Dealy ("Dealy").
[136] [Doc. No. 210]
[137] [Doc. No. 210 at 11, 20]
[138] [Id. at 25, 28]
[139] [Id. at 11, 20, 25, 28]
[140] [Id. at 33–35]
[141] [Waldo depo at 14–17]
[142] [Id. at 29]

(3)    Waldo's initial rollout with Facebook was negatively affected because of the public attacks by the White House and Office of the Surgeon General towards Facebook for allowing misinformation to spread.[143] Clegg of Facebook reached out to attempt to request "de-escalation" and "working together" instead of the public pressure.[144] In the call between Clegg and Murthy, Murthy told Clegg he wanted Facebook to do more to censor misinformation on its platforms. Murthy also requested Facebook share data with external researchers about the scope and reach of misinformation on Facebook's platforms to better understand how to have external researchers validate the spread of misinformation.[145] "Data about misinformation" was the topic of conversation in this call; DJ Patil, chief data scientist in the Obama Administration, Murthy, Waldo, and Clegg all participated on the call. The purpose of the call was to demand more information from Facebook about monitoring the spread of misinformation.[146]

(4)    One of the "external researchers" that the Office of Surgeon General likely had in mind was Renee DiResta ("DiResta") from the Stanford Internet Observatory, a leading organization of the Virality Project.[147] The Virality Project hosted a "rollout event" for Murthy's July 15, 2021 press conference.[148]

There was coordination between the Office of the Surgeon General and the Virality Project on the launch of Murthy's health advisory.[149] Kyla Fullenwider ("Fullenwider") is the Office of the Surgeon General's key subject-matter expert who worked on the health advisory on misinformation. Fullenwider works for a non-profit contractor, United States' Digital Response.[150]

---

[143] [Id. at 91–94]
[144] [Doc. No. 210 at 95–98]
[145] [Id.]
[146] [Doc. No. 210 at 95–98]
[147] The Virality Project will be discussed later in greater detail.
[148] [Id. at 36–38]
[149] [Id. at 38]
[150] [Id. at 39, 59, 85]

Waldo, Fullenwider, and DiResta were involved in a conference call after the July 15, 2021 press conference where they discussed misinformation.[151] The Office of the Surgeon General anticipated that social-media platforms would feel pressured by the Surgeon General's health advisory.[152]

(5)  Waldo and the Office of the Surgeon General received a briefing from the Center for Countering Digital Hate ("CCDH") about the "Disinformation Dozen." CCDH gave a presentation about the Disinformation Dozen and how CCDH measured and determined that the Disinformation Dozen were primarily responsible for a significant amount of online misinformation.[153]

(6)  In his deposition, Waldo discussed various phone calls and communications between Defendants and Facebook. In August of 2021, Waldo joined a call with Flaherty and Brian Rice of Facebook.[154] The call was an update by Facebook about the internal action it was taking regarding censorship.[155] Waldo was aware of at least one call between Murthy and Facebook in the period between President Biden's election and assuming office, and he testified that the call was about misinformation.[156] Waldo was also aware of other emails and at least one phone call where Flaherty communicated with Facebook.[157]

(7)  The first meeting between the Office of the Surgeon General and social-media platforms occurred on May 25, 2021, between Clegg, Murthy, and Slavitt. The purpose of this call was to introduce Murthy to Clegg. Clegg emailed Murthy with a report of misinformation on Facebook on May 28, 2021.[158]

---

[151] [Id.]
[152] [Id. at 39, 59, 85]
[153] [Id. at 43, 47]
[154] [Id. at 66, 124–25]
[155] [Id. at 66, 124–25]
[156] [Id. at 55–56]
[157] [Id. at 64–65]
[158] [Doc. No. 210-4]

Policy updates about increasing censorship were announced by Facebook on May 27, 2021.[159] The Office of the Surgeon General had a pre-rollout (i.e., before the rollout of the Surgeon General's health advisory on misinformation) call with Twitter and YouTube on July 12 and July 14, 2021.[160] The Office of the Surgeon General had a rollout call with Facebook on July 16, 2021. The July 16 call with Facebook was right after President Biden had made his "[T]hey're killing people" comment (II A (19), above), and it was an "awkward call" according to Waldo.[161]

Another call took place on July 23, 2021, between Murthy, Waldo, DJ Patil, Clegg, and Rice. Clegg shared more about the spread of information and disinformation on Facebook after the meeting. At the meeting, Murthy raised the issue of wanting to have a better understanding of the reach of misinformation and disinformation as it relates to health on Facebook; Murthy often referred to health misinformation in these meetings as "poison."[162] The Surgeon General's health advisory explicitly called for social-media platforms to do more to control the reach of misinformation.[163]

On July 30, 2021, Waldo had a meeting with Google and YouTube representatives. At the meeting, Google and YouTube reported to the Office of the Surgeon General what actions they were taking following the Surgeon General's health advisory on misinformation.[164]

On August 10, 2021, Waldo and Flaherty had a call with Rice calling for Facebook to report to federal officials as to Facebook's actions to remove "disinformation" and to provide details regarding a vaccine misinformation operation Facebook had uncovered.[165]

---

[159] [Id. at 78, Exh. 3]
[160] [Id. at 85]
[161] [Id.]
[162] [Id. at 95–98, 101, 105]
[163] [Id. at 107–08]
[164] [Doc. No. 210-4 at 33]
[165] [Id.]

Another meeting took place between Google/YouTube, Waldo, and Flaherty on September 14, 2021, to discuss a new policy YouTube was working on and to provide the federal officials with an update on YouTube's efforts to combat harmful COVID-19 misinformation on its platform.[166]

(8)     After the meetings with social-media platforms, the platforms seemingly fell in line with the Office of Surgeon General's and White House's requests. Facebook announced policy updates about censoring misinformation on May 27, 2021, two days after the meeting.[167] As promised, Clegg provided an update on misinformation to the Office of Surgeon General on May 28, 2021, three days after the meeting[168] and began sending bi-weekly COVID content reports on June 14, 2021.[169]

On July 6, 2021, Waldo emailed Twitter to set up the rollout call for the Office of the Surgeon General's health advisory on misinformation and told Twitter that Murthy had been thinking about how to stop the spread of health misinformation; that he knew Twitter's teams were working hard and thinking deeply about the issue; and that he would like to chat over Zoom to discuss.[170] Twitter ultimately publicly endorsed the Office of the Surgeon General's call for greater censorship of health misinformation.[171]

Waldo sent an email to YouTube on July 6, 2021, to set up the rollout call and to state that the Office of the Surgeon General's purpose was to stop the spread of misinformation on social-media platforms.[172] YouTube eventually adopted a new policy on combatting COVID-19

---

[166] [Id. at 129]
[167] [Doc. No. 210-1 at 138]
[168] [Doc. No. 210-5 at 1–2]
[169] [Doc. No. 210-6]
[170] [Doc. No. 210-7 at 145–46]
[171] [Id.]
[172] [Doc. No. 210-8]

misinformation and began providing federal officials with updates on YouTube's efforts to combat the misinformation.[173]

(9)     At the July 15, 2021 press conference, Murthy described health misinformation as one of the biggest obstacles to ending the pandemic; insisted that his advisory was on an urgent public health threat; and stated that misinformation poses an imminent threat to the nation's health and takes away the freedom to make informed decisions.[174] Murthy further stated that health disinformation is false, inaccurate, or misleading, based upon the best evidence at the time.[175]

Murthy also stated that people who question mask mandates and decline vaccinations are following misinformation, which results in illnesses and death.[176] Murthy placed specific blame on social-media platforms for allowing "poison" to spread and further called for an "all-of-society approach" to fight health misinformation.[177] Murthy called upon social-media platforms to operate with greater transparency and accountability, to monitor information more clearly, and to "consistently take action against misinformation super-spreaders on their platforms."[178] Notably, Waldo agreed in his deposition that the word "accountable" carries with it the threat of consequences.[179] Murthy further demanded social-media platforms do "much, much, more" and take "aggressive action" against misinformation because the failure to do so is "costing people their lives."[180]

(10)     Murthy's July 15, 2021 health advisory on misinformation blamed social-media platforms for the spread of misinformation at an unprecedented speed, and it blamed social-media

---

[173] [Doc. No. 210-8].
[174] [Doc. No. 210-11]
[175] [Doc. No. 210-11]
[176] [Doc. No. 210-11]
[177] [Id.]
[178] [Id.]
[179] [Id.]
[180] [Id.]

features and algorithms for furthering the spread.[181]  The health advisory further called for social-media platforms to enact policy changes to reduce the spread of misinformation, including appropriate legal and regulatory measures.[182]

Under a heading entitled "What Technology Platforms Can Do," the health advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of misinformation, including product changes, changing algorithms to avoid amplifying misinformation, building in "frictions" to reduce the sharing of misinformation, and practicing the early detection of misinformation super-spreaders, along with other measures.[183]  The consequences for misinformation would include flagging problematic posts, suppressing the spread of the information, suspension, and permanent de-platforming.[184]

(11)    The Office of the Surgeon General collaborated and partnered with the Stanford University Internet Observatory and the Virality Project. Murthy participated in a January 15, 2021 launch of the Virality Project. In his comments, Murthy told the group, "We're asking technology companies to operate with great transparency and accountability so that misinformation does not continue to poison our sharing platforms and we knew the government can play an important role, too."[185]

Murthy expressly mentioned his coordination with DiResta at the Virality Project and expressed his intention to maintain that collaboration. He claimed that he had learned a lot from the Virality Project's work and thanked the Virality Project for being such a great "partner."[186]

---

[181] [Doc. No. 210-11]
[182] [Id.]
[183] [Id.]
[184] [Id.]
[185] [Doc. No. 210-13, Doc. No. 210, at 206–07].
[186] [Doc. No. 210-1 at 213]

35a

Murthy also stated that the Office of the Surgeon General had been "partnered with" the Stanford Internet Observatory for many months.[187]

(12)    After President Biden's "[T]hey're killing people" comment on July 16, 2021, Facebook representatives had "sad faces" according to Waldo. On July 21, 2021, Facebook emailed Waldo and Fullenwider with CrowdTangle data and with "interventions" that created "frictions" with regard to COVID misinformation. The interventions also included limiting forwarding of WhatsApp messages, placing warning labels on fact-checked content, and creating "friction" when someone tries to share these posts on Facebook. Facebook also reported other censorship policy and actions, including censoring content that contributes to the risk of imminent physical harm, permanently banning pages, groups, and accounts that repeatedly broke Facebook's COVID-19 misinformation rules, and reducing the reach of posts, pages, groups, and accounts that share other false claims "that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines."[188]

On July 16, 2021, Clegg emailed Murthy and stated, "I know our teams met today to better understand the scope of what the White House expects of us on misinformation going forward."[189]On July 18, 2021, Clegg messaged Murthy stating "I imagine you and your team are feeling a little aggrieved—as is the [Facebook] team, it's not great to be accused of killing people—but as I said by email, I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits."[190] As a result of this communication, a meeting was scheduled for July 23, 2021.[191]

---

[187] [Doc. No. 210-1 at 213]
[188] [Doc. No. 210-15]
[189] [Doc. No. 210-16]
[190] [Doc. No. 210-17]
[191] [Doc. No. 210-18]

36a

At the July 23, 2021 meeting, the Office of the Surgeon General officials were concerned about understanding the reach of Facebook's data.[192] Clegg even sent a follow-up email after the meeting to make sure Murthy saw the steps Facebook had been taking to adjust policies with respect to misinformation and to further address the "disinfo-dozen."[193] Clegg also reported that Facebook had "expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."[194] Further, Facebook also agreed to "do more" to censor COVID misinformation, to make its internal data on misinformation available to federal officials, to report back to the Office of the Surgeon General, and to "strive to do all we can to meet our 'shared' goals."[195]

Evidently, the promised information had not been sent to the Office of the Surgeon General by August 6, 2021, so the Office requested the information in a report "within two weeks."[196] The information entitled "How We're Taking Action Against Vaccine Misinformation Superspreaders" was later sent to the Office of the Surgeon General. It detailed a list of censorship actions taken against the "Disinformation Dozen."[197] Clegg followed up with an August 20, 2021 email with a section entitled "Limiting Potentially Harmful Misinformation," which detailed more efforts to censor COVID-19 Misinformation.[198] Facebook continued to report back to Waldo and Flaherty with updates on September 19 and 29 of 2021.[199]

(13)    Waldo asked for similar updates from Twitter, Instagram, and Google/YouTube.[200]

---

[192] [Id.]
[193] [Id. at 4–5]
[194] [Id.]
[195] [Id.]
[196] [Doc. No. 210-22 at 1–3]
[197] [Doc. No. 210-21]
[198] [Doc. No. 210-22 at 2]
[199] [Doc. No. 210, Waldo depo. Exh 30, 31]
[200] [Doc. No. 210, Waldo depo. at 257–58]

36

(14)    The Office of the Surgeon General also collaborated with the Democratic National Committee. Flaherty emailed Murthy on July 19, 2021, to put Murthy in touch with Jiore Craig ("Craig") from the Democratic National Committee who worked on misinformation and disinformation issues.[201] Craig and Murthy set up a Zoom meeting for July 22, 2021.

(15)    After an October 28, 2021 Washington Post article stated that Facebook researchers had deep knowledge about how COVID-19 and vaccine misinformation ran through Facebook's apps, Murthy issued a series of tweets from his official Twitter account indicating he was "deeply disappointed" to read this story, that health misinformation had harmed people's health and cost lives, and that "we must demand Facebook and the rest of the social-media ecosystems take responsibility for stopping health misinformation on their platforms."[202] Murthy further tweeted that "we need transparency and accountability now."[203]

(16)    On October 29, 2021, Facebook asked federal officials to provide a "federal health contract" to dictate "what content would be censored on Facebook's platforms."[204] Federal officials informed Facebook that the federal health authority that could dictate what content could be censored as misinformation was the CDC.[205]

(17)    Murthy continued to publicly chastise social-media platforms for allowing health misinformation to be spread on their platforms. Murthy made statements on the following platforms: a December 21, 2021 podcast threatening to hold social-media platforms accountable for not censoring misinformation;[206] a January 3, 2022 podcast with Alyssa Milano stating that "platformers need to step up to be accountable for making their spaces safer";[207] and a February

---

[201] [Doc. No. 210, Exh. 22]
[202] [Doc. No. 210, Exh. 31]
[203] [Id.]
[204] [Doc. No. 210, Exh. 33]
[205] [Id.]
[206] [Doc. No. 210, Exh. 38, Audio Transcript, at 7]
[207] [Doc. No. 210–33]

14, 2022 panel discussion hosted by the Rockefeller Foundation, wherein they discussed that technology platforms enabled the speed, scale, and sophistication with which this misinformation was spreading.[208]

On March 3, 2022, the Office of the Surgeon General issued a formal Request for Information ("RFI"), published in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation.[209] The RFI indicated that the Office of the Surgeon General was expanding attempts to control the spread of misinformation on social media and other technology platforms.[210] The RFI also sought information about censorship policies, how they were enforced, and information about disfavored speakers.[211]The RFI was sent to Facebook, Google/YouTube, LinkedIn, Twitter, and Microsoft[212] by Max Lesko ("Lesko"), Murthy's Chief of Staff, requesting responses from these social-media platforms.[213]Murthy again restated social-media platforms' responsibility to reduce the spread of misinformation in an interview with GQ Magazine.[214] Murthy also specifically called upon Spotify to censor health information.[215]

## C. CDC Defendants[216]

(1)    Crawford is the Director for The Division of Digital Media within the CDC Office of the Associate Director for Communications. Her deposition was taken pursuant to preliminary-

---

[208] [Doc. No. 210–34]
[209] [Doc. No. 32. Ex. 42, 87 Fed. Reg. 12712]
[210] [Id.]
[211] [Id.]
[212] [Id. Exh. 46, 47, 48, 49, 50, 51]
[213] [Id.]
[214] [Id. Exh. 51]
[215] [Exh. 52]
[216] The CDC Defendants consist of the Centers for Disease Control & Prevention, Carol Crawford ("Crawford"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), United States Census Bureau ("Census Bureau"), Jennifer Shopkorn ("Shopkorn"), the Department of Health and Human Services ("HHS"), Xavier Becerra ("Becerra"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), and Joshua Peck ("Peck").

injection related discovery here.[217] The CDC is a component of the Department of Health and Human Services ("HHS"); Xavier Becerra ("Becerra") is the Secretary of HHS.[218] Crawford's division provides leadership for CDC's web presence, and Crawford, as director, determines strategy and objectives and oversees its general work.[219] Crawford was the main point of contact for communications between the CDC and social-media platforms.[220]

Prior to the COVID-19 pandemic, Crawford only had limited contact with social-media platforms, but she began having regular contact post-pandemic, beginning in February and March of 2020.[221] Crawford communicated with these platforms via email, phone, and meetings.[222]

(2)    Facebook emailed State Department officials on February 6, 2020, that it had taken proactive and reactive steps to control information and misinformation related to COVID-19. The email was forwarded to Crawford, who reforwarded to her contacts on Facebook.[223] Facebook proposed to Crawford that it would create a Coronavirus page that would give information from trusted sources including the CDC. Crawford accepted Facebook's proposal on February 7, 2020, and suggested the CDC may want to address "widespread myths" on the platform.[224]

Facebook began sending Crawford CrowdTangle reports on January 25, 2021. CrowdTangle is a social-media listening tool for Meta, which shows themes of discussion on social-media channels. These reported on "top engaged COVID and vaccine-related content overall across Pages and Groups."[225] This CrowdTangle report was sent by Facebook to Crawford

---

[217] [Doc. No. 205-1]
[218] [Doc. No. 266-5 at 57–61]
[219] [Doc. No. 205-1 at 11]
[220] [Id. at 249]
[221] [Id. at 16–18]
[222] [Id. at 20]
[223] [Doc. 205-3 at 3]
[224] [Id. at 1–2]
[225] [Id. at 49–52]

40a

in response to a prior conversation with Crawford.[226] The CDC had privileged access to CrowdTangle since early 2020.[227]

Facebook emailed Crawford on March 3, 2020, that it intended to support the Government in its response to the Coronavirus, including a goal to remove certain information.[228] Crawford and Facebook began having discussions about misinformation with Facebook in the Fall of 2020, including discussions of how to combat misinformation.[229]

The CDC used CrowdTangle, along with Meltwater reports (used for all platforms), to monitor social media's themes of discussion across platforms.[230] Crawford recalls generally discussing misinformation with Facebook.[231] Crawford added Census Bureau officials to the distribution list for CrowdTangle reports because the Census Bureau was going to begin working with the CDC on misinformation issues.[232]

(3)     On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook weekly sync with CDC."[233] A number of Facebook and CDC officials were included in the invite, and the CDC could invite other agencies as needed.[234] The CDC had weekly meetings with Facebook.[235]

(4)     On March 10, 2021, Crawford sent Facebook an email seeking information about "Themes that have been removed for misinfo."[236] The CDC questioned if Facebook had info on the types of posts that were removed. Crawford was aware that the White House and the HHS

---

[226] [Doc. No. 205-1, Exh. 6 at 2]
[227] [Id. at 49–52, 146–47]
[228] [Doc. No. 205-4 at 1–2]
[229] [Doc. No. 205-7 at 1–2]
[230] [Doc. No. 205-1 at 154–55]
[231] [Id. at 58]
[232] [Id.]
[233] [Doc. No. 205-1 at 226]
[234] [Doc. No. 205-36]
[235] Doc. No. 205-1 at 226]
[236] [Doc. No. 205-44 at 2–3]

40

were also receiving similar information from Facebook.[237] The HHS was present at meetings with social-media companies on March 1, 2021,[238] and on April 21, 2021.[239]

(5)     On March 25, 2021, Crawford and other CDC officials met with Facebook. In an email by Facebook prior to that meeting, Facebook stated it would present on COVID-19 misinformation and have various persons present, including a Misinformation Manager and a Content-Manager official (Liz Lagone).[240] Crawford responded, attaching a PowerPoint slide deck, stating "This is a deck Census would like to discuss and we'd also like to fit in a discussion of topic types removed from Facebook."[241] Crawford also indicated two Census Bureau officials, Schwartz and Shopkorn, would be present, as well as two Census Bureau contractors, Sam Huxley and Christopher Lewitzke.[242]

The "deck" the Census Bureau wanted to discuss contained an overview of "Misinformation Topics" and included "concerns about infertility, misinformation about side effects, and claims about vaccines leading to deaths."[243] For each topic, the deck included sample slides and a statement from the CDC debunking the allegedly erroneous claim.[244]

(6)     Crawford admits she began engaging in weekly meetings with Facebook,[245] and emails verify that the CDC and Facebook were repeatedly discussing misinformation back and forth.[246] The weekly meetings involved Facebook's content-mediation teams. Crawford mainly inquired about how Facebook was censoring COVID-19 misinformation in these meetings.[247]

---

[237] [Doc. No. 205-1 at 258–61]
[238] Twitter with White House
[239] Twitter with White House
[240] [Doc. No. 205-1 at 103]
[241] [Id.]
[242] [Doc. No. 205-34 at 3]
[243] [Id. at 4]
[244] [Id. at 6–14]
[245] [Doc. No. 205-1 at 68–69]
[246] [Doc. No. 205-9 at 1–4]
[247] [Doc. No. 205-1 at 68–69]

42a

(7)     The CDC entered into an Intra-Agency Agreement ("IAA") with the Census Bureau to help advise on misinformation. The IAA required that the Census Bureau provide reports to the CDC on misinformation that the Census Bureau tracked on social media.[248] To aid in this endeavor, Crawford asked Facebook to allow the Census Bureau to be added to CrowdTangle.[249]

(8)     After the March 2021 weekly meetings between Facebook, the CDC, and Census Bureau began, Crawford began to press Facebook on removing and/or suppressing misinformation. In particular, she stated, "The CDC would like to have more info… about what is being done on the amplification-side," and the CDC "is still interested in more info on how you view or analyze the data on removals, etc."[250] Further, Crawford noted, "It looks like the posts from last week's deck about infertility and side effects have all been removed. Were these evaluated by the moderation team or taken down for another reason?"[251] Crawford also questioned Facebook about the CrowdTangle report showing local news coverage of deaths after receiving the vaccine and questioned what Facebook's approach is for "adding labels" to those stories.[252]

On April 13, 2021, Facebook emailed Crawford to propose enrolling CDC and Census Bureau officials in a special misinformation reporting channel; this would include five CDC officials and four Census Bureau officials. The portal was only provided to federal officials.[253]

On April 23, 2021, and again on April 28, 2021, Crawford emailed Facebook about a Wyoming Department of Health report noting that the algorithms that Facebook and other social-media networks are using to "screen out postings of sources of vaccine misinformation" were also screening out valid public health messages.[254]

---

[248] [Doc. No. 205-1 at 71–72, 110]
[249] [Doc. No. 205-9 at 1]
[250] [Doc. No. 205-9 at 2]
[251] [Id.]
[252] [Doc. No. 205-9 at 1]
[253] [Doc. No. 205-11 at 2]
[254] [Doc. No. 205-38 at 2]

On May 6, 2021, Crawford emailed Facebook a table containing a list of sixteen specific postings on Facebook and Instagram that contained misinformation.[255] Crawford stated in her deposition that she knew when she "flagged" content for Facebook, they would evaluate and possibly censor the content.[256] Crawford stated CDC's goal in flagging information for Facebook was "to be sure that people have credible health information so that they can make the correct health decisions."[257] Crawford continued to "flag" and send misinformation posts to Facebook, and on May 19, 2021,[258] Crawford provided Facebook with twelve specific claims.

(9)    Facebook began to rely on Crawford and the CDC to determine whether claims were true or false. Crawford began providing the CDC with "scientific information" for Facebook to use to determine whether to "remove or reduce and inform."[259] Facebook was relying on the CDC's "scientific information" to determine whether statements  made on its platform were true or false.[260] The CDC would respond to "debunk" claims if it had an answer.[261] These included issues like whether COVID-19 had a 99.96% survival rate, whether COVID-19 vaccines cause bells' palsy, and whether people who are receiving COVID-19 vaccines are subject to medical experiments.[262]

Facebook content-mediation officials would contact Crawford to determine whether statements made on Facebook were true or false.[263] Because Facebook's content-moderation policy called for Facebook to remove claims that are false and can lead to harm, Facebook would

---

[255] [Doc. No. 205-10 at 1–3]
[256] [Doc. No. 205-1 at 88]
[257] [Id.]
[258] [Doc. No. 205-12 at 1]
[259] [Id. at 2]
[260] [Doc. No. 205-1 at 106]
[261] [Id.]
[262] [Doc. No. 205-12 at 1–2]
[263] [Doc. No. 205-12 at 2]

remove and/or censor claims the CDC itself said were false.[264] Questions by Facebook to the CDC related to this content-moderation included whether spike proteins in COVID-19 vaccines are dangerous and whether Guillain-Barre Syndrome or heart inflammation is a possible side effect of the COVID-19 vaccine.[265] Crawford normally referred Facebook to CDC subject-matter experts or responded with the CDC's view on these scientific questions.[266]

(10)    Facebook continued to send the CDC biweekly CrowdTangle content insight reports, which included trending topics such as Door-to-Door Vaccines, Vaccine Side Effects, Vaccine Refusal, Vaccination Lawsuits, Proof of Vaccination Requirement, COVID-19 and Unvaccinated Individuals, COVID-19 Mandates, Vaccinating Children, and Allowing People to Return to Religious Services.[267]

(11)    On August 19, 2021, Facebook asked Crawford for a Vaccine Adverse Event Reporting System ("VAERS") meeting for the CDC to give Facebook guidance on how to address VAERS-related "misinformation."[268] The CDC was concerned about VAERS-related misinformation because users were citing VAERS data and reports to raise concerns about the safety of vaccines in ways the CDC found to be "misleading."[269] Crawford and the CDC followed up by providing written materials for Facebook to use.[270] The CDC eventually had a meeting with Facebook about VAERS-related misinformation and provided two experts for this issue.[271]

(12)    On November 2, 2021, a Facebook content-moderation official reached out to the CDC to obtain clarity on whether the COVID-19 vaccine was harmful to children. This was

---

[264] [Doc. No. 205-26 at 1–4]
[265] [Doc. No. 205-18]
[266] [Doc. No. 205-1 at 140]
[267] [Doc. No. 205-20 at 205–20]
[268] [Doc. No. 205-21]
[269] [Doc. No. 205-22]
[270] [Doc. No. 205-21]
[271] [Doc. No. 205-1 at 151–52]

following the FDA's emergency use authorization ("EUA") related to the COVID-19 vaccine.[272] In addition to the EUA issue for children, Facebook identified other claims it sought clarity on regarding childhood vaccines and vaccine refusals.[273]

The following Monday, November 8, 2021, Crawford followed up with a response from the CDC, which addressed seven of the ten claims Facebook had asked the CDC to evaluate. The CDC rated six of the claims "False" and stated that any of these false claims could cause vaccine refusal.[274]

The questions the CDC rated as "false" were:

1) COVID-19 vaccines weaken the immune system;
2) COVID-19 vaccines cause auto-immune diseases;
3) Antibody-dependent enhancement ("ADE") is a side effect of COVID-19 vaccines;
4) COVID-19 vaccines cause acquired immunodeficiency syndrome (AIDS);
5) Breast milk from a vaccinated parent is harmful to babies/children; and
6) COVID-19 vaccines cause multi-system inflammatory syndrome in children (MIS-C).

(13)    On February 3, 2022, Facebook again asked the CDC for clarification on whether a list of claims were "false" and whether the claims, if believed, could contribute to vaccine refusals.[275] The list included whether COVID-19 vaccines cause ulcers or neurodegenerative diseases such as Huntington's and Parkinson's disease; the FDA's possible future issuance of an EUA to children six months to four years of age; and questions about whether the COVID-19 vaccine causes death, heart attacks, autism, birth defects, and many others.[276]

(14)    In addition to its communications with Facebook, the CDC and Census Bureau also had involvement with Google/YouTube. On March 18, 2021, Crawford emailed Google, with the

---

[272] [Doc. 205-23 at 1–2]
[273] [Id.]
[274] [Doc. No. 205–24]
[275] [Doc. No. 205-26 at 1]
[276] [Id. at 1–4]

45

subject line "COVID Misinfo Project." Crawford informed Google that the CDC was now working with the Census Bureau (who had been meeting with Google regularly) and wanted to set up a time to talk and discuss the "COVID Misinfo Project."[277] According to Crawford, the previous Census project referred to the Census' work on combatting 2020 Census misinformation.[278]

On March 23, 2021, Crawford sent a calendar invite for a March 24, 2021 meeting, which included Crawford and five other CDC employees, four Census Bureau employees, and six Google/YouTube officials.[279] At the March 24, 2021 meeting, Crawford presented a slide deck similar to the one prepared for the Facebook meeting. The slide deck was entitled "COVID Vaccine Misinformation: Issue Overview" and included issues like infertility, side effects, and deaths. The CDC and the Census Bureau denied that COVID-19 vaccines resulted in infertility, caused serious side effects, or resulted in deaths.[280]

(15)   On March 29, 2021, Crawford followed up with Google about using their "regular 4 p.m. meetings" to go over things with the Census.[281] Crawford recalled that the Census was asking for regular meetings with platforms, specifically focused on misinformation.[282] Crawford also noted that the reference to the "4 p.m. meeting" refers to regular biweekly meetings with Google, which "continues to the present day."[283] Crawford also testified she had similar regular meetings with Meta and Twitter, and previously had regular meetings with Pinterest. Crawford stated these meetings were mostly about things other than misinformation, but misinformation was discussed at the meetings.[284]

---

[277] [Doc. No. 205-28]
[278] [Doc. No. 205-1 at 175]
[279] [Doc. No. 214-22 Jones Dec. Exh. T] SEALED DOCUMENT
[280] [Id.] SEALED DOCUMENT
[281] [Doc. No. 205-1 at 179–82]
[282] [Doc. No. 205-1 at 184–85]
[283] [Doc. No. 205-1 at 180]
[284] [Id. at 181]

46

(16)    On May 10, 2021, Crawford emailed Facebook to establish "COVID BOLO" ("Be on The Lookout") meetings. Google and YouTube were included.[285] Crawford ran the BOLO meetings, and the Census Bureau official arranged the meetings and prepared the slide deck for each meeting.[286]

The first BOLO meeting was held on May 14, 2021; the slide deck for the meeting was entitled "COVID Vaccine Misinformation: Hot Topics" and included five "hot topics" with a BOLO note for each topic. The five topics were: the vaccines caused "shedding"; a report made on VAERS that a two-year old child died from the vaccine; other alleged misleading information on VAERS reports; statements that vaccines were bioweapons, part of a depopulation scheme, or contain microchips; and misinformation about the eligibility of twelve to fifteen year old children for the vaccine.[287] All were labeled as "false" by the CDC, and the potential impact on the public was a reduction of vaccine acceptance.

The second BOLO meeting was held on May 28, 2021. The second meeting also contained a slide deck with a list of three "hot topics" to BOLO: that the Moderna vaccine was unsafe; that vaccine ingredients can cause people to become magnetic; and that the vaccines cause infertility or fertility-related issues in men. All were labeled as false by the CDC, and possibly impacted reduced vaccine acceptance.[288]

A third BOLO meeting scheduled for June 18, 2021, was cancelled due to the new Juneteenth holiday. However, Crawford sent the slide deck for the meeting. The hot topics for this meeting were: that vaccine particles accumulate in ovaries causing fertility; that vaccines contain

---

[285] [Doc. No. 205-40]
[286] [Doc. No. 205-1 at 246, 265–66]
[287] [Doc. No. 214-23 at 4–5] SEALED DOCUMENT
[288] [Doc. No. 214-24 at 3–7] SEALED DOCUMENT

microchips; and because of the risk of blood clots to vaccinated persons, airlines were discussing a ban. All were labeled as false.[289]

The goal of the BOLO meetings was to be sure credible information was out there and to flag information the CDC thought was not credible for potential removal.[290]

On September 2, 2021, Crawford emailed Facebook and informed them of a BOLO for a small but growing area of misinformation: one of the CDC's lab alerts was misinterpreted and shared via social media.[291]

(17)    The CDC Defendants also had meetings and/or communications with Twitter. On April 8, 2021, Crawford sent an email stating she was "looking forward to setting up regular chats" and asked for examples of misinformation. Twitter responded.[292]

On April 14, 2021, Crawford sent an email to Twitter giving examples of misinformation topics, including that vaccines were not FDA approved, fraudulent cures, VAERS data taken out of context, and infertility. The list was put together by the Census Bureau team.[293]

On May 10, 2021, Crawford emailed Twitter to print out two areas of misinformation, which included copies of twelve tweets.[294] Crawford informed Twitter about the May 14, 2021 BOLO meeting and invited Twitter to participate. The examples of misinformation given at the meeting included: vaccine shedding; that vaccines would reduce the population; abnormal bleeding; miscarriages for women; and that the Government was lying about vaccines. In a

---

[289] [Doc. No. 214-25 at 2–7] SEALED DOCUMENT
[290] [Doc. No. 205-1 at 266]
[291] [Doc. No. 205-22]
[292] [Doc. No. 205-1 at 197, 205–33]
[293] [Doc. No. 205-33]
[294] [Doc. No. 205-34]

response, Twitter stated that at least some of the examples had been "reviewed and actioned."[295] Crawford understood that she was flagging posts for Twitter for possible censorship.[296]

Twitter additionally offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship.[297] Crawford asked for instructions of how to enroll in the Partnership Support Portal and provided her personal Twitter account to enroll. Crawford was fully enrolled on May 27, 2021.[298] Census Bureau contractor Christopher Lewitzke ("Lewitzke") also requested to enroll in the Partner Support Portal.[299]

Crawford also sent Twitter a BOLO for the alleged misinterpretation of a CDC lab report.[300]

(18)     Crawford testified in her deposition that the CDC has a strong interest in tracking what its constituents are saying on social media.[301] Crawford also expressed concern that if content were censored and removed from social-media platforms, government communicators would not know what the citizen's "true concerns" were.[302]

### D.  NIAID Defendants[303]

The NIAID is a federal agency under HHS. Dr. Fauci was previously the Director of NIAID. Dr. Fauci's deposition was taken as a part of the limited preliminary injunction discovery in this matter.[304]

---

[295] [Id.]
[296] [Doc. No. 205-1 at 211]
[297] [Id. at 211–12]
[298] [Id. at 211–18]
[299] [Doc. No. 201-34 at 2]
[300] [Doc. No. 201-35]
[301] [Doc. No. 201-1 at 57–58]
[302] [Id. at 75]
[303] The NIAD Defendants consist of the National Institute of Allergy and Infectious Disease and Dr. Hugh Auchincloss ("Dr. Auchincloss").
[304] [Doc. No. 206]

50a

1)      Dr. Fauci had been the director of the NIAID for over thirty-eight years and became

Chief Medical Advisor to the President in early 2021.[305] Dr. Fauci retired December 31, 2022.

## 1.   Lab-Leak Theory

Plaintiffs set forth arguments that because NIAID had funded "gain-of-function"[306]

research at Dr. Fauci's direction at the Wuhan Institute of Virology ("Wuhan lab") in Wuhan,

China, Dr. Fauci sought to suppress theories that the SARS-CoV2 virus leaked from the Wuhan

lab.[307]

(1)      Plaintiffs allege that Dr. Fauci's motive for suppressing the lab-leak theory was a

fear that Dr. Fauci and NIAID could be blamed for funding gain-of-function research that created

the COVID-19 pandemic. Plaintiffs allege Dr. Fauci participated in a secret call with other

scientists on February 1, 2020, and convinced the scientists (who were proponents of the lab-leak

theory) to change their minds and advocate for the theory that the COVID-19 virus originated

naturally.[308] A few days after the February 1, 2020 call, a paper entitled "The Proximal Origin of

COVID-19" was published by Nature Medicine on March 17, 2020. The article concludes that

SARS-CoV2 was not created in a lab but rather was naturally occurring.

On February 2, 2020, Dr. Fauci told the other scientists that "given the concerns of so many

people and the threat of further distortions on social media it is essential that we move quickly.

Hopefully, we can get the WHO to convene."[309] Dr. Fauci emailed Dr. Tedros of the WHO and

two senior WHO officials, urging WHO to quickly establish a working group to address the lab-

leak theory. Dr. Fauci stated they should "appreciate the urgency and importance of this issue

---

[305] [Doc. No. 206-1 at 10 (Deposition of Dr. Anthony S. Fauci)]
[306] "Gain-of-function" research involves creating a potentially dangerous virus in a laboratory.
[307] [Doc. No. 212-3 at 151–85]
[308] [Id. at 165]
[309] [Doc. No. 206-9 at 2]

given the gathering internet evident in the science literature and in mainstream and social media to the question of the origin of this virus." Dr. Fauci also stated WHO needed to "get ahead of …the narrative of this and not reacting to reports which could be very damaging."[310] Numerous drafts of "The Proximal Origin of COVID-19" were sent to Dr. Fauci to review prior to the article being published in Nature Medicine.[311]

(2)     On February 9, 2020, in a joint podcast with Dr. Peter Daszak of the Eco Health Alliance,[312] both Drs. Fauci and Daszak discredited the lab-leak theory, calling it a "conspiracy theory."[313]

(3)     Three authors of "The Proximal Origins of SARS-CoV2," Robert Garry, Kristian Anderson, and Ian Lipkin, received grants from NIH in recent years.[314]

(4)     After "The Proximal Origins of SARS-CoV2" was completed and published in Nature Medicine, Dr. Fauci began discrediting the lab-leak theory. "This study leaves little room to refute a natural original for COVID-19." "It's a shining object (lab-leak theory) that will go away in times."[315]

At an April 17, 2020 press conference, when asked about the possibility of a lab-leak, Dr. Fauci stated, "There was a study recently that we can make available to you, where a group of highly qualified evolutionary virologists looked at the sequences there and the sequences in bats as they evolve. And the mutations that it took to get to the point where it is now is totally consistent

---

[310] [Doc. No. 206-9 at 1]
[311] [Doc. No. 206-13 at 1, 7-8; 206-11 at 2–3; and 206–20]
[312] [Doc. No. 206-16 at 1]
[313] [Doc. No. 206-16 at 1; 206-17 at 1]
[314] [Doc. No. 214-30]
[315] [Doc. No. 206-27 at 3–4]

with jump of a species from animal to a human."[316] "The Proximal Origin of SARS-CoV2" has since become one of the most widely read papers in the history of science.[317]

(5)     Twitter and Facebook censored the lab-leak theory of COVID-19.[318] However, Dr. Fauci claims he is not aware of any suppression of speech about the lab-leak theory on social media, and he claims he does not have a Twitter or Facebook account.[319]

(6)     On March 15, 2020, Zuckerberg sent Dr. Fauci an email asking for coordination between Dr. Fauci and Facebook on COVID-19 messaging. Zuckerberg asked Dr. Fauci to create a video to be used on Facebook's Coronavirus Information Hub, with Dr. Fauci answering COVID-19 health questions, and for Dr. Fauci to recommend a "point person" for the United States Government "to get its message out over the platform."[320]

Dr. Fauci responded the next day to Zuckerberg saying, "Mark your idea and proposal sounds terrific," "would be happy to do a video for your hub," and "your idea about PSAs is very exciting." Dr. Fauci did three live stream Facebook Q&A's about COVID-19 with Zuckerberg.[321]

## 2.  Hydroxychloroquine

Plaintiffs further allege the NIAID and Dept. of HHS Defendants suppressed speech on hydroxychloroquine. On May 22, 2020, The Lancet published an online article entitled "Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a multi-national registry analysis."[322] The article purported to analyze 96,032 patients to compare persons who did and did not receive this treatment. The study concluded that hydroxychloroquine

---

[316] (Video of April 17, 2020, White House Coronavirus Task Force Briefing, at https://www.youtube.com/watch?v=brbArPX8=6I)
[317] [Doc. No. 214-30]
[318] [Doc. No. 206-32 at 1–2; Doc. No. 206-33 at 3]
[319] [Doc. No. 206-1 at 210]
[320] [Doc. No. 206-24 at 3]
[321] [Doc. No. 201-1 at 177]
[322] [Doc. No. 206-36 at 1]

and chloroquine were associated with decreased in-hospital survival and an increased frequency of ventricular arrhythmias when used for treatment of COVID-19.[323]

Dr. Fauci publicly cited this study to claim that "hydroxychloroquine is not effective against coronavirus."[324] He then publicly began to discredit COVID-19 treatment with hydroxychloroquine and stated whether the treatment of COVID-19 by hydroxychloroquine was effective could only be judged by rigorous, randomized, double-blind, placebo-based studies. He testified the same on July 31, 2020, before the House Select Subcommittee on Coronavirus Crisis.[325]

(2)     When America's Frontline Doctors held a press conference criticizing the Government's response to the COVID-19 pandemic and spouting the benefits of hydroxychloroquine in treating the coronavirus,[326] Dr. Fauci made statements on Good Morning America[327] and on Andrea Mitchell Reports[328] that hydroxychloroquine is not effective in treating the coronavirus. Social-media platforms censored the America's Frontline Doctors videos. Facebook, Twitter, and YouTube removed the video.[329] Dr. Fauci does not deny that he or his staff at NIAID may have communicated with social-media platforms, but he does not specifically recall it.[330]

### 3.  The Great Barrington Declaration

(1)     The GBD was published online on October 4, 2020. The GBD was published by Plaintiffs Dr. Bhattacharja of Stanford and Dr. Kulldorff of Harvard, along with Dr. Gupta of

---

[323] [Id.]
[324] [Doc. No. 206-35 at 1]
[325] https://www.youtube.com/watch?v=RUNCSOQD2UE
[326] [Doc. No. 207-2 at 5]
[327] [Doc. No. 207-1 at 2]
[328] [Doc. No. 207-1 at 2–3]
[329] [Doc. No. 207-2 at 6]
[330] [Doc. No. 206-1 at 238]

Oxford. The GBD is a one-page treatise opposing reliance on lockdowns and advocating for an approach to COVID-19 called "focused protection."[331] It criticized the social distancing and lockdown approaches endorsed by government experts. The authors expressed grave concerns about physical and mental health impacts of current government COVID-19 lockdown policies and called for an end to lockdowns.[332]

(2)     On October 8, 2020, Dr. Francis Collins emailed Dr. Fauci (and Cliff Lane) stating:

> Hi Tony and Cliff, See https://gbdeclaration.org/. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that online yet- is it underway? Francis.[333]

The same day, Dr. Fauci wrote back to Dr. Collins stating, "Francis: I am pasting in below a piece from Wired that debunks this theory. Best, Tony."[334]

Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the GBD. In a Washington Post story run on October 14, 2020, Dr. Collins described the GBD and its authors as "fringe" and "dangerous."[335] Dr. Fauci consulted with Dr. Collins before he talked to the Washington Post.[336] Dr. Fauci also endorsed these comments in an email to Dr. Collins, stating "what you said was entirely correct."[337]

On October 15, 2020, Dr. Fauci called the GBD "nonsense" and "dangerous."[338] Dr. Fauci specifically stated, "Quite frankly that is nonsense, and anybody who knows anything about

---

[331] [Doc. No. 207-5 at 3]
[332] [Id.]
[333] [Doc. No. 207-6]
[334] [Doc. No. 207-7]
[335] [Doc. No. 207-9]
[336] [Doc. No. 206-1 at 272]
[337] [Doc. No. 207-10]
[338] [Doc. No. 207-11 at 1]

epidemiology will tell you that is nonsense and very dangerous."[339] Dr. Fauci testified "it's possible that" he coordinated with Dr. Collins on his public statements attacking the GBD.[340]

(3)    Social-media platforms began censoring the GBD shortly thereafter. In October 2020, Google de-boosted the search results for the GBD so that when Google users googled "Great Barrington Declaration," they would be diverted to articles critical of the GBD, and not to the GBD itself.[341] Reddit removed links to the GBD.[342] YouTube updated its terms of service regarding medical "misinformation," to prohibit content about vaccines that contradicted consensus from health authorities.[343] Because the GBD went against a consensus from health authorities, its content was removed from YouTube. Facebook adopted the same policies on misinformation based upon public health authority recommendations.[344] Dr. Fauci testified that he could not recall anything about his involvement in seeking to squelch the GBD.[345]

(4)    NIAID and NIH staff sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci. When a Twitter employee reached out to CDC officials asking if a particular account associated with Dr. Fauci was "real or not,"[346] Scott Prince of NIH responded, "Fake/Imposter handle.  PLEASE REMOVE!!!"[347] An HHS official then asked Twitter if it could "block" similar parody accounts: "Is there anything else you can also do to block other variations of his (Dr. Fauci's) name from impersonation so we don't have this

---

[339] [Id. at 3]
[340] [Doc. No. 206-1 at 279]
[341] [Doc. No. 207-12 at 4]
[342] [Id. at 4–5]
[343] [Doc. No. 207-13 at 4–5]
[344] [Doc. No. 207-15]
[345] [Doc. No. 206-1 at 251–52, 255–58]
[346] [Doc. No. 207-17 at 2]
[347] [Id.]

occur again?"[348] Twitter replied, "We'll freeze this @handle and some other variations so no one can hop on them."[349]

On April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh ("Routh"), and stated, "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you I have reported them from NIAID and my personal FB account."[350] Both Lavelle and Routh are members of Dr. Fauci's communications staff.[351] Six of the eight accounts listed were removed by Facebook on the same day.[352]

(5)     On October 30, 2020, a NIAID staffer wrote an email connecting Google/YouTube with Routh, "so that NIAID and the 'Google team' could connect on vaccine communications-specifically misinformation.'"[353] Courtney Billet ("Billet"), director of the Office of Communications and Government Relations of NIAID, was added by Routh, along with two other NIAID officials, to a communications chain with YouTube.[354] Twitter disclosed that Dina Perry ("Perry"), a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship.[355]

(6)     Dr. Fauci testified that he has never contacted a social-media company and asked them to remove misinformation from one of their platforms.[356]

### 4. Ivermectin

(8)     On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask whether the claim that "Ivermectin is effective in treating COVID is false, and if believed, could

---

[348] [Id. at 1]
[349] [Id.]
[350] [Doc. No. 207-19 at 3]
[351] [Doc. No. 206-1 at 308]
[352] [Doc. No. 207-19 at 3]
[353] [Doc. No. 207-20 at 1]
[354] [Id.]
[355] [Doc. No. 214-8 at 1]
[356] [Doc. No. 206-1 at 151]

contribute to people refusing the vaccine or self-medicating."[357] The CDC responded the next day and advised Facebook that the claim that Ivermectin is effective in treating COVID is "NOT ACCURATE."[358] The CDC cited the NIH's treatment guidelines for authority that the claims were not accurate.[359]

### 5. Mask Mandates

(9)      Plaintiffs maintain that Dr. Fauci initially did not believe masks worked, but he changed his stance. A February 4, 2020 email, in which Dr. Fauci responded to an email from Sylvia Burwell, stated, "the typical mask you buy in a drugstore is not really effective in keeping out the virus, which is small enough to pass through mankind."[360] Dr. Fauci stated that, at that time, there were "no studies" on the efficacy of masking to stop the spread.[361] On March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective.[362]

Plaintiffs allege that Dr. Fauci's position on masking changed dramatically on April 3, 2020, when he became an advocate for universal mask mandates.[363] Dr. Fauci testified his position changed in part because "evidence began accumulating that masks actually work in preventing acquisition and transmission,"[364] although Dr. Fauci could not identify those studies.[365]

---

[357] [Doc. No. 207-22 at 2]
[358] [Id. at 1]
[359] [Id.]
[360] [Doc. No. 206-1 at 314]
[361] [Id. at 316]
[362] [Id. at 318]
[363] [Id. at 317]
[364] [Id.]
[365] [Id. at 318]

58a

### 6. Alex Berenson

Alex Berenson ("Berenson") was a former New York Times Science reporter and critic of government messaging about COVID-19 vaccines. He was de-platformed from Twitter on August 28, 2021.[366]

Dr. Fauci had previously sought to discredit Berenson publicly during an interview with CNN.[367] Dr. Fauci does not deny that he may have discussed Berenson with White House or federal officials, but does not recall specifically whether he did so.[368]

### E.   FBI Defendants[369]

(1)   The deposition of Elvis Chan ("Chan") was taken on November 29, 2021.[370] Chan is the Assistant Special Agent in charge of the Cyber Branch for the San Francisco Division of the FBI.[371] In this role, Chan was one of the primary people communicating with social-media platforms about disinformation on behalf of the FBI. There are also other agents on different cyber squads, along with the FBI's private sector engagement squad, who relay information to social-media platforms.[372]

Chan graduated from the Naval Postgraduate School in 2020 with a M.A. in Homeland Security Studies.[373] His thesis was entitled, "Fighting Bears and Trolls. An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections."[374] His thesis focuses on information sharing between the FBI, Facebook,

---

[366] [Doc. No. 207-23 at 4]
[367] [Doc. No. 207-24 at 1–2]
[368] [Doc. No. 206-1 at 341–43]
[369] FBI Defendants include Elvis Chan ("Chan"), the Federal Bureau of Investigation ("FBI"), Lauren Dehmlow ("Dehmlow"), and the U.S. Department of Justice ("DOJ").
[370] [Doc. No. 204-1]
[371] [Id. at 8]
[372] [Id. at 105]
[373] [Id. at 10]
[374] [Doc. No. 204-2 at 1]

Google, and Twitter.[375] Chan relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika,[376] and DiResta of the Stanford Internet Observatory. Chan communicated directly with DiResta about Russian disinformation.[377]

Chan also knows Alex Stamos ("Stamos"), the head of the Stanford Internet Observatory, from when Stamos worked for Facebook.[378] Chan and Stamos worked together on "malign-foreign-influence activities, on Facebook."[379]

(2)    Chan stated that the FBI engages in "information sharing" with social-media companies about content posted on their platforms, which includes both "strategic-level information" and "tactical information."[380]

(3)    The FBI, along with Facebook, Twitter, Google/YouTube, Microsoft, Yahoo!, Wikimedia Foundation, and Reddit, participate in a Cybersecurity and Infrastructure Security Agency ("CISA") "industry working group."[381] Representatives of CISA, the Department of Homeland Security's Intelligence & Analysis Division ("I&A"), the Office of Director of National Intelligence ("ODNI"), the FBI's FITF, the Dept. of Justice National Security Division, and Chan participate in these industry working groups.[382]

Chan participates in the meetings because most social-media platforms are headquartered in San Francisco, and the FBI field offices are responsible for maintaining day-to-day relationships with the companies headquartered in its area of responsibility.[383]

---

[375] [Id. at 18]
[376] [Doc. No. 204-1 at 145]
[377] [Doc. No. 204-1 at 51–52, 85]
[378] [Id. at 54]
[379] [Id at 55]
[380] [Id. at 16–19]
[381] [Id. at 18, 23–24]
[382] [Id. at 24, 171]
[383] [Id. at 24]

60a

Matt Masterson ("Masterson") was the primary facilitator in the meetings for the 2022 election cycle, and Brian Scully ("Scully") was the primary facilitator ahead of the 2022 election.[384] At the USG-Industry ("the Industry") meetings, social-media companies shared disinformation content, providing a strategic overview of the type of disinformation they were seeing. The FBI would then provide strategic, unclassified overviews of things they were seeing from Russian actors.[385]

The Industry meetings were "continuing" at the time Chan's deposition was taken on November 23, 2022, and Chan assumes the meetings will continue through the 2024 election cycle.[386]

(4) Chan also hosted bilateral meetings between FBI and Facebook, Twitter, Google/YouTube, Yahoo!/Verizon, Microsoft/LinkedIn, Wikimedia Foundation and Reddit,[387] and the Foreign Influence Task Force.[388] In the Industry meetings, the FBI raised concerns about the possibility of "hack and dump" operations during the 2020 election cycle.[389] The bilateral meetings are continuing, occurring quarterly, but will increase to monthly and weekly nearer the elections.[390]

In the Industry meetings, FBI officials meet with senior social-media platforms in the "trust and safety or site integrity role." These are the persons in charge of enforcing terms of service and content-moderation policies.[391] These meetings began as early as 2017.[392] At the Industry

---

[384] [Id. at 25–26]
[385] [Id. at 156–57]
[386] [Id. at 285–86]
[387] [Id. at 23–24]
[388] [Id. at 39]
[389] [Id.]
[390] [Id. at 40]
[391] [Id. at 43–44]
[392] [Id. at 87–89]

meetings, in addition to Chan and Laura Dehmlow ("Dehmlow"), head of the FITF, between three

and ten FITF officials and as high as a dozen FBI agents are present.[393]

(5)     On September 4, 2019, Facebook, Google, Microsoft, and Twitter along with the

FITF, ODNI, and CISA held a meeting to discuss election issues. Chan attended, along with

Director Krebs, Masterson, and Scully. Social media's trust and safety on content-moderation

teams were also present. The focus of the meeting was to discuss with the social-media companies

the spread of "disinformation."[394]

(6)     Discovery obtained from LinkedIn contained 121 pages of emails between Chan,

other FBI officials, and LinkedIn officials.[395] Chan testified he has a similar set of communications

with other social-media platforms.[396]

(7)     The FBI communicated with social-media platforms using two alternative,

encrypted channels, Signal and Teleporter.[397]

(8)     For each election cycle, during the days immediately preceding and through

election days, the FBI maintains a command center around the clock to receive and forward reports

of "disinformation" and "misinformation." The FBI requests that social-media platforms have

people available to receive and process the reports at all times.[398]

(9)     Before the Hunter Biden Laptop story breaking prior to the 2020 election on

October 14, 2020, the FBI and other federal officials repeatedly warned industry participants to be

alert for "hack and dump" or "hack and leak" operations.[399]

---

[393] [Id. at 109–10]
[394] [Id. at 151]
[395] [Doc. No. 204-3]
[396] Doc. No. 204-1 at 288]
[397] [Id. at 295–296]
[398] [Id. at 301]
[399] [Doc. No. 204-1 at 172, 232–34]

Dehmlow also mentioned the possibility of "hack and dump" operations.[400] Additionally, the prospect of "hack and dump" operations was repeatedly raised at the FBI-led meetings with FITF and the social-media companies, in addition to the Industry meetings.[401]

Social-media platforms updated their policies in 2020 to provide that posting "hacked materials" would violate their policies. According to Chan, the impetus for these changes was the repeated concern about a 2016-style "hack-and-leak" operation.[402] Although Chan denies that the FBI urged the social-media platforms to change their policies on hacked material, Chan did admit that the FBI repeatedly asked the social-media companies whether they had changed their policies with regard to hacked materials[403] because the FBI wanted to know what the companies would do if they received such materials.[404]

(10) Yoel Roth ("Roth"), the then-Head of Site Integrity at Twitter, provided a formal declaration on December 17, 2020, to the Federal Election Commission containing a contemporaneous account of the "hack-leak-operations" at the meetings between the FBI, other natural-security agencies, and social-media platforms.[405] Roth's declaration stated:

> Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security. During these weekly meetings, the federal law enforcement agencies communicated that they expected "hack-and-leak" operations by state actors might occur during the period shortly before the 2020 presidential election, likely in October. I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social-media platforms, including Twitter. These expectations of hack-and-leak operations

---

[400] [Id. at 175]
[401] [Id. at 177–78]
[402] [Id. at 205]
[403] [Id. at 206]
[404] [Id. at 249]
[405] [Doc. No. 204-5, ¶¶ 10-11, at 2–3]

were discussed through 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden.*[406]

Chan testified that, in his recollection, Hunter Biden was not referred to in any of the CISA Industry meetings.[407] The mention of "hack-and-leak" operations involving Hunter Biden is significant because the FBI previously received Hunter Biden's laptop on December 9, 2019, and knew that the later-released story about Hunter Biden's laptop was not Russian disinformation.[408]

In Scully's deposition,[409] he did not dispute Roth's version of events.[410]

Zuckerberg testified before Congress on October 28, 2020, stating that the FBI conveyed a strong risk or expectation of a foreign "hack-and-leak" operation shortly before the 2020 election and that the social-media companies should be on high alert. The FBI also indicated that if a trove of documents appeared, they should be viewed with suspicion.[411]

(11)    After the Hunter Biden laptop story broke on October 14, 2020, Dehmlow refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry from Facebook, although the FBI had the laptop in its possession since December 2019.[412]

The Hunter Biden laptop story was censored on social media, including Facebook and Twitter.[413] Twitter blocked users from sharing links to the New York Post story and prevented users who had previously sent tweets sharing the story from sending new tweets until they deleted

---

[406] (emphasis added)
[407] [Doc. No. 204-1 at 213, 227–28].
[408] [Doc. No. 106-3 at 5–11]
[409] [Doc. No. 209]
[410] [Id. at 247]
[411] [Doc. 204-6 at 56]
[412] [Doc. No. 204-1 at 215]
[413] [Doc. No. Doc 204-5 at ¶ 17]

the previous tweet.[414] Further, Facebook began reducing the story's distribution on the platform pending a third-party fact-check.[415]

(12)    Chan further testified that during the 2020 election cycle, the United States Government and social-media companies effectively limited foreign influence companies through information sharing and account takedowns.[416] Chan's thesis also recommended standardized information sharing and the establishment of a national coordination center.

According to Chan, the FBI shares this information with social-media platforms as it relates to information the FBI believes should be censored.[417] Chan testified that the purpose and predictable effect of the tactical information sharing was that social-media platforms would take action against the content in accordance with their policies.[418] Additionally, Chan admits that during the 2020 election cycle, the United States Government engaged in information sharing with social-media companies.[419] The FBI also shared "indicators" with state and local government officials.[420]

Chan's thesis includes examples of alleged Russian disinformation, which had a number of reactions and comments from Facebook users, including an anti-Hillary Clinton post, a secure-border post, a Black Lives Matter post, and a pro-Second Amendment post.[421]

Chan also identified Russian-aligned websites on which articles were written by freelance journalists. A website called NADB, alleged to be Russian-generated, was also identified by the FBI, and suppressed by social-media platforms, despite such content being drafted and written by

---

[414] [Id.]
[415] [Doc. No. 204-6 at 2]
[416] [Doc. No. 204-2 at 3]
[417] [Id.]
[418] [Id. at 32–33]
[419] [Id. at 19]
[420] [Id. at 50]
[421] [Id.]

American users on that site.[422] The FBI identified this site to the social-media companies that took action to suppress it.[423]

(13)    "Domestic disinformation" was also flagged by the FBI for social-media platforms. Just before the 2020 election, information would be passed from other field offices to the FBI 2020 election command post in San Francisco. The information sent would then be relayed to the social-media platforms where the accounts were detected.[424] The FBI made no attempt to distinguish whether those reports of election disinformation were American or foreign.[425]

Chan testified the FBI had about a 50% success rate in having alleged election disinformation taken down or censored by social-media platforms.[426] Chan further testified that although the FBI did not tell the social-media companies to modify their terms of service, the FBI would "probe" the platforms to ask for details about the algorithms they were using[427] and what their terms of service were.[428]

(14)    Chan further testified the FBI identifies specific social-media accounts and URLs to be evaluated "one to five times a month"[429] and at quarterly meetings.[430] The FBI would notify the social-media platforms by sending an email with a secure transfer application within the FBI called a "Teleporter." The Teleporter email contains a link for them to securely download the files from the FBI.[431] The emails would contain "different types of indicators," including specific

---

[422] [Id. at 144–46]
[423] [Doc. No. 204-1 at 141-43]
[424] [Id. at 162]
[425] [Id. at 163]
[426] [Id. at 167]
[427] [Id. at 88]
[428] [Id. at 92]
[429] [Id. at 96]
[430] [Id. at 98]
[431] [Id.]

social-media accounts, websites, URLs, email accounts, and the like, that the FBI wanted the platforms to evaluate under their content-moderation policies.[432]

Most of the time, the emails flagging the misinformation would go to seven social-media platforms. During 2020, Chan estimated he sent out these emails from one to six times per month and in 2022, one to four times per month. Each email would flag a number that ranged from one to dozens of indicators.[433] When the FBI sent these emails, it would request that the social-media platforms report back on the specific actions taken as to these indicators and would also follow up at the quarterly meetings.[434]

(15)    At least eight FBI agents at the San Francisco office, including Chan, are involved in reporting disinformation to social-media platforms.[435] In addition to FBI agents, a significant number of FBI officials from the FBI's Foreign Influence Task Force also participate in regular meetings with social-media platforms about disinformation.[436]

Chan testified that the FBI uses its criminal-investigation authority, national-security authority, the Foreign Intelligence Surveillance Act, the PATRIOT Act, and Executive Order 12333 to gather national security intelligence to investigate content on social media.[437]

Chan believes with a high degree of confidence that the FBI's identification of "tactical information" was accurate and did not misidentify accounts operated by American citizens.[438] However, Plaintiffs identified tweets and trends on Twitter, such as #ReleasetheMemo in 2019, and indicated that 929,000 tweets were political speech by American citizens.[439]

---

[432] [Id. at 99]
[433] [Id. at 100–01]
[434] [Id. at 102–03]
[435] [Id. at 105–08]
[436] [Id. at 108]
[437] [Id. at 111–12]
[438] [Id. at 112]
[439] [Doc. No. 204-2 at 71]

(16)     Chan testified that he believed social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles.[440] Chan further thinks that pressure from Congress, specifically the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence, resulted in more aggressive censorship policies.[441] Chan also stated that congressional hearings placed pressure on the social-media platforms.[442]

Chan further testified that Congressional staffers have had meetings with Facebook, Google/YouTube, and Twitter and have discussed potential legislation.[443] Chan spoke directly with Roth of Twitter, Steven Slagle of Facebook, and Richard Salgado of Google, all of whom participated in such meetings.[444]

(17)     Chan testified that 3,613 Twitter accounts and 825 Facebook accounts were taken down in 2018. Chan testified Twitter took down 422 accounts involving 929,000 tweets in 2019.[445]

(18)     Chan testified that the FBI is continuing its efforts to report disinformation to social-media companies to evaluate for suppression and/or censorship.[446] "Post-2020, we've never stopped…as soon as November 3 happened in 2020, we just pretty much rolled into preparing for 2022."[447]

---

[440] [Id. at 115–16]
[441] [Id. at 116]
[442] [Id. at 117–18]
[443] [Id. at 118]
[444] [Id. at 123–26]
[445] [Id. at 133–34, 149–50]
[446] [Doc. No. 204-8 at 2–3]
[447] [Doc. No. 204-8 at 2]

### E. CISA Defendants[448]

The deposition of Brian Scully was taken on January 12, 2023, as part of the injunction-related discovery in this matter.

(1)     The CISA regularly meets with social-media platforms in several types of standing meetings. Scully is the chief of CISA's Mis, Dis and Malinformation Team ("MDM Team"). Prior to President Biden taking office, the MDM Team was known as the "Countering Foreign Influence Task Force ("CFITF").[449] Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of outreach and engagement to key stakeholders, interagency partners, and private sector partners, which includes social-media platforms. Scully performed Protentis's duties while she was on maternity leave.[450] Both Scully and Protentis have done extended detail at the National Security Council, where they work on misinformation and disinformation issues.[451]

(2)     Scully testified that during 2020, the MDM Team did "switchboard work" on behalf of election officials. "Switchboarding" is a disinformation-reporting system provided by CISA that allows state and local election officials to identify something on social media they deem to be disinformation aimed at their jurisdiction. The officials would then forward the information to CISA, which would in turn share the information with the social-media companies.[452]

The main idea, according to Scully, is that the information would be forwarded to social-media platforms, which would make decisions on the content based on their policies.[453] Scully further testified he decided in late April or early May 2022 not to perform switchboarding in 2022.

---

[448] CISA Defendants consist of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"), Kim Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").
[449] [Doc. No. 209-1 at 12]
[450] [Id. at 18–20]
[451] [Id. at 19]
[452] [Id. at 16–17]
[453] [Id. at 17]

However, the CISA website states the MDM Team serves as a "switchboard for routing disinformation concerns to social-media platforms."[454] The switchboarding activities began in 2018.[455]

(3)    The MDM Team continues to communicate regularly with social-media platforms in two different ways. The first way is called "Industry" meetings. The Industry meetings are regular sync meetings between government and industry, including social-media platforms.[456] The second type of communication involves the MDM Team reviewing regular reports from social-media platforms about changes to their censorship policies or to their enforcement actions on censorship.[457]

(4)    The Industry meetings began in 2018 and continue to this day. These meetings increase in frequency as each election nears. In 2022, the Industry meetings were monthly but increased to biweekly in October 2022.[458]

Government participants in the USG-Industry meetings are CISA, the Department of Justice ("DOJ"), ODNI, and the Department of Homeland Security ("DHS"). CISA is typically represented by Scully and Hale. Scully's role is to oversee and facilitate the meetings.[459] Wyman, Snell, and Protentis also participate in the meetings on behalf of CISA.[460] On behalf of the FBI, FITF Chief Dehmlow, Chan, and others from different parts of the FBI participate.[461]

In addition to the Industry meetings, CISA hosts at least two "planning meetings:" one between CISA and Facebook and an interagency meeting between CISA and other participating

---

[454] [Doc. No. 209-19 at 3]
[455] [Id.]
[456] [Doc. No. 209-1 at 21]
[457] [Id.]
[458] [Id. at 24]
[459] [Id. at 25]
[460] [Id. at 28]
[461] [Id. at 29]

federal agencies.[462] The social-media platforms attending the industry meetings include Facebook, Twitter, Microsoft, Google/YouTube, Reddit, LinkedIn, and sometimes the Wikipedia Foundation.[463] At the Industry meetings, participants discuss concerns about misinformation and disinformation. The federal officials report their concerns over the spread of disinformation. The social-media platforms in turn report to federal officials about disinformation trends, share high-level trend information, and repot the actions they are taking.[464] Scully testified that the specific discussion of foreign-originating information is ultimately targeted at preventing domestic actors from engaging in this information.[465]

(5)   CISA has established relationships with researchers at Stanford University, the University of Washington, and Graphika.[466] All three are involved in the Election Integrity Partnership ("EIP").[467]

When the EIP was starting up, CISA interns came up with the idea of having some communications with the EIP. CISA began having communications with the EIP, and CISA connected the EIP with the Center for Internet Security ("CIS"). The CIS is a CISA-funded, non-profit that channels reports of disinformation from state and local government officials to social-media platforms. The CISA interns who originated the idea of working with the EIP also worked for the Stanford Internet Observatory, another part of the EIP. CISA had meetings with Stanford Internet Observatory officials, and eventually both sides decided to work together.[468] The "gap"

---

[462] [Id. at 36–37]
[463] [Id. at 39]
[464] [Id. at 39–41]
[465] [Id. at 41]
[466] [Id. at 46, 48]
[467] [Id. at 48]
[468] [Id. at 49–52]

that the EIP was designed to fill concerned state and local officials' lack of resources to monitor and report on disinformation that affects their jurisdictions.[469]

(6)     The EIP continued to operate during the 2022 election cycle. At the beginning of the election cycle, the EIP gave Scully and Hale, on behalf of CISA, a briefing in May or June of 2022.[470] In the briefing, DiResta walked through what the plans were for 2022 and some lessons learned from 2020. The EIP was going to support state and local election officials in 2022.

(7)     The CIS is a non-profit that oversees the Multi-State Information Sharing and Analysis Center ("MS-ISAC") and the Election Infrastructure Information Sharing and Analysis Center ("EI-ISAC"). Both MS-ISAC and EI-ISAC are organizations of state and/or local government officials created for the purpose of information sharing.[471]

CISA funds the CIS through a series of grants. CISA also directs state and local officials to the CIS as an alternative route to "switchboarding."[472] CISA connected the CIS with the EIP because the EIP was working on the same mission,[473] and it wanted to make sure they were all connected. Therefore, CISA originated and set up collaborations between local government officials and CIS and between the EIP and CIS.

(8)     CIS worked closely with CISA in reporting misinformation to social-media platforms. CIS would receive the reports directly from election officials and would forward this information to CISA. CISA would then forward the information to the applicable social-media platforms. CIS later began to report the misinformation directly to social-media platforms.[474]

---

[469] [Id. at 57]
[470] [Id. at 53–54]
[471] [Id. at 59–61]
[472] [Id. at 61–62]
[473] [Id. at 62–63]
[474] [Id. at 63–64]

The EIP also reported misinformation to social-media platforms. CISA served as a mediating role between CIS and EIP to coordinate their efforts in reporting misinformation to the platforms. There were also direct email communications between the EIP and CISA about reporting misinformation.[475] When CISA reported misinformation to social-media platforms, CISA would generally copy the CIS, who, as stated above, was coordinating with the EIP.[476]

(9)    Stamos and DiResta of the Stanford Internet Observatory briefed Scully about the EIP report, "The Long Fuse,"[477] in late Spring or early Summer of 2021. Scully also reviewed copies of that report. Stamos and DiResta also have roles in CISA: DiResta serves as "Subject Matter Expert" for CISA's Cybersecurity Advisory Committee, MDM Subcommittee, and Stamos serves on the CISA Cybersecurity Advisory Committee, as does Kate Starbird ("Starbird") of the University of Washington.[478] Stamos identified the EIP's "partners in government" as CISA, DHS, and state and local officials.[479] Also, according to Stamos, the EIP targeted "large following political partisans who were spreading misinformation intentionally."[480]

(10)    CISA's Masterson was also involved in communicating with the EIP.[481] Masterson and Scully questioned EIP about their statements on election-related information. Sanderson left CISA in January 2021, was a fellow at the Stanford Internet Observatory, and began working for Microsoft in early 2022.[482]

---

[475] [Id. at 63–66]
[476] [Id. at 67–68]
[477] [Doc. 209-2]
[478] [Doc. No. 209-1, at 72, 361; Doc. No. 212-36 at 4 (Jones Deposition-SEALED DOCUMENT)]
[479] [Doc. No. 209-4 at 4]
[480] [Scully depo. Exh. at l7]
[481] [Doc. No. 209-1 at 76]
[482] [Id. at 88–89]

(11)    CISA received misinformation principally from two sources: the CIS directly from

state and local election officials; and information sent directly to a CISA employee.[483] CISA shared

information with the EIP and the CIS.[484]

(12)    CISA did not do an analysis to determine what percentage of misinformation was

"foreign derived." Therefore, CISA forwards reports of information to social-media platforms

without determining whether they originated from foreign or domestic sources.[485]

(13)    The Virality Project was created by the Stanford Internet Observatory to mimic the

EIP for COVID.[486] As previously stated, Stamos and DiResta of the Stanford Internet Observatory

were involved in the Virality Project. Stamos gave Scully an overview of what they planned to do

with the Virality Project, similar to what they did with the EIP.[487] Scully also had conversations

with DiResta about the Virality Project.[488] DiResta noted the Virality Project was established on

the heels of the EIP, following its success in order to support government health officials' efforts

to combat misinformation targeting COVID-19 vaccines.[489]

(14)    According to DiResta, the EIP was designed to "get around unclear legal

authorities, including very real First Amendment questions" that would arise if CISA or other

government agencies were to monitor and flag information for censorship on social media.[490]

(15)    The CIS coordinated with the EIP regarding online misinformation and reported it

to CISA. The EIP was using a "ticketing system" to track misinformation.[491] Scully asked the

social-media platforms to report back on how they were handling reports of misinformation and

---

[483] [Id. at 119–20]
[484] [Id. at 120–21]
[485] [Id. at 122–23]
[486] [Id. at 134]
[487] [Id. at 134–36]
[488] [Id. at 139]
[489] [Doc. No. 209-5 at 7]
[490] [Id. at 4]
[491] [Doc. No. 209-1 at 159]

disinformation received from CISA.[492] CISA maintained a "tracking spreadsheet" of its misinformation reports to social-media platforms during the 2020 election cycle.[493]

(16)     At least six members of the MDM team, including Scully, "took shifts" in the "switchboarding" operation reporting disinformation to social-media platforms; the others were Chad Josiah ("Josiah"), Rob Schaul ("Schaul"), Alex Zaheer ("Zaheer"), John Stafford ("Stafford"), and Pierce Lowary ("Lowary"). Lowary and Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was the operating the EIP.[494] Therefore, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of both CISA and the EIP.[495] Zaheer and Lowary were also two of the four Stanford interns who came up with the idea for the EIP.[496]

(17)     The CISA switchboarding operation ramped up as the election drew near. Those working on the switchboarding operation worked tirelessly on election night.[497] They would also "monitor their phones" for disinformation reports even during off hours so that they could forward disinformation to the social-media platforms.[498]

(18)     As an example, Zaheer, when switchboarding for CISA, forwarded supposed misinformation to CISA's reporting system because the user had claimed "mail-in voting is insecure" and that "conspiracy theories about election fraud are hard to discount."[499]

CISA's tracking spreadsheet contains at least eleven entries of switchboarding reports of misinformation that CISA received "directly from EIP" and forwarded to social-media platforms

---

[492] [Doc. No. 209-6 at 11]
[493] [Doc. No. 209-1 at 165–66]
[494] [Id. at 166–68, 183]
[495] [Id.]
[496] [Id. at 171, 184–85]
[497] [Id. at 174–75]
[498] [Id. at 75]
[499] [Doc. No. 209-6 at 61–62]

to review under their policies.[500] One of these reports was reported to Twitter for censorship because EIP "saw an article on the Gateway Pundit" run by Plaintiff Jim Hoft.[501]

(19)     Scully admitted that CISA engaged in "informal fact checking" to determine whether a claim was true or not.[502] CISA would do its own research and relay statements from public officials to help debunk postings for social-media platforms. In debunking information, CISA apparently always assumed the government official was a reliable source; CISA would not do further research to determine whether the private citizen posting the information was correct or not.[503]

(20)     CISA's switchboarding activities reported private and public postings.[504] Social-media platforms responded swiftly to CISA's reports of misinformation.[505]

(21)     CISA, in its interrogatory responses, disclosed five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of speech on social media.[506] CISA also had bilateral meetings between CISA and the social-media companies.[507]

(22)     Scully does not recall whether "hack and leak" or "hack and dump" operations were raised at the Industry meetings, but does not deny it either.[508] However, several emails confirm that "hack and leak" operations were on the agenda for the Industry meeting on September 15, 2020,[509] and July 15, 2020.[510]

---

[500] [Doc. No. 214-35 at 5–6, Column C]
[501] [Id. at 4–5, Column F, Line 94]
[502] CISA also became the "ministry of truth."
[503] [Doc. No. 209-1 at 220–22]
[504] [Doc. No. 209-7 at 45–46]
[505] [Doc. No. 209-1 at 291–94; 209–49]
[506] [Doc. No. 209-9 at 38–40]
[507] [Doc. No. 209-1 at 241]
[508] [Id. at 236–37]
[509] [Doc. No. 209-13 at 1]
[510] [Doc. No. 209-14 at 16]

(23)    In the spring and summer of 2022, CISA's Protentis requested that social-media platforms prepare a "one-page" document that sets forth their content-moderation rules[511] that could then be shared with election officials—and which also included "steps for flagging or escalating MDM content" and how to report misinformation.[512] Protentis referred to the working group (which included Facebook and CISA's Hale) as "Team CISA."[513]

(24)    The Center for Internet Security continued to report misinformation to social-media platforms during the 2022 election cycle.[514]

(25)    CISA has teamed up directly with the State Department's Global Engagement Center ("GEC") to seek review of social-media content.[515] CISA also flagged for review parody and joke accounts.[516] Social-media platforms report to CISA when they update their content-moderation policies to make them more restrictive.[517] CISA publicly stated that it is expanding its efforts to fight disinformation-hacking in the 2024 election cycle.[518]

(26)    A draft copy of the DHS's "Quadrennial Homeland Security Review," which outlines the department's strategy and priorities in upcoming years, states that the department plans to target "inaccurate information" on a wide range of topics, including the origins of the COVID-19 pandemic, the efficacy of COVID-19 vaccines, racial justice, the United States' withdrawal from Afghanistan, and the nature of the United States' support of Ukraine.[519]

---

[511] [Doc. No. 209-14]
[512] [Doc. No. 209-15 at 41, 44–45]
[513] [Doc. No. 209-15 at 39]
[514] [Doc. No. 209-1 at 266]
[515] [Doc. No. 209-15 at 1–2]
[516] [Id. at 11–12]
[517] [Id. at 9]
[518] [Doc. No. 209-20 at 1–2]
[519] [Doc. No. 209-23 at 1–4]

(27)     Scully also testified that CISA engages with the CDC and DHS to help them in their efforts to stop the spread of disinformation. The examples given were about the origins of the COVID-19 pandemic and Russia's invasion of Ukraine.[520]

(28)     On November 21, 2021, CISA Director Easterly reported that CISA is "beefing up its misinformation and disinformation team in wake of a diverse presidential election a proliferation of misleading information online."[521] Easterly stated she was going to "grow and strengthen" CISA's misinformation and disinformation team. She further stated, "We live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts."[522]

Easterly also views the word "infrastructure" very expansively, stating, "[W]e're in the business of protecting critical infrastructure, and the most critical is our 'cognitive infrastructure.'"[523] Scully agrees with the assessment that CISA has an expansive mandate to address all kinds of misinformation that may affect control and that could indirectly cause national security concerns.[524]

On June 22, 2022, CISA's cybersecurity Advisory Committee issued a Draft Report to the Director, which broadened "infrastructure" to include "the spread of false and misleading information because it poses a significant risk to critical function, like elections, public health, financial services and emergency responses."[525]

---

[520] [Doc. No. 209-1 at 323–25]
[521] [Doc. No. 209-1 at 335–36]
[522] [Doc. No. 209-18 at 1–2]
[523] [Id.]
[524] [Doc. No. 209-1 at 341]
[525] [Doc. No. 209-25 at 1]

(29)    In September 2022, the CIS was working on a "portal" for government officials to report election-related misinformation to social-media platforms.[526] That work continues today.[527]

### F.  State Department Defendants[528]

### 1.  The GEC

(1)    Daniel Kimmage is the Principal Deputy Coordinator of the State Department's Global Engagement Center ("GEC").[529] The GEC's front office and senior leadership meets with social-media platforms every few months, sometimes quarterly.[530] The meetings focus on the "tools and techniques" of stopping the spread of disinformation on social media, but they rarely discuss specific content that is posted.[531] Additionally, GEC has a "Technology Engagement Team" ("TET") that also meets with social-media companies. The TET meets more frequently than the GEC.[532]

(2)    Kimmage recalls two meetings with Twitter. At these meetings, the GEC would bring between five and ten people including Kimmage, one or more deputy coordinators, and team chiefs from the GEC and working-level staff with relevant subject-matter expertise.[533] The GEC staff would meet with Twitter's content-mediation teams, and the GEC would provide an overview of what it was seeing in terms of foreign propaganda and information. Twitter would then discuss similar topics.[534]

---

[526] [Doc. No. 210-22]
[527] [Id.]
[528] The State Department Defendants consist of the United States Department of State, Leah Bray ("Bray"), Daniel Kimmage ("Kimmage'), and Alex Frisbie ("Frisbie").
[529] Kimmage's deposition was taken and filed as [Doc. No. 208-1].
[530] [Doc. No. 208-1 at 29, 32]
[531] [Id. at 30]
[532] [Id. at 37]
[533] [Id. at 130–31]
[534] [Id. at 133–36]

(3)     The GEC's senior leadership also had similar meetings with Facebook and Google. Similar numbers of people were brought to these meetings by GEC, and similar topics were discussed. Facebook and Google also brought their content-moderator teams.[535]

(4)     Samaruddin Stewart ("Stewart") was the GEC's Senior Advisor who was a permanent liaison in Silicon Valley for the purpose of meeting with social-media platforms about disinformation. Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to explore shared interests and alignment of mutual goals regarding the challenge.[536]

(5)     The GEC also coordinated with CISA and the EIP.  Kimmage testified that the GEC had a "general engagement" with the EIP.[537]

(6)     On October 17, 2022, at an event at Stanford University, Secretary of State Anthony Blinken mentioned the GEC and stated that the State Department was "engaging in collaboration and building partnerships" with institutions like Stanford to combat the spread of propaganda.[538] Specifically, he stated, "We have something called the Global Engagement Center that's working on this every single day."[539]

(7)     Like CISA, the GEC works through the CISA-funded EI-ISAC and works closely with the Stanford Internet Observatory and the Virality Project.

---

[535] [Id. at 141–43]
[536] [Id. at 159–60]
[537] [Id. at 214–215]. The details surrounding the EIP are described in II 6(5)(6)(7)(8)(9)(10)(15) and (16). Scully Ex. 1 details EIPS work carried out during the 2020 election.
[538] [Doc. No. 208-17 at 5]
[539] [Id.]

## 2. The EIP

(8)     The EIP is partially-funded by the United States National Science Foundation through grants.[540] Like its work with CISA, the EIP, according to DiResta, was designed to "get around unclear legal authorities, including very real First Amendment questions" that would arise if CISA or other government agencies were to monitor and flag information for censorship on social media.[541]

The EIP's focus was on understanding misinformation and disinformation in the social-media landscape, and it successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020.[542]

The government agencies that work with and submit alleged disinformation to the EIP are CISA, the State Department Global Engagement Center, and the Elections Infrastructure Information Sharing and Analysis Center.[543]

(9)     The EIP report further states that the EIP used a tiered model based on "tickets" collected internally and from stakeholders. The tickets also related to domestic speech by American citizens,[544] including accounts belonging to media outlets, social-media influencers, and political figures.[545] The EIP further emphasized that it wanted greater access to social-media platform's internal data and recommended that the platforms increase their enforcement of censorship policies.[546]

---

[540] [Id. at 17]
[541] [Doc. No. 209-5 at 4]
[542] [Doc. No. 209-5, Exh. 1; Ex. 4 at 7, Audio Tr. 4]
[543] [Doc. No. 209-2 at 30]
[544] [Id. at 11]
[545] [Id. at 12]
[546] [Id. at 14]

The EIP was formed on July 26, 2020, 100 days before the November 2020 election.[547] On July 9, 2020, the Stanford Internet Observatory presented the EIP concept to CISA. The EIP team was led by Research Manager DiResta, Director Stamos and the University of Washington's Starbird.[548]

(10)    EIP's managers both report misinformation to platforms and communicate with government partners about their misinformation reports.[549] EIP team members were divided into tiers of on-call shifts. Each shift was four hours long and led by one on-call manager. The shifts ranged from five to twenty people. Normal scheduled shifts ran from 8:00 a.m. to 8:00 p.m., ramping up to sixteen to twenty hours a day during the week of the election.[550]

(11)    Social-media platforms that participated in the EIP were Facebook, Instagram, Google/YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest.[551]

(12)    In the 2020 election cycle, the EIP processed 639 "tickets," 72% of which were related to delegitimizing the election results.[552] Overall, social-media platforms took action on 35% of the URLs reported to them.[553] One "ticket" could include an entire idea or narrative and was not always just one post.[554] Less than 1% of the tickets related to "foreign interference."[555]

(13)    The EIP found that the Gateway Pundit was one of the top misinformation websites, allegedly involving the "exaggeration" of the input of an issue in the election process. The EIP did

---

[547] [Id. at 20]
[548] [Id.]
[549] [Id. at 27–28]
[550] [Id. at 28]
[551] [Id. at 35]
[552] [Id. at 45]
[553] [Id. at 58]
[554] [Id. at 27]
[555] [Id. at 53]

not say that the information was false.[556] The EIP Report cites The Gateway Pundit forty-seven times.[557]

(14)    The GEC was engaging with the EIP and submitted "tickets."[558]

(15)    The tickets and URLs encompassed millions of social-media posts, with almost twenty-two million posts on Twitter alone.[559] The EIP sometimes treats as "misinformation" truthful reports that the EIP believes "lack broader context."[560]

(16)    The EIP stated "influential accounts on the political right…were responsible for the most widely spread of false or misleading information in our data set."[561] Further, the EIP stated the twenty-one most prominent report spreaders on Twitter include political figures and organizations, partisan media outlets, and social-media stars. Specifically, the EIP stated, "All 21 of the repeat spreaders were associated with conservative or right-wing political views and support of President Trump."[562] The Gateway Pundit was listed as the second-ranked "Repeat Spreader of Election Misinformation" on Twitter. During the 2020 election cycle, the EIP flagged The Gateway Pundit in twenty-five incidents with over 200,000 retweets.[563] The Gateway Pundit ranked above Donald Trump, Eric Trump, Breitbart News, and Sean Hannity.[564]

The Gateway Pundit's website was listed as the domain cited in the most "incidents"; its website content was tweeted by others in 29,209 original tweets and 840,740 retweets.[565] The Gateway Pundit ranked above Fox News, the New York Post, the New York Times, and the

---

[556] [Id. at 51]
[557] [Id. at 51, 74, 76, 101, 103, 110, 112, 145, 150–51, 153, 155–56, 172, 175, 183, 194–95, 206–09, 211–12, 214–16, and 226]
[558] [Id. at 60]
[559] [Id. at 201]
[560] [Id. at 202]
[561] [Id. at 204–05]
[562] [Id. at 204–05]
[563] [Id.]
[564] [Id. at 246]
[565] [Id. at 207]

Washington Post.[566] The EIP report also notes that Twitter suspended The Gateway Pundit's account on February 6, 2021, and it was later de-platformed entirely.[567]

(17)    The EIP notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies—policies that attempted to slow the spread of specific narratives and tactics that could 'potentially mislead or deceive the public.'"[568] The EIP was not targeting foreign disinformation, but rather "domestic speakers."[569] The EIP also indicated it would continue its work in future elections.[570]

(18)    The EIP also called for expansive censorship of social-media speech into other areas such as "public health."[571]

(19)    The EIP stated that it "united government, academic, civil society, and industry, analyzing across platforms to address misinformation in real time."[572]

(20)    When asked whether the targeted information was domestic, Stamos answered, "It is all domestic, and the second point on the domestic, a huge part of the problem is well-known influences… you… have a relatively small number of people with very large followings who have the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these narratives."[573]

Stamos further stated:

> We have set up this thing called the Election Integrity Partnership, so we went and hired a bunch of students. We're working with the University of Washington, Graphika, and DFR Lab and the vast, vast majority we see we believe is domestic. And so, I think a much bigger issue for the platforms is elite disinformation. The staff that

---

[566] [Id.]
[567] [Id. at 224]
[568] [Id. at 229]
[569] [Id. at 243–44]
[570] [Id. at 243–44]
[571] [Id. at 251]
[572] [Id. at 259]
[573] [Doc. No. 276-1 at 12]

is being driven by people who are verified that are Americans who are using their real identities.[574]

(21)    Starbird of the University of Washington, who is on a CISA subcommittee and an

EIP participant, also verified the EIP was targeting domestic speakers, stating:

> Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States… Most of the accounts perpetrating this…. they're authentic accounts. They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election.[575]

### 3.  The Virality Project

(22)    The Virality Project targeted domestic speakers' alleged disinformation relating to

the COVID-19 vaccines.[576] The Virality Project's final report, dated April 26, 2022, lists DiResta

as principal Executive Director and lists Starbird and Masterson as contributors.[577]

According to the Virality Project, "vaccine mis-and disinformation was largely driven by

a cast of recuring [sic] actors including long-standing anti-vaccine influencers and activists,

wellness and lifestyle influence, pseudo medical influencers, conspiracy theory influencers, right-

leaning political influencers, and medical freedom influencers."[578]

The Virality Project admits the speech it targets is primarily domestic, stating "Foreign …

actor's reach appeared to be far less than that of domestic actors."[579] The Virality Project also calls

for more aggressive censorship of COVID-19 misinformation, calls for more federal agencies to

---

[574] [Id.]
[575] [Doc. No. 276-1 at 42]
[576] [Doc. No. 209-3]; Memes, Magnets, Microchips, Narrative Dynamics Around COVID-19 Vaccines.
[577] [Doc. No. 209-3 at 4]
[578] [Id. at 9]
[579] [Id.]

be involved through "cross-agency collaboration,"[580] and calls for a "whole-of-society response."[581] Just like the EIP, the Virality Project states that it is "multistakeholder collaboration" that includes "government entities" among its key stakeholders.[582] The Virality Project targets tactics that are not necessarily false, including hard-to-verify content, alleged authorization sources, organized outrage, and sensationalized/misleading headlines.[583]

(23)  Plaintiff Hines of the Health Freedom Louisiana was flagged by the Virality Project to be a "medical freedom influencer" who engages in the "tactic" of "organized outrage" because she created events or in-person gatherings to oppose mask and vaccine mandates in Louisiana.[584]

(24)  The Virality Project also acknowledges that government "stakeholders," such as "federal health agencies" and "state and local public health officials," were among those that "provided tips" and "requests to access specific incidents and narratives."[585]

(25)  The Virality Project also targeted the alleged COVID-19 misinformation for censorship before it could go viral. "Tickets also enabled analysts to qualify tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that those partners could determine whether something might merit a rapid public or on-platform response."[586]

(26)  The Virality Project flagged the following persons and/or organizations as spreaders of misinformation:

  i.   Jill Hines and Health Freedom of Louisiana;[587]
  ii.   One America News;[588]

---

[580] [Id. at 12]
[581] [Id.]
[582] [Id. at 17]
[583] [Id. at 19]
[584] [Id. at 9, 19]
[585] [Id. at 24]
[586] [Id. at 37]
[587] [Id. at 59]
[588] [Id. at 60]

iii.  Breitbart News;[589]
iv.  Alex Berenson;[590]
v.  Tucker Carlson;[591]
vi.  Fox News;[592]
vii.  Candace Owens;[593]
viii.  The Daily Wire;[594]
ix.  Robert F. Kennedy, Jr.;[595]
x.  Dr. Simone Gold and America's Frontline Doctors; and[596]
xi.  Dr. Joyce Mercula.[597]

(27)  The Virality Project recommends that the federal government implement a Misinformation and Disinformation Center of Excellence, housed within the federal government, which would centralize expertise on mis/disinformation within the federal government at CISA.[598]

## III.  LAW AND ANALYSIS

### A. Preliminary Injunction Standard

An injunction is an extraordinary remedy never awarded of right. *Benisek v. Lamone*, 138 U.S. 1942, 1943 (2018). In each case, the courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U. S. 7, 24, 129 S. Ct. 365 (2008).

The standard for an injunction requires a movant to show: (1) the substantial likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of an injunction; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Benisek*, 138 U.S. at 1944. The party seeking relief must satisfy a cumulative burden of proving

---

[589] [Id.]
[590] [Id. at 54, 57, 49, 50]
[591] [Id. at 57]
[592] [Id. at 91]
[593] [Id. at 86, 92]
[594] [Id.]
[595] [Id.]
[596] [Id. at 87–88]
[597] [Id. at 87]
[598] [Id. at 150]

each of the four elements enumerated before an injunction can be granted. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). None of the four prerequisites has a quantitative value. *State of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

**B. Analysis**

As noted above, Plaintiffs move for a preliminary injunction against Defendants' alleged violations of the Free Speech Clause of the First Amendment. Plaintiffs assert that they are likely to succeed on the merits of their First Amendment claims because Defendants have significantly encouraged and/or coerced social-media companies into removing protected speech from social-media platforms. Plaintiffs also argue that failure to grant a preliminary injunction will result in irreparable harm because the alleged First Amendment violations are continuing and/or there is a substantial risk that future harm is likely to occur. Further, Plaintiffs maintain that the equitable factors and public interest weigh in favor of protecting their First Amendment rights to freedom of speech. Finally, Plaintiffs move for class certification under Federal Rule of Civil Procedure 23.

In response, Defendants maintain that Plaintiffs are unlikely to succeed on the merits for a myriad of reasons. Defendants also maintain that Plaintiffs lack Article III standing to bring the claims levied herein, that Plaintiffs have failed to show irreparable harm because the risk of future injury is low, and that the equitable factors and public interests weigh in favor of allowing Defendants to continue enjoying permissible government speech.

Each argument will be addressed in turn below.

**1. Plaintiffs' Likelihood of Success on the Merits**

For the reasons explained herein, the Plaintiffs are likely to succeed on the merits of their First Amendment claim against the White House Defendants, Surgeon General Defendants, CDC Defendants, FBI Defendants, NIAID Defendants, CISA Defendants, and State Department

Defendants. In ruling on a motion for Preliminary Injunction, it is not necessary that the applicant demonstrate an absolute right to relief. It need only establish a probable right. *West Virginia Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232 (4th Cir. 1971). The Court finds that Plaintiffs here have done so.

### a. Plaintiffs' First Amendment Claims

The Free Speech Clause prohibits only governmental abridgment of speech. It does not prohibit private abridgment of speech. *Manhattan Community Access Corporation v. Halleck*, 139 S. Ct. 1921, 1928 (2019). The First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. *Id.* Government action, aimed at the suppression of particular views on a subject that discriminates on the basis of viewpoint, is presumptively unconstitutional. The First Amendment guards against government action "targeted at specific subject matter," a form of speech suppression known as "content-based discrimination." *National Rifle Association of America v. Cuomo*, 350 F. Supp. 3d 94, 112 (N.D. N.Y. 2018). The private party, social-media platforms are not defendants in the instant suit, so the issue here is not whether the social-media platforms are government actors,[599] but whether the government can be held responsible for the private platforms' decisions.

Viewpoint discrimination is an especially egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the perspective of the speaker is the rationale for the restriction. *Rosenberger v. Rectors and Visitors*

---

[599] This is a standard that requires the private action to be "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

*of University of Virginia*, 515 U.S. 819, 829 (1995). Strict scrutiny is applied to viewpoint discrimination. *Simon & Schuster, Inc. v. Members of the New York State Crime Victim's Board*, 505 U.S. 105 (1991). The government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. *Police Department of Chicago v. Moseley*, 408 U.S. 92, 96 (1972).

If there is a bedrock principal underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377 (1996). The benefit of any doubt must go to protecting rather than stifling speech. *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 891 (2010).

### i. Significant Encouragement and Coercion

To determine whether Plaintiffs are substantially likely to succeed on the merits of their First Amendment free speech claim, Plaintiffs must prove that the Federal Defendants either exercised coercive power or exercised such significant encouragement that the private parties' choice must be deemed to be that of the government. Additionally, Plaintiffs must prove the speech suppressed was "protected speech." The Court, after examining the facts, has determined that some of the Defendants either exercised coercive power or provided significant encouragement, which resulted in the possible suppression of Plaintiffs' speech.

The State (i.e., the Government) can be held responsible for a private decision only when it has exercised coercive power or has provided such "significant encouragement," either overt or covert, that the choice must be deemed to be that of the State. Mere approval or acquiescence in the actions of a private party is not sufficient to hold the state responsible for those actions. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Rendell-Baker v. Kohn*, 457 U.S. 830, 1004–05 (1982);

*National Broadcasting Co. Inc v. Communications Workers of America, Afl-Cio*, 860 F.2d 1022 (11th Cir. 1988); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1213 (11th Cir. 2003); *Brown v. Millard County*, 47 Fed. Appx. 882 (10th Cir. 2002).

In evaluating "significant encouragement," a state may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish. *Norwood v. Harrison*, 413 U.S. at 465. Additionally, when the government has so involved itself in the private party's conduct, it cannot claim the conduct occurred as a result of private choice, even if the private party would have acted independently. *Peterson v. City of Greenville*, 373 U.S. at 247–48. Further, oral, or written statements made by public officials could give rise to a valid First Amendment claim where the comments of a governmental official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request. *National Rifle Association of America*, 350 F. Supp. 3d at 114. Additionally, a public official's threat to stifle protected speech is actionable under the First Amendment and can be enjoined, even if the threat turns out to be empty. *Backpage.com, LLC v. Dart*, 807 F. 3d at 230–31.

The Defendants argue that the "significant encouragement" test for government action has been interpreted to require a higher standard since the Supreme Court's ruling in *Blum v. Yaretsky*, 457 U.S. 991 (1982). Defendants also argue that Plaintiffs are unable to meet the test to show Defendants "significantly encouraged" social-media platforms to suppress free speech. Defendants further maintain Plaintiffs have failed to show "coercion" by Defendants to force social-media companies suppress protected free speech. Defendants also argue they made no threats but rather sought to "persuade" the social-media companies. Finally, Defendants maintain the private social-media companies made independent decisions to suppress certain postings.

90

91a

In *Blum*, the Supreme Court held the Government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice in law must be deemed to be that of the state." *Blum*, 457 U.S. at 1004. Defendants argue that the bar for "significant encouragement" to convert private conduct into state action is high. Defendants maintain that *Blum*'s language does not mean that the Government is responsible for private conduct whenever the Government does more than adopt a passive position toward it. *Skinner v. Ry. Labor Execs. Ass'n.*, 489 U.S. 602, 615 (1989).

Defendants point out this is a question of degree: whether a private party should be deemed an agent or instrument of the Government necessarily turns on the "degree" of the Government's participation in the private party's activities. 489 U.S. at 614. The dispositive question is "whether the State has exercised coercive power or has provided such significant encouragement that the choice must in law be deemed to be that of the State." *VDARE Fund v. City of Colo. Springs*, 11 F.4th 1151, 1161 (10th Cir. 2021).

The Supreme Court found there was not enough "significant encouragement" by the Government in *American Manufacturers Mutual Ins. Co. v. Sullivan*, 526 U.S. 40 (1999). This case involved the constitutionality of a Pennsylvania worker's compensation statute that authorized, but did not require, insurers to withhold payments for the treatment of work-related injuries pending a "utilization" review of whether the treatment was reasonable and necessary. The plaintiffs' argument was that by amending the statute to grant the utilization review (an option they previously did not have), the State purposely encouraged insurers to withhold payments for disputed medical treatment. The Supreme Court found this type of encouragement was not enough for state action.

91

The United States Court of Appeal for the Fifth Circuit has also addressed the issue of government coercion or encouragement. For example, in *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317 (5th Cir. 2020), the Sons of Confederate Veterans applied to march in a city parade that was coordinated by a private business association. The Mayor sent a letter asking the private business to prohibit the display of the Confederate battle flag. After the plaintiff's request to march in the parade was denied, the plaintiff filed suit and argued the Mayor's letter was "significant encouragement" to warrant state action. The Fifth Circuit found the letter was not "significant encouragement."

In determining whether the Government's words or actions could reasonably be interpreted as an implied threat, courts examine a number of factors, including: (1) the Defendant's regulatory or other decision-making authority over the targeted entities; (2) whether the government actors actually exercised regulatory authority over the targeted entities; (3) whether the language of the alleged threatening statements could reasonably be perceived as a threat; and (4) whether any of the targeted entities reacted in a manner evincing the perception of implicit threat. *Id.* at 114. As noted above, a public official's threat to stifle protected speech is actionable under the First Amendment and can be enjoined, even if the threat turns out to be empty. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339, 340-41 (2d. Cir. 2003).

The closest factual case to the present situation is *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023). In *O'Handley*, the plaintiff maintained that a California agency was responsible for the moderation of his posted content. The plaintiff pointed to the agency's mission to prioritize working closely with social-media companies to be "proactive" about misinformation and the flagging of one of his Twitter posts as "disinformation." The Ninth Circuit rejected the argument

that the agency had provided "significant encouragement" to Twitter to suppress speech. In rejecting this argument, the Ninth Circuit stated the "critical question" in evaluating the "significant encouragement" theory is "whether the government's encouragement is so significant that we should attribute the private party's choice to the State…" *Id.* at 1158.

Defendants cited many cases in support of their argument that Plaintiffs have not shown significant coercion or encouragement. *See VDARE Found v. City of Colo. Springs*, 11 F.4th 1151 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1208 (2022) (city's decision not to provide "support or resources" to plaintiff's event was not "such significant encouragement" to transform a private venue's decision to cancel the event into state action); *S.H.A.R.K. v. Metro Park Serving Summit Cnty.*, 499 F.3d 553 (6th Cir. 2007) (government officials' requests were "not the type of significant encouragement" that would render agreeing to those requests to be state action); *Campbell v. PMI Food Equip, Grp., Inc.*, 509 F.3d 776 (6th Cir. 2007) (no state action where government entities did nothing more than authorize and approve a contract that provided tax benefits or incentives conditioned on the company opening a local plant); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) (payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity). Ultimately, Defendants contend that Plaintiffs have not shown that the choice to suppress free speech must in law be deemed to be that of the Government. This Court disagrees.

The Plaintiffs are likely to succeed on the merits on their claim that the United States Government, through the White House and numerous federal agencies, pressured and encouraged social-media companies to suppress free speech. Defendants used meetings and communications with social-media companies to pressure those companies to take down, reduce, and suppress the

free speech of American citizens. They flagged posts and provided information on the type of posts they wanted suppressed. They also followed up with directives to the social-media companies to provide them with information as to action the company had taken with regard to the flagged post. This seemingly unrelenting pressure by Defendants had the intended result of suppressing millions of protected free speech postings by American citizens. In response to Defendants' arguments, the Court points out that this case has much more government involvement than any of the cases cited by Defendants, as clearly indicated by the extensive facts detailed above. If there were ever a case where the "significant encouragement" theory should apply, this is it.

What is really telling is that virtually all of the free speech suppressed was "conservative" free speech. Using the 2016 election and the COVID-19 pandemic, the Government apparently engaged in a massive effort to suppress disfavored conservative speech. The targeting of conservative speech indicates that Defendants may have engaged in "viewpoint discrimination," to which strict scrutiny applies. *See Simon & Schuster, Inc.*, 505 U.S. 105 (1991).

In addition to the "significant encouragement" theory, the Government may also be held responsible for private conduct if the Government exercises coercive power over the private party in question. *Blum*, 457 U.S. at 1004. Here, Defendants argue that not only must there be coercion, but the coercion must be targeted at specific actions that harmed Plaintiffs. *Bantam Books v. Sullivan*, 372 U.S. 58 (1963) (where a state agency threatened prosecution if a distributor did not remove certain designated books or magazines it distributed that the state agency had declared objectionable); *see also Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (where a sheriff's letter demanded that two credit card issuers prohibit the use of their credit cards to purchase any ads on a particular website containing advertisements for adult services); *Okwedy v.*

*Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curium) (where a municipal official allegedly pressured a billboard company to take down a particular series of signs he found offensive).

The Defendants further argue they only made requests to the social-media companies, and that the decision to modify or suppress content was each social-media company's independent decision. However, when a state has so involved itself in the private party's conduct, it cannot claim the conduct occurred as a result of private choice, even if the private party would have acted independently. *Peterson v. City of Greenville*, 373 U.S. 244, 247–248 (1963).

Therefore, the question is not what decision the social-media company would have made, but whether the Government "so involved itself in the private party's conduct" that the decision is essentially that of the Government. As exhaustedly listed above, Defendants "significantly encouraged" the social-media companies to such extent that the decision should be deemed to be the decisions of the Government. The White House Defendants and the Surgeon General Defendants additionally engaged in coercion of social-media companies to such extent that the decisions of the social-media companies should be deemed that of the Government. It simply makes no difference what decision the social-media companies would have made independently of government involvement, where the evidence demonstrates the wide-scale involvement seen here.

### (1) White House Defendants

The Plaintiffs allege that by use of emails, public and private messages, public and private meetings, and other means, White House Defendants have "significantly encouraged" and "coerced" social-media platforms to suppress protected free speech on their platforms.

The White House Defendants acknowledged at oral arguments that they did not dispute the authenticity or the content of the emails Plaintiffs submitted in support of their claims.[600] However, they allege that the emails do not show that the White House Defendants either coerced or significantly encouraged social-media platforms to suppress content of social-media postings. White House Defendants argue instead that they were speaking with social-media companies about promoting more accurate COVID-19 information and to better understand what action the companies were taking to curb the spread of COVID-19 misinformation.

White House Defendants further argue they never demanded the social-media companies to suppress postings or to change policies, and the changes were due to the social-media companies' own independent decisions. They assert that they did not make specific demands via the White House's public statements and four "asks"[601] of social-media companies.[602] Defendants contend the four "asks" were "recommendations," not demands. Additionally, Defendants argue President Biden's July 16, 2021 "they're killing people" comment was clarified on July 19, 2021, to reflect that President Biden was talking about the "Disinformation Dozen," not the social-media companies.

Although admitting White House employee Flaherty expressed frustration at times with social-media companies, White House Defendants contend Flaherty sought to better understand the companies' policies with respect to addressing the spread of misinformation and hoped to find out what the Government could do to help. Defendants contend Flaherty felt such frustration

---

[600] [Doc. No. 288 at 164–65]

[601] The White House four "asks" are: (1) measure and publicly share the impact of misinformation on their platform; (2) create a robust enforcement strategy; (3) take faster action against harmful posts; and (4) promote quality information sources in their feed algorithm.

[602] [Doc. No. 10-1 at 377–78]

because some of the things the social-media-companies told him were inconsistent with what others told him, compounded with the urgency of the COVID-19 pandemic.

Explicit threats are an obvious form of coercion, but not all coercion need be explicit. The following illustrative specific actions by Defendants are examples of coercion exercised by the White House Defendants:

(a)    "Cannot stress the degree to which this needs to be resolved immediately.  Please remove this account immediately."[603]

(b)    Accused Facebook of causing "political violence" by failing to censor false COVID-19 claims.[604]

(c)    "You are hiding the ball."[605]

(d)    "Internally we have been considering our options on what to do about it."[606]

(e)    "I care mostly about what actions and changes you are making to ensure you're not making our country's vaccine hesitancy problem worse."[607]

(f)    "This is exactly why I want to know what "Reduction" actually looks like – if "reduction" means pumping our most vaccine hesitance audience with Tucker Carlson saying it does not work… then… I'm not sure it's reduction."[608]

(g)    Questioning how the Tucker Carlson video had been "demoted" since there were 40,000 shares.[609]

(h)    Wanting to know why Alex Berenson had not been kicked off Twitter because Berenson was the epicenter of disinformation that radiated outward to the persuadable public.[610] "We want to make sure YouTube has a handle on vaccine hesitancy and is working toward making the problem better. Noted that vaccine hesitancy was a concern. That is shared by the highest ('and I mean the highest') levels of the White House."'[611]

---

[603] [II. A.]
[604] [Id. A. (5)]
[605] [Id. A. (10)]
[606] [Id.]
[607] [Id. A. (11)]
[608] [Id. A. (12)]
[609] [Id. A. (15)]
[610] [Id. A. (16)]
[611] [Id. A. (17)]

(i)      After sending to Facebook a document entitled "Facebook COVID-19 Vaccine Misinformation Brief, which recommends much more aggressive censorship by Facebook. Flaherty told Facebook sending the Brief was not a White House endorsement of it, but "this is circulating around the building and informing thinking."[612]

(j)      Flaherty stated: "Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach and how quickly?"[613]

(k)      Flaherty told Facebook: "Are you guys fucking serious" I want an answer on what happened here and I want it today."[614]

(l)      Surgeon General Murthy stated: "We expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor information more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms."[615]

(m)     White House Press Secretary Psaki stated: "we are in regular touch with these social-media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team. We're flagging problematic posts for Facebook that spread disinformation. Psaki also stated one of the White House's "asks" of social-media companies was to "create a robust enforcement strategy."[616]

(n)      When asked about what his message was to social-media platforms when it came to COVID-19, President Biden stated: "they're killing people. Look, the only pandemic we have is among the unvaccinated and that – they're killing people."[617]

(o)      Psaki stated at the February 1, 2022, White House Press Conference that the White House wanted every social-media platform to do more to call out misinformation and disinformation and to uplift accurate information.[618]

(p)      "Hey folks, wanted to flag the below tweet and am wondering if we can get moving on the process of having it removed. ASAP"[619]

(q)      "How many times can someone show false COVID-19 claims before being removed?"

---

[612] [Id.]
[613] [Id at A. (19)]
[614] [Id.]
[615] [Id.]
[616] [Id.]
[617] [Id.]
[618] [Id. at A. (24)]
[619] [Doc. No. 174-1 at 1]

(r)    "I've been asking you guys pretty directly over a series of conversations if the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content- as you define it, is playing a role."[620]

(s)    "I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy-period."[621]

(t)    "You only did this, however after an election that you helped increase skepticism in and an insurrection which was plotted, in large part, on your platform."[622]

(u)    "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen." [623]

(v)    White House Communications Director, Kate Bedingfield's announcement that "the White House is assessing whether social-media platforms are legally liable for misinformation spread on their platforms, and examining how misinformation fits into the liability protection process by Section 230 of The Communication Decency Act."[624]

These actions are just a few examples of the unrelenting pressure the Defendants exerted against social-media companies. This Court finds the above examples demonstrate that Plaintiffs can likely prove that White House Defendants engaged in coercion to induce social-media companies to suppress free speech.

With respect to 47 U.S.C. § 230, Defendants argue that there can be no coercion for threatening to revoke and/or amend Section 230 because the call to amend it has been bipartisan. However, Defendants combined their threats to amend Section 230 with the power to do so by holding a majority in both the House of Representatives and the Senate, and in holding the Presidency. They also combined their threats to amend Section 230 with emails, meetings, press conferences, and intense pressure by the White House, as well as the Surgeon General Defendants. Regardless, the fact that the threats to amend Section 230 were bipartisan makes it even more

---

[620] [Id. at 11]
[621] [Id.]
[622] [Doc. No. 174-1 at 17–20]
[623] [Id. at 41]
[624] [Doc. No. 10-1 at 477–78]

100a

likely that Defendants had the power to amend Section 230. All that is required is that the government's words or actions "could reasonably be interpreted as an implied threat." *Cuomo*, 350 F. Supp. 3d at 114. With the Supreme Court recently making clear that Section 230 shields social-media platforms from legal responsibility for what their users post, *Gonzalez v. Google*, 143 S. Ct. 1191 (2023), Section 230 is even more valuable to these social-media platforms. These actions could reasonably be interpreted as an implied threat by the Defendants, amounting to coercion.

Specifically, the White House Defendants also allegedly exercised significant encouragement such that the actions of the social-media companies should be deemed to be that of the government. The White House Defendants used emails, private portals, meetings, and other means to involve itself as "partners" with social-media platforms. Many emails between the White House and social-media companies referred to themselves as "partners." Twitter even sent the White House a "Partner Support Portal" for expedited review of the White House's requests. Both the White House and the social-media companies referred to themselves as "partners" and "on the same team" in their efforts to censor disinformation, such as their efforts to censor "vaccine hesitancy" spread. The White House and the social-media companies also demonstrated that they were "partners" by suppressing information that did not even violate the social-media companies' own policies.

Further, White House Defendants constantly "flagged" for Facebook and other social-media platforms posts the White House Defendants considered misinformation. The White House demanded updates and reports of the results of their efforts to suppress alleged disinformation, and the social-media companies complied with these demands. The White House scheduled numerous Zoom and in-person meetings with social-media officials to keep each other informed about the companies' efforts to suppress disinformation.

101a

The White House Defendants made it very clear to social-media companies what they wanted suppressed and what they wanted amplified. Faced with unrelenting pressure from the most powerful office in the world, the social-media companies apparently complied. The Court finds that this amounts to coercion or encouragement sufficient to attribute the White House's actions to the social-media companies, such that Plaintiffs are likely to succeed on the merits against the White House Defendants.

### (2) Surgeon General Defendants

Plaintiffs allege that Surgeon General Murthy and his office engaged in a pressure campaign parallel to, and often overlapping with, the White House Defendants' campaign directed at social-media platforms. Plaintiffs further allege the Surgeon General Defendants engaged in numerous meetings and communications with social-media companies to have those companies suppress alleged disinformation and misinformation posted on their platforms.

The Surgeon General Defendants argue that the Surgeon General's role is primarily to draw attention to public health matters affecting the nation. The SG took two official actions in 2021 and in 2022. In July 2021, the Surgeon General issued a "Surgeon General's Advisory." In March 2022, the Surgeon General issued a Request For Information ("RFI"). Surgeon General Defendants argue that the Surgeon General's Advisory did not require social-media companies to censor information or make changes in their policies. Surgeon General Defendants further assert that the RFI was voluntary and did not require the social-media companies to answer.

Additionally, the Surgeon General Defendants contend they only held courtesy meetings with social-media companies, did not flag posts for censorship, and never worked with social-media companies to moderate their policies. Surgeon General Defendants also deny that they were involved with the Virality Project.

102a

As with the White House Defendants, this Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment free speech claim against the Surgeon General Defendants. Through public statements, internal emails, and meetings, the Surgeon General Defendants exercised coercion and significant encouragement such that the decisions of the social-media platforms and their actions suppressing health disinformation should be deemed to be the decisions of the government. Importantly, the suppression of this information was also likely prohibited content and/or viewpoint discrimination, entitling Plaintiffs to strict scrutiny.

The Surgeon General Defendants did pre-rollout calls with numerous social-media companies prior to publication of the Health Advisory on Misinformation. The Advisory publicly called on social-media companies "to do more" against COVID misinformation Superspreaders. Numerous calls and meetings took place between Surgeon General Defendants and private social-media companies. The "misinformation" to be suppressed was whatever the government deemed misinformation.

The problem with labeling certain discussions about COVID-19 treatment as "health misinformation" was that the Surgeon General Defendants suppressed alternative views to those promoted by the government. One of the purposes of free speech is to allow discussion about various topics so the public may make informed decisions. Health information was suppressed, and the government's view of the proper treatment for COVID-19 became labeled as "the truth." Differing views about whether COVID-19 vaccines worked, whether taking the COVID-19 vaccine was safe, whether mask mandates were necessary, whether schools and businesses should have been closed, whether vaccine mandates were necessary, and a host of other topics were suppressed. Without a free debate about these issues, each person is unable to decide for himself or herself the proper decision regarding their health. Each United States citizen has the right to

decide for himself or herself what is true and what is false. The Government and/or the OSG does not have the right to determine the truth.

The Surgeon General Defendants also engaged in a pressure campaign with the White House Defendants to pressure social-media companies to suppress health information contrary to the Surgeon General Defendants' views. After the Surgeon General's press conference on July 15, 2021, the Surgeon General Defendants kept the pressure on social-media platforms via emails, private meetings, and by requiring social-media platforms to report on actions taken against health disinformation.

The RFI by the Surgeon General Defendants also put additional pressure on social-media companies to comply with the requests to suppress free speech. The RFI sought information from private social-media companies to provide information about the spread of misinformation. The RFI stated that the office of the Surgeon General was expanding attempts to control the spread of misinformation on social-media platforms. The RFI also sought information about social-media censorship policies, how they were enforced, and information about disfavored speakers.

Taking all of this evidence together, this Court finds the Surgeon General Defendants likely engaged in both coercion and significant encouragement to such an extent that the decisions of private social-media companies should be deemed that of the Surgeon General Defendants. The Surgeon General Defendants did much more than engage in Government speech: they kept pressure on social-media companies with pre-rollout meetings, follow-up meetings, and RFI. Thus, Plaintiffs are likely to succeed on the merits of their First Amendment claim against these Defendants.

### (3) CDC Defendants

Plaintiffs allege that the CDC Defendants have engaged in a censorship campaign, together with the White House and other federal agencies, to have free speech suppressed on social-media platforms. Plaintiffs allege that working closely with the Census Bureau, the CDC flagged supposed "misinformation" for censorship on the platforms. Plaintiffs further allege that by using the acronym "BOLO," the CDC Defendants told social-media platforms what health claims should be censored as misinformation.

In opposition, Defendants assert that the CDC's mission is to protect the public's health. Although the CDC Defendants admit to meeting with and sending emails to social-media companies, the CDC Defendants argue they were responding to requests by the companies for science-based public health information, proactively alerting the social-media companies about disinformation, or advising the companies where to find accurate information. The Census Bureau argues the Interagency Agreement, entered into with the CDC in regard to COVID-19 misinformation, has expired, and that it is no longer participating with the CDC on COVID-19 misinformation issues. The CDC Defendants further deny that they directed any social-media companies to remove posts or to change their policies.

Like the White House Defendants and Surgeon General Defendants, the Plaintiffs are likely to succeed on the merits of Plaintiffs' First Amendment free speech claim against the CDC Defendants. The CDC Defendants through emails, meetings, and other communications, seemingly exercised pressure and gave significant encouragement such that the decisions of the social-media platforms to suppress information should be deemed to be the decisions of the Government. The CDC Defendants coordinated meetings with social-media companies, provided examples of alleged disinformation to be suppressed, questioned the social-media companies about

how it was censoring misinformation, required reports from social-media companies about disinformation, told the social-media companies whether content was true or false, provided BOLO information, and used a Partner Support Portal to report disinformation. Much like the other Defendants, described above, the CDC Defendants became "partners" with social-media platforms, flagging and reporting statements on social media Defendants deemed false. Although the CDC Defendants did not exercise coercion to the same extent as the White House and Surgeon General Defendants, their actions still likely resulted in "significant encouragement" by the government to suppress free speech about COVID-19 vaccines and other related issues.

Various social-media platforms changed their content-moderation policies to require suppression of content that was deemed false by CDC and led to vaccine hesitancy. The CDC became the "determiner of truth" for social-media platforms, deciding whether COVID-19 statements made on social media were true or false. And the CDC was aware it had become the "determiner of truth" for social-media platforms. If the CDC said a statement on social media was false, it was suppressed, in spite of alternative views. By telling social-media companies that posted content was false, the CDC Defendants knew the social-media company was going to suppress the posted content. The CDC Defendants thus likely "significantly encouraged" social-media companies to suppress free speech.

Based on the foregoing examples of significant encouragement and coercion by the CDC Defendants, the Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CDC Defendants.

### (4) NIAID Defendants

Plaintiffs allege that NIAID Defendants engaged in a series of campaigns to discredit and procure the censorship of disfavored viewpoints on social media. Plaintiffs allege that Dr. Fauci

106a

engaged in a series of campaigns to suppress speech regarding the Lab-Leak theory of COVID-19's origin, treatment using hydroxychloroquine, the GBD, the treatment of COVID-19 with Ivermectin, the effectiveness of mask mandates, and the speech of Alex Berenson.

In opposition, Defendants assert that the NIAID Defendants simply supports research to better understand, treat, and prevent infectious, immunologic, and allergic diseases and is responsible for responding to emergency public health threats. The NIAID Defendants argue that they had limited involvement with social-media platforms and did not meet with or contact the platforms to change their content or policies. The NIAID Defendants further argue that the videos, press conferences, and public statements by Dr. Fauci and other employees of NIAID was government speech.

This Court agrees that much of what the NIAID Defendants did was government speech. However, various emails show Plaintiffs are likely to succeed on the merits through evidence that the motivation of the NIAID Defendants was a "take down" of protected free speech. Dr. Francis Collins, in an email to Dr. Fauci[625] told Fauci there needed to be a "quick and devastating take down" of the GBD—the result was exactly that. Other email discussions show the motivations of the NIAID were to have social-media companies suppress these alternative medical theories. Taken together, the evidence shows that Plaintiffs are likely to succeed on the merits against the NIAID Defendants as well.

### (5) FBI Defendants

Plaintiffs allege that the FBI Defendants also suppressed free speech on social-media platforms, with the FBI and FBI's FITF playing a key role in these censorship efforts.

---

[625] [Doc. No. 207-6]

107a

In opposition, Defendants assert that the FBI Defendants' specific job duties relate to foreign influence operations, including attempts by foreign governments to influence U.S. elections. Based on the alleged foreign interference in the 2016 U.S. Presidential election, the FBI Defendants argue that, through their meetings and emails with social-media companies, they were attempting to prevent foreign influence in the 2020 Presidential election. The FBI Defendants deny any attempt to suppress and/or change the social-media companies' policies with regard to domestic speech. They further deny that they mentioned Hunter Biden or a "hack and leak" foreign operation involving Hunter Biden.

According to the Plaintiffs' allegations detailed above, the FBI had a 50% success rate regarding social media's suppression of alleged misinformation, and it did no investigation to determine whether the alleged disinformation was foreign or by U.S. citizens. The FBI's failure to alert social-media companies that the Hunter Biden laptop story was real, and not mere Russian disinformation, is particularly troubling. The FBI had the laptop in their possession since December 2019 and had warned social-media companies to look out for a "hack and dump" operation by the Russians prior to the 2020 election. Even after Facebook specifically asked whether the Hunter Biden laptop story was Russian disinformation, Dehmlow of the FBI refused to comment, resulting in the social-media companies' suppression of the story. As a result, millions of U.S. citizens did not hear the story prior to the November 3, 2020 election. Additionally, the FBI was included in Industry meetings and bilateral meetings, received and forwarded alleged misinformation to social-media companies, and actually mislead social-media companies in regard to the Hunter Biden laptop story. The Court finds this evidence demonstrative of significant encouragement by the FBI Defendants.

Defendants also argue that Plaintiffs are attempting to create a "deception" theory of government involvement with regards to the FBI Defendants. Plaintiffs allege the FBI told the social-media companies to watch out for Russian disinformation prior to the 2020 Presidential election and then failed to tell the companies that the Hunter Biden laptop was not Russian disinformation. The Plaintiffs further allege Dr. Fauci colluded with others to cover up the Government's involvement in "gain of function" research at the Wuhan lab in China, which may have resulted in the creation of the COVID-19 pandemic.

Although this Court agrees there is no specified "deception" test for government action, a state may not induce private persons to accomplish what it is constitutionally forbidden to accomplish. *Norwood*, 413 U.S. at 455. It follows, then, that the government may not deceive a private party either—it is just another form of coercion. The Court has evaluated Defendants' conduct under the "coercion" and/or "significant encouragement" theories of government action, and finds that the FBI Defendants likely exercised "significant encouragement" over social-media companies.

Through meetings, emails, and in-person contacts, the FBI intrinsically involved itself in requesting social-media companies to take action regarding content the FBI considered to be misinformation. The FBI additionally likely misled social-media companies into believing the Hunter Biden laptop story was Russian disinformation, which resulted in suppression of the story a few weeks prior to the 2020 Presidential election. Thus, Plaintiffs are likely to succeed in their claims that the FBI exercised "significant encouragement" over social-media platforms such that the choices of the companies must be deemed to be that of the Government.

**(5) CISA Defendants**

Plaintiffs allege the CISA Defendants served as a "nerve center" for federal censorship efforts by meeting routinely with social-media platforms to increase censorship of speech disfavored by federal officials, and by acting as a "switchboard" to route disinformation concerns to social-media platforms.

In response, the CISA Defendants maintain that CISA has a mandate to coordinate with federal and non-federal entities to carry out cybersecurity and critical infrastructure activities. CISA previously designated election infrastructure as a critical infrastructure subsector. CISA also collaborates with state and local election officials; as part of its duties, CISA coordinates with the EIS-GCC, which is comprised of state, local, and federal governmental departments and agencies. The EI-SSC is comprised of owners or operators with significant business or operations in U.S. election infrastructure systems or services. After the 2020 election, the EI-SCC and EIS-GCC launched a Joint Managing Mis/Disinformation Group to coordinate election infrastructure security efforts. The CISA Defendants argue CISA supports the Joint Managing Mis-Disinformation Group but does not coordinate with the EIP or the CIS. Despite DHS providing financial assistance to the CIS through a series of cooperative agreement awards managed by CISA, the CISA Defendants assert that the work scope funded by DHS has not involved the CIS performing disinformation-related tasks.

Although the CISA Defendants admit to being involved in "switchboarding" work during the 2020 election cycle, CISA maintains it simply referred the alleged disinformation to the social-media companies, who made their own decisions to suppress content. CISA maintains it included a notice with each referral to the companies, which stated that CISA was not demanding censorship. CISA further maintains it discontinued its switchboarding work after the 2020 election

cycle and has no intention to engage in switchboarding for the next election.[626] CISA further argues that even though it was involved with USG-Industry meetings with other federal agencies and social-media companies, they did not attempt to "push" social-media companies to suppress content or to change policies.

The Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CISA Defendants. The CISA Defendants have likely exercised "significant encouragement" with social-media platforms such that the choices of the social-media companies must be deemed to be that of the government. Like many of the other Defendants, the evidence shows that the CISA Defendants met with social-media companies to both inform and pressure them to censor content protected by the First Amendment. They also apparently encouraged and pressured social-media companies to change their content-moderation policies and flag disfavored content.

But the CISA Defendants went even further. CISA expanded the word "infrastructure" in its terminology to include "cognitive" infrastructure, so as to create authority to monitor and suppress protected free speech posted on social media. The word "cognitive" is an adjective that means "relating to cognition." "Cognition" means the mental action or process of acquiring knowledge and understanding through thought, experiences, and the senses.[627] The Plaintiffs are likely to succeed on the merits on its claim that the CISA Defendants believe they had a mandate to control the process of acquiring knowledge. The CISA Defendants engaged with Stanford University and the University of Washington to form the EIP, whose purpose was to allow state and local officials to report alleged election misinformation so it could be forwarded to the social-

---

[626] However, at oral argument, CISA attorneys were unable to verify whether or not CISA would be involved in switchboarding during the 2024 election. [Doc. No. 288 at 122]

[627] Google English Dictionary

media platforms to review. CISA used a CISA-funded non-profit organization, the CIS, to perform

the same actions. CISA used interns who worked for the Stanford Internal Observatory, which is

part of the EIP, to address alleged election disinformation. All of these worked together to forward

alleged election misinformation to social-media companies to view for censorship. They also

worked together to ensure the social-media platforms reported back to them on what actions the

platforms had taken. And in this process, no investigation was made to determine whether the

censored information was foreign or produced by U.S. citizens.

According to DiResta, head of EIP, the EIP was designed "to get around unclear legal

authorities, including very real First Amendment questions that would arise if CISA or the other

government agencies were to monitor and flag information for censorship on social media."[628]

Therefore, the CISA Defendants aligned themselves with and partnered with an organization that

was designed to avoid Government involvement with free speech in monitoring and flagging

content for censorship on social-media platforms.

At oral arguments on May 26, 2023, Defendants argued that the EIP operated

independently of any government agency. The evidence shows otherwise: the EIP was started

when CISA interns came up with the idea; CISA connected the EIP with the CIS, which is a CISA-

funded non-profit that channeled reports of misinformation from state and local government

officials to social-media companies; CISA had meetings with Stanford Internet Observatory

officials (a part of the EIP), and both agreed to "work together"; the EIP gave briefings to CISA;

and the CIS (which CISA funds) oversaw the Multi-State Information Sharing and Analysis

Center ("MS-ISAC") and the Election Infrastructure Information Sharing and Analysis Center

---

[628] [Doc. No. 209-5 at 4]

("EI-ISAC"), both of which are organizations of state and local governments that report alleged election misinformation.

CISA directs state and local officials to CIS and connected the CIS with the EIP because they were working on the same mission and wanted to be sure they were all connected. CISA served as a mediating role between CIS and EIP to coordinate their efforts in reporting misinformation to social-media platforms, and there were direct email communications about reporting misinformation between EIP and CISA. Stamos and DiResta of the EIP also have roles in CISA on CISA advisory committees. EIP identifies CISA as a "partner in government." The CIS coordinated with EIP regarding online misinformation. The EIP publication, "The Long Fuse,"[629] states the EIP has a focus on election misinformation originating from "domestic" sources across the United States.[630] EIP further stated that the primary repeat spreaders of false and misleading narratives were "verified blue-checked accounts belonging to partisan media outlets, social-media influencers, and political figures, including President Trump and his family."[631] The EIP further disclosed it held its first meeting with CISA to present the EIP concept on July 9, 2020, and EIP was officially formed on July 26, 2020, "in consultation with CISA."[632] The Government was listed as one of EIP's Four Major Stakeholder Groups, which included CISA, the GEC, and ISAC.[633]

As explained, the CISA Defendants set up a "switchboarding" operation, primarily consisting of college students, to allow immediate reporting to social-media platforms of alleged election disinformation. The "partners" were so successful with suppressing election

---

[629] [Doc. No. 209-2]
[630] [Id. at 9]
[631] [Id. at 12]
[632] [Id. at 20–21]
[633] [Id. at 30]

disinformation, they later formed the Virality Project, to do the same thing with COVID-19 misinformation that the EIP was doing for election disinformation. CISA and the EIP were completely intertwined. Several emails from the switchboarding operation sent by intern Pierce Lowary shows Lowary directly flagging posted content and sending it to social-media companies. Lowary identified himself as "working for CISA" on the emails.[634]

On November 21, 2021, CISA Director Easterly stated: "We live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if people get to pick their own facts." The Free Speech Clause was enacted to prohibit just what Director Easterly is wanting to do: allow the government to pick what is true and what is false. The Plaintiffs are likely to succeed on the merits of their First Amendment claim against the CISA Defendants for "significantly encouraging" social-media companies to suppress protected free speech.

### (5) State Department Defendants

Plaintiffs allege the State Department Defendants, through the State Department's GEC, were also involved in suppressing protected speech on social-media platforms.

In response, the State Department Defendants argue that they, along with the GEC, play a critical role in coordinating the U.S. government efforts to respond to foreign influence. The State Department Defendants argue that they did not flag specific content for social-media companies and did not give the company any directives. The State Department Defendants also argue that they do not coordinate with or work with the EIP or the CIS.

The Court finds that Plaintiffs are also likely to succeed on the merits regarding their First Amendment Free Speech Clause against the State Department Defendants. For many of the same reasons the Court reached its conclusion as to the CISA Defendants, the State Department

---

[634] [Doc. No. 227-2 at 15, 23, 42, 65 & 78]

114a

Defendants have exercised "significant encouragement" with social-media platforms, such that the choices of the social-media companies should be deemed to be that of the government. As discussed previously, both CISA and the GEC were intertwined with the VP, EIP, and Stanford Internet Observatory.

The VP, EIP, and Stanford Internet Observatory are not defendants in this proceeding. However, their actions are relevant because government agencies have chosen to associate, collaborate, and partner with these organizations, whose goals are to suppress protected free speech of American citizens. The State Department Defendants and CISA Defendants both partnered with organizations whose goals were to "get around" First Amendment issues.[635] In partnership with these non-governmental organizations, the State Department Defendants flagged and reported postings of protected free speech to the social-media companies for suppression. The flagged content was almost entirely from political figures, political organizations, alleged partisan media outlets, and social-media all-stars associated with right-wing or conservative political views, demonstrating likely "viewpoint discrimination." Since only conservative viewpoints were allegedly suppressed, this leads naturally to the conclusion that Defendants intended to suppress only political views they did not believe in. Based on this evidentiary showing, Plaintiffs are likely to succeed on the merits of their First Amendment claims against the State Department Defendants.

### (6) Other Defendants

Other Defendants in this proceeding are the U.S. Food and Drug Administration, U. S. Department of Treasury, U.S. Election Assistance Commission, U. S. Department of Commerce, and employees Erica Jefferson, Michael Murray, Wally Adeyemo, Steven Frid, Brad Kimberly, and Kristen Muthig. Plaintiffs confirmed at oral argument that they are not seeking a preliminary

---

[635] [Doc. No. 209-5 at 4]

injunction against these Defendants. Additionally, Plaintiffs assert claims against the Disinformation Governance Board ("DGB") and its Director Nina Jankowicz. Defendants have provided evidence that the DGB has been disbanded, so any claims against these Defendants are moot. Thus, this Court will not address the issuance of an injunction against any of these Defendants.

### ii.  Joint Participation

The Plaintiffs contend that the Defendants are not only accountable for private conduct that they coerced or significantly encouraged, but also for private conduct in which they actively participated as "joint participants." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961). Although most often "joint participation" occurs through a conspiracy or collusive behavior, *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992), even without a conspiracy, when a plaintiff establishes the government is responsible for private action arising out of "pervasive entwinement of public institutions and public officials in the private entity's composition and workings." *Brentwood Academy. v. Tennessee Secondary Sch. Athletic Ass'n.*, 531 U. S. 288, 298 (2001).

Under the "joint action" test, the Government must have played an indispensable role in the mechanism leading to the disputed action. *Frazier v. Bd. Of Trs. Of N.W. Miss. Reg.'l Med. Ctr.*, 765 F.2d 1278, 1287-88 (5th Cir.), *amended*, 777 F.2d 329 (5th Cir. 1985). When a plaintiff establishes "the existence of a conspiracy involving state action," the government becomes responsible for all constitutional violations committed in furtherance of the conspiracy by a party to the conspiracy. *Armstrong v. Ashley*, 60 F.4th 262, (5th Cir. 2023). Conspiracy can be charged as the legal mechanism through which to impose liability on each and all of the defendants without

116a

regard to the person doing the particular act that deprives the plaintiff of federal rights. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990).

Much like conspiracy and collusion, joint activity occurs whenever the government has "so far insinuated itself" into private affairs as to blur the line between public and private action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). To become "pervasively entwined" in a private entity's workings, the government need only "significantly involve itself in the private entity's actions and decision-making"; it is not necessary to establish that "state actors … literally 'overrode' the private entity's independent judgment." R*awson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751, 753 (9th Cir. 2020). "Pervasive intertwinement" exists even if the private party is exercising independent judgment. *West v. Atkins*, 487 U.S. 42, 52, n.10 (1988); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (holding that a "substantial degree of cooperative action" can constitute joint action).

For the same reasons as this Court has found Plaintiffs met their burden to show "significant encouragement" by the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the FBI Defendants, the NIAID Defendants, the CISA Defendants, and the State Department Defendants, this Court finds the Plaintiffs are likely to succeed on the merits that these Defendants "jointly participated" in the actions of the private social-media companies as well, by insinuating themselves into the social-media companies' private affairs and blurring the line between public and private action.[636]

However, this Court finds Plaintiffs are not likely to succeed on the merits that the "joint participation" occurred as a result of a conspiracy with the social-media companies. The evidence

---

[636] It is not necessary to repeat the details discussed in the "significant encouragement" analysis in order to find Plaintiffs have met their initial burden.

thus far shows that the social-media companies cooperated due to coercion, not because of a conspiracy.

This Court finds the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the NIAID Defendants, the FBI Defendants, the CISA Defendants, and the State Department Defendants likely "jointly participated" with the social-media companies to such an extent that said Defendants have become "pervasively entwined" in the private companies' workings to such an extent as to blur the line between public and private action. Therefore, Plaintiffs are likely to succeed on the merits that the government Defendants are responsible for the private social-media companies' decisions to censor protected content on social-media platforms.

### iii. Other Arguments

While not admitting any fault in the suppression of free speech, Defendants blame the Russians, COVID-19, and capitalism for any suppression of free speech by social-media companies. Defendants argue the Russian social-media postings prior to the 2016 Presidential election caused social-media companies to change their rules with regard to alleged misinformation. The Defendants argue the Federal Government promoted necessary and responsible actions to protect public health, safety, and security when confronted by a deadly pandemic and hostile foreign assaults on critical election infrastructure. They further contend that the COVID-19 pandemic resulted in social-media companies changing their rules in order to fight related disinformation. Finally, Defendants argue the social-media companies' desire to make money from advertisers resulted in change to their efforts to combat disinformation. In other words, Defendants maintain they had nothing to do with Plaintiffs' censored speech and blamed any suppression of free speech on the Russians, COVID-19, and the companies' desire to make

money. The social-media platforms and the Russians are of course not defendants in this proceeding, and neither are they bound by the First Amendment. The only focus here is on the actions of the Defendants themselves.

Although the COVID-19 pandemic was a terrible tragedy, Plaintiffs assert that it is still not a reason to lessen civil liberties guaranteed by our Constitution. "If human nature and history teaches anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Does 1-3 v. Mills*, 142 S. Ct. 17, 20–21 (2021) (Gorsuch, J., dissenting). The "grave risk" here is arguably the most massive attack against free speech in United States history.

Another argument of Defendants is that the previous Administration took the same actions as Defendants. Although the "switchboarding" by CISA started in 2018, there is no indication or evidence yet produced in this litigation that the Trump Administration had anything to do with it. Additionally, whether the previous Administration suppressed free speech on social media is not an issue before this Court and would not be a defense to Defendants even if it were true.

Defendants also argue that a preliminary injunction would restrict the Defendants' right to government speech and would transform government speech into government action whenever the Government comments on public policy matters. The Court finds, however, that a preliminary injunction here would not prohibit government speech. The traditional test used to differentiate government speech from private speech discusses three relevant factors: (1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains editorial control over the speech. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 465–80 (2009). A government entity has the right to speak for itself and is entitled to say what it wishes and express the views it wishes to express. The Free Speech Clause restricts government

119a

regulation of private speech; it does not regulate government speech. *Pleasant Grove City, Utah*, 555 U.S. at 468.

The Defendants argue that by making public statements, this is nothing but government speech. However, it was not the public statements that were the problem. It was the alleged use of government agencies and employees to coerce and/or significantly encourage social-media platforms to suppress free speech on those platforms. Plaintiffs point specifically to the various meetings, emails, follow-up contacts, and the threat of amending Section 230 of the Communication Decency Act. Plaintiffs have produced evidence that Defendants did not just use public statements to coerce and/or encourage social-media platforms to suppress free speech, but rather used meetings, emails, phone calls, follow-up meetings, and the power of the government to pressure social-media platforms to change their policies and to suppress free speech. Content was seemingly suppressed even if it did not violate social-media policies. It is the alleged coercion and/or significant encouragement that likely violates the Free Speech Clause, not government speech, and thus, the Court is not persuaded by Defendants' arguments here.

### b. Standing

The United States Constitution, via Article III, limits federal courts' jurisdiction to "cases" and "controversies." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (*citing* U.S. Const. art. III, § 2). The "law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017) (citation omitted). Thus, "the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99

(1975) (citation and internal quotation marks omitted). The Article III standing requirements apply to claims for injunctive and declaratory relief. *See Seals v. McBee*, 898 F.3d 587, 591 (5th Cir. 2018), *as revised* (Aug. 9, 2018); *Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997).

Article III standing is comprised of three essential elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citation omitted). "The plaintiff must have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (internal citations omitted). Furthermore, "[a] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y.*, 581 U.S. at 439 (citations omitted). However, the presence of one party with standing "is sufficient to satisfy Article III's case-or-controversy requirement." *Texas*, 809 F.3d 134 (*citing Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

In the context of a preliminary injunction, it has been established that "the 'merits' required for the plaintiff to demonstrate a likelihood of success include not only substantive theories but also the establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). In order to establish standing, the plaintiff must demonstrate that they have encountered or suffered an injury attributable to the defendant's challenged conduct and that such injury is likely to be resolved through a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). Further, during the preliminary injunction stage, the movant is only required to demonstrate a likelihood of proving standing. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). Defendants raise challenges to each essential element of standing for both the Private Plaintiffs and the States. Each argument will be addressed in turn below. For the reasons stated

herein, the Court finds that the Plaintiffs have demonstrated a likelihood of satisfying Article III's standing requirements.

### i.     Injury-in-fact

Plaintiffs seeking to establish injury-in-fact must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citations and internal quotation marks omitted). For an injury to be "particularized," it must "affect the plaintiff in a personal and individual way." *Id.* (citations and internal quotation marks omitted).

Plaintiffs argue that that they have asserted violations of their First Amendment right to speak and listen freely without government interference.[637] In response, Defendants contend that Plaintiffs' allegations rest on dated declarations that focus on long-past conduct, making Plaintiffs' fears of imminent injury entirely speculative.[638] The Court will first address whether the Plaintiff States are likely to prove an injury-in-fact. Then the court will examine whether the Individual Plaintiffs are likely to prove an injury-in-fact. For the reasons explained below, both the Plaintiff States and Individual Plaintiffs are likely to prove an injury-in-fact.

### (1) Plaintiff States

In denying Defendants' Motion to Dismiss,[639] this Court previously found that the Plaintiff States had sufficiently alleged injury-in-fact to satisfy Article III standing under either a direct injury or *parens patriae* theory of standing and that the States were entitled to special solicitude in the standing analysis.[640] At the preliminary injunction stage, the issue becomes whether the Plaintiffs are likely to prove standing. *See Speech First, Inc.*, 979 F.3d, at 330. The evidence

---

[637] *See* [Doc. No. 214, at 66]
[638] *See* [Doc. No. 266, at 151]
[639] [Doc. No. 128]
[640] [Doc. No. 224, at 20–33]

122a

produced thus far through discovery shows that the Plaintiff States are likely to establish an injury-in-fact through either a *parens patriae* or direct injury theory of standing.

    *Parens patriae*, which translates to "parent of the country," traditionally refers to the state's role as a sovereign and guardian for individuals with legal disabilities. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 n.8 (1982) (*quoting* Black's Law Dictionary 1003 (5th ed. 1979)). The term "*parens patriae* lawsuit" has two meanings: it can denote a lawsuit brought by the state on behalf of individuals unable to represent themselves, or a lawsuit initiated by the state to protect its "quasi-sovereign" interests. *Id.* at 600; *see also Kentucky v. Biden*, 23 F.4th 585, 596–98 (6th Cir. 2022); *Chapman v. Tristar Prod., Inc.*, 940 F.3d 299, 305 (6th Cir. 2019). A lawsuit based on the former meaning is known as a "third-party" *parens patriae* lawsuit, and it is clearly established law that states cannot bring such lawsuits against the federal government. *Kentucky*, 23 F.4th at 596. Thus, to have *parens patriae* standing, the Plaintiff States must show a likelihood of establishing an injury to one or more of their quasi-sovereign interests.

    In *Snapp*, the United States Supreme Court determined that Puerto Rico had *parens patriae* standing to sue the federal government to safeguard its quasi-sovereign interests. *Snapp*, 458 U.S. at 608. The Court identified two types of injuries to a state's quasi-sovereign interests: one is an injury to a significant portion of the state's population, and the other is the exclusion of the state and its residents from benefiting from participation in the federal system. *Id.* at 607–608. The Court did not establish definitive limits on the proportion of the population that must be affected but suggested that an indication could be whether the injury is something the state would address through its sovereign lawmaking powers. *Id.* at 607. Based on the injuries alleged by Puerto Rico, the Court found that the state had sufficiently demonstrated harm to its quasi-sovereign interests and had *parens patriae* standing to sue the federal government. *Id.* at 609–10.

123a

In *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), the United States Supreme Court further clarified the distinction between third-party and quasi-sovereign *parens patriae* lawsuits. There, the Court concluded that Massachusetts had standing to sue the EPA to protect its quasi-sovereign interests. The Court emphasized the distinction between allowing a state to protect its citizens from federal statutes (which is prohibited) and permitting a state to assert its rights under federal law (which it has standing to do). *Massachusetts*, 549 U.S. at 520 n.17. Because Massachusetts sought to assert its rights under a federal statute rather than challenge its application to its citizens, the Court determined that the state had *parens patriae* standing to sue the EPA.

Here, the Plaintiff States alleged and have provided ample evidence to support injury to two quasi-sovereign interests: the interest in safeguarding the free-speech rights of a significant portion of their respective populations and the interest in ensuring that they receive the benefits from participating in the federal system. Defendants argue that this theory of injury is too attenuated and that Plaintiffs are unlikely to prove any direct harm to the States' sovereign or quasi-sovereign interests, but the Court does not find this argument persuasive.

Plaintiffs have put forth ample evidence regarding extensive federal censorship that restricts the free flow of information on social-media platforms used by millions of Missourians and Louisianians, and very substantial segments of the populations of Missouri, Louisiana, and every other State.[641] The Complaint provides detailed accounts of how this alleged censorship harms "enormous segments of [the States'] populations." Additionally, the fact that such extensive examples of suppression have been uncovered through limited discovery suggests that the

---

[641] *See supra*, pp. 8–94 (detailing the extent and magnitude of Defendants' pressure and coercion tactics with social-media companies); *See also* [Doc. No. 214-1, at ¶¶ 1348 (noting that Berenson had nationwide audiences and over 200,000 followers when he was de-platformed on Twitter), 1387 (noting that the Gateway Pundit had more than 1.3 million followers across its social-media accounts before it was suspended), 1397–1409 (noting that Hines has approximately 13,000 followers each on her Health Freedom Louisiana and Reopen Louisiana Facebook pages, approximately 2,000 followers on two other Health Freedom Group Louisiana pages, and that the former Facebook pages have faced increasing censorship penalties and that the latter pages were de-platformed completely), etc.]

124a

censorship explained above could merely be a representative sample of more extensive suppressions inflicted by Defendants on countless similarly situated speakers and audiences, including audiences in Missouri and Louisiana. The examples of censorship produced thus far cut against Defendants' characterization of Plaintiffs' fear of imminent future harm as "entirely speculative" and their description of the Plaintiff States' injuries as "overly broad and generalized grievance[s]."[642] The Plaintiffs have outlined a federal regime of mass censorship, presented specific examples of how such censorship has harmed the States' quasi-sovereign interests in protecting their residents' freedom of expression, and demonstrated numerous injuries to significant segments of the Plaintiff States' populations.

Moreover, the materials produced thus far suggest that the Plaintiff States, along with a substantial segment of their populations, are likely to show that they are being excluded from the benefits intended to arise from participation in the federal system. The U.S. Constitution, like the Missouri and Louisiana Constitutions, guarantees the right of freedom of expression, encompassing both the right to speak and the right to listen. U.S. Const. amend. I; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). The United States Supreme Court has acknowledged the freedom of expression as one of the most significant benefits conferred by the federal Constitution. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."). Plaintiffs have demonstrated that they are likely to prove that federal agencies, actors, and officials in their official capacity are excluding the Plaintiff States

---

[642] [Doc. No. 266, at 151]

125a

and their residents from this crucial benefit that is meant to flow from participation in the federal system. *See Snapp*, 458 U.S. at 608.

Accordingly, the Court finds that the States have alleged injuries under a *parens patriae* theory of standing because they are likely to prove injuries to the States' quasi-sovereign interests in protecting the constitutionally bestowed rights of their citizens.

Further, Plaintiffs have demonstrated direct censorship injuries that satisfy the requirements of Article III as injuries in fact.[643] Specifically, the Plaintiffs contend that Louisiana's Department of Justice, which encompasses the office of its Attorney General, faced direct censorship on YouTube for sharing video footage wherein Louisianans criticized mask mandates and COVID-19 lockdown measures on August 18, 2021, immediately following the federal Defendants' strong advocacy for COVID-related "misinformation" censorship.[644] Moreover, a Louisiana state legislator experienced censorship on Facebook when he posted content addressing the vaccination of children against COVID-19.[645] Similarly, during public meetings concerning proposed county-wide mask mandates held by St. Louis County, a political subdivision of Missouri, certain citizens openly expressed their opposition to mask mandates. However, YouTube censored the entire videos of four public meetings, removing the content because some citizens expressed the view that masks are ineffective.[646] Therefore, this Court finds that the Plaintiff States have also demonstrated a likelihood of establishing an injury-in-fact under a theory of direct injury sufficient to satisfy Article III.

---

[643] [Doc. No. 214-1, at ¶¶1428–1430]
[644] [Id. at ¶1428]
[645] [Id. at ¶1429]
[646] [Id. at ¶ 1430]

126a

Accordingly, for the reasons stated above and explained in this Court's ruling on the Motion to Dismiss,[647] the Plaintiff States are likely to succeed on establishing an injury-in-fact under Article III.

### (2) Individual Plaintiffs

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"), the Supreme Court held that an allegation of future injury may satisfy the Article III injury-in-fact requirement if there is a "substantial risk" of harm occurring. (*quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). In *SBA List*, the petitioner challenged a statute that prohibited making false statements during political campaigns. *Id.* at 151–52. The Court considered the justiciability of the pre-enforcement challenge and whether it alleged a sufficiently imminent injury under Article III. It noted that pre-enforcement review is warranted when the threatened enforcement is "sufficiently imminent." *Id.* at 159. The Court further emphasized that past enforcement is indicative that the threat of enforcement is not "chimerical." *Id.* at 164 (*quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Likewise, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the Supreme Court found that the plaintiffs satisfied Article III's injury-in-fact requirement because the fear of future injury was not "imaginary or wholly speculative." There, the Court considered a pre-enforcement challenge to a statute that deemed it an unfair labor practice to encourage consumer boycotts through deceptive publicity. *Id.* at 301. Because the plaintiffs had engaged in past consumer publicity campaigns and intended to continue those campaigns in the future, the Court found their challenge to the consumer publicity provision satisfied Article III. *Id.* at 302. Similar pre-enforcement review was recognized in *Virginia v. Am. Booksellers Ass'n, Inc.*, 484

---

[647] [Doc. No. 214, at 20–33]

126

U.S. 383, 386 (1988), where the Supreme Court held that booksellers could seek review of a law criminalizing the knowing display of "harmful to juveniles" material for commercial purposes, as defined by the statute. *Virginia*, 484 U.S. at 386 (*certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168 (1988)).

Here, each of the Individual Plaintiffs are likely to demonstrate an injury-in-fact through a combination of past and ongoing censorship. Bhattacharya, for instance, is the apparent victim of an ongoing "campaign" of social-media censorship, which indicates that he is likely to experience future acts of censorship.[648] Similarly, Kulldorff attests to a coordinated federal censorship campaign against the Great Barrington Declaration, which implies future censorship.[649] Kulldorff's ongoing censorship experiences on his personal social-media accounts provide evidence of ongoing harm and support the expectation of imminent future harm.[650] Kheriaty also affirms ongoing and anticipated future injuries, noting that the issue of "shadow banning" his social-media posts has intensified since 2022.[651]

Hoft and Hines present similar accounts of past, ongoing, and anticipated future censorship injuries. Defendants even appear to be currently involved in an ongoing project that encourages and engages in censorship activities specifically targeting Hoft's website.[652] Hines, too, recounts past and ongoing censorship injuries, stating that her personal Facebook page, as well as the pages

---

[648] *See* [Doc. No. 214-1, ¶787 (an email from Dr. Francis Collins to Dr. Fauci and Cliff Lane which read: "Hi [Dr. Fauci] and Cliff, See https://gbdeclaration.org. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that online yet – is it underway?"), ¶¶1368–1372 (describing the covert and ongoing censorship campaign against him)]

[649] *See* [Id. at ¶¶1373–1380 (where Kulldorff explains an ongoing campaign of censorship against his personal social-media accounts, including censored tweets, censored posts criticizing mask mandates, removal of LinkedIn posts, and the ongoing permanent suspension of his LinkedIn account)]

[650] [Id.]

[651] [Id. at ¶¶1383–1386]

[652] *See* [Id. at ¶¶1387–1396 (describing the past and ongoing campaign against his website, the Gateway Pundit, which resulted in censorship on Facebook, Twitter, Instagram, and YouTube)]

of Health Freedom Louisiana and Reopen Louisiana, are constantly at risk of being completely de-platformed.[653] At the time of her declaration, Hines' personal Facebook account was under an ongoing ninety-day restriction. She further asserts, and the evidence supplied in support of the preliminary injunction strongly implies, that these restrictions can be directly traced back to federal officials.

Each of the Private Plaintiffs alleges a combination of past, ongoing, and anticipated future censorship injuries. Their allegations go beyond mere complaints about past grievances. Moreover, they easily satisfy the substantial risk standard. The threat of future censorship is significant, and the history of past censorship provides strong evidence that the threat of further censorship is not illusory or speculative. Plaintiffs' request for an injunction is not solely aimed at addressing the initial imposition of the censorship penalties but rather at preventing any continued maintenance and enforcement of such penalties. Therefore, the Court concludes that the Private Plaintiffs have fulfilled the injury-in-fact requirement of Article III.

Based on the reasons outlined above, the Court determines that both the States and Private Plaintiffs have satisfied the injury-in-fact requirement of Article III.

### ii. Traceability

To establish traceability, or "causation" in this context, a plaintiff must demonstrate a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Therefore, courts examining this element of standing must assess the remoteness, if any, between the plaintiff's injury and the defendant's actions. As explained in *Ass'n of Am. Physicians & Surgeons v. Schiff*, the plaintiff must establish that it is "'substantially probable that the challenged acts of the defendant, not of some absent third party'

---

[653] *See* [Id. at ¶¶1397–1411]

129a

caused or will cause the injury alleged." 518 F. Supp. 3d 505, 513 (D.D.C. 2021), *aff'd sub nom.*

*Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) ("*AAPS II*")

(quoting Fla. Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)).

Plaintiffs argue that they are likely to prove that their injuries are fairly traceable to Defendants' actions of inducing and jointly participating in the social-media companies' viewpoint-based censorship under a theory of "but-for" causation, conspiracy, or aiding and abetting.[654] In support, they cite the above-mentioned examples of switchboarding and other pressure tactics employed by Defendants.[655] In response, Defendants assert that there is no basis upon which this Court can conclude that the social-media platforms made the disputed content-moderation decisions because of government pressure.[656] For the reasons explained below, the Court finds that Plaintiffs are likely to prove that their injuries are fairly traceable to the conduct of the Defendants.

In *Duke Power Co. v. Carolina Envt. Study Grp.*, the United States Supreme Court found that a plaintiff's injury was fairly traceable to a statute under a theory of "but-for" causation. 438 U.S. 59 (1978). The plaintiffs, who were comprised in part of individuals living near the proposed sites for nuclear plants, challenged a statute that limited the aggregate liability for a single nuclear accident under the theory that, but for the passing of the statute, the nuclear plants would not have been constructed. *Id.* at 64–65. The Supreme Court agreed with the district court's finding that

---

[654] [Doc. No. 204, at 67–68]

[655] [Id. at 69–71 (*citing* Doc. No. 214-1, ¶¶57, 64 "(promising the White House that Facebook would censor "often-true" but "sensationalized" content); ¶ 73 "(imposing forward limits on non-violative speech on WhatsApp)"; ¶¶ 89-92 "(assuring the White House that Facebook will use a "spectrum of levers" to censor content that "do[es] not violate our Misinformation and Harm policy, including "true but shocking claims or personal anecdotes, or discussing the choice to vaccinate in terms of personal and civil liberties")"; ¶¶ 93-100 "(agreeing to censor Tucker Carlson's content at the White House's behest, even though it did not violate platform policies)", ¶¶ 103-104 "(Twitter deplatforming Alex Berenson at White House pressure)"; ¶ 171 "(Facebook deplatformed the Disinformation Dozen immediately after these comments). Facebook officials scrambled to get back into the White House's good graces. Id. ¶¶ 172, 224 (pleading for "de-escalation" and "working together").")]

[656] [Doc. No. 266, at 131–136]

130a

there was a "substantial likelihood" that the nuclear plants would have been neither completed nor operated absent the passage of the nuclear-friendly statute. *Id.* at 75.

In *Duke Power Co.*, the defendants essentially argued that the statute was not the "but-for" cause of the injuries claimed by the plaintiffs because if Congress had not passed the statute, the Government would have developed nuclear power independently, and the plaintiffs would have likely suffered the same injuries from government-operated plants as they would have from privately operated ones. *Id.* In rejecting that argument, the Supreme Court stated:

> Whatever the ultimate accuracy of this speculation, it is not responsive to the simple proposition that private power companies now do in fact operate the nuclear-powered generating plants injuring [the plaintiffs], and that their participation would not have occurred but for the enactment and implementation of the Price-Anderson Act. Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief.

*Id.* at 77–78. The Supreme Court's reluctancy to follow the defendants down a rabbit-hole of speculation and "what-ifs" is highly instructive.

Here, Defendants heavily rely upon the premise that social-media companies would have censored Plaintiffs and/or modified their content moderation policies even without any alleged encouragement and coercion from Defendants or other Government officials. This argument is wholly unpersuasive. Unlike previous cases that left ample room to question whether public officials' calls for censorship were fairly traceable to the Government; the instant case paints a full picture.[657] A drastic increase in censorship, deboosting, shadow-banning, and account suspensions directly coincided with Defendants' public calls for censorship and private demands for

---

[657] *See* [Doc. No. 204, at 41-44 (where this Court distinguished this case from cases that "left gaps" in the pleadings)]

censorship.[658] Specific instances of censorship substantially likely to be the direct result of Government involvement are too numerous to fully detail, but a birds-eye view shows a clear connection between Defendants' actions and Plaintiffs injuries.

The Plaintiffs' theory of but-for causation is easy to follow and demonstrates a high likelihood of success as to establishing Article III traceability. Government officials began publicly threatening social-media companies with adverse legislation as early as 2018.[659] In the wake of COVID-19 and the 2020 election, the threats intensified and became more direct.[660] Around this same time, Defendants began having extensive contact with social-media companies via emails, phone calls, and in-person meetings.[661] This contact, paired with the public threats and tense relations between the Biden administration and social-media companies, seemingly resulted in an efficient report-and-censor relationship between Defendants and social-media companies.[662] Against this backdrop, it is insincere to describe the likelihood of proving a causal connection between Defendants' actions and Plaintiffs' injuries as too attenuated or purely hypothetical.

The evidence presented thus goes far beyond mere generalizations or conjecture: Plaintiffs have demonstrated that they are likely to prevail and establish a causal and temporal link between

---

[658] *See, e.g.*, [Doc. No. 241-1, ¶¶1, 7, 17, 164 (examples of Government officials threatening adverse legislation against social-media companies if they do not increase censorship efforts); ¶¶ 51, 119, 133, 366, 424, 519 (examples of social-media companies, typically following up after an in-person meeting or phone call, ensuring Defendants that they would increase censorship efforts)]

[659] [Doc. No. 214-1, ¶1]

[660] *See, e.g.*, [Id. at ¶ 156 (Psaki reinforcing President Biden's "They're killing people" comment); ¶166 (media outlets reporting tense relations between the Biden administration and social-media companies)]

[661] *See, e.g.*, [Doc. No. 174-1, at 3 (Twitter employees setting up a more streamlined process for censorship requests because the company had been "recently bombarded" with censorship requests from the White House)]

[662] *See, e.g.*, [Doc. Nos. 174-1, at 3 (Twitter employees setting up a more streamlined process for censorship requests because the company had been "recently bombarded" with censorship requests from the White House); at 4 (Twitter suspending a Jill Biden parody account within 45 minutes of a White House official requesting twitter to "remove this account immediately"); 214-1, at ¶799 (Drs. Bhattacharya and Kuldorff began experienced extensive censorship on social media shortly after Dr. Collins emailed Dr. Fauci seeking a "quick and devastating take down" of the GBD.); ¶1081 (Twitter removing tweets within two minutes of Scully reporting them for censorship.); ¶¶1266-1365 (Explaining how the Virality Project targeted Hines and health-freedom groups.); 214-9, at 2-3 (Twitter ensuring the White House that it would increase censorship of "misleading information" following a meeting between White House officials and Twitter employees.); etc.]

132a

Defendants' actions and the social-media companies' censorship decisions. Accordingly, this Court finds that there is a substantial likelihood that Plaintiffs would not have been the victims of viewpoint discrimination but for the coercion and significant encouragement of Defendants towards social-media companies to increase their online censorship efforts.[663]

For the reasons stated above, as well as those set forth in this Court's previous ruling on the Motion to Dismiss,[664] the Court finds that Plaintiffs are likely to succeed in establishing the traceability element of Article III standing.

### iii.    Redressability

The redressability element of the standing analysis requires that the alleged injury is "likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 S. Ct. 2104, 2115, 210 L. Ed. 2d 230 (2021) (*quoting Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Additionally, courts typically find that where an injury is traceable to a defendant's conduct, it is usually redressable as well. *See, e.g.*, *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016) ("[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement."); *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) ("Redressability . . . is closely related to traceability, and the two prongs often overlap."); *El Paso Cnty. v. Trump*, 408 F. Supp. 3d 840, 852 (W.D. Tex. 2019).

---

[663] Because this Court finds that Plaintiffs have successfully shown a likelihood of success under a "but for" theory of causation, it will not address Plaintiffs arguments as to other theories of causation. However, the Court does note that caselaw from outside of the Fifth Circuit supports a more lenient theory of causation for purposes of establishing traceability. *See, e.g.*, *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (6th Cir. 2015).

[664] [Doc. No. 204, at 67–71]

133a

Plaintiffs argue that they are likely to prove that a favorable decision would redress their injuries because they have provided ample evidence that their injuries are imminent and ongoing.[665] In response, Defendants contend that any threat of future injury is merely speculative because Plaintiffs rely on dated declarations and focus on long-past conduct of Defendants and social-media companies.[666] For the reasons explained below, the Court finds that Plaintiffs are likely to prove that their injuries would be redressed by a favorable decision.

As this Court previously noted,[667] a plaintiff's standing is evaluated at the time of filing of the initial complaint in which they joined. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004); *Davis v. F.E.C.*, 554 F.3d 724, 734 (2008); *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). The State Plaintiffs filed suit on May 5, 2022,[668] and the individual Plaintiffs joined on August 2, 2022.[669] Both groups are likely to prove that threat of future injury is more than merely speculative.

Plaintiff States have produced sufficient evidence to demonstrate a likelihood of proving ongoing injuries as of the time the Complaint was filed. For instance, on June 13, 2023, Flaherty still wanted to "get a sense of what [Facebook was] planning" and denied the company's request for permission to stop submitting its biweekly "Covid Insights Report" to the White House.[670] Specifically, Flaherty wanted to monitor Facebook's suppression of COVID-19 misinformation "as we start to ramp up [vaccines for children under the age of five]."[671] The CDC also remained in collaboration with Facebook in June of 2022 and even delayed implementing policy changes

---

[665] [Doc. No. 214, at 71–74]
[666] [Doc. No. 266, at 152–157]
[667] [Doc. No. 204, at 62–65]
[668] [Doc. No. 1]
[669] [Doc. No. 45]
[670] [Doc. No. 214-1, at ¶425]
[671] [Id.]

"until [it got] the final word from [the CDC]."[672] After coordinating with the CDC and White House, Facebook informed the White House of its new and government-approved policy, stating: "As of today, [June 22, 2022], all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older."[673]

Likewise, the individual Plaintiffs are likely to demonstrate that their injuries were imminent and ongoing as of August 2, 2022. Evidence obtained thus far indicates that Defendants have plans to continue the alleged censorship activities. For example, preliminary discovery revealed CISA's expanding efforts in combating misinformation, with a focus on the 2022 elections.[674] As of August 12, 2022, Easterly was directing the "mission of Rumor Control" for the 2022 midterm elections,[675] and CISA candidly reported to be "bee[fing] up [its] efforts to fight falsehoods[]" in preparation for the 2024 election cycle.[676] Chan of the FBI also testified at his deposition that online disinformation continues to be discussed between the federal agencies and social-media companies at the USG Industry meetings, and Chan assumes that this will continue through the 2024 election cycle.[677] All of this suggests that Plaintiffs are likely to prove that risk of future censorship injuries is more than merely speculative. Additionally, past decisions to suppress speech result in ongoing injury as long as the speech remains suppressed, and the past censorship experienced by individual Plaintiffs continues to inhibit their speech in the present. These injuries are also affecting the rights of the Plaintiffs' audience members, including those in Plaintiff States, who have the First Amendment right to receive information free from Government interference.

---

[672] [Doc. Nos. 71-7, at 6; 214-1, ¶424]
[673] [Doc. Nos. 71-7, at 6; 71-3, at 5; 214-1, ¶¶424–425]
[674] [Doc. No. 71-8, at 2; Doc. 86-7, at 14]
[675] [Doc. No. 86-7, at 14]
[676] [Doc. No. 214-1, at ¶1106 (*see also* [Doc. No. 71-8, at 2 (CISA "wants to ensure that it is set up to extract lessons learned from 2022 and apply them to the agency's work in 2024.")]
[677] [Id. at ¶ 866]

Accordingly, and for the reasons stated above, the Court finds that Plaintiffs are likely to prove that a favorable decision would redress their injuries because those injuries are ongoing and substantially likely to reoccur.

### iv. Recent United States Supreme Court cases of *Texas* and *Haaland*

Defendants cite to two recent cases from the Supreme Court of the United States which they claim undermine this Court's previous ruling about the Plaintiff States' likelihood of proving Article III standing.

First, Defendants argue that *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023), undermines the States' Article III standing. In *Texas*, Texas and Louisiana sued the Department of Homeland Security (the "Department"), as well as other federal agencies, claiming that the recently promulgated "Guidelines for the Enforcement of Civil Immigration Law" contravened two federal statutes. *Id.* at *2. The Supreme Court held that the states lacked Article III standing because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." The Court further noted that the case was "categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* at *2, *8 (citations omitted).

Here, the Plaintiff States are not asserting a theory that the Defendants *failed* to act in conformity with the Constitution. To the contrary, the Plaintiff States assert that Defendants have affirmatively violated their First Amendment right to free speech. The Plaintiff States allege and (as extensively detailed above) are likely to prove that the Defendants caused direct injury to the Plaintiff States by significantly encouraging and/or coercing social-media companies to censor

posts made on social-media. Further, as noted in this Court's previous ruling, the Plaintiff States are likely to have Article III standing because a significant portion of the Plaintiff States' population has been prevented from engaging with the posts censored by the Defendants. The Supreme Court noted that "when the Executive Branch elects not to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts are often called upon to protect." *Id.* at *5. Here, federal officials allegedly did exercise coercive power, and the Plaintiffs are likely to prevail on their claim that the Defendants violated the First Amendment rights of the Plaintiff States, their citizens, and the Individual Plaintiffs.

Defendants contend that the Supreme Court in *Texas* narrowed the application of special solicitude afforded to states because the Supreme Court noted that the standing analysis in *Massachusetts* "d[id] not control" because "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than the exercise of enforcement discretion. *Id.* at *8 n.6. This Court disagrees with Defendants on that point. As noted by Plaintiffs, the majority opinion in *Texas* does not mention special solicitude. Further, this Court noted in its previous analysis of standing that the Plaintiff States could satisfy Article III's standing requirements without special solicitude. Therefore, even to the extent this Court "leaves that idea on the shelf," as suggested in Justice Gorsuch's concurrence, the Court nonetheless finds that the Plaintiff States are likely to prove Article III standing.

Defendants also argue that the Supreme Court's recent ruling in *Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023), undermines the Plaintiff States' Article III standing. In *Haaland*, the Supreme Court ruled that Texas did not possess standing to challenge the placement provisions of the Indian Child Welfare Act, which prioritizes Indian families in

custody disputes involving Indian children. *Id.* at *19. The Supreme Court reasoned that the states in *Texas* could not "assert equal protection claims on behalf of its citizens because '[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* (*quoting Snapp*, 458 U.S. at 610 n.16)). The Defendants argue that this statement precludes *parens patriae* standing in the present case.[678] However, in its brief discussion regarding *parens patriae* standing, the *Haaland* Court quoted footnote 16 from *Snapp*, which, in turn, reiterated the "Mellon bar." *Haaland*, 2023 WL 4002951, at *19; *Snapp*, 458 U.S. at 610 n.16 (*quoting Massachusetts v.* 262 U.S. at 485–86.

Plaintiffs correctly note that, although both cases employ broad language, neither *Haaland* nor *Snapp* elaborate on the extent of the "Mellon bar." Moreover, the Supreme Court has clarified in other instances that *parens patriae* suits are permitted against the federal government outside the scope of the Mellon bar. *See Massachusetts v. EPA*, 549 U.S. at 520 n.17, (explaining the "critical difference" between barred *parens patriae* suits by Mellon and allowed *parens patriae* suits against the federal government).

Consistent with *Massachusetts v. EPA*, this Court has previously determined that the Mellon bar applies to "third-party *parens patriae* suits," but not to "quasi-sovereign-interest suits."[679] In *Haaland*, Texas presented a "third-party parens patriae suit," as opposed to a "quasi-sovereign-interest suit," as it asserted the equal protection rights of only a small minority of its population (i.e., non-Indian foster or adoptive parents seeking to foster or adopt Indian children against the objections of relevant Indian tribes), which clearly did not qualify as a quasi-sovereign interest. *See Haaland*, 2023 WL 4002951, at *19 & n.11). Here, however, Louisiana and Missouri advocate for the rights of a significant portion of their populations, specifically the hundreds of

---

[678] [Doc. 289, at 2].
[679] [Doc. 224, at 215–26], *quoting Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).

thousands or millions of citizens who are potential audience members affected by federal social-media speech suppression.

Furthermore, when the *Haaland* Court determined that Texas lacked third-party standing, it stressed that Texas did not have either a "'concrete injury' to the State" or any hindrance to the third party's ability to protect its own interests. *Id.* at \*19 n.11 (*quoting Georgia v. McCollum*, 505 U.S. 42, 55–56 (1992)). Here, by contrast, the Plaintiff States have demonstrated a likelihood of succeeding on their claims that they have suffered, and likely will continue to suffer, numerous concrete injuries resulting from federal social-media censorship.[680] Additionally, the ability of the third parties in this case to protect their own interests is hindered because the diffuse First Amendment injury experienced by each individual audience member in Louisiana and Missouri lacks sufficient economic impact to encourage litigation through numerous individual lawsuits. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).

Defendants further contend that *Haaland* rejected Texas's argument regarding the ICWA's placement provisions requiring Texas to compromise its commitment to being impartial in child-custody proceedings.[681] However, the Supreme Court rejected this argument for a specific reason: "Were it otherwise, a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law." *Haaland*, 2023 WL 4002951, at \*19. By contrast, Missouri and Louisiana do not assert that the federal government mandates their complicity in enforcing federal social-media-censorship regimes. The Plaintiff States instead assert that they, along with a substantial portion of their populations, have been injured by Defendants' actions.

Neither *Texas* nor *Haaland* undermine this Court's previous ruling that the Plaintiff States have Article III standing to sue Defendants in the instant case. Further, the evidence produced thus

---

[680] *See, e.g.*, [Doc. 214-1, ¶¶ 1427–1442]
[681] [Doc. 289, at 3] *quoting Haaland*, 2023 WL 4002951, at \*19.

far through limited discovery demonstrates that Plaintiffs are likely to succeed on their First Amendment claims. Accordingly, the Court finds that Plaintiffs are likely to prove all elements of Article III standing, and therefore, are likely to establish that this Court has jurisdiction.

### 2. Irreparable Harm

The second requirement for a Preliminary Injunction is a showing of irreparable injury: plaintiffs must demonstrate "a substantial threat of irreparable injury" if the injunction is not issued. *Texas*, 809 F.3d at 150. For injury to be "irreparable," plaintiffs need only show it cannot be undone through monetary remedies. *Burgess v. Fed. Deposit Inc., Corp.*, 871 F.3d 297, 304 (5th Cir. 2017). Deprivation of a procedural right to protect a party's concrete interests is irreparable injury. *Texas*, 933 F.3d at 447. Additionally, violation of a First Amendment constitutional right, even for a short period of time, is always irreparable injury. *Elrod*, 427 U.S. at 373.

Plaintiffs argue in their memorandum that the First Amendment violations are continuing and/or that there is a substantial risk that future harm is likely to occur. In contrast, Defendants argue that Plaintiffs are unable to show imminent irreparable harm because the alleged conduct occurred in the past, is not presently occurring, and is unlikely to occur in the future. Defendants argue Plaintiffs rely upon actions that occurred approximately one year ago and that it cannot be remedied by any prospective injunctive relief. Further, Defendants argue that there is no "imminent harm" because the COVID-19 pandemic is over and because the elections where the alleged conduct occurred are also over.

The Court finds that Plaintiffs have demonstrated a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc., v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986). To demonstrate irreparable

harm at the preliminary injunction stage, Plaintiffs must adduce evidence showing that the irreparable injury is likely to occur during the pendency of the litigation. *Justin Indus. Inc.*, v. *Choctaw Secs., L.P.*, 920 F.2d 262, 268 n. 7 (5th Cir. 1990). This Plaintiffs have done.

Defendants argue that the alleged suppression of social-media content occurred in response to the COVID-19 pandemic and attacks on election infrastructure, and therefore, the alleged conduct is no longer occurring. Defendants point out that the alleged conduct occurred between one to three years ago. However, the information submitted by Plaintiffs was at least partially based on preliminary injunction-related discovery[682] and third-party subpoena requests that were submitted to five social-media platforms on or about July 19, 2022.[683] The original Complaint[684] was filed on May 5, 2022, and most of the responses to preliminary injunction-related discovery provided answers to discovery requests that occurred before the Complaint was filed. Since completion of preliminary-injunction related discovery took over six months, most, if not all, of the information obtained would be at least one year old.

Further, the Defendants' decision to stop some of the alleged conduct does not make it any less relevant. A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the alleged wrongful behavior could not reasonably be expected to recur. *Already, LLC v. Nike*, 568 U.S. 85, 91 (2013). Defendants have not yet met this burden here.

Defendants also argue that, due to the delay in the Plaintiffs seeking relief,[685] the Plaintiffs have not shown "due diligence" in seeking relief. However, this Court finds that Plaintiffs have exercised due diligence. This is a complicated case that required a great deal of discovery in order

---

[682] [Doc. No. 34]
[683] [Doc. No. 37]
[684] [Doc. No. 1]
[685] Plaintiffs allege actions occurring as far back as 2020.

to obtain the necessary evidence to pursue this case. Although it has taken several months to obtain this evidence, it certainly was not the fault of the Plaintiffs. Most of the information Plaintiffs needed was unobtainable except through discovery.

Defendants further argue the risk that Plaintiffs will sustain injuries in the future is speculative and depends upon the action of the social-media platforms. Defendants allege the Plaintiffs have therefore not shown imminent harm by any of the Defendants.

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*"), the Supreme Court held that, for purposes of an Article III injury-in-fact, an allegation of future injury may suffice if there is "a 'substantial risk' that the harm will occur." (*quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, (2013)). In *SBA List*, a petitioner challenged a statute that prohibited making certain false statements during the course of a political campaign. *Id.* at 151–52. In deciding whether the pre-enforcement challenge was justiciable—and in particular, whether it alleged a sufficiently imminent injury for purposes of Article III—the Court noted that pre-enforcement review is warranted under circumstances that render the threatened enforcement "sufficiently imminent." *Id.* at 159. Specifically, the Court noted that past enforcement is "good evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (*quoting Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).

Similarly, in *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the Supreme Court held that a complaint alleges an Article III injury-in-fact where fear of future injury is not "imaginary or wholly speculative." In *Babbitt*, the Supreme Court considered a pre-enforcement challenge to a statute that made it an unfair labor practice to encourage consumers to boycott using "dishonest, untruthful, and deceptive publicity." *Id.* at 301. Because the plaintiffs had engaged in consumer publicity campaigns in the past and alleged an intention to continue those

142a

campaigns in the future, the Court held that their challenge to the consumer publicity provision presented an Article III case or controversy. *Id.* at 302; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 386 (1988) (where the Supreme Court held that booksellers could seek pre-enforcement review of a law making it a crime to "knowingly display for commercial purpose" material that is "harmful to juveniles," as defined by the statute).

Therefore, the question is whether Plaintiffs have alleged a "substantial risk" that harm may occur, which is not "imaginary or wholly speculative." This Court finds that the alleged past actions of Defendants show a substantial risk of harm that is not imaginary or speculative. *SBA List*, 573 U. S. at 164. Defendants apparently continue to have meetings with social-media companies and other contacts.[686]

Although the COVID-19 pandemic is no longer an emergency, it is not imaginary or speculative to believe that in the event of any other real or perceived emergency event, the Defendants would once again use their power over social-media companies to suppress alternative views. And it is certainly not imaginary or speculative to predict that Defendants could use their power over millions of people to suppress alternative views or moderate content they do not agree with in the upcoming 2024 national election. At oral arguments Defendants were not able to state that the "switchboarding" and other election activities of the CISA Defendants and the State Department Defendants would not resume prior to the upcoming 2024 election;[687] in fact, Chan testified post 2020, "we've never stopped."[688] Notably, a draft copy of the DHS's "Quadrennial Homeland Security Review," which outlines the department's strategy and priorities in upcoming years, states that the department plans to target "inaccurate information" on a wide range of topics,

---

[686] [Doc. No. 204-1 at 40]
[687] [Doc. No. 208 at 122]
[688] [Chan depo. at 8–9]

including the origins of the COVID-19 pandemic, the efficacy of COVID-19 vaccines, racial justice, the U.S. withdrawal from Afghanistan, and the return of U.S. Support of Ukraine.[689]

The Plaintiffs are likely to succeed on the merits in their claims that there is a substantial risk that harm will occur, that is not imaginary or speculative. Plaintiffs have shown that not only have the Defendants shown willingness to coerce and/or to give significant encouragement to social-media platforms to suppress free speech with regard to the COVID-19 pandemic and national elections, they have also shown a willingness to do it with regard to other issues, such as gas prices,[690] parody speech,[691] calling the President a liar,[692] climate change,[693] gender,[694] and abortion.[695] On June 14, 2022, White House National Climate Advisor Gina McCarthy, at an Axios event entitled, "A Conversation on Battling Disinformation," was quoted as saying, "We have to get together; we have to get better at communicating, and frankly, the tech companies have to stop allowing specific individuals over and over to spread disinformation."[696]

The Complaint (and its amendments) shows numerous allegations of apparent future harm. Plaintiff Bhattacharya alleges ongoing social-media censorship.[697] Plaintiff Kulldorff alleges an ongoing campaign of censorship against the GBD and his personal social-media accounts.[698] Plaintiff Kheriaty also alleges ongoing and expected future censorship,[699] noting "shadow-banning" his social-media account is increasing and has intensified since 2022.[700] Plaintiffs Hoft

---

[689] [Doc. No. 209-23 at 4]
[690] [Doc. No. 212-3 at 65–66, ¶ 211]
[691] [Id. at 58-60, ¶¶ 180–188]
[692] [Id. at 61, ¶ 190]
[693] [Id. at 63-64, ¶¶ 200–203]
[694] [Id. at 64-64, ¶¶ 204–208]
[695] [Id. at 65, ¶¶ 209–210]
[696] [Doc. No. 214-15]
[697] [Doc. No. 45-3, ¶¶ 15–33]
[698] [Doc. No. 45-4, ¶¶ 14–16]
[699] [Doc. No. 45-7, ¶¶ 12–18]
[700] [Id. at ¶¶ 15]

144a

and Hines also allege ongoing and expected future censorship injuries.[701] It is not imaginary or speculative that the Defendants will continue to use this power. It is likely.

The Court finds that Plaintiffs are likely to succeed on their claim that they have shown irreparable injury sufficient to satisfy the standard for the issuance of a preliminary injunction.

### 3. Equitable Factors and Public Interest

Thus far, Plaintiffs have satisfied the first two elements to obtain a preliminary injunction. The final two elements they must satisfy are that the threatened harm outweighs any harm that may result to the Federal Defendants and that the injunction will not undermine the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). These two factors overlap considerably. *Texas*, 809 F.3d at 187. In weighing equities, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The public interest factor requires the court to consider what public interests may be served by granting or denying a preliminary injunction. *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 997–98 (8th Cir. 2011).

Defendants maintain their interest in being able to report misinformation and warn social-media companies of foreign actors' misinformation campaigns outweighs the Plaintiffs' interest in the right of free speech. This Court disagrees and finds the balance of equities and the public interest strongly favors the issuance of a preliminary injunction. The public interest is served by maintaining the constitutional structure and the First Amendment free speech rights of the Plaintiffs. The right of free speech is a fundamental constitutional right that is vital to the freedom of our nation, and Plaintiffs have produced evidence of a massive effort by Defendants, from the

---

[701] [Doc. No. 45-7 at ¶¶ 12–18]; [Doc. No. 84 at ¶¶ 401–420]; [Doc. No. 45-12 at ¶ 4, 12]

145a

White House to federal agencies, to suppress speech based on its content. Defendants' alleged suppression has potentially resulted in millions of free speech violations. Plaintiffs' free speech rights thus far outweighs the rights of Defendants, and thus, Plaintiffs satisfy the final elements needed to show entitlement to a preliminary injunction.

### 4. Injunction Specificity

Lastly, Defendants argue that Plaintiff's proposed preliminary injunction lacks the specificity required by Federal Rule of Civil Procedure 65 and is impermissibly overbroad. Rule 65(d)(1) requires an injunction to "state its terms specifically" and to "describe in reasonable detail the acts or acts restrained or required." The specificity provisions of Rule 65(d) are designed to prevent uncertainty and confusion on the part of those faced with injunction orders and to avoid possible contempt based upon a decree too vague to be understood. *Atiyeh v. Capps*, 449 U.S. 1312, 1316–17 (1981). An injunction must be narrowly tailored to remedy the specific action that gives rise to the injunction. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).

This Court believes that an injunction can be narrowly tailored to only affect prohibited activities, while not prohibiting government speech or agency functions. Just because the injunction may be difficult to tailor is not an excuse to allow potential First Amendment violations to continue. Thus, the Court is not persuaded by Defendants arguments here.

Because Plaintiffs have met all the elements necessary to show entitlement to a preliminary injunction, this Court shall issue such injunction against the Defendants described above.

### IV. CLASS CERTIFICATION

In their Third Amended Complaint, the Individual Plaintiffs purport to bring a class action "on behalf of themselves and two classes of other persons similarly situated to them."[702] Plaintiffs

---

[702] [Doc. No. 268 at ¶489].

go on to describe the two proposed classes, as well as state generally that each requirement for class certification is met.[703] Defendants opposed Plaintiffs' request for class certification in their Response to Plaintiffs' Motion for Class Certification and for Leave to File Third Amended Complaint.[704]

The Court is obligated to analyze whether this litigation should proceed as a class action. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) ("A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class."). Pursuant to this obligation, the Court questioned counsel at the hearing on the preliminary injunction as to the basis for class certification. As explained in further detail below, the Court finds that Plaintiffs failed to meet their burden of proof, and class certification is improper here.

## A. Class Certification Standard under FRCP 23

"The decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Id.* at 740. "The party seeking certification bears the burden of proof." *Id.*

Federal Rule of Civil Procedure 23(a) lays out the four key prerequisites for a class action. It states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

---

[703] [Id. at ¶¶490–501].
[704] [Doc. No. 244].

In addition to the enumerated requirements above, Plaintiffs must propose a class that has an objective and precise definition. "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, Plaintiffs specifically bring this class action under Rule 23(b)(2), which allows for maintenance of a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b0) (2). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions. *Amchem Prod., Inc.*, 521 U.S. at 614.

Notably, the Fifth Circuit recently held that a standing analysis is necessary before engaging in the class certification analysis. *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 733 (5th Cir. 2023). However, because this Court has already completed multiple standing analyses in this matter, and because the Court ultimately finds that the class should not be certified, the Court will not address which standing test should be applied to this specific issue.

## B.  Analysis

In order to certify this matter as a class action, the Court must find that Plaintiffs have established each element of Rule 23(a). *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 414–15 (5th Cir. 2004) ("All classes must satisfy the four baseline requirements of rule 23(a):

numerosity, commonality, typicality, and adequacy of representation."). The Court finds that

Plaintiffs failed to meet their burden, and therefore, the Court will not certify the class action.

### 1. Class Definition

Plaintiffs propose two classes to proceed with their litigation as a class action. First,

Plaintiffs define Class 1 as follows:

> The class of social-media users who have engaged or will engage in,
> or who follow, subscribe to, are friends with, or are otherwise
> connected to the accounts of users who have engaged or will engage
> in, speech on any social-media company's platform(s) that has been
> or will be removed; labelled; used as a basis for suspending,
> deplatforming, issuing strike(s) against, demonetizing, or taking
> other adverse action against the speaker; downranked; deboosted;
> concealed; or otherwise suppressed by the platform after Defendants
> and/or those acting in concert with them flag or flagged the speech
> to the platform(s) for suppression.[705]

Next, Plaintiffs define Class 2 as follows:

> The class of social-media users who have engaged in or will engage
> in, or who follow, subscribe to, are friends with, or are otherwise
> connected to the accounts of users who have engaged in or will
> engage in, speech on any social-media company's platform(s) that
> has been or will be removed; labelled; used as a basis for
> suspending, deplatforming, issuing strike(s) against, demonetizing,
> or taking other adverse action against the speaker; downranked;
> deboosted; concealed; or otherwise suppressed by the company
> pursuant to any change to the company's policies or enforcement
> practices that Defendants and/or those acting in concert with them
> have induced or will induce the company to make.[706]

"It is elementary that in order to maintain a class action, the class sought to be represented

must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734

(5th Cir. 1970). The Court finds that the class definitions provided by Plaintiffs are neither

"adequately defined" nor "clearly ascertainable." Simply put, there is no way to tell just how many

---

[705] [Doc. No. 268 at ¶490]
[706] [Id. at ¶491]

148

people or what type of person would fit into these proposed classes. The proposed class definitions are so broad that almost every person in America, and perhaps in many other countries as well, could fit into the classes. The Court agrees with Defendants that the language used is simply too vague to maintain a class action using these definitions.[707] Where a class definition is, as here, "too broad and ill-defined" to be practicable, the class should not be certified. *See Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, No. 22-10145, 2023 WL 4073826, at *14 (5th Cir. June 20, 2023).

Further, no evidence was produced at the hearing on the motion for preliminary injunction that "would have assisted the district court in more accurately delineating membership in a workable class." *DeBremaecker*, 433 F.2d at 734. The Court questioned Plaintiffs' counsel about the issues with the proposed class definitions, but counsel was unable to provide a solution that would make class certification feasible here. Counsel for Plaintiffs stated that "the class definition is sufficiently precise," but the Court fails to see how that is so, and counsel did not explain any further.[708] Counsel for Plaintiffs focused on the fact that the proposed class action falls under Rule 23(b)(2), providing for broad injunctive relief, and therefore, counsel argued that the Court would not need to "figure out every human being in the United States of American [sic] who was actually adversely affected."[709] Even if the Court does not need to identify every potential class member individually, the Court still needs to be able to state the practical bounds of the class definition— something it cannot do with the loose wording given by Plaintiffs.

---

[707] [Doc. No. 244 at 7]
[708] Hearing Transcript at 181, line 15.
[709] [Id. at lines 16–18]

149

Without a feasible class definition, the Court cannot certify Plaintiffs' proposed class action. Out of an abundance of caution, however, the Court will address the other enumerated prerequisites of Rule 23(a) below.

## 2. Numerosity

The numerosity requirement mandates that a class be "so large that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Although the number of members in a proposed class is not determinative of whether joinder is impracticable," classes with a significantly high number of potential members easily satisfy this requirement. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding class of 100 to 150 members satisfied the numerosity requirement). Other factors, such as "the geographical dispersion of the class" and "the nature of the action," may also support a finding that the numerosity element has been met. *Id.* at 624–25.

Here, Plaintiffs state that both Class 1 and Class 2 are "sufficiently numerous that joinder of all members is impracticable."[710] Plaintiffs reference the "content of hundreds of users with, collectively, hundreds of thousands or millions of followers" who were affected by Defendants' alleged censorship.[711] Thus, based on a surface-level look at potential class members, it appears that the numerosity requirement would be satisfied because the class members' numbers reach at least into the thousands, if not the millions.

However, the numerosity requirement merely serves to highlight the same issue described above: the potential class is simply too broad to even begin to fathom who would fit into the class. Joinder of all the potential class members is more than impractical—it is impossible. Thus, while the sheer number of potential class members may tend towards class certification, the Court is only

---

[710] [Doc. No. 268 at ¶¶492–93]
[711] [Id. at ¶¶492]

further convinced by Plaintiffs' inability to estimate the vast number of class members that certification is improper here.

### 3. Commonality

The commonality requirement ensures that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'" *Mullen*, 186 F.3d at 625 (*quoting Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)).

Here, Plaintiffs state that both classes share common questions of law or fact, including "the question whether the government is responsible for a social-media company's suppression of content that the government flags to the company for suppression" for Class 1 and "the question whether the government is responsible for a social-media company's suppression of content pursuant to a policy or enforcement practice that the government induced the company to adopt or enforce" for Class 2.[712] These questions of law are broadly worded and may not properly characterize the specific issues being argued in this case.

At the hearing for the preliminary injunction, Plaintiffs' counsel clarified that the alleged campaign of censorship "involve[es] a whole host of common questions whose resolution are going to determine whether or not there's a First Amendment violation."[713] The Court agrees that there is certainly a common question of First Amendment law that impacts each member of the proposed classes, but notes Defendants' well-reasoned argument that Plaintiffs may be attempting to aggregate too many questions into one class action.[714] The difficulty of providing "a single,

---

[712] [Id. at ¶¶494–95]
[713] Hearing Transcript, at 183, lines 19–21.
[714] [Doc. No. 244 at 10]

class-wide answer," as highlighted by Defendants, further proves to this Court that class certification is likely not the best way to proceed with this litigation.[715] Although commonality is a fairly low bar, the Court is not convinced Plaintiffs have met their burden on this element of Rule 23(a).

### 4. Typicality

The typicality requirement mandates that named parties' claims or defenses "are typical...of the class." Fed. R. Civ. P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *Mullen*, 186 F.3d at 625. It "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Lightbourn*, 118 F.3d at 426.

Here, Plaintiffs assert that the Individual Plaintiffs' claims are typical of both Class 1 and Class 2 members' claims because they "all arise from the same course of conduct by Defendants...namely, the theory that such conduct violates the First Amendment."[716] Further, Plaintiffs state that the Individual Plaintiffs "are not subject to any affirmative defenses that are inapplicable to the rest of the class and likely to become a major focus of the case."[717]

While the general claims of each potential class member would arise from the Defendants' alleged First Amendment violations, the Individual Plaintiffs have not explained how their claims are typical of each proposed class specifically. For example, Class 2 includes those social-media users who "follow, subscribe to, are friends with, or are otherwise connected to the accounts of users" subject to censorship.[718] While the Individual Plaintiffs detail at length their own censorship, they do not clarify how they have been harmed by the censorship of other users. Again,

---

[715] [Id. at 13]
[716] [Doc. No. 268 at ¶496–97]
[717] [Id.]
[718] [Id. at ¶491]

this confusion highlights the myriad issues with this proposed class action as a result of the ill-defined and over-broad class definitions. The Court cannot make a finding that the Individual Plaintiffs' claims are typical of all class members' claims, simply because the Court cannot identify who would fit in the proposed class. Merely stating that the Rule 23(a) requirements have been met is not enough to persuade this Court that the class should be certified as stated.

### 5. Adequate Representation

The final element of a class certification analysis requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Differences between named plaintiffs and class members render the named plaintiffs' inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 626.

On this element, Plaintiffs state that they "are willing and able to take an active role in the case, control the course of litigation, and protect the interest of absentees in both classes."[719] Plaintiff also state that "[n]o conflicts of interest currently exist or are likely to develop" between themselves and the absentees.[720] This element is likely met, without evidence to the contrary.

However, without a working class definition, and with the issues concerning the other Rule 23(a) elements discussed above, the Court finds class certification inappropriate here, regardless of the adequacy of the Individual Plaintiffs' representation. Thus, for the foregoing reasons, the Court declines to certify this matter as a class action.

### V. CONCLUSION

> Once a government is committed to the principle of silencing the
> voice of opposition, it has only one place to go, and that is down the
> path of increasingly repressive measures, until it becomes a source

---

[719] [Id. at ¶498]
[720] [Id.]

of terror to all its citizens and creates a country where everyone lives
in fear.

Harry S. Truman

The Plaintiffs are likely to succeed on the merits in establishing that the Government has used its power to silence the opposition. Opposition to COVID-19 vaccines; opposition to COVID-19 masking and lockdowns; opposition to the lab-leak theory of COVID-19; opposition to the validity of the 2020 election; opposition to President Biden's policies; statements that the Hunter Biden laptop story was true; and opposition to policies of the government officials in power. All were suppressed. It is quite telling that each example or category of suppressed speech was conservative in nature. This targeted suppression of conservative ideas is a perfect example of viewpoint discrimination of political speech. American citizens have the right to engage in free debate about the significant issues affecting the country.

Although this case is still relatively young, and at this stage the Court is only examining it in terms of Plaintiffs' likelihood of success on the merits, the evidence produced thus far depicts an almost dystopian scenario. During the COVID-19 pandemic, a period perhaps best characterized by widespread doubt and uncertainty, the United States Government seems to have assumed a role similar to an Orwellian "Ministry of Truth."[721]

The Plaintiffs have presented substantial evidence in support of their claims that they were the victims of a far-reaching and widespread censorship campaign. This court finds that they are likely to succeed on the merits of their First Amendment free speech claim against the Defendants. Therefore, a preliminary injunction should issue immediately against the Defendants as set out

---

[721] An "Orwellian 'Ministry of Truth'" refers to the concept presented in George Orwell's dystopian novel, '1984.' In the novel, the Ministry of Truth is a governmental institution responsible for altering historical records and disseminating propaganda to manipulate and control public perception.

155a

herein. The Plaintiffs Motion for Preliminary Injunction [Doc. No. 10] is **GRANTED IN PART and DENIED IN PART**.

The Plaintiffs' request to certify this matter as a class action pursuant to Fed. R. Civ. P. Article 23(b)(2) is **DENIED.**

MONROE, LOUISIANA this 4th day of July 2023.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **STATE OF MISSOURI, ET AL.** | **CASE NO. 3:22-CV-01213** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JOSEPH R BIDEN JR., ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## JUDGMENT

For the reasons set forth in the Memorandum Ruling on the Request for Preliminary Injunction,

**IT IS ORDERED, ADJUDGED, AND DECREED** that Plaintiffs' Motion for Preliminary Injunction [Doc. No. 10] is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that: the **DEPARTMENT OF HEALTH AND HUMAN SERVICES** ("HHS") and **THE NATIONAL INSTITUTE OF ALLERGY AND INFECTIOUS DISEASES** ("NIAID"), and specifically the following employees of the HHS and NIAID: **XAVIER BECERRA,**[1] Secretary of HHS; **DR. HUGH AUCHINCLOSS**, Director of NIAID; **YOLANDA BYRD**, HHS Digital Engagement Team; **CHRISTY CHOI**, HHS Office of Communications; **ASHLEY MORSE**, HHS Director of Digital Engagement; **JOSHUA PECK**, HHS Deputy Assistant Secretary, Deputy Digital Director of HHS successor (formerly **JANELL MUHAMMED**); along with their secretaries, directors, administrators and employees; **SURGEON GENERAL VIVEK H. MURTHY**, **KATHARINE DEALY**, Chief Engagement Officer for the Surgeon General, along with her secretaries, directors, administrators, and employees; the **CENTERS FOR DISEASE CONTROL AND PREVENTION** ("CDC"), and specifically the following employees: **CAROL Y. CRAWFORD**, Chief of the Digital Media

---
[1] All individuals named in this Judgment are being sued in their official capacities.

Branch of the CDC Division of Public Affairs; **JAY DEMPSEY**, Social-media Team Leader, Digital Media Branch, CDC Division of Public Affairs; **KATE GALATAS**, CDC Deputy Communications Director; **UNITED STATES CENSUS BUREAU** ("Census Bureau"), and specifically the following employees: **JENNIFER SHOPKORN**, Census Bureau Senior Advisor for Communications, Division Chief for the Communications Directorate, and Deputy Director of the Census Bureau Office of Faith Based and Neighborhood Partnerships**,** along with their secretaries, directors, administrators and employees; the **FEDERAL BUREAU OF INVESTIGATION** ("FBI"), and specifically the following employees: **LAURA DEHMLOW**, Section Chief, FBI Foreign Influence Task Force; **ELVIS M. CHAN**, Supervisory Special Agent of Squad CY-1 in the FBI San Francisco Division; **THE UNITED STATES DEPARTMENT OF JUSTICE**, along with their secretary, director, administrators, and employees; the following members of the Executive Office of the President of the United States: White House Press Secretary **KARINE JEAN-PIERRE**, Counsel to the President; **STUART F. DELERY**, White House Partnerships Manager; **AISHA SHAH**, Special Assistant to the President; **SARAH BERAN**, **MINA HSIANG**, Administrator of the United States Digital Service within the Office of Management and Budget; **ALI ZAIDI**, White House National Climate Advisor; White House Senior COVID-19 Advisor successor (formerly **ANDREW SLAVITT**); Deputy Assistant to the President and Director of Digital Strategy successor (formerly **ROB FLAHERTY**); **DORI SALCIDO**, White House COVID-19 Director of Strategic Communications and Engagement; White House Digital Director for the COVID-19 Response Team successor (formerly **CLARKE HUMPHREY**); Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team successor (formerly **BENJAMIN WAKANA**); Deputy Director for Strategic Communications and External Engagement for the White House COVID-

158a

19 Response Team successor (formerly **SUBHAN CHEEMA**); White House COVID-19 Supply Coordinator successor (formerly **TIMOTHY W. MANNING**); Chief Medical Advisor to the President, **DR. HUGH AUCHINCLOSS**, along with their directors, administrators and employees; the **CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY** (**"CISA"**), and specifically the following employees: **JEN EASTERLY**, Director of CISA; **KIM WYMAN**, Senior Cybersecurity Advisor and Senior Election Security Leader; **LAUREN PROTENTIS**; **GEOFFREY HALE**; **ALLISON SNELL**; **BRIAN SCULLY**, Officials of CISA; the **UNITED STATES DEPARTMENT OF HOMELAND SECURITY** ("DHS"), and specifically the following employees: **ALEJANDRO MAYORKAS**, Secretary of DHS; **ROBERT SILVERS**, Under-Secretary of the Office of Strategy, Policy and Plans; **SAMANTHA VINOGRAD**, Senior Counselor for National Security in the Official of the Secretary for DHS, along with their secretary, directors, administrators, and employees; the **UNITED STATES DEPARTMENT OF STATE** ("State Department"), and specifically the following employees: **LEAH BRAY**, Acting Coordinator of the State Department's Global Engagement Center ("GEC"); **ALEX FRISBIE**, State Department Senior Technical Advisor and member of the Technology Engagement Team at the GEC; **DANIEL KIMMAGE**, Acting Coordinator of the GEC, along with their secretary, directors, administrators, and employees **ARE HEREBY ENJOINED AND RESTRAINED** from taking the following actions as to social-media companies:[2]

---

[2] "Social-media companies" include Facebook/Meta, Twitter, YouTube/Google, WhatsApp, Instagram, WeChat, TikTok, Sina Weibo, QQ, Telegram, Snapchat, Kuaishou, Qzone, Pinterest, Reddit, LinkedIn, Quora, Discord, Twitch, Tumblr, Mastodon, and like companies.

(1)      meeting with social-media companies for the purpose of urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms;[3]

(2)      specifically flagging content or posts on social-media platforms and/or forwarding such to social-media companies urging, encouraging, pressuring, or inducing in any manner for removal, deletion, suppression, or reduction of content containing protected free speech;

(3)      urging, encouraging, pressuring, or inducing in any manner social-media companies to change their guidelines for removing, deleting, suppressing, or reducing content containing protected free speech;

(4)      emailing, calling, sending letters, texting, or engaging in any communication of any kind with social-media companies urging, encouraging, pressuring, or inducing in any manner for removal, deletion, suppression, or reduction of content containing protected free speech;

(5)      collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, the Stanford Internet Observatory, or any like project or group for the purpose of urging, encouraging, pressuring, or inducing in any manner removal, deletion, suppression, or reduction of content posted with social-media companies containing protected free speech;

(6)      threatening, pressuring, or coercing social-media companies in any manner to remove, delete, suppress, or reduce posted content of postings containing protected free speech;

---

[3] "Protected free speech" means speech that is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with jurisprudence of the United States Supreme Court, Courts of Appeal and District Courts.

(7)    taking any action such as urging, encouraging, pressuring, or inducing in any manner social-media companies to remove, delete, suppress, or reduce posted content protected by the Free Speech Clause of the First Amendment to the United States Constitution;

(8)    following up with social-media companies to determine whether the social-media companies removed, deleted, suppressed, or reduced previous social-media postings containing protected free speech;

(9)    requesting content reports from social-media companies detailing actions taken to remove, delete, suppress, or reduce content containing protected free speech; and

(10)    notifying social-media companies to Be on The Lookout ("BOLO") for postings containing protected free speech.

This Preliminary Injunction precludes said named Defendants, their agents, officers, employees, contractors, and all acting in concert with them from the aforementioned conduct. This Preliminary Injunction also precludes said named Defendants, their agents, officers, employees, and contractors from acting in concert with others who are engaged in said conduct.

**IT IS FURTHER ORDERED** that the following actions are **NOT** prohibited by this Preliminary Injunction:

(1)    informing social-media companies of postings involving criminal activity or criminal conspiracies;

(2)    contacting and/or notifying social-media companies of national security threats, extortion, or other threats posted on its platform;

(3)    contacting and/or notifying social-media companies about criminal efforts to suppress voting, to provide illegal campaign contributions, of cyber-attacks against election infrastructure, or foreign attempts to influence elections;

(4)     informing social-media companies of threats that threaten the public safety or security of the United States;

(5)     exercising permissible public government speech promoting government policies or views on matters of public concern;

(6)     informing social-media companies of postings intending to mislead voters about voting requirements and procedures;

(7)     informing or communicating with social-media companies in an effort to detect, prevent, or mitigate malicious cyber activity;

(8)     communicating with social-media companies about deleting, removing, suppressing, or reducing posts on social-media platforms that are not protected free speech by the Free Speech Clause in the First Amendment to the United States Constitution.

**IT IS FURTHER ORDERED** that no security is required to be posted by Plaintiffs under Federal Rule of Civil Procedure 65.

**IT IS FURTHER ORDERED** that this Preliminary Injunction Order shall remain in effect pending the final resolution of this case or until further orders issue from this Court, the United States Court of Appeals for the Fifth Circuit, or the Supreme Court of the United States.

**IT IS FURTHER ORDERD** that the Motion for Preliminary Injunction [Doc. No. 10] is **DENIED** as to the following Defendants: U.S. Food and Drug Administration; U. S. Department of Treasury; U.S. Election Assistance Commission; U. S. Department of Commerce and employees Erica Jefferson, Michael Murray, Wally Adeyemo, Steven Frid, Brad Kimberly, and Kristen Muthig; and Disinformation Governance Board ("DGB") and its Director Nina Jankowicz.

**IT IS FURTHER ORDERED** that no evidentiary hearing is required at this time.

162a

**IT IS FURTHER ORDERED** that Plaintiffs' request for certification of this proceeding as a class action pursuant to Fed. R. Civ. P. Article 23 (b)(2) is **DENIED.**

**THUS, DONE AND SIGNED IN MONROE, LOUISIANA,** this 4th day of July 2023**.**

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

163a

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

STATE OF MISSOURI ET AL        CIVIL ACTION NO. 3:22-cv-1213

VERSUS        JUDGE TERRY A. DOUGHTY

JOSEPH R BIDEN JR ET AL        MAG. JUDGE KAYLA D. MCCLUSKY

## MEMORANDUM RULING ON MOTION TO STAY

Before the Court is a Motion to Stay Preliminary Injunction Pending Appeal and Alternatively, for Administrate Stay [Doc. No. 297] ("Motion to Stay") filed by Defendants.[1] An Opposition [Doc. No. 299] was filed by Plaintiffs.[2]

For the reasons set forth herein, Defendants' Motion to Stay is **DENIED**.

## I.    BACKGROUND

On July 4, 2023, this Court issued a Preliminary Injunction against the Defendants,[3] which prohibited the Defendants from contacting social-media companies and taking specific actions for the purpose of urging, encouraging, pressuring, or inducing in any manner, the removal, deletion,

---

[1] Defendants consist of President Joseph R Biden ("President Biden"), Jr, Karine Jean-Pierre ("Jean-Pierre"), Vivek H Murthy ("Murthy"), Xavier Becerra ("Becerra"), Dept of Health & Human Services ("HHS"), Dr. Hugh Auchincloss ("Auchincloss"), National Institute of Allergy & Infectious Diseases ("NIAID"), Centers for Disease Control & Prevention ("CDC"), Alejandro Mayorkas ("Mayorkas"), Dept of Homeland Security ("DHS"), Jen Easterly ("Easterly"), Cybersecurity & Infrastructure Security Agency ("CISA"), Carol Crawford ("Crawford"), United States Census Bureau ("Census Bureau"), U. S. Dept of Commerce ("Commerce"), Robert Silvers ("Silvers"), Samantha Vinograd ("Vinograd"), Ali Zaidi ("Zaidi"), Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Stuart F. Delery ("Delery"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Mina Hsiang ("Hsiang"), U. S. Dept of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Laura Dehmlow ("Dehmlow"), Elvis M. Chan ("Chan"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), Katharine Dealy ("Dealy"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), Joshua Peck ("Peck"), Kym Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), Jennifer Shopkorn ("Shopkorn"), U. S. Food & Drug Administration ("FDA"), Erica Jefferson ("Jefferson"), Michael Murray ("Murray"), Brad Kimberly ("Kimberly"), U. S. Dept of State ("State"), Leah Bray ("Bray"), Alexis Frisbie ("Frisbie"), Daniel Kimmage ("Kimmage"), U. S. Dept of Treasury ("Treasury"), Wally Adeyemo ("Adeyemo"), U. S. Election Assistance Commission ("EAC"), Steven Frid ("Frid"), and Kristen Muthig ("Muthig").
[2] Plaintiffs consist of the State of Missouri, the State of Louisiana, Dr. Aaron Kheriaty ("Kheriaty"), Dr. Martin Kulldorff ("Kulldorff"), Jim Hoft ("Hoft"), Dr. Jayanta Bhattacharya ("Bhattacharya"), and Jill Hines ("Hines").
[3] [Doc. No. 294]

164a

suppression, or reduction of content containing protected free speech posted on social-media platforms.[4] The Judgment defined "protected free speech" as "speech that is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with the jurisprudence of the United States Supreme Court, Courts of Appeal and District Courts."[5]

Defendants filed a Notice of Appeal[6] on July 5, 2023. On July 6, 2023, Defendants filed the instant Motion to Stay.[7] In the Motion to Stay, Defendants seek to have the Court Stay the Preliminary Injunction pending appeal, or alternatively to administratively stay the preliminary injunction for seven days.

The Defendants allege that they face irreparable harm with each day the injunction remains in effect, because the injunction's broad scope and ambiguous terms may be read to prevent the Defendants from engaging in a vast range of lawful and responsible conduct, including speaking on matters of public concern, and working with social-media companies on initiatives to prevent grave harm to the American people and the Country's various democratic processes.

## II.     LAW AND ANALYSIS

In determining whether to grant a stay pending appeal, a court is to consider: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent  a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009). In evaluating these factors, courts have refused to apply them in a rigid or mechanical fashion. *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983).

---

[4] [Id.]
[5] [Id. at 4, n. 3]
[6] [Doc. No. 296]
[7] [Doc. No. 297]

165a

## A.    Success on the Merits

For all the reasons set forth in the Memorandum Ruling,[8] this Court finds the Plaintiffs have shown a likelihood of success on the merits and, therefore, that Defendants have failed to show a likelihood of success on the merits. As discussed in detail in the Memorandum Ruling, all of the Defendants likely "significantly encouraged" and/or "jointly participated" with the social-media companies to engage in viewpoint-based suppression of protected free speech. Additionally, the White House Defendants[9] and the Surgeon General Defendants[10] were found to have likely engaged in coercion of social-media companies.

The following are a few examples of actions taken by Defendants that demonstrate they are unlikely to succeed on the merits.

### 1.    White House Defendants

(a)    On January 23, 2021, White House Digital Director for COVID-19 Response Team Clarke Humphrey emailed Twitter and requested the removal of an anti-COVID-19 vaccine tweet by Robert F. Kennedy, Jr.[11]

(b)    On April 14, 2021, White House Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty") demanded censorship by Facebook of a video of Fox News hosts Tucker Carlson and Tomi Lahren where Tucker Carlson was saying COVID-19 vaccines don't work and Tomi Lahren was saying she won't take a COVID-19 vaccine.[12] Flaherty demanded immediate answers from Facebook on April 16, 2021, in relation to the video, and on

---

[8] [Doc. No. 294]
[9] White House Defendants consist of President Joseph R. Biden ("President Biden"), White House Press Secretary Karine Jean-Pierre ("Jean-Pierre"), Ashley Morse ("Morse"), Deputy Assistant to the President and Director of Digital Strategy Rob Flaherty ("Flaherty"), Dori Salcido ("Salcido"), Aisha Shah ("Shah"), Sarah Beran ("Beran"), Stuart F. Delery ("Delery"), Mina Hsiang ("Hsiang"), and Dr. Hugh Auchincloss (Dr. Auchincloss")
[10] Surgeon General Defendants consists of Dr. Vivek H. Murthy ("Murthy") and Katharine Dealy ("Dealy").
[11] [Doc. No. 293 at 9]
[12] [Doc. No. 293 at 16]

April 21, 2021, despite not violating Facebook's policies, Facebook gave the video a 50% reduction for seven days and stated it would continue to demote the video.[13]

### 2.   Surgeon General Defendants

(a)    Senior Advisor to the Surgeon General Eric Waldo ("Waldo") testified that Surgeon General Dr. Vivek H. Murthy ("Murthy") used his office to advocate for social-media platforms to take stronger actions against "health misinformation," which involved putting pressure on social-media platforms to reduce the dissemination of health misinformation. That message was given to social-media platforms both publicly and privately.[14]

(b)    In addition to public statements, Murthy had meetings with social-media companies, called health misinformation "poison," and called for social-media companies to do more to control the reach of health disinformation. When Murthy was calling posts "health disinformation," he was referring to anti-vaccine posts.[15]

### 3.   CDC Defendants[16]

(a)    The CDC Defendants consistently had regular contact with social-media platforms via email, phone, and in-person meetings. The CDC Defendants received CrowdTangle reports from Facebook as to the "top engaged COVID and vaccine related content.[17]

(b)    The CDC Defendants provided PowerPoint slide decks to Facebook, which provided examples of misinformation topics and made recommendations to Facebook as to whether claims were true or false. Some of the items designated as false by the CDC Defendants

---

[13] [Doc. No. 297 at 17-18]
[14] [Doc. No. 293 at 28]
[15] [Doc. No. 293 at 31-33]
[16] The CDC Defendants consist of the Centers for Disease Control & Prevention, Carol Crawford ("Crawford"), Jay Dempsey ("Dempsey"), Kate Galatas ("Galatas"), United States Census Bureau ("Census Bureau"), Jennifer Shopkorn ("Shopkorn"), the Department of Health and Human Services ("HHS"), Xavier Becerra ("Becerra"), Yolanda Byrd ("Byrd"), Christy Choi ("Choi"), Ashley Morse ("Morse"), and Joshua Peck ("Peck").
[17] [Doc. No. 293 at 39]

167a

included medically debatable topics such as whether COVID-19 had a 99.96% survival rate, whether COVID-19 vaccines weaken the immune system, and the safety of COVID-19 vaccines.[18]

### 4.    NIAID Defendants[19]

(a)    Dr. Francis Collins sent an email to Dr. Anthony Fauci on October 8, 2020, which stated that the Great Barrington Declaration[20] needed to have a "quick and devastating take-down."[21]

(b)    Dr. Fauci sent back information to "debunk" The Great Barrington Declaration and both Dr. Collins and Dr. Fauci followed up with a series of public media statements attacking the Great Barrington Declaration. Thereafter the Great Barrington Declaration was censored by social-media platforms.[22]

### 5.    FBI Defendants[23]

(a)    The FBI Defendants, along with numerous social-media platforms, CISA, and the Department of Homeland Security, met consistently at Industry Meetings. The Industry Meetings were used by the FBI Defendants and others to discuss election disinformation.[24]

(b)    Prior to the 2020 Presidential election, the FBI repeatedly warned social-media companies to be alert for "hack and dump" or "hack and leak" operations. The Hunter Biden laptop story was published by the Washington Post on October 14, 2020. After being asked by Facebook whether the Hunter Biden laptop story was Russian disinformation, the FBI's Laura Dehmlow

---

[18] [Doc. No. 293 at 41-44]
[19] The NIAD Defendants consist of the National Institute of Allergy and Infectious Disease and Dr. Hugh Auchincloss ("Dr. Auchincloss").
[20] [Doc. No. 293 at 55]
[21] The Great Barrington Declaration is a one-page treatise opposing the reliance of lockdowns, criticized social distancing, and expressed concerns about physical and mental health impacts of lockdowns.
[22] [Doc. No. 293 at 54]
[23] FBI Defendants include Elvis Chan ("Chan"), the Federal Bureau of Investigation ("FBI"), Lauren Dehmlow ("Dehmlow"), and the U.S. Department of Justice ("DOJ").
[24] [Doc. No. 293 at 54]

168a

refused to comment, leading Facebook to suppress the story. The FBI had had the laptop since December of 2019, and knew that the story was not Russian disinformation.[25]

### 6.    CISA Defendants[26]

(a)    The CISA Defendants regularly met with social-media platforms at several types of meetings. At those meetings, disinformation was discussed as well as reports about social-media companies' changes to censorship policies.[27] CISA had five sets of recurring meetings with social-media platforms that involved discussions of misinformation, disinformation, and/or censorship of protected free speech on social media.[28]

(b)    The CISA Defendants collaborated with the Election Integrity Partnership, working with them in a "switchboarding" operation which reported alleged election misinformation to social-media companies. The alleged election misinformation included claims that "mail-in voting is insecure" and "theories about election fraud are hard to discount."[29]

(c)    CISA Director Jen Easterly views the word "infrastructure" expressively to include our "cognitive infrastructure," which deals with the way people acquire knowledge and understanding.[30]

### 7.    State Department Defendants[31]

(a)    The State Department Defendants worked closely and collaborated with the Election Integrity Partnership and the Virality Project, who forwarded alleged election

---

[25] [Doc. No. 293 at 61-63]
[26] CISA Defendants consist of the Cybersecurity and Infrastructure Security Agency ("CISA"), Jen Easterly ("Easterly"), Kim Wyman ("Wyman"), Lauren Protentis ("Protentis"), Geoffrey Hale ("Hale"), Allison Snell ("Snell"), Brian Scully ("Scully"), the Department of Homeland Security ("DHS"), Alejandro Mayorkas ("Mayorkas"), Robert Silvers ("Silvers"), and Samantha Vinograd ("Vinograd").
[27] [Doc. No. 293 at 68-69]
[28] [Doc. No. 293 at 75]
[29] [Doc. No. 293 at 70-74]
[30] [Doc. No. 293 at 77]
[31] The State Department Defendants consist of the United States Department of State, Leah Bray ("Bray"), Daniel Kimmage ("Kimmage'), and Alex Frisbie ("Frisbie").

169a

misinformation and COVID-19 misinformation to social-media companies.[32] The alleged misinformation related to content by American citizens. The alleged disinformation primarily involved social media posts which delegitimized election results,[33] and posts which involved anti-vaccine content by such personalities as Alex Berenson, Candace Owens, Tucker Carlson, and John F. Kennedy, Jr.[34]

(b)     The Election Integrity Partnership was designed "to get around unclear legal authorities, including very real First Amendment questions" that would arise if government agencies were to monitor and flag information for censorship on social media.[35]

## B.    Standing

Defendants further argue that they will prevail as to establishing that Plaintiffs lack Article III standing. For the reasons set forth previously in the Memorandum Ruling[36] this Court found all of the Plaintiffs are likely to establish all elements of Article III standing. Defendants argue the States of Missouri and Louisiana do not have *parens patriae* standing to bring a claim against the Federal Government. This Court disagrees. In *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), the United States Supreme Court concluded that *Massachusetts* had standing to sue the E.P.A. to protect its *quasi-sovereign* interests. The court clarified that because *Massachusetts* sought to assert its rights under federal law, rather than challenge the federal law's application for its citizens, the *State of Massachusetts* had standing. Like *Massachusetts*, the States of Missouri and Louisiana are asserting their rights under the First Amendment to the United States Constitution, and also asserting rights under each Plaintiff States' own constitution. The Plaintiff States are likely to

---

[32] [Doc. No. 293 at 79-81]
[33] [Doc. No. 293 at 81]
[34] [Doc. No. 293 at 86]
[35] [Doc. No. 293 at 73].
[36] [Doc. No. 293 at 119-139] (see also [Doc. No. 214] (Memorandum Ruling Denying Defendants' Motion to Dismiss))

prevail on their standing argument because they have adequately alleged (and provided evidence supporting) injuries to their *quasi-sovereign* interest as well as direct censorship injuries on social-media.

There are also individual Plaintiffs in this case. Only one Plaintiff with standing is required to be able to maintain this suit. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Defendants argue that the individual Plaintiffs' standing have not shown "irreparable harm." The individual Plaintiffs' standing analysis is set forth in the Memorandum Ruling.[37] The "irreparable harm" element was also specifically discussed in the Memorandum Ruling.[38] Violation of a First Amendment Constitutional right, even for a short period of time, is always irreparable injury. *Elrod v. Burns*., 427 U.S. 347 (1976). Accordingly, for the reasons set forth previously, the Plaintiffs have shown there is a substantial risk that future harm is likely to occur and that they are likely to satisfy the requirements of Article III standing.

### C.    Public Interest and Harm

Defendants further maintain they will be irreparably injured absent a stay, and that the balance of the equities weighs heavily in the Defendants' favor of granting a stay. Again, this Court disagrees. As discussed in the Memorandum Ruling,[39] the First Amendment free speech rights of Plaintiffs by far outweighs the Defendants' interests.

Defendants argue that the injunction may be read to prevent the Defendants from engaging in a vast range of lawful conduct—including speaking on matters of public concern and working with social-media companies on initiatives to prevent grave harm to the American people and our democratic processes. However, the Preliminary Injunction only prohibits what the Defendants

---

[37] [Id. at 126-135]
[38] [Id. at 139-140]
[39] [Id. at 144-45]

171a

have no right to do—urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech on social-media platforms. The Defendants provide no argument that they are legally allowed to take such action. The Defendants are asking the Court to grant them relief to a Preliminary Injunction that only bars illegal conduct. In other words, the only effect of staying the Preliminary Injunction would be to free Defendants to urge, encourage, pressure, or induce the removal, deletion, suppression, or reduction of content containing protected free speech on social-media platforms.

The Preliminary Injunction also has several exceptions which list things that are **NOT** prohibited. The Preliminary Injunction allows Defendants to exercise permissible public government speech promoting government policies or views on matters of public concern, to inform social-media companies of postings involving criminal activity, criminal conspiracies, national security threats, extortion, other threats, criminal efforts to suppress voting, providing illegal campaign contributions, cyber-attacks against election infrastructure, foreign attempts to influence elections, threats against the public safety or security of the United States, postings intending to mislead voters about voting requirements, procedures, preventing or mitigating malicious cyber activity, and to inform social-media companies about speech not protected by the First Amendment.

Defendants cite no specific action that would be prohibited by this Preliminary Injunction that would provide grave harm to the American people or over democratic processes. In fact, in opposition to the Motion for Preliminary Injunction, Defendants submitted five Declarations[40] that addressed Defendants' concerns. Every one of these concerns was addressed in the Preliminary

---

[40] Leah Bray [Doc. No. 226-6 at 198-296] (foreign propaganda); Larissa Knapp [Doc. No. 266-6 at 448-47] (crimes, threats, national security threats); Brandon Wales [Doc. No. 266-6 at 553-572] (malicious cyber activity); Max Lesko [Doc. No. 266-4 at 130-178] (commission of public health issues); and Carol Crawford [Doc. No. 266-5 at 67-77] (public health information)

Injunction exceptions. An enjoined party must identify a specific concern that the injunction will prohibit. *Regal Knitwear Co. v. N.L.R.B.*, 65 S. Ct. 478, 482 (1945). Defendants have failed to do so. Therefore, the Defendants would not be irreparably harmed, and the balance of equities and harm weighs in favor of Plaintiffs, not Defendants.

### D.     Specificity of Preliminary Injunction

Additionally, Defendants argue that the Preliminary Injunction is sweeping in scope and vague in its terms.[41] A Preliminary Injunction must describe in reasonable detail the act or acts restrained or required. FED. R. CIV. P. 65. An ordinary person reading the Court's order must be able to ascertain from the document itself exactly what conduct is proscribed or prohibited. *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). Defendants argue that both the prohibited conduct and the conduct that is not prohibited is vague.

Defendants first argue the definition of "protected free speech" is vague because it refers to jurisprudence of the United States Supreme Court, The United States Courts of Appeal, and United States District Courts. Defendants question whether an agency official would be required to research the laws of every federal court to determine what is "protected free speech."

In order to clarify the definition of "protected free speech" in the Preliminary Injunction, this Court will modify the definition of "protected free speech" in n. 3 to read as follows:

> "Protected free speech" means speech which is protected by the Free Speech Clause of the First Amendment to the United States Constitution in accordance with the jurisprudence of the United States Supreme Court.

Although general "obey the law" injunctions are normally too vague to form the basis of an injunction, language in an injunction to prohibit future violations of a statute will be upheld when it relates to the type of acts the Defendants are alleged to have committed. *NLRB. V. Express*

---

[41] [Doc. No. 297-1 at 3]

173a

*Pub. Co.*, 61 S. Ct. 693, 699 (1941); *Interstate Commerce Commission v. Keeshin Motor Exp. Co.*, 134 F.2d 228, 231, (7th Cir. 1943) cert. den. 64 S. Ct. 38 ( 1943).

The Preliminary Injunction at issue prohibits the Defendants from taking the described actions with social-media companies as to "protected free speech," which is defined by jurisprudence of the United States Supreme Court. The actions prohibited are the type of actions the Defendants are alleged to have committed. Therefore, the reference to United States Supreme Court jurisprudence is not vague. Defendant officials can be and should be trained to recognize what speech is protected and what speech is not prior to working with social-media companies to suppress or delete postings. Additionally, the exceptions to the Free Speech Clause of the First Amendment are "well-defined and narrowly limited classes of speech." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010).

Defendants further argue that the exemption in the Preliminary Injunction, which allows the Government to exercise permissible government speech promoting government policies or views on matters of public concern, is vague in light of references in the Memorandum Ruling to government speech by the White House Defendants and the Surgeon General Defendants.[42] It is clear that the Preliminary Injunction does not prohibit government speech. The portion of the Memorandum Ruling addressing Defendants' government speech argument[43] clearly notes that the government speech was not a First Amendment violation. Rather, it was the use of government agencies and employees to coerce and/or significantly encourage social-media platforms to suppress free speech on their platforms. Therefore, the government speech exception in the Preliminary Injunction is not ambiguous or vague.

---

[42] [Doc. No. 294 at 6]
[43] [Doc. No. 293 at 118-119].

Defendants further allege that the injunction is not clear what entities or individuals are covered because the Preliminary Injunction names entire agencies which are composed of many sub-components. Defendants noted that the Preliminary Injunction did not enjoin the Food and Drug Administration ("FDA") but enjoined the Department of Health and Human Services, of whom the FDA is a part.

The Motion for Preliminary Injunction is clearly denied as to the FDA, along with the other entities specifically noted. FED. R. CIV. P. Rule 65 not only prohibits the party Defendants, but also those identified with them in interest, in priority with them, represented by them, or subject to their control. *Regal Knitwear Co. v. N.L.R.B.*, 65 S. Ct. 478, 481 (1945). An injunctive order also binds the party's officers, agents, servants, employees, attorneys, and those persons in active concert with them who receive actual notice of the order. *U.S. v. Hall*, 472 F.2d 261, 267, (5th Cir. 1972). FED R. CIV. P. Rule 65(d) specifically allows an agency's officers, agents, servants, employees, and attorneys to be bound. Therefore, the Preliminary Injunction is not vague or ambiguous as to the entities or individuals who are covered. If Defendants' interpretation was accepted, an agency could simply instruct a sub-agency to perform the prohibited acts and avoid the consequences of an injunction.

## III.    CONCLUSION

Plaintiffs are likely to prove that all of the enjoined Defendants coerced, significantly encouraged, and/or jointly participated social-media companies to suppress social-media posts by American citizens that expressed opinions that were anti-COVID-19 vaccines, anti-COVID-19 lockdowns, posts that delegitimized or questioned the results of the 2020 election, and other content not subject to any exception to the First Amendment. These items are protected free speech

and were seemingly censored because of the viewpoints they expressed. Viewpoint discrimination is subject to strict scrutiny.

Although this Preliminary Injunction involves numerous agencies, it is not as broad as it appears. It only prohibits something the Defendants have no legal right to do—contacting social-media companies for the purpose of urging, encouraging, pressuring, or inducing in any manner, the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms. It also contains numerous exceptions.

Therefore, for the reasons set forth herein,

The Defendants' Motion to Stay [Doc. No. 297] is **DENIED**.

**MONROE, LOUISIANA**, this 10th day of July 2023.

_____
**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

176a

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

STATE OF MISSOURI ET AL      CIVIL ACTION NO. 3:22-cv-1213

VERSUS      JUDGE TERRY A. DOUGHTY

JOSEPH R BIDEN JR ET AL      MAG. JUDGE KAYLA D. MCCLUSKY

## JUDGMENT ON MOTION TO STAY

For the reasons set forth in the Memorandum Ruling on Motion to Stay,

**IT IS ORDERED, ADJUDGED, AND DECREED** that the definition of "protected free speech" in the Memorandum Ruling [Doc. No. 294, at p.4, n.3] shall be amended to read as follows:

> "Protected free speech" means speech which is protected by the Free Speech Clause of the First Amendment of the United States Constitution in accordance with the jurisprudence of the United States Supreme Court.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Stay Preliminary Injunction Pending Appeal, and Alternatively, for Administrative Stay [Doc. No. 297] is **DENIED.**

**MONROE, LOUISIANA**, this 10th day of July 2023,

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**

# United States Court of Appeals for the Fifth Circuit

_____

No. 23-30445

_____

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY;
MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA;
JILL HINES,

*Plaintiffs—Appellees,*

*versus*

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA;
DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY
FAUCI; ET AL.,

*Defendants—Appellants.*

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:22-CV-1213

_____

## UNPUBLISHED ORDER

Before STEWART, GRAVES, and OLDHAM, *Circuit Judges*.

PER CURIAM:

IT IS ORDERED that this appeal is EXPEDITED to the next available Oral Argument Calendar.

IT IS FURTHER ORDERED that a temporary administrative stay is GRANTED until further orders of the court.

IT IS FURTHER ORDERED that Appellants' opposed motion for stay pending appeal is deferred to the oral argument merits panel which receives this case.

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 8, 2023

Lyle W. Cayce
Clerk

No. 23-30445

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

*Plaintiffs—Appellees*,

*versus*

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI; ET AL.,

*Defendants—Appellants.*

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:22-CV-1213

Before CLEMENT, ELROD, and WILLETT, *Circuit Judges*.

PER CURIAM:

A group of social-media users and two states allege that numerous federal officials coerced social-media platforms into censoring certain social-media content, in violation of the First Amendment. We agree, but only as to some of those officials. So, we AFFIRM in part, REVERSE in part, VACATE the injunction in part, and MODIFY the injunction in part.

180a

No. 23-30445

# I.

For the last few years—at least since the 2020 presidential transition—a group of federal officials has been in regular contact with nearly every major American social-media company about the spread of "misinformation" on their platforms. In their concern, those officials— hailing from the White House, the CDC, the FBI, and a few other agencies— urged the platforms to remove disfavored content and accounts from their sites. And, the platforms seemingly complied. They gave the officials access to an expedited reporting system, downgraded or removed flagged posts, and deplatformed users. The platforms also changed their internal policies to capture more flagged content and sent steady reports on their moderation activities to the officials. That went on through the COVID-19 pandemic, the 2022 congressional election, and continues to this day.

Enter this lawsuit. The Plaintiffs—three doctors, a news website, a healthcare activist, and two states[1]—had posts and stories removed or downgraded by the platforms. Their content touched on a host of divisive topics like the COVID-19 lab-leak theory, pandemic lockdowns, vaccine side-effects, election fraud, and the Hunter Biden laptop story. The Plaintiffs maintain that although the platforms stifled their speech, the government officials were the ones pulling the strings—they "coerced, threatened, and pressured [the] social-media platforms to censor [them]" through private

---

[1] Specifically, the Plaintiffs are (1) Jayanta Bhattacharya and Martin Kulldorff, two epidemiologists who co-wrote the Great Barrington Declaration, an article criticizing COVID-19 lockdowns; (2) Jill Hines, an activist who spearheaded "Reopen Louisiana"; (3) Aaron Kheriaty, a psychiatrist who opposed lockdowns and vaccine mandates; (4) Jim Hoft, the owner of the Gateway Pundit, a once-deplatformed news site; and (5) Missouri and Louisiana, who assert their sovereign and quasi-sovereign interests in protecting their citizens and the free flow of information. Bhattacharya, Kulldorff, Hines, Kheriaty, and Hoft, collectively, are referred to herein as the "Individual Plaintiffs." Missouri and Louisiana, together, are referred to as the "State Plaintiffs."

No. 23-30445

communications and legal threats. So, they sued the officials[2] for First Amendment violations and asked the district court to enjoin the officials' conduct. In response, the officials argued that they only "sought to mitigate the hazards of online misinformation" by "calling attention to content" that violated the "platforms' policies," a form of permissible government speech.

The district court agreed with the Plaintiffs and granted preliminary injunctive relief. In reaching that decision, it reviewed the conduct of several federal offices, but only enjoined the White House, the Surgeon General, the CDC, the FBI, the National Institute of Allergy and Infectious Diseases (NIAID), the Cybersecurity and Infrastructure Security Agency (CISA), and the Department of State. We briefly review—per the district court's order and the record—those officials' conduct.

## A.

Considering their close cooperation and the ministerial ecosystem, we take the White House and the Surgeon General's office together. Officials from both offices began communicating with social media companies—

---

[2] The defendant-officials include (1) the President; (2) his Press Secretary; (3) the Surgeon General; (4) the Department of Health and Human Services; (5) the HHS's Director; (6) Anthony Fauci in his capacity as the Director of the National Institute of Allergy and Infectious Diseases; (7) the NIAID; (8) the Centers for Disease Control; (9) the CDC's Digital Media Chief; (10) the Census Bureau; (11) the Senior Advisor for Communications at the Census Bureau; (12) the Department of Commerce; (13) the Secretary of the Department of Homeland Security; (14) the Senior Counselor to the Secretary of the DHS; (15) the DHS; (16) the Cybersecurity and Infrastructure Security Agency; (17) the Director of CISA; (18) the Department of Justice; (19) the Federal Bureau of Investigation; (20) a special agent of the FBI; (21) a section chief of the FBI; (22) the Food and Drug Administration; (23) the Director of Social Media at the FDA; (24) the Department of State; (25) the Department of Treasury; (26) the Department of Commerce; and (27) the Election Assistance Commission. The Plaintiffs also sued a host of various advisors, officials, and deputies in the White House, the FDA, the CDC, the Census Bureau, the HHS, and CISA. Note that some of these officials were not enjoined and, therefore, are not mentioned again in this opinion.

182a

No. 23-30445

including Facebook, Twitter (now known as "X"), YouTube, and Google—in early 2021. From the outset, that came with requests to take down flagged content. In one email, a White House official told a platform to take a post down "ASAP," and instructed it to "keep an eye out for tweets that fall in this same [] genre" so that they could be removed, too. In another, an official told a platform to "remove [an] account immediately"—he could not "stress the degree to which this needs to be resolved immediately." Often, those requests for removal were met.

But, the White House officials did not only flag content. Later that year, they started monitoring the platforms' moderation activities, too. In that vein, the officials asked for—and received—frequent updates from the platforms. Those updates revealed, however, that the platforms' policies were not clear-cut and did not always lead to content being demoted. So, the White House pressed the platforms. For example, one White House official demanded more details and data on Facebook's internal policies at least twelve times, including to ask what was being done to curtail "dubious" or "sensational" content, what "interventions" were being taken, what "measurable impact" the platforms' moderation policies had, "how much content [was] being demoted," and what "misinformation" was not being downgraded. In one instance, that official lamented that flagging did not "historically mean[] that [a post] was removed." In another, the same official told a platform that they had "been asking [] pretty directly, over a series of conversations" for "what actions [the platform has] been taking to mitigate" vaccine hesitancy, to end the platform's "shell game," and that they were "gravely concerned" the platform was "one of the top drivers of vaccine hesitancy." Another time, an official asked why a flagged post was "still up" as it had "gotten pretty far." The official queried "how does something like that happen," and maintained that "I don't think our position is that you should remove vaccine hesitant stuff," but "slowing it down seems

No. 23-30445

reasonable." Always, the officials asked for more data and stronger "intervention[s]."

From the beginning, the platforms cooperated with the White House. One company made an employee "available on a regular basis," and another gave the officials access to special tools like a "Partner Support Portal" which "ensure[d]" that their requests were "prioritized automatically." They all attended regular meetings. But, once White House officials began to demand more from the platforms, they seemingly stepped-up their efforts to appease the officials. When there was confusion, the platforms would call to "clear up" any "misunderstanding[s]" and provide data detailing their moderation activities. When there was doubt, they met with the officials, tried to "partner" with them, and assured them that they were actively trying to "remove the most harmful COVID-19 misleading information." At times, their responses bordered on capitulation. One platform employee, when pressed about not "level[ing]" with the White House, told an official that he would "continue to do it to the best of [his] ability, and [he will] expect [the official] to hold [him] accountable." Similarly, that platform told the Surgeon General that "[w]e're [] committed to addressing the [] misinformation that you've called on us to address." The platforms were apparently eager to stay in the officials' good graces. For example, in an effort to get ahead of a negative news story, Facebook preemptively reached out to the White House officials to tell them that the story "doesn't accurately represent the problem or the solutions we have put in place."

The officials were often unsatisfied. They continued to press the platforms on the topic of misinformation throughout 2021, especially when they seemingly veered from the officials' preferred course. When Facebook did not take a prominent pundit's "popular post[]" down, a White House official asked "what good is" the reporting system, and signed off with "last time we did this dance, it ended in an insurrection." In another message, an

184a

No. 23-30445

official sent Facebook a Washington Post article detailing the platform's alleged failures to limit misinformation with the statement "[y]ou are hiding the ball." A day later, a second official replied that they felt Facebook was not "trying to solve the problem" and the White House was "[i]nternally . . . considering our options on what to do about it." In another instance, an official—demanding "assurances" that a platform was taking action—likened the platform's alleged inaction to the 2020 election, which it "helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform."

To ensure that problematic content was being taken down, the officials—via meetings and emails—pressed the platforms to change their moderation policies. For example, one official emailed Facebook a document recommending changes to the platform's internal policies, including to its deplatforming and downgrading systems, with the note that "this is circulating around the building and informing thinking." In another instance, the Surgeon General asked the platforms to take part in an "all-of-society" approach to COVID by implementing stronger misinformation "monitoring" programs, redesigning their algorithms to "avoid amplifying misinformation," targeting "repeat offenders," "[a]mplify[ing] communications from trusted . . . experts," and "[e]valuat[ing] the effectiveness of internal policies."

The platforms apparently yielded. They not only continued to take down content the officials flagged, and provided requested data to the White House, but they also changed their moderation policies expressly in accordance with the officials' wishes. For example, one platform said it knew its "position on [misinformation] continues to be a particular concern" for the White House, and said it was "making a number of changes" to capture and downgrade a "broader set" of flagged content. The platform noted that, in line with the officials' requests, it would "make sure that these additional

185a

No. 23-30445

[changes] show results—the stronger demotions in particular should deliver real impact." Another time, a platform represented that it was going to change its moderation policies and activities to fit with express guidance from the CDC and other federal officials. Similarly, one platform noted that it was taking down flagged content which seemingly was not barred under previous iterations of its moderation policy.

Relatedly, the platforms enacted several changes that coincided with the officials' aims shortly after meeting with them. For example, one platform sent out a post-meeting list of "commitments" including a policy "change[]" "focused on reducing the virality" of anti-vaccine content even when it "does not contain actionable misinformation." On another occasion, one platform listed "policy updates . . . regarding repeat misinformation" after meeting with the Surgeon General's office and signed off that "[w]e think there's considerably more we can do in partnership with you and your teams to drive behavior."

Even when the platforms did not expressly adopt changes, though, they removed flagged content that did not run afoul of their policies. For example, one email from Facebook stated that although a group of posts did not "violate our community standards," it "should have demoted them before they went viral." In another instance, Facebook recognized that a popular video did not qualify for removal under its policies but promised that it was being "labeled" and "demoted" anyway after the officials flagged it.

At the same time, the platforms often boosted the officials' activities at their request. For example, for a vaccine "roll out," the officials shared "what [t]he admin's plans are" and "what we're seeing as the biggest headwinds" that the platforms could help with. The platforms "welcome[d] the opportunity" to lend a hand. Similarly, when a COVID vaccine was halted, the White House asked a platform to—through

No. 23-30445

"hard . . . intervention[s]" and "algorithmic amplification"—"make sure that a favorable review reaches as many people" as possible to stem the spread of alleged misinformation. The officials also asked for labeling of posts and a 24-hour "report-back" period to monitor the public's response. Again, the platforms obliged—they were "keen to amplify any messaging you want us to project," *i.e.*, "the right messages." Another time, a platform told the White House it was "eager" to help with vaccine efforts, including by "amplify[ing]" content. Similarly, a few months later, after the White House shared some of the "administration's plans" for vaccines in an industry meeting, Facebook reiterated that it was "committed to the effort of amplifying the rollout of [those] vaccines."

Still, White House officials felt the platforms were not doing enough. One told a platform that it "remain[ed] concerned" that the platform was encouraging vaccine hesitancy, which was a "concern that is shared at the highest (and I mean highest) levels of the [White House]." So, the official asked for the platform's "road map to improvement" and said it would be "good to have from you all . . . a deeper dive on [misinformation] reduction." Another time, the official responded to a moderation report by flagging a user's account and saying it is "[h]ard to take any of this seriously when you're actively promoting anti-vaccine pages." The platform subsequently "removed" the account "entirely" from its site, detailed new changes to the company's moderation policies, and told the official that "[w]e clearly still have work to do." The official responded that "removing bad information" is "one of the easy, low-bar things you guys [can] do to make people like me think you're taking action." The official emphasized that other platforms had "done pretty well" at demoting non-sanctioned information, and said "I don't know why you guys can't figure this out."

The officials' frustrations reached a boiling point in July of 2021. That month, in a joint press conference with the Surgeon General's office, the

No. 23-30445

White House Press Secretary said that the White House "expect[s] more" from the platforms, including that they "consistently take action against misinformation" and "operate with greater transparency and accountability." Specifically, the White House called on platforms to adopt "proposed changes," including limiting the reach of "misinformation," creating a "robust enforcement strategy," taking "faster action" because they were taking "too long," and amplifying "quality information." The Press Secretary said that the White House "engag[es] with [the platforms] regularly and they certainly understand what our asks are." She also expressly noted that several accounts, despite being flagged by the White House, "remain active" on a few platforms.

The Surgeon General also spoke at the press conference. He said the platforms were "one of the biggest obstacles" to controlling the COVID pandemic because they had "enabled misinformation to poison" public discourse and "have extraordinary reach." He labeled social-media-based misinformation an "urgent public health threat[]" that was "literally costing . . . lives." He asked social-media companies to "operate with greater transparency and accountability," "monitor misinformation more closely," and "consistently take action against misinformation super-spreaders on their platforms." The Surgeon General contemporaneously issued a public advisory "calling out social media platforms" and saying they "have a role to play to improve [] health outcomes." The next day, President Biden said that the platforms were "killing people" by not acting on misinformation. Then, a few days later, a White House official said they were "reviewing" the legal liability of platforms—noting "the president speak[s] very aggressively about" that—because "they should be held accountable."

The platforms responded with total compliance. Their answer was four-fold. First, they capitulated to the officials' allegations. The day after the President spoke, Facebook asked what it could do to "get back to a good

place" with the White House. It sought to "better understand . . . what the White House expects from us on misinformation going forward." Second, the platforms changed their internal policies. Facebook reached out to see "how we can be more transparent," comply with the officials' requests, and "deescalate" any tension. Others fell in line, too—YouTube and Google told an official that they were "working on [it]" and relayed the "steps they are currently taking" to do better. A few days later, Facebook told the Surgeon General that "[w]e hear your call for us to do more," and wanted to "make sure [he] saw the steps [it took]" to "adjust policies on what we are removing with respect to misinformation," including "expand[ing] the group of false claims" that it removes. That included the officials' "specific recommendations for improvement," and the platform "want[ed] to make sure to keep [the Surgeon General] informed of [its] work on each."

Third, the platforms began taking down content and deplatforming users they had not previously targeted. For example, Facebook started removing information posted by the "disinfo dozen"—a group of influencers identified as problematic by the White House—despite earlier representations that those users were not in violation of their policies. In general, the platforms had pushed back against deplatforming users in the past, but that changed. Facebook also made other pages that "had not yet met their removal thresholds[] more difficult to find on our platform," and promised to send updates and take more action. A month later, members of the disinfo dozen were deplatformed across several sites. Fourth, the platforms continued to amplify or assist the officials' activities, such as a vaccine "booster" campaign.

Still, the White House kept the pressure up. Officials continuously expressed that they would keep pushing the platforms to act. And, in the following year, the White House Press Secretary stressed that, in regard to problematic users on the platforms, the "President has long been concerned

about the power of large" social media companies and that they "must be held accountable for the harms they cause." She continued that the President "has been a strong supporter of fundamental reforms to achieve that goal, including reforms to [S]ection 230, enacting antitrust reforms, requiring more transparency, and more." Per the officials, their back-and-forth with the platforms continues to this day.

## B.

Next, we turn to the CDC. Much like the White House officials, the CDC tried to "engage on a [] regular basis" with the platforms. They also received reports on the platforms' moderation activities and policy updates. And, like the other officials, the CDC also flagged content for removal that was subsequently taken down. In one email, an official mentioned sixteen posts and stated, "[W]e are seeing a great deal of misinfo [] that we wanted to flag for you all." In another email, CDC officials noted that flagged content had been removed. And, the CDC actively sought to promote its officials' views over others. For example, they asked "what [was] being done on the amplification-side" of things.

Unlike the other officials, though, the CDC officials also provided direct guidance to the platforms on the application of the platforms' internal policies and moderation activities. They did so in three ways. First, CDC officials authoritatively told the platforms what was (and was not) misinformation. For example, in meetings—styled as "Be On the Lookout" alerts—officials educated the platforms on "misinformation[] hot topics." Second, CDC officials asked for, or at least encouraged, harmonious changes to the platforms' moderation policies. One platform noted that "[a]s soon as the CDC updates [us]," it would change information on its website to comply with the officials' views. In that same email, the platform said it was expanding its "misinfo policies" and it was "able to make this change based

on the conversation we had last week with the CDC." In another email, a platform noted "several updates to our COVID-19 Misinformation and Harm policy based on your inputs." Third, through its guidance, the CDC outright directed the platforms to take certain actions. In one post-meeting email, an official said that "as mentioned on the call, any contextual information that can be added to posts" on some alleged "disinformation" "could be very effective."

Ultimately, the CDC's guidance informed, if not directly affected, the platforms' moderation decisions. The platforms sought answers from the officials as to whether certain controversial claims were "true or false" and whether related posts should be taken down as misleading. The CDC officials obliged, directing the platforms as to what was or was not misinformation. Such designations directly controlled the platforms' decision-making process for the removal of content. One platform noted that "[t]here are several claims that we will be able to remove as soon as the CDC debunks them; until then, we are unable to remove them."

## C.

Next, we consider the conduct of the FBI officials. The agency's officials regularly met with the platforms at least since the 2020 election. In these meetings, the FBI shared "strategic information with [] social-media companies" to alert them to misinformation trends in the lead-up to federal elections. For example, right before the 2022 congressional election, the FBI tipped the platforms off to "hack and dump" operations from "state-sponsored actors" that would spread misinformation through their sites. In another instance, they alerted the platforms to the activities and locations of "Russian troll farms." The FBI apparently acquired this information from ongoing investigations.

No. 23-30445

Per their operations, the FBI monitored the platforms' moderation policies, and asked for detailed assessments during their regular meetings. The platforms apparently changed their moderation policies in response to the FBI's debriefs. For example, some platforms changed their "terms of service" to be able to tackle content that was tied to hacking operations.

But, the FBI's activities were not limited to purely foreign threats. In the build up to federal elections, the FBI set up "command" posts that would flag concerning content and relay developments to the platforms. In those operations, the officials also targeted domestically sourced "disinformation" like posts that stated incorrect poll hours or mail-in voting procedures. Apparently, the FBI's flagging operations across-the-board led to posts being taken down 50% of the time.

**D.**

Finally, we briefly discuss the remaining offices, namely the NIAID, CISA, and the State Department. Generally speaking, the NIAID did not have regular contact with the platforms or flag content. Instead, NIAID officials were—as evidenced by internal emails—concerned with "tak[ing] down" (*i.e.*, discrediting) opposing scientific or policy views. On that front, Director Anthony Fauci publicly spoke in favor of certain ideas (*e.g.*, COVID lockdowns) and against others (*e.g.*, the lab-leak theory). In doing so, NIAID officials appeared on podcasts and livestreams on some of the platforms. Apparently, the platforms subsequently demoted posts that echoed or supported the discredited views.

CISA and the State Department, on the other hand, both communicated directly with the platforms. The State Department hosted meetings that were meant to "facilitate [] communication" with the platforms. In those meetings, they educated the platforms on the "tools and techniques" that "malign" or "foreign propaganda actors" (*e.g.*, terrorist

groups, China) were using to spread misinformation. Generally, the State Department officials did not flag content, suggest policy changes, or reciprocally receive data during those meetings.

CISA, however, did flag content. Beyond holding regular industry meetings with the platforms, CISA officials engaged in "switchboarding" operations, meaning they acted as an intermediary for a third-party group by forwarding flagged content from them to the platforms. For example, during a federal election, CISA officials would receive "something on social media that [local election officials] deemed to be disinformation aimed at their jurisdiction" and, in turn, CISA would "share [that] with the appropriate social media compan[y]." In switchboarding, CISA officials worked alongside the Center for Internet Security and the Election Integrity Project, two private organizations. The officials' actions apparently led to content being removed or demoted by the recipient platforms.

* * *

Relying on the above record, the district court concluded that the officials, via both private and public channels, asked the platforms to remove content, pressed them to change their moderation policies, and threatened them—directly and indirectly—with legal consequences if they did not comply. And, it worked—that "unrelenting pressure" forced the platforms to act and take down users' content. Notably, though, those actions were not limited to private actors. Accounts run by state officials were often subject to censorship, too. For example, one platform removed a post by the Louisiana Department of Justice—which depicted citizens testifying against public policies regarding COVID—for violating its "medical misinformation policy" by "spread[ing] medical misinformation." In another instance, a platform took down a Louisiana state legislator's post discussing COVID vaccines. Similarly, one platform removed several videos, namely

193a

No. 23-30445

testimonials regarding COVID, posted by St. Louis County. So, the district court reasoned, the Plaintiffs were "likely to succeed" on their claim because when the platforms moderated content, they were acting under the coercion (or significant encouragement) of government officials, in violation of the First Amendment, at the expense of both private and governmental actors.

In addition, the court found that considerations of equity weighed in favor of an injunction because of the clear need to safeguard the Plaintiffs' First Amendment rights. Finally, the court ruled that the Plaintiffs had standing to bring suit under several different theories, including direct First Amendment censorship and, for the State Plaintiffs, quasi-sovereign interests as well. Consequently, the district court entered an injunction against the officials barring them from an assortment of activities, including "meeting with," "communicat[ing]" with, or "flagging content" for social-media companies "for the purpose of urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech." The officials appeal.

## II.

We review the district court's standing determination *de novo. Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 507 (5th Cir. 2019). "We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo.* Whether an injunction fulfills the mandates of Fed. R. Civ. P. 65(d) is a question of law we review *de novo.*" *Louisiana v. Biden*, 45 F.4th 841, 845 (5th Cir. 2022) (internal quotation marks and citation omitted).

## III.

We begin with standing. To establish Article III standing, the Plaintiffs bear the burden to show "[1] an injury in fact [2] that is fairly traceable to the challenged action of the defendant and [3] likely to be redressed by [their]

No. 23-30445

requested relief." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Because the Plaintiffs seek injunctive relief, the injury-in-fact and redressability requirements "intersect[]" and therefore the Plaintiffs must "demonstrat[e] a continuing injury or threatened future injury," not a past one. *Id.* "At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citations omitted). The presence of any *one* plaintiff with standing to pursue injunctive relief as to the Plaintiffs' First-Amendment claim satisfies Article III's case-or-controversy requirement. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

## A.

An injury-in-fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). "For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (quoting *Stringer*, 942 F.3d at 721). Past harm can constitute an injury-in-fact for purposes of pursuing injunctive relief if it causes "continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Otherwise, "'[p]ast wrongs are evidence' of the likelihood of a future injury but 'do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy.'" *Crawford*, 1 F.4th at 375 (quoting *Lyons*, 461 U.S. at 102–03) (alteration adopted).

Each of the Individual Plaintiffs has shown *past* injury-in-fact. Bhattacharya's and Kulldorff's sworn declarations allege that their article,

the Great Barrington Declaration, which was critical of the government's COVID-related policies such as lockdowns, was "deboosted" in Google search results and removed from Facebook and Reddit, and that their roundtable discussion with Florida Governor Ron DeSantis concerning mask requirements in schools was removed from YouTube. Kulldorff also claimed censorship of his personal Twitter and LinkedIn accounts due to his opinions concerning vaccine and mask mandates; both accounts were suspended (although ultimately restored). Kheriaty, in his sworn declaration, attested to the fact that his Twitter following was "artificially suppressed" and his posts "shadow bann[ed]" so that they did not appear in his followers' feeds due to his views on vaccine mandates and lockdowns, and that a video of one of his interviews concerning vaccine mandates was removed from YouTube (but ultimately re-posted). Hoft—founder, owner, and operator of news website The Gateway Pundit—submitted a sworn declaration averring that The Gateway Pundit's Twitter account was suspended and then banned for its tweets about vaccine mandates and election fraud, its Facebook posts concerning COVID-19 and election security were either banned or flagged as false or misinformation, and a YouTube video concerning voter fraud was removed. Hoft's declaration included photographic proof of the Twitter and Facebook censorship he had suffered. And Hines's declaration swears that her personal Facebook account was suspended and the Facebook posts of her organization, Health Freedom Louisiana, were censored and removed for their views on vaccine and mask mandates.

The officials do not contest that these past injuries occurred. Instead, they argue that the Individual Plaintiffs have failed to demonstrate that the harm from these past injuries is ongoing or that similar injury is likely to reoccur in the future, as required for standing to pursue injunctive relief. We disagree with both assertions.

All five Individual Plaintiffs have stated in sworn declarations that their prior censorship has caused them to self-censor and carefully word social-media posts moving forward in hopes of avoiding suspensions, bans, and censorship in the future. Kulldorff, for example, explained that he now "restrict[s] what [he] say[s] on social-media platforms to avoid suspension and other penalties." Kheriaty described how he now must be "extremely careful when posting any information on Twitter related to the vaccines, to avoid getting banned" and that he intentionally "limit[s] what [he] say[s] publicly," even "on topics where [he] ha[s] specific scientific and ethical expertise and professional experience." And Hoft notes that, "[t]o avoid suspension and other forms of censorship, [his website] frequently avoid[s] posting content that [it] would otherwise post on social-media platforms, and [] frequently alter[s] content to make it less likely to trigger censorship policies." These lingering effects of past censorship must be factored into the standing calculus. *See Lyons*, 461 U.S. at 102.

As the Supreme Court has recognized, this chilling of the Individual Plaintiffs' exercise of their First Amendment rights is, itself, a constitutionally sufficient injury. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). True, "to confer standing, allegations of chilled speech or self-censorship must arise from a fear of [future harm] that is not imaginary or wholly speculative." *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir. 2018) (internal quotation marks and citation omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm"). But the fears motivating the Individual Plaintiffs' self-censorship, here, are far from hypothetical. Rather, they are grounded in the very real censorship injuries they have previously suffered to their speech on social media, which are "evidence of the likelihood of a future injury." *Crawford*, 1 F.4th at 375 (internal quotation marks and citation

omitted). Supported by this evidence, the Individual Plaintiffs' self-censorship is a cognizable, ongoing harm resulting from their past censorship injuries, and therefore constitutes injury-in-fact upon which those Plaintiffs may pursue injunctive relief. *Lyons*, 461 U.S. at 102.

Separate from their ongoing harms, the Individual Plaintiffs have shown a substantial risk that the injuries they suffered in the past will reoccur. The officials suggest that there is no threat of future injury because "Twitter has stopped enforcing its COVID-related misinformation policy." But this does nothing to mitigate the risk of future harm to the Individual Plaintiffs. Twitter continues to enforce a robust general misinformation policy, and the Individual Plaintiffs seek to express views—and have been censored for their views—on topics well beyond COVID-19, including allegations of election fraud and the Hunter Biden laptop story.[3] Plaintiffs use social-media platforms other than Twitter—such as Facebook and YouTube—which still enforce COVID- or health-specific misinformation policies.[4] And most fundamentally, the Individual Plaintiffs are not seeking to enjoin Twitter's content moderation policies (or those of any other social-media platform, for that matter). Rather, as Plaintiffs' counsel made clear at oral argument, what the Individual Plaintiffs are challenging is the government's *interference with*

---

[3] Notably, Twitter maintains a separate "crisis misinformation policy" which applies to "public health emergencies." *Crisis misinformation policy*, TWITTER (August 2022), https://help.twitter.com/en/rules-and-policies/crisis-misinformation. This policy would presumably apply to COVID-related misinformation if COVID-19 were again classified as a Public Health Emergency, as it was until May 11, 2023. *See End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 5, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html.

[4] *Facebook Community Standards: Misinformation*, META, https://transparency.fb.com/policies/community-standards/misinformation/ (last visited August 11, 2023); *Misinformation policies*, YOUTUBE, https://support.google.com/youtube/topic/10833358 (last visited August 11, 2023).

No. 23-30445

those social-media companies' independent application of their policies. And there is no evidence to suggest that the government's meddling has ceased. To the contrary, the officials' attorney conceded at oral argument that they continue to be in regular contact with social-media platforms concerning content-moderation issues today.

The officials also contend that future harm is unlikely because "all three plaintiffs who suggested that their social-media accounts had been permanently suspended in the past now appear to have active accounts." But as the Ninth Circuit recently recognized, this fact weighs in *Plaintiffs'* favor. In *O'Handley v. Weber*, considering this issue in the context of redressability,[5] the Ninth Circuit explained:

> Until recently, it was doubtful whether [injunctive] relief would remedy [the plaintiff]'s alleged injuries because Twitter had permanently suspended his account, and the requested injunction [against government-imposed social-media censorship] would not change that fact. Those doubts disappeared in December 2022 when Twitter restored his account.

62 F.4th 1145, 1162 (9th Cir. 2023). The same logic applies here. If the Individual Plaintiffs did not currently have active social-media accounts, then there would be no risk of future government-coerced censorship of their speech on those accounts. But since the Individual Plaintiffs continue to be active speakers on social media, they continue to face the very real and imminent threat of government-coerced social-media censorship.

---

[5] When plaintiffs seek injunctive relief, the injury-in-fact and redressability requirements intersect. *Stringer*, 942 F.3d at 720. So, it makes no difference that the Ninth Circuit addressed the issue of reinstated social-media accounts in its redressability analysis while we address it as part of injury-in-fact. The ultimate question is whether there was a sufficient threat of future injury to warrant injunctive relief.

199a

No. 23-30445

Because the Individual Plaintiffs have demonstrated ongoing harm from their past censorship as well as a substantial risk of future harm, they have established an injury-in-fact sufficient to support their request for injunctive relief.

## B.

Turning to the second element of Article III standing, the Individual Plaintiffs were also required to show that their injuries were "fairly traceable" to the challenged conduct of the officials. *Stringer*, 942 F.3d at 720. When, as is alleged here, the "causal relation between [the claimed] injury and [the] challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (internal quotation marks and citation omitted). "To satisfy that burden, the plaintiff[s] must show at the least 'that third parties will likely react in predictable ways.'" *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)).

The officials contend that traceability is lacking because the Individual Plaintiffs' censorship was a result of "independent decisions of social-media companies." This conclusion, they say, is a matter of timing: social-media platforms implemented content-moderation policies in early 2020 and therefore the Biden Administration—which took office in January 2021—"could not be responsible for [any resulting] content moderation." But as we just explained, the Individual Plaintiffs do not challenge the social-media platforms' content-moderation policies. So, the fact that the Individual Plaintiffs' censorship can be traced back, at least in part, to third-party policies that pre-date the current presidential administration is irrelevant. The dispositive question is whether the Individual Plaintiffs' censorship can

200a

No. 23-30445

also be traced to government-coerced *enforcement* of those policies. We agree with the district court that it can be.

On this issue, *Department of Commerce* is instructive. There, a group of plaintiffs brought a constitutional challenge against the federal government's decision to reinstate a citizenship question on the 2020 census. 139 S. Ct. at 2561. Their theory of harm was that, as a result of this added question, noncitizen households would respond to the census at lower rates than citizen households due to fear of immigration-related consequences, which would, in turn, lead to undercounting of population in certain states and a concomitant diminishment in political representation and loss of federal funds. *Id.* at 2565–66. In response, the government presented many of the same causation arguments raised here, contending that any harm to the plaintiffs was "not fairly traceable to the [government]'s decision" but rather "depend[ed] on the independent action of third parties" (*there*, noncitizens refusing to respond to the census; *here*, social-media companies censoring posts) which "would be motivated by unfounded fears that the Federal Government will itself break the law" (*there*, "using noncitizens' answers against them for law enforcement purposes"; *here*, retaliatory enforcement actions or regulatory reform). *Id.* But a unanimous Supreme Court disagreed. As the Court explained, the plaintiffs had "met their burden of showing that third parties will likely react in predictable ways to the citizenship question" because evidence "established that noncitizen households have historically responded to the census at lower rates than other groups" and the district court had "not clearly err[ed] in crediting the . . . theory that the discrepancy [was] likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." *Id.* at 2566.

That logic is directly applicable here. The Individual Plaintiffs adduced extensive evidence that social-media platforms have engaged in censorship of certain viewpoints on key issues and that the government has

engaged in a years-long pressure campaign designed to ensure that the censorship aligned with the government's preferred viewpoints. The district court did not clearly err in crediting the Individual Plaintiffs' theory that the social-media platforms' censorship decisions were likely attributable at least in part to the platforms' reluctance to risk the adverse legal or regulatory consequences that could result from a refusal to adhere to the government's directives. The Individual Plaintiffs therefore met their burden of showing that the social-media platforms will likely react in a predictable way—*i.e.*, censoring speech—in response to the government's actions.

To be sure, there were instances where the social-media platforms *declined* to remove content that the officials had identified for censorship. But predictability does not require certainty, only likelihood. *See Dep't of Com.*, 139 S. Ct. at 2566 (requiring that third parties "will *likely* react in predictable ways"). Here, the Individual Plaintiffs presented extensive evidence of escalating threats—both public and private—by government officials aimed at social-media companies concerning their content-moderation decisions. The district court thus had a sound basis upon which to find a *likelihood* that, faced with unrelenting pressure from the most powerful office in the world, social-media platforms did, and would continue to, bend to the government's will. This determination was not, as the officials contend, based on "unadorned speculation." Rather, it was a logical conclusion based directly on the evidence adduced during preliminary discovery.

## C.

The final element of Article III standing—redressability—required the Individual Plaintiffs to demonstrate that it was "likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted). The redressability analysis focuses on "the relationship between

202a

No. 23-30445

the judicial relief requested and the injury" alleged. *California*, 141 S. Ct. at 2115 (internal quotation marks and citation omitted).

Beginning first with the injury alleged, we have noted multiple times now an important distinction between censorship as a result of social-media platforms' *independent* application of their content-moderation policies, on the one hand, and censorship as a result of social-media platforms' *government-coerced* application of those policies, on the other. As Plaintiffs' counsel made clear at oral argument, the Individual Plaintiffs seek to redress the latter injury, not the former.

The Individual Plaintiffs have not sought to invalidate social-media companies' censorship policies. Rather, they asked the district court to restrain the officials from unlawfully interfering with the social-media companies' independent application of their content-moderation policies. As the Ninth Circuit has also recognized, there is a direct relationship between this requested relief and the injury alleged such that redressability is satisfied. *See O'Handley*, 62 F.4th at 1162.

## D.

We also conclude that the State Plaintiffs are likely to establish direct standing.[6] First, state officials have suffered, and will likely continue to suffer, direct censorship on social media. For example, the Louisiana Department of Justice posted a video showing Louisiana citizens testifying at the State Capitol and questioning the efficacy of COVID-19 vaccines and mask mandates. But one platform removed the video for spreading alleged "medical misinformation" and warned that any subsequent violations would

---

[6] The State Plaintiffs also contend that they have *parens patriae* standing. We do not consider this alternative argument.

result in suspension of the state's account. The state thereafter modified its practices for posting on social media for fear of future censorship injury.

Similarly, another platform took down a Louisiana state legislator's post discussing COVID vaccines. And several videos posted by St. Louis County showing residents discussing COVID policies were removed, too. Acts of this nature continue to this day. In fact, at oral argument, counsel for the State of Louisiana explained that YouTube recently removed a video of counsel, speaking in his official capacity, criticizing the federal government's alleged unconstitutional censorship in this case.[7]

These acts of censorship confer standing for substantially the same reasons as those discussed for the Individual Plaintiffs. That is, they constitute an ongoing injury, and demonstrate a likelihood of future injury, traceable to the conduct of the federal officials and redressable by an injunction against them.

The federal officials admit that these instances of censorship occurred but deny that the State Plaintiffs have standing based on the assertion that "the First Amendment does not confer rights on States." But the Supreme Court has made clear that the government (state and otherwise) has a "right" to speak on its own behalf. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000); *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08 (2015). Perhaps that right derives from a state's sovereign nature, rather than from the First Amendment itself. But regardless of the source of the right, the State

---

[7] These actions are not limited to the State Plaintiffs. On the contrary, other states' officials have offered evidence of numerous other instances where their posts were removed, restricted, or otherwise censored.

204a

No. 23-30445

Plaintiffs sustain a direct injury when the social-media accounts of state officials are censored due to federal coercion.

Federally coerced censorship harms the State Plaintiffs' ability to listen to their citizens as well. This right to listen is "reciprocal" to the State Plaintiffs' right to speak and constitutes an independent basis for the State Plaintiffs' standing here. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 (1976).

Officials from the States of Missouri and Louisiana testified that they regularly use social media to monitor their citizens' concerns. As explained by one Louisiana official:

> [M]ask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year. It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them.

And a Missouri official testified to several examples of critical speech on an important topic that he was not able to review because it was censored:

> [O]ne parent who posted on nextdoor.com (a neighborhood networking site operated by Facebook) an online petition to encourage his school to remain mask-optional found that his posts were quietly removed without notifying him, and his online friends never saw them. Another parent in the same school district who objected to mask mandates for schoolchildren responded to Dr. Fauci on Twitter, and promptly received a warning from Twitter that his account would be banned if he did not delete the tweets criticizing Dr. Fauci's approach to mask mandates. These examples are just the sort of online speech by Missourians that it is important for me and the Missouri Attorney General's Office to be aware of.

No. 23-30445

The Government does not dispute that the State Plaintiffs have a crucial interest in listening to their citizens. Indeed, the CDC's own witness explained that if content were censored and removed from social-media platforms, government communicators would not "have the full picture" of what their citizens' true concerns are. So, when the federal government coerces or substantially encourages third parties to censor certain viewpoints, it hampers the states' right to hear their constituents and, in turn, reduces their ability to respond to the concerns of their constituents. This injury, too, means the states likely have standing. *See Va. State Bd. of Pharm.*, 425 U.S. at 757.

\* \* \*

The Plaintiffs have standing because they have demonstrated ongoing harm from past social-media censorship and a likelihood of future censorship, both of which are injuries traceable to government-coerced enforcement of social-media platforms' content-moderation policies and redressable by an injunction against the government officials. We therefore proceed to the merits of Plaintiffs' claim for injunctive relief.[8]

## IV.

A party seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) there is a "substantial threat" they will suffer an "irreparable injury" otherwise, (3) the potential injury "outweighs any harm that will result" to the other side, and (4) an injunction will not "disserve the public interest." *Atchafalaya Basinkeeper* v. *U.S. Army*

---

[8] The Individual Plaintiffs' standing and the State Plaintiffs' standing provide independent bases upon which the Plaintiffs' injunctive-relief claim may proceed since there need be only one plaintiff with standing to satisfy the requirements of Article III. *Rumsfeld*, 547 U.S. at 52 n.2.

206a

No. 23-30445

*Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citing *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010)). Of course, a "preliminary injunction is an extraordinary remedy," meaning it should not be entered lightly. *Id.*

We start with likelihood of success. The Plaintiffs allege that federal officials ran afoul of the First Amendment by coercing and significantly encouraging "social-media platforms to censor disfavored [speech]," including by "threats of adverse government action" like antitrust enforcement and legal reforms. We agree.

## A.

The government cannot abridge free speech. U.S. Const. amend. I. A private party, on the other hand, bears no such burden—it is "not ordinarily constrained by the First Amendment." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). That changes, though, when a private party is coerced or significantly encouraged by the government to such a degree that its "choice"—which if made by the government would be unconstitutional, *Norwood v. Harrison*, 413 U.S. 455, 465 (1973)—"must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Barnes v. Lehman*, 861 F.2d 1383, 1385–36 (5th Cir. 1988).[9] This is known as the close nexus test.[10]

---

[9] That makes sense: First Amendment rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).

[10] Note that, at times, we have called this test by a few other names. *See, e.g.*, *Frazier v. Bd. of Trustees of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1284 (5th Cir. 1985) ("the fair attribution test"); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999) ("The state compulsion (or coercion) test"). We settle that dispute now—it is the close nexus test. *Am. Mfrs.*, 526 U.S. at 52 (a "close nexus" is required). In addition, some of our past decisions

207a

No. 23-30445

Under that test, we "begin[] by identifying 'the specific conduct of which the plaintiff complains.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (quoting *Blum*, 457 U.S. at 1004 ("Faithful adherence to the 'state action' requirement . . . requires careful attention to the gravamen of the plaintiff's complaint.")). Then, we ask whether the government sufficiently induced that act. Not just any coaxing will do, though. After all, "the government can speak for itself," which includes the right to "advocate and defend its own policies." *Southworth*, 529 U.S. at 229; *see also Walker*, 576 U.S. at 207. But, on one hand there is persuasion, and on the other there is coercion and significant encouragement—two distinct means of satisfying the close nexus test. *See Louisiana Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020) (per curiam) ("Responding agreeably to a request and being all but forced by the coercive power of a governmental official are different categories of responses . . ."). Where we draw that line, though, is the question before us today.

## 1.

We start with encouragement. To constitute "significant encouragement," there must be such a "close nexus" between the parties that the government is practically "*responsible*" for the challenged decision. *Blum*, 457 U.S. at 1004 (emphasis in original). What, then, is a close nexus? We know that "the mere fact that a business is subject to state regulation" is not sufficient. *Id*. (alteration adopted) (citation omitted); *Halleck*, 139 S. Ct. at 1932 ("Put simply, being regulated by the State does not make one a state actor."). And, it is well established that the government's "[m]ere approval of or acquiescence in" a private party's actions is not enough either. *Blum*,

---

have confused this test with the joint action test, *see Bass*, 180 F.3d at 242, but the two are separate tests with separate considerations.

457 U.S. at 1004–05. Instead, for encouragement, we find that the government must exercise some active, meaningful control over the private party's decision.

Take *Blum v. Yaretsky*. There, the Supreme Court found there was no state action because a decision to discharge a patient—even if it followed from the "requir[ed] completion of a form" under New York law—was made by private physicians, not the government. *Id.* at 1006–08. The plaintiff argued that, by regulating and overseeing the facility, the government had "affirmatively command[ed]" the decision. *Id.* at 1005. The Court was not convinced—it emphasized that "physicians, [] not the forms, make the decision" and they do so under "professional standards that are not established by the State." *Id.* Similarly, in *Rendell-Baker v. Kohn* the Court found that a private school—which the government funded and placed students at—was not engaged in state action because the conduct at issue, namely the decision to fire someone, "[was] not . . . influenced by any state regulation." 457 U.S. 830, 841 (1982).

Compare that, though, to *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984). There, we held that a horseracing club's action was attributable to the state because the Louisiana government—through legal and informal supervision—was overly involved in the decision to deny a racer a stall. *Id.* at 224. "Something more [was] present [] than simply extensive regulation of an industry, or passive approval by a state regulatory entity of a decision by a regulated business." *Id.* at 228. Instead, the stalling decision was made partly by the "racing secretary," a legislatively created position accompanied by expansive supervision from on-site state officials who had the "power to override decisions" made by the club's management. *Id.* So, even though the secretary was plainly a "private employee" paid by the club, the state's extensive oversight—coupled with *some* level of authority on the part of the state—meant that the club's choice was not fully independent or

No. 23-30445

made wholly subject to its own policies. *Id.* at 227–28. So, this case is on the opposite end of the state-involvement spectrum to *Blum*.

Per *Blum* and *Roberts*, then, significant encouragement requires "[s]omething more" than uninvolved oversight from the government. *Id.* at 228. After all, there must be a "close nexus" that renders the government practically "*responsible*" for the decision. *Blum*, 457 U.S. at 1004. Taking that in context, we find that the clear throughline for encouragement in our caselaw is that there must be *some* exercise of *active* (not passive), *meaningful* (impactful enough to render them responsible) *control* on the part of the government over the private party's challenged decision. Whether that is (1) entanglement in a party's independent decision-making or (2) direct involvement in carrying out the decision itself, the government must encourage the decision to such a degree that we can fairly say it was the state's choice, not the private actor's. *See id.*; *Roberts*, 742 F.2d at 224; *Rendell-Baker*, 457 U.S. at 841 (close nexus test is met if action is "compelled or [] *influenced*" by the state (emphasis added)); *Frazier*, 765 F.2d at 1286 (significant encouragement is met when "the state has had some affirmative role, albeit one of encouragement short of compulsion," in the decision).[11]

---

[11] This differs from the "joint action" test that we have considered in other cases. Under that doctrine, a private party may be considered a state actor when it "operates as a 'willful participant in joint activity with the State or its agents.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 941 (1982)). The difference between the two lies primarily in the degree of the state's involvement.

Under the joint action test, the level of integration is *very high*—there must be "pervasive entwinement" between the parties. *Id.* at 298. That is integration to such a degree that "will support a conclusion that an ostensibly private organization ought to be charged with a *public character*." *Id.* at 302 (emphasis added) (finding state action by athletic association when public officials served on the association's board, public institutions provided most of the association's funding, and the association's employees received public benefits); *see also Rendell-Baker*, 457 U.S. at 842 (requiring a "symbiotic

No. 23-30445

Take *Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544 (5th Cir. 1988). There, a group of onion growers—by way of state picketing laws and local officials—shut down a workers' strike. *Id.* at 548–49. We concluded that the growers' "activity"—axing the strike—"while not compelled by the state, was so *significantly encouraged*, both overtly and covertly, that the choice must in law be deemed to be that of the state." *Id.* at 555 (alterations adopted) (citation and quotation marks omitted)

---

relationship"); *Frazier*, 765 F.2d at 1288 & n.22 (explaining that although the joint action test involves the government playing a "meaningful role" in the private actor's decision, that role must be part of a "functionally symbiotic" relationship that is so extensive that "*any act* of the private entity will be fairly attributable to the state even if it cannot be shown that the government played a direct role in the *particular* action challenged." (emphases added)).

Under the close nexus test, however, the government is not deeply intertwined with the private actor as a whole. Instead, the state is involved in only one facet of the private actor's operations—its decision-making process regarding the *challenged* conduct. *Roberts*, 742 F.2d at 224; *Howard Gault*, 848 F.2d at 555. That is a much narrower level of integration. *See Roberts*, 742 F.2d at 228 ("We do not today hold that the state and Louisiana Downs are in such a relationship that all acts of the track constitute state action, nor that all acts of the racing secretary constitute state action," but instead that "[i]n the area of stalling, . . . state regulation and involvement is so specific and so pervasive that [such] decisions may be considered to bear the imprimatur of the state."). Consequently, the showings required by a plaintiff differ. Under the joint action test, the plaintiff must prove substantial integration between the two entities *in toto*. For the close nexus test, the plaintiff instead must only show significant involvement from the state in the *particular* challenged action.

Still, there is admittedly *some* overlap between the tests. *See Brentwood*, 531 U.S. at 303 ("'Coercion' and 'encouragement' are like 'entwinement' in referring to kinds of facts that can justify characterizing an ostensibly private action as public instead. Facts that address any of these criterion are significant, but no one criterion must necessarily be applied. When, therefore, the relevant facts show pervasive entwinement to the point of largely overlapping identity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test."). But, that is to be expected— these tests are not "mechanical[ly]" applied. *Roberts*, 742 F.2d at 224.

(emphasis added).[12] Specifically, "[i]t was the heavy participation of state and state officials," including local prosecutors and police officers, "that [brought] [the conduct] under color of state law." *Id.* In other words, the officials were directly involved in carrying out the challenged decision. That satisfied the requirement that, to encourage a decision, the government must exert some meaningful, active control over the private party's decision.

Our reading of what encouragement means under the close nexus test tracks with other federal courts, too. For example, the Ninth Circuit reads the close nexus test to be satisfied when, through encouragement, the government "overwhelm[s] the private party['s]" choice in the matter, forcing it to "act in a certain way." *O'Handley*, 62 F.4th at 1158; *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 751 (9th Cir. 2020) ("A finding that individual state actors or other state requirements literally 'overrode' a nominally private defendant's independent judgment might very well provide relevant information."). That analysis, much like meaningful control, asks whether a decision "was the result of [a party's] own independent judgment." *O'Handley*, 62 F.4th at 1159.

## 2.

Next, we take coercion—a separate and distinct means of satisfying the close nexus test. Generally speaking, if the government compels the

---

[12] We note that although state-action caselaw seems to deal most often with § 1983 (*i.e.*, the under-color-of-law prong) and the Fourteenth Amendment, there is no clear directive from the Supreme Court that any variation in the law or government at issue changes the state-action analysis. *See Blum*, 457 U.S. at 1004. In fact, we have expressly rejected such ideas. *See Miller v. Hartwood Apartments, Ltd.*, 689 F.2d 1239, 1243 (5th Cir. 1982) ("Although the *Blum* decision turned on § 1983, we find the determination of federal action to rest on the same general principles as determinations of state action."); *Barnes*, 861 F.2d at 1385 ("The analysis of state action under the Fourteenth Amendment and the analysis of action under color of state law may coincide for purposes of § 1983.").

No. 23-30445

private party's decision, the result will be considered a state action. *Blum*, 457 U.S. at 1004. So, what is coercion? We know that simply "being regulated by the State does not make one a state actor." *Halleck*, 139 S. Ct. at 1932. Coercion, too, must be something more. But, distinguishing coercion from persuasion is a more nuanced task than doing the same for encouragement. Encouragement is evidenced by an exercise of active, meaningful control, whether by entanglement in the party's decision-making process or direct involvement in carrying out the decision itself. Therefore, it may be more noticeable and, consequently, more distinguishable from persuasion. Coercion, on the other hand, may be more subtle. After all, the state may advocate—even forcefully—on behalf of its positions. *Southworth*, 529 U.S. at 229.

Consider a Second Circuit case, *National Rifle Ass'n v. Vullo*, 49 F.4th 700 (2d Cir. 2022). There, a New York state official "urged" insurers and banks via strongly worded letters to drop the NRA as a client. *Id.* at 706. In those letters, the official alluded to reputational harms that the companies would suffer if they continued to support a group that has allegedly caused or encouraged "devastation" and "tragedies" across the country. *Id.* at 709. Also, the official personally told a few of the companies in a closed-door meeting that she "was less interested in pursuing the [insurers' regulatory] infractions . . . so long as [they] ceased" working with the NRA. *Id.* at 718. Ultimately, the Second Circuit found that both the letters and the statement did not amount to coercion, but instead "permissible government speech." *Id.* at 717, 719. In reaching that decision, the court emphasized that "[a]lthough she did have regulatory authority over the target audience," the official's letters were written in a "nonthreatening tone" and used persuasive, non-intimidating language. *Id.* at 717. Relatedly, while she referenced "adverse consequences" if the companies did not comply, they were only "reputational risks"—there was no intimation that "punishment

213a

No. 23-30445

or adverse regulatory action would follow the failure to accede to the request." *Id.* (alterations adopted). As for the "so long as" statement, the Second Circuit found that—when viewed in "context"—the official was merely "negotiating[] and resolving [legal] violations," a legitimate power of her office.[13] *Id.* at 718–19. Because she was only "carrying out her regulatory responsibilities" and "engaging in legitimate enforcement action," the official's references to infractions were not coercive. *Id.* Thus, the Second Circuit found that *seemingly* threatening language was actually permissible government advocacy.

That is not to say that coercion is *always* difficult to identify. Sometimes, coercion is obvious. Take *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). There, the Rhode Island Commission to Encourage Morality—a state-created entity—sought to stop the distribution of obscene books to kids. *Id.* at 59. So, it sent a letter to a book distributor with a list of verboten books and requested that they be taken off the shelves. *Id.* at 61–64. That request conveniently noted that compliance would "eliminate the necessity of our recommending prosecution to the Attorney General's department." *Id.* at 62 n.5. Per the Commission's request, police officers followed up to make sure the books were removed. *Id.* at 68. The Court concluded that this "system of informal censorship," which was "clearly [meant] to intimidate" the recipients through "threat of [] legal sanctions and other means of coercion" rendered the distributors' decision to remove the books a state action. *Id.* at 64, 67, 71–72. Given *Bantam Books*, not-so

---

[13] Apparently, the companies had previously issued "illegal insurance policies— programs created and endorsed by the NRA"—that covered litigation defense costs resulting from any firearm-related injury or death, in violation of New York law. *Vullo*, 49 F.4th at 718. The court reasoned that the official had the power to bring those issues to a close.

214a

No. 23-30445

subtle asks accompanied by a "system" of pressure (*e.g.*, threats and follow-ups) are clearly coercive.

Still, it is rare that coercion is so black and white. More often, the facts are complex and sprawling as was the case in *Vullo*. That means it can be quite difficult to parse out coercion from persuasion. We, of course, are not the first to recognize this. In that vein, the Second Circuit has crafted a four-factor test that distills the considerations of *Bantam Books* into a workable standard. We, lacking such a device, adopt the Second Circuit's approach as a helpful, non-exclusive tool for completing the task before us, namely identifying when the state's messages cross into impermissible coercion.

The Second Circuit starts with the premise that a government message is coercive—as opposed to persuasive—if it "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Vullo*, 49 F.4th at 715 (quotation marks and citation omitted). To distinguish such "attempts to coerce" from "attempts to convince," courts look to four factors, namely (1) the speaker's "word choice and tone"; (2) "whether the speech was perceived as a threat"; (3) "the existence of regulatory authority"; and, "perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* (citations omitted). Still, "[n]o one factor is dispositive." *Id.* (citing *Bantam Books*, 372 U.S. at 67). For example, the Second Circuit found in *Vullo* that the state officials' communications were not coercive because, in part, they were not phrased in an intimidating manner and only referenced reputational harms—an otherwise acceptable consequence for a governmental actor to threaten. *Id.* at 717, 719.

The Ninth Circuit has also adopted the four-factor approach and, in doing so, has cogently spelled out the nuances of each factor. Consider *Kennedy v. Warren*, 66 F.4th 1199 (9th Cir. 2023). There, Senator Elizabeth

215a

No. 23-30445

Warren penned a letter to Amazon asking it to stop selling a "false or misleading" book on COVID. *Id.* at 1204. The senator stressed that, by selling the book, Amazon was "providing consumers with false and misleading information" and, in doing so, was pursuing what she described as "an unethical, unacceptable, and potentially unlawful course of action." *Id.* So, she asked it to do better, including by providing a "public report" on the effects of its related sales algorithms and a "plan to modify these algorithms so that they no longer" push products peddling "COVID-19 misinformation." *Id.* at 1205. The authors sued, but the Ninth Circuit found no state action.

The court, lamenting that it can "be difficult to distinguish" between persuasion and coercion, turned to the Second Circuit's "useful non-exclusive" four-factor test. *Id.* at 1207. First, the court reasoned that the senator's letter, although made up of "strong rhetoric," was framed merely as a "request rather than a command." *Id.* at 1208. Considering both the text and the "tenor" of the parties' relationship, the court concluded that the letter was not unrelenting, nor did it "suggest[] that compliance was the only realistic option." *Id.* at 1208–09.

Second, and relatedly, even if she had said as much, the senator lacked regulatory authority—she "ha[d] no unilateral power to penalize Amazon." *Id.* at 1210. Still, the sum of the second prong is more than just power. Given that the overarching purpose of the four-factor test is to ask if the speaker's message can "reasonably be construed" as a "threat of adverse consequences," the lack of power is "certainly relevant." *Id.* at 1209–10. After all, the "absence of authority influences how a reasonable person would read" an official's message. *Id.* at 1210; *see also Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) (finding no government coercion where city official lacked "the power to impose sanctions on merchants who did not respond to [his] requests") (citing *Bantam Books*, 372 U.S. at 71). For

216a

No. 23-30445

example, in *Warren*, it would have been "unreasonable" to believe, given Senator Warren's position "as a single Senator" who was "removed from the relevant levers of power," that she could exercise any authority over Amazon. 66 F.4th at 1210.

Still, the "lack of direct authority" is not entirely dispositive. *Id.* Because—per the Second and Ninth Circuits—the key question is whether a message can "reasonably be construed as coercive," *id.* at 1209,[14] a speaker's power over the recipient need not be clearly defined or readily apparent, so long as it can be reasonably said that there is *some* tangible power lurking in the background. *See Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (finding a private party "could reasonably have believed" it would face retaliation if it ignored a borough president's request because "[e]ven though [he] lacked direct regulatory control," there was an "implicit threat" that he would "use whatever authority he does have . . . to interfere" with the party's cashflow). That, of course, was not present in *Warren*. So, the second prong was easily resolved against state action.

Third, the senator's letter "contain[ed] no explicit reference" to "adverse consequences."[15] 66 F.4th at 1211. And, beyond that, no "threat

---

[14] According to the Ninth Circuit, that tracks with its precedent. "[I]n *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987), [they] held that a deputy county attorney violated the First Amendment by threatening to prosecute a telephone company if it continued to carry a salacious dial-a-message service." *Warren*, 66 F.4th at 1207. But, "in *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002), [they] held that San Francisco officials did not violate the First Amendment when they criticized religious groups' anti-gay advertisements and urged television stations not to broadcast the ads." *Id.* The rub, per the court, was that "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction." *Id.*

[15] The Ninth Circuit emphasized that officials may advocate for positions, including by "[g]enerating public pressure to motivate others to change their behavior."

217a

No. 23-30445

[was] clear from the context." *Id.* To be sure, an "official does not need to say 'or else,'" but there must be some message—even if "unspoken"—that can be reasonably construed as intimating a threat. *Id.* at 1211–12. There, when read "holistically," the senator only implied that Amazon was "morally complicit" in bad behavior, nothing more. *Id.* at 1212.

Fourth, there was no indication that Amazon perceived the message as a threat. There was "no evidence" it "changed its algorithms"—"let alone that it felt compelled to do so"—as a result of the senator's urgings. *Id.* at 1211. Admittedly, it is not required that the recipient "bow[] to government pressure," but courts are more likely to find coercion if there is "some indication" that the message was "understood" as a threat, such as evidence of actual change. *Id.* at 1210–11. In *Warren*, it was apparent (and there was no sense to the contrary) that the minor policy change the company did make stemmed from reputational concerns, not "fears of liability in a court of law." *Id.* at 1211. Considering the above, the court found that the senator's message amounted to an attempt at persuasion, not coercion.

**3.**

To sum up, under the close nexus test, a private party's conduct may be state action if the government coerced *or* significantly encouraged it. *Blum*, 457 U.S. at 1004. Although this test is not mechanical, *see Roberts*, 742 F.2d at 224 (noting that state action is "essentially [a] factual determination" made by "sifting facts and weighing circumstances case by case to determine if there is a sufficient nexus between the state and the particular aspect of the

---

*Warren*, 66 F.4th at 1208. In that vein, it dismissed any references to "potential legal liability" because those statements do not necessarily "morph an effort to persuade into an attempt to coerce." *Id.* at 1209 (citing *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1165 (10th Cir. 2021)). Instead, there must be "clear allegation[s] of legal violations or threat[s] of specific enforcement actions." *Id.*

private individual's conduct which is complained of" (citation and quotation marks omitted)), there are clear, although not exclusive, ways to satisfy either prong.

For encouragement, we read the law to require that a governmental actor exercise active, meaningful control over the private party's decision in order to constitute a state action. That reveals itself in (1) entanglement in a party's independent decision-making or (2) direct involvement in carrying out the decision itself. *Compare Roberts*, 742 F.2d at 224 (state had such "continuous and intimate involvement" and supervision over horseracing decision that, when coupled with its authority over the actor, it was considered a state action) *and Howard Gault*, 848 F.2d at 555 (state eagerly, and effectively, assisted a private party in shutting down a protest), *with Blum*, 457 U.S. at 1008 (state did not sufficiently influence the decision as it was made subject to independent standards). In any of those scenarios, the state has such a "close nexus" with the private party that the government actor is practically "*responsible*" for the decision, *Blum*, 457 U.S. at 1004, because it has necessarily encouraged the private party to act and, in turn, commandeered its independent judgment, *O'Handley*, 62 F.4th at 1158–59.

For coercion, we ask if the government compelled the decision by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply. *Vullo*, 49 F.4th at 715. Sometimes, that is obvious from the facts. *See, e.g.*, *Bantam Books*, 372 U.S. at 62–63 (a mafiosi-style threat of referral to the Attorney General accompanied with persistent pressure and follow-ups). But, more often, it is not. So, to help distinguish permissible persuasion from impermissible coercion, we turn to the Second (and Ninth) Circuit's four-factor test. Again, honing in on whether the government "intimat[ed] that some form of punishment" will follow a "failure to accede," we parse the speaker's messages to assess the (1) word choice and tone, including the overall "tenor" of the parties' relationship;

219a

No. 23-30445

(2) the recipient's perception; (3) the presence of authority, which includes whether it is reasonable to fear retaliation; and (4) whether the speaker refers to adverse consequences. *Vullo*, 49 F.4th at 715; *see also Warren*, 66 F.4th at 1207.

Each factor, though, has important considerations to keep in mind. For word choice and tone, "[a]n interaction will tend to be more threatening if the official refuses to take 'no' for an answer and pesters the recipient until it succumbs." *Warren*, 66 F.4th at 1209 (citing *Bantam Books*, 372 U.S. at 62–63). That is so because we consider the overall "tenor" of the parties' relationship. *Id.* For authority, there is coercion even if the speaker lacks present ability to act so long as it can "reasonably be construed" as a threat worth heeding. *Compare id.* at 1210 (single senator had no worthwhile power over recipient, practical or otherwise), *with Okwedy*, 333 F.3d at 344 (although local official lacked direct power over the recipient, company "could reasonably have believed" from the letter that there was "an implicit threat" and that he "would use whatever authority he does have" against it).

As for perception, it is not necessary that the recipient "admit that it bowed to government pressure," nor is it even "necessary for the recipient to have complied with the official's request"—"a credible threat may violate the First Amendment even if 'the victim ignores it, and the threatener folds his tent.'" *Warren*, 66 F.4th at 1210 (quoting *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015)). Still, a message is more likely to be coercive if there is *some* indication that the party's decision resulted from the threat. *Id.* at 1210–11. Finally, as for adverse consequences, the government need not speak its threat aloud if, given the circumstances, it is fair to say that the message intimates *some* form of punishment. *Id.* at 1209. If these factors weigh in favor of finding the government's message coercive, the coercion test is met, and the private party's resulting decision is a state action.

No. 23-30445

## B.

With that in mind, we turn to the case at hand. We start with "the specific conduct of which the plaintiff complains." *Am. Mfrs.*, 526 U.S. at 51. Here, that is "censor[ing] disfavored speakers and viewpoints" on social media. The Plaintiffs allege that the "Defendants [] coerced, threatened, and pressured social-media platforms"—via "threats of adverse government action" like increased regulation, antitrust enforcement, and changes to Section 230—to make those censorship decisions. That campaign, per the Plaintiffs, was multi-faceted—the officials "publicly threaten[ed] [the] companies" while they privately piled on "unrelenting pressure" via "demands for greater censorship." And they succeeded—the platforms censored disfavored content.

The officials do not deny that they worked alongside the platforms. Instead, they argue that their conduct—asking or trying to persuade the platforms to act—was permissible government speech. So, we are left with the task of sifting out any coercion and significant encouragement from their attempts at persuasion. Here, there were multiple speakers and messages. Taking that in context, we apply the law to one set of officials at a time, starting with the White House and Office of the Surgeon General.

## 1.

We find that the White House, acting in concert with the Surgeon General's office, likely (1) coerced the platforms to make their moderation decisions by way of intimidating messages and threats of adverse consequences, and (2) significantly encouraged the platforms' decisions by commandeering their decision-making processes, both in violation of the First Amendment.

Generally speaking, officials from the White House and the Surgeon General's office had extensive, organized communications with platforms.

221a

No. 23-30445

They met regularly, traded information and reports, and worked together on a wide range of efforts. That working relationship was, at times, sweeping. Still, those facts alone likely are not problematic from a First-Amendment perspective. But, the relationship between the officials and the platforms went beyond that. In their communications with the platforms, the officials went beyond advocating for policies, *Southworth,* 529 U.S. at 229, or making no-strings-attached requests to moderate content, *Warren,* 66 F.4th at 1209. Their interaction was "something more." *Roberts*, 742 F.2d at 228.

We start with coercion. On multiple occasions, the officials coerced the platforms into direct action via urgent, uncompromising demands to moderate content. Privately, the officials were not shy in their requests—they asked the platforms to remove posts "ASAP" and accounts "immediately," and to "slow[] down" or "demote[]" content. In doing so, the officials were persistent and angry. *Cf. Bantam Books*, 372 U.S. at 62–63. When the platforms did not comply, officials followed up by asking why posts were "still up," stating (1) "how does something like [this] happen," (2) "what good is" flagging if it did not result in content moderation, (3) "I don't know why you guys can't figure this out," and (4) "you are hiding the ball," while demanding "assurances" that posts were being taken down. And, more importantly, the officials threatened—both expressly and implicitly—to retaliate against inaction. Officials threw out the prospect of legal reforms and enforcement actions while subtly insinuating it would be in the platforms' best interests to comply. As one official put it, "removing bad information" is "one of the easy, low-bar things you guys [can] do to make people like me"—that is, White House officials—"think you're taking action."

That alone may be enough for us to find coercion. Like in *Bantam Books*, the officials here set about to force the platforms to remove metaphorical books from their shelves. It is uncontested that, between the White House and the Surgeon General's office, government officials asked

222a

No. 23-30445

the platforms to remove undesirable posts and users from their platforms, sent follow-up messages of condemnation when they did not, and publicly called on the platforms to act. When the officials' demands were not met, the platforms received promises of legal regime changes, enforcement actions, and other unspoken threats. That was likely coercive. *See Warren*, 66 F.4th at 1211–12.

That being said, even though coercion may have been readily apparent here, we find it fitting to consult the Second Circuit's four-factor test for distinguishing coercion from persuasion. In asking whether the officials' messages can "reasonably be construed" as threats of adverse consequences, we look to (1) the officials' word choice and tone; (2) the recipient's perception; (3) the presence of authority; and (4) whether the speaker refers to adverse consequences. *Vullo*, 49 F.4th at 715; *see also Warren*, 66 F.4th at 1207.

First, the officials' demeanor. We find, like the district court, that the officials' communications—reading them in "context, not in isolation"— were on-the-whole intimidating. *Warren*, 66 F.4th at 1208. In private messages, the officials demanded "assurances" from the platforms that they were moderating content in compliance with the officials' requests, and used foreboding, inflammatory, and hyper-critical phraseology when they seemingly did not, like "you are hiding the ball," you are not "trying to solve the problem," and we are "gravely concerned" that you are "one of the top drivers of vaccine hesitancy." In public, they said that the platforms were irresponsible, let "misinformation [] poison" America, were "literally costing . . . lives," and were "killing people." While officials are entitled to "express their views and rally support for their positions," the "word choice and tone" applied here reveals something more than mere requests. *Id.* at 1207–08.

44

223a

No. 23-30445

Like *Bantam Books*—and unlike the requests in *Warren*—many of the officials' asks were "phrased virtually as orders," 372 U.S. at 68, like requests to remove content "ASAP" or "immediately." The threatening "tone" of the officials' commands, as well as of their "overall interaction" with the platforms, is made all the more evident when we consider the persistent nature of their messages. Generally speaking, "[a]n interaction will tend to be more threatening if the official refuses to take 'no' for an answer and pesters the recipient until it succumbs." *Warren*, 66 F.4th at 1209 (citing *Bantam Books*, 372 U.S. at 62–63). Urgency can have the same effect. *See Backpage.com*, 807 F.3d at 237 (finding the "urgency" of a sheriff's letter, including a follow-up, "imposed another layer of coercion due to its strong suggestion that the companies could not simply ignore" the sheriff), *cert. denied*, 137 S. Ct. 46 (2016). Here, the officials' correspondences were both persistent and urgent. They sent repeated follow-up emails, whether to ask why a post or account was "still up" despite being flagged or to probe deeper into the platforms' internal policies. On the latter point, for example, one official asked at least *twelve* times for detailed information on Facebook's moderation practices and activities. Admittedly, many of the officials' communications are not by themselves coercive. But, we do not take a speaker's communications "in isolation." *Warren*, 66 F.4th at 1208. Instead, we look to the "tenor" of the parties' relationship and the conduct of the government in context. *Id.* at 1209. Given their treatment of the platforms as a whole, we find the officials' tone and demeanor was coercive, not merely persuasive.

Second, we ask how the platforms perceived the communications. Notably, "a credible threat may violate the First Amendment even if 'the victim ignores it, and the threatener folds his tent.'" *Id.* at 1210 (quoting *Backpage.com*, 807 F.3d at 231). Still, it is more likely to be coercive if there is some evidence that the recipient's subsequent conduct is *linked* to the

official's message. For example, in *Warren*, the Ninth Circuit court concluded that Amazon's decision to stop advertising a specific book was "more likely . . . a response to widespread concerns about the spread of COVID-19," as there was "no evidence that the company changed [course] in response to Senator Warren's letter." *Id.* at 1211. Here, there is plenty of evidence—both direct and circumstantial, considering the platforms' contemporaneous actions—that the platforms were influenced by the officials' demands. When officials asked for content to be removed, the platforms took it down. And, when they asked for the platforms to be more aggressive, "interven[e]" more often, take quicker actions, and modify their "internal policies," the platforms did—and they sent emails and assurances confirming as much. For example, as was common after public critiques, one platform assured the officials they were "committed to addressing the [] misinformation that you've called on us to address" after the White House issued a public statement. Another time, one company promised to make an employee "available on a regular basis" so that the platform could "automatically prioritize" the officials' requests after criticism of the platform's response time. Yet another time, a platform said it was going to "adjust [its] policies" to include "specific recommendations for improvement" from the officials, and emailed as much because they "want[ed] to make sure to keep you informed of our work on each" change. Those are just a few of many examples of the platforms changing—and acknowledging as much—their course as a direct result of the officials' messages.

Third, we turn to whether the speaker has "authority over the recipient." 66 F.4th at 1210. Here, that is clearly the case. As an initial matter, the White House wields significant power in this Nation's constitutional landscape. It enforces the laws of our country, U.S. CONST. art. II, and—as the head of the executive branch—directs an army of federal

225a

No. 23-30445

agencies that create, modify, and enforce federal regulations. We can hardly say that, like the senator in *Warren*, the White House is "removed from the relevant levers of power." 66 F.4th at 1210. At the very least, as agents of the executive branch, the officials' powers track somewhere closer to those of the commission in *Bantam Books*—they were legislatively given the power to "investigate violations[] and recommend prosecutions." *Id.* (citing *Bantam Books*, 372 U.S. at 66).

But, authority over the recipient does not have to be a clearly-defined ability to act under the close nexus test. Instead, a generalized, non-descript means to punish the recipient may suffice depending on the circumstances. As the Ninth Circuit explained in *Warren*, a message may be "*inherently coercive*" if, for example, it was conveyed by a "law enforcement officer" or "penned by an executive official with unilateral power." *Id.* (emphasis added). In other words, a speaker's power may stem from an inherent authority over the recipient. *See, e.g.*, *Backpage.com*, 807 F.3d 229. That reasoning is likely applicable here, too, given the officials' executive status.

It is not even necessary that an official have direct power over the recipient. Even if the officials "lack[ed] direct authority" over the platforms, the cloak of authority may still satisfy the authority prong. *See Warren*, 66 F.4th at 1210. After all, we ask whether a "reasonable person" would be threatened by an official's statements. *Id.* Take, for example, *Okwedy*. There, a borough president penned a letter to a company—which, per the official, owned a "number of billboards on Staten Island and derive[d] substantial economic benefits from them"—and "call[ed] on [them] as a responsible member of the business community to please contact" his "legal counsel." 333 F.3d at 342. The Second Circuit found that, even though the official "lacked direct regulatory authority" or control over the company, an "implicit threat" flowed from his letter because he had *some* innate authority to affect the company. *Id.* at 344. The Second Circuit noted that "[a]lthough

the existence of regulatory or other direct decisionmaking authority is certainly relevant to the question of whether a government official's comments were unconstitutionally threatening or coercive, a defendant without such direct regulatory or decisionmaking authority can also exert an impermissible type or degree of pressure." *Id.* at 343.

Consider another example, *Backpage.com*. There, a sheriff sent a cease-and-desist letter to credit card companies—which he admittedly "had no authority to take any official action" against—to stop doing business with a website. 807 F.3d at 230, 236. "[E]ven if the companies understood the jurisdictional constraints on [the sheriff]'s ability to proceed against them directly," the sheriff's letter was still coercive because, among other reasons, it "invok[ed] the legal obligations of [the recipients] to cooperate with law enforcement," and the sheriff could easily "refer the credit card companies to the appropriate authority to investigate" their dealings,[16] much like a White House official could contact the Department of Justice. *Id.* at 236–37.

True, the government can "appeal[]" to a private party's "interest in avoiding liability" so long as that reference is not meant to intimidate or compel. *Id.* at 237; *see also Vullo*, 49 F.4th at 717–19 (statements were non-coercive because they referenced legitimate use of powers in a

---

[16] This was true even though the financial institutions were large, sophisticated, and presumably understood the federal authorities were unlikely to prosecute the companies. *Backpage.com*, 807 F.3d at 234. As the Seventh Circuit explained, it was still in the credit card companies' financial interests to comply. Backpage's measly $135 million in annual revenue was a drop in the bucket of the financial service companies' combined net revenue of $22 billion. *Id.* at 236. Unlike credit card processors that at least made money servicing Backpage, social-media platforms typically depend on advertisers, not their users, for revenue. *Cf. Wash. Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019) (holding campaign finance regulations on online ads unconstitutional where they "ma[de] it financially irrational, generally speaking, for platforms to carry political speech when other, more profitable options are available").

nonthreatening manner). But here, the officials' demands that the platforms remove content and change their practices were backed by the officials' unilateral power to act or, at the very least, their ability to inflict "*some form of punishment*" against the platforms.[17] *Okwedy*, 333 F.3d at 342 (citation omitted) (emphasis added). Therefore, the authority factor weighs in favor of finding the officials' messages coercive.

Finally, and "perhaps most important[ly]," we ask whether the speaker "refers to adverse consequences that will follow if the recipient does not accede to the request." *Warren*, 66 F.4th at 1211 (citing *Vullo*, 49 F.4th at 715). Explicit and subtle threats both work— "an official does not need to say 'or else' if a threat is clear from the context." *Id.* (citing *Backpage.com*, 807 F.3d at 234). Again, this factor is met.

Here, the officials made express threats and, at the very least, leaned into the inherent authority of the President's office. The officials made inflammatory accusations, such as saying that the platforms were "poison[ing]" the public, and "killing people." The platforms were told they needed to take greater responsibility and action. Then, they followed their statements with threats of "fundamental reforms" like regulatory changes and increased enforcement actions that would ensure the platforms were "held accountable." But, beyond express threats, there was *always* an "unspoken 'or else.'" *Warren*, 66 F.4th at 1212. After all, as the executive of the Nation, the President wields awesome power. The officials were not shy to allude to that understanding native to every American—when the platforms faltered, the officials warned them that they were

---

[17] Or, as the Ninth Circuit put it, "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or *threatened* imposition of *government power or sanction*." *Warren*, 66 F.4th at 1207 (citation omitted) (emphasis added).

"[i]nternally . . . considering our options on what to do," their "concern[s] [were] shared at the highest (and I mean highest) levels of the [White House]," and the "President has long been concerned about the power of large social media platforms." Unlike the letter in *Warren*, the language deployed in the officials' campaign reveals clear "plan[s] to punish" the platforms if they did not surrender. *Warren*, 66 F.4th at 1209. *Compare id.*, *with Backpage.com*, 807 F.3d at 237. Consequently, the four-factor test weighs heavily in favor of finding the officials' messages were coercive, not persuasive.

Notably, the Ninth Circuit recently reviewed a case that is strikingly similar to ours. In *O'Handley*, officials from the California Secretary of State's office allegedly "act[ed] in concert" with Twitter to censor speech on the platform. 62 F.4th at 1153. Specifically, the parties had a "collaborative relationship" where officials flagged tweets and Twitter "almost invariably" took them down. *Id.* Therefore, the plaintiff contended, when his election-fraud-based post was removed, California "abridged his freedom of speech" because it had "pressured Twitter to remove disfavored content." *Id.* at 1163. But, the Ninth Circuit disagreed, finding the close nexus test was not satisfied. The court reasoned that there was no clear indication that Twitter "would suffer adverse consequences if it refused" to comply with California's request. *Id.* at 1158. Instead, it was a "purely optional," "no strings attached" request. *Id.* Consequently, "Twitter complied with the request under the terms of its own content-moderation policy and using its own independent judgment." *Id.*[18] To the Ninth Circuit,

---

[18] The Ninth Circuit insightfully noted the difficult task of applying the coercion test in the First Amendment context:

[W]e have drawn a sharp distinction between attempts to convince and attempts to coerce. Particularly relevant here, we have held that government officials do not violate the First Amendment when they

229a

No. 23-30445

there was no indication—whether via tone, content, or otherwise—that the state would retaliate against inaction given the insubstantial relationship. Ultimately, the officials conduct was "far from the type of coercion" seen in cases like *Bantam Books*. *Id.* In contrast, here, the officials made clear that the platforms *would* suffer adverse consequences if they failed to comply, through express or implied threats, and thus the requests were not optional.

Given all of the above, we are left only with the conclusion that the officials' statements were coercive. That conclusion tracks with the decisions of other courts. After reviewing the four-factor test, it is apparent that the officials' messages could "reasonably be construed" as threats. *Warren*, 66 F.4th at 1208; *Vullo*, 49 F.4th at 716. Here, unlike in *Warren*, the officials' "call[s] to action"—given the context and officials' tone, the presence of *some* authority, the platforms' yielding responses, and the officials' express and implied references to adverse consequences—"directly suggest[ed] that compliance was the only realistic option to avoid government sanction." 66 F.4th at 1208. And, unlike *O'Handley*, the officials were not simply flagging posts with "no strings attached," 62 F.4th at 1158—they did much, much more.

_____

request that a private intermediary not carry a third party's speech so long as the officials do not threaten adverse consequences if the intermediary refuses to comply. This distinction tracks core First Amendment principles. A private party can find the government's stated reasons for making a request persuasive, just as it can be moved by any other speaker's message. The First Amendment does not interfere with this communication so long as the intermediary is free to disagree with the government and to make its own independent judgment about whether to comply with the government's request.

*O'Handley*, 62 F.4th at 1158. After all, consistent with their constitutional and statutory authority, state "[a]gencies are permitted to communicate in a non-threatening manner with the entities they oversee without creating a constitutional violation." *Id.* at 1163 (citing *Vullo*, 49 F.4th at 714–19).

Now, we turn to encouragement. We find that the officials also significantly encouraged the platforms to moderate content by exercising active, meaningful control over those decisions. Specifically, the officials entangled themselves in the platforms' decision-making processes, namely their moderation policies. *See Blum*, 457 U.S. at 1008. That active, meaningful control is evidenced plainly by a view of the record. The officials had consistent and consequential interaction with the platforms and constantly monitored their moderation activities. In doing so, they repeatedly communicated their concerns, thoughts, and desires to the platforms. The platforms responded with cooperation—they invited the officials to meetings, roundups, and policy discussions. And, more importantly, they complied with the officials' requests, including making changes to their policies.

The officials began with simple enough asks of the platforms—"can you share more about your framework here" or "do you have data on the actual number" of removed posts? But, the tenor later changed. When the platforms' policies were not performing to the officials' liking, they pressed for more, persistently asking what "interventions" were being taken, "how much content [was] being demoted," and why certain posts were not being removed. Eventually, the officials pressed for outright change to the platforms' moderation policies. They did so privately and publicly. One official emailed a list of proposed changes and said, "this is circulating around the building and informing thinking." The White House Press Secretary called on the platforms to adopt "proposed changes" that would create a more "robust enforcement strategy." And the Surgeon General published an advisory calling on the platforms to "[e]valuate the effectiveness of [their] internal policies" and implement changes. Beyond that, they relentlessly asked the platforms to remove content, even giving reasons as to why such

content should be taken down. They also followed up to ensure compliance and, when met with a response, asked how the internal decision was made.

And, the officials' campaign succeeded. The platforms, in capitulation to state-sponsored pressure, changed their moderation policies. The platforms explicitly recognized that. For example, one platform told the White House it was "making a number of changes"—which aligned with the officials' demands—as it knew its "position on [misinformation] continues to be a particular concern" for the White House. The platform noted that, in line with the officials' requests, it would "make sure that these additional [changes] show results—the stronger demotions in particular should deliver real impact." Similarly, one platform emailed a list of "commitments" after a meeting with the White House which included policy "changes" "focused on reducing the virality" of anti-vaccine content even when it "does not contain actionable misinformation." Relatedly, one platform told the Surgeon General that it was "committed to addressing the [] misinformation that you've called on us to address," including by implementing a set of jointly proposed policy changes from the White House and the Surgeon General.

Consequently, it is apparent that the officials exercised meaningful control—via changes to the platforms' independent processes—over the platforms' moderation decisions. By pushing changes to the platforms' policies through their expansive relationship with and informal oversight over the platforms, the officials imparted a lasting influence on the platforms' moderation decisions without the need for any further input. In doing so, the officials ensured that any moderation decisions were not made in accordance with independent judgments guided by independent standards. *See id.*; *see also Am. Mfrs.*, 526 U.S. at 52 ("The decision to withhold payment, like the decision to transfer Medicaid patients to a lower level of care in *Blum*, is made by concededly private parties, and 'turns on . . . judgments made by private

232a

No. 23-30445

parties' without 'standards . . . established by the State.'"). Instead, they were encouraged by the officials' imposed standards.

In sum, we find that the White House officials, in conjunction with the Surgeon General's office, coerced and significantly encouraged the platforms to moderate content. As a result, the platforms' actions "must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004.

**2.**

Next, we consider the FBI. We find that the FBI, too, likely (1) coerced the platforms into moderating content, and (2) encouraged them to do so by effecting changes to their moderation policies, both in violation of the First Amendment.

We start with coercion. Similar to the White House, Surgeon General, and CDC officials, the FBI regularly met with the platforms, shared "strategic information," frequently alerted the social media companies to misinformation spreading on their platforms, and monitored their content moderation policies. But, the FBI went beyond that—they urged the platforms to take down content. Turning to the Second Circuit's four-factor test, we find that those requests were coercive. *Vullo*, 49 F.4th at 715.

First, given the record before us, we cannot say that the FBI's messages were plainly threatening in tone or manner. *Id.* But, second, we do find the FBI's requests came with the backing of clear authority over the platforms. After all, content moderation requests "might be inherently coercive if sent by . . . [a] law enforcement officer." *Warren*, 66 F.4th at 1210 (citations omitted); *see also Zieper v. Metzinger*, 392 F. Supp. 2d 516, 531 (S.D.N.Y. 2005) (holding that a reasonable jury could find an FBI agent's request coercive when he asked an internet service provider to take down a controversial video that could be "inciting a riot" because he was "an FBI agent charged with investigating the video"); *Backpage*, 807 F.3d at 234

54

("[C]redit card companies don't like being threatened by a law-enforcement official that he will sic the feds on them, even if the threat may be empty."). This is especially true of the lead law enforcement, investigatory, and domestic security agency for the executive branch. Consequently, because the FBI wielded *some* authority over the platforms, *see Okwedy*, 333 F.3d at 344, the FBI's takedown requests can "reasonably be construed" as coercive in nature, *Warren*, 66 F.4th at 1210.

Third, although the FBI's communications did not plainly reference adverse consequences, an actor need not express a threat aloud so long as, given the circumstances, the message *intimates* that some form of punishment will follow noncompliance. *Id.* at 1209. Here, beyond its inherent authority, the FBI—unlike most federal actors—also has tools at its disposal to force a platform to take down content. For instance, in *Zieper*, an FBI agent asked a web-hosting platform to take down a video portraying an imaginary documentary showing preparations for a military takeover of Times Square on the eve of the new millennium. 392 F. Supp. 2d at 520–21. In appealing to the platform, the FBI agent said that he was concerned that the video could be "inciting a riot" and testified that he was trying to appeal to the platform's "'good citizenship' by pointing out a public safety concern." *Id.* at 531. And these appeals to the platform's "good citizenship" worked—the platform took down the video. *Id.* at 519. The Southern District of New York concluded that a reasonable jury could find that statement coercive, "particularly when said by an FBI agent charged with investigating the video." *Id.* at 531. Indeed, the question is whether a message intimates that *some* form of punishment that may be used against the recipient, an analysis that includes means of retaliation that are not readily apparent. *See Warren*, 66 F.4th at 1210.

Fourth, the platforms clearly perceived the FBI's messages as threats. For example, right before the 2022 congressional election, the FBI warned

the platforms of "hack and dump" operations from "state-sponsored actors" that would spread misinformation through their sites. In doing so, the FBI officials leaned into their inherent authority. So, the platforms reacted as expected—by taking down content, including posts and accounts that originated from the United States, in direct compliance with the request. Considering the above, we conclude that the FBI coerced the platforms into moderating content. But, the FBI's endeavors did not stop there.

We also find that the FBI likely significantly encouraged the platforms to moderate content by entangling themselves in the platforms' decision-making processes. *Blum*, 457 U.S. at 1008. Beyond taking down posts, the platforms also changed their terms of service in concert with recommendations from the FBI. For example, several platforms "adjusted" their moderation policies to capture "hack-and-leak" content after the FBI asked them to do so (and followed up on that request). Consequently, when the platforms subsequently moderated content that violated their newly modified terms of service (*e.g.*, the results of hack-and-leaks), they did not do so via independent standards. *See Blum*, 457 U.S. at 1008. Instead, those decisions were made subject to commandeered moderation policies.

In short, when the platforms acted, they did so in response to the FBI's inherent authority *and* based on internal policies influenced by FBI officials. Taking those facts together, we find the platforms' decisions were significantly encouraged and coerced by the FBI.[19]

---

[19] Plaintiffs and several *amici* assert that the FBI and other federal actors coerced or significantly encouraged the social-media companies into disseminating information that was favorable to the administration—information the federal officials knew was false or misleading. We express no opinion on those assertions because they are not necessary to our holding here.

235a

No. 23-30445

**3.**

Next, we turn to the CDC. We find that, although not plainly coercive, the CDC officials likely significantly encouraged the platforms' moderation decisions, meaning they violated the First Amendment.

We start with coercion. Here, like the other officials, the CDC regularly met with the platforms and frequently flagged content for removal. But, unlike the others, the CDC's requests for removal were not coercive— they did not ask the platforms in an intimidating or threatening manner, do not possess any clear authority over the platforms, and did not allude to any adverse consequences. Consequently, we cannot say the platforms' moderation decisions were coerced by CDC officials.

The same, however, cannot be said for significant encouragement. Ultimately, the CDC was entangled in the platforms' decision-making processes, *Blum*, 457 U.S. at 1008.

The CDC's relationship with the platforms began by defining—in "Be On the Lookout" meetings—what was (and was not) "misinformation" for the platforms. Specifically, CDC officials issued "advisories" to the platforms warning them about misinformation "hot topics" to be wary of. From there, CDC officials instructed the platforms to label disfavored posts with "contextual information," and asked for "amplification" of approved content. That led to CDC officials becoming intimately involved in the various platforms' day-to-day moderation decisions. For example, they communicated about how a platform's "moderation team" reached a certain decision, how it was "approach[ing] adding labels" to particular content, and how it was deploying manpower. Consequently, the CDC garnered an extensive relationship with the platforms.

From that relationship, the CDC, through authoritative guidance, directed changes to the platforms' moderation policies. At first, the

platforms asked CDC officials to decide whether certain claims were misinformation. In response, CDC officials told the platforms whether such claims were true or false, and whether information was "misleading" or needed to be addressed via CDC-backed labels. That back-and-forth then led to "[s]omething more." *Roberts*, 742 F.2d at 228.

Specifically, CDC officials directly impacted the platforms' moderation policies. For example, in meetings with the CDC, the platforms actively sought to "get into [] policy stuff" and run their moderation policies by the CDC to determine whether the platforms' standards were "in the right place." Ultimately, the platforms came to *heavily rely* on the CDC. They adopted rule changes meant to implement the CDC's guidance. As one platform said, they "were able to make [changes to the 'misinfo policies'] based on the conversation [they] had last week with the CDC," and they "immediately updated [their] policies globally" following another meeting. And, those adoptions led the platforms to make moderation decisions based entirely on the CDC's say-so—"[t]here are several claims that we will be able to remove as soon as the CDC debunks them; until then, we are unable to remove them." That dependence, at times, was total. For example, one platform asked the CDC how it should approach certain content and even asked the CDC to double check and proofread its proposed labels.

Viewing these facts, we are left with no choice but to conclude that the CDC significantly encouraged the platforms' moderation decisions. Unlike in *Blum*, the platforms' decisions were not made by independent standards, 457 U.S. at 1008, but instead were marred by modification from CDC officials. Thus, the resulting content moderation, "while not compelled by the state, was so significantly encouraged, both overtly and covertly" by CDC officials that those decisions "must in law be deemed to be that of the state." *Howard Gault*, 848 F.2d at 555 (alterations adopted) (internal quotation marks and citation omitted).

**4.**

Finally, we address the remaining officials—the NIAID, the State Department, and CISA. Having reviewed the record, we find the district court erred in enjoining these other officials. Put simply, there was not, at this stage, sufficient evidence to find that it was likely these groups coerced or significantly encouragement the platforms.

For the NIAID officials, it is not apparent that they ever communicated with the social-media platforms. Instead, the record shows, at most, that public statements by Director Anthony Fauci and other NIAID officials promoted the government's scientific and policy views and attempted to discredit opposing ones—quintessential examples of government speech that do not run afoul of the First Amendment. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) ("[The government] is entitled to say what it wishes, and to select the views that it wants to express." (quotation marks and citations omitted)); *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view . . . ."). Consequently, with only insignificant (if any) communication (direct or indirect) with the platforms, we cannot say that the NIAID officials likely coerced or encouraged the platforms to act.

As for the State Department, while it did communicate directly with the platforms, so far there is no evidence these communications went beyond educating the platforms on "tools and techniques" used by foreign actors. There is no indication that State Department officials flagged specific content for censorship, suggested policy changes to the platforms, or engaged in any similar actions that would reasonably bring their conduct within the scope of the First Amendment's prohibitions. After all, their messages do not appear coercive in tone, did not refer to adverse consequences, and were not

backed by any apparent authority. And, per this record, those officials were not involved to any meaningful extent with the platforms' moderation decisions or standards.

Finally, although CISA flagged content for social-media platforms as part of its switchboarding operations, based on this record, its conduct falls on the "attempts to convince," not "attempts to coerce," side of the line. *See Okwedy*, 333 F.3d at 344; *O'Handley*, 62 F.4th at 1158. There is not sufficient evidence that CISA made threats of adverse consequences—explicit or implicit—to the platforms for refusing to act on the content it flagged. *See Warren*, 66 F.4th at 1208–11 (finding that senator's communication was a "request rather than a command" where it did not "suggest[] that compliance was the only realistic option" or reference potential "adverse consequences"). Nor is there any indication CISA had power over the platforms in any capacity, or that their requests were threatening in tone or manner. Similarly, on this record, their requests—although certainly amounting to a non-trivial level of involvement—do not equate to meaningful control. There is no plain evidence that content was actually moderated per CISA's requests or that any such moderation was done subject to non-independent standards.

\* \* \*

Ultimately, we find the district court did not err in determining that several officials—namely the White House, the Surgeon General, the CDC, and the FBI—likely coerced or significantly encouraged social-media

No. 23-30445

platforms to moderate content, rendering those decisions state actions.[20] In doing so, the officials likely violated the First Amendment.[21]

But, we emphasize the limited reach of our decision today. We do not uphold the injunction against all the officials named in the complaint. Indeed, many of those officials were permissibly exercising government speech, "carrying out [their] responsibilities," or merely "engaging in [a] legitimate [] action." *Vullo*, 49 F.4th at 718–19. That distinction is important because the state-action doctrine is vitally important to our Nation's operation—by distinguishing between the state and the People, it promotes "a robust sphere of individual liberty." *Halleck*, 139 S. Ct. at 1928. That is why the Supreme Court has been reluctant to expand the scope of the doctrine. *See Matal v. Tan*, 582 U.S. 218, 235 (2017) ("[W]e must exercise great caution before extending our government-speech precedents."). If just any relationship with the government "sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities." *Halleck*, 139 S. Ct. at 1932. So, we do not take our decision today lightly. But, the Supreme Court has rarely been faced with a coordinated campaign of this magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life. Therefore, the district court was correct in its assessment—"unrelenting pressure" from certain government

---

[20] Here, in holding that some of the officials likely coerced or sufficiently encouraged the platforms to censor content, we pass no judgment on any joint actor or conspiracy-based state action theory.

[21] "With very limited exceptions, none applicable to this case, censorship—'an effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive,' as distinct from punishing such dissemination (if it falls into one of the categories of punishable speech, such as defamation or threats) after it has occurred—is prohibited by the First Amendment as it has been understood by the courts." *Backpage.com*, 807 F.3d at 235 (citation omitted).

No. 23-30445

officials likely "had the intended result of suppressing millions of protected free speech postings by American citizens." We see no error or abuse of discretion in that finding.[22]

## V.

Next, we address the equities. Plaintiffs seeking a preliminary injunction must show that irreparable injury is "likely" absent an injunction, the balance of the equities weighs in their favor, and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (collecting cases).

While "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)), "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury," *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016).

Here, the district court found that the Plaintiffs submitted enough evidence to show that irreparable injury is likely to occur during the pendency of the litigation. In so doing, the district court rejected the officials' arguments that the challenged conduct had ceased and that future harm was speculative, drawing on mootness and standing doctrines. Applying the standard for mootness, the district court concluded that a defendant must

---

[22] Our holding today, as is appropriate under the state-action doctrine, is limited. Like in *Roberts*, we narrowly construe today's finding of state action to apply only to the challenged decisions. *See* 742 F.2d at 228 ("We do not doubt that many of the actions of the racetrack and its employees are no more than private business decisions," but "[i]n the area of stalling, [] state regulation and involvement is so specific and so pervasive that [such] decisions may be considered to bear the imprimatur of the state.").

show that "it is absolutely clear the alleged wrongful behavior could not reasonably be expected to recur" and that the officials had failed to make such showing here. In assessing whether Plaintiffs' claims of future harm were speculative and dependent on the actions of social-media companies, the district court applied a quasi-standing analysis and found that the Plaintiffs had alleged a "substantial risk" of future harm that is not "imaginary or wholly speculative," pointing to the officials' ongoing coordination with social-media companies and willingness to suppress free speech on a myriad of hot-button issues.

We agree that the Plaintiffs have shown that they are likely to suffer an irreparable injury. Deprivation of First Amendment rights, even for a short period, is sufficient to establish irreparable injury. *Elrod*, 427 U.S. at 373; *Cuomo*, 141 S. Ct. at 67; *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012).

The district court was right to be skeptical of the officials' claims that they had stopped all challenged conduct. *Cf. Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice, even in cases in which injunctive relief is sought."). But, the district court's use of a "not imaginary or speculative" standard in the irreparable harm context is inconsistent with binding case law. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on *a possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (citation omitted) (emphasis added)). The correct standard is whether a future injury is "likely." *Id.* But, because the Plaintiffs sufficiently demonstrated that their First Amendment interests are either threatened or impaired, they have met this standard. *See Opulent Life Church*, 697 F.3d at 295 (citing 11A Charles

Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")). Indeed, the record shows, and counsel confirmed at oral argument, that the officials' challenged conduct has not stopped.

Next, we turn to whether the balance of the equities warrants an injunction and whether such relief is in the public interest. Where the government is the opposing party, harm to the opposing party and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The district court concluded that the equities weighed in favor of granting the injunction because the injunction maintains the "constitutional structure" and Plaintiffs' free speech rights. The officials argue that the district court gave short shrift to their assertions that the injunction could limit the Executive Branch's ability to "persuade" the American public, which raises separation-of-powers issues.

Although both Plaintiffs and the officials assert that their ability to speak is affected by the injunction, the government is not permitted to use the government-speech doctrine to "silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 235.

It is true that the officials have an interest in engaging with social-media companies, including on issues such as misinformation and election interference. But the government is not permitted to advance these interests to the extent that it engages in viewpoint suppression. Because "[i]njunctions protecting First Amendment freedoms are always in the public interest," the equities weigh in Plaintiffs' favor. *Opulent Life Church*, 697 F.3d at 298 (quotation marks and citations omitted).

243a

No. 23-30445

While the officials raise legitimate concerns that the injunction could sweep in lawful speech, we have addressed those concerns by modifying the scope of the injunction.

## VI.

Finally, we turn to the language of the injunction itself. An injunction "is overbroad if it is not 'narrowly tailored to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (alterations adopted) (quoting *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). This requirement that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" is in recognition of a federal court's "constitutionally prescribed role . . . to vindicate the individual rights of the people appearing before it," not "generalized partisan preferences." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018).

In addition, injunctions cannot be vague. "Every order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1). The Supreme Court has explained:

> [T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

244a

No. 23-30445

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citations omitted).

To be sure, "[t]he specificity requirement is not unwieldy," *Meyer v. Brown & Root Construction Co.*, 661 F.2d 369, 373 (5th Cir. 1981), and "elaborate detail is unnecessary," *Islander E. Rental Program v. Barfield*, No. 96-41275, 1998 WL 307564, at *4 (5th Cir. Mar. 24, 1998). But still, "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Louisiana v. Biden*, 45 F.4th at 846 (citation omitted).

The preliminary injunction here is both vague and broader than necessary to remedy the Plaintiffs' injuries, as shown at this preliminary juncture. As an initial matter, it is axiomatic that an injunction is overbroad if it enjoins a defendant from engaging in legal conduct. Nine of the preliminary injunction's ten prohibitions risk doing just that. Moreover, many of the provisions are duplicative of each other and thus unnecessary.

Prohibitions one, two, three, four, five, and seven prohibit the officials from engaging in, essentially, any action "for the purpose of urging, encouraging, pressuring, or inducing" content moderation. But "urging, encouraging, pressuring" or even "inducing" action does not violate the Constitution unless and until such conduct crosses the line into coercion or *significant* encouragement. *Compare Walker*, 576 U.S. at 208 ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position."), *Finley*, 524 U.S. at 598 (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view . . . ."), *and Vullo*, 49 F.4th at 717 (holding statements "encouraging" companies to evaluate risk of doing business with the plaintiff did not violate the Constitution where the statements did not "intimate that some form of punishment or adverse regulatory action would follow the failure to accede to the request"), *with Blum*, 457 U.S. at 1004, *and*

*O'Handley*, 62 F.4th at 1158 ("In deciding whether the government may urge a private party to remove (or refrain from engaging in) protected speech, we have drawn a sharp distinction between attempts to convince and attempts to coerce."). These provisions also tend to overlap with each other, barring various actions that may cross the line into coercion. There is no need to try to spell out every activity that the government could possibly engage in that may run afoul of the Plaintiffs' First Amendment rights as long the unlawful conduct is prohibited.

The eighth, ninth, and tenth provisions likewise may be unnecessary to ensure Plaintiffs' relief. A government actor generally does not violate the First Amendment by simply "following up with social-media companies" about content-moderation, "requesting content reports from social-media companies" concerning their content-moderation, or asking social media companies to "Be on The Lookout" for certain posts.[23] Plaintiffs have not carried their burden to show that these activities must be enjoined to afford Plaintiffs full relief.

These provisions are vague as well. There would be no way for a federal official to know exactly when his or her actions cross the line from permissibly communicating with a social-media company to impermissibly "urging, encouraging, pressuring, or inducing" them "*in any way*." *See Scott*, 826 F.3d at 209, 213 ("[a]n injunction should not contain broad generalities"); *Islander East*, 1998 WL 307564, at *4 (finding injunction against "interfering in any way" too vague). Nor does the injunction define

---

[23] While these activities, standing alone, are not violative of the First Amendment and therefore must be removed from the preliminary injunction, we note that these activities *may* violate the First Amendment when they are part of a larger scheme of government coercion or significant encouragement, and neither our opinion nor the modified injunction should be read to hold otherwise.

246a

No. 23-30445

"Be on The Lookout" or "BOLO." That, too, renders it vague. *See Louisiana v. Biden*, 45 F.4th at 846 (holding injunction prohibiting the federal government from "implementing the Pause of new oil and natural gas leases on public lands or in offshore waters as set forth in [the challenged Executive Order]" was vague because the injunction did not define the term "Pause" and the parties had each proffered different yet reasonable interpretations of the Pause's breadth).

While helpful to some extent, the injunction's carveouts do not solve its clarity and scope problems. Although they seem to greenlight legal speech, the carveouts, too, include vague terms and appear to authorize activities that the injunction otherwise prohibits on its face. For instance, it is not clear whether the Surgeon General could publicly urge social media companies to ensure that cigarette ads do not target children. While such a statement could meet the injunction's exception for "exercising permissible public government speech promoting government policy or views on matters of public concern," it also "urg[es] . . . in any manner[] social-media companies to change their guidelines for removing, deleting, suppressing, or reducing content containing protected speech." This example illustrates both the injunction's overbreadth, as such public statements constitute lawful speech, *see Walker*, 576 U.S. at 208, and vagueness, because the government-speech exception is ill-defined, *see Scott*, 826 F.3d at 209, 213 (vacating injunction requiring the Louisiana Secretary of State to maintain in force his "policies, procedures, and directives" related to the enforcement of the National Voter Registration Act, where "policies, procedures, and directives" were not defined). At the same time, given the legal framework at play, these carveouts are likely duplicative and, as a result, unnecessary.

Finally, the fifth prohibition—which bars the officials from "collaborating, coordinating, partnering, switchboarding, and/or jointly working with the Election Integrity Partnership, the Virality Project, the

Stanford Internet Observatory, or any like project or group" to engage in the same activities the officials are proscribed from doing on their own— may implicate private, third-party actors that are not parties in this case and that may be entitled to their own First Amendment protections. Because the provision fails to identify the specific parties that are subject to the prohibitions, *see Scott*, 826 F.3d at 209, 213, and "exceeds the scope of the parties' presentation," *OCA-Greater Houston v. Texas*, 867 F.3d 604, 616 (5th Cir. 2017), Plaintiffs have not shown that the inclusion of these third parties is necessary to remedy their injury. So, this provision cannot stand at this juncture. *See also Alexander v. United States*, 509 U.S. 544, 550 (1993) ("[C]ourt orders that actually [] forbid speech activities are classic examples of prior restraints."). For the same reasons, the injunction's application to "all acting in concert with [the officials]" is overbroad.

We therefore VACATE prohibitions one, two, three, four, five, seven, eight, nine, and ten of the injunction.

That leaves provision six, which bars the officials from "threatening, pressuring, or coercing social-media companies in any manner to remove, delete, suppress, or reduce posted content of postings containing protected free speech." But, those terms could also capture otherwise legal speech. So, the injunction's language must be further tailored to exclusively target illegal conduct and provide the officials with additional guidance or instruction on what behavior is prohibited. To be sure, our standard practice is to remand to the district court to tailor such a provision in the first instance. *See Scott*, 826 F.3d at 214. But this is far from a standard case. In light of the expedited nature of this appeal, we modify the injunction's remaining provision ourselves.

In doing so, we look to the Seventh Circuit's approach in *Backpage.com*, 807 F.3d at 239. There, the Seventh Circuit held that a county

248a

No. 23-30445

sheriff violated Backpage's First Amendment rights by demanding that financial service companies cut ties with Backpage in an effort to "crush" the platform (an online forum for "adult" classified ads). *Id.* at 230. To remedy the constitutional violation, the court issued the following injunction:

> Sheriff Dart, his office, and all employees, agents, or others who are acting or have acted for or on behalf of him, shall take no actions, formal or informal, to coerce or threaten credit card companies, processors, financial institutions, or other third parties with sanctions intended to ban credit card or other financial services from being provided to Backpage.com.

*Id.* at 239.

Like the Seventh Circuit's preliminary injunction in *Backpage.com*, we endeavor to modify the preliminary injunction here to target the coercive government behavior with sufficient clarity to provide the officials notice of what activities are proscribed. Specifically, prohibition six of the injunction is MODIFIED to state:

> Defendants, and their employees and agents, shall take no actions, formal or informal, directly or indirectly, to coerce or significantly encourage social-media companies to remove, delete, suppress, or reduce, including through altering their algorithms, posted social-media content containing protected free speech. That includes, but is not limited to, compelling the platforms to act, such as by intimating that some form of punishment will follow a failure to comply with any request, or supervising, directing, or otherwise meaningfully controlling the social-media companies' decision-making processes.

70

249a

No. 23-30445

Under the modified injunction, the enjoined Defendants cannot coerce or significantly encourage a platform's content-moderation decisions. Such conduct includes threats of adverse consequences—even if those threats are not verbalized and never materialize—so long as a reasonable person would construe a government's message as alluding to some form of punishment. That, of course, is informed by context (*e.g.*, persistent pressure, perceived or actual ability to make good on a threat). The government cannot subject the platforms to legal, regulatory, or economic consequences (beyond reputational harms) if they do not comply with a given request. *See Bantam Books*, 372 U.S. at 68; *Okwedy*, 333 F.3d at 344. The enjoined Defendants also cannot supervise a platform's content moderation decisions or directly involve themselves in the decision itself. Social-media platforms' content-moderation decisions must be theirs and theirs alone. *See Blum*, 457 U.S. at 1008. This approach captures illicit conduct, regardless of its form.

Because the modified injunction does not proscribe Defendants from activities that could include legal conduct, no carveouts are needed. There are two guiding inquiries for Defendants. First, is whether their action could be reasonably interpreted as a threat to take, or cause to be taken, an official action against the social-media companies if the companies decline Defendants' request to remove, delete, suppress, or reduce protected free speech on their platforms. Second, is whether Defendants have exercised active, meaningful control over the platforms' content-moderation decisions to such a degree that it inhibits the platforms' independent decision-making.

To be sure, this modified injunction still "restricts government communications not specifically targeted to particular content *posted by plaintiffs themselves*," as the officials protest. But that does not mean it is still overbroad. To the contrary, an injunction "is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in

the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Pro. Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 274 (5th Cir. 1984) (citations omitted); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987). Such breadth is plainly necessary, if not inevitable, here. The officials have engaged in a broad pressure campaign designed to coerce social-media companies into suppressing speakers, viewpoints, and content disfavored by the government. The harms that radiate from such conduct extend far beyond just the Plaintiffs; it impacts every social-media user. Naturally, then, an injunction against such conduct will afford protections that extend beyond just Plaintiffs, too. *Cf. Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) ("[A]n injunction [can] benefit non-parties as long as that benefit [is] merely incidental." (internal quotation marks and citation omitted)).

As explained in Part IV above, the district court erred in finding that the NIAID Officials, CISA Officials, and State Department Officials likely violated Plaintiffs' First Amendment rights. So, we exclude those parties from the injunction. Accordingly, the term "Defendants" as used in this modified provision is defined to mean only the following entities and officials included in the original injunction:

> The following members of the Executive Office of the President of the United States: White House Press Secretary, Karine Jean-Pierre; Counsel to the President, Stuart F. Delery; White House Partnerships Manager, Aisha Shah; Special Assistant to the President, Sarah Beran; Administrator of the United States Digital Service within the Office of Management and Budget, Mina Hsiang; White House National Climate Advisor, Ali Zaidi; White House Senior COVID-19 Advisor, formerly Andrew Slavitt; Deputy Assistant to the President

and Director of Digital Strategy, formerly Rob Flaherty; White House COVID-19 Director of Strategic Communications and Engagement, Dori Salcido; White House Digital Director for the COVID-19 Response Team, formerly Clarke Humphrey; Deputy Director of Strategic Communications and Engagement of the White House COVID-19 Response Team, formerly Benjamin Wakana; Deputy Director for Strategic Communications and External Engagement for the White House COVID-19 Response Team, formerly Subhan Cheema; White House COVID-19 Supply Coordinator, formerly Timothy W. Manning; and Chief Medical Advisor to the President, Dr. Hugh Auchincloss, along with their directors, administrators and employees. Surgeon General Vivek H. Murthy; and Chief Engagement Officer for the Surgeon General, Katharine Dealy, along with their directors, administrators and employees. The Centers for Disease Control and Prevention ("CDC"), and specifically the following employees: Carol Y. Crawford, Chief of the Digital Media Branch of the CDC Division of Public Affairs; Jay Dempsey, Social-media Team Leader, Digital Media Branch, CDC Division of Public Affairs; and Kate Galatas, CDC Deputy Communications Director. And the Federal Bureau of Investigation ("FBI"), and specifically the following employees: Laura Dehmlow, Section Chief, FBI Foreign Influence Task Force; and Elvis M. Chan, Supervisory Special Agent of Squad CY-1 in the FBI San Francisco Division.

252a

No. 23-30445

## VII.

The district court's judgment is AFFIRMED with respect to the White House, the Surgeon General, the CDC, and the FBI, and REVERSED as to all other officials. The preliminary injunction is VACATED except for prohibition number six, which is MODIFIED as set forth herein. The Appellants' motion for a stay pending appeal is DENIED as moot. The Appellants' request to extend the administrative stay for ten days following the date hereof pending an application to the Supreme Court of the United States is GRANTED, and the matter is STAYED.

**EXHIBIT B**

**Pages 1 - 53**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge Presiding

```
ROBERT F. KENNEDY, JR.,        )
                               )
          Plaintiff,           )
                               )
  VS.                          )     NO. C 23-03880 TLT
                               )
GOOGLE LLC, a Delaware         )
corporation, and YOUTUBE, LLC,)
a Delaware corporation,        )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Monday, August 21, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        JW HOWARD/ATTORNEYS
        201 South Lake Avenue, Suite 303
        Pasadena, California  91101
      **BY:**  **SCOTT J. STREET**
           **ATTORNEY AT LAW**

For Defendant:

        MUNGER, TOLLES & OLSON LLP
        560 Mission Street - 27th Floor
        San Francisco, California  94105
      **BY:**  **JONATHAN H. BLAVIN**
           **JULIANA MARIKO YEE**
           **ATTORNEYS AT LAW**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

<u>**Monday - August 21, 2023**</u>                                    **9:56 a.m.**

                                    P R O C E E D I N G S

                                         ---oOo---

           **THE CLERK:**  Now calling Case Number 23-cv-03880,

     Kennedy, Jr. versus Google, LLC, et al.

           Counsel, will you please come forward to the podium and

     state your appearances, beginning with the plaintiff.

           **ATTORNEY STREET:**  Good morning, Your Honor.  Scott

     Street for the plaintiff, Mr. Kennedy.

           **THE COURT:**  Good morning.

           **ATTORNEY BLAVIN:**  Good morning, Your Honor.  Jonathan

     Blavin for defendants Google and YouTube.

           **ATTORNEY YEE:**  Good morning, Your Honor.  Juliana Yee

     on behalf of Google and YouTube.

           **THE COURT:**  Good morning.  And pleasure to meet you

     all.  And I'm glad that there were safe travels coming from

     Burbank as well as the streets of San Francisco.  So pleasure

     to see everyone.

           All right.  This matter is before the Court for an

     application of a temporary restraining order.  Plaintiff has

     filed an application for a prospective temporary restraining

     order to enjoin Google and YouTube from using its

     misinformation policies during the 2024 presidential campaign.

           Counsel, if you'll please approach, I'm going to have some

     general rules.  Those of you who are going to be presenting to

1    the Court should approach the podium so that you can be heard

2    by the Court as well as our court reporter.  Thank you.

3         For those who may be unfamiliar with this Court, I will

4    generally give a recitation of what I believe the facts to be

5    and allow you to provide correction during your presentation.

6         I will also have a list of questions and some I will

7    intermittently pose to you.  Please understand if I'm asking

8    these questions, these are questions that are relevant to my

9    ultimate decision.

10        I've read all of the briefing as well as the cases that

11   you've recited in your briefing, and I'm very clear in terms of

12   the standard of a temporary restraining order.

13        So, counsel, I'll note that the Court will have as one of

14   its first questions is why is this an emergency given the lapse

15   of time?  So please take that into consideration.

16        Now, on January 23rd, 2021, Twitter, not YouTube, removed

17   a tweet from Mr. Kennedy's Twitter account.  The takedown was

18   precipitated by an e-mail sent before from Clarke Humphrey of

19   the White House office flagging the tweet and asked if we can

20   get moving on the process for having it removed.  This is based

21   on the motion and declaration filed by Mr. Street.

22        This is a fact that I believe supports documentation of

23   *Missouri v. Biden*, but I want to note that Mr. Kennedy had

24   filed a motion to intervene and I believe that motion was

25   denied on January 10th, 2023, by the District Court Western

1    Division of Louisiana, Monroe Division.

2         Now the facts that are relevant to this case are as

3    follows and those of which the Court is asked to consider.

4    Mr. Kennedy announced his candidacy on April 19th, 2023.  He

5    spoke earlier, a month prior, at Saint Amselm College in

6    New Hampshire Institute of Politics on March -- in March of

7    2023.  I do -- I would like to know the actual date.

8         The speech centered around Mr. Kennedy's concern about the

9    merger of corporate and state power as it related to vaccines

10   that children are asked to take.

11        He spoke about the environmental and legal work fighting

12   corporate polluters.  And this is based on the motion pages 9

13   through 10, and counsel, Mr. Street's declaration paragraph 4.

14        Manchester Public Television posted a video of the speech,

15   and YouTube removed it.  This is according to the declaration

16   filed by Mr. Street.

17        Once again, Mr. Kennedy announced his candidacy a month

18   later on April 19th, 2023.  And he's seeking the Democratic

19   Party's nomination for President.  He has filed the necessary

20   paperwork within the Federal Election Commission and is taking

21   steps to qualify for the ballot in early primary states

22   including New Hampshire.

23        Now then YouTube removed a video of an interview with

24   podcast host Jordan Peterson and comedian Joe Rogan after he

25   announced his candidacy.  On June 17th, YouTube removed the

1  video titled "RFK on Joe Rogan, Pfizer COVID Vaccine Trial,"

2  and this is based upon the declaration in Exhibit A, Amaryllis

3  Kennedy.

4      Kennedy does not identify what video interview with Jordan

5  Peterson was taken down, the topics of the interview, what date

6  it was posted, or what date it was taken down.

7      On the 4th of July, 2023, the decision in *Missouri v.*

8  *Biden* was filed.  The appeal was filed on July 6th, 2023.

9  Defendant's motion to stay during appeal was denied on

10  July 10th.  Oral arguments for the appeal were held on

11  August 10th, 2023.

12      Plaintiff filed his complaint on August 8th, 2023, and his

13  TRO application on August 9th, 2023.

14      Now then, counsel, I invite you to share any additional

15  facts that you believe are relevant to the Court in making this

16  final decision and whether to grant a TRO.

17      There are standards of which the Court would like to know

18  which do you feel are the appropriate standards to apply,

19  keeping in mind that *Missouri v. Biden* at best is persuasive.

20  *O'Handley v. Weber* found at 62 F.4th 1143, decided in 2023 by

21  our Ninth Circuit, is the case that the Court will follow.  And

22  the Court would like to know which of the tests in that case

23  you feel is appropriate.

24      What date in March of 2023 did Mr. Kennedy give his

25  speech?  What date did Manchester Public Television post

1  Mr. Kennedy's speech?  On what date was Mr. Kennedy's speech

2  taken down by YouTube?  How many other videos of Mr. Kennedy

3  have been taken down by YouTube, if any?  And please precisely

4  indicate the date and the content.

5      Twitter, who is not a party to this case, allegedly

6  removed a video of Mr. Kennedy on January 23rd, '21.  Was this

7  video also posted to YouTube, and did YouTube remove it?

8      Now, I do have other questions.  And we'd like to start

9  with under which test for determining a state actor does

10  plaintiff suggest in controlling this case and why in terms of

11  the decision that I will be making today?

12      So, counsel, I have a number of other questions, but those

13  are kind of the broad stroke.  Please correct me on any facts

14  that I may have stated in error.  Speak as slowly as possible

15  for our court reporter.  And, please, I ask that neither party

16  speak over one another so we have a clear record.

17      **ATTORNEY STREET:**  Okay.  Thank you, Your Honor.  And

18  thank you for obviously putting a lot of time into this.

19      I know it was done on short notice, and thank you for

20  indulging my efforts to get here in person so -- which

21  fortunately were successful.

22      **THE COURT:**  You're welcome.  And as you can tell from

23  your binder behind you, every page has been read.

24      **ATTORNEY STREET:**  I appreciate that, by you and by me.

25  Thank you, Your Honor.

1    There were a lot of questions that the Court posed. So
2  I'm going to start with the question that Your Honor -- the
3  last question that you asked, which is which test applies here.

4    And I want to emphasize that under -- that both the Ninth
5  Circuit and the Supreme Court have said that the tests are
6  really guides to use in determining whether private action --
7  otherwise private action is, quote, fairly attributable to the
8  state. That's the standard that the Supreme Court laid out in
9  the *Brentwood* -- in the *Brentwood* case in 2002. And the Ninth
10 Circuit has mentioned that several times including in *O'Handley*
11 and in the *Rawson v. Recovery* case that we cited in our brief.

12   Of the tests that are used, I think here the joint action
13 and the nexus tests are the most on point because of the
14 significant parent coordination between Google, YouTube, and
15 the government in developing particularly the vaccine
16 misinformation policy, which is the one that has been cited
17 when removing my speech -- my client's speech from YouTube.

18   That policy was drafted and the evidence that was
19 developed in *Missouri v. Biden* case showed that that policy was
20 developed by Google in 2020 -- I believe 2021 in response to
21 the government's demands for it.

22   **THE COURT:** If I could interrupt, and I apologize
23 because I want to make sure our record is clear. You indicated
24 that the joint action test along with the nexus test which has
25 two separate tests under nexus, under the nexus test.

1    **ATTORNEY STREET:**  Yes.

2    **THE COURT:**  And please identify which one.

3    With regards to the user agreement, and you misspoke and

4    said your speech as opposed to Mr. Kennedy's speech.  Did

5    Mr. Kennedy sign the user agreement when he became a consumer

6    on the free YouTube platform?  Did he sign the user agreement

7    or agreed to it electronically?

8    **ATTORNEY STREET:**  Well, as a -- as a user, yes, he

9    signed it.  But the issue in this case, Your Honor, is not

10   YouTube taking down videos posted by Mr. Kennedy, but

11   YouTube -- YouTube taking down videos of Mr. Kennedy's speech

12   posted by third parties, including Manchester Public

13   Television, including the individual whose name was redacted

14   but we included the e-mail with our filing.

15   And so what that has done is, irrespective of

16   Mr. Kennedy's post to YouTube themselves, Google's actions have

17   created this chill effect where they have said essentially to

18   third parties, including independent media, if you post videos

19   of this man, this political candidate talking about these

20   issues, your video is liable to be removed and you could be

21   punished, given a strike, for violating our policy.

22   And so that's -- and I want to pull back for a second,

23   Your Honor, to emphasize that what we're here for today is not

24   just to protect my client, Mr. Kennedy's, rights but to protect

25   the political process itself.

1        **THE COURT:**  I understand.  But you've now mentioned

2   third parties, and does Mr. Kennedy have standing to represent

3   those unknown third parties?

4        **ATTORNEY STREET:**  Yes.  In this context, Your Honor,

5   in the political process, the Supreme Court's made very clear

6   that where First Amendment rights are concerned and what the

7   plaintiff is alleging is a chilling effect on speech, a

8   plaintiff like Mr. Kennedy, who has clearly a concrete interest

9   in this relief, has standing to pursue such relief.

10       We cited those cases in our brief, and I think they're

11  especially appropriate in this context of the presidential

12  campaign.

13       **THE COURT:**  I don't know if you answered my earlier

14  question with regards to the joint action and nexus test.  I

15  indicated that there are two versions of the nexus test.  And

16  do you plan to address both or just one?

17       **ATTORNEY STREET:**  I do plan to address both,

18  Your Honor.  I just want to make sure that I have them -- I

19  have them both so I don't -- I don't discuss them in a

20  contrary -- contrary fashion.

21       So that the nexus test, the first one is the pervasive

22  entwinement between public officials and the government, which

23  I think is shown here by the evidence that's been developed in

24  the *Missouri v. Biden* case, the interaction between Google and

25  government officials in drafting the policy that it's been

1   using to remove my client's speech.

2       But the other one I think is even more appropriate, which

3   is the government encouragement that's discussed in the

4   *O'Handley* case at page 1158. And this really gets into -- and

5   I think that second aspect of the nexus test overlaps with the

6   joint action test. You can see that in *O'Handley*. It

7   discusses the facts -- factors under each interchangeably.

8       And this is where, in *O'Handley*, the Ninth Circuit was

9   very, very clear, Your Honor, that a constitutional problem

10  would arise if Twitter had agreed to serve as an arm of the

11  government thereby fulfilling the state's censorship goals.

12      Now that wasn't satisfied in *O'Handley*, Your Honor,

13  because the only allegation in *O'Handley* was that a government

14  agency was flagging tweets that the government believed

15  violated a preexisting policy developed by Twitter to try to

16  protect the sanctity of its platform in the civic process.

17      Here you don't have information -- you don't have flagging

18  the one-way channel of communication that the Ninth Circuit

19  discussed in *O'Handley*. Here you have actually evidence that

20  Google developed this policy in response to government demands

21  for it in apparent collaboration with government officials in

22  writing it -- in writing it, at least that's what the evidence

23  from the *Missouri v. Biden* case suggests.

24      And the policy itself is based entirely on what the

25  government says. The policy says you cannot disagree with what

1   the government says about these issues.

2       And so that's why I think this case goes far beyond what

3   the Ninth Circuit was dealing with in *O'Handley* and satisfies

4   really both the nexus and the joint action test.

5       And more importantly, Your Honor, really shows that this

6   policy that Google developed, it's not its own policy.  It may

7   not have been compelled by the government to adopt it, but it's

8   a policy that looks entirely to the government to decide which

9   information to remove.  And I think under the Supreme --

10          **THE COURT:**  So you agree that they were not compelled,

11  that Google was not compelled by the government.  Do you agree

12  with that?

13          **ATTORNEY STREET:**  Well, I haven't seen evidence yet to

14  say that they were compelled.  I know that that was shown in

15  the *Missouri v. Biden* case.

16          **THE COURT:**  And again, *Missouri v. Biden* is persuasive

17  authority, not controlling, and *O'Handley* is the case that we

18  are concerned about.

19          **ATTORNEY STREET:**  That is true, Your Honor, and I will

20  note, though, that the *Missouri v. Biden* case had an

21  evidentiary record that did not exist in the *O'Handley* case or

22  any of the other what I'll call censorship cases that were

23  litigated in this court.

24      In fact, I think it's interesting that the allegations

25  that were deemed implausible in *O'Handley* and similar cases,

1    the court developed -- the parties developed actually an

2    evidentiary record in the *Missouri v. Biden* case which showed

3    exactly what the Ninth Circuit said was implausible in these

4    prior technology companies.

5         And I think that's very important because that's -- it was

6    the record in that case that convinced the judge,

7    Judge Doughty, and I think what convinced the Fifth Circuit

8    that there was coercion.

9         We may develop that here, I don't know yet, and I don't

10   want to argue coercion without having a good faith basis to do

11   that.  I think on the record we've established already, though,

12   Your Honor, we have satisfied the joint action and nexus tests.

13   We have shown that Google's policy is fairly attributable to

14   the government.  And we have shown that in the political

15   process where the Supreme Court has always said more speech is

16   better than less speech, that we have satisfied the burden.

17        And that brings me back to the first question that the

18   Court asked about what is the emergency here?  Now --

19            **THE COURT:**  No, my first question was actually -- I'm

20   going to go back to my questions because I need these answered.

21        What date in March of 2023 did Mr. Kennedy give his

22   speech?

23            **ATTORNEY STREET:**  So the date -- I should know this

24   since I was there.  If I remember correctly the date, it was

25   March 3rd of 2023.

1          **THE COURT:**  All right.  And on what date did

2  Manchester Public Television post his speech?

3          **ATTORNEY STREET:**  The same day.

4          **THE COURT:**  The same day.

5    And on what date was the video taken down?

6          **ATTORNEY STREET:**  As I recall, the same date or one

7  day later.  Not simultaneously but within a day or two.

8          **THE COURT:**  How many other videos by Mr. Kennedy have

9  been taken down by YouTube, if you know?

10          **ATTORNEY STREET:**  I know of at least half a dozen.

11          **THE COURT:**  And can you identify that half dozen?

12          **ATTORNEY STREET:**  Three of them were identified in

13  our -- in our moving papers.  There was an interview with

14  Jordan Peterson that was posted and removed.  There was -- and

15  it was reported on publicly.  There was a podcast that

16  Mr. Kennedy did with Joe Rogan that was taken down.

17    And then I have since -- which is referred to in our

18  moving papers -- and then I have since heard, received numerous

19  e-mails, communications from other people who said -- who told

20  me they have had similar content removed --

21          **THE COURT:**  Well, no.

22               (Simultaneous colloquy.)

23          **THE COURT:**  -- I want to know the actual.  So far I

24  know of two.  And one was with comedian Joe Rogan.  And the

25  date of that of which it was removed was what?

1    **ATTORNEY STREET:** I don't have the date offhand,

2  Your Honor. I can look for that.

3    **THE COURT:** All right.

4    **ATTORNEY STREET:** I believe it was in early July.

5    **THE COURT:** And then with regards to podcast host

6  Jordan Peterson, what day was this one taken down?

7    **ATTORNEY STREET:** Let me --

8    **THE COURT:** What was the date of the interview and

9  what day was it taken down? The date of the interview with

10  comedian Joe Rogan, and what date was that taken down?

11    **ATTORNEY STREET:** That is not something I don't have

12  at the top of my head, Your Honor. So I have to look through

13  my files to see if I have that.

14    **THE COURT:** All right. And then going back to my

15  earlier question, because it's in your declaration, Twitter was

16  not a party to this case, allegedly removed a video of

17  Mr. Kennedy on January 23rd, 2021. Was this video also posted

18  to YouTube, and did YouTube remove it?

19    **ATTORNEY STREET:** That question I don't have an answer

20  to, Your Honor, but I would be happy to look and find out.

21    **THE COURT:** And then is the video of Mr. Kennedy at

22  the college in New Hampshire still available to view online

23  outside of YouTube?

24    **ATTORNEY STREET:** I have not looked so I do not know

25  the answer to that. I know it is not available through

1    Manchester Public Television.

2           **THE COURT:**  All right.  Then that brings us to the

3    topic that you want to address now, which is what grounds do

4    you allege which makes this an urgent request?  And was there

5    any correlation between this request and its urgency driven by

6    in any way the appeal taken in *Missouri v. Biden*?

7           **ATTORNEY STREET:**  Well, the urgency, Your Honor, is

8    twofold.  First off, the Ninth Circuit and Supreme Court have

9    always -- always recognized that First Amendment harms are

10   different than other harms.  And so as a general matter, they

11   have applied these doctrines flexibly, recognizing that ongoing

12   harms are actionable and that any chilling of speech is

13   irreparable and --

14          **THE COURT:**  But we waited from March to August.  So

15   I'm just trying to understand.

16          **ATTORNEY STREET:**  Sure.  Sure.  And I understand.  I'm

17   going to tell you as a practical matter what -- what the reason

18   for the delay, if there was a delay, was Mr. Kennedy believed

19   strongly that during his political campaign, the technology

20   companies would stop censoring him, recognizing the settled --

21   settled principles that more speech, not enforced silence,

22   rules in the political process.

23          Twitter and Facebook, in fact, changed the way they deal

24   with him and have stopped censoring him during his presidential

25   campaign.  Google has not, despite repeated requests.

1    We believed after -- and going back to the *Missouri v.*

2    *Biden* case, Your Honor noted that Mr. Kennedy moved to

3    intervene in that case.  That motion was denied, but he

4    subsequently filed a lawsuit against the federal officials who

5    were also named in that case.  And he filed that case in

6    Louisiana this spring.

7    And the judge, Judge Doughty in Louisiana, enforced --

8    issued an order essentially saying that the same injunction

9    that was issued in the State Attorney General case would apply

10   to protect Mr. Kennedy, given the overlapping issues.

11   So --

12   **THE COURT:**  Okay.  Well, I'm just trying to get some

13   clarity for areas that were a little foggy for me.  And I have

14   no ego invested in this so I want to make sure I get this right

15   and I'm clear.

16   The speech was early March of 2023.  Mr. Kennedy announced

17   his candidacy in April.  But the urgency, as you're describing

18   it, and the delay and his treatment by others have some nexus

19   to this case, and I'm just trying to allow you to tease that

20   out.

21   And then I may turn to Google after we get through a

22   couple of other questions that I have and give you an

23   opportunity to see if you can locate the dates I asked about

24   earlier.  But go ahead.

25   **ATTORNEY STREET:**  Sure.  Well, the truth is,

1   Your Honor, I don't know why Google removes some of my client's

2   speeches and not others.

3       **THE COURT:**  Well, I'm just looking at the timeline and

4   the urgency question.

5       **ATTORNEY STREET:**  I understand.  I understand.

6       So but that plays into my answer because it is my client

7   and his campaign have repeatedly reached out to Google to

8   prevent this from happening.

9       It doesn't -- he doesn't get censored completely, but

10  certain high-profile speeches and interviews do get censored.

11      And so we realized really in late July or early August

12  that Google was not changing its policies.  And in fact in the

13  last three days, Google has actually amended its misinformation

14  policies.  It really blended the vaccine misinformation and the

15  medical misinformation policies to prohibit all kinds of speech

16  on medical matters, including vaccines, abortion, cancer

17  screenings, and the like.

18      So it's become clear to us in the last month that Google

19  is, unlike Facebook and Twitter which have pulled back from the

20  censorship of people on their platforms, Google was actually

21  doing more censoring.  And that will likely continue during

22  Mr. Kennedy's presidential campaign.

23      And the damage that would be done to the political

24  process, if that's allowed to continue, would be irreparable.

25      **THE COURT:**  All right.  Let me ask three very precise

1   questions.  Then I'm going to turn to counsel on behalf of

2   Google to see if some of these dates and information or

3   questions I've asked can be resolved.

4        What authority does plaintiff have for the proposition

5   that defendants may not rely on local health authorities

6   informing their own medical misinformation policy?

7        Second question, and, again, going back to my earlier one:

8   Under which tests for determining a state actor does plaintiff

9   suggest is controlling and why?

10       And what irreparable harm will plaintiff suffer if the TRO

11  is not granted since we're talking about a video that was

12  uploaded prior to his announcement of his candidacy and then

13  one with a podcast host and the other with a comedian?

14       Please respond.

15       **ATTORNEY STREET:**  Well, with respect to the first

16  question, Your Honor, there is no evidence on this record that

17  Google has anybody making independent decisions about how to

18  apply its misin-- at least its medical misinformation policies.

19  The policies themselves depend entirely on government sources.

20       And so I guess in a hypothetical world, could they do

21  that?  Sure.  But in this situation, the record we have before

22  us, we have no record of independent decision-making.  Instead

23  we have a policy that was drafted in response to government

24  demands for it and collaboration with government -- government

25  sources, and a policy that looks on its face entirely to the

1    government to decide what is -- what is false, what is

2    misleading, what is damaging.  And that is exactly what I think

3    the state action doctrine was designed to prevent.

4         And I actually want to go -- I want to mention a case that

5    we cited in our reply brief, Your Honor, called *Brown v.*

6    *Hartlage* which 41 years ago dealt with a similar situation.

7    The government of Kentucky addressing alleged false

8    information -- false and misleading information by a political

9    candidate in an election.  And the Supreme Court said it's not

10   up to the government to decide what is true and what is false,

11   what is misleading in a political campaign.

12        Obviously this situation is different because there's a

13   private party involved, but you have a private party relying

14   entirely on government sources.  And so what that means is that

15   triggers constitutional scrutiny.  And that's what's

16   significant here.

17        Now to the Court's -- to the Court's other two questions.

18   I think -- again I think that in this case, at least on the

19   record we have right now, the joint action and nexus tests are

20   the most appropriate, but I would also say that we need to

21   remember that in Supreme Court's view stated in the *Brentwood*

22   case, what we're always looking for is whether seemingly

23   private action is, quote, fairly attributable to the

24   government.

25        And so regardless of whether we're using one test or

1    another applying aspects of different tests, I think that has

2    been -- that has been satisfied here.

3        And the danger to the political process, not just to my

4    client's presidential campaign, but the danger to the political

5    process of allowing Google to even selectively remove speech on

6    matters of public concern during a presidential campaign is

7    significant and would grossly affect the campaign itself.

8        **THE COURT:**  All right.  Does YouTube, as a private

9    company offering both free and paid services, have a right to

10    decide what's published or not published on their website?  Do

11    they have that right?

12        **ATTORNEY STREET:**  Well, if they were a publisher,

13    Your Honor, they would have that right, but they're not a

14    publisher.  And we went through this several pages in our -- in

15    our reply brief talking about the differences between

16    technology companies, Internet companies of today, and

17    publishers like the *New York Times* or private parties that are,

18    you know, putting in a newsletter, in the *PG&E* case, in their

19    billing statements.

20        And in fact, there's -- and the most fundamental reason

21    that Google/YouTube is not a publisher is, unlike publishers,

22    they take no responsibility for the content that's posted on

23    their platform.  And as a matter of law, they cannot be held

24    liable for that.

25        So that's an important -- that's an important distinction,

1    Your Honor, and one that distinguishes this case from the *Miami*
2    *Herald* case, *PG&E* case, and the *Hurley* cases that we discussed
3    in our brief.

4         **THE COURT:**  And, again, Mr. Kennedy did agree to
5    YouTube's terms and services when creating his account.  And
6    this issue from your perspective is going beyond his particular
7    account?

8         **ATTORNEY STREET:**  This does go beyond his particular
9    account.  And I would also say, Your Honor, that an agreement
10   cannot be used to circumvent the Constitution.

11        I think that would need to look at -- address each
12   question in the appropriate constitutional framework, and here
13   that weighs strongly in his favor.

14        **THE COURT:**  And so he agreed to the user agreement
15   which included misinformation language and other third parties
16   that they were all on notice and they could either accept or
17   decline that service.  Would that be fair?

18        **ATTORNEY STREET:**  I don't know if it's fair or not,
19   but what I know is that it can't be -- whether you agree to
20   boilerplate terms of service in a user agreement or not, I
21   don't think that even a private party can use those policies to
22   violate individuals' constitutional rights and to create a
23   chilling effect on speech in the political process.

24        **THE COURT:**  Thank you.

25        All right.  Counsel, the same questions are posed to you.

1   I will probably have a couple of additional questions with

2   regards to YouTube's user policy.  And if you can recite the

3   relevant portions.  And could YouTube be found liable by

4   private parties for not addressing information, therefore is

5   there any coercive nature that can be imposed by anyone?

6       If you know how many people died of COVID-19 by the end of

7   January 2021, and whether there's any dispute about the number

8   of citizens that were impacted by COVID-19.

9       And how does YouTube make decisions on what videos

10  violates its misinformation policies?

11      How are YouTube's misinformation policies enforced?

12      And if Mr. Kennedy plans on posting videos that violates

13  the terms and services or policies, how would that be addressed

14  in the future given the lifeline of COVID-19 as it stands now?

15      And if you need me to repeat any of the previous questions

16  posed to counsel, let me know and I'll go back and recite those

17  questions as well with regards to how many videos of

18  Mr. Kennedy were taken down and if you happen to know the

19  chronology of events.

20      **ATTORNEY BLAVIN:**  Thank you, Your Honor.

21      I'll start with Your Honor's questions relating to the

22  videos taken down and the timing with respect to them.

23      I think the record is unclear precisely when the video of

24  the Saint Amselm speech was taken down.  I don't have any

25  reason to dispute that it was within a short period of time of

1    the speech given on March 3rd, but there's nothing in the

2    record in this case at least in terms of the declarations that

3    have been submitted which identify the specific date.

4            THE COURT:  But it's definitely before he announced

5    his campaign?

6            ATTORNEY BLAVIN:  Yes, I know that's for sure.  I

7    think it was attempted to be reposted I believe on March 6th.

8    It was at that point not permitted.  So it was certainly within

9    a very close time frame of when it was posted to the site.

10           As to the Seth Rogan -- I'm sorry, the video with the

11   comedian Mr. Rogan, not Seth Rogan, not somebody else, and

12   Mr. Kennedy, I believe the record demonstrates that -- and this

13   is attached as an exhibit I believe to the A Kennedy

14   declaration, the takedown communications with Mr. Kennedy, I

15   believe it's identified as June 17th, 2023, in an e-mail from

16   YouTube to the recipients:  We've reviewed your content.  We

17   think it violates our medical misinformation policies and it's

18   been removed.

19           So I think we have a June 17th date for that.

20           With respect to the Peterson video, as Your Honor noted,

21   they don't identify the specific video at issue.  So I just

22   don't think it's clear from the record what that video was or

23   when it was removed.

24           THE COURT:  Thank you.

25           ATTORNEY BLAVIN:  Unless Your Honor has any more

1    questions about those specific issues, I'm happy to go to

2    Your Honor's questions relating to the applicable test and how

3    it applies here in the Ninth Circuit decision in *O'Handley*.

4        **THE COURT:**  All right.  And with regards to the

5    comedian Joe Rogan's video, you believe that that may be a

6    family member of the Kennedy family, or at least the same last

7    name, sharing the same last name as Mr. Kennedy?

8        **ATTORNEY BLAVIN:**  Are you referencing, Your Honor --

9        **THE COURT:**  The June 17th, 2023.

10       **ATTORNEY BLAVIN:**  Oh, yes, I believe that was sent

11   to -- it's redacted, I believe the "To" line, but from my

12   understanding of the declaration it was sent to Mr. Kennedy's

13   relative.

14       **THE COURT:**  Thank you.

15       And then if you'll proceed under which test for

16   determining a state actor, do you believe, is controlling and

17   why?

18       **ATTORNEY BLAVIN:**  So the Ninth Circuit's decision in

19   *O'Handley*, as Your Honor correctly identified, is controlling

20   here.

21       Plaintiffs, in their motion papers, didn't identify

22   specifically which test would apply.  As we indicated in our

23   opposition, we think if there's going to be any test which

24   would apply, it would be either the nexus test or the joint

25   action test.

1    Plaintiff's counsel today said that they are in fact in

2    agreement on that, that those would be the two applicable

3    tests.  And those tests are very demanding as the Ninth Circuit

4    made absolutely clear in *O'Handley*.

5        With respect to the nexus test, just to flesh it out,

6    Your Honor, the Ninth Circuit said, as Your Honor indicated,

7    there's two subparts to that test which could apply, the first

8    one being the State cannot, quote, threaten adverse action to

9    coerce a private party into performing a particular act.

10       And just to pause on that for a second, because I think

11   counsel conceded today that there's absolutely no evidence at

12   all that the federal government coerced Google in this instance

13   to either adopt a medical misinformation policy, much less to

14   apply that policy specifically to Mr. Kennedy's content.

15       In fact, there's absolutely nothing in the record

16   regarding any communications or even knowledge of the federal

17   government with respect to Mr. Kennedy's particular posts that

18   are at issue in this case or a request to take them down.

19       And that's very different from *O'Handley* where you had the

20   plaintiff's specific content, a request from the government to

21   remove that content, and the Ninth Circuit nonetheless said

22   that that did not constitute a state action under the nexus

23   test.

24       The second element of the nexus test is whether the state

25   uses positive incentives such that they, quote, overwhelm the

1   private party and essentially compel the party to act in a

2   certain way.

3       And just to pause on that, Your Honor, I don't think

4   there's anything in the record indicating any positive

5   incentives from the state to Google, much less one that would

6   essentially compel Google to act in a particular way.

7       With respect to the joint action test, the Ninth Circuit

8   said that the party -- the government, that is, has to so far

9   insinuate itself into a position of interdependence with the

10  private party that it must be recognized as a joint participant

11  in the challenged activity or significantly involve itself in

12  the private party's actions and decision-making in a complex

13  and deeply intertwined process.

14      And, again, in the Ninth Circuit decision in *O'Handley*,

15  based on the allegations of the complaint, the court found that

16  neither of those tests were satisfied.

17      And just to quickly summarize what those allegations were,

18  because I think they demonstrate, if anything, substantially

19  more government involvement than what we have in this case.

20  There Twitter allegedly established an expedited review process

21  for posts that were specifically flagged by state officials.

22  It removed 98 percent of the 300 posts that were flagged by the

23  state, including one specifically involving the plaintiff's

24  content.  And third, Twitter allegedly worked -- or the

25  government worked in partnership with social media companies to

1   develop more efficient reporting procedures for potential

2   misinformation.

3        Nonetheless the Ninth Circuit held that Twitter exercised

4   its own independent judgment in adopting its policies and

5   enforcing them, and the mere fact that you have information

6   sharing in cooperation between the government and the private

7   party does not establish state action.

8        And the Ninth Circuit specifically noted, because I know

9   plaintiffs have indicated this during today's argument,

10  plaintiff's counsel and also in their reply brief, that, well,

11  if there's a shared mission or objective between the private

12  party and the government, that could somehow satisfy the joint

13  action test.

14       Actually the Ninth Circuit specifically rejected that in

15  *O'Handley*.  The Ninth Circuit said that, quote, private and

16  state actors were generally aligned in a mission to limit the

17  spread of misleading election information...does not transform

18  private conduct into state action.

19       Moreover, Your Honor, courts in this district, both before

20  and after *O'Handley*, have rejected near identical claims.

21       And I want to direct Your Honor's attention to the *Hart v.*

22  *Facebook* decisions from Judge Breyer which plaintiff's counsel

23  did not address during today's argument or in their reply

24  brief.

25       There, similar to here, there was a motion to dismiss

which was granted by Judge Breyer.  Then the plaintiffs took

all of the discovery they could find from the *Missouri v. Biden*

proceeding and filed a motion for leave to amend their

complaint, and said, look, we have enough now based upon this

discovery to state a claim and to establish state action under

either of *O'Handley*'s test.

And Judge Breyer considered all of that evidence,

including Carol Crawford's CDC deposition testimony, which has

been submitted to Your Honor.  We provided the entire

transcript including e-mails from Mr. Flaherty of the

White House to Facebook and Twitter.  And if anything, and

Your Honor can see this in the declaration I submitted, those

communications were even more aggressive from the state than

anything that we have here.

And nonetheless Judge Breyer said under *O'Handley*, even

taking all of this evidence into account from the *Missouri v.*

*Biden* proceeding, that it does not satisfy the *O'Handley* test.

And I think that's exactly right, Your Honor, and I think that

analysis squarely applies here.

Other decisions such as the *Federal Agency of News* case we

cite from Judge Koh involving Facebook, she held that the mere

fact that there was allegedly a partnership between government

and law enforcement agencies and Facebook to deal with Russian

misinformation on the platform did not satisfy either of these

state actions.

1    So there's a host of authority on this which plaintiff's

2    counsel has not addressed.

3    And I'll pause there to see if Your Honor has any

4    questions on the test.  But I would like to go through the

5    specific evidence that plaintiff's counsel has put forward

6    because they make assertions regarding that evidence, but the

7    actual evidence itself does not bear out what they're saying.

8    **THE COURT:**  All right.  That would be helpful since

9    the plaintiff is indicating they will suffer irreparable harm

10   if this TRO is not granted and it will have a chilling effect

11   on speech.

12   **ATTORNEY BLAVIN:**  Yes, Your Honor.

13   So if you look at the actual documents and materials that

14   plaintiff's counsel has put forward to establish state action

15   here, they formed the three buckets:  One, 2021 meetings with

16   the Surgeon General's office.  Second, an April 22nd, 2021,

17   e-mail from Rob Flaherty of the White House to Google.  And

18   three, meetings between the CDC and major online platforms in

19   2021, at which vaccine misinformation was occasionally

20   addressed.

21   Now if you actually look at the record here, two things

22   are absolutely clear.  First, none of these communications

23   offer any evidence of coercion which I think plaintiff has

24   conceded now, nor do they establish any sort of overwhelming

25   positive incentives to establish the nexus test.

1    But, two, with respect to the joint action test, what

2    these documents show and testimony shows is that Google was

3    already and independently crafting and developing its own

4    policies at the time it was talking with the government.

5    There's no evidence at all to state that Google somehow only

6    did this as a result of its discussions with the government.

7    So, for example, if you look at the communications with

8    the office of the Surgeon General, Eric Waldo testified in his

9    deposition that the government perceived Google to have

10   independently decided to limit vaccine-related misinformation

11   without any prompting by the government.

12   He describes his meetings with Google as saying what

13   Google was already doing to address these issues, and that's at

14   pages 119 through 121 of his deposition, which is attached as

15   Street Declaration Exhibit H, and he says the same thing at

16   page 129.

17   With respect to the White House communications, the

18   communications from Rob Flaherty, this is again the April 22nd,

19   2021 e-mail, Flaherty, in that e-mail, never directs Google to

20   take any particular action with respect to a medical

21   misinformation policy, whether with a carrot or a stick.  Just

22   the opposite, Flaherty acknowledges, and this is quoting from

23   his e-mail, that, quote, removing content that is unfavorable

24   to the cause of increasing vaccine adoption is not a realistic

25   or even a good solution.

1    So basically he's saying we're not saying to do this,

2    we're not even recommending to do that, it may not be the right

3    thing.  And that's exactly what he's accusing Google of doing

4    in this case.

5    With respect to the communications as to the CDC, we

6    provided Your Honor with a complete copy of Carol Crawford's

7    deposition testimony, and again this is the testimony that

8    Judge Breyer also considered in the *Hart v. Facebook* case.

9    And in that deposition testimony, which Mr. Kennedy only

10   provides excerpts for, we provided Your Honor with the entire

11   transcript, at pages -- page 105 of the deposition to 106, she

12   states in that deposition that no one at the CDC had crafted

13   the content policy of any social media company or even gave

14   input on what such a policy should look like.

15   So I think, Your Honor, collectively when you look at all

16   of this evidence, it doesn't even establish, you know, what

17   plaintiff's counsel has stated here today that somehow Google

18   just adopted this policy in response to the communications with

19   the government.

20   If anything, it shows that Google was independently

21   exercising its own judgment that these were important policies

22   to adopt, the government shared that objective, and that's

23   exactly what the Ninth Circuit in *O'Handley* rejected as

24   sufficient to satisfy the joint action test.

25   Now, if I could respond to an additional argument which

1    plaintiff's counsel made today regarding the fact that, well,

2    the fact that Google and YouTube made reference government

3    policies, you know, with respect to vaccine -- you know,

4    information, with respect to COVID-19, et cetera, that that

5    somehow would convert Google into a state actor.

6        And of course relying on the expertise of particular

7    agencies and individuals if they're in the government or

8    outside the government would not be sufficient to satisfy

9    either of *O'Handley*'s joint -- either of *O'Handley*'s state

10   action tests.

11       And I think in *O'Handley* itself, again, you had the

12   government that was specifically flagging for Twitter a post

13   that it thought constituted election misinformation.  And

14   Twitter was relying upon that expertise in terms of looking at

15   those posts itself and making its own independent judgment.  So

16   that can't be enough.

17       But beyond that, if you actually look at Exhibit D to the

18   Street declaration, and this is I believe the vaccine

19   misinformation policy, it specifically says that Google looks

20   to WHO and -- the World Health Organization, WHO, and local

21   health agencies in terms of identifying, you know, proper

22   information related to these policies.

23       So it's not even the federal government that Google was

24   looking to, and that's a big disconnect in that argument.  It's

25   looking to other regulatory agencies.

1    And then finally, Your Honor, on this point, you know,

2    even if, you know, there was allegedly some sort of government

3    pressure, which I think plaintiff's has counsel conceded there

4    wasn't even, the fact is he doesn't identify -- the plaintiff

5    doesn't identify any particular state action as to his content.

6    And the Supreme Court in the *Blum v. Yaretsky* case made

7    clear that the government must compel, quote, the specific

8    conduct of which the plaintiff complains.

9    And both in the *Hart* decision from Judge Breyer, his first

10   decision, and in the *Federal Agency of News* case from

11   Judge Koh, they both independently dismiss the claims at issue

12   because even though there may have been generalized discussions

13   relating to Russian misinformation, or in *Hart*, again, medical

14   misinformation between the government and the private party,

15   there was nothing to show that there was a specific

16   communication or pressure relating to any particular piece of

17   content of the plaintiff.

18   And I think as Your Honor correctly identified here, all

19   that they have with respect to Mr. Kennedy's own content is an

20   e-mail that a White House official sent more than two years ago

21   to a different company, Twitter.

22   And even if there was that type of evidence here, under

23   *O'Handley* it makes clear that even if the government tells you,

24   hey, we think this information should be removed, and then the

25   company exercises its own independent judgment and decides to

1    remove that, that cannot satisfy the state action doctrine.

2         And then finally on these legal issues, Your Honor, we've

3    heard frequently today that Mr. Kennedy is a political

4    candidate during the 2024 presidential election and that that

5    somehow should change the analysis.  But it doesn't.  The fact

6    that you're running for office doesn't excuse you from

7    satisfying the demanding requirements of the state action

8    doctrine.  And there's nothing, there's no authority at all

9    that somehow a looser standard were to apply when you have a

10   political candidate at issue.

11        **THE COURT:**  And just for clarity and closure, please

12   address the plaintiff's position on standing.  And then also

13   the, just for clarity, because I know you've woven it into your

14   argument, how YouTube's misinformation policies are enforced

15   and how does YouTube make decisions on what videos violate its

16   medical misinformation policies?

17        **ATTORNEY BLAVIN:**  Yes, Your Honor.  I'm sorry.  Could

18   you repeat that first question again?  I just want to make sure

19   I have that right.

20        **THE COURT:**  The first one was standing.

21        **ATTORNEY BLAVIN:**  Yes.

22        **THE COURT:**  Address plaintiff's argument on standing.

23   And then the next is how are YouTube's misinformation policies

24   enforced and how does YouTube make decisions on what videos

25   violates its medical information policies.

1    On standing, we're looking at causation and

2    redressability.

3        **ATTORNEY BLAVIN:** Yes. So with respect to the

4    standing arguments, I think -- and these were, I think,

5    interjected a little bit in the reply brief. There were

6    various cases citing with respect to, you know, you can have

7    standing if there's a general chilling effect, et cetera,

8    et cetera.

9        All of those cases, Your Honor, address the particular

10   issue of where the government is taking direct action on the

11   plaintiff. And I think the briefs were speaking a little bit

12   past each other because Google has not made a standing argument

13   here with respect to this content. So there's no state action

14   to begin with. So there's nothing to analyze under the First

15   Amendment in terms of whether or not there's standing.

16       In the *Brown* case, which plaintiff's counsel referenced,

17   again that involved a state actor taking action with respect to

18   a particular political candidate's content, not a private

19   party.

20       So the mere fact that Mr. Kennedy feels that he's

21   suffering a chilling effect on future content or that other

22   third parties may feel that they don't want to upload his

23   content, none of that is relevant for purposes of First

24   Amendment standing because there's no state action to begin

25   with. And that really ends the inquiry. There's not a

1    question of standing.  There's just a question of state action.
2    And without a state action, there's no potential violation of
3    Mr. Kennedy's First Amendment rights.

4        With respect to the application and development of
5    YouTube's own policies and their applications to Mr. Kennedy, I
6    want to pause here because I think Your Honor raised this
7    question in the context of your discussion with plaintiff's
8    counsel on Google's own rights here.  And I think that's
9    important to emphasize.

10        Google has its own First Amendment rights in terms of
11   deciding what content is appropriate to appear on its platform
12   or not.  So plaintiff's counsel actually have it backwards.  If
13   the Court were to issue an injunction here, that wouldn't
14   preserve plaintiff's rights.  It would actually violate
15   Google's First Amendment rights.  And that's exactly what
16   Judge Breyer held in the District Court in the *O'Handley*
17   decision.

18        He made clear that:

19            An online platform, quote, has important First
20        Amendment rights that would be jeopardized by a court
21        order telling it what content moderation policies to adopt
22        and how to enforce those policies.  The Court will issue
23        no such order.

24        And Judge Breyer's decision, as he noted, was consistent
25   with Supreme Court and Ninth Circuit precedent.  The Supreme

1   Court going back to the *Miami Herald v. Tornillo* case made

2   absolutely clear.  And again this case, just to be clear, it

3   involved political candidates.  The issue was whether or not

4   the government could force a newspaper to carry the content of

5   a political candidate to respond.  And the Supreme Court said

6   no, the treatment of public issues and public officials,

7   whether fair or unfair, constitute the exercise of editorial

8   control and judgment which is protected by the First Amendment.

9       The Eleventh Circuit, in the *NetChoice* case, this was

10  versus the Attorney General of Florida, similarly held that

11  online platforms have this First Amendment right.  The Eleventh

12  Circuit specifically said, quote, when a platform selectively

13  removes what it perceives to be incendiary political rhetoric,

14  pornographic content, or public health misinformation, it

15  conveys a message and thereby engages in speech within the

16  meaning of the First Amendment.

17      And the statute there also dealt with political candidate

18  speech.  The Florida statute limited the ability of platforms

19  to remove content of political candidates.  The Eleventh

20  Circuit confirmed the District Court's decision that that would

21  violate the platform's First Amendment rights.

22      So if anything, the injunction here that's being proposed

23  would violate Google's First Amendment rights, not plaintiff's

24  First Amendment rights, which demonstrates that the irreparable

25  harm would be suffered by Google and the balance of equities

1    sharply tip in Google's favor.

2        With respect to the policies themselves and their

3    enforcement, I think the record is clear here that the policies

4    were developed independently by Google, just looking at the

5    communications with the government, and Google exercised its

6    own independent judgment of what those policies would be, as we

7    went over the evidence before.

8        And as to the application of those policies, it's not in

9    the record, Your Honor, specifically how those policies are

10   applied, but I think if you look at the communications such as

11   Exhibit D to the A. Kennedy declaration, it says, "Our team has

12   reviewed your content, and unfortunately we think it violates

13   our medical misinformation policy."

14       So there's a team at Google that uses their own

15   independent judgment in reviewing content and determining

16   whether it violates the policies and to remove that content if

17   it does.

18       And, again, that's Google's First Amendment right to do

19   that, as Judge Breyer held, as the Eleventh Circuit held, and

20   several other decisions have held as well, referenced in our

21   papers.

22       I can address Your Honor's additional questions, and I

23   apologize if I miss anything.  So please interject at any point

24   in time.

25       I think you asked with respect to the harm that COVID had

1    been causing during the pandemic, you know, how many people may

2    have died back in 2021 as a result of COVID when these policies

3    were being adopted and how many people, you know, have died at

4    this point.

5        I know at least the latter, I think it's very well

6    publicly settled though I'm not sure if it's in the docket,

7    although we did noted this in our brief.  At this point over a

8    million people have died in the United States from COVID-19

9    back in 2021.

10       I don't have the specific figures, Your Honor, and I'm

11   happy to supplement the record if that would be helpful.  But I

12   think we knew that, you know, at that point close to half a

13   million back in 2021 may have passed away from COVID.

14       And again this isn't in the record, and I'm just relying

15   upon my colleague, Ms. Yee, looking for some of this

16   information from public sources.  We're happy to supplement.

17       But I think what this will demonstrate is that this was a

18   serious public health emergency.  I think it remains a serious

19   public health issue.  There's discussion all the time of new

20   variants coming up or even happening in San Francisco right

21   now, a mini-surge of COVID.  So these are incredibly important

22   issues that remain important public health issues.

23       And if you look at, you know, the question of would an

24   injunction be in the public interest, I think the answer is

25   absolutely not.  Besides the fact that such an injunction would

1    violate Google's First Amendment rights so it would causes

2    irreparable harm to Google, and if the First Amendment

3    demonstrates what's in the public interest, an injunction would

4    do exactly the opposite.  But forcing Google to carry medical

5    vaccine misinformation on YouTube is absolutely against the

6    public interest.

7        As the Surgeon General letter that is attached to the

8    Street declaration, Exhibit K, states, "The proliferation of

9    health misinformation during the pandemic has been both

10   extensive and dangerous and poses a growing threat to the

11   nation's health."

12       The Ninth Circuit in the *Doe v. San Diego Unified School

13   District* case, which we cited in our papers with respect to the

14   public interest, that involved the question of an injunction to

15   enjoin the San Diego School District's vaccine mandate.  And

16   what the Ninth Circuit said is the public interest weighs

17   strongly in favor of denying the injunction.

18       And the court noted that the record indicates that

19   vaccines are safe and effective at preventing the spread of

20   COVID-19 and that a mandate is therefore likely to promote the

21   health and safety of school students and staff as well as the

22   broader community.

23       So if anything, the Surgeon General itself has recognized

24   forcing Google to carry this type of medical misinformation,

25   vaccine-related misinformation would be directly contrary to

41

1    the public interest in this matter.

2        **THE COURT:**  All right.  Thank you.

3        Now then, plaintiff, based on the fact that the defendants

4    indicate that they did not rely on local health authorities

5    informing their medical information policy but were guided by

6    the expertise of those in the community, regulatory agencies,

7    and local health authorities, your response?

8        **ATTORNEY STREET:**  Well, that's still -- those are

9    still government actors, Your Honor.  And I think that it's

10   what's helpful from the record, that entry record that was

11   developed in the *Missouri v. Biden* case is that the evidence of

12   communications between these technology companies like Google,

13   Facebook, and Twitter, and government authorities while writing

14   these policies shows that there is something more than --

15   there's something more than Google having, say, a team of

16   doctors who are writing a policy.

17       **THE COURT:**  Do you have information to support that

18   assertion?

19       **ATTORNEY STREET:**  I'm sorry?

20       **THE COURT:**  Do you have information to support that

21   assertion that it's beyond their independent evaluation?

22       **ATTORNEY STREET:**  Well, there's no evidence in the

23   record that there's been an independent evaluation.  And I

24   think -- and this is my point as to the evidence that was

25   developed in *Missouri v. Biden*.

1    In the previous cases that Google's counsel cited that
2    were decided in this district, those cases were dismissed
3    because the judges in those cases decided that, well, it's
4    implausible to believe that Google or Facebook or Twitter are
5    working with the government or communicating with the
6    government and writing these policies.

7    And the relevance of the record, the evidence that was
8    gathered in *Missouri v. Biden* case is that in fact that is what
9    was happening.

10    Now this case may -- you know, we're still at an early
11    stage, and so I don't think that is the only issue that matters
12    here.  In fact, I think what's far more important in this case,
13    Your Honor, is the content of the policies, the misinformation
14    policies themselves.  They prohibit speech that contradict
15    government sources.  They change -- by their terms, they change
16    not when Google changes its mind, but when the government
17    changes its mind about these subjects.

18    And I'm glad that my colleague mentioned, you know, the
19    interest in -- Google's interest in promoting public -- you
20    know, what it calls public health, which is fine.  But
21    promoting public health, that's something that the government
22    does, and that's an inherently governmental action.

23    And if you're a publisher, say, you're the *New York Times*
24    or whoever else, and you want to write articles, write
25    editorials as a publisher that also promote public health, that

1    say, you know, the government is right, we think this is

2    important, we think people like Kennedy are quacks and aren't

3    to be listened to, aren't to be trusted, that's fine.  But a

4    publisher takes responsibility for what it publishes.  Under

5    the law, it has an obligation to do that.

6        Google does not.  Google disclaims responsibility for

7    anything.  It is not -- it is not a publisher.  And so I think

8    as to the balance of harms, there is no harm to Google in

9    issuing this injunction.  Which I would note, Your Honor, we've

10   actually narrowed substantially to only apply to speech from my

11   client, Mr. Kennedy, on issues related to his presidential

12   campaign.

13       And that's important because what's happening here is when

14   Google takes down a speech or a video content of Mr. Kennedy

15   speaking, it's not just removing what it claims to be or what

16   the government claims to be misinformation about medical

17   information, it's also removing political speech.  That's the

18   importance of that speech in New Hampshire that was taken down

19   back in March.

20       I was at that speech.  At least half of it had nothing to

21   do with medical information whatsoever.  It was Mr. Kennedy,

22   you know, talking about his environmental record, his

23   childhood.

24       So that's -- that's the issue here.  When you're removing

25   political speech, there is a chilling effect, and that does

1    damage the political process.

2         THE COURT:  So that brings me to a question.  Are you

3    indicating that the only objectionable portion was any

4    reference to the vaccines, that he didn't say anything else in

5    any of these speeches that may violate other policies, just the

6    medical policy standing alone, just the medical policy?

7         ATTORNEY STREET:  That is the only policy that

8    YouTube -- and if you look at the exhibit to my declaration

9    that attached a news article with YouTube's explanation, that's

10   the policy that they --

11        THE COURT:  No.  My question to you is, is it your

12   position there's nothing else in those speeches that could be

13   found as objectionable or violating any service agreement?

14        ATTORNEY STREET:  Well, correct, because I don't

15   think -- I don't think the discussion of Mr. Kennedy's

16   environmental record, like say with the Hudson River CAPERs,

17   is -- I wouldn't even claim -- I don't think they would even

18   claim that that's -- that that's misinformation.

19        THE COURT:  Well, the March one is not as relevant as

20   the April -- anything post-April since that is kind of the

21   linchpin of where you begin in your arguments.  And so I'm just

22   trying to have some clarity about what encompasses this TRO and

23   what does not.

24        ATTORNEY STREET:  Well, I'd say what encompasses this

25   TRO, Your Honor, is that -- and I think we spelled this out in

1    the order -- it's just that we're asking for the Court to order

2    Google to not remove speech of Mr. Kennedy's on matters of

3    public concern during his campaign.

4        Now if he ceases to be a presidential candidate, then

5    maybe that's a different situation.  But I think that given --

6    given the importance of my client's criticism of the government

7    on certain issues, including public health policy, it's

8    impossible to carve one out.  It's impossible to say, well, you

9    know, this certain information violates our policies, we'll

10    take this down.

11        And I think that's actually why we've seen, Your Honor,

12    that Google is not removing all of the content that's posted

13    regarding Mr. Kennedy.  It just happens to be certain -- you

14    know, certain -- certain content.

15        But that doesn't -- that doesn't change the analysis

16    because it still creates the chilling effect.  And some of the

17    videos they have taken down again have been some of the most

18    widely viewed videos, including the New Hampshire speech, the

19    Rogan interview, and the Peterson interview.  Which I checked

20    my notes and I don't -- I don't have the date.  I know that it

21    was in either June or July, but I apologize, I don't have the

22    specific date.

23        **THE COURT:**  All right.  Thank you.

24    Anything further?

25        **ATTORNEY BLAVIN:**  Yeah, Your Honor.  If you wouldn't

1    mind, I'll briefly go through just a last set of points here.

2        First with respect to the issue of whether only a portion

3    of the speech was removed and other parts of the speech may not

4    have been offending Google's policies, it's not Google's

5    obligation to edit the video.  If the video violates its

6    medical misinformation policies, its vaccine-related

7    misinformation policies, it can remove that video.

8        Now if plaintiffs want to or anyone else wants to edit the

9    video to take out the part of the video that's violating its

10   policies, of course they are free to do so.

11       And, again, as Your Honor recognized, Mr. Kennedy, as he

12   acknowledges, has his videos up on Twitter, or X as it's now

13   called, has his videos up on Facebook.  There's several other

14   videos of him up on YouTube.  He just acknowledge, yeah, if the

15   videos don't violate those policies, generally they stayed up.

16   So that's just a fact that I wanted to make sure that was clear

17   in the record.

18       With respect to the reliance on government experts, I mean

19   it can't be the fact that you rely on a government agency for

20   their expertise would automatically convert you into a state

21   actor when you're exercising your own independent judgment in

22   adopting a policy and enforcing it.  And plaintiff cites no

23   authority to support that.

24       And more so, as noted before, the specific government

25   agencies that are referenced in the policies are not even the

1    federal government.  It's WHO and local health authorities.  So
2    there's a disconnect there.

3        With regards to plaintiff's counsel's argument that, well,
4    none of these other courts that have dismissed these cases,
5    again on the pleadings without any discovery whatsoever,
6    considered *Missouri v. Biden*.

7        Well, as I noted, Your Honor, that's just wrong.
8    Judge Breyer considered substantial evidence from *Missouri v.*
9    *Biden* including a significant amount of evidence that's in
10   front of your court and held that there was no state action
11   whatsoever.

12       And then briefly, Your Honor, with respect to, you know,
13   the alleged harm Mr. Kennedy would suffer from these handful of
14   videos being removed, Google also has, besides its First
15   Amendment rights, as we noted in our papers, Google has a
16   strong interest in its own content moderation policies
17   maintaining users' trusts and expectations in the platforms.

18       We've submitted to Your Honor several of those policies,
19   and they emphasized that the safety of our creators, viewers,
20   and partners is our highest priority.

21       So an injunction that would force Google to carry this
22   content would not only violate the First Amendment, but it
23   would harm its own efforts to make sure that it has a safe
24   platform in which potentially dangerous medical and vaccine
25   misinformation does not exist on it.

1    And then briefly, Your Honor, just on the issue of, you

2  know, plaintiffs have suggested that, you know, there could be

3  more out there that they just don't have.

4    Again, Your Honor, all of these cases have been dismissed

5  on the pleadings, including the *O'Handley* case which had

6  significant evidence in it, the *Hart* case*, Federal Agency of*

7  *News* case.

8    Courts do not allow discovery to determine if you have a

9  claim.  And plaintiff here has already had access to

10  substantial discovery from the *Missouri v. Biden* case,

11  including communications between government officials and

12  Google employees, deposition transcripts, government discovery

13  responses.  All that would happen with enabling any discovery

14  where there's absolutely no basis to issue a TRO would be a

15  fishing expedition from Google to see if the plaintiff has a

16  claim.

17    And Google's motion to dismiss is due on August 30th.  We

18  plan to file that motion on or before that date.  And we think

19  Your Honor should rule on that motion which we think is clear

20  based upon the record submitted here and the allegations of the

21  complaint that the complaint here is facially deficient, does

22  not come close to stating a claim.  We believe the Court should

23  dismiss that complaint on its face without permitting any

24  potential discovery from Google in the interim.

25        **THE COURT:**  Anything further?

1      **ATTORNEY STREET:**  The only thing I would add,

2   Your Honor, is that the Supreme Court and the Ninth Circuit,

3   indeed all federal courts in this country, have a very proud

4   history of protecting dissenting viewpoints, protecting

5   government dissent, especially in the political process, and

6   that's what this case comes down to.

7      Now, obviously we're dealing with it in a modern context

8   of you have huge companies that control what the Supreme Court

9   has called the, you know, modern public square, and that's a

10  new development.

11     But I would urge the Court to read the court's -- Supreme

12  Court's state action cases very, very closely.  And I'd also

13  ask the Court to think about the Ninth Circuit's reasoning in

14  the *O'Handley* case.  And in the context of the Supreme Court's

15  admonition, what we're really looking at is whether seemingly

16  private behavior is fairly attributable to the state.

17     And I think that the Ninth Circuit -- if the Ninth Circuit

18  had believed these cases never had merit, can't possibly be

19  brought, they would have said so.  It actually said to the

20  contrary, that there is a situation we can envision in which

21  private action could be deemed state action, and I think this

22  is that case.

23     And I think that the importance of protecting the

24  political process while minimizing any harm to Google who is

25  not a publisher, cannot be held liable for what my client says

1    on YouTube, weighs in favor of granting the relief.

2          **THE COURT:**  All right.  Thank you.

3       And I'm glad that you brought the Court back to *O'Handley*,

4    and I'm going to recite for the record the items that I'm going

5    to take under submission and based on what I've heard whether

6    the evidence and arguments fall short of state action.

7       And then taking a look at the guidelines in *O'Handley*,

8    whether a private entity's conduct amounts to state action,

9    namely, was the alleged constitutional violation caused by an

10    exercise of some right or privilege created by the state or by

11    a rule of conduct imposed by the state or by a person for whom

12    the state is responsible.

13       When I look at nexus test one, whether there is pervasive

14    entwinement of public institutions and public officials in the

15    private actor's composition and workings, that's the first

16    question that I would be looking at when I analyze this issue

17    in reflection based upon all of the arguments of counsel.

18       Number two seems to have been conceded with regards to the

19    nexus test, whether government officials have exercised

20    coercive power or provided such significant encouragement,

21    either overt or covert, that the choice must in law be deemed

22    to be that of the state; whether the government officials

23    threaten adverse action to coerce the private party into

24    performing a particular act or encouraged by using positive

25    incentives that overwhelm the private party and essentially

1    compel them to act.  Counsel has conceded that that does not

2    apply.

3        The joint action test, a plaintiff can show joint action

4    either by proving the existence of a conspiracy or by showing

5    that the private party was a willful participant in joint

6    action with the state or its agents.

7        Counsel is arguing that relying upon WHO and local

8    authorities and regulatory agencies and any public health

9    officials, that that somehow entwines and becomes a joint

10   action.

11       With regards to the remaining issues, the Court finds that

12   there's nothing to show that there's any coercion or

13   retaliation, and the evidence falls short of dates and nexus to

14   the actions that were taken by Google.

15       So I'm going to be focused on two questions in reflection.

16   It does not appear that, based upon what I've heard thus far,

17   would warrant discovery at this stage.

18       We do have a further case management conference scheduled

19   for September 12th, 2024.  And I can give you anticipated dates

20   that you may be assigned based on my calendar so that you can

21   begin your planning.  And when you have your joint conference

22   with regards to your case management conference, you can at

23   least determine whether these dates are suitable to your

24   calendar.

25       The first available trial date is March 17th, 2025.  So I

1   want you to know that.  Final pretrial conference would thereby

2   take place on February 13th, 2025.  And joint pretrial

3   statements would be due January 30th, 2025.

4        Now then we are going to reserve the date of November 7,

5   2023, at 2:00 p.m., that's an in-person hearing for motion for

6   preliminary injunction and motion to dismiss.

7        I believe the briefing schedule has already been uploaded

8   for you.  We will provide you with additional dates such as

9   close of discovery.  Fact discovery would be August 30th, 2024.

10  Expert disclosure September 30th, 2024.  Rebuttal expert

11  disclosure October 21st, 2024.  And close of expert discovery

12  November 11th, '24.  Last day to file dispositive motions would

13  be December 10th, '24.

14       This is a tentative schedule.  And the Court will place

15  the tentative schedule on ECF so that you can review it.  It

16  will be a standalone document that will indicate tentative

17  trial schedule.

18       Of course, these dates will fall off if the Court denies

19  the motion for preliminary injunction and/or the TRO.  And also

20  if the Court grants the motion to dismiss, any later dates that

21  come after November 7th would fall off the Court's calendar.

22       All right.  So we will post the tentative schedule so that

23  when you meet and confer, you will have the dates that are

24  convenient to the Court's calendar.

25       Thank you both for being so amazingly prepared and making

```
 1   it through some inclement weather.  And it was a pleasure
 2   meeting each of you.  Thank you.
 3              ATTORNEY STREET:  Thank you, Your Honor.
 4              ATTORNEY BLAVIN:  Thank you, Your Honor.
 5              THE COURT:  This matter is concluded.
 6                   (Proceedings adjourned at 11:13 a.m.)
 7                        ---oOo---
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3                    **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, August 24, 2023

8

9

10

11    _____

12            Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-16141

I am the attorney or self-represented party.

**This brief contains 2,284 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Scott J. Street **Date September 18, 2023**

14

# CERTIFICATE OF SERVICE

***Robert F. Kennedy, Jr. v. Google, LLC, et al.***
**U.S. Court of Appeals for the Ninth Circuit, Case No.**
**23-16141**

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On September 18, 2023, I caused **REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL; SUPPL. DECL. OF SCOTT J. STREET** to be filed and served via the Court's Electronic Service upon the parties listed on the Court's service list for this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 18, 2023 at San Diego, California.

*/s/ Dayna Dang*
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com